**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PAUL RUSESABAGINA** | : |
| 315 Pleasant Knoll, | : |
| San Antonio, TX 78260 | : |
| | : |
| and | : |
| | : |
| Taciana Mukangamije | : |
| 315 Pleasant Knoll, | : |
| San Antonio, TX 78260 | : |
| | : |
| and | : |
| | : |
| Anaïse Umubyeyi Kanimba | : |
| 315 Pleasant Knoll, | : |
| San Antonio, TX 78260 | : |
| | : |
| and | : |
| | : |
| Aimee-Lys Rusesabagina | : |
| 7 Hopstraat, 9300 Aalst, Belgium | : |
| | : |
| and | : |
| | : |
| Carine Izere Kanimba | : |
| 315 Pleasant Knoll, | : |
| San Antonio, TX 78260 | : |
| | : |
| and | : |
| | : |
| Aimee-Diane Rusesabagina | : |
| 23 Teerlingveldstraat, | : |
| 9320 Aalst, Belgium | : |
| | : |
| and | : |
| | : |
| Trésor Rusesabagina | : |
| 315 Pleasant Knoll, | : |
| San Antonio, TX 78260 | : |
| | : |
| and | : |
| | : |
| | : |
| | : |

1

Roger Aime Rusesabagina             :
16 Eastview Ave.,                   :
Billerica, MA 01821               :
                                       :
                                       :
       Plaintiffs,                :
                                       :
v.                                  :     Civil Case No.: _____
                                       :

**THE REPUBLIC OF RWANDA**       :
c/o Rwandan Ministry of Foreign Affairs and  :
International Cooperation           :
Dr. Vincent Biruta               :
23WM+5HX / Kigali, Rwanda     :
                                       :
and                                 :
                                       :
Paul Kagame                   :
President Republic of Rwanda      :
Office of the President          :
53 KG 7 Avenue                :
Kigali, Rwanda                :
                                     :
and                                :
                                   :
Johnston Busingye           :
Minister of Justice of Rwanda     :
Attorney General of Rwanda      :
Ministry of Justice             :
KG 1 Roundabout           :
Kigali, Rwanda                :
                                     :
and                                :
                                   :
Colonel Jeannot Ruhunga       :
Rwandan Investigative Bureau     :
KN5 Rd                    :
Kamukina, Kigali, Rwanda      :
                                     :
and                                :
                                   :
Brig. Gen. Joseph Nzabamwita    :
Secretary General of Rwandan NISS   :
National Intelligence Security and Service  :
Kigali, Rwanda                :
                                     :

Defendants.                                    :
………………………………………………………:

# COMPLAINT

COME NOW, Plaintiffs, by and through undersigned counsel, and for their Complaint against the Defendants, state as follows:

1.       The Rwandan government has openly admitted that it planned an elaborate operation inside the United States to track Paul Rusesabagina and use its agents to trick him into traveling—with false promises of contractual work in Burundi—from his home in the United States to Rwanda. In Dubai, members of the conspiracy lied to Mr. Rusesabagina and led him to believe the final leg of the flight would take him to Burundi. Instead, he was drugged and taken to Rwanda where President Paul Kagame's security agents forcibly abducted him, tortured him, and forced him into illegal imprisonment. In Rwanda he has been sentenced to 25 years, essentially life imprisonment, and deprived of his necessary medication and treatment as a cancer survivor. Public statements by the Rwandan President, the then-Justice Minister, and the head of Rwanda's National intelligence and Security Services (NISS), which are fully described and explained below, all confirm the plot. *See infra*, at ¶¶148-161.  The kidnapping has been by universally condemned by neutral human rights nonprofit groups world-wide.[1]

2.       The Rwandan government tracked, harassed, and ultimately kidnapped Paul Rusesabagina because of his criticism of President Paul Kagame's dictatorial policies and his

---

[1] *See e.g.*, https://www.americanbar.org/news/abanews/aba-news-archives/2021/09/rwandan-trial-verdict/#:~:text=WASHINGTON%2C%20D.C.%2C%20September%2020%2C,trial%20as%20part%20of%20the; https://www.hrw.org/news/2020/09/10/rwanda-rusesabagina-was-forcibly-disappeared; https://www.lantosfoundation.org/news/2021/6/7/lantos-foundation-calls-for-magnitsky-sanctions-in-paul-rusesabagina-case; https://freedomhouse.org/report/transnational-repression/rwanda.

regime's ongoing human rights abuses in Rwanda, the local region, and overseas.  The co-conspirators operated in the United States for years to bring this illegal conspiracy to fruition.

3.      Defendants and their employees hatched and executed their conspiracy under the cloak of the authority of their respective offices, and thus acted "under the color of law." Defendants and their employees authorized and inflicted Mr. Rusesabagina's torture[2] and cruel and degrading treatment under the cloak of the authority of their respective offices, and thus have and continue to act, "under the color of law."  The cruel, degrading, and barbaric actions of Defendants and their employees have perverted and degraded their offices and corrupted every person involved.

4.      Paul Rusesabagina is an award-winning humanitarian and political activist. Born to farmers in Southern Rwanda in 1954, Mr. Rusesabagina studied hotel management at Utalii College in Nairobi, Kenya. After completing his education in Kenya and Switzerland, Rusesabagina joined Sabena Hotels, where he managed luxury hotels in Rwanda's capital, Kigali. As violence swept through Rwanda in 1994, Mr. Rusesabagina converted Kigali's Hôtel des Milles Collines into a safe haven despite serious risks to the lives of himself and his family.  At the Hôtel des Milles Collines, Mr. Rusesabagina offered refuge to 1,268 Tutsis and moderate Hutus—who were sure to be horrifically murdered at the time—as they fled the Interhamwe militias.  As the Rwandan genocide raged outside the hotel's gates, no one in the hotel was injured or killed. Mr. Rusesabagina's story inspired the Academy Award-nominated film Hotel Rwanda, which was met

---

[2] The State Department 2019 Country Report on Human Rights Practices, Rwanda, reported that "[t]he constitution and law prohibit such practices [torture], but there were numerous reports of abuse of detainees by police, military, and National Intelligence and Security Services (NISS) officials." https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/rwanda/

with international acclaim.  Paul Rusesabagina is a hero to many millions of people around the world and in Rwanda for his incredible heroism during the 1994 Rwandan genocide.

5.     Mr. Rusesabagina has been systematically targeted by the Rwandan government for many years for his criticism of President Paul Kagame and the Kagame regime. He founded the Hotel Rwanda Rusesabagina Foundation to initially support the education of young girls and women who were genocide survivors and then to generate support for the Truth and Reconciliation Commission for Rwanda and the Great Lakes Region of Africa. The Foundation was a U.S. 501(c)(3) non-governmental and non-profit organization, and paperwork has been filed to renew this status. The Foundation also worked on issues related to the ongoing conflict in the Democratic Republic of Congo.     He has received many awards, including the U.S. Presidential Medal of Freedom from George W. Bush in 2005.[3]

---

[3] Immortal Chaplains Prize for Humanity, 3 February 2000; Enduring Spirit award from Amnesty International, 9 December 2004; The Peace Abbey Courage of Conscience Award, 25 February 2005; The Marcus Jewish Community Center of Atlanta token of Appreciation, 18 April 2005; The Golden Plate Award by the International Academy of Achievement, 3 June 2005; Raoul Wallenberg Medal of the University of Michigan & Certificate of Merit from the Center for Afroamerican & African Studies at the University of Michigan, 11 October 2005; National Civil Rights Museum Freedom Award, 3 November 2005; International Crisis Group President's Award, 28 November 2005; Citation from Governor John Lynch of the State of New Hampshire, 23 August 2005; Conrad N. Hilton Humanitarian Prize, 25 August 2005; The AmeriCare Giving Award, 1 October 2005; Freedom Award – State of Tennessee, 28 October 2005; Presidential Medal of Freedom, 9 November 2005; First Annual World Refugee Day Humanitarian Award, 2005; Commissioned a Kentucky Colonel by Governor Ernie Fletcher from the Commonwealth of Kentucky, 18 January 2006; Regione Abruzzo Presidenza Consiglio Regionale a Paul Rusesabagina, 28 January 2006; Massachusetts General Count Resolutions Honoring the Accomplishments of Paul Rusesabagina – House of Representative, 6 February 2006; Flag Flown over New Mexico Military Institute Presented to Paul Rusesabagina, 15 February 2006; Visionary Leadership Award Twenty-First Century Democrats, 14 June 2006; Vanderbilt Hillel – Tree of Life dedication, 25 September 2006; Union County Board of Chosen Freeholders Resolution – New Jersey, 16 February 2007; Elijah Award B-NAI ISRAEL, 23 February 2007; Ralph J Bunche Centenary Award, 22 February 2007; Honorary Doctorate of

6.     Mr. Rusesabagina is a permanent legal resident of San Antonio, Texas, along with his wife, Taciana.   Mr. Rusesabagina's son Roger and his daughter Carine are both American citizens. They originally came to the U.S. in the late 2000s, graduated from American universities, and currently live and work in the U.S. Two of Mr. Rusesabagina's children – his son Trésor and daughter Anaïse – are both legal permanent residents of the United States. They came to the U.S. in 2005 and 2006, and attended middle school, high school, and college in the U.S. They currently live and work in the U.S. as well.

7.     Mr. Rusesabagina has been an outspoken critic of the current political regime in Rwanda. Mr. Rusesabagina concluded his autobiography, *An Ordinary Man*, with a critique of President Kagame's government and its abuses against the Rwandan people. Mr. Rusesabagina has worked to highlight the UN's Mapping Report, which states that President Kagame and his government are responsible for war crimes, crimes against humanity, and possibly even genocide against Hutu refugees in the eastern Congo.[4] As a result of these criticisms of President Kagame and the Rwandan government, Mr. Rusesabagina has become the subject of a decades-long campaign of harassment, threats, multiple assassination attempts, and now has been kidnapped,

---

Law from the University of Guelph, 12 June 2007; Friends of Linebaugh Library, Tennessee – Awarded by President Bill Patterson, 25 August 2007; Rescuer of Humanity Award, 6 December 2007; "Fidelis Causae" A.D.A Per la lunga militanza associative", 2007; Honorary Degree, Doctor of Humane Letters from Gustavus Adolphus College, 2008; Honorary Degree from Loyola University Chicago, at the Bachelor of Arts Commencement, 2009; Appointed as Martin Luther King Jr. Fellow, Boston University, 10 November 2009; Black Heritage International Humanitarian & Hero Award, 6 December 2009; Sustaining Presence Award Interfaith Care Partners, 27 February 2011; The Tom Lantos Human Rights Prize, 17 November 2011; USANATO AFNorth BN – Supreme Headquarters – Allied Powers Europe, Belgium, 13 July 2016; Lideres del Manana, 2018; Dejando Huella- Otorga el Presente Reconocimento a Paul Rusesabagina, 5 March 2019.

[4] https://www.ohchr.org/Documents/Countries/CD/DRC_MAPPING_REPORT_FINAL_EN.pdf

forcibly detained, subjected to a show trial without any semblance of due process, and sentenced to life imprisonment despite a complete lack of evidence.

8.        This action arises from the deliberate and intentional campaign by agents, employees, and officials of the Rwandan government, acting at the direction of the Rwandan government, to track, harass, and ultimately lure Paul Rusesabagina, under false pretenses, from his home in Texas to Dubai where he was kidnapped on August 26, 2020 by the Rwandan government.  Plaintiffs bring suit against the Republic of Rwanda ("Rwanda") under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA"), 28 U.S.C. §§ 1605(a)(2), (a)(5) , and against Paul Kagame, the President of Rwanda ("Kagame"), Brig. Gen. Joseph Nzabamwita, the Secretary General of Rwandan National Intelligence and Security Services ("NISS"), Colonel Jeannot Ruhunga, the head of the Rwandan Investigative Bureau ("RIB"), and Johnston Busingye, then-Minister of Justice and Attorney General of Rwanda, under the Torture Victims Protection Act, 28 U.S.C. § 1350 note ("TVPA"), for severe personal injuries, torture, fear of imminent death, and other irreparable harm suffered as a result of Defendants' unlawful acts of slander, kidnapping, false imprisonment, torture, and other torts. Certain Plaintiffs are aliens who bring claims for torts in violation of the law of nations under 28 U.S.C. § 1350, the Alien Tort Statute.

## Jurisdiction and Venue

9.        Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1350, 1367, 1605(a)(2), and 1605(a)(5).

10.        The Court exercises *in personam* jurisdiction over Defendant Rwanda in accordance with the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq*., 28 U.S.C. § 1330(b).

11.     Defendant Rwanda is not immune for the fraud and breach of contract committed by its agents against Mr. Rusesabagina all of which began with the offer of employment to him in the United States, under 28 U.S.C. § 1605(a)(2).

12.     Defendant Rwanda is not immune for the series of torts committed against Mr. Rusesabagina all of which began with the illegal conspiracy to track, harass, and kidnap him from the United States, under 28 U.S.C. § 1605(a)(5).

13.     The Court exercises *in personam* jurisdiction over Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Minister of Justice Busingye in accordance with Federal Rule 4(k)(2) and the District of Columbia Long Arm Statute.

14.     The Court may assert jurisdiction over Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Minister of Justice Busingye for the violations of the law of nations committed against Mr. Rusesabagina, all of which began with the illegal conspiracy directed against him in the United States and interference in the internal affairs of the United States, resulting in Mr. Rusesabagina's ongoing torture, under 28 U.S.C. § 1350.

15.     28 U.S.C. § 1350 note provides a cause of action against Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Minister of Justice Busingye for Mr. Rusesabagina's ongoing torture, caused by the illegal conspiracy directed against him in the United States.

16.     Venue in this Court is proper in accordance with the provisions of 28 U.S.C. §§ 1391(b)(2), 1391(c), 1391(f)(1), and 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state and Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Minister of Justice Busingye may be brought in the United States District Court for the District of Columbia.

## THE PARTIES

**Plaintiffs**

17.     Paul Rusesabagina is a resident of San Antonio, Texas and a lawful permanent resident in the United States. He is currently illegally held by the Rwandan government after they forcibly disappeared him: their agents illegally kidnaped him after a successful conspiracy to track, harass, and lure him from Texas to Dubai where he was tricked into flying to Rwanda. In Rwanda he was subjected to torture to extract a coerced confession, subjected to a sham trial without due process, and sentenced to 25 years, which is effectively life imprisonment.

18.     Plaintiff Taciana Mukangamije is a citizen of Belgium and a lawful permanent resident of the United States and divides her time between Belgium and her home in San Antonio, Texas. She is the wife of plaintiff Paul Rusesabagina

19.     Plaintiff Anaïse Umubyeyi Kanimba is a citizen of Belgium and a lawful permanent resident of the United States, who resides in Washington, D.C. She is the daughter of plaintiff Paul Rusesabagina. She also files as Mr. Rusesabagina's next friend while Rwanda continues to illegally hold him in prison and monitor and regulate his communications.

20.     Plaintiff Aimee-Lys Rusesabagina is a citizen of Belgium who resides in Alost, Belgium. She is the eldest daughter of plaintiff Paul Rusesabagina.

21.     Plaintiff Carine Izere Kanimba is a citizen of Belgium and the United States who is a Texas resident. She is the daughter of plaintiff Paul Rusesabagina.

22.     Plaintiff Aimee-Diane Rusesabagina, is a citizen of Belgium who resides in Alost, Belgium. She is the daughter of plaintiff Paul Rusesabagina.

23.     Plaintiff Trésor Rusesabagina is a citizen of Belgium and a lawful permanent resident of the United States in San Antonio, Texas. He is the son of plaintiff Paul Rusesabagina.

24.     Plaintiff Roger Aime Rusesabagina is a citizen of Belgium and the United States who resides in the United States in Billerica, MA. He is the elder son of plaintiff Paul Rusesabagina.

**Defendants**

25.     Defendant the Republic of Rwanda ("Rwanda") is a foreign state. At all times relevant herein, and currently, Rwanda's President is Paul Kagame.  At all times relevant herein, Rwanda acted through and is responsible for the tortious acts or omissions of its employees, officials, and agents acting at the direction of the Rwandan Government.

26.     Defendant Paul Kagame is the President of Rwanda.  Mr. Kagame was a de facto leader of the country from 1994 to 2000, when he became president, and continues to rule as president.

27.     Defendant Johnston Busingye was the Rwandan Minister of Justice and Attorney General of Rwanda at all times relevant to the events discussed in this Complaint, since May 24, 2013 until September 2021. The State Department 2020 Country Report on Human Rights Practices, Rwanda reported "The Rwanda National Police, under the Ministry of Justice, is responsible for internal security. . . . In 2018 the Rwanda Investigation Bureau began carrying out many of the investigative functions formerly performed by the Rwandan National Police, including counterterrorism investigations, investigation of economic and financial crimes, and judicial police functions."[5]  The Minister of Justice also has oversight over the Rwandan Investigative Bureau ("RIB") and the Rwandan prison system.

28.     Defendant Colonel Jeannot Ruhunga was appointed by President Kagame as the head of the RIB in 2018.  The RIB website states that the "Rwanda Investigation Bureau (RIB)

---

[5] https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/rwanda/

was established by law Nº12/2017 of 07/04/2017 which gives it mandate to perform career criminal investigative functions. This mandate was formerly under the responsibility of the Rwanda National Police - Criminal Investigation Department since its establishment in 2000."[6]

29.     Major General Joseph Nzabamwita, called "Rwanda's spy chief" by the New York Times, was appointed by President Kagame as the Secretary General of Rwandan NISS on March 22, 2016.

30.     Rwanda is a "foreign state" within the meaning of the FSIA. *See* 28 U.S.C. § 1603.

<u>**CHRONOLOGY OF EVENTS**</u>

31.     In the aftermath of the 1994 Rwandan genocide, Paul Rusesabagina became the target of public criticism and violence by the Rwandan government because of his critical opinions of the Kagame regime. Rwandan government agents hounded Mr. Rusesabagina first from his home in Rwanda and then from his sanctuary in Belgium.  Rwandan government agents attempted to assassinate Mr. Rusesabagina first in his home in Rwanda in 1994, and then ransacked his home in Belgium in 2009, forcing him to move to the United States for fear of his life.

32.     President Kagame has been criticized for his increasingly dictatorial leadership and well-documented human rights abuses that occur under his government. He instituted Rwanda's first elections, but international groups have called them a sham—Kagame has always won more than 90 percent of the vote. His last term was supposed to end in 2017, but a constitutional amendment has now allowed him to potentially remain president until 2034.  In the most recent 2017 election, Kagame won with 98.79% of the vote.

---

[6] https://www.rib.gov.rw/index.php?id=24

33.     Rwandan critics of the Kagame regime, including members of his own party and government, frequently flee overseas in fear of violent retaliation from the Rwandan intelligence services.  Opponents abroad have been murdered, and while none of these murders has been pinned directly on President Kagame's government, the President has publicly said that the victims deserved their fate.

**CRITICS OF KAGAME ARE TARGETS OF VIOLENCE**

34.     In February 2021, Seif Bamporiki, an organizer in South Africa for the Rwanda National Congress (RNC), an opposition group, was shot dead after being lured to a backstreet. Seth Sendashonga, a former interior minister, was shot in Kenya in 1998. Patrick Karegeya, a former intelligence chief, was strangled in a hotel in South Africa in 2013. President Kagame appears to celebrate these attacks: "You can't betray Rwanda and not get punished for it."

35.     Rwandan exiles have been harassed, assaulted, or killed in at least six countries, as part of an apparent campaign to silence Kagame's critics. Often, they are accused of having participated in the Rwandan genocide, with little or no evidence presented.

36.     According to Human Rights Watch[7], "Rwanda has an established track record of using unlawful, cloak-and-dagger methods to target those it perceives to be a threat to the ruling party."[8]

---

[7] Human Rights Watch is an international non-governmental organization that conducts research and advocacy on human rights on five continents. https://www.hrw.org/about/about-us.  The group pressures governments, policy makers, companies, and individual human rights abusers to denounce abuse and respect human rights, and the group often works on behalf of refugees, children, migrants, and political prisoners.  Human Rights Watch in 1997 shared in the Nobel Peace Prize as a founding member of the International Campaign to Ban Landmines and it played a leading role in the 2008 treaty banning cluster munitions.
[8] "Rwanda: Rusesabagina Was Forcibly Disappeared"
https://www.hrw.org/news/2020/09/10/rwanda-rusesabagina-was-forcibly-disappeared

37.     The most recent EU annual Report on Human Rights and Democracy in the World states that "the most serious violations of human rights" are "enforced disappearances, arbitrary detentions and use of torture and other inhuman or degrading treatments in detention facilities" and "the area with the most significant restrictions of human rights" is "political rights, freedoms of expression, association and assembly."[9]

38.     Inside Rwanda also, critics of the regime have vanished or died mysteriously.

39.     The State Department 2019 Country Report on Human Rights Practices, Rwanda, reported that:

> There were numerous reports the [Rwandan] government committed arbitrary or unlawful killings. For example, according to media reports, on March 9, Anselme Mutuyimana, a member of the unregistered United Democratic Forces-Inkingi (FDU-Inkingi) opposition party, was found dead in a forest in northwestern Rwanda. An FDU-Inkingi press release stated that Mutuyimana's body showed signs of strangulation. The press release added that on March 9, witnesses saw uniformed officers detain Mutuyimana and force him to enter a red vehicle without license plates.  Human Rights Watch (HRW) characterized Mutuyimana's death as the latest in a long line of murders, disappearances, politically motivated arrests, and unlawful detentions of suspected government opponents.[10]

40.     As noted by the Lantos Foundation[11]:

> Tragically, Paul Rusesabagina is not the first critic of the Rwandan government to find himself in this situation – or one that is even worse. Over the past several years under President Paul Kagame, the Rwandan government has demonstrated an

---

[9] EU Annual Report on Human Rights and Democracy in the World 2020 at 43 (June 21, 2021), available at
https://eeas.europa.eu/sites/default/files/2020_eu_human_rights_and_democracy_country_reports.pdf.
[10] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/rwanda/
[11] https://www.lantosfoundation.org/ ("The Lantos Foundation for Human Rights & Justice was established to carry on Congressman Tom Lantos' proud legacy as a leading advocate for American engagement in human rights globally. We seek to advance human rights and justice by advocating for the United States and other democratic nations to prioritize these fundamental rights for all global citizens, through campaigns and initiatives designed to raise awareness about key human rights challenges, and by supporting and empowering those on the frontlines of human rights struggles. We focus our work in four key areas as we strive to, in Tom's words, 'carry the noble banner of human rights to every corner of the world.'").

alarming pattern of subjecting its critics to a range of gross human rights violations, including enforced disappearance, imprisonment and extrajudicial killings. Indeed, the Lantos Foundation's submission includes an attachment that details numerous chilling examples of what has happened to a long string of Kagame's opponents, among them Patrick Karegeya (assassinated in South Africa), Boniface Twagirimana (disappeared from Rwandan prison), Kizito Mihigo (died in Rwandan prison) and many others. Rwanda bills itself as a vibrant democracy and an inspiring success story, but its repeated and increasingly bold-faced efforts to stifle any form of dissent tell the story of a country that has descended deep into authoritarian rule.[12]

41.     As the Freedom House[13] reported in its massive 2021 report titled Out of Sight, Not

Out of Reach:

> A group of former regime insiders founded the RNC in 2010. The following year, four of the founding members were sentenced in absentia to 20 years in prison on charges including threatening state security. Among those sentenced were Patrick Karegeya, a former head of the intelligence service who was murdered in a Johannesburg hotel on January 1, 2014, and Lieutenant General Kayumba Nyamwasa, who was shot in 2010 after escaping to South Africa, but survived. As of 2019, Nyamwasa said he has been targeted for assassination at least four times. Of Karegeya's murder, the Rwandan defense minister said, "When you choose to be a dog, you die like a dog."[14]

## PAUL RUSESABAGINA STOOD UP TO PRESIDENT PAUL KAGAME AND HAS BEEN SYSTEMATICALLY TARGETED WITH VIOLENCE AND SLANDER AS A RESULT

42.     In 1994, a member of the Rwandan military attempted to assassinate Mr.

Rusesabagina at his home, but he escaped onto a crowded street. After a continuing campaign of

---

[12]https://www.lantosfoundation.org/news/2021/6/7/lantos-foundation-calls-for-magnitsky-sanctions-in-paul-rusesabagina-case.

[13] Freedom House is a non-profit, non-governmental organization headquartered in Washington, D.C. with field offices in a dozen countries, that conducts research and advocacy on democracy, political freedom, and human rights. Freedom House was founded in October 1941, and Wendell Willkie and Eleanor Roosevelt served as its first honorary chairpersons. "Freedom House is the oldest American organization devoted to the support and defense of democracy around the world. It was formally established in New York in 1941 to promote American involvement in World War II and the fight against fascism." https://freedomhouse.org/about-us/our-history

[14] https://freedomhouse.org/report/transnational-repression/rwanda, (internal footnotes omitted).

harassment and persecution leading into 1996, he left Rwanda to seek political asylum in Belgium where the United Nations recognized him as a refugee based on the threats to him in Rwanda.

43.     After fleeing Rwanda, Mr. Rusesabagina continued to criticize the Rwandan government's policies and advocate on behalf of democratic change and for truth, justice, and reconciliation with the goal of sustainable peace in Rwanda. As a result, he has endured continuing public attacks from the government. After the release of the movie Hotel Rwanda, the government painted him as a "false hero," and attempted to label him a "terrorist" and "funder of terrorists." Mr. Rusesabagina, who was at the time of the film's release living in Belgium, did not attend the screening of the film in Rwanda for his own safety. While living in Belgium, intruders broke into his home twice. In 2009, out of fear for his safety, he was forced to relocate to the United States.

44.     In recent years, Mr. Rusesabagina has become one of the foremost political opponents of President Kagame in the Rwandan diaspora. He has been called "one of the most prominent critics of Rwanda's autocratic regime." Mr. Rusesabagina has supported calls for regime change and many opposition groups look to him as a leader due to his "international standing as well as his popularity inside Rwanda" both among Hutus and Tutsis.

45.     Mr. Rusesabagina has criticized a broad range of human rights violations in Rwanda since 2005, including lack of democracy and unfair elections, freedom of speech, freedom of association, and freedom of the press. He has also questioned arbitrary detentions, torture, and extra-judicial killings by the Kagame government. He has publicly alleged that the Kagame regime committed war crimes and crimes against humanity since before the 1994 genocide, and especially since 1996 in the neighboring Democratic Republic of the Congo. Mr. Rusesabagina's criticisms are echoed on a regular basis by Human Rights Watch, Amnesty International, Reporters Without Borders, the U.S. State Department and the United Nations, among others.

46.     President Kagame, and his government on his behalf, does not tolerate criticism. The State Department 2019 Country Report on Human Rights Practices, Rwanda reported:

> Significant human rights issues included: unlawful or arbitrary killings by state security forces; forced disappearance by state security forces; torture by state security forces; arbitrary detention by state security forces; political prisoners; arbitrary or unlawful interference with privacy; the worst forms of restrictions on free expression, press, and the internet, including threats of violence against journalists, censorship, website blocking, and criminal libel and slander laws; substantial interference with the rights of peaceful assembly and freedom of association, such as overly restrictive nongovernmental organization (NGO) laws; and restrictions on political participation; criminal violence against women and girls, which the government took insufficient action to prevent or prosecute.[15]

47.     The State Department 2020 Country Report on Human Rights Practices, Rwanda reported the continuation of the same human rights abuses:

> Significant human rights issues included: unlawful or arbitrary killings by the government; forced disappearance by the government; torture by the government; harsh and life-threatening conditions in some detention facilities; arbitrary detention; political prisoners or detainees; politically motivated reprisal against individuals located outside the country; arbitrary or unlawful interference with privacy; serious restrictions on free expression, press, and the internet, including threats of violence against journalists, censorship, and website blocking; substantial interference with the rights of peaceful assembly and freedom of association, such as overly restrictive nongovernmental organization laws; and restrictions on political participation.[16]

48.     President Kagame and members of his government have criticized and threatened Mr. Rusesabagina since the movie Hotel Rwanda premiered. Shortly after the premier, President Kagame called Mr. Rusesabagina a "manufactured hero." At a 2007 genocide commemoration, President Kagame called Mr. Rusesabagina a "swindler," a "gangster" and someone who "maligns" the good name of Rwanda.

---

[15] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/rwanda/
[16] https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/rwanda/

49.     In 2007, Rwanda's leading newspaper published 21 articles over a six-month period, and many times in the years since, assailing Mr. Rusesabagina's credibility with headlines like "Rusesabagina's Megalomania Has No Limit," "Rusesabagina's dishonest behavior," and "Paul Rusesabagina created a hoax charity to enrich himself." As is discussed below, the Rwandan government tightly controls domestic journalism.

50.     Rwanda's Ambassador to the United States, James Kimonyo, stated at a forum in Chicago that Mr. Rusesabagina purchased guns in South Africa in 2007 to aid rebel groups in the Congo – an accusation that has been repeated by the Rwandan government-mouthpiece *New Times*.[17] Yet no evidence was ever produced, and no criminal charges were ever filed, including at the sham trial which occurred in Kigali, Rwanda 2021 after the conspiracy to kidnap Mr. Rusesabagina succeeded.

51.     Ambassador Kimonyo also leveled these spectacular and unsupported charges against former U.S. Ambassadors Robert Krueger and Robert Flaten. Ambassador Kimonyo asserted a fantastic conspiracy during a panel discussion that included Ambassador Kimonyo and Mr. Rusesabagina at the Reverend Jesse Jackson's Rainbow PUSH Coalition's headquarters. He asserted that Mr. Rusesabagina, along with former U.S. Ambassadors Robert Krueger and Robert Flaten, had been seen in South Africa a few months earlier purchasing weapons for an anti-Rwandan rebel group based in the Democratic Republic of the Congo.

52.     In fact, Mr. Rusesabagina and Ambassador Krueger, both of whom were present, immediately denied the accusation. They had not even met at that time, and Mr. Rusesabagina showed his passport to prove that he was in another country on the date in question. The allegation included a statement that the group was going to "use Hotel Rwanda Rusesabagina Foundation

---

[17] https://www.hrw.org/news/2009/05/18/response-new-times-article-rwandan-genocide

money to purchase the weapons." This was easily debunked by a review of foundation funds. Nonetheless, this accusation resurfaced multiple times in the Rwandan press and by Rwandan government spokespeople and is repeated to this day. No evidence has ever been presented to support these claims.

**THE RWANDAN GOVERNMENT CONTROLS THE DOMESTIC PRESS**

53.     The Human Rights Watch 2021 World Report regarding Rwanda states: "State interference and intimidation have forced many civil society actors and journalists to stop working on sensitive political or human rights issues. Most print and broadcast media continued to be heavily dominated by pro-government views."[18]

54.      The Human Rights Watch 2022 World Report regarding Rwanda states: "The ruling Rwandan Patriotic Front (RPF) continued to stifle dissenting and critical voices and to target those perceived as a threat to the government and their family members. The space for political opposition, civil society, and media remained closed. Several high-profile critics, including opposition members and commentators using social media or YouTube to express themselves, went missing, were arrested or threatened. Arbitrary detention, ill-treatment, and torture in official and unofficial detention facilities was commonplace, and fair trial standards were routinely flouted in cases deemed sensitive."[19]

55.     There is no freedom of the press in Rwanda on "sensitive matters" which include criticism of the "presidency and government policy on security, human rights, and other matters deemed sensitive."  In 2018, Rwandan government amended the penal code to make it a crime to

---

[18] https://www.hrw.org/world-report/2021/country-chapters/rwanda#
[19] https://www.hrw.org/world-report/2022/country-chapters/rwanda

"defame" President Kagame or "humiliate" "verbally, by gestures or threats, in writings or cartoons" a government official.

56.     The State Department 2019 Country Report on Human Rights Practices, Rwanda reported: "The constitution provides for freedom of expression, including for the press 'in conditions prescribed by the law,' but the government severely restricted this right. Journalists reported government officials questioned, threatened, and at times arrested journalists who expressed views deemed critical of the government on sensitive topics."

57.     The group called Reporters Without Borders has published a World Press Freedom Index every year since 2002 which ranks countries "level of freedom available to the media in 180 countries." Rwanda ranked 155 in 2020, but slipped to 156 in 2021.[20]

58.     The 2021 Index ranking for Rwanda found:

> Since 1996, eight journalists have been killed or reported missing, and 35 have had to flee abroad . . . . Kagame's reelection in August 2017, after a constitutional amendment allowed him to run for a third term, means that authoritarianism and censorship are likely to continue for the foreseeable future. The number of press freedom violations registered by RSF has fallen in recent years, but censorship is ubiquitous and self-censorship is widely used to avoid running afoul of the regime, especially as an overhaul of the penal code in 2018 retained prison sentences for journalists convicted of insult or defamation.[21]

59.     Freedom House assessed Rwanda as "Not Free" in its Freedom on the Net 2021 survey, with a score of 38 out of 100. The report states:

> Internet freedom in Rwanda continued to decline during the coverage period, with the government taking steps to detain, intimidate, and block the content of online journalists and critics. Self-censorship online remains common, as the government increasingly tightens its control of the online media environment. Recent evidence implicates Rwandan authorities in the widespread use of commercial surveillance tools against journalists, activists, and opposition leaders. President Paul Kagame

---

[20] https://rsf.org/en/rwanda
[21] https://freedomhouse.org/country/rwanda/freedom-net/2021

and the Rwandan Patriotic Front (RPF) have ruled Rwanda since 1994, and maintain tight control over the political system. The government habitually suppresses political dissent through pervasive surveillance, intimidation, arrest, and suspected assassinations of dissidents, including across borders.[22]

60.     Over the past four years, Mr. Rusesabagina has been more active in organizing Rwandans in the diaspora, especially in the United States, which has increased the anger of members of the Rwandan government and their desire to silence him.

## RWANDAN GOVERNMENT SUVEILLANCE OF PAUL RUSESABAGINA INSIDE THE UNITED STATES

61.     The Rwandan government exerts great effort at tracking and harassing dissidents located abroad. As the Freedom House reported in its massive 2021 report titled Out of Sight, Not Out of Reach:

> Transnational repression has been a feature of President Paul Kagame's regime since the early days of his rule. . . . Kagame's regime has gained an international reputation for maintaining stability and economic growth, but at least some of the regime's longevity is made possible by persistent suppression of political dissent through surveillance, intimidation, and violence. These tactics are used indiscriminately within Rwanda and are mirrored outside the country. "What I can tell you is that in justice there is no long distance. Wherever anyone who tries to destabilize the country is located, they should be aware that justice will reach you," said a spokesperson for the Rwanda Investigations Bureau, after rendering an alleged rebel leader from Comoros in 2019.[23]

62.     The Rwandan government has spied on and harassed Mr. Rusesabagina, his foundation, and his employees across the United States for many years.

63.     Michelle Martin briefly volunteered with the Hotel Rwanda Rusesabagina Foundation (HRRF) in 2010 in Chicago, IL. She was introduced to the HRRF by Providence

---

[22] *Id.*
[23] https://freedomhouse.org/report/transnational-repression/rwanda

Rubingisa, who asked her to volunteer with the foundation. Providence Rubingisa would later be the victim of computer hacks resulting in the theft of thousands of his emails.

64.     Mr. Rubingisa had met Mr. Rusesabagina in 2004, while working for a non-profit that sought to aid poor Rwandans.  Later, Mr. Rusesabagina offered to speak for no cost at events for the non-profit to help it fundraise.  The two men began a friendly relationship and aided each other's humanitarian efforts.  For example, whenever Mr. Rusesabagina's name would appear as a speaker at an event, the Rwandan government would coordinate mailings and other efforts in an effort to either interrupt Mr. Rusesabagina while he was speaking or to have whoever invited him to revoke the invitation.  Mr. Rubingisa would come to his defense and offer information about the policies of the Rwandan government and its efforts against Mr. Rusesabagina.

65.     Mr. Rubingisa met Ms. Martin sometime around 2006-07, and she led him to believe that she agreed with his opposition to Kagame.  She invited him and his co-worker to speak to her class at DePaul University.  This and other actions reinforced Mr. Rubingisa's initial belief that she was a trustworthy person.

66.     Ms. Martin used her relationship to try to meet some of the top opponents of Kagame's regime—all of whom would be the target of violent plots.

67.     Ms. Martin requested an introduction to the HRRF, which Mr. Rubingisa facilitated. He did not closely follow her interactions with the HRRF after this introduction.

68.     At some point in 2012 or 2013, while accessing his Yahoo email account, Yahoo informed Mr. Rubingisa that another person was accessing his email at the same time.  He remembered that he had accessed his email while using Ms. Martin's computer at her home.  He immediately called her and asked her if she had accessed his email account; she replied that she had, but it had been by "accident."

69.     In 2021 during Ms. Martin's testimony at the sham trial against Mr. Rusesabagina, she admitted that she had without permission read, printed, and stolen thousands of emails from Mr. Rubingisa and lied on the stand when she said that he had given her his password.

70.     Ms. Martin used her relationship with Mr. Rubingisa in attempt to meet two famous Rwandan dissidents, Patrick Karegeya and Kayumba Nyamwasa, who had been very close to Kagame prior to their defection.   She was "dying to meet them" and repeatedly asked for an introduction.

71.     As the Human Rights Watch reported, "From 1994 to 2004, Karegeya was the head of Rwanda's external intelligence services. But he fell out with the government and was imprisoned twice before fleeing to South Africa in 2007. There he was joined by [Rwanda's former army chief of staff General Kayumba] Nyamwasa, and the two founded the exiled opposition party the Rwanda National Congress (RNC). Both were outspoken critics of the Rwandan government and President Paul Kagame."[24]

72.     Mr. Karegeya was strangled to death on December 31, 2013 in South Africa.  Mr. Nyamwasa survived an assassination attempt in 2010 in South Africa.   The day after the assassination attempt, Kagame told a rally, "Whoever betrays the country will pay the price, I assure you…Whoever it is, it is a matter of time."

73.     South Africa continues to seek extradition of two Rwandan nationals residing in Rwanda for their role in the assassination of Mr. Karegeya after the South Africa National Prosecution Authority issued arrest warrants in 2019.

---

[24] https://www.hrw.org/news/2019/09/13/rwandans-charged-murder-exiled-critic#

74.     Shortly after Mr. Karegeya's killing, the Rwandan Defense Minister James Kabarebe said: "When you choose to be a dog, you die like a dog, and the cleaners will wipe away the trash so that it does not stink for them."

75.     On June 12, 2013, Ms. Martin filed a FARA report with the Department of Justice which disclosed past and ongoing work as a foreign agent for the government of Rwanda, specifically the Ministry of Foreign Affairs and General Patrick Karuretwa. While FARA requires a registration within 10 days of either agreeing to act as an agent, or performing such activities,[25] Ms. Martin's report reveals that she had been working for the government of Rwanda many months prior to the FARA filing: "[foresees providing her research to U.S. government agencies] regarding the findings of my research, primarily that members of the former regime are using social media to engage politically in homeland affairs while often misreprenting [sic] themselves as genocide survivors."[26]  Indeed, Ms. Martin attached at least one contractual agreement between her and the Rwandan government dated September 26, 2012 and provides for payment of $5,000 over a 12 month period.  The second FARA report includes a contract which is dated September 20, 2013. The dates on the contracts do not appear to be accurate, and in view of the fact that they were provided as exhibits to a FARA report which was filed years late and out-of-time, it is doubtful that these two reports fully describe Ms. Martin's course of work for the Rwandan Foreign Ministry.

76.     The FARA report states that she will "[m]ap the transnational networks of Rwanda's post-genocide negative CGD . . . ." She omits any description of how long she had been

---

[25]

https://fara.us/?gclid=Cj0KCQiAjc2QBhDgARIsAMc3SqTyJr7Hl6Y5XhpdZN4PA42sqXFCLz06YgrPVr9KB4Z_K3gpxjnLeHwaAusgEALw_wcB
[26] https://efile.fara.gov/docs/6175-Exhibit-AB-20130612-1.pdf

working for the Rwandan government.  Based upon the specificity in the second report, it is clear that Ms. Martin was purposefully vague in the first report regarding when she had started working for the Rwanda government.

77.     On December 30, 2013, Ms. Martin filed another FARA report[27] regarding her renewed contract with the government of Rwanda, and her ongoing effort to study the diaspora. In this report, she specifies the length of her renewed contract.

78.     Ms. Martin pushed Mr. Rusesabagina—through his volunteers at HRRF as she rarely interacted with him—to join the Democratic Forces for the Liberation of Rwanda (FDLR)— a group run by Rwandan Hutu rebels.  Mr. Rusesabagina never spoke with her about this and did not join this group.

79.     Although she did not spend much time with Mr. Rusesabagina and was only cc:ed on a few dozen emails, in March 2021, Ms. Martin appeared as a "star witness" for the Rwandan government in the sham trial against Mr. Rusesabagina and testified for four hours.  And despite the fact that she was cc:ed on only a handful of emails, she testified that "I have information that I learned about 10 years ago, related to this case. Naturally, I am a curious person and most of the time, I keep records. I will reveal hundreds of notes, screenshots, emails, and text messages alongside my testimony".  In this same timeframe, Providence Rubingisa, who did not work for or volunteer for HRRF, had his email account hacked and thousands of emails were stolen.

80.     Ms. Martin said she had been privy to email correspondence "about financing rebel activities" and accused Mr. Rusesabagina of "genocide denial." Ms. Martin revealed that once she discovered Mr. Rusesabagina was "engaging in activities that appeared to be illegal, I turned everything over to US law enforcement." She revealed she had acted as an informant in a 2012

---

[27] https://efile.fara.gov/docs/6175-Exhibit-AB-20131230-2.pdf

investigation against Mr. Rusesabagina in the United States and cooperated in the investigation from February to September 2012.

81.     In fact, Ms. Martin had been spying on Mr. Rusesabagina in the United States in coordination with the Rwandan embassy in Washington, DC.  Members of the Washington, DC embassy, including Ambassador James Kimonyo, were charged with tracking the Rwandan diaspora in the United States to keep Kagame apprised of any U.S. based opposition; Mr. Rusesabagina was at the top of their list.  General Patrick Karuretwa (then-major) played a key role in these efforts.

82.     General Karuretwa is the signatory on Ms. Martin's contracts with the government of Rwanda. On those contracts, General Karuretwa is identified as a member of the Ministry of Foreign Affairs although he in fact was a member of the President's office. At the time he served as Kagame's security and defense advisor. Kagame later elevated him to private secretary, as well as promoted him to the rank of general.

83.     Ms. Martin traveled to Kigali more than once at this time, and was received by General Karuretwa, who coordinated her visit and took her to meet Kagame at his private home, which was very unusual for someone with her profile as an academic researcher.

84.     President Kagame pressured his Ambassador to the United Nations at the time to set up a meeting for Ambassador James Kimonyo, Michelle Martin, and Susan Rice, then U.S. Ambassador to the United Nations in the hopes of destroying Mr. Rusesabagina's reputation and exposing him to legal jeopardy on trumped-up charges.  Ms. Martin asserted that she was sharing information with the FBI regarding Mr. Rusesabagina's links to terrorists.

85.     Despite this meeting and the alleged FBI investigation, the United States never announced any investigation into Mr. Rusesabagina or charged him for any crime.

86.    Ms. Martin was not heard from again until 2021 when she suddenly appeared as a "star witness" at Mr. Rusesabagina's sham trial in Kigali.  During her testimony, which consisted of 70 pages of written and prepared testimony, Ms. Martin accused Mr. Rusesabagina of "genocide ideology," "negationism" and "genocide denial." She claimed that she realized he was guilty of these offense after working with him. Importantly, these precise terms are frequently used by the Rwandan government against those who claim that Hutus were killed during the genocide, or that the Rwandan government has committed human rights violations, or those who speak negatively about President Paul Kagame. In fact, the threat of these "crimes" has been used by the Rwandan government to stifle free speech, and to impugn or arrest those who speak out against that government. Ms. Martin's use of these precise terms shows her allegiance to the Rwandan government.

87.    To accuse Mr. Rusesabagina of "genocide ideology," "negationism" and "genocide denial" is to indulge in fantasy.  Pressing outlandish and blatantly false statements in an attempt to slander individuals and confuse neutral third parties has been a favored tactic of dictators and fascists for a long time, especially in recent years. In fact, Mr. Rusesabagina's mother and wife are Tutsi, and his mother-in-law was murdered, as were many other close family members during the genocide. Mr. Rusesabagina daughters, Anaïse and Carine, are also Tutsi. Their parents were murdered during the genocide, and Mr. Rusesabagina and his wife found the girls in a refugee camp immediately after the genocide and adopted them.

**RWANDAN GOVERNMENT ILLEGAL USAGE OF SPYWARE INSIDE THE UNITED STATES**

88.    As the Freedom House reported in its massive 2021 report titled Out of Sight, Not Out of Reach, the Rwandan government has used Pegasus to track and pursue targets:

After CitizenLab exposed the deployment of NSO Group's Pegasus spyware via WhatsApp, the Financial Times identified six Rwandans affected. Those targeted include members of the RNC; the United Democratic Forces–Inkingi, an opposition party the Rwandan government has accused of terrorism; a human rights defender; and Patrick Karegeya's nephew. According to the Times, many of the targeted Rwandans fear that their communications helped the Rwandan government track and pursue targets. David Batenga, Karegeya's nephew, is among those who expressed such concerns:

*Mr. Batenga says he is worried about how the information stolen from his phone via Pegasus could have been used. He helped arrange a trip for a Belgium-based compatriot in August, who then vanished a few days after landing in Kampala, the Ugandan capital, despite taking precautions that included changing safe houses.*[28]

Upon information and belief, in violation of the U.S. criminal code at 18 U.S.C. § 2511, the Rwandan government spied on Mr. Rusesabagina through software called Pegasus, created by the NSO Group, which among other things allowed the Rwandan government to read his WhatsApp messages.

89.     Freedom House also reported: "Faustin Rukundo, an activist and member of the RNC who was subject to Pegasus infection, suspects the malware was involved in the plot to render Rusesabagina."[29]

90.     The head of Rwanda's National intelligence and Security Services (NISS), Brig. Gen. Joseph Nzabamwita revealed his government's surveillance of Mr. Rusesabagina in a public interview: "He went for his COVID test, bought his [air ticket]."[30]

---

[28] https://freedomhouse.org/report/transnational-repression/rwanda, (internal citations omitted).
[29] *Id.*
[30] The Daily Podcast, "A Battle for the Soul of Rwanda," NEW YORK TIMES, 18 February 2020, available at https://www.nytimes.com/2021/02/18/podcasts/the-daily/hotel-rwanda-paul-rusesabagina-trial.html?showTranscript=1.

91.     Amnesty International, after a global collaborative investigation by 17 media organizations, has documented—through forensic investigation—the use of Pegasus spyware for unlawful surveillance of human rights workers by foreign governments:

> NSO Group claims that its Pegasus spyware is only used to **"investigate terrorism and crime"** and **"leaves no traces whatsoever"**. This Forensic Methodology Report shows that neither of these statements are true. This report accompanies the release of the Pegasus Project, a collaborative investigation that involves more than 80 journalists from 17 media organizations in 10 countries coordinated by Forbidden Stories with technical support of Amnesty International's Security Lab. Amnesty International's Security Lab has performed in-depth forensic analysis of numerous mobile devices from human rights defenders (HRDs) and journalists around the world. This research has uncovered widespread, persistent and ongoing unlawful surveillance and human rights abuses perpetrated using NSO Group's Pegasus spyware.
>
> As laid out in the UN Guiding Principles on Business and Human Rights, NSO Group should urgently take pro-active steps to ensure that it does not cause or contribute to human rights abuses within its global operations, and to respond to any human rights abuses when they do occur. In order to meet that responsibility, NSO Group must carry out adequate human rights due diligence and take steps to ensure that HRDs and journalists do not continue to become targets of unlawful surveillance.[31]

92.     The report and its forensic methodology have been subjected to peer review by the Citizen Lab, based at the Munk School of Global Affairs at the University of Toronto,[32] which concluded "Amnesty International's core forensic methods for analyzing devices to determine that they have been infected with NSO Group spyware are sound."[33]

---

[31] https://www.amnesty.org/en/latest/research/2021/07/forensic-methodology-report-how-to-catch-nso-groups-pegasus/, (internal citations omitted).

[32] "The Citizen Lab, which is based at the Munk School of Global Affairs at the University of Toronto, is an interdisciplinary laboratory that operates at the intersection of human rights, global security, and the digital world. The Lab develops new approaches for researching and documenting information controls – such as network surveillance and censorship – that impact the openness and security of the Internet and that pose threats to human rights."
https://www.macfound.org/maceirecipients/2014/the-citizen-lab

[33] https://citizenlab.ca/2021/07/amnesty-peer-review/

93.     The Amnesty International report covered Pegasus activity from 2014 through July 2021.  Pegasus spyware enables the NSO Group customer, such as Rwanda, to take total control of the victim's cellphone without their knowing.  Thus, Rwanda can watch as the cell phone user sends and receives calls and messages, or otherwise uses the phone.

94.     One of the media organizations that participated in the effort reported: "WhatsApp had contacted at least six dissidents related to Rwanda in 2019 that they had [been] targeted by spyware made by the NSO in an attack that affected hundreds of users around the world over a two-week period from April to May that year. Several prominent names in the Rwandan diaspora have been spotted in the leaked list of probable targets selected by NSO clients."[34]

95.     Another of the media organizations that participated in the effort reported: "The numbers for at least three other Rwandan expatriates living in the United States who have criticized their home country's government also appeared" as targets of the illegal surveillance.[35]

96.     Rwanda featured prominently in the Amnesty International report: "[n]ew evidence uncovered by Amnesty International and Forbidden Stories has revealed that Rwandan authorities used NSO Group's spyware to potentially target more than 3,500 activists, journalists and politicians. It was also used to infect the phone of Carine Kanimba, Paul Rusesabagina's daughter, of Hotel Rwanda fame."[36]  Rwanda has also used Pegasus to spy on Mr. Gashabana, Mr. Rusesabagina's lawyer in Rwanda.[37]

---

[34] https://thewire.in/tech/pegasus-journalist-wife-targetted-by-nso-spyware-finds-belgiums-military-intelligence
[35] https://www.washingtonpost.com/national-security/2021/07/19/us-phone-numbers-nso/
[36] https://www.amnesty.org/en/latest/news/2021/07/rwandan-authorities-chose-thousands-of-activists-journalists-and-politicians-to-target-with-nso-spyware/
[37] https://cdn.occrp.org/projects/project-p/#/profiles/227

97.     Carine Kanimba has a Belgian cell phone and a US cellphone.  The Rwandan government infected Carine's Belgian cell phone while she stayed in Belgium in January 2021. She traveled back to the United States in May 2021.  When she arrived in the US, Carine turned the Belgian carrier to her Belgian cell phone off and mainly used and relied on her US cellphone but would return messages sent to her Belgian cellphone and make and receive calls by periodically using Wi-Fi to turn on the Belgian cellphone.

98.     Upon information and belief, Rwanda infected Mr. Rusesabagina's Belgian cell phone while he was in Belgium in 2018, if not earlier. After he returned to the US in November 2019, with his Belgian and US cellphones, he turned the Belgian plan off just as his daughter Carine but would use the phone when he had access to Wi-Fi to communicate with those who only had the phone number of his Belgian cellphone, which was nearly constant as he was quarantined at his home in San Antonio due to the pandemic.  He took both cellphones with him when he traveled to Dubai in 2020.

99.     In 2018 and 2019, Mr. Rusesabagina often told his daughter Anaïse Umubyeyi Kanimba that he thought the Rwandan authorities were listening to his calls and would therefore limit the sharing of information during phone calls.  Thus, his family did not learn of his trip to Burundi until he called his wife the day of his travel.

100.     On November 23, 2021, Apple sued NSO Group, the company that manufactured Pegasus and sold it to its customers, such as Rwanda, to allow it to spy on unknowing persons around the world.

101.     The  U.S.  Commerce  Department  blacklisted  NSO  Group  in  November  2021, prohibiting  it  from  using  American  technology  in  its  operations. Meta,  formerly  known  as

Facebook, is also separately suing NSO Group, alleging it helped hack users of Meta subsidiary WhatsApp.

102.    Apple stated in the lawsuit filed in federal court in the Northern District of California that NSO Group software permits "attacks, including from sovereign governments that pay hundreds of millions of dollars to target and attack a tiny fraction of users with information of particular interest to NSO's customers[.]" Apple continued by stating that this is not "ordinary consumer malware."

**RWANDAN GOVERNMENT USE OF DIASPORA AS SPY NETWORK INSIDE THE UNITED STATES**

103.    The Rwandan government also used pro-Kagame members of the Rwandan diaspora to spy on, track, and harass Mr. Rusesabagina.  A prime example is Moses (Moise) Rudasunikwa who lives in San Antonio, Texas.

104.    Mr. Rudasunikwa has a community-wide reputation of strong pro-Kagame support, since at least 2008.  Members of the Rwandan military—who were training with the U.S. military— would socialize in uniform at his house in Texas.  Based upon his strong statements of support for Kagame, members of the Rwandan diaspora who feared Kagame would avoid Mr. Rudasunikwa.

105.    Mr. Rudasunikwa proclaims that he is the "president of the Rwandan Community" in San Antoinio, Texas in an online presentation and discussion of pro-Kagame supporters, called Demystifying Rusesabagina & Fallacy of Hotel Rwanda (PART 1), recorded and stored on YouTube and dated October 27, 2021.[38]  Mr. Rudasunikwa is identified as the President of

---

[38] https://www.youtube.com/watch?v=GcmtqJO-KFA at (8:52).

Rwandan Community Abroad ("RCA") of San Antonio in a San Antonio Express-News article dated January 23, 2022, for which he gave a quote.[39]

106.    The Rwandan Ministry of Foreign Affairs and International Cooperation describes the RCA as "a Unit at MINAFFET that deals on a daily basis with Rwandans living abroad."[40] The webpage for the Embassy of Rwanda in the United States includes a link, under "Diaspora", to the US chapter of the RCA.[41]   Michelle Martin's first FARA report lists the address of the Rwandan government at the MINAFFET office in Kigali, Rwanda.

107.    Mr. Rudasunikwa claims he met Mr. Rusesabagina in 2007 and then made him his "main focus" and made it a "task to follow" Mr. Rusesabagina since 2007.[42]

108.    Mr. Rudasunikwa admits that after meeting Mr. Rusesabagina in 2007 he called the Rwandan Embassy in Washington, DC, spoke to a councilor at the Embassy, and asked for documentation to support his opposition to Mr. Rusesabagina.[43]   Mr. Rudasunikwa's ties to the Embassy eventually resulted in a visit by the Rwandan Ambassador to San Antonio to speak in 2007.[44]  The  current Rwandan Ambassador has also visited San Antonio.

109.    When then-Rwandan Ambassador James Kimonyo visited San Antonio, Mr. Rudasunikwa coordinated meetings for the Ambassador and was able to invite friends to sit next to the ambassador on-stage at various ceremonies.

---

[39] https://digital.olivesoftware.com/olive/odn/sanantonioexpressnews/shared/ShowArticle.aspx?doc=SAEN%2F2022%2F01%2F23&entity=Ar00302&sk=34911C3B&mode=text#

[40] https://www.minaffet.gov.rw/rwanda-community-abroad

[41] https://usrwandancommunityabroad.org/

[42] https://www.youtube.com/watch?v=GcmtqJO-KFA at (9:00).

[43] *Id.* at (43:30).

[44] *Id.* at (44:15).

110.     The Freedom House report also documented the Rwandan government's use of its citizens located abroad to further its repression and spying on domestic opponents located abroad: "'They [the Rwandan government] work through the embassy and through the diaspora community,' one Rwandan activist told us. 'There is no unity anymore, we don't trust each other anymore.'"[45]

111.     The Rwandan government forces civilians to aid its intelligence services:

[E]vidence supports the belief that the Rwandan government enlists civilians to target their acquaintances. In 2015, Major Robert Higiro testified before the US Congress that the Rwandan director of military intelligence, Colonel Dan Munyuza, requested that he kill General Kayumba Kyamwasa and Colonel Patrick Karegeya in South Africa, for a fee of $1 million. "That's the way it works in Rwanda," he testified. "They look for people they think are vulnerable or weak. If you say no, they track you down and kill you; if you agree, they will eventually kill you too. You have no options." Higiro played along for a time, while gathering evidence of the plot, before eventually fleeing to Belgium. However, Rwanda apparently managed to find another acquaintance to help carry out the mission; a friend of Karageya's who ultimately persuaded him to rent the hotel room where he was killed.

Similar allegations about recruitment of diaspora members were leveled by Rwandans in Australia in an extensive report by ABC. The report also documents allegations that the Rwandan government furnishes spies, operatives, and loyalists with false documentation in order to gain asylum and implant themselves in Rwandan communities abroad. Rwandans interviewed by Freedom House raised the same concerns.

In addition to mistrust at an individual level, Rwandans report suspicion of official bodies, including embassies and diaspora organizations. ABC reviewed footage of the chair of the Rwandan Diaspora of Australia, who reportedly received political asylum in Australia in 2004, pledging loyalty in Rwandan's High Commission in Singapore in 2017. Similarly, the British Broadcasting Corporation (BBC) has reported based on leaked video that Rwandans were forced to take a loyalty oath to the RPF in the Rwandan Embassy to the United Kingdom.[46]

---

[45] https://freedomhouse.org/report/transnational-repression/rwanda
[46] *Id.* (internal citations omitted).

112.    The Rwandan government's use of the diaspora to inflict violence against its dissidents has been documented by many foreign governments:

> Many governments are aware of the problem and have taken some action to protect Rwandans, such as when British intelligence services disrupted an assassination plot in London. The US Congress has heard testimony about it multiple times, while Sweden expelled a Rwandan diplomat for refugee espionage and South Africa expelled three after an attack on General Nyamwasa's home. A Canada Border Services Agency report describes "a well-documented pattern of repression [including threats, attacks, and killings], of Rwandan government critics, both inside and outside Rwanda," the Immigration and Refugee Board of Canada has specifically documented the persecution of RNC members, and British intelligence services have issued at least one warning for the Rwandan government to end its campaign against Rwandans in the United Kingdom. Despite this abundant knowledge at high levels of government, the Rwandan campaign of transnational repression continues, and ordinary Rwandans around the world remain unable to fully enjoy their basic human rights.[47]

113.    In 2020, Mr. Rudasunikwa organized a group of pro-Kagame members of the Rwandan diaspora to visit Mr. Rusesabagina's speech at Dreamweek[48], to make their presence felt.  Security for the event sat next to the group and stifled any attempts at harassment.

114.    The pro-Kagame supporters in the Rwandan diaspora bombarded the Dreamweek organizers with letters of opposition to Mr. Rusesabagina's appearance.

115.    On April 6, 2021, Plaintiffs Anaïse Kanimba and Taciana Mukangamije joined a St. Mary's School of Law[49] class held by Zoom to discuss the kidnapping.  Unbeknownst to them, a Rwandan official also joined.

---

[47] *Id.* (internal citations omitted).
[48] "DreamWeek is a 16-day summit of events to foster the exchange of ideas on universal issues in an environment curated for successful civil and civic engagements.  The January, city-wide summit takes place in and around downtown San Antonio. The aim is to invite all to participate in an open forum where real-world issues are presented and nurtured, with the understanding that the truest voices will always prevail. An idea inspired by Dr. Martin Luther King Jr.'s teachings."  https://dreamweek.org/faq/
[49] St. Mary's School of Law at St. Mary's University in San Antonio, Texas.

116.    Toward the end of the class on April 6, St. Mary's staff discovered at least one participant attending the session without the knowledge or permission of the organizing faculty member, Associate Professor of Communication Studies Bill Israel. When it became clear the intruder remained online, Professor Israel challenged him to identify himself. He did not. Professor Israel and executive director of Academic Technology Services Jeff Schomburg then terminated the intruder's connection.

117.    Director Schomburg and the University's information technology personnel later determined that the intruder initially joined the meeting for less than three minutes under the name Charles Ntageruka, but then departed. The intruder reappeared a few minutes later under a changed screen name "MN," and remained until Director Schomburg terminated the connection.

118.    The University's IT staff determined that the intruder in both cases was using an identical internet address.

119.    Charles Ntageruka is the Second Counselor at the Embassy of the Republic of Rwanda in Washington, D.C. Professor Israel has reported the matter to the FBI.

**THE 2020 PLOT AND KIDNAPPING OF PAUL RUSESABAGINA FROM TEXAS**

120.    Ms. Martin and the Rwandan government's attempt to utilize the FBI against Mr. Rusesabagina was not the only time the Rwandan government attempted to flush him out of his relative sanctuaries outside of the reach of Kagame.

121.    Rwanda made a formal application to Belgium for Mr. Rusesabagina's extradition to Rwanda, on September 13, 2019, a request that was accompanied by a list of undertakings concerning the respect of his rights to a fair trial.

122.    In November 2019, the FBI notified Mr. Rubingisa that Belgian agents wished to interview him, and he agreed to be interviewed.  The Belgian agents traveled to the United States

to interview him.  At the outset of the interview, the Belgian agents produced a large number of printed emails with the intent to interview Mr. Rubingisa regarding their contents, but at the beginning of the interview he quickly noticed that an email purportedly sent from his email account had an incorrect domain name—it was a fake email.  The domain name of his email address was @yahoo.com but the nearly perfect fake address contained an incorrect domain name, @yahoo.fr.  Mr. Rubingisa believes the emails were fabricated.   The interview was part of Belguim's investigation of Mr. Rusesabagina.

123.    Belgium subsequently rejected the Rwandan request for extradition.

124.    Mr. Rusesabagina regularly travels around the world to speak at churches and public gatherings about his experiences during the genocide and in favor of reconciliation.  For example, in 2014 Mr. Rusesabagina gave the keynote speech for the 20th Anniversary of the Rwandan Genocide at the Gerald R. Ford School of Public Policy at the University of Michigan.[50] However more recently, the COVID pandemic severely curtailed his travel and ability to attend conferences or give speeches.

125.    During this time, Mr. Rusesabagina was eager to travel again to give speeches and make appearance to raise awareness and money for his political causes. This was a constant point of conversation with close associates.  One of his goals was to foster the creation of a truth and reconciliation commission for the Great Lakes Region in Africa, which included Burundi and Rwanda.  The region has been burdened by several, complicated conflicts, including the Rwandan genocide and related violence, partially as a legacy of failed colonial rule.

126.    At different times, while Mr. Rusesabagina was at his home in San Antonio, Texas, or traveling around the United States, he received communications on his cellphone via WhatsApp

---

[50] https://ipc.umich.edu/video/2014/paul-rusesabagina-20-years-after-rwandan-genocide

from a man who identified himself as Mr. Constantin Niyomwungere, whom he had met in Belgium in 2017, and who claimed to be a Bishop.

127.    During the period of 2018-2020 there were numerous communications—both calls and texts—from Mr. Niyomwungere to Mr. Rusesabagina.

128.    During 2019 and 2020, Mr. Niyomwungere and Mr. Rusesabagina were in regular communication about a trip to Burundi.

129.    Mr. Rusesabagina spoke to Mr. Niyomwungere regarding his idea for addressing conflict in the Great Lakes Region. Mr. Rusesabagina would update friends and associates, including Kitty Kurth[51], regarding these communications.  His wife enjoyed hearing about these discussions because she believed the "Bishop" was a "man of god", which she greatly respected. During a trip by a group of friends and associates to visit Mr. Rusesabagina in late January and early February 2020 in San Antonio, Texas, Mr. Rusesabagina spoke of a potential Burundi trip yet again, but this time he sounded much more definitive.  Mrs. Kurth had already heard a great deal about the possible trip to Burundi and communications with Mr. Niyomwungere, but it sounded to her this time that the trip would go forward in the near future.

130.    Mr. Niyomwungere invited Mr. Rusesabagina to speak at churches in Burundi and with leaders there about his personal experiences in 1994. The visit was scheduled from August 26, 2020 – September 2, 2020. Mr. Rusesabagina was told he would be compensated for this speaking engagement.

---

[51] "As the Senior Communications and Strategy Advisor for the Hotel Rwanda Rusesabagina Foundation, Kurth has been instrumental in guiding the message and activities of the foundation, helping it become a leading voice globally for truth and reconciliation in Rwanda and the Great Lakes Region of Africa." https://kurthlampe.com/kitty-kurth

131.    With this trip, Mr. Rusesabagina sought to reinvigorate the speaking tours and engagements, and wished to continue speaking to churches and universities about his experiences, genocide, and the need for a peace and truth and reconciliation commission to support sustainable peace.

132.    Because the Rwandan government kidnapped Mr. Rusesabagina and stole his phone, the Rwandan government has possession of all the evidence regarding the precise timing and number of communications between Mr. Rusesabagina and Mr. Niyomwungere.   The Rwandan government also has illegally imprisoned Mr. Rusesabagina and severely curtailed his communications with outside parties by torturing him, threatening his life,  and monitoring any communications which do occur, including those with his lawyers  In a practice that started in December 2020, all case-related materials were confiscated from Mr. Rusesabagina himself, following visits by his lawyers.  Since April 2021, Mr. Rusesabagina's lawyers have not been permitted to carry any documents into prison for their meetings with him.  From the time of his kidnapping on August 27, 2020 until November 2, 2020, the Rwandan government did not allow Mr. Rusesabagina to have a lawyer of his own choosing.  The only other witnesses to the illegal conspiracy are Rwandan government agents, employees, or officials.

133.    Mr. Niyomwungere has admitted that he collaborated with the Rwanda Investigation Bureau ("RIB") to bring Mr. Rusesabagina to Rwanda.  Mr. Niyomwungere further alleged that RIB agents threatened him with prosecution because of his links to Mr. Rusesabagina.

134.    On February 27, 2020, Mr. Niyomwungere had been arrested in Kigali, and interviewed by RIB Investigator Michel Mbazabagabo. He was informed that he was accused of having "collaborated with people who are in a terrorist organization, FLN, whose objective is to destabilize the security of Rwanda, those people are Paul Rusesabagina and Wilson Irategeka",

which qualified as being a member of a terrorist organization and having committed acts of terrorism under Rwandan law.  After two days of interviews on February 27-28, 2020, the RIB released Mr. Niyomwungere.

135.    During the interview, Mr. Niyomwungere promised the RIB that he would provide them with any information he could gather about Mr. Rusesabagina.  He affirmed that collaboration by, among other things, revealing the plans for Mr. Rusesabagina to travel to Burundi and coordinating with RIB to bring about the kidnapping.

136.    From that point on, Mr. Niyomwungere worked with RIB to bring Mr. Rusesabagina away from his safe haven in the United States and into Rwanda where the RIB could illegally imprison him and extract a confession through torture.

137.    Mr. Rusesabagina told Mr. Niyomwungere that he could not travel to certain countries because of his fear that Rwandan secret police would seize him and illegally imprison him, so Mr. Niyomwungere falsely offered him assurances of a route through Dubai, where he knew Mr. Rusesabagina would be seized.[52]

138.    Mr. Rusesabagina told Mr. Niyomwungere that he feared taking a commercial flight to Burundi because such a flight could be diverted to Rwanda. To falsely reassure him, Niyomwungere suggested to Mr. Rusesabagina that the two meet in Dubai, where Mr. Niyomwungere could rent a private jet to fly him to Burundi.

139.    On August 26, 2020, Mr. Rusesabagina flew from San Antonio to Chicago, and then to Dubai, UAE.  He arrived in Dubai just before 7:00pm local time on August 27 and called his family at approximately 11:00pm to tell them he had arrived safely.  From there, with Mr.

---

[52] *Id.*

Niyomwungere, he boarded a GainJet private jet he believed would take him to Bujumbura, Burundi.  Instead, on the morning of August 28, 2020, the plane landed in Kigali, Rwanda.

140.    GainJet officers and employers must have been aware that they were flying to Kigali, Rwanda, rather than to Bujumbura, Burundi. Mr. Rusesabagina questioned the pilots and the staff on the flight, and they all assured him they were flying to Burundi. As such, they must have been included in the plan to bring Mr. Rusesabagina to Rwanda without his knowledge.

141.    Through its social media, GainJet proudly showcases its dealings in Rwanda. It frequently provides charter flights for Rwandan government officials, and it even boasts about President Kagame as a member of its customer base.  In 2014, GainJet launched GainJet Africa in Kigali, Rwanda.

142.    Mr. Rusesabagina never sleeps during flights but fell asleep during the flight between Dubai and Kigali, only coming awake as the plane descended into Kigali, which he recognized from local landmarks. He believes he was drugged.

143.    As Mr. Niyomwungere testified in court, "[m]yself, the pilot and cabin crew knew we were coming to Kigali . . . . The only person who didn't know where we were headed was Paul [Rusesabagina]." Mr. Niyomwungere also stated that he purposefully distracted Mr. Rusesabagina whenever he inquired about the destination of the flight.

144.    After the plane landed, Mr. Niyomwungere left the plane and returned with Rwandan security agents who seized Mr. Rusesabagina.  The security agent who had conspired with Mr. Niyomwungere to set up the plan that would lure Mr. Rusesabagina from Texas was among the group that bound Mr. Rusesabagina and took him from the plane after it had landed in Kigali.  Rwandan security agents threw Mr. Rusesabagina, who was bound, in a car "as a tree trunk".

145.    According to Rwandan Justice Minister Busingye, and other sources, the Rwandan government paid for the flight from Dubai to Kigali.[53]  Mr. Niyomwungere stated that the RIB provided the jet because of his surveillance and informing of Mr. Rusesabagina's plans.

## THE RWANDAN GOVERNMENT DIRECTED THE KIDNAPPING PLOT, AND ADMITTED IT

146.    On August 31, 2020, the RIB announced its first version of Mr. Rusesabagina's arrest in a tweet that Rwandan authorities had, "through international cooperation," arrested Mr. Rusesabagina and taken him into custody.[54] The specifics of the "international cooperation" have never been provided. The RIB tweet was re-tweeted on the same day by Johnston Busingye, Minister of Justice and Attorney General for Rwanda, who lauded arrests taking place "thanks to international cooperation."[55] The RIB also announced via a tweet that Mr. Rusesabagina "is suspected to be the founder, leader, sponsor and member of violent, armed, extremist terror outfits including MRCD and PDR-Ihumure, operating out of various places in the region and abroad"[56] and that he was the subject of an "International Arrest Warrant." The specifics of this "International Arrest Warrant" have never been provided.

147.    The UAE denied the first version of this story, with an official confirming that, there is no agreement between the UAE and Rwanda to extradite criminals or wanted people.

---

[53] Mudge, Lewis. "Rwandan Judiciary Under Scrutiny." Human Rights Watch. 02 March, 2021. available at https://www.hrw.org/news/2021/03/02/rwandan-judiciary-under-scrutiny.

[54] Rwanda Investigation Bureau (@RIB_Rw), Twitter, 31 August 2020, available at https://twitter.com/RIB_Rw/status/1300350300377710594

[55]  Busingye Johnston, Minister of Justice and Attorney General, Republic of Rwanda (@BusingyeJohns), Twitter, 31 August 2020, available at https://twitter.com/BusingyeJohns/status/1300409898967199744

[56] Rwanda Investigation Bureau (@RIB_Rw), Twitter, 31 August 2020, available at https://twitter.com/RIB_Rw/status/1300350302248464384

According to the official, Mr. Rusesabagina was only present in Dubai for five hours before he departed "legally" in a private jet from Al Maktoum airport just after midnight on August 28, 2020.

148.    Later, on December 21, 2020, the UAE further explained that Mr. Rusesabagina "was not detained and no legal measures were taken in his regard . . . he was not the subject of any notices from the International Criminal Police Organization (INTERPOL) or from any other organization. He was not obstructed in any way . . . . Moreover, there are no memorandums of security cooperation between the United Arab Emirates and the Government of Rwanda and, in any case, no security notice existed against this person."[57]

149.    In Rwanda's second version of his arrest, on September 6, 2020, Rwandan President Kagame appeared on national television and admitted that Mr. Rusesabagina had been "lured" or tricked into coming to Rwanda[58]:

> It's like if you fed somebody with a false story that, you know, fits well in his narrative of what he wants to be and he follows it and then finds himself in a place like that…There was no kidnap. There was not any wrongdoing in the process of his getting here. He got here on the basis of what he believed and wanted to do. It is like dialing, you are calling a number. You want to get in touch with somebody, and you find you have called a wrong number. That is how it happened. So, there was no kidnap. It was actually flawless.[59]

---

[57] Permanent Mission of the United Arab Emirates in Geneva, Ref: 2/3/32 – 362, 21 December 2020
https://spcommreports.ohchr.org/TMResultsBase/DownLoadFile?gId=35816.

[58] A. L. Dahir, "Rwanda Hints It Tricked 'Hotel Rwanda' Dissident Into Coming Home," THE NEW YORK TIMES, 6 September 2020, available at
https://www.nytimes.com/2020/09/06/world/africa/paul-rusesabagina-hotel-rwanda-arrest.html (last accessed 6 October 2020).

[59] Rwanda TV, "President Kagame discusses Rusesabagina's arrest, crimes and how he arrived in Kigali", 06 September 2020, available at
https://www.youtube.com/watch?v=LvG-cqnknKg?t=365

150.    President Kagame's inside view and admissions regarding the kidnapping plot confirm his role in the conspiracy, either he had advance knowledge and directed the plot or later affirmed it.

151.    The head of Rwanda's National intelligence and Security Services (NISS), Brig. Gen. Joseph Nzabamwita commented that:

> Well it was quite flawless, and I should say one of the best operations that any country can ever conduct. . . . That's why I told you that this was one of the best intelligence operations. . . . I actually executed it right from the planning to the full execution, when he landed in Kigali. . . . He went for his COVID test, bought his [air ticket].[60]

152.    Later, in February 2021, President Kagame again confirmed the Rwandan conspiracy to kidnap Mr. Rusesabagina from the U.S. when speaking with a CNN reporter, Richard Quest:

> KAGAME: It was very proper and legal. In fact, he more or less brought himself, you see, whether he was acting on wrong signals, but he went by those signals to continue the journey of doing the wrong things he had been doing in the past. So, I don't see --
> QUEST: He got on a plane intending to go to one destination.
> KAGAME: You know which one that is?
> QUEST: He was bound and gagged and brought to this destination.
> KAGAME: You know which destination --
> QUEST: Tell me.
> KAGAME: He was going to Burundi.
> QUEST: Exactly.
> KAGAME: He wasn't going to Dubai as some of the people have said. Dubai was just a transit like Chicago was a transit. He came all the way from the United States.
> QUEST: But he didn't expect to end up in Kigali.
> KAGAME: Well, I don't mind what he expected. If he expected to go to Burundi to connect with the people he has been working with or leading into the destabilization of our country, what sympathies do I owe him or anybody?
> QUEST: Did the government of Rwanda have a hand in bringing him to Kigali? Did you--was the government responsible for renditioning him to Kigali?

---

[60] The Daily Podcast, "A Battle for the Soul of Rwanda," NEW YORK TIMES, 18 February 2020, available at https://www.nytimes.com/2021/02/18/podcasts/the-daily/hotel-rwanda-paul-rusesabagina-trial.html?showTranscript=1.

KAGAME: No, no, no. *Bringing him or guiding him to come to Kigali and rendition means like that--that seem to be illegal. Totally different things.* Absolutely. Now, if somebody, for him, he was working with somebody in Burundi, right, in the same plot of destabilizing our country and the same person, for example, decided to drive him to Kigali, the person he was working with and he had trusted and the government was working with that person he trusted. How does the government become culpable for that cooperation?[61]

153.    Here President Kagame affirms the kidnapping plot and admits that Rwanda's role in luring Mr. Rusesabagina to Kigali would constitute an illegal act or a rendition.  "Bringing him or guiding him to come to Kigali and rendition means like that--that seem to be illegal. Totally different things." Later the world learned that the Rwandan government employed Mr. Niyomwungere to deceive Mr. Rusesabagina and lure him to Kigali.

154.    In an interview with Al Jazeera on February 26, 2021, Johnston Busingye, the Minister of Justice, affirmed that the Rwandan government paid for the flight that transported Mr. Rusesabagina to Kigali.[62] He claimed that "the payment was to facilitate the plan of [a person operating with Rusesabagina] to transport Rusesabagina to Rwanda."[63]  This confirms the Rwandan government's advance knowledge of the plot to divert Mr. Rusesabagina from his intended destination (Burundi) to Rwanda and Rwanda's critical role in that plot.

155.    Thus, the Rwandan government admitted to intentionally luring Rusesabagina, under false pretenses, from his home in the United States to Rwanda—a country to which he would

---

[61] Interview with Richard Quest, CNN Business Anchor, February 2021, Reported on 17 February 2021. CNN.com - Transcripts; (emphasis added) http://www.cnn.com/TRANSCRIPTS/2102/17/qmb.01.html.

[62] February 26, 2021 Al Jazeera Interview; Rwanda Ministry of Justice (@Rwanda_Justice), Twitter, 26 February, 2021 (The Ministry of Justice tweeted a clarification to the Al Jazeera interview, in which it confirmed the Minster's statement that the government paid for the flight that transported Mr. Rusesabagina to Kigali.), https://twitter.com/Rwanda_Justice/status/1365375804423561216.

[63] February 26, 2021 Al Jazeera Interview, (emphasis added).

have never voluntarily returned, so long as the Kagame regime was in power, for legitimate fear of his life.

156.    Because RIB agents had conspired with Mr. Niyomwungere to lure Mr. Rusesabagina out of Texas to Rwanda, and the RIB and the Rwandan Minister of Justice led the communications effort to mislead the world about the kidnapping plot, it is clear that the RIB and the Rwandan Minister of Justice played principal roles in the plot from beginning to end.

157.    Everyone in the conspiracy, from Mr. Niyomwungere to the RIB agents he worked with in the plot to lure Mr. Rusesabagina from Texas to Dubai, where he would be kidnapped, knew the purpose of the conspiracy—to deliver Mr. Rusesabagina to the Rwandan security services in Kigali.

158.    As stated by the Lantos Foundation, Minister Busingye played a key role in the kidnapping plot:

> Lantos Foundation President Dr. Katrina Lantos Swett has written directly to British Foreign Secretary Dominic Raab, encouraging him to reject the credentials of Mr. Busingye based on the evidence that he played a key role in the extraordinary rendition and kidnapping of Paul Rusesabagina, the real-life hero depicted in the film *Hotel Rwanda*, in late August 2020. At the time of Mr. Rusesabagina's kidnapping and subsequent arrest, Mr. Busingye served as Rwanda's Minister of Justice, the agency which has overseen Rusesabagina's capture, imprisonment and subsequent sham trial. Then-Minister Busingye admitted during a televised interview on Al Jazeera in February 2021 that the Rwandan government had paid for the plane that transported Mr. Rusesabagina, against his will and without his knowledge, to Kigali. Mr. Busingye's own statements make his complicity in the kidnapping of Mr. Rusesabagina crystal clear.
>
> In light of the clear evidence of Mr. Busingye's involvement in the kidnapping, the Lantos Foundation filed a formal submission to the U.S. Department of State and U.S. Department of Treasury in May 2021, recommending Global Magnitsky sanctions against Mr. Busingye and another high-ranking official from the Rwanda Investigation Bureau (RIB). The submission made the case that these men played a significant role in grave human rights violations for which they should be held accountable. This submission was simultaneously transmitted to authorities in the

U.K. for consideration. Neither country has taken action to impose sanctions, to date.[64]

159.    The Lantos Foundation also noted the responsibility of Colonel Jeannot Ruhunga:

It can sometimes prove difficult to build a case that establishes government officials' direct involvement in and responsibility for human rights abuses. However, in the case of Paul Rusesabagina's kidnapping, the complicity and responsibility of both Busingye and Ruhunga is crystal clear. Minister Busingye admitted during a televised interview on Al Jazeera in February 2021 that the Rwandan government had paid for the plane that transported Rusesabagina, without his knowledge, to Kigali. Likewise, Colonel Ruhunga, as head of the RIB, not only oversaw the operation to kidnap Rusesabagina but was also named in a recent jailhouse transcript as one of two people who visited Rusesabagina when he was held incommunicado in an unknown location during the three days between the time he was kidnapped and when he was presented in handcuffs in Kigali.[65]

160.    Rwandan Justice Minister Busingye admitted to RIB's conspiracy with Mr. Niyomwungere to kidnap Mr. Rusesabagina during an interview with Al Jazeera:

There is a person who was operating with Rusesabagina for a long time, who was an interest of our public criminal investigation department, who accepted to turn him in and the payment was to facilitate the plan of this man to transport Rusesabagina to Rwanda," he added. "The government did not play a role in transporting him. It was facilitating this gentleman who wanted to bring him to Rwanda."[66]

161.    While Minister Busingye insisted that his government did not "play a role in transporting him", his government threatened Mr. Niyomwungere into participating in the kidnapping plot, contrived the kidnapping plot with Mr. Niyomwungere, and paid for Mr.

---

[64] https://www.lantosfoundation.org/news/2021/9/9/lantos-foundation-calls-on-uk-foreign-ministry-to-reject-credentials-of-newly-appointed-rwandan-ambassador
[65] https://www.lantosfoundation.org/news/2021/6/7/lantos-foundation-calls-for-magnitsky-sanctions-in-paul-rusesabagina-case
[66] https://network.aljazeera.net/pressroom/rwanda%E2%80%99s-minister-justice-johnston-busingye-tells-upfront-rwanda-paid-plane-transported

Rusesabagina's transportation to Kigali—the Rwandan government led the plot from beginning to end.

162.    Even the Rwandan High Court has confirmed in a ruling that Mr. Rusesabagina was tricked into coming to Rwanda.

163.    In Rwandan court proceedings, Mr. Niyomwungere again confirmed his role in the conspiracy, stating that he worked with the RIB to trick Mr. Rusesabagina onto a private plane that he believed was going to neighboring Burundi, but instead flew to Kigali.

## PAUL RUSESABAGINA HAS BEEN TORTURED BY RWANDAN SECURITY SERVICES AND DENIED HIS CHOICE OF LEGAL REPRESENTATION

164.    The State Department 2019 Country Report on Human Rights Practices, Rwanda, reported that "[t]he constitution and law prohibit such practices [torture], but there were numerous reports of abuse of detainees by police, military, and National Intelligence and Security Services (NISS) officials."[67]

165.    When Mr. Rusesabagina was delivered to Kigali, he was held in an unknown and unannounced location for three days, where he was bound and blindfolded during interrogation. Rwandan officials kept his arms and legs tied up almost the entire period, even having to hold him up so he could defecate because they refused to untie him.  He was untied and unblindfolded only once during this period. He lost any notion of time.

166.    The State Department 2019 Country Report on Human Rights Practices, Rwanda, reported that "[h]uman rights advocates reported numerous instances of illegally detained individuals tortured in unofficial detention centers."

---

[67] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/rwanda/

167.     As he testified, "I call that place the slaughterhouse," he said, according to an affidavit. "I could hear persons, women screaming, shouting, calling for help."

168.     Between August 27–31, 2020 Rwandan authorities would not allow any family member, counsel or diplomatic representative to speak with Mr. Rusesabagina and gave no reason for his detention.

169.     Rwandan authorities tortured Mr. Rusesabagina during this period.   Michel Mbazabagabo, the RIB agent who had conspired with Mr. Niyomwungere to trick him into coming to Dubai, led the torture.   For example, the agent, wearing military boots, would step on Mr. Rusesabagina's neck and tape his mouth and nose while he was tied up, making it almost impossible to breath.   the abuse caused Mr. Rusesabagina's legs to convulse involuntarily due to lack of oxygen.   Mr. Rusesabagina feared for his life and suffered severe pain during the torture.

170.     The Rwandan authorities boasted to Mr. Rusesabagina that "we know how to torture."   Mr. Rusesabagina lost almost 20 pounds due to the torture.   As a result of the earlier torture, Mr. Rusesabagina continues to fear for his life.

171.     Havugiyaremye Aimable, the Rwandan Prosecutor General, and Jeannot Ruhunga, the Secretary General of the RIB, visited Mr. Rusesabagina and demanded that he confess that the President of Zambia gave him money for the FLN[68], and they would release him.

172.     As head of the RIB, Jeannot Ruhunga was responsible for Mr. Rusesabagina's treatment while in this facility.

173.     On September 14, 2020, Mr Rusesabagina appeared for the first time in front of a judge, eighteen days after his arrest. The hearing was held before the Kicukiro Primary Court, at which Mr Rusesabagina was formally charged.

---

[68] National Liberation Front, an opposition group against President Kagame.

174.    The State Department 2019 Country Report on Human Rights Practices, Rwanda, reported that "[a]dvocates asserted that military, police, and intelligence personnel employed torture and other cruel, inhuman, or degrading treatment or punishment to obtain information and elicit confessions before transferring the individuals to formal detention facilities."

175.    Rwandan authorities forced Mr. Rusesabagina to confess prior to allowing him access to any lawyers—a lawyer was not assigned to him until September 5, 2020.  Even then, Rwandan authorities assigned lawyers to Mr. Rusesabagina that he did not choose, and Rwandan authorities refused to allow lawyers of his choosing to participate, although he eventually was given access to lawyers of his own choosing.

176.    Any so-called confessions, admissions, or statements made by Mr. Rusesabagina at this time are invalid as procured through, torture, harsh conditions, and without any legal representation or due process.

177.    From the time of his kidnapping on August 27, 2020 until November 2, 2020, the Rwandan government did not allow Mr. Rusesabagina to have a lawyer of his own choosing.  Mr. Rusesabagina's family then engaged the services of the former President of the Rwandan Bar Association, Maitre Gatera Gashabana.   Mr. Gashabana then visited the police station on September 2, 2020 twice in an effort to meet his client, but was denied access.  Instead, the Rwandan government hand-picked a lawyer from Rwandan Bar Association ("RBA"), whose fees are paid by the Rwandan government.  The RBA lawyer held a press conference and claimed that Mr. Rusesabagina had chosen him, but the family denies this.  Additionally, RBA lawyers are only appointed if the defendant is unable to pay for his own attorney, and Mr. Rusesabagina has the means to do so.

178.    In view of Mr. Rusesabagina's experience with officials of the Rwandan government and the corruption of the Rwandan legal system, he could not trust lawyers appointed by the government which had kidnapped and tortured him.  As noted by the U.S. State Department 2020 Country Reports on Human Rights Practices, "outcomes in high-profile genocide, security, and politically sensitive cases appeared predetermined."[69]

179.    On October 3, 2020, Mr. Rusesabagina's lawyer in Belgium, Vincent Lurquin, arrived in Rwanda, and sought access to his client. He was told he would need the authorization of the *Bâtonnier* of the RBA, Mr. Julien Kavarugenda.  Mr. Kavarugenda would neither meet with Mr Lurquin, nor take his calls.  On October 10, 2020, Mr. Lurquin left Rwanda without having seen his client.  The Rwandan authorities finally allowed Mr. Rusesabagina to have lawyers of his own choosing on November 2, 2020, although Mr. Gashabana could not represent Mr. Rusesabagina in court until November 27, 2020.

180.    Rwandan authorities restricted Mr. Rusesabagina's access to his lawyers and sometimes refuse their access to prison, such as on January 2, 2021.

181.    Since December 2020, the Rwandan prison authorities have confiscated any documents brought by the lawyers to prison, including privileged and confidential documents marked as such that were directly relevant to the preparation of his defense. In the lead up to his trial, Mr. Rusesabagina had no access to the casefile against him, which was comprised of approximately 5,000 documents, or even to a pen and paper. After his lawyers served the court with a request for time and resources to prepare, Mr. Rusesabagina was given a laptop which purported to give him access to the 5,000 documents, but they were not organized in any

---

[69] https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/rwanda/

manageable or meaningful way, and he was given no additional time to review them and give instructions to his lawyers before the trial started.

182.    Mr. Rusesabagina has not been able to hold privileged and confidential discussion or communications with his lawyers. For example, on April 23, 2021, Rwandan authorities informed Mr. Rusesabagina's lawyers that they were not allowed to bring any papers or information into prison for their meetings with Mr. Rusesabagina unless the authorities were able to review them first. Furthermore, prison officials have arbitrarily seized documents from Mr. Rusesabagina's lawyers and not allowed Mr. Rusesabagina access to them. This also means that Mr. Rusesabagina is not able to sign any affidavits or documents that his lawyers would bring to him, hampering his defense and denying him the right to communicate with the outside world about his treatment and conditions. Since April 2021, Mr. Rusesabagina's lawyers have not been permitted to carry any documents into prison for their meetings with him.

183.    The Rwandan authorities have refused proper and consistent medical care for Mr. Rusesabagina who suffers from hypertension, cardiovascular disease, and is a cancer survivor.

184.    His symptoms have continued to worsen during his illegal imprisonment while the Rwandan authorities refuse him adequate medication. Mr. Rusesabagina's family has provided this medication to Rwandan authorities, but they refused to distribute it to him in a consistent manner or in the necessary dosage.

185.    Mr. Rusesabagina's treating doctor in Belgium has stated: "The interruption or modification of antihypertensive treatment and intense stress of all kinds carries a risk of severe hypertensive attacks and complications such as a stroke. It is reported to me that his hypertension is currently severe despite a triple antihypertensive, requiring management in a specialized center."

186.     Rwandan authorities held Mr. Rusesabagina in solitary confinement for over 245 days. The UN Mandela Rules for the Treatment of Prisoners state that any period over 15 days in solitary confinement amounts to torture. According to the UN Office of the High Commissioner for Human Rights[70]: "The Mandela Rules, updated in 2015, are a revised minimum standard of UN rules that defines solitary confinement as 'the confinement of prisoners for 22 hours or more a day without meaningful human contact.' Solitary confinement may only be imposed in exceptional circumstances, and 'prolonged" solitary confinement of more than 15 consecutive days is regarded as a form of torture.'"

187.     Mr. Rusesabagina fears that he will die of a stroke or other ailment from the Rwandan authorities' refusal to provide proper medical care.

188.     On at least one occasion the Rwandan authorities threatened to withhold food, medicine, and water to compel Mr. Rusesabagina's participation in the sham legal proceedings against him.

189.     Additionally, the Rwandan authorities do not provide Mr. Rusesabagina with proper nutrition or water.

190.     The State Department 2019 Country Report on Human Rights Practices, Rwanda, reported that "[S]ome defendants alleged in court they had been tortured while in detention, but there were no reports of any judges ordering an investigation into such allegations or dismissing evidence obtained under torture, and there were no reported prosecutions of state security forces personnel for torture."

---

[70] "The Office of the High Commissioner for Human Rights (UN Human Rights) is the **leading UN entity on human rights**. We represent the world's commitment to the promotion and protection of the full range of human rights and freedoms set out in the Universal Declaration of Human Rights."  https://www.ohchr.org/EN/AboutUs/Pages/WhoWeAre.aspx (emphasis in original).

191.    Because Rwanda continues to illegally hold Mr. Rusesabagina as well as monitor and regulate his communications, Mr. Rusesabagina cannot file a complaint. Thus, Anaïse Umubyeyi Kanimba files as his next friend.  Because Rwanda continues to illegally hold Mr. Rusesabagina as well as monitor and regulate his communications, Rwanda has interfered with the timely filing of this lawsuit.

192.    Rwanda's has engaged in illegal surveillance of Plaintiffs and interfered in their attempt to pursue justice for Mr. Rusesabagina. The following is only one example:  In April 2021, Mr. Rusesabagina informed his Rwandan lawyer, Mr. Jean-Felix Rudakemwa, about the torture inflicted on him between August 27-31, 2021.  The Rusesabagina family and their legal team outside of Rwanda discussed the matter, including on Carine Kanimba's iPhone which at the time was infected with the Pegasus spyware. They then prepared an affidavit for Mr. Rusesabagina to sign, detailing his torture. On April 23, 2021, Mr. Rudakemwa visited the prison in order to have Mr. Rusesabagina sign the affidavit detailing the torture. The Rwandan prison authorities informed Mr. Rudakemwa that, for the first time, his legal visit with Mr. Rusesabagina would be subject to a full search of his possessions and persons, and specifically asked to see a document he was bringing for Mr. Rusesabagina to sign.

193.    As Carine stated, "On April 23, our lawyer in Rwanda was searched when he went to the prison to see my father. The authorities were looking for an affidavit that we wanted my father to sign on the torture that he had received. Our lawyer was searched and asked specifically for this document."  Rwanda could only have known about this information through its continued illegal surveillance of the Plaintiffs.

194.    Despite the many months of preparation that Defendants and their employees and agents spent in concocting and executing their illegal conspiracy to offer a false employment

opportunity to Mr. Rusesabagina in Burundi, and the many months Mr. Rusesabagina sat in isolation in Rwandan jail, the Defendants were unsurprisingly unable to gather useful evidence for use in the 2021 sham trial. After successfully torturing confessions out of Mr. Rusesabagina, their attempts at manufacturing evidence seems to have come to an end.

195.    The trial itself saw the presentation of witnesses against Mr. Rusesabagina: 1) Noel Habiyaremye, a former Rwandan detainee convicted of terrorism, who offered recycled testimony which he had already given against another Rwandan Government opponent in 2013—testimony which had been rejected by the Rwandan trial court in 2013 yet nonetheless coincided with a shortened prison term, and 2) a long-time U.S. paid agent, Ms. Martin, who had an active history of shadowing Mr. Rusesabagina in the United States. Neither had any relevant information for the prosecution, at least in terms of proving the case purportedly at issue before the Rwandan court.

196.    The Defendants did not bother to produce any relevant evidence to support the subsequent conviction of Mr. Rusesabagina. Unsurprisingly, staggering violations of due process riddled the show trial throughout: "Throughout the monitoring, ABA CHR found serious discrepancies and severe violations of Rusesabagina's fair trial rights. Among the procedural flaws documented, the Rwandan authorities violated Rusesabagina's right to confidential communication with a lawyer, his right to adequate facilities to prepare for trial, and his right to the presumption of innocence."[71]

197.    The Human Rights Watch 2022 World Report regarding Rwanda states: "The September conviction and 25-year sentence of critic and political opponent Paul Rusesabagina on charges including murder and membership in a terrorist group after a flawed trial was emblematic

---

[71] https://www.americanbar.org/news/abanews/aba-news-archives/2021/09/rwandan-trial-verdict/#:~:text=WASHINGTON%2C%20D.C.%2C%20September%2020%2C,trial%20as%20part%20of%20the

of the government's overreach and manipulation of the justice system. Rusesabagina was forcibly disappeared and unlawfully returned to Rwanda in August 2020. His trial was marred with fair trial and due process rights violations."[72]

198.    The campaign of the Defendants and their agents, officials, and employees to silence and discredit Mr. Rusesabagina includes and targeted his immediate family.   The Defendants and their agents, officials, and employees conspired to kidnap and torture Mr. Rusesabagina to silence his opposition, both by jailing him and attacking his credibility, but Mr. Rusesabagina's family is the other intended target of this outrageous conduct.   Members of his family have been directly targeted in a coordinated online harassment campaign emanating from the Rwandan government spokesperson, Yolande Makolo.[73]  Ms. Makolo has unleashed a barrage of taunts and insults via Twitter, mainly directed against Mr. Rusesabagina's adopted daughter, Carine[74] but have included Trésor as well.[75]

199.    The attacks by the government spokesperson encourage others to do the same, and have resulted in violent threats.  On October 6, 2020, Tom Ndahiro, the head[76] of the Department of Civil and Political Rights in the Rwandan National Human Rights Commission of Rwanda[77] has publicly stated that Carine deserves the "GoldenMachete."[78]  Goven that the machete was the

---

[72] https://www.hrw.org/world-report/2022/country-chapters/rwanda

[73] https://twitter.com/YolandeMakolo?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor

[74] https://twitter.com/yolandemakolo/status/1364942175528574984?s=21

[75] https://twitter.com/YolandeMakolo/status/1363793199978938369?s=20&t=vugl2J45RyyxehpnR7zzpA

[76] https://hrp.bard.edu/tom-ndahiro/

[77] A commission established by the Rwandan government, https://www.hrw.org/reports/2001/africa/rwanda/rwanda.html

[78] https://twitter.com/tomndahiro/status/1313364569864261632?s=21

weapon of choice during the Rwandan Genocide, the language is meant to threaten, silence, and intimidate, if not a call for violence.

## COUNT I
## CLAIM FOR FRAUD

200.     Plaintiff Paul Mr. Rusesabagina repeats, re-alleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein against all Defendants.

201.     Defendants, and their employees, officers, and agents, conspired to utilize false statements directed at Paul Rusesabagina in Texas to lure him to Rwanda where he could be illegally imprisoned.   Defendants made false statements during phone calls with Paul Rusesabagina describing non-existent speaking opportunities with false promises of pay and employment in Burundi. Defendants made these statements knowing that such opportunities did not exist and that the goal of the scheme was to lure Paul Rusesabagina to Rwanda for imprisonment.  Defendants gave false assurances regarding the safety of travel and avoidance of Rwanda in order to convince Paul Rusesabagina that he would not be exposed to Rwandan security agents.

202.     As a result of the wrongful, illegal, and intentional acts of the Defendants and their employees, officers, and agents, Plaintiff Paul Rusesabagina was caused all of the damages listed in this complaint.

203.     Plaintiff's injuries and damages were caused solely and proximately by the wrongful, negligent, reckless and intentional the acts of Defendants and their employees, officers, and agents.

**WHEREFORE**, Plaintiff Mr. Rusesabagina demand judgment against Defendant in the amount of $40,000,000 and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT II
## CIVIL CONSPIRACY

204.    All Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein against all Defendants.

205.    Defendants and their employees, officers, and agents conspired to solicit the services of Paul Rusesabagina by falsely offering him employment in Burundi, while the actually intending to lure him from Texas to allow him to be kidnapped.

206.    Defendants and their employees, officers, and agents' conspiracy resulted in overt acts which damaged Plaintiffs in the form of loss of liberty, physical and emotional pain and suffering and mental distress.

207.    All of Defendants and their employees, officers, and agents knew the false cover story of employment in Burundi and also knew and intended the actual goal of kidnapping Mr. Rusesabagina.

208.    Defendants and their employees, officers, and agents damaged Plaintiffs in furtherance of their scheme to kidnap, falsely imprison, assault, and batter upon Paul Rusesabagina, and intentionally inflict emotional distress upon all Plaintiffs.

209.    Plaintiffs' injuries and damages were caused solely and proximately by the reckless and intentional acts of Defendants' employees, officers, and agents.

**WHEREFORE**, Plaintiffs demand judgment against Defendant in the amount of $10,000,000, and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT III
## CLAIM FOR SOLATIUM

210.     Plaintiffs Carine Izere Kanimba, Roger Rusesabagina, Taciana Mukangamije Rusesabagina, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein against all Defendants.

211.     Paul Rusesabagina and Taciana Mukangamije were married at the time of the attack, and continued to be married, and their children are Carine Izere Kanimba, Roger Rusesabagina, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina.

212.     As a result of the wrongful, illegal, and intentional acts of the Defendants and their employees, officers, and agents, Plaintiffs Carine Izere Kanimba, Roger Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina live in fear that their father has been tortured and that he will be murdered and have been caused to suffer, and will continue to suffer grief, fear, severe emotional damages, loss of society, affection, assistance, and the parental love and support of their father, all to the detriment of their relationship.

213.     Carine Izere Kanimba, Roger Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina's injuries and damages were caused solely and proximately by the wrongful, negligent, reckless and intentional the acts of Defendants and their employees, officers, and agents.

**WHEREFORE**, Plaintiffs Carine Izere Kanimba, Roger Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane

Rusesabagina, and Trésor Rusesabagina demand judgment against Defendant in the amount of $10,000,000, each, and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT IV
## CLAIM FOR FALSE IMPRISONMENT

214.    Plaintiff Paul Rusesabagina repeats, re-alleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein against all Defendants, acting through their employees, agents, and co-conspirators.

215.    Defendants Rwanda, President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye, acting through their employees, agents, and co-conspirators arbitrarily detained, restrained, and/or falsely imprisoned Plaintiff Paul Rusesabagina within Rwanda without his consent.  Such detention, restraint and/or false imprisonment was illegal and unjust, and carried out without any lawful authority or justification.

216.    Plaintiff's injuries and damages were caused solely and proximately by the reckless and intentional acts of the Defendant's employees, officers, and agents.

**WHEREFORE**, Plaintiff Paul Rusesabagina, demands judgment against Defendants in the amount of $10,000,000 and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT V
## CLAIM FOR ASSAULT

217.    Plaintiff Paul Rusesabagina repeats, re-alleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein against all Defendants, acting through their employees, agents, and co-conspirators.

218.   Defendants Rwanda, President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye, acting through their employees, agents, and co-conspirators employees, officers, and agents acted intentionally to cause harmful and offensive contact to Plaintiff.

219.   Defendants Rwanda President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye, acting through their employees, agents, and co-conspirators acted in concert to intentionally put Plaintiff Paul Rusesabagina in imminent apprehension of such harmful contact.

220.    Plaintiff Paul Rusesabagina suffered physical, mental and emotional damages as a result of the intentional acts of the Defendants, acting through their employees, agents, and co-conspirators, who were acting jointly and in concert.

221.   Plaintiff's injuries and damages were caused solely and proximately by the reckless and intentional acts of Defendants and their employees, officers, and agents.

**WHEREFORE**, Plaintiff Paul Rusesabagina demands judgment against Defendants in the amount of $10,000,000 and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT VI
## CLAIM FOR BATTERY

222.   Plaintiff Paul Rusesabagina repeats, re-alleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein against all Defendants, acting through their employees, agents, and co-conspirators.

223.   Defendants Rwanda, President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye, acting through their employees, agents, and co-conspirators acted intentionally to, and did cause harmful and offensive contact to Plaintiff.

224.    Defendants Rwanda, President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye, acting through their employees, agents, and co-conspirators acted in concert to intentionally put Plaintiff Paul Rusesabagina in imminent apprehension of such harmful contact.

225.    Plaintiff Paul Rusesabagina suffered physical, mental and emotional damages as a result of the intentional acts of the Defendants, through their agents, who were acting jointly and in concert.

226.    Plaintiff's injuries and damages were caused solely and proximately by the reckless and intentional acts of Defendants and their employees, officers, and agents.

**WHEREFORE**, Plaintiff Paul Rusesabagina demands judgment against Defendants in the amount of $10,000,000 and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT VII
## CLAIM FOR INTENTIONAL INFLICTION OF
## EMOTIONAL DISTRESS

227.    All Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein against all Defendants.

228.    Defendants and their employees, officers, and agents kidnapped, attacked, tortured, and slandered Paul Rusesabagina, subjected him to an internationally-covered sham trial, convicted him of false charges, and sentenced him to life in prison for these false charges. Such conduct is extreme, outrageous and undertaken with the intent (or alternatively, was undertaken recklessly) to cause Plaintiffs severe emotional distress.

229.    Defendants and their employees, officers, and agents acted jointly and in concert and had the effect of causing Plaintiffs severe emotional distress.

230.    Plaintiffs' injuries and damages were caused solely and proximately by the reckless and intentional acts of Defendants and their employees, officers, and agents.

**WHEREFORE**, Plaintiffs demand judgment against Defendants in the amount of $20,000,000, each, and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT VIII
## CLAIM FOR LOSS OF CONSORTIUM

231.    Plaintiffs Paul Rusesabagina and Taciana Mukangamije repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein against all Defendants.

232.    Paul Rusesabagina and Taciana Mukangamije were married at the time of the attack and continued to be married.

233.    As a result of the wrongful, illegal, and intentional acts of the Defendants and their employees, officers, and agents, Plaintiffs Paul Rusesabagina and Taciana Mukangamije were caused to suffer, and will continue to suffer, loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

234.    Paul Rusesabagina and Taciana Mukangamije's injuries and damages were caused solely and proximately by the wrongful, negligent, reckless and intentional the acts of Defendants and their employees, officers, and agents.

**WHEREFORE**, Plaintiffs Paul Rusesabagina and Taciana Mukangamije demand judgment against Defendants in the amount of $10,000,000, each, and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

## COUNT IX
## TORTURE VICTIM PROTECTION ACT, 28 U.S.C. § 1350 note

235.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

236.    At all times relevant herein, Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye acted through their officials or employees who were acting within the scope of their office or employment.

237.    Defendants' employees, officers, and agents kidnapped, attacked, tortured, and slandered Paul Rusesabagina and subjected him to an internationally-covered sham trial, convicted him of false charges, and sentenced him to life in prison for these false charges.

238.    Paul Rusesabagina has been under the physical control of Defendants since his illegal kidnapping

239.    Paul Rusesabagina endured severe physical pain and lost nearly 20 pounds after days of extreme physical torture.

240.    Paul Rusesabagina was tortured to extract a false confession.

241.    President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye are responsible for Paul Rusesabagina's kidnapping, false imprisonment, and the terrible conditions he endures daily.  Because of the incidents of physical torture, denial of medicine and medical treatment, inconsistent provision of food, and the brutality and arbitrariness of his treatment, Paul Rusesabagina fears his imminent death—yet another form of mental torture.  And because Defendants' employees, officers, and agents have tortured Paul Rusesabagina, boasting they know how to torture, he is under the constant fear that he will be tortured again.

242.    Paul Rusesabagina's torture continues at times to attempt to extract his cooperation with the sham trial proceedings.

243.    Rwandan authorities held Mr. Rusesabagina in solitary confinement for over 245 days. The UN Mandela Rules for the Treatment of Prisoners state that any period over 15 days in solitary confinement amounts to torture. According to the UN Office of the High Commissioner for Human Rights: "The Mandela Rules, updated in 2015, are a revised minimum standard of UN rules that defines solitary confinement as 'the confinement of prisoners for 22 hours or more a day without meaningful human contact.' Solitary confinement may only be imposed in exceptional circumstances, and 'prolonged' solitary confinement of more than 15 consecutive days is regarded as a form of torture.'"

244.    Defendants and their employees, officers, and agents acted jointly and in concert and had the effect of causing Plaintiff's severe emotional distress.

245.    Defendants and their employees hatched and executed their conspiracy under the cloak of the authority of their respective offices, and thus acted "under the color of law." Defendants and their employees have authorized and inflicted Rusesabagina's torture and cruel and degrading treatment under the cloak of the authority of their respective offices, and thus acted "under the color of law" and continue to do so.  Then actions of Defendants and their employees have perverted and degraded their offices.  Their cruel, degrading, and barbaric conduct corrupts every person involved.

246.    Plaintiffs' injuries and damages were caused solely and proximately by the reckless and intentional acts of Defendants' employees, officers, and agents.

**WHEREFORE**, Plaintiff Paul Rusesabagina demands judgment against President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister

Busingye in the amount of $50,000,000, and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

**COUNT X**
**VIOLATION OF THE LAW OF NATIONS, 28 U.S.C. § 1350**
**VIOLATION OF PROHIBITION ON ENFORCED DISAPPEARANCES**

247.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth full herein.

248.    At all times relevant herein, Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye acted through their officials or employees who were acting within the scope of their office or employment.

249.    Plaintiffs Paul Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina are "aliens" for purpose of the Alien Tort Statute.

250.    The Alien Tort Statute was enacted in 1789 in response, in part, to an assault and battery upon a French Ambassador in violation of international law, including principles now found in the Vienna Convention on Diplomatic Relations and other authorities.

251.    Intentional infliction of emotional distress, assault, false imprisonment, and battery are torts. The torts in this action were committed by agents, employees, and officials acting at the instruction of Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye in violation of international law. Specifically, the torts were committed in violation of the prohibition in international law against abduction, extraordinary rendition, and forced disappearance of Mr. Rusesabagina. These actions violated customary international law prohibiting extraordinary rendition and persecution as reflected, expressed,

defined, and codified in customary international law, multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities. Thus, violations of this norm are cognizable under 28 U.S.C § 1350.

252.    Rwanda's frequent but unlawful practice of enforced disappearances has regularly been noted in human rights reports, including in the U.S. State Department's Annual Human Rights Report.[79] There are a number of documented cases where an individual was disappeared either inside the country or outside the country, reported missing by their family, and, in cases where they reappeared, did so in police/state custody.

253.    The Rome Statute of the International Criminal Court is a multilateral treaty, adopted in 1998, created the International Criminal Court and established the international crimes over which it has jurisdiction. The Rome Statute lists enforced disappearance in person as a crime against humanity and defines it as "the arrest, detention or abduction of persons by, or with the authorization, support or acquiescence of, a State or a political organization, followed by a refusal to acknowledge that deprivation of freedom or to give information on the fate or whereabouts of those persons, with the intention of removing them from the protection of the law."[80]

254.    This pattern of enforced disappearances conflicts with the United Nation's International Convention for the Protection of All Persons from Enforced Disappearance, which clearly states that "no exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification for enforced disappearance." This Convention also states that "the widespread or systematic

---

[79] U.S. Department of State, Bureau of Democracy, Human Rights and Labor. 2019 Country Reports on Human Rights Practices. Available at: https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/rwanda/

[80] Rome Statute of the International Criminal Court art. 7, July 17, 1998, 2187 U.N.T.S. 3.

practice of enforced disappearance constitutes a crime against humanity as defined in applicable international law and shall attract the consequences provided for under such applicable international law."[81]

255.    According to the Declaration on the Protection of All Persons from Enforced Disappearance, adopted by the U.N. General Assembly in 1992, enforced disappearances occur when persons are arrested, detained or abducted against their will or otherwise deprived of their liberty by officials of different branches or levels of Government… followed by a refusal to disclose the fate or whereabouts of the persons concerned or a refusal to acknowledge the deprivation of their liberty, which places such persons outside the protection of the law.[82]

256.    The Inter-American Convention on Forced Disappearance of Persons, adopted in 1994, defines forced disappearance of persons as the act of depriving a person or persons of his or her freedom, in whatever way, perpetrated by agents of the state or by persons or groups of persons acting with the authorization, support, or acquiescence of the state, followed by an absence of information or a refusal to acknowledge that deprivation of freedom or to give information on the whereabouts of that person, thereby impeding his or her recourse to the applicable legal remedies and procedural guarantees.[83]

257.    The International Covenant on Civil and Political Rights is a multilateral

---

[81] United Nations, Office of the High Commissioner, International Convention for the Protection of All Persons from Enforced Disappearance. (2006, December 20). Available from: https://www.ohchr.org/en/hrbodies/ced/pages/conventionced.aspx

[82] U.N. General Assembly, "Declaration on the Protection of All Persons from Enforced Disappearance," (New York: United Nations, 1992), A/RES/47/133. Available at: https://www.hrw.org/legacy/backgrounder/usa/us1004/4.htm#_ftn56

[83] Organization of American States, "Inter-American Convention on Forced Disappearance of Persons," 2003, Preamble, para. 3.  Available at: https://www.hrw.org/legacy/backgrounder/usa/us1004/4.htm#_ftn56

treaty adopted by United Nations General Assembly Resolution 2200A (XXI) on 16 December 1966, and in force from 23 March 1976. Article 9 of the ICCPR, guarantees Mr. Rusesabagina's right to security of his person and to be free from arbitrary detention and deprivation of his liberty.

258.    Defendants are liable for the violations of international law alleged herein. Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye are responsible for the actions of their agents, officials, or employees who: initiated the conspiracy to lure Mr. Rusesabagina from Texas by telephone communications to him in Texas which falsely promised opportunities to speak at churches in Burundi regarding his experiences during the Rwandan genocide, enlisted the aid of Mr. Niyomwungere to give their fraudulent plot the appearance of a legitimate business and charitable venture, enlisted the aid of GainJet officers and employees to charter a flight from Dubai to Kigali, Rwanda but also to knowingly and intentionally lie to Mr. Rusesabagina as to the destination of the flight, as well as fail to come to his aid when he was kidnapped from the GainJet aircraft on August 28, 2020, as well as the continuing series of torts inflicted on Mr. Rusesabagina resulting from the illegal kidnapping, which have continued from that date.

259.    These torts occurred during the illegal rendition and disappearance of Mr. Rusesabagina. Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye are liable for its acts and omissions that led to the injuries described herein in violation of the law of nations. The acts and omissions of Defendants and their agents, officials, or employees were deliberate and intentional.

260.    Plaintiffs Paul Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina suffered injuries and damages as a result of these actions by Defendants' agents, officials, or employees.

261.    This violation, *i.e.,* the key acts in the conspiracy to kidnap Mr. Rusesabagina as described above, took place in the U.S.

262.    **WHEREFORE**, Plaintiffs Paul Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina demand judgment against President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye in the amount of $50,000,000, and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

### COUNT XI
### VIOLATION OF THE LAW OF NATIONS, 28 U.S.C. § 1350
### VIOLATION OF ENFORCEMENT JURISDICTION

263.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth full herein.

264.    At all times relevant herein, Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye acted through their officials or employees who were acting within the scope of their office or employment.

265.    Plaintiffs Paul Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina are "aliens" for purpose of the Alien Tort Statute.

266.    The Alien Tort Statute was enacted in 1789 in response, in part, to an assault and battery upon a French Ambassador in violation of international law, including principles now found in the Vienna Convention on Diplomatic Relations and other authorities.

267.    Intentional infliction of emotional distress, assault, false imprisonment, and battery are torts. The torts in this action were committed by agents, employees, and officials acting at the

instruction of Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye in violation of international law. Specifically, the torts were committed in violation of the prohibition in international law against foreign states exercising their enforcement jurisdiction in the territory of another State and interfering in the internal affairs of another State. Defendants improperly exerted powers and enforcement jurisdiction in the United States in violation of customary international law and international treaties.

268. The prohibition against one state exercising its enforcement jurisdiction in and interfering in the internal affairs of another state is an international norm accepted by the civilized world and defined with specificity. Thus, violations of this norm are cognizable under 28 U.S.C § 1350.

269. "Now the first and foremost restriction imposed by international law upon a State is that failing the existence of a permission rule to the contrary it may not exercise its power in any form in the territory of another State. In this sense jurisdiction is certainly territorial; it cannot be exercised by a State outside its territory except by virtue of a permissive rule derived from international custom or from a convention." *S.S. "Lotus" (Fr. V. Turk.*) 1927 P.C.I.J. (ser. A) No. 10, (Sept. 7).

270. The principle of non-intervention in the internal affairs of another state is found in numerous United Nations General Assembly Resolutions including, but not limited to: The Essentials of Peace, UNGA Res 290 (V), A/RES/4/290, 1 Dec. 1949; Declaration on the Inadmissibility of Intervention in the Domestic Affairs of States and the Protection of their Independence and Sovereignty, UGA Res 2131(XX), A/RES/20/2131, 21 Dec. 1965; and the Friendly Relations Declaration, UNGA Res 2625 (XXV), A/RES/25/2625, 24 Oct. 1970.

271.    The principle of non-intervention is also found in the Vienna Convention on Diplomatic Relations. Article 41 provides that "without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving state. They also have a duty not to interfere in the internal affairs of that State." U.N.T.S. vol. 500, p.95, 18 April 1961, entered into force 24 April 1964. A diplomatic mission functions to protect the interests of the sending state in the receiving state "within the limits permitted by international law." *Id.* at Art. 3(b). Article 22 provides "that receiving state is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent a disturbance of the peace of the mission or impairment of its dignity." *Id.* at Art. 22.

272.    Defendants interfered in the U.S.'s internal affairs and enforced its jurisdiction in the U.S. when its agents, officials, or employees bypassed U.S. state and federal law enforcement agencies to falsely lure Mr. Rusesabagina from U.S. soil to execute their kidnapping plot. In doing so, Defendants used powers and enforcement jurisdiction to deceitfully lure a lawful U.S. permanent resident from the safety of his home in San Antonio, Texas to disappear him into unlawful imprisonment in Rwanda.

273.    Defendants are liable for the violations of international law alleged herein. Defendants President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga and Justice Minister Busingye are responsible for the actions of their agents, officials, or employees who: initiated the conspiracy to lure Mr. Rusesabagina from Texas by telephone communications to him in Texas which falsely promised opportunities to speak at churches in Burundi regarding his experiences during the Rwandan Genocide; enlisted the aid of Bishop Niyomwungere to give their fraudulent plot the appearance of a legitimate business and charitable venture; enlisted the

aid of GainJet officers and employees to charter a flight from Dubai to Kigali, Rwanda; knowingly and intentionally lied to Mr. Rusesabagina as to the destination of the flight; failed to come to Mr. Rusesabagina's aid when he was kidnapped from the GainJet aircraft on August 28, 2020; and engaged in the continuing series of torts inflicted on Mr. Rusesabagina resulting from the illegal kidnapping, which have continued from that date.

274.   These torts interfered in the internal affairs of the U.S. and enforced Defendants powers and jurisdiction in the U.S. Defendants President Kagame and Justice Minister Busingye are liable for its acts and omissions that led to the injuries described herein in violation of the law of nations. The acts and omissions of Defendants and their agents, officials, or employees were deliberate and intentional.

275.   Plaintiffs Paul Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina suffered injuries and damages as a result of these actions by Defendants' agents, officials, or employees.

276.   Plaintiffs' claims touch and concern the U.S. because this violation, *i.e.,* the key acts in the conspiracy to kidnap Mr. Rusesabagina, took place in the U.S.

277.   **WHEREFORE**, Plaintiffs Paul Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina demand judgment against President Kagame, Brig. Gen. Joseph Nzabamwita, Colonel Jeannot Ruhunga, and Justice Minister Busingye in the amount of $50,000,000, and any other such relief as this Court deems just and necessary including treble damages, pre-judgment interest, punitive damages, costs, and attorneys' fees.

WHEREFORE, Plaintiffs hereby demand:

a)   compensation for all injuries;

b)      punitive damages;

c)      prejudgment interest;

d)      attorneys' fees and reimbursement of litigation expenses, recoverable under

applicable law; and

e)      such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims triable by a jury.

Respectfully submitted,


**/s/ Steven R. Perles**
Steven R. Perles (D.C. Bar # 326975)
Edward MacAllister (D.C. Bar # 494558)
Joshua K. Perles (D.C. Bar # 1031069)
Emily Amick (D.C. Bar # 242018)
Perles Law Firm, PC
816 Connecticut Avenue, NW
12th Floor
Washington, D.C. 20036
Phone: (202) 955-9055
sperles@perleslaw.com
emacallister@perleslaw.com

John Arthur Eaves, Jr. (D.C. Bar #432137)
Christopher Brady Eaves (V.T. Bar #6370)
Eaves Law Firm
101 North State Street
Jackson, MS 39201
Phone: (601) 355-7971
johnjr@eaveslawmail.com

Agnieszka M. Fryszman (D.C. Bar #459208)
Nicholas Jacques (D.C. Bar #1673121)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, DC 20005
Phone: (202) 408-4600
Fax: (202) 408-4699

73

afryszman@cohenmilstein.com
NJacques@cohenmilstein.com

John Calvin Patterson (M.S. Bar # 103140) *Of Counsel*
213 Main Street
Como, MS 38619
Phone: (662) 526-1992
JCP@Pattersonehrhardt.com