Exhibit C

THE HIGH COURT, CHAMBER FOR INTERNATIONAL AND CROSS-BORDER CRIMES, SITTING IN KIGALI, TRYING CRIMINAL CASES AT THE FIRST INSTANCE LEVEL, HAS ON THIS DAY OF 20/09/2021 DECIDED CASE RP 00031/2019/HC/HCCIC AS FOLLOWS:


**THE PARTIES**


THE PUBLIC PROSECUTION represented by HABYARIMANA Angelique, NP RUBERWA Bonaventure, NP DUSHIMIMANA Claudine, NP HABARUREMA Jean Pierre, NP HABIMANA Jean Cabin and Prosecutor BUTERA Oscar.


And


NSABIMANA Callixte alias Sankara, NSENGIMANA Herman, RUSESABAGINA Paul, NIZEYIMANA Marc, BIZIMANA Cassien, MATAKAMBA Jean Berchmans, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Simeon, NTABANGANYIMANA Joseph, NSANZUBUKIRE Felicien, MUNYANEZA Anastase, IYAMUREMYE Emmanuel, NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA Andre, HAKIZIMANA Theogene, NDAGIJIMANA Jean Chretien, MUKANDUTIYE Angelina and NSABIMANA Jean Damascene.


Persons instituting Civil action: NSENGIYUMVA Vincent and company.

# TABLE OF CONTENTS

**THE PARTIES** ..................................................................................................................... 6

**ALLEGED VIOLATIONS** ..................................................................................................... 20

**I.   BRIEF BACKGROUND OF THE CASE** ...................................................................... 24

**II.   ANALYSIS OF THE CASE CONTENT** ......................................................................... 29

**II.1. CONCERNING CRIMINAL OFFENSES** ...................................................................... 29

- Submission of the Public Prosecution against NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul ................................................................................................... 29

- The defense of the accused ....................................................................................... 43

- The view of the court ................................................................................................. 50

➢ Background to the creation of MRCD and how its military wing launched attacks on Rwanda from 2018 ......................................................................................................... 50

➢ Determining whether NSABIMANA Callixe alias Sankara and RUSESABAGINA Paul have formed the irregular armed group FLN and whether they have been members of the terrorist organization MRCD-FLN. ................................................................................... 53

  1.   Concerning the acts, they are prosecuted for. ...................................................... 53

  2.   Legal provision on forming an irregular armed group ........................................... 58

  3.   Legal provision on the offence of membership of a terrorist group ...................... 60

➢ Determining whether RUSESABAGINA Paul has financed the terrorist group MRCD-FLN 64

  1.   Acts and proofs serving as evidence .................................................................... 64

  2.   Legal provision on the offence of the financing of terrorism ................................ 71

➢ Determining how to qualify terrorist acts committed in the attacks which NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul are accused of and the role they played in them ...................................................................................................................................... 74

  1.   Concerning acts and evidence .............................................................................. 74

  2.   Legal provision on acts of terrorism and participating in them ............................. 78

➢ Determining whether NSABIMANA Callixte alias Sankara is guilty of the other offences he is accused of ................................................................................................................. 85

  1.   On the offence of conspiracy and incitement to commit terrorist acts .................. 86

  2.   On the offence of spreading false information or harmful propaganda with intent to create a hostile international opinion against the Rwandan state ........................................ 87

  3.   On the offence of terrorism for political purposes ................................................ 88

4.   On the offence of donating, receiving and inciting to receive the proceeds of terrorism.................................................................................................................. 89

5.   On Offence of maintaining relations with a foreign government in the aim to wage war 90

6.   On the offence of genocide denial and genocide minimization.................................... 90

7.   On the offense of fraudulently obtaining or producing and using false documents and issued by competent authorities. ...................................................................................... 92

➢   Determining whether NSENGIMANA Herman is guilty of the offence of membership in the irregular armed group of FLN and of membership in the terrorist group MRCD-FLN..... 93

•   The Prosecution's arguing of the case.......................................................... 93

•   NSENGIMANA Herman's defense .................................................................. 95

•   The view of the court..................................................................................... 97

1.   On acts and evidence ........................................................................... 97

2.   Legal provision on the offence of forming an irregular armed group...................... 99

3.   Legal provision on the offence of membership in a terrorist organization .............. 99

➢   Concerning offences NIZEYIMANA Marc is prosecuted for ........................................... 100

•   The Prosecution's arguing of the case.......................................................... 100

•   NIZEYIMANA Marc defense ....................................................................... 103

➢   Determining whether NIZEYIMANA Marc has been a member of the armed groups FDLR-FOCA and FLN, and if he has been a member of the terrorist group MRCD-FLN .. 106

•   The view of the court..................................................................................... 106

1.   On the offence of creating an irregular armed group................................ 107

2.   On the offence of membership in a terrorist organization ....................... 108

➢   Determining how to qualify terrorist acts committed in the attacks for which NIZEYIMANA Marc is prosecuted and determining whether he participated in them ................................. 109

•   The view of the Court................................................................................... 109

➢   Determining whether NIZEYIMANA Marc has maintained any relation with foreign government employees in the intention to wage or support war ........................................... 111

•   The view of the Court................................................................................... 111

➢   Concerning the role of BIZIMANA Cassien, MATAKAMBA Jean Berchmans, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Simeon and NSABIMANA Jean Damascene in acts perpetrated in the attacks launched in Rusizi District 112

•   The Prosecution's arguing of the case.......................................................... 112

- The defendants' defense............................................................................ 124
- The view of the court................................................................................ 141

➢ Determining whether BIZIMANA Cassien was a member of the irregular armed group FDLR-FOCA and of FLN ............................................................................................. 143

- The view of the Court................................................................................ 143

➢ Determining whether BIZIMANA Cassien, MATAKAMBA Jean Berchmans, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Simeon and NSABIMANA Jean Damascene have been members of the terrorist group MRCD-FLN... 144

- The view of the Court................................................................................ 144

➢ Determining whether they are guilty of conspiracy to commit murder, arson of a person's building, means of transportation as acts of terrorism............................................. 148

- The view of the Court................................................................................ 148

➢ Determining whether they are guilty of illegally using explosives in a public place and of committing and participating in terrorist acts.......................................................... 152

- The view of the Court................................................................................ 152

➢ Determining whether BIZIMANA Cassien, MATAKAMBA Jean Berchmans, SHABANI Emmanuel and NTIBIRAMIRA Innocent have committed the offence of conspiracy and incitement to commit terrorist acts.................................................................................... 154

- The view of the the Court.......................................................................... 154

➢ Determining whether NTABANGANYIMANA Joseph has been a member of the terrorist organization MRCD-FLN .................................................................................................. 157

- The Prosecution's arguing of the case...................................................... 157
- NTABANGANYIMANA Joseph'sdefense. ................................................. 158
- The view of the Court................................................................................ 159

➢ Concerning NSANZUBUKIRE Felicien, MUNYANEZA Anastase, IYAMUREMYE Emmanuel. NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA Andre, HAKIZIMANA Theogene, NDAGIJIMANA Jean Chretien and MUKANDUTIYE Angelina. 163

- The Prosecution's arguing on this case...................................................... 163
- The defendants' defense............................................................................ 167

➢ Determining whether the acts that NSANZUBUKIRE Felicien and MUNYANEZA Anastase are charged with constitute an offence of membership in the irregular armed groups FDLR-FOCA and CNRD ........................................................................................................ 178

- The view of the Court................................................................................ 178

➢    Determining whether the offences they are accused of constitute an offence of membership in the terrorist association FDLR....................................................... 179

•    The view of the Court...................................................................................... 179

➢    Determining whether IYAMUREMYE Emmanuel, NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA Andre and HAKIZIMANA Theogene have been members of the irregular armed groups FDLR-FOCA and FLN and of the terrorist groups FDLR-FOCA and MRCD-FLN................................................................................................................. 180

•    The view of the Court...................................................................................... 180

➢    Determining whether NDAGIJIMANA Jean Chretien has been a member of the irregular armed group FLN and whether he has been a member of the terrorist group MRCD-FLN 184

•    The view of the Court...................................................................................... 184

➢    Determining whether MUKANDUTIYE Angelina has been a member of the terrorist group MRCD-FLN ...................................................................................................... 186

➢    Concerning the request of some of the defendants to be not prosecuted but rather be reintegrated into ordinary life ............................................................................... 187

•    The view of the Court...................................................................................... 189

**II.2. ON THE FILING OF A LEGAL ACTION** ................................................................. 190

➢    Determining whether parties with shared interests who institute a civil action can deposit joint court fees and if their court actions can be received if they provide documents exonerating them of court fees after proceedings have started............................................. 191

•    The view of the Court...................................................................................... 192

➢    Determining whether those claiming for damages deserve them.................................. 193

•    The way the claimants for civil action argue their case ................................. 193

•    The way the accused defend themselves against the civil action ............................ 212

•    The view of the court....................................................................................... 216

•    Finding out if all the accused members of the terrorist organisation MRCD-FLN must pay damages. ................................................................................................................. 232

•    The view of the Court....................................................................................... 232

**II.3 CONCERNING PENALTIES** ........................................................................... 235

Penalties requested by the Prosecution ........................................................................ 235

What the defendants say about penalties requested for them.................................... 236

The view of the court .......................................................................................... 240

**III.THE COURT'S DECISION**.............................................................................. 251

# THE PARTIES

**THE PUBLIC PROSECUTION**: represented by NP HABYARIMANA Angelique, NP RUBERWA Bonaventure, NP DUSHIMIMANA Claudine, NP HABARUREMA Jean Pierre, NP HABIMANA Jean Cabin and Prosecutor BUTERA Oscar.

**THE DEFENDANTS:**

1. **NSABIMANA Callixte alias Sankara**: son of Gafirigi Gaspard and Mukarutabana Mediatrice, born on 10/03/1982 in Gacu Cell, Rwabicuma Sector, Nyanza District, Southern Privince in the Republic of Rwanda. He is represented by Mr NKUNDABARASHI Moise as his legal counsel.

2. **NSENGIMANA Herman**: son of Kayumba Charles and Mujawamariya Anathalie, born on 12/07/1980 in Runazi village, Rukingiro cell, Busoro Sector, Nyanza District, Southern Province in the Republic of Rwanda who was living in what is called Ziraro-Kitindiro in Karehe Zone, South Kivu Province in the Democratic Republic of the Congo (DRC). He isrepresented by Mr KABERA Johnson and Mr RUGEYO Jean as his legal counsels.

3. **RUSESABAGINA Paul**: son of Rupfure Thomas and Nyirampara Kezia, born on 15/06/1954 in the former Nyakabungo cell, Nkomero Sector, Murama Commune, Gitarama Prefecture, currently in Ruhango District, Southern Province in Rwanda. He lives in the suburb of Kraainem in the city of Brussels in Belgium. He is represented by Mr GATERA Gashabana and Mr RUDAKEMWA Jean Felix as his legal counsels.

4. **IZEYIMANA Marc**: son of Mbavu Elie and Mukamanzi Marthe, born on 27/02/1972 in the former Rubona Cell, Kibirizi Sector, Mabanza Commune, Kibuye Prefecture, who used to live in the Democratic Republic of the Congo ( DRC) Kivu South, Kalehe Zone. He is represented by Ms MUREKATETE Henriette as his legal counsel.

5. **BIZIMANA Cassien**: son of Gasigwa Donatien and Nyirahavugimana Leoncie, born on 18/06/1974 in the former Makoma Sector, Gafunzo Commune, Cyangugu Prefecture who

lived in the Democratic Republic of the Congo, in South Kivu Province. He is represented by Ms MUREKATETE Henriette as his legal counsel.

6. **MATAKAMBA Jean Berchmans**: son of Byakatsi Celestin and Mukanganizi Verediane, born in 1962 in Kagarama Cell, Mururu Sector, Rusizi District, Western Province. He is represented by Ms MUKARUZAGIRIZA Chantal as his legal counsel.

7. **SHABANI Emmanuel**: son of Gasamira Bernard and Sibomana Fortunee, born on 03/01/1971 in what used to be Rwimbogo Cell, Mutongo Sector, Cyimbogo Commune, Cyangugu Prefecture, currently residing in Mutongo Village, Tara Cell, Mururu Sector, Rusizi District, Western Province. He is represented by Ms UWIMANA Channy as his legal counsel.

8. **NTIBIRAMIRA Innocent**: son of Sota Berchmans and Nyirandege Melanie, born on 01/01/1976 in Kagarama Cell, Mururu Sector, Rusizi District, Western Province. He is represented by Mr NGAMIJE Kirabo Guido as his legal counsel.

9. **BYUKUSENGE Jean Claude**: son of Uwitonze Abel and Nyiranteziryayo Seraphine, born in 1985, residing in Karambi Village, Mpumbu Cell, Bushekeri Sector, Nyamasheke District, Western Province. He is represented by Mr NGAMIJE Kirabo Guido as his legal counsel.

10. **NIKUZWE Simeon**: son of Gasamira Bernard and Sibomana Fortunee, born in 1981, residing in in Gatamba Village, Mushaka Cell, Rwimbogo Sector, Rusizi District, Western Province.

11. **NTABANGANYIMANA Joseph**: son of Balinda Jean and Nyirakamana Esperance, born in 1965 in the former Gishyita Commune, Kibuye Prefecture, who lived in the Democratic Republic of the Congo (DRC), South Kivu Province, Bukavu Locality. He is represented by Mr NGAMIJE Kirabo Guido as his legal counsel.

12. **NSANZUBUKIRE Felicien**: son of Rwamanywa Leopold and Nyirarubibi Leocadie, born in 1966 in the former Binunga Cell, Kinyinya Sector, Rubungo Commune, Kigali Ngali

Prefecture, who lived in the Democratic Republic of the Congo (DRC). He is represented by Mr TWAJAMAHORO Herman as his legal counsel.

13. **MUNYANEZA Anastase**: son of Kanyandekwe Ladislas and Mukarubibi Belancila, born on 03/02/1969 in the former Byenene Cell, Bibungo Sector, Mugina Commune, Gitarama Prefecture, who lived in the Democratic Republic of the Congo (DRC), South Kivu Province, Fizi Territory. He is represented by Mr TWAJAMAHORO Herman as his legal counsel.

14**. IYAMUREMYE Emmanuel**: son of Simbayobewe Paul and Nyirangaruye Marie, born on 01/04/1972 in the former Mpanga Cell, Kibanda Sector, Kivumu Commune, Kibuye Prefecture, who lived in the Democratic Republic of the Congo (DRC). He is represented by Mr URAMIJE James as his legal counsel.

15. **NIYIRORA Marcel**: son of Mwambari Andre and Kabutumwa Suzane, born in 1975 in the former Gahondo Cell, Kavumu Sector, Gisovu Commune, Kibuye Prefecture, who lived in the Democratic Republic of the Congo (DRC). He is represented by Mr URAMIJE James as his legal counsel.

16. **NSHIMIYIMANA Emmanuel**: son of Kagaba Modeste and Kabega Stephanie, born in 1993 in Kigarama Village, Gafumba Cell, Rusatira Sector, Huye District, Southern Province, who lived in the Democratic Republic of the Congo (DRC), South Kivu Province, Kalehe Territory. He is represented by Mr URAMIJE James as his legal counsel.

17. **KWITONDA Andre**: son of Munyazogeye Ezechias and Mukatara Marisiyana, born in 1975 in the former Tangabo Cell, Kagano Sector, Rutsiro Commune, Kibuye Prefecture, who lived in the Democratic Republic of the Congo (DRC), Kivu North Province, Goma locality. He is represented by Mr MUGABO Sharif Yussuf as his legal counsel.

18.**HAKIZIMANA Theogene**: son of Bihurwango Ignace and Mukarwego Bibiane, born on 09/09/1971 in the former Satinsyi Commune, Gisenyi Prefecture, who lived in the Democratic Republic of the Congo (DRC), South Kivu Province, Uvira territory. He is represented by Mr MUGABO Sharif Yussuf as his legal counsel.

19. **NDAGIJIMANA Jean Chretien**: son of Ndagijimana Laurent alias Wilson Irategeka and Iragena Josephine, born on 04/06/1996 in the Democratic Republic of the Congo (DRC), South Kivu Province, Bukavu locality, who lived in the Democratic Republic of the Congo (DRC), North Kivu Province, Masisi locality (Mweso). He is represented by Mr MUGABO Sharif Yussuf as his legal counsel.

20. **MUKANDUTIYE Angelina**: daughter of Munyarugamba Dismas and Ntoragurwa Asterie, born on 12/01/1951 in the former Remera Cell, Kinturire Sector, Giciye Commune, Gisenyi Prefecture. She is serving a life sentence in Nyarugenge Prison after being tried and sentenced by Nyarugenge Gacaca Court for genocide crimes she committed against Tutsi in 1994. She was represented by Ms MUKARUZAGIRIZA Chantal as her legal counsel.

21. **NSABIMANA Jean Damascene**: son of Ngirente Laurent and Mukandinda Bernadette, born in 1979 in Cyete Village, Kagarama Cell, Murur Sector, Rusizi District in the Western Province. He is represented by Mrs UWIMANA Channy as his legal counsel.

**PERSONS WHO HAVE FILED FOR CIVL ACTION:**

1. **NSENGIYUMVA Vincent**: son of Munyampeta Jean Damascene and Kagoyire Eugenie, born in 1979, living in Masaka Sector, Kicukiro District, Kigali City, Tel: 0788746993.

2. **NYIRAYUMVE Eliane**: born in 1985, daughter of Simbarikure Fabien and Nyirabwimana Valerie, residing in Gitwa Village, Gasayo Cell, Karengera Sector, Nyamasheke District, Western Province, having identity card No 118570074284098.

3. **NDUTIYE Yussuf**: son of Ndutiye Sylvain and Mukamuligo Bellancile, born on 27/07/1969, residing in Kigarama Sector, Kicukiro District, Kigali City.

4. **AREGESA Phenias**: son of Birikano John and Musigi Sarah, born on 1/1/1972, residing in Byimana Village, Gatare Cell, Niboye Sector, Kicukiro District, Kigali City.

5.**RUDAHUNGA Ladislas**: son of Gatama Ladislas and Mukamvunganyi Alvera, born in 1956, currently living in Nyagatare, Eastern Province, Tel: 0788435227.

6.**RUDAHUNGA Dieudonne**: son of Rudahunga Ladislas and Muhongerwa Anne Marie, born on 15/06/2006, staying in Nyagatare-Nyagatare, Eastern Province, a brother to Mutesi Jacqueline. He is represented by Rudahunga Ladislas.

7.**SHUMBUSHO David**: son of Rudahunga Ladislas and Muhongerwa Anne Marie, born on 31/12/2004, staying in Nyagatare, Eastern Province, a brother to Mutesi Jacqueline. He is represented by Rudahunga Ladislas.

8.**KIRENGA Darius**: son of Rudahunga Ladislas and Muhongerwa Anne Marie, born in 2000, staying in Nyagatare- Nyagatare, Eastern Province where he resides, a brother to Mutesi Jacqueline. He is represented by Rudahunga Ladislas.

9. **UMURIZA Adeline**: daughter of Rudahunga Ladislas and Muhongerwa Anne Marie, born in 1999, staying in Nyagatare District, Eastern Province where she resides, a sister to Mutesi Jacqueline. She is represented by Rudahunga Ladislas.

10. **Company ALPHA EXPRESS Ltd**: based in Kigali City. It is represented by Nkundizera Bertin.

11. **Company OMEGA Ltd**: based in Kamembe Sector, Rusizi District. It is represented by Hakizimana Thacien.

12. **NGIRABABYEYI Desire**: son of Hanyuruwenda Oscar and Mukamukiza Siphora, born on 1/1/1990, residing in Migina Village, Gihinga Cell, Gacurabwenge Sector, Kamonyi District, Southern Province, having the identity card No 1199080068206052.

13. **HABIMANA Zerothee**: son of Mageza Jean and Nyirandimurwango, born in 1989, residing in Karagwiza Village, Kigenge Cell, Nzahaha Sector, Rusizi District, Western Province.

14. **HAVUGIMANA Jean Marie Vianney**: son of Hemerintwari Ananias and Nyiramana Dorothee, residing in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province, whose identity card is No 1198880185796143.

15. **BAPFAKURERA Venuste**: son of Habimana Sylvain and Mukamana Annonciata, who lives in Cyunuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province, with identity card No 1199180045823044.

16. **SEBAGEMA Simon**: son of Bavugirije Gervais and Nyirabusimba Cecile, living in Rutobwe Cell, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and carrying identity card No 1196880029072040.

17. **BARAYANDEMA Viateur**: son of Nsabiyeze Semeon and Nyirampumbya Laurence, living in Cyunuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province, holding identity card No 1197980048137095.

18. **NSABIMANA Straton**: son of Rukebesha Michel and Nyirakajumba Aurelie, residing in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province, having identity card No 1198580177610046.

19. **KARERANGABO Antoine**: son of Myasiro Felicien and Nyiraminani Bellancilla, residing in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province, who has identity card No 1194980026919055.

20. **HABIMANA Viateur**: son of Ayabahutu Anastase and Mukabutera Agnes, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No 1198080056737081.

21. **HABYARIMANA Damascene**: son of Myasiro Felicien and Nyiraminani Bellancilla, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No 1198180057720069.

22. **NYIRAHABIMANA Vestine**: daughter of Nyirahabuhazi  Marciane, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No 1197270033045020.

23. **BENINKA Marceline**: daughter of Ntahondereye Eliphase and Nzabamwita Josephine, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No 1198270032180032.

24. **RUHIGISHA Emmanuel**: son of Muhoza Abiel and Karuyonga Bernadette, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru Sector, Southern Province and who holds identity card No 1196180018300071.

25. **RUSINGIZANDEKWE Leandre**: son of Ruremesha Leopold and Gashongore Catherine, who lives in Cyumuzi Cell, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No 1195680016852029.

26. **SHUMBUSHA Damascene**: son of Muzigirwa Elisa and Nyiragema Josephine, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No1198880059442097.

27. **MUNYENTWALI Cassien**: son of Muzigirwa Lisa and Mukangoga Esperance who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No 1197780038170057.

28. **NANGWAHAFI Callixte**: son of Ruhangintwari Tharcisse and Kanakuze Domithile, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No1196880028463005.

29. **NYIRAGEMA Josephine**: daughter of Burindwi Ananias and Nyirabakunda Felicita, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds identity card No 1195870019956032,

30. **SIBORUREMA Venuste**: son of Sibobugingo Phenias and Kaminani Josephine, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1198780057268042.

31. **HABYARIMANA Vianney**: son of Nyirinkindi Mathias and Nyirampakaniye Melcianna, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1198480066700079.

32. **NSABIMANA Anastase**: son of Munyankindi Celestin and Mutegwaraba Ancila, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1198080056774072.

33**. NGENDAKUMANA David**: son of Habimana Samuel and Nyirazibera Dative, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No1199480147492074.

34.**NYIRAHORA Godelive**: daughter of Rwabigwi Zacharie and Nyiranzigiye, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1196070023133070.

35.**KANGABE Christine**: daughter of Namubonye Berchmans and Bangaheza Saverina, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1195870019962072.

36.**NYIRAMANA Bellancilla**: daughter of Semanywa Sylvain and Kabaganwa Immaculee, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card in No 1198770057263013.

37.**NDIKUMANA Callixte**: son of Gumiriza Cyprien and Nyirabahinyuza Gaudence, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No1197880045699077.

38.**NSAGUYE Jean**: son of Ngarukiye Francisco and Nyiramakuba Ester, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is 1196780`023423008.

39.**BANGAYANDUSHA Jean Marie Vianney**: son of Karekezi Celestin and Nyirabutama Marguerite, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1199080053111075.

40.**NYIRASHYIRAKERA Theophila**: daughter of Nsanzabarinda Silas and Rimbwiye Josephine, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1198970054939014.

41.**NYIRAZIBERA Dative**: daughter of Kanyeshyamba Vincent and Nyirabagaruka Costasie, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1196970073261145.

42. **RUGERINYANGE Dominique**: son of Murengerantwari Pascal and Kanyambo Athanasie, who lives in Rutobwe Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1196680023669065.

43. **MUKASHYAKA Josephine**: daughter of Kagibwami Edouard andNyiranteziryimana Agnes, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and whose identity card is No 1198270187227099.

44. **INGABIRE Marie Chantal**: daughter of Gashugi Jonas and Nyiramukesha Petronille, who lives in Akajongi Village, Kibeho Cell, Kibeho Sector, Nyaruguru District, Southern Province and who holds the identity card No1198870057597087.

45. **NYIRAMINANI Melanie**: daughter of Ndimurwango Faustin and Mukabagema Athanasie, who lives in Rwerere Village, Nyabimata Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds the identity card No 1199970078168103.

46. **NDIKUMANA Viateur**: son of Sikubwabo Samuel and Nyirashegu Esperance, who lives in Cyumuzi Village, Ruhinga Cell, Nyabimata Sector, Nyaruguru District, Southern Province and who holds the identity card No 1196780023435070.

47. **SEBARINDA Emmanuel**: son of Kayonga Michel and Nyirandizihiwe Xaverine, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province and who holds the identity card No 1197280034250035.

48. **NIYOMUGABA**: son of Surwumwe Justin and Niyonagira Violette, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1199880060786041.

49. **BIGIRIMANA Fanuel**: son of Bucumi Vianney and Nyirankuriza Esperance, who lives Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1198480067386039.

50. **RUTIHUNZA Enos**: son of Rutwazangeri Abraham and…. Who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1195980022803092.

51. **NDAYISENGA Edouard**: son of Rutihunza Enos and Nishyirembere Verena, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1199080055558072.

52. **BARAGAMBA**: daughter of Nyirinkwaya Emmanuel and Nyirandwaniye Therese, who lives in Uwimbogo village, Uwumusebeya cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1199770174544091

53. **BARIRWANDA Innocent**: son of Gashongore Samuel and Nyiramanzi Xaverine, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1198480067390005.

54. **HARERIMANA Emmanuel**: son of Bucumi Vianney and Nyirankuriza Esperance, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1198580064731045.'

55. **HABAKURAMA Gratien**: son of Sebarinda Emmanuel and Nyiranziza Annonciata, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province.

56. **HABIMANA Innocent**: son of Rubumba Fenias and Karwera Bonifrida, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1198380062680125.

57. **NKUNDIREMA Damascene**: son of Nzajyibwami Joramu and Nyiranyandwi, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, who holds the identity card No 1196980026931113.

58. **GASHONGORE Samuel**: son of Nshunguyinka and Mwiririza, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, and whose identification card is No 1194880009471035.

59. **NSABIYAREMYE Pascal**: son of Gashongore Samuel and Nyirakanani Violette, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, and whose identification card is No 1199380193694026.

60. **NZAJYIBWAMI Joramu**: son of Nshunguyinka and Nyiramugasa, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, and whose identification card is No 1194080008512033.

61.**MANARIYO Theogene**: son of Nzajyibwami Joramu and Nyiranjangwe Marie, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, and whose identification card is No 1198980055603045.

62.**NZABIRINDA Viateur**: son of Rutaremara and Nyirandenzi, who lives in Uwimbogo Village, Uwumusebeya Cell, Ruheru Sector, Nyaruguru District, Southern Province, and whose identification card is No 1196580022846021.

63.**NGAYABERURA Emmanuel**: son of Nyamurinda Ernest and Nyiribaturanyi Verediana, who lives in Kintama Village, Gahurizo Cell, Kivu Sector, Nyaruguru District, Southern Province and whose identification card is No 1196380023543093.

64.**DUSENGIMANA Solange**: daughter of Munyentwari Narcisse and Nyiramisigaro Beatrice, who lives in Kintama Village, Gahurizo Cell, Kivu Sector, Nyaruguru District, Southern Province and whose identification card is No 1199070052591051.

65.**NYIRAMYASIRO Verediyana**: daughter of Ringuyeneza Elias and Nyiranjangwe Julienne, who lives in Kintama Village, Gahurizo Cell, Kivu Sector, Nyaruguru District, Southern Province and whose identification card is No 1196470023615093.

66.**NYIRAKOMEZA Claudine**: daughter of Nkebesha Wenceslas and Bihoyiki Melanie, who lives in Kintama Village, Gahurizo Cell, Kivu Sector, Nyaruguru District, Southern Province and whose identification card is No 1199470015359003.

67.**HAGENIMANA Patrice alias Budara**: son of Ntezimana Etienne and Nyiragasimba Verena who lives in Kintama Village, Gahurizo Cell, Kivu Sector, Nyaruguru District, Southern Province and whose identification card is No 1196880023618048.

68.**KANYANDEKWE Venant**: son of Nkunzabagabo Marcel and Nyirakanani Felicite, who lives in Gasezo Village, Gahurizo Cell, Kivu Sector, Nyaruguru District, Southern Province and whose identification card is No 1196680066549034.

69. **NSANGIYEZE Emmanuel**: son of Sekabwa Fabien and Nyiraboneza Felicite, who lives in Nyaruguru District, Kivu Sector, Gahurizo Cell, Kintama Village and identification No is 1195680016608033.

70. **NGIRUWONSANGA Venuste**: son of Mbonyivugiro Frederic and Nyirabahinda Laudie, who lives in Bigugu Village, Sabayonga Cell, Muganza Sector, Nyaruguru District, Southern Province whose identification No is 1195380012922009.

71. **NTABARESHYA Dativa**: daughter of Kamandwa Narcisse and Nyirandinkabandi Marcianne, who lives in Bigugu Village, Sabayonga Cell, Muganza Sector, Nyaruguru District, Southern Province whose identification No is 1197270100569038.

72. **YAMBABARIYE Vedaste**: son of Nyagahakwa Evariste and Nyirakamondo Philomene who lives in Gasarenda Village, Uwingugu Cell, Kitabi Sector, Nyamagabe District, Southern Province and whose identification card No is 1198480060717036.

73. **GAKWAYA Gerard**: son of Manuma Leopold and Nyarubumbiro Genevieve who lives in Cyimbogo Village, Karangiro Cell, Nyakarenzo Sector, Rusizi District, Western Province and whose identification card number is 1196180019728089.

74. **NKURUNZIZA Jean Nepomuscene**: son of Muzuka Augustin and Nyirabunyenzi Madeleine, who lives in Mont Cyangugu Village, Cyangugu Cell, Kamembe Sector, Rusizi District, Western Province and whose identification card number is 1196680025245065.

75. **NSABIMANA Joseph**: son of Kabagema Jean and Mukakayonga Stephanie, who lives in Mont Cyangugu Village, Cyangugu Cell, Kamembe Sector, Rusizi District, Western Province and whose identification card number is 1197280009201059.

76. **NIYONTEGEREJE Azele**: daughter of Habimana Gratien and Nyirahabineza Eveliana, who lives in Kibakure Village, Cyendajuru Cell, Giheke Sector, Rusizi District, Western Province and whose identification card number is 1198170016651169.

77. **MAHORO Jean Damascene**: son of Ncamihigo Venant and Mukamugombwa Josephine, who lives in Cyunyu Village, Burunga Cell, Gihundwe Sector, Rusizi District, Western Province and whose identification card number is 1197880048811025.

78. **UWAMBAJE Francoise**: daughter of Kayumba Francois and Mukamuhozi Leoncie, who lives in Ryagatebe Village, Rusayo Cell, Gashonga Sector, Rusizi District, Western Province and whose identification card number is 1198570066495040.

79. **RUTAYISIRE Felix**: son of Kanyamahanga Willy and Nyiransabimana Athanasie, who lives in Mont Cyangugu Village, Cyangugu Cell, Kamembe Sector, Rusizi District, Western Province and whose identification card number is 1197380035639083.

80. **NYIRANDIBWAMI Mariane**: daughter of Mvuyekure and Mukagahungu who lives in Murinzi Village, Cyendajuru Cell, Giheke Sector, Rusizi District, Western Province and whose identification card number is 1195970023703099.

81. **NYAMINANI Daniel**: son of Mazora Simon and Nyiragasabo Marie, who lives in Cyandarama Village, Tara Cell, Mururu Sector, Rusizi District, Western Province and whose identification card number is 1196880031506174.

82. **NZEYIMANA Paulin**: son of Sebahire Isaie and Murekatete Marie, who lives in Birogo Village, Gahinga Cell, Mururu Sector, Rusizi District, Western Province and whose identification card number is 1198480191145047.

83. **NTIBAZIYAREMYE Samuel**: son of Habinshuti Celestin and Mukarepubulika Laurence, who lives in Nyamata Sector, Bugesera District, Eastern Province and whose identity card number is 119898007148105.

84. **MUKESHIMANA Diane**: daughter of Ngarukiye Etienne and Mukabahizi Hillarie, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province.

85. **NDIKUMANA Isaie**: son of Ngarukiye Etienne and Mukabahizi Hillarie, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province.

86. **MUKANDUTIYE Alphonsine**: daughter of Ngarukiye Etienne and Mukabahizi Hillarie, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province.

87. **UZAYISENGA Liliane**: daughter of Ngarukiye Etienne and Mukabahizi Hillarie, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province.

88. **HABAKUBAHO Adeline**: daughter of Ngarukiye Etienne and Mukabahizi Hillarie, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province.

89. **VUGABAGABO Jean Marie Vianney**: son of Humvumugabo Antoine and Nyirabuguzi Costa, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province and whose identity card number is 1196480002762169.

90. **MURENGERANTWARI Donat**: son of Humvumugabo Antoine and Nyirabuguzi Costa, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province and whose identity card number is 1197080031785019.

91. **HAKIZIMANA Denis**: son of Humvumugabo Antoine and Nyirabuguzi Costa, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province.

92. **RWAMIHIGO Alexis**: son of Humvumugabo Antoine and Nyirabuguzi Costa, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province and whose identity card number is 1198080157155117.

93. **NYIRAGABIRE Valerie**: daughter of Humvumugabo Antoine and Nyirabuguzi Costa, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province and whose identity card number is 1198170155048036.

94. **SEMIGABO Deo**: son of Humvumugabo Antoine and Nyirabuguzi Costa, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province and whose identity card number is 1198480008379056.

95. **MBONIGABA Richard**: son of Humvumugabo Antoine and Nyirabuguzi Costa, who lives in Gakomeye Village, Gakomeye Cell, Giheke Sector, Rusizi District, Western Province and whose identity card number is 1198880067342019.

96. **KAYITESI Alice**: daughter of Kalisa Martin and Nyirazamani Josephine, who lives in Kigabiro Village, Munanira 2 Cell, Nyakabanda Sector, Nyarugenge District, Kigali City and whose identity card number is 1199570083338097.

97. **MUGISHA GASHUMBA Yves**: son of Gashumba Fulgence and Nyirandabukiye Adrolatte, who lives in Gasiza Village, Munanira 2 Cell, Nyakabanda Sector, Nyarugenge District, Kigali City and whose identity card number is 1199680022952033.

98. **BWIMBA Vianney**: son of Rusine Sebastien and Nyinawabahizi Gorette, who lives in Nyacyongwa Village, Shyogwe Cell, Nyamirama Sector, Kayonza District, Eastern Province and whose identity card number is 1199280067907234.


## ALLEGED VIOLATIONS


- **Concerning NSABIMANA Callixte alias Sankara**
1. Creating or joining an irregular armed group;
2. Membership of a terrorist group;
3. Terrorism for political purposes;
4. Conspiracy and incitement to commit terrorism;
5. Murder as an act of terrorism;
6. Kidnapping as an act of terrorism;
7. Spreading false information or propaganda with intent to create a hostile international opinion against the Rwandan state.
8. Genocide denial;
9. Genocide minimization
10. Armed robbery as an act of terrorism;
11. Deliberate arson against another person's house, means of transport for the purpose of terrorism;
12. Maintaining relations with foreign governments with intent to wagea war;
13. Fraudulently obtaining or making and using documents issued by legal authorities;

14. Intentional assault and battery as an act of terrorism;

15. Donating, receiving or inciting to receive proceeds from terrorism

- **Concerning RUSESABAGINA Paul**

1. Formation of an irregular armed group;

2. Membership of a terrorist group;

3. Financing terrorism;

4. Murder as an act of terrorism;

5. Kidnapping as an act of terrorism;

6. Armed robbery as an act of terrorism;

7. Deliberate arson of another person's house, means of transport as an act of terrorism;

8. Attempt to commit murder as an act of terrorism;

9. Intentional assault and battery as an act of terrorism.

- **Concerning NSENGIMANA Herman:**

1. Joining an irregular armed group;

2. Membership of a terrorist group;

- **Concerning NIZEYIMANA Marc:**

1. Joining an irregular armed group;

2. Membership of a terrorist group

3. Maintaining relations with foreign countries' employees with intent to support war;

4. Murder as an act of terrorism;

5. Kidnapping as an act of terrorism;

6. Armed robbery as an act of terrorism;

7. Deliberate arson of another person's house, means of transportation as an act of terrorism;

8. Attempt to commit murder as an act of terrorism;

9. Intentional assault and battery as an act of terrorism

- **Concerning BIZIMANA Cassien**:
1. Joining an irregular armed group;
2. Membership of a terrorist organization;
3. Conspiracy and incitement to commit terrorism;
4. Illegal use of explosives in a public place;
5. Attempt to commit murder as an act of terrorism;
6. Deliberate arson of another person's house, means of transport as an act of terrorism.

- **Concerning MATAKAMBA Jean Berchmans**
1. Conspiracy and incitement to commit terrorism;
2. Attempt to commit murder as an act of terrorism;
3. Membership of a terrorist group;
4. Illegal use of explosives in a public place;

- **Concerning SHABANI Emmanuel**:
1. Conspiracy and incitement to commit terrorism;
2. Illegal use of explosives in a public place;
3. Membership of a terrorist organization;
4. Attempt to commit murder as an act of terrorism;
5. Deliberate arson of another person's house, means of transport as an act of terrorism.

- **Concerning NTIBIRAMIRA Innocent**
1. Membership of a terrorist group;
2. Conspiracy and incitement to commit terrorism;
3. Deliberate arson of someone's house, means of transport as an act of terrorism.
4. Illegal use of explosives in a public place.

- **Concerning BYUKUSENGE Jean Claude**:
1. Membership of a terrorist group;
2. Deliberate arson of another person's house, means of transport as an act of terrorism;
3. Attempt to commit murder as an act of terrorism;
4. Illegal use of explosives in a public place.

- **Concerning NIKUZWE Simeon**:
1. Membership of a terrorist group.

- **Concerning NTABANGANYIMANA Joseph**:
1. Membership of a terrorist group.
- Concerning NSANZUMUHIRE Felicien and MUNYANEZA Anastase:
1. Voluntarily joining and accepting to be recruited into an irregular armed group;
2. Membership of a terrorist group.

- **Concerning IYAMUREMYE Emmanuel, NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA Andre, HAKIZIMANA Theogene and NDAGIJIMANA Jean Chretien:**
1. Joining an irregular armed group;
2. Membership of a terrorist group

- **Concerning MUKANDUTIYE Angelina**:
1. Membership of a terrorist group

- **Concerning NSABIMANA Jean Damascene**;
1. Membership of a terrorist group;
2. Attempt to commit murder as a terrorist act;
3. Illegal use of explosives in a public place

**CASE RP 00031/2019/HC/HCCIC**                                      **Page 24**

## I.   BRIEF BACKGROUND OF THE CASE

1. In 1994, some Rwandans fled their country and took refuge in various countries including the Democratic Republic of the Congo (DRC), and when they arrived there, they formed different organizations whose aim was to fight the Rwandan government. In 2000, they created the 'Forces démocratiques pour la libération du Rwanda (FDLR) which had an armed wing called 'Forces Combattantes Abacunguzi (FOCA)'. In different cases decided by courts, including the Supreme Court, it was confirmed that FDLR was a terrorist organization and its members were convicted of the offence of membership of that organization and of committing acts of terrorism.[1]

2. Apart from those cases, on 31/12/2012, the Security Council of the United Nations placed the group FDLR on the list of terrorist organizations, including some of its leaders like MURWANASHYAKA Ignace and MUSONI Straton who were also placed on it and were later prosecuted by a German court which indicted them and sentenced one to thirteen years (13) years of imprisonment and the other to eight (8) years.

3. In 2016, the organization FDLR experienced some internal dissension that led it to splitting into two factions, with some combatants joining the faction led by NDAGIJIMANA Laurent alias Wilson IRATEGEKA Rumbago and forming the political party CNRD-Ubwiyunge.[2] In discussions held between Wilson IRATEGEKA and RUSESABAGINA Paul on 04/07/2017, the political parties

---

[1] Case RPA 0050/15/CS-RPA 0031/16/CS MP C/MP C/MANIRAGUHA RWEGO Gilbert et crts of 22/12/2017, RPA 0011/13/CS MP C/NSHIMIYIMANA Shema Jimmy of 10/11/2017, RPA 0088/13/CS-RPA 0098/13/CS MP C/SERUKUNDO Jean Bosco et crts of 01/12/2017 and case RPA 0090/12/CS of 04/03/2016 which have been decided by the Supreme Court and cases RP 00019/2019/HC/HCCIC MP c/MUNYANEZA Félicien of on 16/10/2019, RP/GEN 00001/2019/HC/HCCIC MP C/NKUNDABOSE Sébastien of 05/02/2021 decided by the Chamber for cross border crimes.

[2] Conseil National pour le Renouveau et la Democratie (CNRD-Ubwiyunge)

CNRD-Ubwiyunge and PDR-Ihumure[3] formed the coalition of parties MRCD (Mouvement Rwandais pour le Changement Democratique – Rwandan Movement for Democratic Change) and on 18/03/2018 the political party RRM[4] under the leadership of NSABIMANA Callixte alias Sankara in its turn joined that coalition which then put in place its top leadership: RUSESABAGINA Paul was made president, NDAGIJIMANA Laurent alias Wilson IRATEGEKA Lumbago first Vice President, while NSABIMANA Callixte alias Sankara was made second Vice President. They also agreed that PDR-Ihumure would be in charge of foreign affairs issues and fund mobilization, CNRD of military affairs, while RRM would be responsible for communication.

4. On 15/07/2018, MRCD issued a communiqué announcing that they had formed an armed wing calledForces de Liberation Nationale (FLN), which they had entrusted with a mission of removing the RPF regime using all means possible, including armed conflict. After the formation of MRCD-FLN, its leaders recruited other fighters, mainly from Rwandan refugee camps in the Democratic Republic of the Congo (DRC) as well asin other countries, and they provided it with means, including funds contributed by Rwandans from across the world, which were used to buy ammunition, communication equipment and food for the combatants.

5. In that same year of 2018, the military force FLN started launching attacks on the Rwandan territory. On 19/06 and 01/07/2018, they launched an attack in Nyabimata Sector.On 13/07/2018, an attack was launched in Kivu Sector, Nyaruguru District and on 15/12/2018 they attacked in Nyungwe Forest in Kitabi Sector, Nyamagabe District. In 2019, FLN continued with its attacks in Rusizi District where in June 2019 they attacked in Nyakarenzo Sector at a place called Karangiro and in Rubondwe. In July 2019, they again attacked in Karangiro and then towards the end of September 2019, they launched an attack in Nyakarenzo

---

[3]Parti Democratique au Rwanda (PDR-Ihumure)

[4]Rwandese Revolutionary Movement (RRM)

Sector at a place called ku Cyapa. On 19/10/2019, a grenade was concealedat Kamembe Sector office and another one was exploded in Kamembe town.

6. All those attacks had consequences to the population and their property as some were killed, others were wounded and some were left with serious permanent disability, houses were set ablaze, vehicles including those for public transport and personal use were set on fire, they looted property and forced some people to carry what they had looted to the Nyungwe forest where somewere afterwards released while the whereabouts of others is still unknown up today.

7. The carried out attacks were publically claimedthrough communiqués, international broadcasting radios and other social media by RUSESABAGINA Paul and NSABIMANA Callixte alias Sankara who was FLN spokesman and even by NSENGIMANA Herman who replaced him. They were heard confirming thatFLN had carried out those attacks in Cyangugu, Nyamagabe, Nyaruguru, Bugesera and Huye and warning the populationagainst getting close to Nyungwe forest where they said hostilities were on-goingand they were asking the population to distance itself from the authorities andrather support FLN.

8. It is upon the acts committed in those attacks that the prosecution based its accusation of NSABIMANA Callixte alias Sankara, and then his case was linked with that of NSENGIMANA Herman. Later on, those two cases were linked with the case of RUSESABAGINA Paul and his cohort of 17 persons and even with the one of NSABIMANA Jean Damascene. The prosecution charged them with offences comprising forming an irregular armed group, membership of a terrorist group, murder, assault and battery, deliberate arson as acts of terrorism.

9. The case also includes persons numbering more than ninety (90) who stepped on the prosecution's accusation to file for civil action, including compensation for members of their families the attacks killed, the inhuman treatments they were subjected to, and even for the property that was damaged or looted.

10. The proofs provided by the prosecution to validate their accusation include testimonies of questioned witnesses who bear consequences of those attacks, defendants' testimonies, various reports of local administration authorities which attest to the authenticity of those attacks, medical reports showing the dead and the wounded, seized items, photos of houses and vehicles burned. The evidence used includes also MRCD-FLN press releases comprising those retrieved from RUSESABAGINA Paul's computer during the search conducted at his house in Belgium, documents showing MRCD-FLN members' money transfers, telephone messages, Youtube uploads and others.

11. Most of the defendants admit being members of FDLR-FOCA and FLN organizations but say that they did not know that they were terrorist organizations. They also say that they were not among those who prepared or carried out attacks on the Rwanda territory and that they did not play any role whatsoever in those attacks. Though they do not contest the fact that those who have filed for compensation deserve it, they nonetheless point out that the liability should be settled by those who were responsible for the attacks in which they incurreddamage. They add that some charges should not be validated because they did not follow the usual procedures, while others lack evidence.

12. Before the case hearings on merits started, the defendants raised objections, including one by RUSESABAGINA Paul related to the court's competence. The court examined it and concluded that it was competent to try him and that there were no grounds to send the case to Belgian courts. It also examined the objections related to the request of annulling the decision of temporarily detaining RUSESABAGINA Paul in which the latter alleged having been brought to Rwanda by way of kidnapping, but the court concluded that the objection had no validity since nothing proved that force was used to bring him to Rwanda or that the sovereignty of another country had been violated.

13. The court also examined RUSESABAGINA Paul's decision to withdraw from the proceedings and ruled that the case trial should proceed in his absence but that as long as the case trial had not been concluded, he was free to attend the proceedings, and in case he fails to attend, he would in be always notified of the date and venue of theproceedings and of their progress. The court examined as well the objections filed by NSANZUBUKIRE Félicien and MUNYANEZA Anastase related to their request for provisional release and ruled that they should remained detained while the trial goes on.

14. The issues being examined in the trial include those related to determining if the defendants had been members of the irregular armed groups of FDLR-FOCA  and FLN and whether those groups are terrorist, if the perpetrators of the acts committed should be prosecuted and punished for murder, assault and battery committed as terrorist acts or whether those offences should be consideredunder counter terrorism laws;in addition,determining whether the offence of financing terrorism by one of the founding members of a terrorist group or its leader should be prosecuted as an offence in itself or as a terrorist act.

15. The other issue to be examined is related to determining if some of the parties who have filed for a civil action have the same interests to the extent that they can deposit joint court fees, and determining if the complaint filedbyparties with court fee exemption after a case has started can be accepted; it is also tobe examined whether there is evidence that parties instituting civilaction are victims of the acts they base on their claims and determining who should bear theliability.

## II.      ANALYSIS OF THE CASE CONTENT

## II.1. CONCERNING CRIMINAL OFFENSES

- **Submission of the Public Prosecution against NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul**

**1.  Concerning NSABIMANA Callixte alias Sankara**

16. The Public Prosecution contends that NSABIMANA Callixte alias Sankara committed offences he is accused of from 2013 until 2019 when he was arrested. They assert that he was a member of the political party RRM of which he was president and which joined CNRD-Ubwiyunge and PDR-Ihumure political parties to form the coalition MRCD which created FLN, an illegal armed branch, and he recruited fighters for that group and mobilized funds for it to buy military equipment, including guns and ammunition.

17. It contends that the organization MRCD-FLN, of which NSABIMANA Callixte alias Sankara was a member, launched terrorist attacks on Rwandan territory in Nyaruguru and Nyamagabe Districts, in which it killed persons and wounded others, committed arson, looted property, kidnapped civilian persons with the intent to instill fear among the population and coerce the Rwandan government to accept negotiations. It also claims that NSABIMANA Callixte and MRCD leaders met some members of the Burundian and Ugandan authorities at different times in the context of mobilizing support for FLN fighters (Forces de Liberation Nationale). It further claims that he received money and a telephone he used for communication and advocacy for the terrorist organization MRCD-FLN.

18. The public prosecution also accuses him of having been heard spreading false information on the radio and social media or making propaganda with intent to create a hostile opinion against the Rwandan state among the population and the international community and using a language that downplays the gravity or

the consequences of genocide and the methods used to commit it. Moreover, in order to reach his objective, he changed his name to KABERA Joseph originating from Masisi in the Democratic Republic of the Congo (DRC), which enabled him to fraudulently obtain a Lesotho identity card and passport that he used to travel to different countries.

19. It goes on mentioning that when he arrived in South Africa, he joined RNC (Rwanda National Congress), an opposition party to the Rwandan government and occupied different posts including that of youth president, recruitment and fund mobilization. It claims that he left that party in 2017 and together with his colleagues they formed the political party RRM (Rwandese Revolutionary Movement) of which he became president. Afterwards, on 18/3/2018 he had that party join the coalition MRCD[5] which was made up of CNRD-Ubwiyunge under the leadership of Wilson IRATEGEKA and PDR-Ihumure of RUSESABAGINA Paul. They formed an illegal armed wingcalled FLN and NSABIMANA Callixte alias Sankara was made the second Vice president of MRCD and the spokesperson for the two of them (MRCD, FLN) and was promoted to the rank of major so that he could represent themas a military figure.

20. It further contends that it was FLN that carried out different attacks in the Southern Province in Nyaruguru and Nyamasheke Districts. As one of the leaders, NSABIMANA Callixte alias Sankara played a role, given that he gave orders to be followed on the battlefield, and boasted about the attacks carried out on Rwandan territory in the media. He also kept inciting the population to rebel against authorities, forbidding it to ensure its own security like night patrols and other activities till when he was arrested on 13/4/2019 and brought back to Rwanda. I also indicate that the attacks carried out in those districts caused fear among the

---

[5] Mouvement Rwandais pour le Changement Democratique

local population and those passing by because NSABIMANA Callixte had warned that it was an area of hostilities.

21. It mentions that whether during his questioning by the investigation bureau  and the prosecution or even in court when he was being tried for detention and provisional release, NSABIMANA Callixte alias 'Sankara pleaded guilty to the offences he was charged with and  exposed how he committed them together with RUSESABAGINA Paul and some soldiers, including Ndagijimana Laurent alias Wilson Irategeka Rumbago, Habimana Hamada, Sinayobye Barnabe alias Morani and even those based in various countries including Belgium, Canada, Australia, Tanzania, Uganda, Burundi, Zambia and other places who supported the group FLN in its activities .

22. It also claims that NSABIMANA Callixte alias Sankara admitted having incited the youth to join the irregular armed group FLN to which he sent thirty (30) combatants who passed through Uganda toFLN training base in DRC. He said that those he sent included NSENGIMANA Herman who came to replace him as the organization spokesperson. It goes on exposing that he admitted to having given orders in the context of FLN operations, having sought support for it, talked to Major Bertin alias Moses, head of intelligence in Burundi, with the view of securing a passage for FLN combatants to carry attacks into Rwanda; he also talked with Brigadier Abel KANDIHO, head of intelligence (CNI) in Uganda, requesting him to receive FLN leaders for discussions on the support they may provide them.

23. It also claims that during the investigation, NSABIMANA Callixte alias Sankara admitted that as an FLN spokesperson, he used to receive $1,000 a month as an upkeep, that one time he even received $5,000 and three telephones, and that he, together with RUSESABAGINA Paul and General Wilson IRATEGEKA, had telephones of the type of Blackphone they used to communicate among themselves without being monitored. It also said that among the other pieces of evidence showing the role of NSABIMANA Callixte alias Sankara in the offences

he is accused of are the various documents, communiqués, talks on international broadcasts like VOA, BBC and Youtube talks he produced in which he was heard boasting about attacks the group had launched in different localities on Rwandan territory, precising that the objective was to topple the current Rwandan leadership.

24. In addition, it asserts that when NSABIMANA Callixte was joining his political party with MRCD and the ensuing creation of the armed force FLN, he knew very well that the organization was illegal in Rwandan laws and that their objective in creating it was to commit acts of terrorism as he himself admits in his questioning when he says that the tasks given to its members included the launching of attacks on Rwandan territory. And indeed those attacks were carried out in June and July 2018 in Kivu and Nyabimata sectors, Nyaruguru District and in Nyungwe forest in Kitabi Sector, Nyamagabe District in December 2018. It precises that those attacks killed nine (9) civilians while others were wounded. They damaged and set fire to their property, comprising houses, vehicles and a motorcycle, looted clothes and foodstuffs from a house and they even forced people to carry for them what they had looted.

25. The prosecution argues that the proof that those terrorist acts were committed by MRCD-FLN is demonstrated by the local sector administration authorities' reports, testimonies given by the victims of those attacks, including NSENGIYUMVA Vincent, the Nyabimata Sector Executive Secretary at the time whom they found in his home and shot in the head though he did not die, but his vehicle was set on fire; the testimony of MUNYANEZA Fidele, shot by those fighters on 21/6/2018 and who later succumbed to the bullet wounds he suffered, testimonies of survivors of Nyungwe forest attacks in which private and public transport vehicles were shot at and set ablaze as well as testimonies of persons who were forced to carry looted property. It also said that the case file contains forensic expertise reports showing persons who died of bullet wounds and others who were wounded and pictures of vehicles and a motorcycle which were burned.

26. The prosecution also asserts that NSENGIMANA Herman made statements in which he said that it was NSABIMANA Callixte alias Sankara who sent him to represent RRM political party within FLN, and that he replaced him as its spokesperson. There is also Sgt MUTAGA Pierre Claver's testimony in which he alleges that he incited him to join factionsopposed to the Rwandan government and asked him also to recruit for him young genocide survivors who had had military training to join the FLN force. He also alleged that he incited him to engage in terrorist activities, including dropping leaflets, exploding grenades, cutting bridges, killing civilian and military leaders and their families, and that he sent him one hundred and eleven thousand francs (111,000 Rwf) for his trip to FLN.

27. The prosecution also maintains that he committed the offence of denying and minimizing the genocide against the Tutsi as he was heard on international broadcasts and on social media using words downplaying its gravity or its consequences, softening the way it was committed with the intent to mislead Rwandans and the international community about the truth of the genocide that was perpetrated against the Tutsi in Rwanda in 1994, by asserting that there was a double genocide. He said that there was no genocide committed against Tutsi, that it is rathera trump card for the current regime, that the government has made it a commodity and that Tutsi were killed because of Hutu's anger following the downing of the plane carrying president HABYARIMANA. It reiterates that even in his questioning by the investigation officers, he admitted being induced into following that ideology of genocide denial after joining RNC when he arrived in South Africa, and that he maintained it when hejoined MRCD as it transpires in the 15/07/2018 press release he put out when he was its spokesperson.

28. The prosecution concludes saying that the acts constituting offences NSABIMANA Callixte alias Sankara is prosecuted for are those of forming or joining an irregular armed group, terrorism for political interests, giving orders in a terrorist act, membership of a terrorist group, conspiracy and incitement to commit terrorism,

murder, kidnapping, armed robbery, deliberate arson against another person's house or means of transport, assault and battery as an act of terrorism, maintaining

relations with a foreign government with intent to wage a war, spreading false information or harmful propaganda with intent to cause a hostile international opinion against the Rwandan government, denying and minimizing the 1994 genocide against the Tutsi in Rwanda, fraudulently obtaining or making and using official documents, and the offence of donating, receiving and inciting to receive proceeds from terrorism, offences for which he is personally liable.

## 2. Concerning RUSESABAGINA Paul

29. The prosecution alleges that since the formation of the foreign based political party PDR-Ihumure in 2009, RUSESABAGINA Paul and his colleagues thought of giving it an armed force. And it was in that context that he tried to recruit FDLR-FOCA fighters, but given that the one called HABIYAREMYE Noel who helped him in that activity came to be arrested and got jailed in Rwanda, he failed to get fighters and then realizing that he was not going to succeed, he teamed up with General NDAGIJIMANA Laurent alias Wilson IRATEGEKA Rumbago who had broken away from FDLR and had formed the political party CNRD-Ubwiyunge.They formed MRCD, a coalition of parties. It also said that on 18/03/2018, the political party RRM led by NSABIMANA Callixte alias Sankara on its turn joined the coalition and they formed the armed group FLN. In June 2019, TWAGIRAMUNGU Faustin's RDI-Rwanda Rwiza on its turn joined the coalition MRCD-FLN and they all agreed that the presidency of that coalition would rotate among the presidents of the parties every year.

30. It goes on pointing out that RUSESABAGINA Paul is one of the founders of the irregular armed group FLN which is affiliated to the coalition MRCD, and that he is one of those who incited others to join it and he provided it with financial and

material support. It also contends that between June 2018 and October 2019 when MRCD-FLN was under RUSESABAGINA Paul's leadership, FLN launched terrorist attacks in Nyaruguru, Nyamagabe and Rusizi Districts in which persons were killed or wounded, others kidnapped, property was damaged, burned and looted with intent to cause fear among the population and coerce the government to abandon some of its principles.

31. It also indicates that the assertion that RUSESABAGINA Paul created the irregular armed group FLN is based on the statements he made in his questioning by the investigation bureau and the prosecution authority in which he admitted that in collaboration with other MRCD coalition members they had created the armed organization of FLN, and that after the formation of MRCD, he became its president. It also indicates that his statements matchNSABIMANA Callixte alias Sankara and NIZEYIMANA Marc's accountsduring the investigation in which they revealed that FLN was an MRCD military winggrouping all its political parties and that RUSESABAGINA Paul was the coalition president.

32. It also claims that the other pieces of evidence demonstrating his role in the creation of FLN are press releases retrieved from his computer during the search conducted by the Belgian police. One of them states that they formed that armed group for the purpose of liberating the country and overthrowing the RPF[6] regime; and he is heard saying in another one that young men and women making up their FLN armed force are carrying on the struggle with military activities that oppose them to RPF[7]forces. It goes on saying that those press releases complement an internet radio talk on "The Rock-55 "that brought together RUSESABAGINA Paul and TWAGIRAMUNGU Faustin in which RUSESABAGINA Paul claims that FLN had been formed by three political parties forming the coalition MRCD, and that it

---

[6] MRCD press release No 2018 of 15 July 2018 put out by MRCD
[7] Communique No 2019/04/30 by MRCD of 30 April 2019.

was given a name in May 2018, and adding that he was one of its founding members.

33. The prosecution claims that one of the pieces of evidence showing that RUSESABAGINA Paul was a member of the terrorist group MRCD-FLN is the fact that he admitted on 11/09/2020, when he was being interrogated at the Prosecution, that he became its leader from 01/07/2017 until 30/08/2019, and that the fact that he was its leader is also proven by what came out of the investigation conducted by the Belgian police and a message he exchanged with TWAGIRAMUNGU Faustin[8] which was retrieved from his telephone. It says that there is a passage in it where RUSESABAGINA Paul mentioned that his boys were under fire, and that he was caught up in different matters, and he was asking him to postpone the meeting they had to another day, given that he was running from left and right trying to find for them means to defend themselves. Those he called his boys were FLN fighters as he explained in his interrogation at the Prosecution on 16/09/2020. It also adds that there is another telephone message[9] of 08/05/2019 he exchanged with Wilson IRATEGEKA in which the latter asked him to send him money. During his questioning at the Investigation Bureau on 05/03/2020, RUSESABAGINA Paul explained that those he called farmers in that message were fighters, guns were called hoes, ammunition was seeds and the battle field was farm.

34. It goes on asserting that RUSESABAGINA Paul personally provided money and equipment to support MRCD-FLN in its terrorist activities, and even his political party PDR-Ihumure used to make monthly contributions to it; and he also incited different people to support the group. It explains that the proof of his role in supporting terrorism is his admission during his questioning at the investigation bureau on 31/08/2020 that he was one of the main FLN supporters, and that he

---

[8] Whatsapp chat 136 retrieved from RUSESABAGINA's telephone by the Belgian police which shows the conversations RUSESABAGINA Paul had with TWAGIRAMUNGU Faustin between 29/12/2018 and 13/10/2019 on MRCD-FLN functioning.

[9] Whatsapp chat 106 containing a conversation between RUSESABAGINA Paul and Wilson IRATEGEKA.

gave it a contribution of €20,000. In addition, he admitted on 05/09/2021 that each one among those they collaborated in the governance of MRCD-FLN made a monthly contribution, that the contribution from various countries he remembers which had already been sent to FLN amounted to $ 300,000, but that he could not know the total sum of money sent because it was not transferred through their accountants or through him as the president of the organization. According to him, those who would be in a position to know the total amount of money transferred are the treasurers, namely Munyemana Eric, Emilien and another one he doesn't remember. It also asserts that he again admitted financing the group during his questioning by the prosecution on 11/09/2020 when he was also being tried for detention and provisional release.

35. It avers that the financing of FLN by RUSESABAGINA Paul was confirmed by both NIYONZIMA Arthemon, a CNRD accountant, when he was questioned by the investigation bureau on 06/02/2020 and NSABIMANA Callixte alias Sankara in his 31/08/2020 questioning when he admitted that RUSESABAGINA Paul made a contribution of € 6,000 he sent to Lieutenant General Wilson IRATEGEKA, which the latter used to send thirty (30) RRM young men from Uganda to an MRCD-FLN base in DRC under the command of NSENGIMANA Herman.

36. It also alleges that on 16/07/2018, RUSESABAGINA Paul's wife sent €1,000 to one named Mlinde Msoubout Soighir who was in the Comoro Islands, and it was revealed by a document found in his room when the Belgian police searched his house on 21/10/2019, and that was moreover confirmed by NSABIMANA Callixte who said that he had sent him that money using his wife's name MUKANGAMIJE Taciana as he wanted to leave the Comoro Islands for security reasons. It said that when RUSESABAGINA Paul was interrogated on 05/09/2020 during the investigation, he too admitted that his wife sent it to him because she and Sankara's mother are from the same area.

37. It also alleges that NDAGIJIMANA Jean Chretien on his turn explained in his questioning on 16/07/2020 that RUSESABAGINA Paul was among the politicians who supported FLN because he used to talk to his father on the phone and to send him money, and his father would send him to collect it. It in addition said that there is one called Baloka Christian who also confirmed during his interrogation by the Belgian police on 24/01/2020 that he sent money to different persons at the request of MUNYEMANA Eric. It also indicated that the investigation had revealed that there was someone named Andriantsimiavontsoa Jose Philippe in Madagascar who received a telephone sent to him on 11/09/2018, a fact that was also admitted by NSABIMANA Callixte on 17/5/2020 and on 31/8/2020 during the interrogation by the prosecution, when he said that he received that telephone, and that there were even five (5) others of the type of Blackphone which were sent to him by Munyemana Eric after being bought by a certain Olivier who was in England, using money provided by RUSESABAGINA Paul. When the latter was questioned by the Investigation bureau, he explained how those telephones had been purchased, and he mentioned those who received them, and it was confirmed by the receipt found in his house during the search conducted by the Belgian police on 21/10/2019.

38. It goes on indicating that even a report from Belgium from an investigation officer called Gerard Jean-Yves shows an amount of more than fourteen thousand nine hundred seventy nine and forty four cents Euros ( € 14,979.44 ) sent in 32 transfers to different places by a Congolese called Baloka Christian, one of the persons used by MRCD-FLN treasurer, MUNYEMANA Eric, to send money as he explained in his 24/01/2020 written account given during his interrogation by the Belgian police in which he said that Munyemana Eric lied to him about the persons the money was transferred to and the motive for sending it.

39. It alleges that the money sent was a financial support to FLN provided by MRCD under the leadership of RUSESABAGINA Paul, that in his interrogation by the Prosecution on 27/05/2019, NSABIMANA Callixte alias Sankara explained that

MUNYEMANA Eric produced each month a report of the amount of money he had received and the amount transferred to FLN, and the report was given to its leaders (the College of the Presidents): RUSESABAGINA Paul, PDR-Ihumure president and president of MRCD-FLN, General Wilson IRATEGEKA,CNRD-Ubwiyunge president and first vice president of MRCD-FLN and NSABIMANA Callixte alias Sankara. RRM president and MRCD-FLN second vice president.

40. It also indicates that nine (9) persons were killed in MRCD-FLN attacks carried out in Nyabimata Sector, Nyaruguru District and Kitabi Sector in Nyamagabe District as confirmed by medical reports. Apart from those reports, there are testimonies of persons questioned during the investigation, including Munyaneza Fidele, Havugimana Jean Marie Vianney and Habimana Venuste who confirmed they witnessed those attacks. In his questioning at the investigation Bureau on 20/07/2018, Habimana Venuste stated that armed persons attacked in Rwerere village on 19/06/2018, and the first person they met was Habarurema Joseph who was at Munyarugendo Aloys's place in a pub, and then they ordered him to take them to the sector leader's home. He told them that he did not know where it was and they shot him dead.

41. The prosecution contends that there were other attacks which killed persons in Nyamagabe as it is also reported by eye witnesses who include the one called Uwimana Stappin and Ngirababyeyi Desire who explained that, as he reached Nyungwe forest, he arrived at another Coaster vehicle belonging to OMEGA which they had just set on fire. They stopped him as well and fired at the vehicle he was driving, a Coaster vehicle with plate number RAC 341 U belonging to ALPHA Company. He was stopped by a log they had put across the road at about one hundred meters (!00 m) away. They hurled an explosive at him that was like a hand grenade and it threw the vehicle off into the forest. There was a young girl who was in his vehicle whom they shot in the head and who died instantly.

42. It also mentions that among those who were in one of the vehicles set on fire, there is one called Bwimba Vianney who was questioned and who explained that on reaching Kitabi on their way from Rusizi, they met people in military, police and civilian uniforms. They had put a log across the road and they stopped them and then they started firing at their vehicle, some of the passengers went out through the windows and he was shot in the thigh.

43. The prosecution also points out that apart from those acts of terrorism perpetrated by MRCD-FLN in different attacks they carried out, they also kidnapped persons whom they obliged to go with and to carry items they had looted as it was reported by some of the abductees, including Ndikumana Viateur who, in his questioning at the investigation bureau on 20/07/2018 stated that on 19/06/2018 towards eight o'clock in the evening, he met a group of about fifty (50) persons armed with guns.They tied him up, stripped him of the watch he was wearing and ordered him to take them to Nyabimata Sector executive secretary's house.When they arrived there, they did not find him, then they continued with him together with other local persons they had arrested, and they made them carry goods they had looted. They spent three (3) hours walking and when they reached near Nyungwe forest, they held a meeting with them and then they let them go.

44. It also indicates that apart from abducting persons in Nyaruguru District, there are equally other local persons  who were abducted in Nyamagabe District by MRCD-FLN as it was reported by one named Semushi David who explained at the prosecution office on 16/12/2018, that as he was coming from Nyamasheke to Kigali on 15/12/2018 at five and half in the afternoon, he was one of those who were abducted by persons calling themselves the national army and who were armed with guns and spoke Kinyarwanda, Kirundi and Lingala.

45. The prosecution alleges also that in the attacks MRCD-FLN fighters carried out in Nyabimata Sector, Nyaruguru District and in Kitabi Sector, Nyamagabe District, they stole some property belonging to the local population using fire arms. The

property included money, telephones, small live stock, crops and other goods, and it comes out in the report produced by Nyabimata Sector's authorities. The report shows that in the night of 30/06 sliding to 01/07/2018, armed criminals stole local people's livestock, twelve (12) sheep, two (2) goats, clothes, money and potatoes, and that the content of the report matches what has been explained  at the Investigation Bureau on 20/07/2018 by those who were robbed, including Nsabimana Anastase who explained in his questioning at the Investigation Bureau that on 01/07/2018 those combatants took money from him, food and even a telephone and that they ordered him to carry those things till Nyungwe forest, together with Mugisha Gashumba Yves who said in his 08/05/2019 statement at the Investigation Bureau that they took from him an I-phone worth 70,000 frs, clothes and even two hundred and fifty dollars ($250).

46. It goes on pointing out that houses, vehicles and two (2)[10] motorcycles were set on fire as it shows up in the report produced by Nyabimata Sector's authorities in Nyaruguru District. Pictures and documents of some of those vehicles and their owners'statements at the prosecution, including that of Mahoro Jean Damascene, Ingabire Joyeux and Ndutiye Yussuf, and the fact that those combatants attempted to kill civilian people in the Districts of Nyaruguru, Nyamagabe and Rusizi as indicated in medical reports confirming that several persons suffered gun wounds in those attacks while others suffered grenade[11] attacks. It also mentions that there are accounts given during the investigation by some of those who were shot at in those attacks, and those who witnessed them, namely Kayitesi Alice, Mugisha Gashumba Yves, Ngirababyeyi Desire, Bwimba Vianney, Uwimana Stappin,

---

[10] Those vehicles burned include a Toyota RAV 4 RAD 802 K belonging to Nsengimana Vincent, Coaster RAD 201 N and RAC 357 J of OMEGA Sarl, Coaster RAC 341 U of ALPHA Express Company Ltd, Minibus RAA 777 W belonging to Urayeneza.

[11] Those shot in those attacks are: Ndahayo Noel, Kimanaga Faustin, Kabutumwa Zerida, Niyomugabo Emmanuel, Munganyinka Verene, Baswayi Clement, Uwinfura Bernard, Shema Philbert, Nteziryayo Claude, Nyiranziza Christine, Uwimana Stappin, Bakera Ally, Hakizimana Zachee, Nduwayo Arnaud, Kayitesi Alice, Niyontegereje Azela, Kulimushi Byamungu, Niyitegeka Emmanuel, Jumapili Juma and Nsengiyumva Vincent.

Nsengiyumva Vincent, Rutayisire Felix, Nsabimana Joseph, Nkurunziza Jean Nepomuscene and Bizirurema Celestin.

47. The prosecution alleges also that in those attacks, the combatants beat and wounded some of the local people in Nyabimata Sector, Nyaruguru District, Kitabi Sector in Nyamagabe District and some of the pieces of evidence of those acts include attack survivor Karerangabo Antoine's 20/07/2018 statement found at the Investigation Bureau, and that of 05/08/2019 of Jumapili Issa who survived the Nyungwe attack, and medical reports attesting that some persons were beaten by those FLN fighters and endured varying degree of pain[12].Those statements match those of Habimana Viateur, Habyarimana Leonard, Habyarimana Damascene and Habyarimana Vianney.

48. It also indicates that RUSESABAGINA Paul himself, whether during his interrogation at the investigation bureau on 05/09/2020, at the prosecution on 11/09/2020 and even on 14/09/2020 in his detention and provisional release trial, he did not dispute the terrorist acts FLN committed as an MRCD armed group, even though he said that he never sent those fighters to kill people, and that he never was on the scene. Nonetheless, he acknowledged the acts committed by FLN and apologized for them, and the allegation that what they did is not what he sent them to do does not absolve him of his responsibility, because in addition to financing those terrorist acts, he was also the leader and a member of the coalition of the parties that joined forces to form MRCD which directed what those fighters did.

49. The Prosecution concludes saying that terrorist acts RUSESABAGINA Paul is prosecuted for were committed in the broad MRCD-FLN objective to cause fear among the population, coerce the government to hold negotiations and force it to

---

[12] Those beaten up by those FLN combatants and who endured different pain include: Baswayi Clement, Hakizimana Zachee, Kabutumwa Zerida, Kimanaga Faustin, Munganyinka Verene, Ndahayo Noel, Niyomugabo Emmanuel, Nteziryayo Claude, Uwimana Stappin and Jumapili Issa.

change its standpoint, and those constitute offences of creating an irregular armed force, membership of a terrorist organization, financing terrorism, murder, kidnapping, armed robbery, deliberate arson against another person's house, means of transport, conspiracy to murder and assault and battery as acts of terrorism for which he must bear responsibility.

- **The defense of the accused**

1. **NSABIMANA Callixte alias Sankara's defense arguments**

50. NSABIMANA Callixte alias Sankara had for defense counsel Mr Moise NKUNDABARASHI. He defended himself saying that he was pleading guilty to the charges against him, but that the way the prosecution had presented his role was very much mistaken because he is considered as one of the founders of FLN armed force, which is based on wrong background information on MRCD-FLN. He goes on stating that the allegation by the prosecution that the acts he committed were part of a long held plan is not correct, because when he left the country and fled to South Africa he found himself in the company of RNC members of Kayumba Nyamwasa, an opposition party to the Rwandan government, and he was indoctrinated into working with them to fight the current leadership using social media, and that he now pleads guilty and asks for forgiveness for the false information he spread, that it was stemming from an ideology of creating division among Rwandans that was instilled into him to the extent that he denied and minimizrd the 1994 genocide against Tutsi, when he himself is a genocide survivor.

51. He further alleges that he is not among those who created the coalition MRCD (Rwandan Movement for Democratic Change) since it was formed on 04/07/2017 as a result of an agreement signed in Lusaka, Zambia between CNRD-Ubwiyunge led by Wilson IRATEGEKA and RUSESABAGINA Paul's political party PDR-Ihumure, and in which they also agreed that RUSESABAGINA Paul would become MRCD's president and Wilson IRATEGEKA its vice president and the one called

KARINIJABO Jean Paul its chief secretary. They also formed an armed force named FLN, and at that time he was still the RNC Commissar in charge of communication.

52. He points out that it was on 28/10/2017 that he left RNC, and together with other eight colleagues, they created RRM as a political party of which he became president. On 18/3/2018, following discussions he had with RUSESABAGINA Paul, his party joined MRCD-FLN and he was made the second vice president representing his political party. Concerning the armed force FLN, he says that they agreed that it was going to continue to be a joint armed force, and that it was in that context that RRM sent in thirty (300) young men who passed through Uganda. They included NSENGIMANA Herman who later on replaced him as FLN spokesperson.

53. He indicates that decision making military instances remained as they were, the chief of staff was Lt General HABIMANA Hamada deputized by Major General SINAYOBYE Barnabe alias Morani who was in charge of military operations, Brigadier General HAKIZIMANA Antoine alias JEVA who was in charge of the Northern Sector, Brigadier General JOB in charge of the Southern Sector, whereas Captain Robert REBERO was its spokesperson. The political party RRM had no single position in the administrative structure of FLN. And apart the names of these leaders he managed to know, he had no role in its creation because it was formed by CNRD-Ubwiyunge on 06/06/2016 following its split with FDLR-FOCA.

54. He goes on contending that since joining FLN in July 2018, he has never set foot in DRC where its base was, that he only talked to its leaders, mostly Lt General Wilson IRATEGEKA who was CNRD president and FLN supreme commander. He indicates that an extraordinary meeting of MRCD political bureau was convened on 15/07/2018 and was chaired by its president RUSESABAGINA Paul and attended by Major General SINAYOBYE Barnabe alias Morani, the FLN deputy chief of staff in charge of military operations who explained to them that FLN forces

were in Nyungwe forest and that they were ready to capture it and fight RDF forces until the government of Rwanda accepts negotiations. He also informed them that the attacks launched on Nyabimata in Nyaruguru were by FLN forces, and that for him (NSABIMANA Callixte) it was the first time he was learning that the forces which carried out the attacks were FLN.

55. He also alleges that it was in that meeting that he was appointed FLN spokesperson and was promoted to the rank of major even though he was a civilian. It was also decided that he immediately issue an agreed-on MRCD press release calling for war against the Rwandan government, that he did not therefore promote himself to that rank as the prosecution alleges in order to show that he was a very powerful person within FLN, but that it was given to him by his FLN superiors so that he could speak for them as a soldier. He also alleges that he was not among those who planned those attacks, because even if his political party RRM had not joined the coalition MRCD, it would not have prevented it from materializing since the mastermind of attacking Nyungwe was Major General SINAYOBYE Barnabe alias Morani who told him that the attack was not going to be difficult for him, because it was an area he knew well, and that even the local population knew him and was going to help him feed the soldiers and give them money.

56. He also alleges that he had presented the plan to MRCD after CNRD-Ubwiyunge joined PDR-Ihumure on 4/07/2017 and to other FLN military leaders, and that was before his political party joined the coalition; and that RUSESABAGINA Paul accepted at that time to give it a financial support of one hundred thousand dollars ($100,000), and promised them that he would mobilize funds for them. For NSABIMANA Callixte alias Sankara, his role was only limited to communication, and even then, he was given instructions by Lt General Wilson and General Morani on what he had to make public and what he was not to say, and that is different from what the prosecution had presented.

57. He goes on arguing that Major RUSANGANTWALI Felix alias Gwado who was sent by General HAKIZIMANA Antoine alias JAVA is the one who commanded all the attacks in Nyaruguru and Kitabi, that all the bloodshed, all the damages caused in those areas in June and July 2018 are to be blamed on General SINAYOBYE alias Morani who sent him into Nyungwe forest together with the soldiers he commanded. He further added that the military force which launched the attacks is the FLN faction belonging to Wilson's CNRD political party, that there was no single soldier from RRM political party who participated in those attacks, considering that the military forces arrived in Nyungwe in April 2018 before RRM sent in its forces, while its four (4) soldiers who set foot on the Rwandan soil for the first time were involved in the attack launched at the beginning of 2019 in a contingent of one hundred soldiers (100) which came by way of  lake Kivu in Kilimbi, Nyamasheke District under the command of Major Appolon and which perished in Nyungwe forest.

58. NSABIMANA Callixte alias Sankara maintains that the role he accepts and for which he asks for forgiveness is the one he played after the attacks launched in Nyabimata, Nyaruguru District in June and July 2018, because he accepted to be FLN spokesperson and signed a press release confirming that it was their group that had done it, and he, in addition, used international broadcasters of BBC and VOA to boast that it was FLN which had done it, and that he asks the court to judiciously examine his role in those attacks, because he had no information at all about their planning and implementation.

59. He further alleges that with regard to the attacks carried out in Kitabi in Nyamagabe on 15/12/2018, he learned about them five (5) days earlier from General Morani who told him that he was planning something that would make Inkotanyi end the year badly, and on his turn he asked him to provide him in due time with videos and pictures that would help him prepare some propaganda that they would use to shame RDF soldiers by showing that the Rwandan forces have no power. What they needed was an act of bravery to present to the refugees and their fans so that

they increase their contributions for Morani, but after receiving the news about the attacks, including the burning of civilian vehicles, he realized that Morani had done the opposite of what they expected - to attack and burn military camps - and that he had tarnished their image.

60. He also alleges that after asking General Morani the reason why they burned civilian vehicles and what he or MRCD stood to gain from that, and after being rebuked by him, he turned away and went to talk with MRCD politicians, namely RUSESABAGINA Paul, MUNYEMANA Eric and KARINIJABO Jean Paul, and he found them angry against General Morani because of what the attack had done. They even said that what Morani had done conferred an advantage to the Rwandan government, given that they could be prosecuted and arrested, and indeed it did not take long for him to get arrested. The one who supported Morani was Lt Genera Wilson IRATEGEKA, MRCD's first vice president with whom they had collaborated in planning the attack.

61. He goes on stating that they never bragged about the attack, but that they instead issued a communiqué condemning it anddeclaring that it was done by the Rwandan government in order to create a motive to attack Burundi; and that he even went on Ubumwe radio and stressed it, given that they were afraid of being apprehended by the international police (Interpol), and they had planned in case they were summoned to show that communiqué as a proof that it was not done by them. It is that announcement that the prosecution confuses with the one he issued on 21/03/2019 about the attack of one hundred (100) soldiers who crossed lake Kivu at Nyamasheke under the command of Major Apollon in which he declared that they were controlling Nyungwe forest and was warning people against using roads going through it.

62. NSABIMANA Callixte alias Sankara maintains that the responsibility he accepts and for which he requests the court to legally examine with discernment the related offence and correctly qualify it, is the act he committed after Kitabi attack in

Nyungwe forest which he attributed to the Rwandan government because it was a public international terrorist act done by Morani.

63. He goes on mentioning that the other time he was on the international broadcasters BBC and VOA was after issuing the 21/03/2019 communiqué No 2019/03/21on Nyamasheke attackand that it was broadcastat the request of Morani, who was in charge of FLN operations, and who convinced him that a section of Nyungwe forest below the road which is contiguous with Nyamasheke and Karongi Districts was under the control of those forces which had crossed over through lake Kivu.

64. He goes on stating that he pleads guilty to offences of Tutsi genocide denial and minimization for which he is being prosecuted and is asking for forgiveness. He explains that he did it because he was convinced that it was President Kagame who had shot down the plane carrying HABYARIMANA Juvenal, and that the person who killed HABYARIMANA was the one who triggered the genocide. They had started that political line of thought in RNC, declaring that RPF had killed Hutus and genocide survivors, and was using genocide as a trump card and a commodity which it makes profit from; that he used it as a propaganda to turn the population against the government, and that was inculcated into him by the group Kayumba Nyamwasa and Patrick Karegeya he had joined in South Africa who claimed that RPF was lying to them by deforming the genocide history, and that he proclaimed it over different radio stations, Youtube and social media, and that it was the line of action he found within MRCD and pursued.

65. He declares that he also pleads guilty to the offence of maintaining relations with a foreign government with intent to wage a war, but that he would like to rectify what the prosecution said because it was not him who went to Uganda to meet General Abel KANDIHO, the DMI chief, but he rather sent there emissaries who had been sent by General Wilson IRATEGEKA. He, in addition, says that he pleads guilty and asks for forgiveness for the offence of using counterfeited documents, because when he arrived in South Africa in 2013, he used a Lesotho passport

when he wanted to go to Europe. He called himself a Congolese with the name of Joseph Kabera, the reason being the situation in which he was since he could not get a Rwandan passport.

66. Concerning the funding he received from MRCD-FLN, NSABIMANA Callixte alias Sankara confesses that he used to incite people to provide and collect contributions for MRCD. He explains that one hundred and ninety ( $190,000) thousand dollars was given by RUSESABAGINA Paul, including $125,000 the latter gave to Morani, $25,000 to another soldier, and that he had received all of that money from Lungu, the president of Zambia. He also gave $ 20,000 to General Wilson IRATEGEKA, $ 20,000 to General Java who said that he was going to plan hostilities in the north, and that there was approximately another $35,000 that came from America and Belgium which was collected by MUNYEMANA Eric and was sent to FLN, that the whole contribution amounted to $300,000, but there were other funds secretly contributed by businessmen.

67. He concludes saying that he is pleading guilty to all the offences he is charged with and feels sorry for them, and he is imploring pardon from all Rwandans, his country of birth, his excellence the President of the Republic of Rwanda, and in particular the victims of the attacks carried out by FLN for which he was a spokesperson, that he is ready to cooperate with other Rwandans to fight all the enemies of the country by exhorting all those he collaborated with in those bad acts to stay away from them and renew with the authority, and that it was in that context that he had indefinitely broken away from the political party RRM and the coalition of parties MRCD, and had provided information to the investigation and the prosecution that helped the country swart the planning of evil plots that could have endangered people's lives or damaged their property, like the formations of MRCD-FLN, FDLR-FOCA, RUD-Urunana, FPP-Isangano, PS and others because even though he was not their member, he had infiltrated them to the extent that he was well informed about most of their activities.

### 2. RUSESABAGINA Paul's defense

68. RUSESABAGINA Paul attended his case hearings on merits when the case started and was assisted by Mr GATERA GASHABANA and Mr RUDAKEMWA Jean Felix. He filed for objections and they were examined; when the prosecution began to present their accusation, he subtracted himself from the hearings but continued to be informed about the proceedings until the case hearings were concluded before he reappeared.

- The view of the court

  ➢ Background to the creation of MRCD and how its military wing launched attacks on Rwanda from 2018.

69. After NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul left Rwanda, they joined organizations that sought to overthrow the Rwandan government. NSABIMANA Callixte alias Sankara left Rwanda in 2013, and when he arrived in South Africa, he joined the organization Rwandan National Congress (RNC), an opposition group to the Rwandan government, and he was given different positions, including that of RNC youth coordinator in South Africa. In 2017, he left that organization and together with his colleagues they formed a political party called RRM which later merged with PDR-Ihumure and CNRD-Ubwiyunge into the coalition MRCD, which then formed the group FLN.

70. RUSESABAGINA Paul created his political party PDR-Ihumure, and then starting in 2009, he undertook to find ways of forming a force affiliated to it. He contacted HABIYAREMYE Noel who used to be in FDLR but it didn't work out because the latter came to get arrested in Burundi and was sent to Rwanda. RUSESABAGINA Paul maintained the idea of having a military force until his political party merged with CNRD-Ubwiyunge which was mostly made up of forces that had broken off from FDLR.

71. The fact that RUSESABAGINA Paul collaborated with FDLR people is corroborated by witnesses who were questioned in court, namely HABIYAREMYE Noel and Dr Michelle Martin. In his testimony, HABIYAREMYE Noel revealed that when he was in FDLR, RUSESABAGINA Paul asked him to help him recruit soldiers from FDLR to form a military force affiliated to PDR-Ubwiyunge, and he confided in him that it was impossible to do politics without having a military force. He also explained that in those discussions they had, he asked him to go to Burundi to meet with General Adolphe NSHIMIRIMANA, and that he took off with NDITURENDE Tharcisse who had broken off from FDLR, and when they arrived in Bujumbura, they met that officer and asked him if he could help them get military equipment and a rear base for their attacks, and they were given a positive response.

72. He also explained that they reported it to RUSESABAGINA Paul and also informed him that they had a communication problem, and then he sent him money through Western Union, but after collecting it they were arrested and sent to Rwanda. He also revealed that for the journey to Burundi, it was RUSESABAGINA Paul who provided him with transport by sending him two thousand ($2000) dollars through a certain MINANI Innocent who was in Belgium, but that he used to send him other funds for personal use.

73. Witness Michelle Martin in his testimony given in court confirmed that RUSESABAGINA Paul collaborated with FDLR, and that he learned it from a certain Prudence RUBINGISA who worked with him in assisting him to register and answer persons using emails, and that it was in that way that he noticed in his computer about thirty-three (33) messages he had exchanged with an FDLR fighter who was in Congo and who called himself Fernando Ngamiji, and he noticed that those messages were copied to RUSESABAGINA Paul. He also said that there are some messages he saw which were addressed to RUSESABAGINA Paul personally about funds to be sent to FDLR, and for his trip to South Africa to meet with MURWANASHYAKA in order to discuss the issue of buying arms.

74. He also said in that testimony that he once met RUBINGISA who told him that he had worked with somebody from FDLR for a period of about three years, but then RUSESABAGINA wanted to do it himself instead of using other persons, but after things didn't go well. Then, after realizing that RUSESABAGINA and RUBINGISA collaborated with FDLR, he informed the government of the United States about it.

75. The court finds that in 2010, after getting information that RUSESABAGINA Paul might be in some form of collaboration with FDLR, the prosecution opened a case file in which it was prosecuting RUSESABAGINA Paul for offences related to forming an irregular armed group affiliated to the political party PDR-Ihumure using some of FDLR fighters. In 2012, it transmitted that case file to the Belgian prosecution to prosecute him, but following terrorist attacks that the group FLN launched on Rwandan territory in 2018, the prosecution opened another case file which was transmitted to this court and in which it accused RUSESABAGINA Paul and his group of terrorist offences.

76. In the investigation the prosecution did on this case, it requested the Belgian prosecution to investigate RUSESABAGINA Paul and to question him on matters related to the offences he was charged with. He was questioned, his house was searched and the results of the investigation were sent to the Rwandan persecution and were used as some of the evidence on which they based to indict him in this case.

77. In 2016, after the political party PDR-Ihumure led by RUSESABAGINA Paul merged with CNRD-Ubwiyunge of General NDAGIJIMANA Laurent alias Wilson


IRATEGEKA Rumbago and formed a coalition they called MRCD, the political party RRM led by NSABIMANA Callixte alias Sankara on its turn entered into that coalition in 2018, and then in May 2018, they formed the military force of FLN which was made up of soldiers who had come from FDLR-FOCA and others who joined

later, like those sent by the RRM party, and it is that force that launched attacks on Rwandan territory in 2018 and 2019.

78. Following those attacks, NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul were heard on radios and social media boasting that it was the FLN force that had done it and that the force had been given the mission to launch those attacks, and that they would use all means possible until they overthrow the present Rwandan leadership.

➢ Determining whether NSABIMANA Callixe alias Sankara and RUSESABAGINA Paul have formed the irregular armed group FLN and whether they have been members of the terrorist organization MRCD-FLN.

1. Concerning the acts, they are prosecuted for.

79. The court finds that when NSABIMANA Callixte alias Sankara pleaded the case on merits, he admitted that the RRM party he led was a member of the coalition MRCD which had a military force affiliated to it - FLN. He also admitted that he was the second vice president and the spokesperson of that coalition and that he sent to it thirty (30) combatants.

80. The court finds that what he admitted during the trial, he had admitted it before in his interrogation before the investigators and the prosecution, and even when pleading for detention and provisional release when he explained how they formed MRCD and its affiliated armed force of FLN, how he had thirty (30) RRM fighters join it, and how he all along maintained relations with Burundian and Ugandan government employees with the purpose of getting support for FLN fighters.

81. The court finds that what he admitted concerning the formation of the coalition of MRCD parties and the affiliated military group FLN, bringing fighters into that

formation and being MRCD and FLN spokesperson was also confirmed by RUSESABAGINA Paul in his questioning during the investigation, when he said that the RRM party led by NSABIMANA Callixte alias Sankara joined the MRCD coalition, and that they formed an affiliated military force of FLN, that there were some fighters who were brought in by the RRM party, and how it was NSABIMANA Callixte who was made MRCD and FLN spokesperson.

82. It finds also that NSENGIMANA Herman, an RRM member, explained while he was pleading the case on merits that NSABIMANA Callixte alias Sankara was the one who incited him to join the FLN military formation, and who told him that their party had entered into MRCD coalition. He equally explained that it was NSABIMANA Callixte alias Sankara who provided the trip fare from Uganda to DRC, and it was him who introduced him to General Java, who also sent other thirty (30) young men who joined him there, and it was him who requested that he be made an MRCD information commissar.

83. NSENGIMANA Herman explained also that after the arrest of NSABIMANA Callixte, he was made MRCD-FLN spokesperson by General Wilson IRATEGEKA who told him that they were following the agreements they had with RRM. This explanation he gave during the trial on merits is what he had given in his questioning before the investigators, the prosecution and the court when he pleaded for detention and provisional release.

84. It also finds that even Sgt MUTAGA Pierre Claver in his questioning before the investigators had explained how NSABIMANA Callixte alias Sankara incited him to join opposition parties to the Rwandan government, and had asked him to recruit for him young genocide survivors who had done military training to enroll into MRCD military training. He also explained that he incited him to engage in securitydisturbing acts such as spreading leaflets, throwing hand grenades, cutting bridges, killing military and civilian authorities, and he indicated that it started from the end of 2017 to June 2018. He also said that with the request for him to join the

FLN armed group, NSABIMANA Callixte alias Sankara sent him one hundred and ten thousand (110,000 Rwf) francs to use to leave Rwanda, and that there are other persons, among them KAYITARE Jean Pierre and NSENGIMANA Paul, that he incited to join that formation.

85. In addition to those declarations, there are communiqués which prove that NSABIMANA Callixte alias Sankara was a member of MRCD-FLN and one of the FLN founders as demonstrated by the  18/03/2018 communiqué signed by RUSESABAGINA Paul, NSABIMANA Callixte alias Sankara and Wilson IRATEGEKA which proves that the RRM party was welcomed within MRCD; and another one of 15/07/2018 on MRCD leaders who formed the FLN armed group which he signed in his capacity as the MRCD second vice president and FLN spokesperson.

86. Pursuant to the provisions of article No 110 of Law No 15/2004 of 12/06/2004 on evidence and its production, which provides that a judicial admission refers to statements the accused or his or her representative makes before the court, and that such statements shall serve as plaintiff arguments. And even article 119 of that law and article 108 of Law No 27/2019 of 19/09/2019 on criminal case hearing provides that in criminal cases, evidence is based on all grounds, factual or legal provided that parties have been given a chance to be present for cross-examination, and it therefore finds that all that evidence proves beyond doubt that NSABIMANA Callixte alias Sankara is among the founders of the armed group FLN, and is also an MRCD-FLN member.

87. RUSESABAGINA Paul who did not attend his case hearing on the merits so that he could defend himself, admitted before the investigators on 31/08/2020 that the PDR-Ihumure party of which he was a leader, merged with CNRD-Ubwiyunge party led by Wilson IRATEGEKA and they formed the coalition MRCD. He also stated that it was in March 2018 when the RRM party of NSABIMANA Callixte alias

Sankara joined that coalition and they formed an armed group affiliated to it they called FLN.

88. It finds that he stated that the biggest number of FLN fighters belonged to CNRD-Ubwiyunge, that the others came from inside Rwanda, Rwandan refugee camps, and others had been brought by Sankara's party RRM. He also said that the objective of MRCD-FLN was to bring the international community, international institutions and the government of Rwanda to comprehend that refugees had to go back home and fight for their rights using all means possible, whether through negotiations or hostilities.

89. When RUSESABAGINA Paul was also interrogated by the prosecution, he again explained that together with Wilson IRATEGEKA, they launched what they called MRCD, and among what they agreed was the formation of an armed force, and that in March 2018 they signed an agreement with Sankara's RRM party which also brought along its young men, and that it was at that time that the force which used to belong to CNRD became FLN. He also said that the three of them who were leaders of the parties making up MRCD asked CNRD soldiers to find them an appropriate name for the force, and those are the ones who brought the idea of calling it FLN and it was accepted.

90. On 14/09/2020, when RUSESABAGINA Paul was being tried for detention and provisional release, he explained that on the question of knowing whether he accepts to plead guilty to the offences he was charged with, he had talked about it with the investigation organs and that he gave an answer to each question, and that if necessary he would repeat it during the case hearing on the merits.

91. Apart from what RUSESABAGINA Paul said himself, there are persons who accuse him of being one of the founders of MRCD and FLN, and they include NSABIMANA Callixte alias Sankara who was MRCD second vice president and FLN spokesperson. In his questioning by the investigators or during his pleading

for detention and provisional release and even during the case trial on the merits, he confirmed that RUSESABAGINA Paul was one of the founders of MRCD coalition and its armed branch FLN. NIZEYIMANA Marc, who was one of FLN commanders, confirmed in his questioning by investigators that MRCD was a coalition of PDR-Ihumure party led by RUSESABAGINA Paul, CNRD which was led by Wilson IRATEGEKA, and RRM of NSABIMANA Callixte alias Sankara and that the coalition had a military wing called FLN. NSENGIMANA Herman told the court that Sankara told him that CNRD and PDR-Ihumure had discussions in which RRM also took part, and that RUSESABAGINA, General Wilson and Sankara had their own space to hold private meetings as presidents when they didn't want the presence of others. He also said that the MRCD presidents rotated each year, that when he joined FLN it was RUSESABAGINA who was president, and then after he was replaced by IRATEGEKA.

92. It finds that there are also communiqués which were retrieved from RUSESABAGINA Paul's computer during the search conducted by the Belgian police, including the 15/07/2018 MRCD coalition declaration announcing that MRCD leaders had created a military force of FLN, and that they had entrusted it with a firm mission of overthrowing without delay the RPF regime, and the one of 30/04/2019 in which RUSESABAGINA Paul says that young men and women making up the FLN force are continuing the struggle in military activities opposing them to RPF government forces.

93. There are also discussions, including one that was aired on the internet radio 'the rock' in which RUSESABAGINA Paul explained how, as three (3) political parties, they formed FLN and how that formation was given the name of FLN in May; and another one on Youtube in which he said that they had put in place the military force of FLN whose mission was to liberate the Rwandan population, saying that the time was ripe to use any means to bring change in Rwanda. It also finds that as it emerges from a whatsapp discussion on chat No 136 retrieved from RUSESABAGINA Paul's phone by the Belgian police, he admitted in his

16/09/2020 questioning by the prosecution that the message was about a conversation he held with TWAGIRAMUNGU Faustin, and he admitted that those he called his boys under fire was FLN, and that is another proof that he was trying to find means for FLN fighters.

94. Basing on what is provided by article 108 of Law No 27/2019 of 19/09/2019 related to criminal procedure and on the writings of legal experts comprising Michel FRANCHMONT et alii on the matter, that it is the judge who gives appreciation to the investigative statements of witnesses, it finds that RUSESABAGINA Paul's statements before the investigators[13] and in court while pleading for detention and provisional release in which he admitted being among those who formed MRCD and  FLN, the statements of those who played a role in the activities of those formations, including NSABIMANA Callixte alias Sankara, NIZEYIMANA Marc and NSENGIMANA Herman as well as other mentioned evidence, including announcements and talks, constitute evidence which proves beyond doubt that RUSESABAGINA Paul is one of the FLN founders and is an MRCD-FLN member.

### 2.  Legal provision on forming an irregular armed group

95. The Public Prosecution bases on what is provided by article 459 first paragraph of Organic Law No 01/2012/OLof 02/05/2012 instituting the penal code to accuse NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul of the offence of forming an irregular armed group. The court finds that the article provides that any person who carries out recruitments or incites or makes an arrangement with the armed group other than the regular forces of the State, by gifts, remuneration, threats, abuse of authority or power shall be liable to a term of imprisonment of ten (10) years to fifteen (15) years.

---

[13] La force probante des proces verbaux est appreciee par le juge, comme pour toute autre preuve. (...).
FRANCHIMONT M. et alii, Manuel de progedure penale, 2e edition, Editions Larcier, 2006, p,1063.

96. It finds that article 200 of Law No 68/2018 of 30/08/2018 determining offences and penalties in general stipulates that any person who by donations, remuneration, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular armed group or signs an agreement with this group for the purposes of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than ten (10) years and not more than fifteen (15) years.

97. After analyzing the provision of these articles, the court finds that they punish any person who forms an irregular armed group or incites it or makes arrangement with an irregular armed group for the purpose of supporting an armed attack by irregular forces through donations, remuneration, intimidation or abuse of power.

98. The court finds that in view of the fact that the law instituting the penal code of 2012 and that of 2018 provide both the same penalties, what must be applied is the organic law instituting the penal code of 2012, since it is the one that was applicable when FLN was created, based on article 334 of law No 68/2018 of 30/08/2018 which provides that an offence committed prior to the publication of this Law in the Official Gazette of the Republic of Rwanda is punishable under the Law hitherto applicable unless this Law provides for lesser penalties.

99. When the court examines the category of offences the formation of an irregular armed group belongs to in that penal code, it finds it in the offences against external State security. It finds this to be the same in the law of the 1977 penal code and even in the 2018 law on offences and penalties in general. Moreover, the offence of forming an irregular armed force was examined in different cases including the case of MUSHAYIDI Deogratias and that of INGABIRE UMUHOZA Victoire decided by the High Court and confirmed by the Supreme Court which have

determined that the purpose of that offence is to have the Rwandan state conquered by foreign countries[14].

100. By associating what is provided by article 459 mentioned above with acts committed by NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul of creating the MRCD coalition and subsequently forming an affiliated armed wing FLN, the court finds that what they did does not constitute the offence of forming an irregular armed group, because it is not in the category of offences against external state security and that they did not do it in the intention of supporting an armed attack by another irregular armed force. Considering the manner in which those acts were committed, the court must consider whether it does not constitute the offence of membership of a terrorist group.

### 3. Legal provision on the offence of membership of a terrorist group

101. The offence of membership of a terrorist group is provided by article 18 of Law No 46/2018 of 13/08/2018 on counter terrorism as amended until today which stipulates that a person who is a member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity building of another terrorist group, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of no less than fifteen (15) years but not more than twenty (20) years. It finds that article 2, paragraph 11 of that law explains that a terrorist group is a structured group of persons acting in concert and with intent to commit terrorist acts.

---

[14] RP 0040/10/HC/KIG MP C/MUSHAYIDI Deogratias decided by the High Court on 17/09/2010, paragraph 32 and case RP 0081-0110/10/HC/KIG MPC/ INGABIRE UMUHOZA Victoire and company decided by on 30/10/2010, paragraph 60: " (…). Even the explanatory memorandum of the Rwandan penal code shows it, because it states that the armed group mentioned in this article is the armed group known as "mercenaries" (Epose des motifs du Projet du code Penal, page 12), and the acts MUSHAYIDI Deogratias is accused of are not setting up a " group of mercenaries".

102. When the court analyses what is provided by those articles, it finds that article 18 punishes three (3) acts, namely: membership and accepting to be a member of a terrorist group; participating in acts of a terrorist group and contributing to the capacity building of another terrorist group, whereas article 2 part 11 explains what a terrorist group is.

103. The definition of a terrorist group given by that article coincides with explanations given by legislations and decisions of other countries like Belgium[15], Tunisia[16] and Senegal[17] and even writings of experts[18] which have also explained that a terrorist group is a structured group of persons acting together with intent to commit terrorist acts, which means that a group is considered as an act of terrorism when it was formed to commit such acts.

104. It finds that article 421-2-1 of the French penal code and the explanations provided therein stipulate that a terrorist group is defined as an association of criminals when it possesses the necessary means and equipment and has the intent to commit terrorist acts even if they have not decided where to commit them

---

[15] Article 139 of the Belgian penal code defines terrorist group as a structured association of more than two persons, established in time and which acts in a concerted way in order to commit terrorist offences provided in the penal code. That definition aims to comprehend a group whose structure not being necessarily fixed or stable, has intentionally constituted itself with the purpose of committing terrorist acts", Tribunal correctionnel de Bruxelles, 16 February 2006, Feuillet 101.

[16] Article 3 of Organic Law No 2015-26 of 7 August 2015, on counter terrorism and money laundering stipulates that a terrorist organization is a structured group made up of three or more persons, created for any length of time and working together with the purpose of committing either one of the offences provided by the present legislation on the national territory or abroad.

[17] Considering that the association of criminals is qualified as an act of terrorism, when it is included in a terrorist context, in other words when it is intentionally in relation with an individual or collective undertaking with the aim of disturbing public order or the normal functioning of the national or international institutions, by intimidation or terror,…" Jugement No 91/CCS/of 19/07/2018 MP/Aliou NDAO and 29 others.

[18] "A terrorist group is a subnational collective of individuals who pursue a common political goal through the practice of terrorist acts", Tood Sandler: Terrorism what everyone needs to know, Oxford University Press, New York 2018, p.46.

or planned them[19]. It is also in that way that the instructions of the European Union on counter terrorism define what terrorism is and what a structured group is.[20]

105. The court finds that, as it was explained, the coalition MRCD had a structure and formed the armed group FLN which had also a military structure as it is explained by the defendants in this case. It also finds that when MRCD leaders formed the FLN force, they gave it the task to use all means including armed conflict and in 2018 that formation started launching on Rwandan territory attacks which targeted the local civilian population and their property.

106. On the basis of acts committed, the court therefore finds MRCD-FLN to be a terrorist group because it is structured, has the intent to commit terrorism since it committed the mentioned acts comprising murder, robbery and arson without any other purpose other than intimidating the non combatant population whom they found in their homes, on trips in their vehicles and in other places.

107. Therefore, on the basis of what article 18 of the mentioned Law No 46/2018 of 13/08/2018 provides, and matching it with the fact that NSABIMANA Callixte alias Sankara and RUESESABAGINA Paul are MRCD members, that they also formed the FLN force, the court finds them guilty of the offence of membership of the terrorist group MRCD-FLN.

---

[19] "L'article 421-2-1 du code penal punit la participation a un groupement forme ou a une entente etablie en vue de la preparation, caracterisee par un ou plusieurs faits materiels, d'un des actes de terrorisme. (….). Un groupement peut etre qualifie d'association de malfaiteurs s'il rassemble et conserve la capacite et la structure logistique necessaire aux actions terroristes et agit materiellement en vue de leur preparation, y compris avant meme que la cible n'ait été selectionnee ou qu'un plan operationnel n'ait été mis au point », Recueil ses cas sur les affaires de terrorisme, Nations Unies, New York, 2010, p. 23, para. 54.

[20] Article 2.3 EU Directive 2017/541 on Combatting terrorism defines « terrorist group » as structured group of more than two persons, established for a period of time and acting in concert to commit terrorist offences; "structured group" as group that is not randomly formed for the immediate commission of an offence and that does not need to have formally defined roles for its members, continuity of its membership or a developed structure.

108. Considering the series of acts NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul committed in it, including creating MRCD, giving it the military force of FLN which launched various attacks on the Rwandan territory in 2018 and 2019, and that they subsequently boasted about it in different communiqués including that of 15/07/2018 signed by NSABIMANA Callixte alias Sankara, MRCD second vice president and FLN spokesperson, which declared that FLN, the armed forces of MRCD has tried to do acts of liberation in Cyangugu, Nyamagabe, Nyaruguru, Bugesera and Huye and that it was requesting support to the FLN youth. The court finds that they became members of that organization knowing that it was involved in terrorist activities, and they were willing to be its members. The fact that the intention to commit an offence could be examined in the light of the series of acts committed coincides with what was confirmed in Garry Bell versus the State of Connecticut[21]case.

109. The court finds that the allegations denying the existence of the terrorist group MRCD-FLN have no grounds because they themselves admitted that the group exists as demonstrated by the 10/06/2019 MRCD communiqué signed by RUSESABAGINA Paul as MRCD president, which was retrieved from his computer during the search conducted in Belgium in which he points out, after Sankara's arrest, that MRCD-FLN continues to follow the case of Major Callixte NSABIMANA alias Sankara the ex-military operations spokesperson, thus inferring that the group that committed terrorist acts and of which they were members was MRCD-FLN, as you cannot separate MRCD from its military activities.

110. The court finds again that stating that they had no intention to commit terrorist acts when they formed MRCD and FLN, that they rather intended to free Rwandans by removing the current Rwandan leadership and to hold negotiations with the

---

[21] State of Connecticut v, Garry Bell (AC 21374), Argued December 11, 2001 – officially released March 19, 2002: "Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available… Intent is often inferred from conduct … and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom",
https://www.jud.ct.gov/external/supapp/Cases/AROap/68ap243.pdf , accessed on 15 September 2021.

Rwandan government so that the refugees could go back home have also no grounds, because if they had those intentions, they would not have launched indiscriminate attacks on the population, killing, robbing, committing arson of their property including houses, means of transport, ambushing people on roads and setting fire to vehicles transporting them, exploding grenades in public places and so on.

➢ Determining whether RUSESABAGINA Paul has financed the terrorist group MRCD-FLN

1. Acts and proofs serving as evidence

111. The acts that serve as the basis for the prosecution to accuse RUSESABAGINA Paul of financing the terrorist group MRCD-FLN is the fact that he personally provided funds and equipment to that organization, was involved in activities of mobilizing different persons to support it and the fact that his political party PDR-Ihumure also made contributions to activities of that organization.

112. RUSESABAGINA Paul who did not attend the case hearings on merit admitted in his 31/08/2020 questioning before the investigators that he was one of the main FLN funders, that he gave it twenty thousand (€ 20,000) Euros, and that there were other funds provided on a personal basis from across the world, that fundraisings intended to finance that group were organized. He also said that those who would know the amount of money used to finance FLN and MRCD are its treasorers like the one called MUNYEMANA Eric and Emilien who used to receive money and transfer it to the Democratic Republic of the Congo, but that he did not know how the money was transferred. He also said that the total amount of money they had sent so far was close to three hundred thousand ($ 300,000) dollars.

113. It finds that he explained that the origin of the military equipment used by FLN combatants was known by the combatants themselves, because for them as

MRCD, what they did was to provide funds which were sent to the FLN appointed officials. It was them who looked for equipment including guns, ammunition, medicines, food, clothes and so on, that it was General SINAYOBYE Barnabe who was in charge of buying military equipment. The other thing he admitted in that questioning is that for security reasons, MRCD leaders used secured telephones of the type of blackphone which had been purchased in Great Britain at a cost of probably eight hundred (800) dollars a piece.

114. In his 05/09/2020 interrogation by the investigators, RUSESABAGINA Paul said that at one-time Brigadier General HAKIZIMANA Antoine JEVA wrote to him asking him to send him food because his FLN forces were hungry, but that he never responded. He also said that he did not remember sending a funding of six thousand ($ 6,000) dollars to General Wilson IRATEGEKA to bring more than thirty (30) RRM party combatants from Uganda to FLN in DRC, that it was rather Sankara who told him that those fighters had come from Uganda and had gone to FLN.

115. It finds that he also said that he once sent three thousand ($3,000) dollars to General SINAYOBYE Barnabe, field operations commandant, who had told him that he had a problem of money and that he gave it to him for help because he had asked for it due to living conditions, being with a wife and children, but that it angered General Wilson IRATEGEKA who wanted that the money be rather sent to him. He also said that whenever Wilson IRATEGEKA who was In DRC asked for money, each MRCD-FLN party member brought through their treasurer its contribution which was transmitted to Eric MUNYEMANA, the main treasurer, and who in turn would send it where it was needed without holding any other meeting.

116. It finds that once again RUSESABAGINA Paul said in his interrogation at the prosecution that he made a financial contribution of twenty thousand (€ 20,000) dollars to FLN forces because they needed money for living. He also said that by financing that irregular armed force, he did not intend to commit terrorism because

their intention was to sensitize the international community, international organizations and even Rwanda about the problem of refugees who had spent twenty-four (24) years in exile, having tried all other peaceful means and failed and that there was no other avenue to give them back their rights.

117. The court finds that during the hearing of his case on detention and provisional release on 14/09/2020, RUSESABAGINA Paul said that with regard to the offences he is charged with, he had explained them during the investigation, but he once again admitted that he gave FLN twenty thousand (€20,000) Euros and that he sent General SINAYOBYE Barnabe three thousand ($3,000) dollars on compassion as he was almost crying when he asked for his assistance, and that the money was not given to FLN. He also said that the money his wife is alleged to have sent to Comoros, the recipient they mentioned is a wrong one, that she sent it to Sankara because she and Sankara's mother were born in the same district. He also said that the fundraising of three hundred thousand ($ 300,000) dollars is attributed to him because he was the PDR top leader, but that he did not use the money. It also finds that he also said that among the names visible in the FLN money transfer documents shown to him in his questioning during the interrogation, the persons he knows are Eric MUNYEMANA and INGABIRE Claire.

118. Apart from what he explained, there are also statements showing that he used to send money to FLN combatants. They include those of NDAGIJIMANA Jean Chretien who confirmed during the investigation that RUSESABAGINA Paul sent money to General Wilson IRATEGEKA, and those of Colonel NIYONZIMA Arthemon, the CNRD treasurer who in his statements at the investigation Bureau on 06/02/2020 explained that CNRD friends used to personally send money through Eric, whereas those in the coalition like RUSESABAGINA, TWAGIRAMUNGU Faustin and SANKARA used to send it through their party secretaries, and the latter would give it to the finance commissar who would send it to the CNRD president.

119. It finds that also NSABIMANA Callixte alias Sankara, in his questioning at the prosecution on 20/05/2019 and at the investigation bureau on 31/08/2020 confirmed that RUSESABAGINA personally financed FLN by revealing that he instructed MUNYEMANA Eric to send fifteen thousand ($15,000) dollars to a businessman in Bujumbura called Issa who had to hand the money over to General Steven who was in charge of intelligence so that he help FLN fighters to get a passage and equipment; and that the businessman was General Hamada's young brother and it was him who was the intermediary between General Steven and RUSESABAGINA Paul. He even said that once RUSESABAGINA Paul sent six thousand ($ 6,000) dollars to Wilson IRATEGEKA which was used to bring thirty (30) young men who were sent from Uganda to FLN base in DRC by RRM party under the command of NSENGIMANA Herman.

120. It finds that NSABIMANA Callixte alias Sankara said also that towards the end of 2017, RUSESABAGINA Paul gave to SINAYOBYE Barnabe alias Morani one hundred thousand ($100,000) dollars after him, IRATEGEKA, Hamada and HAKIZIMANA Antoine alias Jeva together with Morani had agreed to launch attacks in Nyungwe forest. He also said that the second time he gave him fifty thousand ($50,000) dollars which he split with HABIMANA Hamada who was the FLN chief of staff, and that it was that money that enabled General Morani to take a trip from Congo to Burundi to secure a passage for the forces which came from FLN division II in North Kivu under Java, that those forces numbering more than one hundred (100) were led by Major RUSANGANTWALI Felix alias Gwado and they were the ones who committed terrorist acts in Nyaruguru and Nyamagabe Districts in 2018.

121. The court finds that NSABIMANA Callixte alias Sankara once again testified against RUSESABAGINA Paul when he was questioned by the investigation bureau on 19/10/2020, alleging that he sent to FLN a financial support of one hundred and ninety thousand ($190,000) dollars including one hundred thousand ($100,000) he gave to Morani, and he again gave him another twenty five thousand

($25,000) dollars, and gave HABIMANA Hamada twenty five thousand ($25,000) dollars, and another twenty thousand ($20,000) to Wilson IRATEGEKA out of which he took six thousand ($6,000) dollars that was used to bring soldiers from Uganda to FLN, and that there is another twenty thousand ($20,000) dollars he gave to Java who claimed he was preparing attacks into Rwanda from the volcanoes, and that it was the funds in dollarst he remembered but that there was some other money he squandered which he did not pay attention to what it was used for.

122. It further finds that in his questioning by the investigators, NSABIMANA Callixte mentioned also the Blackphone telephones, including the one MUNYEMANA Eric sent him when he was in Madagascar which had been purchased with the money given by RUSESABAGINA.

123. NSABIMANA Callixte alias Sankara again admitted during the hearing of his case on merits that in different times RUSESABAGINA Paul provided FLN with funds for support totaling about three hundred thousand ($300,000) dollars, that some of it was channeled through MUNYEMANA Eric, the MRCD treasurer and was sent to FLN commanders including Morani, Wilson IRATEGEKA and Jeva. He also said that after he released the 15/07/2018 communiqué calling for war against the Rwandan government, he became worried about his security and asked money RUSESABAGINA, and then on 16/07/2018, he sent him one thousand (€1,000) Euros which was sent by his wife through a friend of hers called SOIGHIR Mlinde Msoubouti and the money was destined to buy a plane ticket from Comoros to Madagascar, and that when he arrived there, he sent him another five thousand ($5,000) dollars through Eric MUNYEMANA, the MRCD treasurer, and that he again sent him another one thousand ($1,000) dollars also through Eric MUNYEMANA which he used to return to the Comoros from Madagascar.

124. It finds that in his questioning by the investigators on 06/02/2020, Colonel GATABAZI Joseph alias Gathos also detailed how FLN was financed, he indicated

that he did not know the amount of the financial support each party provided, but that they were told by Wilson IRATEGEKA alias Rumbago that the funds were collected by each party, and the party perceived 10% and the rest would be sent to FLN, and that all the contributions were received in Belgium by Eric MUNYEMANA, the treasurer. He also said that RUSESABAGINA Paul was among the persons who contributed money.

125. It finds that even Brigadier General MBERABAHIZI David who was in the political department and also an MRCD advisor in security and social affairs stated in his 06/02/2020 questioning before the investigators that some money was given by RUSESABAGINA Paul and other contributions came from refugees, donors and the fundraising held in Australia, organized by a certain Jean Paul KARINIJABO.

126. The court finds that also on 29/01/2019 there was an exchange on whatsapp chat no 127 between RUSESABAGINA Paul and HAKIZIMANA Antoine alias Jeva, one of the FLN commanders, which was retrieved from RUSESABAGINA Paul's telephone during the investigation carried out in Belgium, in which RUSESABAGINA thanked HAKIZIMANA Antoine for the report he had sent him, telling him that on their part they were trying to put their hands in their pockets.

127. Considering RUSESABAGINA Paul's statements in the investigations and in court when he pleaded for detention and provisional release, and the available statements of other persons who testified against him, and even the talk he had with HAKIZIMANA Antoine alias Jeva posted on whatsapp chat, and matching that with article 108 of Law No 027/2019 of 19/09/2019 on criminal procedure, the court finds that there is enough evidence to prove that there was financial support that was sent to FLN forces in DRC, which included contributions made by RUSESABAGINA Paul himself, money from organized fundraisings as well as from contributions from the political party PDR-Ihumure he led and from other party members of the coalition MRCD of which he was also president.

128. After the analysis of that evidence, the court finds that in addition to the financial support, RUSESABAGINA Paul contributed also material support to MRCD made up of telephones used by its leadership in the context of ensuring the security of the exchanges they had. He admitted this in his 31/08/2020 questioning by the investigators when he explained that those telephones had been purchased in Great Britain and specified the price of each one of them. The fact that Blackphone telephones were used by MRCD leaders was also confirmed by NSABIMANA Callixte in his questioning on 17/05/2020 when he said that there were telephones of Blackphone brand, including the one sent to him by MUNYEMANA Eric in Madagascar, which had been bought with the money provided by RUSESABAGINA. This is corroborated by the 29/08/2018 receipt of the company Blackphone which is in the file confiscated in the 21/10/2019 search conducted in MUNYEMANA Eric's house in Belgium showing that there were three (3) telephones bought for one thousand three hundred (£1,300) pounds.

129. The other proof of the existence of money being sent to DRC is what came out of the investigation conducted in Belgium when MUNYEMANA Eric's wife, UWIRAGIYE Odette was interrogated on 18/10/2019 and confessed that her husband used to give her money to send to various friends and family members, but that he did not tell her its motive, and that she did not know anything about MRCD and FLN. INGABIRE Marie Claire admitted in her revelations of her 17/10/2019 questioning during that investigation that she was an RRM member, that there was one MRCD meeting she attended in which she met RUSESABAGINA Paul and Eric and confirmed that MUNYEMANA Eric was an MRCD member.

130. MUNYEMANA Eric himself admitted on his 17/10/2019 questioning during the investigation that he used to send money, even though he did not want to reveal those to whom he sent it, where they were and the means he used to send it. The fact that MUNYEMANA Eric used to send money to various persons in different countries was also confirmed by a certain BALOKA Christian in his 27/1/2020

questioning in which he said that he helped MUNYEMANA Eric to send money to DRC, Rwanda and Madagascar through Western Union on the pretext that he had forgotten his identification documents; that the person he remembers to whom he sent money in Madagascar is one called Adriantsimiavontsoa.

131. However, in his 18/10/2019 questioning during that investigation, RUSESABAGINA Paul refused to say anything on the issue of MRCD and the sending of money, but as it was explained in the search conducted in his house, documents related to MRCD and one showing that his wife had sent money to NSABIMANA Callixte, as the latter explained, were seized.

132. The file also contains a whatsapp chat no 27which is in the evidence obtained from the investigation carried out in Belgium which reveals a platform used by persons who called themselves Abadasigana-MRCD, which indicates that from 07/09/2019 they were informed that the MRCD secretariat had put in place the HABARAMBE  means to help them support one another in case of emergency, and it was exhorting them to make contributions, and it contains also a message from MUNYEMANA Eric informing them that the money they had, had been sent to those they referred to as farmers to help them buy foodstuff, and some other funds were sent to buy hoes, pebbles and to help farmers cross over to the farms, buy medicines and other things. He was also informing them that from January 2019, they had sent one hundred and fifty thousand ($150,000) dollars. It finds that the content of this message coincides with what RUSESABAGINA Paul explained in his questioning during the investigation that they used a coded language in which FLN combatants were referred to as farmers and the battle field as farm and so on.

2. Legal provision on the offence of the financing of terrorism

133. The court finds that the offence of terrorism financing is provided by article 24 of Law No 69/2018 of 31/08/2018 on prevention and punishment of money laundering

and terrorism financing which stipulates that any person who finances terrorism, makes an agreement or has an interest in it in order to acquire funds or any other assets, or enables another person to acquire money or support, knowing or having reasonable grounds to believe that they can be used for terrorist purpose.Upon conviction, he/she is liable to imprisonment for a term of not less than seven (7) years but not more than ten(10) years and a fine of three (3) to five (5) times the amount of money given. The court also finds that terrorism financing is also provided under article 2, 4 of Law 46/2018 of 13/08/2018 on counter terrorism as amended until today as a terrorist act.

134. It finds that punishing terrorism financers is provided in international laws like article 2 of the International Convention for the suppression of the financing of terrorism adopted by the United Nations on 09/12/1999[22] and ratified by presidential order No 43/01 of 14/04/2002.

135. The court finds that the definition of terrorism financing given by article 3, 1o of that law which says that it is an act committed directly or indirectly by a natural person or a legal organization, on behalf of a terrorist or a terrorist group, in giving, collecting or managing property or funds, offering advice, in order to acquire those funds or equipment that may be used, knowing that they are intended to be used, in whole or in part in terrorist activities.

136. This definition of an act of terrorism financing is the same as that given in article 3, 3o of law 75/2019 of 29/01/2020 on prevention and punishment of money laundering, financing of terrorism and financing of proliferation of weapons of mass

---

[22] Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out: (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing an act. (....)" Article 2 of International Convention for the suppression of the financing of terrorism. New York, 9 December 1999.

destruction23, and it was the definition given by article 4 second paragraph of law No 47/2008 of 09/09/2008 on prevention and punishment of money laundering and financing of terrorism. The court finds that the definition given by these articles corresponds to laws of other countries such as the one of Turkey on prevention of terrorism financing24 and that of the United States of America25.

137. If the court addresses holistically the provision of article 24 of the law on prevention and punishment of money laundering and financing of terrorism which punishes the financing of terrorism as an offence, whereas article 2 of the law on counter terrorism provides that support is an act of terrorism, it finds that a person who has financed acts of terrorism should not be punished for the support as an offence on its own as provided under article 24 of law No 69/2018 of 31/08/2018 mentioned earlier, but should rather be punished as someone who has committed an act of terrorism provided under article 2 of law on counter terrorism, since this law providing for it is on counter terrorism and is more specific and the most recent one.

138. The court finds that, apart from what has been explained, this offence of financing terrorism should be charged on a natural person or a legal organization financing a terrorist group but who are not among its founders or a member of its leadership, and who did it with the knowledge that the support would be used in terrorist acts.

---

23 Article 3 3o of Law no 75/2019 of 29/01/2020 on prevention and punishment of money laundering , financing of terrorism and financing of proliferation of weapons of mass destruction defines the financing of terrorism as: an act committed directly or indirectly by a natural or legal person, on behalf of a terrorist or terrorist organization in giving, collecting or managing property or funds, offering advice, teaching, training in order to acquire property or funds that may be used, knowing or is likely to know that they are intended to be used, in whole or in part in terrorism activities.

24 Aux termes de l'article 4 de la loi Turque no 6415 : « l'infraction de financement du terrorisme consiste en la mise a disposition ou la collecte de fonds pour un terroriste ou une organisation terroriste dans l'intention que ces fonds soient utilises, ou en ayant connaissance et en approuvant le fait qu'ils doivent l'etre, en vue de commettre des actes pou lesquels l'article 3 interdit de mettre a disposition or de collecter des fonds ».

25 "Material support or resources" is defined  in &2339A by a listing of different types  of aid. It means: currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communication equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials", Norman Abrams, The Material Support Terrorism Offenses: Perspectives Derived from the (Esrly) Model Penal Code, https://jnsip.com/wp-content/uploads/2010/08/02 ABRAMS. pdf, accessed on 15th September 2021.

139. Therefore, the court, considering the acts committed by RUSESABAGINA Paul including forming the FLN force which launched attacks on the Rwandan territory, giving money to FLN commanders who led those attacks, accepting that his political party PDR-Ihumure provide monthly contributions to MRCD-FLN force and having purchased telephones for its leaders to use for communication between themselves without being intercepted in their exchanges, finds that he had a role in acts of terrorism. As a consequence, that role he played in terrorist acts will be explained together with other acts of terrorism he is being prosecuted for.

➢ Determining how to qualify terrorist acts committed in the attacks which NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul are accused of and the role they played in them

1. Concerning acts and evidence

140. The court finds that from June 2018 to October 2018, FLN fighters launched attacks in Nyabimata Sector, Nyaruguru District, Nyungwe forest in Kitabi Sector, Nyamagabe District and in Rusizi District. They killed nine (9) civilian people and others were wounded and some seriously, they set on fire people's property including houses, vehicles, looted clothes and foodstuffs and even kidnapped persons whom they used to transport what they had looted.

141. The local persons killed in those attacks are Mutesi Jacqueline, Atete Sine Ornella, Mukabahizi Hilarie, Nteziryayo Samuel, Niyobuhungiro Jeanine, Niyonshuti Isaac, Habarurema Joseph, Maniriho Anatole and Munyaneza Fidele. The wounded include Nsengiyumva Vincent, Kayitesi Alice, Bwimba Vianney, Nkurunziza Jean Nepomuscene and Rutayisire Felix. Those whose property was looted and those who were forced to transport it include Shumbusho Damascene, Ntakirutimana Sylvain, Nsabimana Anastase, Ngendakumana David, Siborurema

Venuste and Habyarimana JMV. There are also vehicles that were set on fire including public transport vehicles belonging to OMEGA, EXPRESS Ltd and ALPHA Express Company Ltd.

142. The court finds that those acts served as a basis for the prosecution to accuse NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul of murder, assault and battery, kidnapping, deliberate arson of a person's house and means of transport and armed robbery as acts of terrorism. There is in addition for RUSESABAGINA Paul the attempt to commit murder as an act of terrorism.

143. Concerning those acts committed in those attacks, NSABIMANA Callixte alias Sankara admitted in his case hearing on merits that it was FLN that launched those attacks. He mentioned that there was a meeting of MRCD political bureau which took place and in which General SINAYOBYE Barnabe alias Morani was invited and who informed them about the presence of FLN forces in Nyungwe forest and that they were ready to seize it and that attacks launched on Nyabimata in Nyaruguru were those of FLN forces. He also admitted that it was decided in that meeting that he immediately release, as an FLN spokesperson, a communiqué calling for hostilities against the Rwandan government. And he says that the role he played in those attacks in Nyabimata, Nyaruguru in June and July 2018 was to have put out a press release claiming that they were the ones who had done it and to have had it broadcast over international radio stations.

144. He also explained that he was told about the 15/12/2018 attack launched in Kitabi Sector in Nyamagabe by General Morani five days before it took place, and that on his turn he asked him to give him a video and pictures, but after observing that civilian vehicles were burned in that attack, he realized that the expectations that Morani would attack and burn military camps is not what happened since he did different things from what he had told them, and therefore they did not claim that attack, but instead they released a communiqué condemning it and blaming it on the Rwandan government saying it was a pretext to attack Burundi, and he

announced it over radio Ubumwe. He also said that he had meetings with Burundi and Uganda officials in the context of negotiating a passage for FLN fighters and a reception of its commanders for discussions on the support they would give it. The court finds that what he admitted during the hearings of his case on merits, he had admitted it in the interrogation during the investigation and when he was pleading for his detention and provisional release.

145. Apart from his statements, there are also communiqués that NSABIMANA Callixte alias Sankara put out bragging about attacks carried out by the FLN group like the mentioned 15/07/2018 communiqué he signed related to the formation of FLN, the task it was given and the attacks it carried out, and the one on 19/03/2019 announcing that from 17/03/2018 they had launched attacks on the peripheries of Nyungwe forest in Nyamasheke District. In his court hearings and even in his questioning during the investigation, NSABIMANA Callixte admitted that he had given talks over international radios and on Youtube, and even his case file contains audio and video talks in which he is heard claiming responsibility for different attacks carried out by FLN.

146. It finds that RUSESABAGINA Paul on his part alleged in the statements he gave in the investigations and in court while pleading for detention and provisional release that he came to learn about the bad acts committed by FLN fighters in those attacks and that after them, in their capacity as MRCD leaders (the college of the presidents), they demanded explanation from the field commanders who told them that they were not the ones who had done it.

147. It finds that in his 05/09/2020 interrogation at the Investigation Bureau, RUSESABAGINA Paul admitted that in their position as MRCD leaders, they had authorized FLN to carry them under the command of HABIMANA Hamada who had been made Chief of staff, that they received first hand reports after the acts to avoid that they became known before hand, but that what those forces did was not what they had asked them to do, that the task they had given them was to fight

against the Rwandan government forces and to seize an area and then bring to the attention of the international community that there was an issue.

148. The court finds that the case file contains other pieces of evidence which prove that MRCD-FLN carried out attacks in the mentioned different sectors including a report of the local administration authorities, like the report of Nyabimata Executive Secretary which talks about the bad acts committed on 03/06/2018, 19/06/2018 and 01/07/2018 and testimonies given by victims including NDUTIYE Yussuf, MUNYANEZA Fidele who was shot by those fighters on 21/06/2018 and who later succumbed to the bullet wounds he had sustained, testimonies of those who were illegally abducted and were forced to carry looted property including NDIKUMANA Viateur, HAVUGIMANA Jean Marie Vianney, medical certificates showing those killed or wounded by gun shots, pictures of vehicles, motorcycles and houses burned.

149. Basing on all those pieces of evidence, the court finds that those FLN fighters were the ones who launched attacks including the ones on 19/06/2018 and on 01/07/2018 in Nyabimata Sectour, the one on 13/07/2018 in Kivu Sector, Nyaruguru District and that of 15/12/2018 in Nyungwe forest, Kitabi Sector, Nyamagabe District in which some local citizens were killed, others beaten up, wounded and their property damaged by setting it on fire, looting it and forcing kidnapped persons to transport it.

150. It finds NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul, even though nothing shows that they personally took part in those attacks, but the fact that they authorized them and financed MRCD-FLN proves that they played a role in terrorist acts committed by MRCD-FLN including murder, assault and battery, kidnapping, arson and armed robbery as acts of terrorism.

151. The court finds that their role is further proven by the fact that they themselves admitted creating the coalition MRCD and forming its armed wing FLN, that they

authorized FLN forces to launch attacks under the command of the chief of staff HABIMANA Hamada, and that they were given reports after the attacks and the fact that it was asserted by those who were questioned during the investigation, including their co-defendants who confirmed that they provided MRCD-FLN with funds from political parties which FLN fighters used to buy military equipment and food, and that they mobilized others to give their financial support.

152. It finds in particular that NSABIMANA Callixte alias Sankara became MRCD and FLN spokesperson, incited the youth to join FLN and even the political party he led brought in about thirty (30) fighters, had contacts with other countries' intelligence officers in his efforts to secure passage for FLN fighters and other assistance. It finds that RUSESABAGINA Paul, apart from sending money to FLN field commanders as it was explained, wrote also different letters including one he wrote to the United Nations General Secretary on 30/08/2018 telling him that MRCD had resorted to using all means possible to remove the existing Rwandan regime, and he also held talks explaining the objective they had.

## 2. Legal provision on acts of terrorism and participating in them

153. The court finds that article 2 paragraph 4 of law No 46/2018 of 13/08/2018 on counter terrorism as amended until today [26] is the one that gives the definition of an act of terrorism, exposes acts that must be considered as acts of terrorism,

---

[26] Article 2 paragraph 4 of Law No 46/2018 of 13/08/2018 on counter terrorism as amended until today stipulates that a terrorist act is: a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:
i)intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;
ii)disrupt any public service, the delivery of any essential service to the public or to create a public emergency;
iii) create general insurrection in a state;
b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

which include those that endanger life or property which are normally a violation of criminal laws when committed in the intention of intimidating the population, coercing or inducing the government to abandon a particular standpoint.

154. The definition of terrorism coincides with the provisions of the OAU Convention on the Prevention of Terrorism[27] as well as with the EU Framework Decision on Combating Terrorism.[28] The court finds that even though legislations of different countries like Canada[29], Great Britain[30], the United States of America[31], Lebanon[32] and other places do not define terrorism in the same way, but in general what they all have in common is that of being criminal acts intended to cause fear or

---

[27] OAU Convention on the Prevention and Combating of Terrorism, 1999, article 1 point 3: "Terrorist act" means: a) any act which is a violation of the criminal laws or a State Party and which may endanger the life, physical integrity or freedom of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to: (i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act, or to adopt or abandon a particular standpoint, or to act according to certain principles; or (ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency; or (iii) create general insurrection in a State; b) any promotion, sponsoring, contribution to, command, aid, incitement, encouragement, attempt, threat, conspiracy, organizing, or procurement of any person, with the intent to commit any act referred to in paragraph (a) (i) to (iii).

[28] The EU Framework Decision on Combating Terrorism 13.06.2002 identifies terrorism as activities with the aim of "seriously intimidating a population, or; unduly compelling a government or international organization to perform or abstain from performing any act, or; seriously destabilizing or destroying the fundamental political, constitutional, economic or social structures of a country or an international organization…".

[29] Criminal Code, R.S.C. 1985, c. C-48, s. 83.01 defines terrorism as an act committed "in whole or in part for a political, religious or ideological purpose, objective or cause" with the intention of intimidating the public "…with regard to its security, including its economic security, or compelling a person, a government or a domestic or an international organization to do or to refrain from doing any act".

[30] British Terrorism Act (2006), Chapter 11: "Terrorism refers to the use and threat of action" designed to influence the government or to intimidate the public or a section of the public and made for the purpose of advancing a political, religious or ideological cause".

[31] 28 C.F.R. Section 0.8 defines terrorism as: "The unlawful use of force and violence against persons or property to intimidate or coerce a government, the civilian population, or any segment thereof, in furtherance of political or social objectives".

[32] L'article 314 du Code pénal libanais prévoit que sont compris dans l'expression actes de terrorisme tous faits dont le but est de créer un état d'alarme, qui auront été commis par des moyens susceptibles de produire un moyen commun tels qu'engins explosifs, matières inflammables, produits toxiques ou corrosifs, agents infectieux ou microbiens.

intimidate the population or coerce a state to undertake or abstain from undertaking a particular action.

155. The court finds that in the Rwandan legislation, a terrorist act is defined by article 2 point four of the above mentioned Law no 46/2018 of 13/08/2018 and is punished as an offence on the basis of what is provided in chapter four related to acts of terrorism and penalties. It finds that acts of terrorism referred to in that chapter are nineteen (19) offences including the offence of membership of a terrorist group, committing and participating in terrorist acts, conspiracy and incitement to commit a terrorist act, illegal use of explosives or any noxious substance in a public place, and so on. It finds that among the acts punished as terrorist acts, there are some which are usually punished under criminal laws and others which are specific to terrorism.

156. Basing on those definitions, the court finds that a person who is guilty of one of the actions that may endanger life, cause serious injury or death to a person, damages or may damage the property of the state or of an individual person, finance, support, conspire, plan or provide equipment and other acts mentioned in article 2 point four of the above mentioned law should not be qualified as murder, assault and battery, kidnapping, arson of buildings and means of transport, armed robbery as an act of terrorism as the prosecution presents it, because when those acts are committed with the purpose of committing terrorism, they must be qualified as offences provided by this particular law on counter terrorism given that the court finds it comprehensive in showing which terrorism offences are punished and by which penalties.

157. Basing on what is provided under article 19 of Law no 46/2018 of 13/08/2018 on counter terrorism as amended until today which stipulates that a person who commits, attempts to commit, participates in or supports terrorist acts commits an

offence[33], and matching it with acts NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul committed by authorizing the FLN force to launch attacks on Rwanda, financing it, supporting the acts it committed in bragging about them as it was explained, there is proof that they played a role in the acts committed by that force.

158. The court must determine if a person who provides financial support and equipment to a terrorist group that helped the combatants of that group to commit acts of terrorism, who supports it by boasting that the force he created and financed is the one that did it and who even urged people to support it and join it, would be punished for the offence of membership of a terrorist group because of participating in acts of a terrorist group on the basis of what is provided in article 18 of that law, or whether he should be punished for the offence of committing and participating in terrorist acts based on its article 19.

159. By analyisng the provisions of Articles 18 and 19, the court finds that both are concerned with the partcitipation in terrorist acts. Article 18 talks about the membership of a terrorist group as an act of terrorism, whereas Article 19 deals with participating in terrorist acts as an offence of committing and partcipating in acts of terrorism, and provides for severe penalties when the offence involves a leader of the group or any other person who played a role in its formation.

160. The court finds, in the laws of other countries such as Belgium, that a person who donates equipments or money in terrorist acts is convicted of the offence of participating in the acts of a terrorist group. In Rwanda, the perpetrator is convicted of participating in terrorist acts, an offence provided for in Article 19, and not of

---

[33]Article 19 of Law 46/2018 of 13/08/2018 on counter terrorism as modified until today stipulates that: "Any person who commits, participates in or supports terrorist acts, commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years. If the offence referred to in Paragraph One of the Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years".

being a member of a terrorist group as provided for in Article 18 refered to above. This is because, the court believes that the role referred to in Article 18 should be limited to membership of a terrorist group or the consent of being a member of a terrorist group or doing something that enhances the capacity of another group such as giving training or agreeing to be trained, recruiting a person in the terrorist group, providing skills, entering or staying in a country for the benefit of a terrorist group as is the case in Canada[34]

161. The court finds that when a person commits an act of terrorism or is directly involved in such an act such as providing financial aid or any other act directly related to the act of terrorism, he/she must be punished of committing and participating in acts of terrorism provided for under Article 19 mentioned above. The fact that participating in the acts of a terrorist group must be limited to being its member or its leader is in line with what Mr Paolo CRISCENZO wrote about how Article 140 of the Belgian Penal Code, in relation to the offence of taking part in the acts of a terrorist group, must be interpreted[35]. The article states that participating in the acts of a terrorist group means that the person who is a member

---

[34]L'article 83.18 (3) du Code criminal (L.R.C. (1985), ch.C -46) dispose que le fait de participer ou de contribuer à une

activité d'un groupe terroriste comprend, entre autres, ce qui suit : le fait de donner ou d'acquérir de la formation ou de recruter une personne à une telle fin;le fait de mettre des compétences ou une expertise à la di sposition d'un groupe terroriste, à son profit ou sous sa direction, ou en association avec lui, ou d'offrir de le faire; le fait de recruter une personne en vue de faciliter ou de commettre une infraction de terrorisme ou un acte ou une omission à l'étran ger qui, s'il était commis au Canada, constituerait une telle infraction;le fait d'entrer ou de demeurer dans un pays au profit ou sous la direction d'un groupe terroriste, ou en association avec lui;le fait d'être disponible, sous les instructions de quiconque fait partie d'un groupe terroriste, pour faciliter ou commettre une infraction de terrorisme ou un acte ou une omission à l'étranger qui, s'il était commis au Canada, constituerait une telle infraction.

[35]La participation aux activités d'une organisation terroriste peut prendre deux formes. Soit en tant que simple membre de l'organisation, soit en tant que dirigeant. Le dirigeant est celui qui participe à la structure de l'organisation, qui choisit les membres et définit les opérations exécutées. Plus généralement, il s'agit de la personne qui assume les principales responsabilités au sein de l'organisation. Quant au simple membre, il est considéré comme participant lorsqu'il fournit des informations, des moyens matériels ou toute forme de financement au groupe terroriste, en ayant connaissance que cette participation contribue à commettre une infraction terroriste", commentaires de Me Paolo CRISCENZO sur l'article 140 du Code pénal Belge,https://www.actualitesdroitbelge.be/droit-penal/droit-penal-special/les-infractions-terroristes/la-participation-a-une-activite-d-un-groupe-terroriste#toc,page consultée le 9/09/2021.

of that group provides it with information, equipment or any other means including financial support that it can use to commit a terrorist act[36].

162. Therefore, the court finds that, considering the provisions of Articles 18 and 19 referred to above, a person who does not commit an act of terrorism that could be life threatening, causing serious injury or death or causisng damage to property as provided for in Article 2, Section 4o (a), but who engages in the promotion, support, assistance, management, encouragement and other activities referred to in this Article, section 4o, is participating in acts of terrorism and should be punished for the offence of committing and participating in acts of terrorism provided for under Article 19 mentioned above.

163. Besides, considering the provisions of Article 19 of Law no 46/2018 of 13/08/2018, and linking these with the acts committed by NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul who provided financial and material assistance to the MRCD-FLN combatants in killing people, injuring them, burning and looting their property and other acts committed in various attacks perpetrated in Nyaruguru, Nyamagabe and Rusizi Districts; considering that after the perpetration of these acts they supported the attacks on the radio and on social media, and called on the people to support the FLN and join it.  Hence, as MRCD-FLN leaders, who authorized the attacks, they should be convicted of participating and committing terrorist acts.

164. The Court therefore finds that NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul should not be prosecuted as personally responsible for the following acts committed by the MRCD-FLN fighters in their attacks:  assault and battery, abduction, voluntary arson of a building, means of transport and property,

---

[36] Article 140 du Code pénal Belge " Toute personne qui participe à une activité d'un groupe terroriste, y compris par la fourniture d'informations ou de moyens matériels au groupe terroriste, ou par toute forme de financement d'une activité du groupe terroriste, en ayant connaissance que cette participation contribue à commettre un crime ou un délit du groupe terroriste, …"

armed robbery; and attempt to commit a murder as terrorist acts for
RUSESABAGINA Paul. The court finds that what they did was to take part in these
acts of terrorism which constitute the offence of participating and committing acts
of terrorism

165.  The Court finds that the allegations made by NSABIMANA Callixte alias Sankara
      and RUSESABAGINA Paul, arguing that the acts perpetrated by the FLN fighters
      were not carried out under their instructions, are unfounded because the MRCD
      press release dated 15/07/2018 states that acts perpetrated by the FLN fighers
      were authorised by them. In fact, the press release reads that they had given the
      FLN the instructions to start an armed conflict as in their statements they confirm
      that they are the ones who gave orders to launch the attacks.

166. Another indicator that shows they cannot pretend that FLN has acted contrary to
      the mission they had assigned to it is that during the proceedings, NSABIMANA
      Callixte argued that after he discovered the magnitude and impact of the acts
      carried out by the FLN fighters in the Kitabi attack in Nyungwe forest, they
      attributed the attack to the Rwandan army because they could see it was clear to
      evey one that it was an act of international terrorism that would lead everyone to
      prosecute them. The attribution of the attack to the Rwandan defence forces
      matches with the contents of the press release issued on 21/03/2019 whereby he
      was denying the responsibility of the attack and claiming the attacks were
      perpetrated by the Rwanda Defence forces[37].

167. The Court finds unfounded NSABIMANA Callixte Alias Sankar's statement that
      he is not among the founders of the MRCD coalition because it was formed on
      04/07/2017 and that at that time he had not joined it yet; that   he had no role in the
      formation of the FLN because it was also formed by CNRD-Ubwiyunge on
      06/06/2016 after seceding from the FDLR-FOCA. This is also unfounded because

---

[37]Press release issued by NSABIMANA Callixte, FLN spoksperson on 21/03/2019 whereby he states that the attacks were
perpetrated by the Rwandan Defence Forces.

he himself admitted having joined the MRCD after reaching an agreement with the other parties and on 18/03/2018, himself, RUSESABAGINA Paul and Wilson IRATEGEKA signed a statement welcoming his RRM party; that on 15/07/2018, he also signed MRCD press release as the second vice-president of the MRCD and spokesperson of FLN stating that they had formed an armed group called FLN, in which he also admitted to bringing in about thirty (30) fighters.

168. The court also finds unfounded his claims that he was not among the conspirators of the attacks perpetrated in the Nyabimata and Kivu sectors, arguing that his role came in later after the attacks. The court finds this unfounded because he agreed to be the spokesman for the FLN, and he boasted about this on international radio. The court also finds unfounded his claim that the troops that carried out the attacks reached Nyungwe forest in April 2018 before the RRM party sent troops to MRCD because the attacks were perpetrated when he was one of the MRCD leaders and its military wing was already in place.

169. The court also finds unfounded his claim that his role started after the attacks when he was boasting about them. This is unfounded because his excessive pride and self-satistaction prove that he was supporting the attacks. The allegations that he did not participate in the attacks also does not make him innocent because they were perpetrated by the FLN forces they had set up and for which he had agreed to be a spokesperson. Besides, in a press release signed by himself and in the international media, he confirmed the attacks were carried out by FLN forces.

➢ Determining whether NSABIMANA Callixte alias Sankara is guilty of the other offences he is accused of

170. The court finds that in consideration of some of the acts explained above, including inciting people to join the MRCD-FLN, sensitizing them to provide support, disseminating false information, the prosecution is moreover charging

NSABIMANA Callixte alias Sankara of terrorism for political purposes, conspiracy and incitement to commit a terrorist act, spreading false information or harmful propaganda with intent to cause a hostile international opinion against the Rwandan Government  and giving, receiving or inciting to receive proceeds from terrorism.

1. On the offence of conspiracy and incitement to commit terrorist acts

171. The court finds that the prosecution's charges of conspiracy and incitement to commit acts of terrorism against NSABIMANA Callixte include recruiting young men and women to join FLN fighters, seeking financial means to disseminate and support FLN activities and meeting the Head of Intelligence in Uganda with the purpose of securing equipment for FLN and get it known to the public.

172. Given the provisions of article 20 of the law on counter terrorism, the court finds no link between the above-mentioned acts and the offence of conspiracy and inciting others to commit a terrorist act because as other courts[38] have explained it, conspiracy to commit terrorism is a consensus reached between more than one person to commit one of the acts of terrorism. They must also agree on the means to be used to carry out those acts. In the case of NSABIMANA Callixte however, there is no evidence or indication presented that he reached an agreement with his counterparts on how to carry out the terrorist acts he is accused of.

173. The court also finds that those acts can not be referred to as inciting people to commit a terrosist act because this requires the perpetrator to use all means in delivering his/her message aimed at inciting people to commit acts of terrorism[39].

---

[38]TL-17-07/1/AC/R176 bis du 18/10/2017 de la Chambre d'appel du Tribunal spécial pour le Liban, p.85 & 86.

[39]Le Conseil de l'Europe a adopté la Convention européenne pour la prévention du terrorisme (2005). Cet instrument demande que soit érigée en infraction pénale l'incitation au terrorisme, qui est décrite comme suit dans l'article 5: "Aux fins de la présente Convention, on entend par provocation publique à commettre une infraction terroriste la diffusion ou toute autre forme de mise à disposition du public d'un me ssage, avec l'intention d'inciter à la commission d'une infraction terroriste, lorsqu'un tel

The court therefore finds the commonality of the pieces of evidence presented is that NSABIMANA Callixte alias Sankara sent fighters into FLN and this can not be referred to as inciting people to carry out terrorist acts because this constitutes the offence of participating and committing acts of terrorism. Concerning the statement of Sgt MUTAGA Pierre Claver during the investigation, according to which not only NSABIMANA Callixte alias Sankara incited him to join FLN but also told him to carry out acts that includes demolishing bridges, throwing grenades, killing leaders and their families… alone they can not constitute irrefutable evidence that he incited him to commit those acts.

174. The court also finds that the fact that he also sought financial support to disseminate and support FLN activities and that he met with the head of the Ugandan intelligence with the aim to get equipment for FLN and make it known to the public does not constitute the offence of conspiracy and incitement to commit a terrorist act either because as it was explained, there is no evidence that they agreed or that he incited them to commit a terrorist act. Its role was to recruit young people to join FLN and to seek funds for it.

2. On the offence of spreading false information or harmful propaganda with intent to create a hostile international opinion against the Rwandan state

175. The court finds that the prosecution is accusing NSABIMANA Callixte of spreading false information or harmful propaganda with intent to cause a hostile international opinion against the Rwandan Government  as provided for in Article 194 of Law N°68 / 2018 of 30/08/2018 determining offences and penalties in general, based on the fact that he was heard on the radio and on social media

---

comportement, qu'il préconise directement ou non la commission d'infractions terroristes, crée un danger qu'une ou plusieurs de ces infractions puissent être commi ses", UNODC, Recueil de cas sur les affaires de terrorisme, janvier 2010, para 105.

calling on people to fight the government of Rwanda and to spread false information and harmful propaganda to cause a hostile national and international opinion against the goverenemnt of Rwanda.

176. The court finds that NSABIMANA Callixte can not be prosecuted for spreading false information or harmful propaganda aimed at causing a hostile international opinion against the Rwandan Government as a common law offence, but that what he did constitutes acts carried out with the intention to perpetrate terrorism, and that he did it to support and back the activities of the MRCD-FLN terrorist group. The court therefore finds that the acts, as explained, constitute the offence of participating in terrorist acts.

### 3. On the offence of terrorism for political purposes

177. The prosecution charges NSABIMANA Callixte alias Sankara with terrorism for political purposes as provided for under Article 33 of Law no 46/2018 of 13/08/2018 mentioned above[40] based on the fact that the attacks caused panic in the period when they were perpetrated in the said sectors; the Kitabi-Rusizi road was not practical due to fear of FLN attacks because he claimed the area was a battlefield; tourism, biodiversity and environment in the Nyungwe Forest were disrupted as a result of the fighting, and that he was one of the senior officers of the FLN with the rank of Major and was also responsible for being the spokesperson for the FLN, and one of the leaders of the MRCD-FLN.

178. The court finds that these acts, as explained, do not constitute the offence of terrorism for political purpose, but the offence of participating and committing acts of terrorism because the offence was committed with the aim of intimidating the

---

[40]Article 33 of law No 46/2018 of 13/08/2018 stipulates that : A person who commits any terrorist act for political purposes, with intent to destabilize public organs or cause to change their functioning, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

population and putting pressure on the State to abandon its standpoint and act according to certain principles as provided for in Article 2, point 4 of Law no 46/2018 of 13/08 / 2018 mentioned above.

4.  On the offence of donating, receiving and inciting to receive the proceeds of terrorism

179. NSABIMANA Callixte alias Sankara is prosecuted for the charges related to donating, receiving and inciting to receive the proceeds from terrorism under the mentioned[41] article 32 of Law no 46/2018 of 13/08/2018 . They include the acts of

inciting various persons to donate money and equipment to assist FLN on the war front and train its fighters and to have received money and telephone to use for FLN's terrorist and advocacy purposes.

180. Considering the provisions of that article, the court finds that, those acts do not constitute the offence of donating, receiving and inciting to receive the proceeds from terrorism. Instead, as it was explained, they are related to the provision of financial assistance and equipment to assist FLN in carrying out attacks; while receiving money and telephones constitutes the offence of participating and committing acts of terrorism. Therefore, he should not be convicted of donating,

---

[41]Article 32 of law n° 46/2018  of 13/08/2018 on counter terrorism stipulates that : " A person who donates or receives financial support or any other assets while believing or having grounds to believe that they result from a terrorist act or may be used for terrorist purposes, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than ten (10) years but not more than fifteen (15) years. A person who incites another person to donate or receive financial support or any other assets while believing or having reasonable to believe that they result from terrorist acts or may be used for terrorist purpose, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of more than fifteen (15) years but not more than twenty (20) years".

receiving and inciting to receive the proceeds from terrorism on the basis of such acts.

5.   On Offence of maintaining relations with a foreign government in the aim to wage war

181. The court finds that NSABIMANA Callixte alias Sankara is not convicted of maintaining relations with a foreign government with the intent to wage a war as provided for in Article 193 of Law N°68 / 2018 of 30/08/2018 determining offences and penalties in general. He can not be convicted just because he requested Burundian and Ugandan government officials to provide FLN fighters with access and receive its leaders in order to negotiate their possible aid. By doing so he was seeking support for FLN fighters in order to launch terrorist attacks against Rwanda, and not to wage a war or any other attack aimed at undermining the freedom of the state and that of other countries.

6.   On the offence of genocide denial and genocide minimization

182. The court finds that NSABIMANA Callixte alias Sankara pleaded guilty to genocide denial and genocide minimization, explaining that there were statements he made on international radio and social media asserting that there was no genocide perpetrated against the Tutsi in Rwanda; that the Tutsis were massacred because Hutus were outraged Hutus after the plane carrying President Habyarimana was shot down; and that Rwandan officials were genocide as a commodity; that the genocide was caused by the shooting down of Habyarimana Juvénal's plane; that the assassination of HABYARIMANA was the cause of the genocide; that RPF killed Hutus and genocide survivors; that it also uses the genocide as a trump card, and sells it; that it was their stand in MRCD.

183. The court finds that NSABIMANA Callixte alias Sankara aknowldeged before the investigator to have said this; that he even acckonowledges his other similar statements that are in his file. This constitutes unequivocal evidence that he made the remarks. The court finds that the crime of genocide denial is provided for under Article 5 of Law n⁰ 59/2018 of 22/8/2018 on the crime of genocide ideology and related crimes which states that a person who, in public commits an act intended to:

1⁰ state or indicate that the genocide is not genocide;

2⁰ distort the facts about genocide for the purpose of misleading the public;

3⁰ affirm that there was double genocide in Rwanda;

4⁰ state or indicate that the genocide was not planned;

Whereas the crime of minimization of genocide is provided for under Article 6 of the law which states that a person, who, in public and deliberately, manifests a bahaviour intended to: 1⁰ minimize the gravity or consequences of the genocide; 2⁰ lessen the means through which the genocide was committed and 3⁰ providing wrong statistics about the victims of the genocide, commits an offence of minimization of genocide.

184. After anaylysing the statements made by NSABIMANA Callixte alias Sankara on the radio and on social media and the provisions of those articles, the court therefore finds that his remarks contained a denial of the genocide. The example of this denial is when he states that the genocide against the Tutsi was not planned but was caused by the crash of HABYARIMANA Juvénal's plane, that the RPF killed more than a million Hutus and that it does not allow them to remember their loved ones; that the RPF killed the survivors and distorted the truth about how the genocide took place. The court also finds that his remarks contain a minimization of the genocide against the Tutsis. An example of this minimization is when he says that the RPF is using it as a trump card, that it has been singing and selling genocide for twenty-five years.

185. NSABIMANA Callixte Alias Sankara should therefore be convicted of genocide denial and genocide minimisation in accordance with Articles 5 and 6 of Law nº 59/2018 of 22/8/2018 mentioned above. The court therefore finds him guilty of those particular offences because the elements that make them are different from other acts that make offences relating to terrorism he is prosecuted for; and even the interests protected and provided for by the law are different because the law protects humanity from genocide and the law on counter terrorism protects the rights of the people.

7. On the offense of fraudulently obtaining or producing and using false documents and issued by competent authorities.

186. The court finds that NSABIMANA Callixte alias Sankara, in his defence on merits, explained how he obtained his identity card and passport from Lesotho under the names of a certain Joseph KABERA, a congolese born in Masisi. He had also admitted this in his interrogation during the investigation, and during his pre-trial for provisional detention or release. The court also finds in the file that the arrest warrant dated 13/04/2019 shows that he was arrested with a Passport and ID issued by Lesotho. It turns out that this is a proof that in 2013 he fraudulently obtained these documents before he joined MRCD -FLN and after he did so, he continued to use them until his arrest.

187. Thus, in accordance with the provisions of Article 277 of Law Nº68 / 2018 of 30/08/2018 determining offences and penalties in general, the Court finds that NSABIMANA Callixte alias Sankara should be convicted of fraudulent acquisition or production and use of forged documents and papers issued by competent authorities.

➢ Determining whether NSENGIMANA Herman is guilty of the offence of membership in the irregular armed group of FLN and of membership in the terrorist group MRCD-FLN

• The Prosecution's arguing of the case

188. The prosecution charges NSENGIMANA Herman of going to the DRC to join the illegal FLN armed group. He was sent there by the RRM party and underwent military training. Later, after NSABIMANA Callixte alias Sankara was arrested, he replaced him as the spokesperson for the FLN. So, these acts constitute the basis for the prosecution to charge him with the offence of joining the armed group FLN and being a member of the terrorist group MRCD-FLN.

189. The prosecution further argues that the evidence that he was in an illegal armed group from 18/04/2018 to December 2019 when he was captured in fighting with the DRC forces is that when he was interrogated during the investigation and before the Prosecution, he admitted being in that group. He explained that he joined FLN on April 18, 2018 after being sensitised by NSABIMANA Callixte alias Sankara who asked him to represent the RRM party in the DRC. He left Uganda to Faringa in Rutshuru where CNRD and FLN were operating.  When he arrived there, he underwent military training and on September 12th, 2018, he became a FLN soldier with the rank of private. After the arrest of NSABIMANA Callixte alias Sankara in April 2019, he replaced him and was appointed FLN spokesperson and promoted to the rank of Captain. He admitted this during the pre-trial hearings for provisional detention or release.

190. According to the prosecution, another piece of evidence that NSENGIMANA Herman joined the irregular armed group FLN is in NSABIMANA Callixte alias Sankara's statement. When he was interrogated by the prosecution, he explained that Captain NSENGIMANA Herman was one of their youth commissioners who

was also the leader of their group in FLN, and that he was the first soldier he sent into FLN.  According to his statement, the task he had set for him was to transport and receive young people sent from Rwanda and Uganda by a certain TWIHANGANE Chariff.  His role was to send money for transport of the above mentioned young people. It is also mentioned that during the investigation on 07/02/20120, a certain NSHIMIYIMANA Anastase confirmed that NSENGIMANA Herman was one of the mobilisation cadres who sensistised the youth to join them in the bush.

191. It is further indicated that there was a press release dated 05/05/2019 and signed by the MRCD-FLN chairman RUSESABAGINA Paul stating that NSENGIMANA Herman was appointed FLN spokesperson; and that in his interrogation of 08/09/2020 during the investigation RUSESABAGINA Paul explained that as soon as NSABIMANA Callixte Sankara was arrested, they replaced him with NSENGIMANA Herman who had the rank of Captain, a rank he was given by the FLN.

192. The prosecution also observes that his statements are consistent with the fact that, as an FLN spokesperson, he has been heard on various radio stations and social media sites. For example, in an interview with Radio Urumuri aired online when a journalist asked him about the 22/09/2019 attack in Rusizi district, he replied that the attack that took place at Ku Cyapa near the military detach was perpetrated by FLN. The same happened in another interview with that Radio Ubumwe and even on Radio BBC Gahuzamiryango where he was talking about MRCD-FLN terrorist activities and calling on people, especially the youth, to come and join them in the deeds. He confirmed this when he was questioned by the investigator on 19/03/2010 about the audio recordings of his interviews, and he acknowledged that he was the one who said it when he was in the DRC.

- NSENGIMANA Herman's defense

193. NSENGIMANA Herman, represented  by Mr RUGEYO Jean, testified that he left Rwanda on April 22, 2014 for Uganda for security reasons; that when he arrived there, he used to defend the cause of NSABIMANA Callixte alias Sankara on social media and  to enquire from him about the situation; that in October 2017 Sankara informed him that he was no longer in RNC but he did not reveal to him that he had formed a political party; that in January 2018 he faced insecurity in Uganda and that Sankara called him and told him that what he could do for him was to take him to DR Congo where he would be waiting for the return to Rwanda together with other Rwandans including some young men who used to be with him in RNC and soldiers who wanted to return with them;  that on March 3, 2018 he called him and informed him that CNRD and PDR-Ihumure together with RRM had formed  the MRCD coalition, that they would attack the Rwandan government and hold negotiations like it was done in Arusha II.

194. He further said that he was again called by SANKARA who informed him that they were looking for money for his travel to Congo. He adds that SANKARA also gave him Gen JEVA's phone number who spoke with him and directed him on how he would reach the MRCD headquarters in Mweso where he later found Gen. IRATEGEKA but was told that he would be staying at Gen. JEVA's; that he spent a month doing military training and later Sankara told him that there were other young men that were to join him. He said that after he arrived in Mwesa, about thirty (30) other young men from Uganda and Rwanda joined him in the training until 12/09/2018; that he was their representative but after the course they were deployed in different units, and he stayed with JEVA.

195. He says that in September 2018 there was a fight between their forces and a MAI MAI group and they moved to Kalehe where he was immediately deployed at Gen. IRATEGEKA's as a private soldier without any position of responsibility; that when he arrived there SANKARA proposed him as the information commissioner (in

charge of communication and media). Later, he was transferred to the youth department/commissariat but he did not attend any meeting. He also said that after NSABIMANA Callixte alias Sankara was arrested, Gen.Wilson IRATEGEKA appointed him the spokesperson for MRCD-FLN on 5/5/2019 and told him that this was in line with the contract they had with RRM. His role was to read what JEVA had given him; that he never issued any press release because he was staying in the bush; that it was in September 2019, after he was told that the FLN had carried out attacks against the Rwandan Defence Forces that he spoke to the BBC and MRCD Radio Ubumwe;  that he was its spokesperson until his arrest on 04/10/2019; that the other attacks that the FLN carried out in Rwanda and on which he commented on  include that of Ruheru in October (after JEVA sent him pictures of military uniforms and guns captured) and that of Bweyeye after JEVA sent him a video of soldiers wearing RDF uniforms.

196. He goes on to explain that he did not work with Paul RUSESABAGINA because the latter was in a high position; that he did not attend any MRCD meetings because they were done online and were attended by Wilson IRATEGEKA who had the equipment; that he did not even know the soldiers in Nyungwe, either Gen. Morani or Gwado; that the one he knew when they arrived in Kalehe was Maj. Appolinaire; that he learnt there were people crossing Lake Kivu; that he did not have enough information because it was confidential between very few people.

197.   He also acknowledged his FLN membership but that he did not know it was an illegal armed group or terrorsit group; that he did not participate in any other illegal activity; that what he had been told was that they were  to fight and then hold negotiation and some of them get positions of responsibility; that since his interrogation during the investigation and before the prosecution, he has pleaded guilty to the charges against him; that he regrets and apologizes to the Rwandan community for the harm FLN caused to Rwandans.

198. He added that with regard to the offence of belonging to the terrorist group MRCD-FLN, the prosecution did not prove there were any MRCD individual members, either NSENGIMANA Herman or any other person since MRCD was a coalition of political parties made up of CNRD-Ubwiyunge Party, PDR-Ihumure, RRM and RDI-Rwanda rwiza of TWAGIRAMUNGU Faustin; that there is no where the court can get him convicted of that offence when he is not a member or one of the founders of that group; that what they can do is to accuse him of being a member of the FLN military force which is an armed group different from MRCD.

- The view of the court

### 1. On acts and evidence

199. The court finds that NSENGIMANA Herman defended his case on the merits and pleaded guilty to the charges of being a member of FLN armed group. He joined it after he was sensitized by NSABIMANA Callixte alias Sankara. Once in FLN, he underwent military training and represented his colleagues who, together with him, had originated from the RRM party. He was later appointed the commissioner in charge of youth and after NSABIMANA Sankara was arrested he was appointed FLN spokesperson and replaced him. He also said that although he was an FLN member, he did not know it was an illegal armed group or a terrorist group because their goal was to fight and negotiate with the Rwandan government.

200. The court also finds that he requested not to be convicted of being a member of the MRCD-FLN terrorist group because he was neither a member of the MRCD nor one of its founders since MRCD is a coalition of CNRD-Ubwiyunge, PDR-Ihumure, RRM and RDI-Rwanda nziza of TWAGIRAMUNGU Faustin; that for him the prosecution is accusing him only on the grounds that he was a member of FLN, an armed group different from MRCD which is a political movement.

201. The court finds that in his interrogation during the investigation or before the prosecution, NSENGIMANA Herman admitted having been an FLN member after he was sensitized by NSABIMANA Callixte alias Sankara. He also admitted to have undergone military training, was promoted to the rank of captain and was appointed its spokesperson. He has admitted this during the pre-trial hearings for provisional detention or release.

202. The court finds that NSABIMANA Callixte alias Sankara, during both the court proceedings and during the investigation said that NSENGIMANA Herman was a commissioner in their RRM party; that he was also their representative in the FLN; that he was the first soldier RRM sent to the FLN; and that he was in charge of the transport of young people from Rwanda and Uganda joining FLN. Also, in his interrogation dated 7/01/2020 during the investigation, NSHIMIYIMANA Anastase also confirmed that NSENGIMANA Herman was one of the mobilization team that sensitazed others to join them in FLN in the jungles of the Congo.

203. The Court also finds that during his 08/09/2020 interrogation by the investigator, RUSESABAGINA Paul explained that the post of spokesperson for FLN had been given to the RRM; that as soon as Sankara was arrested he was replaced by NSENGIMANA Herman who had been given the rank of Captain by the FLN.

204. This evidence is corroborated by a statement issued on 05/05/2019 and signed by RUSESABAGINA Paul showing that NSENGIMANA Herman was appointed FLN spokesperson and that he gave interviews to international radio stations and online Radio Urumuri, where he claimed that it was FLN that attacked ku Cyapa in Rusizi, Nyakarenzo Sector on 22/09/2019.

2.  Legal provision on the offence of forming an irregular armed group

205. The Court, after analyzing all the evidence, in accordance with the provisions of Article 459 of the said Organic Law which was in force at the time of NSENGIMANA Herman's entry into the FLN, finds that from 18/04/2018 until his arrest in December 2019, he was in the FLN armed group, doing military training, and was given the rank of Captain, and  was FLN spokesperson. These are proofs that he voluntarily joined the FLN but, as explained, the court finds that this does not constitute the offence of creating an illegal armed group because his acts are not part of the crimes that undermine the freedom of the state and other countries. Also, the court finds that he did not do so in support of the war by illegal armed forces because what he did was in a bid to commit terrorism. The court should therefore examine whether the act constitutes the offence of membership in a terrorist group.

3.  Legal provision on the offence of membership in a terrorist organization

206. After anaysing his defence and the evidence provided, and confronting it with Article 18 of Law no 46/2018 of 13/08/2018 mentioned above, the court finds that the fact that NSENGIMANA Herman was in MRCD as a representative of RRM party, that he was the youth commissioner, that he was the spokesperson  of FLN, an armed wing of MRCD and the fact that he has been heard on the radio and on social media boasting of the FLN attacks, it is an indication that he was a member of the MRCD-FLN terrorist group which carried out terrorist acts in various parts of Rwanda. His acts constitute an offence of membership of a terroris group. Therefore, he must be convicted of that offence.

207. The court finds unacceptable the excuse that he joined FLN without being aware that it was an irregular armed group or a terrorist group, that he had never been involved in any other illegal acts, that he was told they were fighting in order to

negotiate with the Rwandan government, because, as explained, when he was in that armed group of FLN, which was affiliated to MRCD, there were terrorist acts that the group committed and when he became the FLN spokesperson he boasted about some of them like the attack perpetrated in Rusizi ku Cyapa in Nyakarenzo Sector on 22/09/2019.

208. The court also finds unfounded the allegations that he is not a member of the MRCD because it is only a coalition of partiesy; that it is different from the FLN armed group, because he himself admits that he was in the MRCD representing his RRM party; that he was the youth commissioner when FLN was an MRCD military as it was explained. Also in a statement dated 10/06/2019 and signed by RUSESABAGINA, it is clearly stated that the acts perpetrated were carried out as those of MRCD-FLN; and understandably military operations carried out by FLN could not be separated from MRCD, the group founder.

➢ Concerning offences NIZEYIMANA Marc is prosecuted for

• The Prosecution's arguing of the case

209. The prosecution charges Marc NIZEYIMANA of being a member of FDLR's armed group FOCA from its inception in 2000 to 2016 when it split into two factions and he joined the faction that founded CNRD-Ubwiyunge party and which later formed an armed group called FLN; that he participated in the acts of FDLR-FOCA and MRCD-FLN terrorist groups; and that he maintained relations with some officials of the Burundi Armed Forces. The prosecution also accuses him of being a member of MRCD-FLN group which carried out terrorist attacks in Nyaruguru districts in Kitabi, Nyamagabe and Rusizi sectors between June 2018 and October 2019, killing, injuring, kidnapping, burning and looting with the aim to intimidate the public and force the government to change its standpoint.

210. The Prosecution argues that their evidence is based on the fact that during his interrogation by the investigator on 15/07/20120 and before the Prosecution on 13/08/20120 and 23/09/20120 and before the judges during the pre-trial hearings for provisional detention and release, he admitted having been in both FOCA and FLN armed groups, and that he was also one of the leaders of those groups with the rank of Lieutenant Colonel and the Deputy Sector Commander in charge of operations. The prosecution also argues that he admitted to have been caught when he was in the process of transporting MRCD-FLN fighters from the DRC to Burundi where they were to join their comrades in their positions in the Kibira forest.

211. The prosecution also explains that NIZEYIMANA Marc has been in contact with foreign government officials because he was collaborating with some Burundian military commanders, including the Commandant of the 114th Battalion operating in Cibitoke province who accommodated FLN troops on transit from DRC to their base in Kibira Forest. The foreign officials also include WO Niyonzima, a Burundian military intelligence officer from the High Command who provided them with military equipment, including ammunition. The prosecution argues that in his July 15, 2020 interrogation during the investigation, he admittted this and explained that on 18/02/2020 he withdrew troops from Kahanda in the DRC to Cibitoke Province in the 114th Battalion barracks where they spent a week; that Lt. Col. Fabien in charge of logistics in FLN who was based in Bujumbura connected them with WO Niyonzima, a G2 military intelligence officer, who provided them with fifteen (15) boxes of ammunition, nine (9) for Kalashnikov and six (6) for machinegun; that they had paid three hundred (300) dollars for three (3) boxes and the rest was given to them for free as a support.

212. The prosecution also charges NIZEYIMANA Marc of terrorist acts that were perpetrated by FLN combatants in Nyaruguru and Nyamagabe districts including killing nine (9) people, beating and injuring others, kidnapping civilians and looting and burning their property. The prosecution explains that this is because when the

acts were perpetrated, NIZEYMANA Marc was the FLN Deputy Commander of Sector North which also constituted the source of the combattants who carried out errorist attacks in Rwanda at different periods; and that he particpated in those terrorist acts by selecting some of the fighters.

213.  The prosecution argues that the evidence that NIZEYIMANA Marc was involved in those killings is that when he was interrogated by the investigator on 15/07/2020, he admitted that he was involved in moving the assailants who perpetrated the attack to cross from DRC to Rwanda through Burundi. He also admitted that it was the FLN army, which he belonged to, that killed civilians ; that there are also medical reports and evidence that the nine (9)[42] people who were murdered were killed by gunfire ; and that it was also confirmed by statements of some of the people who witnessed the attacks in both Nyaruguru and in Nyamagabe. They include Munyaneza Fidèle, Habimana Vénuste and Havugimana Jean Marie Vianney for Nyaruguru and Ngirababyeyi Désiré, Bwimba Vianney and Uwimana Stappin for Nyamagabe.

214. The prosecution goes on explaining that their other evidence includes the report of Nyabimata Sector according to which there were attacks that were perpetrated in the sector on 03/06/2018, 19/06/2018 and 01/07/2018; that on the night attack of 19/06/2018 between sixty (60) and eighty (80) assailants murdered two civilians (Maniraho Anatole and Habarurema Joseph) and kidnapped others. The report also mentions that the attack looted civilian property including money, telephones, small livestock including twelve (12) sheep and two (2) goats, clothes, money and irish potatoes. The prosecution also says that in the case file there are other testimonies of the abductees interrogated by the investigators who include Semushi David, Ndikumana Viateur, Nsabimana Anastase, Mugisha Gashumba

---

[42]The nine (9) people who were murdered are: Mutesi Jackline, Atete Sine Ornella, Mukabahizi Heralie, Nteziryayo Samuel, Niyobuhungiro Jeanine, Niwenshuti Isaac, Habarurema Joseph, Maniriho Anatole and Munyaneza Fidèle

and others and whose statements corroborate the identifications of the burnt vehicles; and that after their perpetration MRCD -FLN boasted of the attacks in the voice of NSABIMANA Callixte alias Sankara who was its spokesperson.

215. The Prosecution concludes by saying that the acts for which NIZEYIMANA Marc is prosecuted were part of the MRCD-FLN's plan to intimidate the public, force the government to change its standpoint and negotiate with them. They therefore constitute the offence of forming an illegal armed group, membership of a terrorist group, sponsoring terrorism, murder, kidnapping, armed robbery, deliberate arson of someone else's building and other means of transport, attempt to commit an offence, intentional assault and battery as acts of terrorism and maintaining relations with foreign government officials with the purpose of supporting war.

- NIZEYIMANA Marc defense

216. NIZEYIMANA Marc, represented by Ms MUREKATETE Henriette, pleaded guilty to the charges of being a member of an irregular armed group because when he was arrested, he was Colonel in the FLN army and Deputy Commander of Sector Two. He explains that in 1994 he fled to the former Zaire; that in 1996 there was a war and they were encouraged to join the military; that he started the training and in 1998 he joined the Democratic Republic of Congo armed froces (Forces armées congolaises, FAC), fighting in Katanga – Pepa; that in 2002 he joined the FDLR-FOCA and ascended the military ranks until he became sector protection commander in Masisi.

217. He goes on to explain that he left FDLR in 2016 after a disagreement over the idea of conducting a refugees'census. The supporters of the idea broke away from FDLR and formed CNRD. So, being one of the supporters of the census, he joined CNRD and took with him the force under his command. At the beginning, he didn't change his reposnsabilities but a month later he became Deputy Sector Commander in North Kivu for Rutshuru and Masisi. He also says that in 2018,

Gen. Wilson IRATEGEKA told him that there had been a coalition of parties called MRCD, but he did not pay much attention to it because he had no connection with any politician as most of the time he was on the battlefield and could not know where the meetings was taking place.

218. He admits having been a member of the FDLR-FOCA and FLN irregular armed groups but that he has not committed any terrorist acts on Rwandan soil. He argues that since he fled the country he has not returned to Rwanda; that he has not been a member of the MRCD-FLN terrorist group and has not issued any instructions to commit acts of terrorism; that the prosecution does not show any clause in the fundamental principles of those groups that mentions carrying out acts of terrorism so as to be accused of having joined the groups being aware and supporting that ideology. Concerning the allegations that FLN committed acts of terrorism, he argues that he learnt about them when he was interrogated by the investigator.

219. NIZEYIMANA Marc pleads not guilty to the charges of maintaining relations with foreign government officials to support war. He explains that when they were in UVIRA, they had an agreement with the MAI MAI militia that they should work together; that on 18/02/2020 he left Uvira for Burundi in Cibitoki province in the 114th Battalion where they spent a week and where they were joined by WO NIYONZIMA, a military intelligence officer working in G2.  The liaison was ensured by Lt. Col. KAMAYI Fabien, the FLN incharge of logistics who was based in Burundi. NIYONZIMA brought them fifteen (15) boxes of ammunition, nine for Kalachnikov and six for machine guns. According to NIZEYIMANA Marc, they had paid three hundred US dollars ($ 300) to buy three (3) boxes of ammunition, which means the other boxes were offered for free to support them. As he said, they had no intention of using them to attack Rwanda because they crossed over to the DRC with them in the intention of using them to ensure their security where they were based in Congo.  He continues arguing that the prosecution does not indicate that there was an attack that was perpetrated as a result of the collaboration with

the Burundian officials or any other relations that exist between them; that Lt. Colonel Kamayi Fabien they are referring to is not a Burundian.

220. He further added that he pleads not guilty to the charges of murder as an of terrorism, kidnaping as an act of terrorism, armed robbery as an act of terrorism, voluntary arson of buildings, means of transport as an act of terrorism, attempt to commit an offence as an act of terrorism,  intentional assault and battery as an act of terrorism because Sector Two he led was not the one that planned the attacks that were perpetrated in Rwanda in 2018; that he did not bring any fighters to Rwanda; and that the instructions to carry out those attacks came from the High Command and were given to his superior, who in turn gave them to the implementors; that the fighers were sent to Rwanda in secret  to protect them from being known

221. He explains that he acknowledges one hundred (100) combatants that he had selected in March 2019, at the request of FLN High Command, who were to go to support those who were in Rwanda; that, even his co-accused IYAMUREMYE Emmanuel himself explained during his interrogation on 15/07/2020 that the selected combatants went by boat to Nyamasheke via lake Kivu, and when they arrived, they fought the Rwandan soldiers; that, he could not know what the combatants he had helped to cross did over there.

222. He also says that, some time after his return from Burundi where he had gone to look for ammunition, he tried to go back leading fifteen (15) persons carrying equipment that included firearms and ammunition for his protection, a nurse, and communication equipment, but, when they arrived at Rusizi river, the first batch of nine (9) people crossed over but the others drowned and he was arrested; that they wanted to go to the Kibira forest to rest after fighting; that they did not have any intention to attack Rwanda.

223. He also says that the acts committed during the attacks in Rwanda should be accounted for by the people who committed them because criminal liability is personal; and he did not send or lead FLN combatants who attacked Nyaruguru; that they had not agreed on what they did because what was known was that FLN combatants had gone to start a war; he was not informed about nor participated in killing civilians, beating and injuring them, robbing and setting fire on their property.

224. He concludes arguing that he does not see any reason for him to be prosecuted and if that was necessary it would be before a military tribunal because the provision of the Ministerial Order on reintegration of former infiltrators and other members of armed groups, he does not understand why he has not been taken to a civic education camp (ingando) and be facilitated to reintegrate normal life.

➢ Determining whether NIZEYIMANA Marc has been a member of the armed groups FDLR-FOCA and FLN, and if he has been a member of the terrorist group MRCD-FLN

• The view of the court

225. The Court finds that during the case hearing on merits, NIZEYIMANA Marc admitted having been in the FDLR- FOCA and FLN armed groups; that he had left FLDL over some internal dissention that split it and one faction created CNRD which then joined PDR-Ihumure and RRM political parties to form a coalition they called MRCD which, in turn created a military branch, FLN in which he was Deputy Commander of the Second Sector operating in Northern Kivu in Rutshuru and Masisi. The court finds his argument that that even though he admits having belonged to armed groups, they were not terrorist organisations because their goal was to overthrow the Government, not to commit terrorism.

226. The court finds that to be the same explanation he provided during the questioning by the Judicial Police on 15/07/2020 and by the Prosecution on 13/08/2020 and on 13/10/2020 when he admitted that he belonged to an armed group whose aim was to overthrow the Government; he also explains that he became a member of two armed groups: FDLR and CNRD which formed a military force called FLN after the creation of MRCD. This is what he admitted during the hearings on detention and provisional release when he said that he did not create any armed group, that he only admits having been a member of FDLR and FLN, but that he was not a member of a terrorist organization as the acts committed were not terrorist acts but were rather intended to cause insecurity, and given the nature of the war they were waging, those acts cannot be qualified as acts of terrorism.

227. The Court finds that what he has admitted constitutes irrefutable evidence proving that NIZEYIMANA Marc became a member of FDLR-FOCA and of the armed group FLN which was affiliated to MRCD. The fact that he belonged to those armed groups is confirmed by the statements made during interrogation and the court hearings by other persons who had belonged to them, including BIZIMANA Cassien, MUKANDUTIYE Angelina, KWITONDA André and IYAMUREMYE Emmanuel.

### 1. On the offence of creating an irregular armed group

228. The Court, considering the provisions of article 459 of Organic law instituting Penal Code, and NIZEYIMANA Marc's acts of joining FDLR-FOCA and FLN armed group, finds, as it was explained in NSABIMANA Callixte alias Sankara's and RUSESABAGINA Paul's cases, that they do not constitute an offence of creating an illegal armed group because the acts he committed do not belong to the category of crimes against national security or the security of other countries; that he did not commit them to support an attack by another army other than the regular army; instead, he committed them with intent to commit terrorism.

Therefore, the Court must examine whether they constitute the offence of belonging to a terrorist organization.

### 2. On the offence of membership in a terrorist organization

229. The Court finds that, at various times, FDLR which had launched terrorist attacks on the Rwandan soil; attacks that killed people, destroyed infrastructure; damaged the Government's or individuals' property, is a terrorist organization as it was confirmed in various verdicts rendered by the Supreme Court, such as in the CASE No of MANIRAGUHA Rwego Gilbert and his companions and  NSHIMIYIMANA Shema Jimmy aforementioned, and also by the UN Security Council resolution of 31/12/2012 that put it on the list of terrorist organisations[43].

230. The Court, considering that NIZEYIMANA Marc, either during the hearing on merits or during the hearing on detention and provisional release, admitted that he had belonged to FDLR-FOCA and MRCD-FLN, and that he was one of FLN military commanders as it was confirmed by the statements of BIZIMANA Cassien, KWITONDA André, IYAMUREMYE Emmanuel and  MUKANDUTIYE Angelina, finds that he belonged to the terrorist organization FDLR-FOCA as it has been explained and has been also in MRCD –FLN which it finds also to be a terrorist organization because, as it has been explained, the purpose of its creation was to carry out acts of terrorism, and, indeed, it committed them in various districts in Rwanda.

231. The court finds that putting together the fact of having been a member of the terrorist organisation FDLR-FOCA and having continued with the terrorist organisation MRCD-FLN until he fell under the provisions of article 18 of the law on counter terrorism aforementioned, NIZEYIMANA Marc should be convicted of the offence of

---

[43] United NationsSecurity Council consolidated list, https://scsanctions.un.org/5w2joen-all.html accessed on 9 thSeptember 2021.

membership of a terrorist organization. Therefore, his claim that FDLR-FOCA and MRCD-FLN are armed groups and not terrorist organisations is unfounded.

> Determining how to qualify terrorist acts committed in the attacks for which NIZEYIMANA Marc is prosecuted and determining whether he participated in them

- The view of the Court

232. The Prosecution, basing on the acts committed by the terrorist organization MRCD-FLN on the Rwandan soil, accuses NIZEYIMANA Marc of killing, unlawful abduction of persons, armed robbery, deliberate arson against another person's house and means of transport, attempt to commit murder, assault and battery, as acts of terrorism.

233. The Court, after examining NIZEYIMANA Marc's plea during the hearing on merits, his statements during investigation and the hearing on detention and provisional release, finds that, even though he did not participate in the attacks in Nyaruguru and Nyamagabe Districts, his statements prove that he closely worked with the combatants who planned and led the attacks, namely, Gen. Jeva and Rusangantwali Félix alias Gwado who led the attacks in those districts as it was confirmed by NSABIMANA Callixte alias Sankara, the MRCD and FLN spokesperson. This is also confirmed by the fact that, in his statements, he admits that he selected about one hundred (100) strong men among FLN combatants who had to go and give support to those who were in Nyungwe forest and how, in February 2020, before his arrest while trying to go into Nyungwe forest from Burundi, he helped nine (9) combatants who were going to Nyungwe forest to cross over the Rusizi river.

234. The court finds that those acts prove that he was involved in the planning of the attacks, considering in particular that Rusangantwali Félix alias Gwado, the attack

commander he wanted to join in Nyungwe forest but who was later on arrested, had called him before he crossed over and helping the nine (9) combatants to cross over.

235. The Court, considering that NIZEYIMANA Marc was one of the MRCD-FLN military commanders and Jeva's deputy, considering also that he was arrested on his way to Nyungwe forest with combatants and equipment; considering also that before crossing over he first called Rusangantwari Félix alias Gwado, the attack commander, and that one of his mission objectives was to prepare Jeva's way, finds that he participated in the acts that were committed by MRCD-FLN combatants.

236. The court finds however that he cannot answer for the acts committed by those combatants, such as murder, attempt to commit murder, assault and battery, unlawful abduction, deliberate arson against another person's house and means of transport, and armed robbery as forms of terrorism, because he did not commit them personally, he got involved in them through his collaboration with people who planned, carried out and led the attacks. The Court finds that his involvement constitutes the offence of committing and participating in terrorism, as provided under article 19 of law no 46/2018 of 3/08/2018 aforementioned, because his acts were part of a plan to commit terrorism; and, as this has been explained in NSABIMANA Callixte alias Sankara's and RUSESABAGINA Paul's cases, they should not be qualified as ordinary offences in the Penal Code, in addition to being terrorist acts.

237. The court finds the allegations that he did not play any role in the attacks that were carried out in Rwanda because even the selection of combatants he did in March 2019 had been requested by the FLN High Command to be unfounded, considering that in his statements he admitted that he worked closely with people who planned and carried out attacks in Rwanda; and that at one time he said that he was arrested on his way to Burundi in Kibira to prepare the way for the combatants who were to accompany Gen. Jeva and that, the combatants he had selected were going to join their comrades in Nyungwe Forest.

238. The Court finds that even his statements that their trip to Kibira in Burundi was not part of a plan to attack Rwanda, that they were instead going for a break after fighting, are unfounded because the court has no way to confirm his assertions considering that, as he says himself, it is not understandable how he came from Congo for a break in the forest in Burundi, accompanied with fifteen (15) combatants carrying weapons including heavy armament, after calling Gwado, the operations commander in Nyaruguru and Nyamagabe Districts, and preparing the way for General Jeva who was one of the top military commanders who planned attacks.

➢ Determining whether NIZEYIMANA Marc has maintained any relation with foreign government employees in the intention to wage or support war

• The view of the Court

239. The act upon which the Prosecution bases its accusation of NIZEYIMANA Marc for this offence is that he had ties with some officials in the Burundi army, namely the 114 Battalion Commander of Cibitoke Province and Warrant Officer (adjudant) NIYONZIMA who was an intelligence officer in Burundi Army High Command (Etat major).

240. The Court finds that, the fact that NIZEYIMANA Marc and his companions went to Burund in Cibitoki Province in 114 Battallion, and that Colonel Kamayi Fabien who was the FLN representative in Burundi introduced him to Warrant Officer (adjudant) NIYONZIMA who brought them ammunition, as it has been explained in NSABIMANA Callixte alias Sankara's case, NIZEYIMANA Marc should not be convicted of the offence of having ties with a foreign Government with intent to wage war, because what he did was not intended to start or support war or any other attack, that his acts fall into the category of ordinary crimes which are committed to destabilize a Government, as provided under article 193 of law Nº68/2018 of 30/08/2018

determining offences and penalties in general; he rather did it with the intention of finding for FLN military equipment that was to be used to commit terrorism. The Court finds that that role itself constitutes also the offence of committing and participating in acts of terrorism, as provided under article 19 of no 46/2018 of 13/08/2018 aforementioned.

➢ Concerning the role of BIZIMANA Cassien, MATAKAMBA Jean Berchmans, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Simeon and NSABIMANA Jean Damascene in acts perpetrated in the attacks launched in Rusizi District

- The Prosecution's arguing of the case

### 1. Concerning BIZIMANA Cassien

241. The Prosecution accuses BIZIMANA Cassier aka Passy of membership in the FDLR's armed wing called FOCA, membership and of participation in the activities of the terrorist organization MRCD-FLN which carried out acts of terrorism in the Districts of Nyaruguru in Kitabi Sector, Nyamagabe and Rusizi, between June 2018 and October 2019 which killed people, injured others, nearly killed some, burnt people's property, robbed some other property, and exploded grenades in public places.

242. The Prosecution explains that during interrogation by the Judicial Police and the Prosecution, BIZIMANA Cassien admitted that he also joined FDLR's armed group FOCA since its creation until 2016 when it split into two, one faction joining CNRD which later became the armed group FLN, that he studied in a military academy and graduated Second Lieutenant; he also admits that he belonged to the terrorist group MRCD-FLN, participated in its activities because he exercised several responsibilities

such as fighting and looking after sick people, that, in September 2018 he was sent to work in Bukavu to prepare and launch attacks in Rusizi in Rwanda. They say that his statements were confirmed by NIZEYIMANA Marc during his interrogation by the Prosecution on 13/10/2020.

243. They also say that BIZIMANA Cassien, assisted by BUGINGO Justin who was FLN representative in Bukavu in DRC RDC devised a plot to carry out terrorist attacks in Rusizi District on the request of Brigadier General Antoine Hakizimana alias Jeva, that he sensitized people like SHABANI Emmanuel, MATAKAMBA Jean Berchmans and NIKUZWE Siméon to join in the plot to plan acts of terrorism that were committed in Rusizi District between May and October 2019, that he was the one who distributed equipment including grenades, firearms and ammunition to be used during those acts, that the equipment was brought into Rwanda and kept by MATAKAMBA Jean Berchimas.

244. The Prosecution says that he also admitted this during investigation when he gave the names of his accomplices, how he took three Kalashnikov guns to Bukavu (3), two (2) grenades and one hundred (100) bullets and handed them over to BUGINGO Justin who told him that there was someone who would help him to transport the weapons to Rwanda. He also explains how he introduced him to SHABANI Emmanuel and MATAKAMBA Jean Berchmans and NIKUZWE Siméon. He also admitted that the equipment that was used to carry out acts of terrorism in Rusizi had been brought by SHABANI Emmanuel and himself.

245. The Prosecution also says that BIZIMANA Cassien's statements during investigation complement those SHABANI Emmanuel gave in the investigation when he admitted that he was introduced into terrorist acts by BUGINGO Justin who linked him up with BIZIMANA Cassien to whom he showed the paths to Rusizi river when he was going to carry out acts of terrorism which took place in Rusizi District between May and October 2019.

246. They also say that even MATAKAMBA Jean Berchmans declared during the investigation that he heard about FLN for the first time through BIZIMANA Cassien and BUGINGO Justin; that it is these two who asked him for collaboration in days ahead and he accepted. After that, they first asked him to provide them with information that would help FLN combatants to cross the Rusizi on their way over to Burundi. Some time later, they asked him to collaborate with them during the attacks that were to be carried out in Rusizi District.  The Prosecution says that he also admitted that it was Bizimana Cassien who was to bring him the equipment that was used in the attacks, that one time BIZIMANA Cassien and SHABANI Emmanuel crossed the Rusizi river with firearms and ammunition that they were bringing and he went to collect them; that the second time they came with two (2) guns and ammunition and hid themselves in a field, and after dark, they went to the tarmac road at a place called mu Rubondwe and opened fire on a vehicle but he did not manage to know whether people had been killed at that time;

247. They also say that NIKUZWE Siméon during interrogation by the Judicial Police on 16/07/2020 and by the Prosecution on 14/08/2020 also confirmed that BIZIMANA Cassien called and told him that he wanted to give him a job, that they met at a place called Nyangezi near Bukavu and he told him that the job consisted of planting bombs (grenades) but if he felt unable to do it to find him someone who had been a soldier, but who was no longer working for the Government and whom he would be paying one hundred dollars (100 USD).

248. They also say that the grenades that were used during the attack that was carried out by BYUKUSENGE Jean Claude in Umuganda Village, Kamashangi Cell, in Kamembe Sector, near Stella's pub, during which several people were injured including RUTAYISIRE Félix, NSABIMANA Joseph, NKURUNZIZA Jean Népomuscène and NIZEYIMANA Paulin, had been brought across Rusizi river by BIZIMANA Cassien. They also say that the fact that people were injured in that attack has been confirmed by BIZUMUREMYI Célestin during interrogation by the

Prosecution on 06/10/2020 when he admitted that persons were injured by a grenade thrown near Stella's pub, that it was confirmed by medical reports.

249. They say that BIZIMANA Cassien, during investigation, admitted that he led the attack on the maize mill in Karangiro; that he, himself, set on fire a Daihatsu vehicle, that, the fact that the arson of property was also confirmed by the people who were interrogated during the investigation, namely Ingabire Joyeux who said that the grenade attack on 19/10/2019 burnt Habarurema Vénuste alias Rwandema's vehicle and Mahoro Jean Damascène who explained that the attack in Karangiro set his vehicle on fire. They also say that it was confirmed by BYUKUSENGE Jean Claude's statements who declared that he was with BIZIMANA Cassien during that attack when they burnt a Daihatsu vehicle; and that it is this same person who smashed the car windshield and set it on fire with petrol.

250. The Prosecution says that BIZIMANA  Cassien alias  Passy's acts constitute the offence of membership in an irregular armed group, membership in a terrorist organisation, conspiracy and incitement to commit terrorism and also, attempt to commit murder, deliberate arson against another person's house and means of transport as forms of terrorism, and illegal use of an explosive device in a public place; that those acts were part of MRCD-FLN plan to terrorise the population and compel the Government to adopt or abandon its standpoint and principles.

## 2. Concerning MATAKAMBA Jean Berdchmas

251. The Prosecution says that MATAKAMBA Jean Berchmans, assisted by BIZIMANA Cassien, devised a plot to carry out attacks in Rusizi District, and then he tried to convince NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude to join them in that plot. The Prosecution says that these two confirmed it during the interrogation in which they explained that it was MATAKAMBA Jean Berchmas who put them in contact with BIZIMANA Cassien for ther plan to carry out attacks in Rusizi District.

252. The Prosecution also says that MATAKAMBA Jean Berchmas kept weapons which included firearms, ammunition and grenades, some of which have been used during attacks on the civilian population at Nyakarenzo Signpost (ku cyapa), and he gave the others to his companions who used them to fire and throw grenades on civilian population in an attempt to kill them, that he has admitted it during the interrogation in which he explained that he also took part in the attack that fired on a truck and smashed its windshield but the driver was unharmed, that that attack took place in August 2019 at a place called Nyakarenzo Signpost (Ku Cyapa cya Nyakarenzo) towards Mibirizi near a military position; and that he was with

   BYUKUSENGE Jean Claude, NTIBIRAMIRA Innocent and with a motorcyclist called NSABIMANA Jean Damascène.

253. The Prosecution says that the proof that MATAKAMBA Jean Berchimas was involved in those acts at different places in Rusizi District was given by the accused who admitted on 16 July 2020, before the Judicial Police that BIZIMANA Cassien and SHABANI Emmanuel crossed the Rusizi River with firearms and ammunition and that he went to collect them; that his statement corresponds to BIZIMANA Cassien's statement before the Judicial Police on 16 July 2020 when he admitted that it was MATAKAMBA Jean Berchmans who collected and kept the equipment that included firearms, grenades and ammunition; moreover, NTIBIRAMIRA Innocent also explained to the Judicial Police on 16/07/2020 that it was MATAKAMBA Jean Berchmans who kept the equipment that had been used during the attacks, that there are also weapons that were brought over by BIZIMANA Cassien and SHABANI Emmanuel as well as others that were brought later  and were hidden in MATAKAMBA Jean Berchmans' field; he also said that the grenade that was thrown in Kamembe City near Stella's pub had been brought over by NSABIMANA Jean Damascène from that place.

254. The Prosecution goes on to say that MATAKAMBA Jean Berchmas' involvement in five (5) attacks in Rusizi District is based on his own statements as well as on those of his accomplices in these terror attacks, namely, BIZIMANA Cassien's statement (s) and SHABANI Emmanuel's statement on the attack on Rubondwe, and NTIBIRAMIRA Innocent's statement on the attack on Rubondwe and Nyakarenzo, BYUKUSENGE Innocent's statement on the attack on Karangiro, and the statement of NIKUZWE Siméon who, during interrogation by the Judicial Police on 16/07/2020, explained that MATAKAMBA called and asked him to meet him at the taxi station, at a place commonly known as "kuri avoka", and gave him a small bag in which there was a grenade; that he went to hide it while waiting to use it in terror attacks.

255. To conclude, the Prosecution says that MATAKAMBA Jean Berchmas' acts constitute offences of conspiracy to commit a crime, incitement to carry out an act of terrorism, attempt to commit murder as an act of terrorism, membership in a terrorist organization and illegal use of explosives in a public place as an attempt by the MRCD-FLN terrorist group to terrorize the population and compel the Government of Rwanda to adopt or abandon its standpoint and principles.

### 3. Concerning SHABANI Emmanuel

256. The Prosecution says that SHABANI Emmanuel also committed the offence of compiracy and incitement to carry out acts of terrorism, because he encouraged NIKUZWE Siméon to participate in the acts of terrorism that were carried out in Rusizi District by the MRCD-FLN terrorist group, and his role consisted in that he gave directions to BIZIMANA Cassien about a particular route that would be used to smuggle weapons including firearms, ammunition and grenades, into Rwanda which were to be kept at MATAKAMBA Jean Berchmas' house; he also led him to places from which they led attacks and fired on civilian population, threw grenades into a public place, and burnt  people's property including a vehicle that was set on fire in Karangiro..

257. The Prosecution also says that the evidence that he committed those acts is that during his interrogation by the Judicial Police on 16 /07/2020, he freely admitted, that he encouraged his younger brother NIKUZWE Siméon to join in the terror attacks that were carried out in Rusizi District following a request by BUGINGO and BIZIMANA Cassien alias Paccy who were in Bukavu, who told him that they wanted to leave Mururu Sector and go into Bugarama, that his statement was  confirmed by NIKUZWE Siméon who, during his interrogation on that date, explained that the person who got him involved into the plot to carry out terror attacks in Rusizi District is his elder brother SHABANI Emmanuel.

258. The Prosecution explains further that other pieces of evidence to support their claim consist in that, during his interrogation by the Judicial Police, SHABANI Emmanuel admitted that he went with BIZIMANA in two (2) terror attacks that were carried out in Rwanda, that during those attacks, people were injured and property destroyed, that even Bizimana Cassien during interrogation by the Judicial Police explained SHABANI Emmanuel's role in those attacks, he admitted that they brought together the equipment that was used during those attacks, that that equipment was kept by MATAKAMBA Jean Berchmas, that the latter also accuses them of smuggling into the country military equipment including firearms and ammunition that they used to launch the attack in Rubondwe where they fired on passing by vihicles.

259. The Prosecution also says that SHABANI Emmanuel is also denounced by NTIBIRAMIRA Innocent who declared that both of them, together with BIZIMANA Cassien and SIBOMANA Emmanuel, took part in an attack in July 2019 on a maize mill; that SHABANI Emmanuel was among those who distributed weapons including grenades, that even  BYUKUSENGE Jean Claude confirms that they participated with MATAKAMBA Jean Berchmas , NTIBIRAMIRA Innocent, SIBOMANA Emmanuel and BIZIMANA Cassien in the July 2019 attack during which they stopped a car but it refused to stop, and they fired on it but it managed to escape.

260. To conclude, the Prosecution says that SHABANI Emmanuel's acts constitute offences of membership in a terrorist organization, conspiracy and incitement to commit terrorist acts, attempt to commit murder and deliberate arson against another person's house and means of transport means, and illegal use of explosives in a public place, and these were carried out with intent to terrorize innocent civilians and to compel the Government of Rwanda to adopt or abandon its standpoint and principles.

### 4. Concerning NTIBIRAMIRA Innocent

261. The Prosecution says that NTIBIRAMIRA Innocent was involved in the acts of the terrotist organization-MRCD-FLN. They explain that during the interrogation by the Judicial Police on 16 July 2020, and by the Prosecution on 24 September 2020, he admitted that he took part in five attacks (5) in different areas in Rusizi District; he explained that the first attack was carried out in June 2019 on a cassava processing factory in a location called 'mu Karangiro, somewhere between Mururu and Nyakarenzo, at a place where there used to be SOPECYA petrol station, that during that attack he was carrying a gun and was with SIBOMANA Jean Bosco who was carrying a grenade that he threw onto a vehicle but it did not explode, then he, himself, fired about six (6) gunshots into the air.

262. They also say that he explained how the second attack which took place towards the end of June 2019 in Rubondwe in Mururu Sector near the coffee washing station was carried out: the attack commanders were BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, SIBOMANA Jean Bosco and BYUKUSENGE Jean Claude. They opened fire on two (2) vehicles among which there was a truck, but the driver refused to stop; the third  (3rd) attack in which he participated took place in July 2019 at a location known as 'mu Karangiro' at a cassava processing factory, and his involvement consisted in helping BIZIMANA Cassien who was with SIBOMANA and BYUKUSENGE Jean Claude to cross over, then SIBOMANA and himself went home leaving behind BIZIMANA and BYUKUSENGE Jean Claude who set on fire a vehicle which was nearby.

263. They go on saying that he provided details on the fourth (4th) attack which took place towards the end of September 2019 in Nyakarenzo Sector at a location known as 'ku Cyapa' near a military position, however that their aim was not to attack that place but to stop vehicles, that during that attack he was with MATAKAMBA, BYUKUSENGE, NSABIMANA Damascène and SIBOMANA Jean Bosco. They also say that he said that during the attack they stopped a truck which refused to stop, but when they opened fire the driver came out, that while they were about to set it on fire, soldiers who had heard the gunshots fired on them and they immediately ran away; that the fifth (5th) attack took place in Kamembe City, where they planned to carry out a grenade attack at Kamembe Sector Office and in the city centre.

264. They also say that NTIBIRAMIRA Innocent said that SIBOMANA and himself, under the command of MATAKAMBA had to carry out the grenade attack on the Sector office; but because they had gone on foot and MATAKAMBA by car, they were unable to meet and their project aborted because MATAKAMBA could not be reached by telephone and they set a boobytrap on the lower side of the Sector's office, a second grenade was thrown into Kamembe City by BYUKUSENGE assisted by NSABIMANA Jean Damascène who took him away on a moto bike.

265. The Prosecution also says that during the interrogation by the Judicial Police on 16 July 2020 and by the Prosecution on 24/09/2020, NTIBIRAMIRA Innocent admitted he had sensitized a certain SIBOMANA Jean Bosco and a certain NSABIMANA Jean Damascène to join in the terrorist attacks in Rusizi, that he had helped BIZIMANA Cassien to cross over from DRC in order to launch attacks in Rwanda

266. They say that in other proofs of NTIBIRAMIRA Innocent's involvement there are statements made by BYUKUSENGE Jean Claude at the Judicial Police and the Prosecution, where he confirmed that they both participated in different terror attacks in Rusizi District; and also MAHORO Jean Damascene's statement during the interrogation in which he explained that during the attack on 08/07/2019 at 'mu

Karangiro', Nyakarenzo Sector, Rusizi District a Toyota DYNA van (RAC 943 B) was set on fire.

267. To conclude, they say that NTIBIRAMIRA Innocent's actions were part of a plot to terrorise innocent civilians and to compel the Government of Rwanda to adopt or abandond its stand point and principles, that these constitute also the crimes of membership in a terrorist organisation, conspiracy and incitement to commit terrorism, deliberate arson against another person's house and means of transport, and illegal use of explosives in a public place, and these were carried out with intent to terrorize innocent civilians through illegal use of explosives device in public places

## 5. Concerning BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène

268. The Prosecution accuses BYUKUSENGE Jean Claude of his involvement in attacks launched by the terrorist organization-MRCD-FLN, in Rusizi District in mid-October 2019; in these attacks, people were injured, and their property damaged, namely vehicles that were burnt. They also say that people who were injured by the grenade that was thrown into Kamembe City include Nizeyimana Paulin, Nkurunziza Jean Népomscène, Nsabimana Joseph and Rutayisire Felix; this has been confirmed by Bizirurema Célestin, Uwamahoro Theodette  and Ntihanabayo Eric, during their interrogation, and that medical reports show that they suffer various forms of permanent disability.

269. They also say that other incriminating evidence is the fact that during his interrogation, BYUKUSENGE Jean Claude has pleaded guilty and disclosed the names of his accomplices ; he also explained that on 19/10/2019 he carried out a grenade attack in Umuganda Village, Kamashangi Cell, Kamembe Sector near Stella pub and several people were injured; this grenade had been brought by NSABIMANA Jean Damascène aka motard who got it from MATAKAMBA Jean Berchmas; he had

explained that his companions and himself had been involved in other attacks during which they set fire on a vehicle that was parked in Karangiro at a maize mill and its cabin caught fire ; he was with BIZIMANA Cassien when they set on fire a Toyota Dyna van (RAC 943 B), this was confirmed by Mahoro Jean Damascène, the car's owner and by Habiyaremye Martin, Nteziryayo and Gakwaya Gérard during the interrogation by the Judicial Police. They also said that he participated in the attack on Nyakarenzo during which he fired and threw a grenade on a truck which smashed its windshield,

270. They also mention BYUKUSENGE Jean Claude's involvement in five (5) attacks in Rusizi District; these attacks were also mentioned in the statements made by MATAKAMBA Jean Berchmas, BIZIMANA Cassien, SHABANI Emmanuel, NTIBIRAMIRA Innocent and NSABIMANA Jean Damascène who participated in them.

271. The Prosecution says that NSABIMANA Jean Damascène was involved in MRCD-FLN's terrorist activities, namely the attacks in Rusizi District and that in one of them, they threw a grenade in a public place in Kamembe City and civilians were injured, and the raid in Karagiro during wich they fired on a truck and the windshield was smashed; they also say that NSABIMANA Jean Damascene smugled into the country military equipment some of which kept at his place and which included fireams, ammunition and grenades.

272. They say that some of the proofs of NSABIMANA Jean Damascène's involvement in those attacks is his admission during the interrogation by the Judicial Police that he joined the group after being recruited by MATAKAMBA Jean Berchmas ; he also admitted that he participated in its activities ; he explained how he smuggled into the country military equipment which included three (3) AK47 and their ammunition (more than three hundred bullets (300) as well as a pistol and six (6) grenades, that after smuggling them into Rwanda, they handed them over to MATAKAMBA Jean Berchmas.

273. They also say that when BYUKUSENGE Jean Claude went to carry out the grenade attack at a place known as Kurya gatatu in Kamembe, it is this man who took him there and after the attack, he took him home, that he explained how he participated in the attack on Nyakarenzo, that he admitted having a pistol and a grenade in a sycamore tree on the bank of Rusizi River in Gitwa Village, Kagarama Cell, Mururu Sector, that this is also attested by the recorded writing of seizure prepared by a police officer ; this document is available in the file and it proves that those items were taken from that place as it appears in their photos.

274. They also say that other proofs of NSABIMANA Jean Damascène's involvement can be found in statements of the people who have participated in those attacks, namely MATAKAMBA Jean Berchmas who explained that he played the role of bringing the grenade and participating in the grenade attack in Kamembe City ; he was also involved in the attack that fired on a vehicle ; that, BYUKUSENGE and NTIBIRAMIRA had also participated in that attack. The information on this attack and NSABIMANA Jean Damascène's participation have been explained by NTIBIRAMIRA during the investigation.

275. To conclude, the Provecution says that the purpose of BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène's acts was to terrorise innocent civilians and compel the Government of Rwanda to adopt or abandon its standpoint and principles ; that these acts constitute offences of membership in a terrorist organisation, attempt to commit murder as a a form of terrorism, illegal use of explosives in a public place ; and for BYUKUSENGE Jean Claude's case, there is in addition the offence of deliberate arson against another person's house and means of transport.

### 6. Concerning NIKUZWE Siméon

276. The Prosecution says that NIKUZWE Siméon must answer for his involvement in terrorist acts by MRCD-FLN because he smuggled into the country and kept military

equipment, of which grenades that were to be used in terrorist acts that the group was planning to carry ou in Rusizi District.

277. They explain that the incriminating evidence is that during investigation, NIKUZWE Siméon admitted committing all the acts he is being accused of; he says that he received grenades two (2) times; that the first time he received one from BIZIMANA Cassien in Bukavu and brought it into Rwanda, the second one was brought by MATAKAMBA Jean Berchimans who instructed him on how to keep them until they would be used in attacks in Rusizi District.

278. They also say that his statement is confirmed by his elder brother SHABANI Emmanuel's statements during the interrogation by the Prosecution on 24/09/2020 in which he explained that he persuaded Nikuze Simeon to join them in that plot when he introduced him to BUGINGO Justin who, in turn, introduced him to their accomplices in Rwanda who were plotting carry out terror attacks in Rusizi District.

279. To conclude, the Prosecution says that the purpose of NIKUZWE Siméon's acts was to terrorise innocent civilians and compel the Government of Rwanda to adopt or abandon its standpoint and principles, and that, they constitute an offence of membership in a terrorist group.

- The defendants' defense

1. BIZIMANA Cassien's plea

280. BIZIMANA Cassien, assisted by his lawyer MUREKATETE Henriette, says that among the crimes he has been accused of he only pleads guilty to belonging to an illegal armed group, i.e FLN, but that he was never a member of FDLR-FOCA. He went on to explain that he fled Rwanda in 1994 as a soldier of the former Rwandan army, went into the former Zaire, and stayed in the Panzi refugee camp; when refugee

camps were dismantled, he fled to Kisangani where he was shot in the shoulder, and when he recovered, he came back to Walikare and got a job as a nurse in Kiyanjiko dispensary.

281. He also says that in 2015, MAYIMAYI combattantss attacked all the Rwandan refugees who were still in Congo and they moved to Rutshuru, more exactly to Faringa; in 2016, one of their leaders had them registered with UNHCR, but the FDLR was not happy with it and this led to a schism in the army, one faction joined the person who had carried out the census and the other remained with the FDLR. He added that on 31/05/2016, those who accepted the census founded a party they called CNRD-Ubwiyunge; on 10/6/2016 they created an armed branch they called FLN; he also joined this group because its manifesto aimed at repatriating the refugees, stopping all military activities and entering into negotiations with the Government of Rwanda, because that would help him to have a happier old age; in the meantime, je joined a military academy where he graduated with the rank of second lieutenant.

282. He goes on sayin that he admits he was once a member of MRCD – FLN but, for him it was not a terrorist organization because Congolese soldiers helped FLN to protect the refugees when they were attacked by FOCA and this led him to believe that CNRD - Ubwiyunge/FLN was an internaltionally recognized organization, even by the UN.

283. He further says that he admits his role in the attacks in Rusizi District, namely where he led a attack that set a vehicle on fire, and that he was responsible for bringing equipment that was used during the attacks. He explains that before he was given that mission in September 2018, he was summoned by Brigadier Gen JEVA who told him that a certain Justin BUGINGO who was in Bukavu in RDC had young men who were willing to carry out attacks in Rusizi  but, that they did not have the necessary equipment, he also tod him that there was some equipment that had arrived in Nyabibwe four months before(4); among them there were three (3) AK47, sixt (60) bullets and two grenades but there was no one to take them to Justin Bugingo in

Bukavu so that he may give them to people in Rwanda. He also said that after handing them over to Justin, he introduced him to MATAKAMBA and NTIBIRAMIRA; as for the others, he meet them on various occasions: when he brought them equipment or in attack missions; that, whatever he did, he did it as a messenger and a subordinate who executed orders, that he never did anything on his own, that Brigadier General Jeva Antoine had told him that FLN had started the war to undermine the national security by sabotage with the purpose of compellingl the Government of Rwanda to negotiate.

284. He also says that he pleads guilty and apologises for conspiracy and incitement to commit terrorism; he explains that for Bugingo Justin and himself they were instructed by Jeva to launch attacks in Rusizi Districton on behalf of FLN, he pleads guilty for the involvement in those attacks and for having sought accomplices but he denies any incitement to commit terrorism because he did not know anyone; that even SHABANI Emmanuel was introduced to him by Bugingo in order to show him the way to Rusizi in Rwanda because he was born in that region, that when they met he already knew about the existing plans and that they could not work together if they had not met before;   that, the only person he met is, according to him MATAKAMBA who he needed to get acquainted withso that they could discuss how to find the equipment; these discussions were by telephone using sim cards from DRC.

285. He also talks about NIKUZWE: he was called by BUGINGO who told him that he wanted that attacks be carried out in Gishoma and that he had found somebody who would help them; he told him that he was going to send that person and give him a grenade he would use, and he accepted; then he sent NIKUZWE Siméon who gave it to him; he said that the second grenade that they found him with had been given by MATAKAMBA whom he had met through BUGINGO, that NIKUZWE Siméon's allegation during the interrogation that he knew nothing about grenades is not true because he could not be ignorant about them and then know how to smuggle them through Rusizi II border post despite  searches on anyone passing through that

border post; that, saying that he went to look for another person who would throw it is an attempt to evade and conceal his responsibility in all those acts.

286. BIZIMANA Cassien goes on to say that in those attacks, they did not kill anyone and that Jeva had forbidden them to kill, steal, take hostages, injure people deliberately or rob people's property; that he had even promised an incetive of one hundred US dollars (100 USD) to anyone who would have participated in a attack that, that is the reason why they had to obey instructions like carrying out acts of sabotage by opening fire and throwing grenades on certain locations without causing any casualties or firing on military positions; that he perfectly obeyed these instructions and in August 2019 he was even promoted by NRD-Ubwiyunge to the rank of Lieutenant.

287. He goes on saying that he gave some weapons to MATAKAMBA, that he took part in some attacks in Rusizi, for instance the attack in Rubondwe, a place that had been indicated by MATAKAMBA:  they opened fire then went home; they carried a second attack in Cyimbogo near the maize mill where they found a Daihatsu vehicle in which they found clothes which looked like military outfit. He informed Jeva about it on the telephone, the latter ordered him to burn it; he told him that everything that looked like military or police materials should be burned; thus he set the vehicle on fire, but only the cushions caught fire and he returned to Bukavu.

288. He explains that to participate in that second attack he had been called by NTIBIRAMIRA who was the group commander in Rwanda at the time, because MATAKAMBA was sick in Kigali; he told him that he knew of a place they could attack, then he came with SHABANI Emmanuel and when they arrived at Rusizi border post, he stayed behind to see that no one was waiting from them; as for him, he continued his way and when he arrived in Rwanda, he met BYUKUSENGE Jean Claude, SIBOMANA Jean Bosco and NTIBIRAMIRA Innocent who had come to help him cross the border post and and to take him to the vehicle, they set it on fire then he went back into DRC with BYUKUSENGE Jean Claude. He also says that he never

participated in the attack of 10/10/2019, but he only admitted that he provided the equipment; that during those attacks, they did not open fire on anyone, but that if people had been injured, it was by accident; that it was not done deliberately because MRCD- FLN's goal was not to terrorize the population, and that if ever anyone fired on the population, he was the only one to answer for it.

289. He also said that he wanted the court to ignore the medical report in the file of a person who claims that he was injured, because it was done on 2/7/2019 while on that date the attack which allegedly would have injured them had not yet happened; that he did not provide the information contained in the statement of his interrogation by the Judicial Police on 16/07/2020 relating to the financial support from RUSESABAGINA and TWAGIRAMUNGU to FLN, as well as the support and route that were to be provided by Uganda and Uburundi, that it should not be considered because at his level he could not know or be entrusted with that kind of information.

## 2. MATAKAMBA Jean Berchmans' plea

290. Assisted by his lawyer MUKARUZAGIRIZA Chantal, MATAKAMBA Jean Berchmas pleads guilty of all the charges; he says that he has chosen to say the truth in order that no one else may be induced into committing the same offences. He explains that he worked in a stone quarry as a stone digger; this eventually stopped because the Government said that all underground resources were their property, then he went to Bukavu in RDC and made a drink called Rafiki Soft Drink; that in April 2019, he came across a certain BUGINGO and a certain Pacifique who both used to work for him in a quarry, they intimidated him,  reminding him of the person his younger brother had reported to the Rwandan soldiers who, then arrested him; Bugingo told him that he was going to introduce him to somebody and the matter would be settled.Then he introduced him to BIZIMANA Cassien aka PASSY so that he may help him; they told him he was sure that even though the Government of Rwanda had made him go bankrupt, his assistance to BIZIMANA Cassien would yield a lot money.

291. He goes on saying that BIZIMANA Cassien sent him to NTIBIRAMIRA  Innocent who was an FDLR soldier, then he came to look for him and briefed him about the deal, then they went to Bukavu together ; BUGINGO Justin asked them to help them carry out attacls in Rusizi District, they told him that they could not because they were not soldiers, then he came back to Rwanda and contacted on their behalf a certain BYUKUSENGE Jean Claude who used to belong to FDLR ; he introduced him to Bugingo Justin and BIZIMANA Cassien then, they worked out the details of carrying out attacks in Rusizi District ; they also informed NTIBIRAMIRA Innocent again that they had said that they no longer belonged to  FDLR, that they had joined CNRD which had a military wing called FLN ; they asked them to join them and they acepted, they accepted to help them in those terrorist activities by providing information and helping their soldiers to get across  the Rusizi river because they lived in its vicinity, then BIZIMANA Cassien told NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude to look after the equipment that they would give to MATAKAMBA, and that they would receive a salary of one hundred US dollars (100 $) a month.

292. He also says that he pleads guilty for conspiracy and incitement to commit terrorism because he went to Bukavu several times and had discussions with people who planned to attack Rwanda but failed to inform any of the Government organs; instead, he persuaded NTIBIRAMIRA Innocent andBYUKUSENGE Jean Claude to join BUGINGO and BIZIMANA in preparing attacks on the Rwandan soil.

293. He also says that he admits his role in the attempt to commit murder, but that he had received no plans nor instructions to kill. He also explains that in August 2019, BIZIMANA Cassien and SHABANI Emmanuel crossed Rusizi river with guns and ammunition, and he went with NTIBIRAMIRA to collect them; they also brought two (2) more guns plus their ammunition and hid them in his field; and each time he received five (500) dollars.

294. He also says that he admits that he went with BIZIMANA Cassien and Shabani Emmanuel to carry out an attack in Rubondwe where he lied to them that there was

a military position when no one lived in that area except the forest on the upper side of a marshland ; that, when they arrived, NTIBIRAMIRA and himself were hiding so, he could not tell whether BIZIMANA Cassien and his companions fired on vehicles, that, however, they had planned to fire on military positions, that, before the attack he let Passy and Shaban hide in his field while they were waiting for darkness to launch the attack ; he also indicated the military position so they may not discover them and foil their plot, that BYUKUSENGE Jean Claude and himself had accompanied them on their way back to Congo, and on that day he received one hundred dollars (100$) in payment. He also said that after the attack, he met with FLN Commander, Gen. Antoine JEVA, to discuss about their plan to attack Rwanda and how he would look after their equipment until they would collect it for the attack.

295. He goes on to say that in August 2019, NTIBIRAMIRA Innocent, a motorcyclist called NSABIMANA Jean Damascène, BYUKUSENGE Jean Claude, SIBOMANA Jean Bosco and himself carried out an attack at Nyakarenzo signpost (ku Cyapa cya Nyakarenzo) near a military position ; they fired on a truck and smashed its windshield but, by sheer luck,  the driver went unharmed; that, while preparing for the third on Kamembe City, a certain Damascène went into Congo and brought him grenades out of which three (3) were taken to NTIBIRAMIRA Innocent, the rest were hidden in his field ; after that, he was instructed to give a grenade to a certain NIKUZWE Siméon, he also gave Damascène one (1) grenade that he took to Kamembe where he met BYUKUSENGE Jean Damascène and they exploded it in Kamembe ; another grenade and one pistol were taken to Gihundwe by NTIBIRAMIRA Innocent ; he was left with four (4) grenades and four (4) guns with their ammunition, that he distributed those grenades but ignored what they would be used for ;  that, even if he did not participate in the attack carried out by NTIBIRAMIRA and Sugabo, on which a vehicle was set on fire, the equipment used during the attack had been brought by him.

296. He also pleads guilty to illegal use of explosives with intent to commit terrorism because as he has explained, he kept firearms, ammunition, and grenades that were used to commit terrorism in Rusizi District, that, he also participated in those attacks

because he went with people who had to carry them out ; that he gave three (3) grenades to NTIBIRAMIRA Innocent, one (1) to Damascène the motorcyclist which was exploded in Kamembe, as well as those he gave to NIKUZWE Siméon ; however, he cannot tell what they were used for ; that, there are other four (4) that he handed over to the authorities when he was arrested

297. To conclude, he says that he never belonged to the terrorist organisation-MRCD-FLN because he came to know FLN later when he heard people talk about it; that he worked for a businessman called BUGINGO Justin who asked him, as his younger brother, to help him: he told him that the equipment was meant to go to Burundi but they used it in attacks in Rusizi, that he did not know anything about FLN and MRCD, apart from what he heard from BIZIMANA. He adds that he had never been a member of any foreign political party or armed group. He also says that wherever he is, for the sake of justice, he feels he cannot deny the fact that he was a member of a terrorist organisation because he was fully aware of its objectives and yet participated in its activities, i.e, carrying out attacks ; and in view of all this, he pleads guilty to that offence, feels sorry for it and asks for clemency.

### 3. SHABANI Emmanuel's plea

298. Assisted by his lawyer Uwimana Shanny, SHABANI Emmanuel says that in 2015 he graduated from the university but could not find a job and he went to live in Bukavu in RDC; he registered as a refugee so that he could benefit from the aid; that, during refugee meetings he met a certain BUGINGO Justin who hired him to load cargo on his boat. He says that one time they went to Kalehe on that boat, when he arrived, his job had been changed and he was considered as a soldier because they embarked between 80 and 100 soldiers with military equipment. He also says that around eight o'clock in the evening, a boat driver came and they left Ijwi island and headed for Rwanda; when they arrived, the passangers got off the boat and continued their journey on foot into Nyungwe forest; as for him he went back to Bukavu with the

boat driver; that, when he asked about the passengers, he told him that they were FLN combattants; then he paid him fifty dollrs (50$), then he went home.

299.  He goes on to say that in June 2019, BUGINGO Justin called him again and told him that he would like him to accompany someone up to Rusizi river, when he asked him who it was, he told him that he was a CNRD combatant; that at first he refused but he told him that it was a paying job; that they would give him five thousand dollars (5000 $) then he accepted because he was unemployed;  he accompanied him up to Rusizi, he called people in Rwanda who came to help him cross over but he denied him going back lest he should talk about it; then they swam and arrived in Rwanda; that, the FLN combattant was BIZIMNA Cassien. He said that when they aarived in Rwanda, they found others and their total number grew to six (6) people among them three had guns.

300. He went on saying that the third time he got involved in terrorist activities was when BUGINGO Justin asked him to find him a person in Rwanda he could do business with, then he introduced him to his younger brother NIKUZWE Siméon ; that after that, his brother had called and told him that the person BUGINGO had introduced him to had given him a grenade, and, in turn, he told him to be careful whenever they asked him to do something; that is how, according to him, for the sake of money, he got involved in acts aimed at destabilising the national security; that he regrets it and apologises to the Rwandan people in general and to his younger brother who fell into that trap.

301. He also feels guilty to the crime of conspiracy and incitment to commit terrorism ; however, while he was committing those acts, he did not know that they were part of a plan to commit terrorism, that he understood it after his younger brother NIKUZWE got involved and when he asked Justin BUGINGO the reason why he did it, he replied that if he had told him he would not have accepted ; that he feels guilty to attempting to commit murder, deliberate arson, illegal use of explosive devices as acts of terrorism and membership in a terrorist organisation because he accepted, against

remuneration, to accompany and guide about three times FLN combattants, namely BIZIMANA Cassien who was carrying a gun and grenades and was coming to carry out attacks in Rwanda ; that he first acompanied him up to Rusizi river ; the second time he accompanied him, he was carrying a gun like a soldier, but as for him, he did not have any equipment. When they reached Rusizi river, he went back. The third time, he acompanied him when he was taking some equipment to his comrades; he left him at Rusizi river; that he participated in one attack in Rwanda, and the fact that he had accompanied him makes him an accomplice of whatever he may have done.

302. To conclude, he says that when he started working with Bugingo Justin, he did not know that he was working with FLN; that he came to know about it after he hired him and told him he was working for CNRD with its military wing FLN; as for MRCD, he heard about it when he arrived in court.

### 4. NTIBIRAMIRA Innocent's plea

303. Assisted by his lawyer NGAMIJE KIRABO GUIDO, NTIBIRAMIRA Innocent says that he pleads guilty to being a member of a terrorist organisation because he accepted to work with BIZIMANA Cassien aka Passy from FLN. He explains that a certain MATAKAMBA Jean Berchmans came to see him at home and told him that Congolese soldiers were looking for him; he resisted a bit but told him that there was a lot of money involved and he accepted; that in March 2019, Passy went to buy him beer and asked him if he used to be in FDLR and he admitted it but that he had later returned to Rwanda; he promised him that he was going to earn a lot of money and become rich because they would pay him and that it was MATAKAMBA who would relay messages to him. He continues saying that he admits the offence of conspiracy and incitement to commit terrorism because, upon MATAKAMBA Jean Berchimas's request, he convinced a certain SIBOMANA that Matakamba wanted to talk to him when he knew quite well what he was going to tell him.

304. He also says that he pleads guilty to deliberate arson against another person's house and means of transport as forms of terrorism. He also explains that he went with BYUKUSENGE Jean Claude and SIBOMANA Jean Bosco to Rusizi river to help BIZIMANA Cassien cross [the river] being fully aware that he was coming to ambush vehicles because MATAKAMBA had told them that they were going to carry out a highly visible act of setting fire on a vehicle; that, the first attack was carried out in Karangiro on the maize mill; he was with SIBOMANA Jean Bosco who hurled a grenade in the intention of setting the vehicle on fire but it failed to explode;  that at that time the equipment had been provided by MATAKAMBA Jean Berchimas; that during that attack he fired six bullets (6).

305. He further indicates that the second attack in which he took part happened in Rubondwe: he was with BIZIMANA, MATAKAMBA and BYUKUSENGE. They planned to ambush vehicles and set them on fire, that at that time BIZIMANA stopped a car but it refused to stop and then SIBOMANA opened fire, another came and refused to stop, then came a truck but it also did not stop and they opened fire. As the day was dawning, they went home; that during the third attack in which he participated a vehicle was set on fire; that all the guns that were used in the second and third attacks came from Congo. He also says that during the fourth raid that happened in Nyakarenzo on the road to Mibirizi, he was with NSABIMANA Jean Damascène, BIZIMANA, BYUKUSENGE and SIBOMANA. They ambushed vehicle but when they stopped them, they refused; however, the last one did stop and SIBOMANA threw a grenade but the vehicle did not catch fire, the soldiers who were nearby intervened, and the assailants fled; that he thinks that the vehicles's glasses may have been broken but it carried on; that, he cannot remember the number of bullets he fired because they had agreed that all of them had to open fire to make believe that they were a big number.

306. He also says that the other place they launched an attack was at Kamembe Sector where he went with SIBOMANA and where they had planned a grenade attack while SIBOMANA Jean Bosco and NSABIMANA Jean Damascène had to explode it in

Kamembe City, that at that time they had agreed with MATAKAMBA that he had to come and pick them and take them to a rallying point; but when they called him he could not be reached, then they thought of setting a booby trap near a path while those who had gone to Kamembe City exploded it; that it was the following morning that BYUKUSENGE telephoned and told him that MATAKAMBA had been arrested the previous day, then he went to hide the grenade and the pistol he had in MATAKAMBA's field.

## 5. BYUKUSENGE Jean Claude's plea

307. Assisted by his lawyer NGAMIJE KIRABO GUIDO, BYUKUSENGE Jean Claude declares that he pleads guilty to all the charges against him and asks for for forgiveness. He indicates that in 1994 he was nine (9) years old when he fled to Zaire with his parents. In 1996, refugee camps were dismantled, and they fled to Kisangani and he was separeted from his parents when he was eleven (11) years old. In 2012, the combattants he lived with enrolled him into FDLR, after a long time he heard that his parents had gone back to Rwanda and in June 2012 he also came back to Rwanda. After he arrived, he experienced a lot of poverty related problems. Then, they told him that MATAKAMBA could offer him a job in his quarry and he nt there and worked for him untl 2017 when he went bankrupt and all his employees went back home; MATAKAMBA asked him to pay back the money he had lent him but he could not find it; then he sued him in court and Byukusenge lost the case. He further says that MATAKAMBA asked him to work for him again in order to repay him and he took him to Bukavu in RDC. When he arrived, BUGINGO Justin told him that since they knew that he had been an FDLR combattant he could help them get some equipment cross over in return for a payment of one hundred dollards (100$), and given that he badly needed it, he accepted.

308. He goes on indicating that in July MATAKAMBA called and told him that people who were bringing equipment he had told him about were near his field; they went to see them together and when they arrived they found there SHABANI Emmanuel and

BIZIMANA Passy; they told him to make sure that no civilian should lose their property; that, around midnight SIBOMANA showed them the path to follow to launch an attack in Rubondwe; when they arrived, BIZIMANA Passy blocked the road upwards and the other downwards and then they fired; and what MATAKAMBA said that they hid themselves is not correct because they needed not hide since they had guns and they had been soldiers; that, however, he was not aware of the existence of a plan to set vehicles on fire; that, they opened fire just to indicate that FLN was around, and so that they could get the money they were promised; that when BIZIMANA and SHABANI returned home, he helped them cross the river because they could not swim.

309. He also indicated that he took part in the attack in Karangiro; he explains that NTIBIRAMIRA told him that they were planning to open fire in Karangiro; then, they went to wait for BIZIMANA Cassien at Rusizi river, then they went to the maize mill; he blocked the road upwards and opened fire northwards; when they left they came across a Daihatsu vehicle andwhen he looked he saw inside military uniforms; BIZIMANA Cassien told him that he was going to fire on it but before he was going to inquire first, though he did not manage to know those he enquired from; that after that Passy took petrol from the vehicle and set it on fire and after that they went into Congo; that MATAKAMBA did not participate in that attack because he was sick.

310. He goes indicating that in the beginning of September 9, he took part in another attack in Nyakarenzo at the signpost (Ku cyapa). He was with NTIBIRAMIRA Innocent, SIBOMANA and MATAKAMBA who talked to BUGINGO and told him that he was going to send them some people, and when they arrived, he blocked the road coming from the military post while the others remained in a tree plantation. MATAKAMBA told him that he had been instructed that they had to open fire to signal that they had arrived; during that attack they had three (3) guns; then a truck appeared and they stopped it, he fired on the window glass and smashed it but the driver came out and hid under the vehicle.  MATAKAMBA asked the people inside to calm down, telling

them that they were not looking for them; that after a short time, soldiers fired lots of shots and they ran away without setting the truck on fire. He also said that MATAKAMBA had not told him that they had instructions to set vehicles on fire; besides, he seemed to be the only one with military experience because his other companions were civilians.

311. He also pleads guilty to his participation in the attack on 19/10/2019 in Kamembe City. He explains that while he was at his house in Nyamasheke, BUGINGO Justin texted him on whatsapp telling him to go to Kamenbe to meet a person who had a message for him; when he arrived, he found that it was NSABIMANA Jean Damascène aka Motard who told him that he was the messenger, that he was given a grenade to bring to him so that he explodes it in Kamembe town; that they went to town near the mosque Ku rya gatatu (on the third street) at a pub they call Stella and he hurled it and it landed near a car; then NSABIMANA Damascène took him immediately to his place in Mururu on a motorbike. That, around eleven o'clock pm, BIZIMANA phoned him and asked him why he can undertake an action and not inform him when he is the one who is answerable and who in particular is responsible of that area. He explained to him what had happened, and that it was in the next morning that MATAKAMBA Jean Berchimas was arrested, and then they were also arrested.

312. He maintains that when he joined the attacks he did not have any intention to kill, because if he had had any, he could have thrown the grenade into a crowded place or in that pub; that, even the person who got injured was hit by accident because he had not seen him; that, even the medical reports contained in the file indicate that people got injured before the grenade was thrown, since they were written in May before he got involved in those acts, that the court should exercise discernement with regard to those medical reports, in particular the one regarding RUTAYISIRE.

### 6. NIKUZWE Siméon's plea

313. NIKUZWE Siméon admits that he smuggled a grenade across the border and kept it but had done it under Bugingo's pressure; that he denies being a member of a terrorist organization, and that no one ever sensitized him to join one, because he did not even know that those who gave him a grenade were agents of that group. He explains that towards the end of October 2019, he was called by his elder brother SHABANI Emmanuel who told him that there was an old man who needed information on a manager of his property. Then he went to see SHABANI Emmanuel in Bukavu who took him to BUGINGO Justin's place; when he arrived, he asked him his telephone number so that he can call him later and inform him about what he wanted him for; then, he gave him thirty dollars (30$) as transport fare. He says that on 05/10/2019, BIZIMANA Cassien called him and told him that he had a message for him from BUGINGO; he went to see him and he gave him a grenade and asked him to take it with him; he also asked him to look for people who would throw it and he replied that it was difficult for him because he had never been a soldier; then he called a person he could not identify and told that he was refusing the job; then out of fear that he could harm him accepted and took the grenade. He was shown how to carry it and keep it so that it may not explode. He also says that BUGINGO Justin promised that he would be paying him two hundred (200$) dollars that he would share with the person who would have thrown the grenade.

314. He goes on alleging that he came to have disagreements with BUGINGO Justin and told him that if he did not come to collect his grenade he would throw it into Rusizi river; then he intimidated him telling him that they know where he lives; then he decided to go and inform SHABANI Emmanuel, but he did not find him, and on his way home he had an accident and he went for treatment. He also says that while he was waiting for an answer from his elder brother, he went back to Congo to inform the military authorities and they referred him to the person in charge of those issues and he gave him his full identification and that of the person who had given him the

grenade; in the meantime, he continued to talk with his elder brother to help him so they may come and remove that grenade from his place.

315. He alleges that on 16/10/2019, he was called by MATAKAMBA who told him that there was a message for him from BUGINGO; he went to see him at a place called Arete. He gave him through the car window a small bag containing clothes and he told him to ask BUGINGO Justin about the rest. When he arrived home and opened it, he found inside a second grenade. He also informed his elder brother about it and the latter replied that there was nothing he could do about it. Then, he called another Congolese person and told him about it; the person told him that they were going to think about to give once he is arrested; that the reason why he did not inform the Rwandan authorities was because of the accident: he had and the operation appointment for the 24/10/2019, that he felt he was going to handle the situation himself; that he had even informed a Village Cell leader called Vincent but had not not given him full details; and that he was afterwards arrested before they could meet again and inform him in detail about the issue.

## 7. NSABIMANA Jean Damascène's plea

316. Assisted by his lawyerl Uwimana Channy, NSABIMANA Jean Damascène declares that he pleads guilty to three (3) offences he has been accused of, namely membership in a terrorist organisation, attempt to commit murder as an act of terrorism, as well as illegal use of explosive devices in public places. He explains that when he was working as a taxi motorcyclist in Rusizi District, his motorbike broke down and he became very poor; this obliged him to borrow one hundred and fifty thousand (RwF150,0000) francs from a cooperative, but that he was unable to pay back the loan; then, as the cooperative was about to sell his plot of land in auction given that he had offered it as a guarantee, he met a certain NTIBIRAMIRA Innocent who told him that MATAKAMBA Jean Berchmas was looking for him to offer him a job.

317. He goes on claiming that when he arrived at MATAKAMBA's house, the latter told him that he was going to give him money to pay back the cooperative loan, but that they would go together to recruit members for his political party that was operating in RDC, which included people he heard were fighting the Government of Rwanda and he refused. He says that when he went back to MATAKAMBA's place to ask for the money, he gave him one hundred dollars (100$), and promised him to buy him a new motorbike; and that is when he told him that there was some military equipment sent to him by those people in DRC which he could help him bring over through the border post, and when he refused, MATAKAMBA told him to give him back his money; and since he could not find it, he eventually accepted.

318. He also alleges that when they were going to DRC to look for that equipment, they met SIBOMANA and BYUKUSENGE Jean Claude at Rusizi river and they crossed together and when they reached the other side they met SHABANI Emmanuel and BIZIMANA Cassien who gave them a bag; and when they arrived in Rwanda, they looked inside and found grenades, ammunition, firearms and military uniforms which they handed over to MATAKAMBA who informed him that the equipment belonged to FLN, a group that was fighting the Government of Rwanda, and he right away he hid them in his sugar cane field; that at the beginning he did not know that he was working for FLN because those he knew were BYUKUSENGE and MATAKAMBA and besides, his only objective was to get money and the motorbike which had been promised to him.

319. He claims that after a few days, MATAKAMBA called him again and they went to a place that they planned to attack known as Ku Cyapa, because they wanted to make it known that FLN was present and then force the Government of Rwanda to negotiate; that, BYUKUSENGE Jean Claude, SIBOMANA, NTIBIRAMIRA Innocent and himself had been called by MATAKAMBA Jean Berchmas to work with him; that when they arrived, everyone was carrying a gun, they ambushed vehicles that were passing by BYUKUSENGE Jean Claude fired on one of them and also exploded a grenade. And then another time MATAKAMBA called and told him that there was

some equipment that had to get across from DRC; he went and met Bizimana Cassien who gave him a pistol, four (4) grenades, a big telephone and clothes in a packaging. He was with BYUKUSENGE Jean Claude, and they took the whole thing to MATAKAMBA's place.

320. He claims that one time MATAKAMBA called and asked him to accompany him on a motorbike to Gihundwe in Kamembe near the ADPR church. He asked him to take a grenade to BYUKUSENGE Jean Claude and that he was informed about where to explode it. After he met BYUKUSENGE Jean Claude, he told him that MATAKAMBA had asked him to explode it in Kamembe town, but because of fear and out of precaution, he told him to explode it in Kadasomwa forest. He refused arguing that if they explode it in that place he would not receive his reward; that after driving a passenger to a certain place, he had it exploded at a place called 'Kurya gatatu'. The next day, BYUKUSENGE Jean Claude came to tell him that MATAKAMBA had been arrested and that he too had a grenade and wanted him to keep it for him but he refused and rather showed him where to hide it on his farm.

321. To conclude, he states that he admits being responsible for the people who were injured by the grenade that was exploded in Kamembe town; however, that before he flew into DRC, he decided to give back the pistol and grenade he had hidden while fleeing and when he arrived in DRC he sent his wife a message explaining where to find them and inform the authorities.

• The view of the court

322. After examination of the Prosecution's accusations and the defendants' positions, the Court finds that in Rusizi District in different sectors, about five attacks were carried out with the participation of BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Siméon and NSABIMANA Jean Damascène.

323. The court finds that in those attacks, various acts of terrorism were committed. In June 2019, the first attack was carried out at a place known as mu Karangiro at a maize mill; they threw a grenade on a vehicle in an attempt to set it on fire but it did not explode and about five gunshots were also fired. The second attack during the same month was carried out in Rubondwe with a plan to ambush vehicles and set them on fire; they fired many gunshots; in July 2019, a third attack was carried out in Karangiro and a vehicle was set on fire; towards the end of September 2019, another attack took place in Nyakarenzo Sector at a location known as ku Cyapa near a military post and they fired on a truck. On 19/10/2019, attacks were also launched in Kamembe Sector: they set a booby trap at the Sector's office and a grenade was exploded near Stella's pub in Kamembe town, people were injured and a vehicle was damaged.

324. The Court finds that weapons including firearms, ammunition and grenades were used in those attacks. Those weapons came from DRC; when they arrived in Rwanda, some of them were kept by MATAKAMBA Jean Berchmas before they were used, others were brought by the assailants from RDC, namely BIZIMANA Cassien who used to be an FDLR-FOCA combatant and later an FLN combattant.

325. The court finds that MATAKAMBA Jean Berchmas had been persuading his comrades in Rwanda into joining the plot to carry out attacks in Rusizi District. He recruited Ntibiramira Innocent, Byukusenge Jean Claude and Nsabimana Jean Damascène whom he introduced to FLN combattants in RDC, namely Bizimana Cassien alias Passy, Bugingo Justin and Shabani Emmanuel who provided them with that equipment. Shabani Emmanuel has, in turn, recruited his younger brother Nikuzwe Siméon who kept some of the equipment. It finds that those who were in Rwanda helped those from DRC to cross the Rusizi river to carry out attacks.

326. The court finds that these acts constitute the basis for the offences they are accused of, namely membership in irregular armed groups, membership in a terrorist organization, conspiracy and incitement to commit terrorism, illegal use of explosives

in public places, attempt to commit murder, and deliberate arson against another person's house and means of transport.

> ➢ Determining whether BIZIMANA Cassien was a member of the irregular armed group FDLR-FOCA and of FLN

- The view of the Court

327. The Court finds that during the hearing of the case on the merits, BIZIMANA Cassien aka Passy denied the offence of membership in an irregular armed group/FDLR-FOCA; that he pleads guilty to membership in an irregular armed group/FLN that was created by CNRD-Ubwiyunge; that, he joined them because they had good mobilization tactics, aimed at refugee repatriation, cessation of all military activities and negotiations with the Government of Rwanda.

328. The Courts finds that even if though BIZIMANA  Cassien denies having ever been a member of the FDLR-FOCA armed group, when it compares his plea in court with his statements at the Judicial Police on 16/07/2020, it finds that he was a member of that group because during interrogation he admitted that he had joined FDLR and worked as a paramedic who looked after injured persons, even if he was registered in a group known as the Resistants who were in charge of protecting the refugees; that, in 2016 after the creation of CNRD he left FDRL and joined Wilson IRATEGEKA's group. His statement was confirmed by NIZEYIMANA Marc's statements at the Prosecution Office on 13/10/2020 in which he declared knowing BIZIMANA Cassien, that when they were still in FDLR he was a traditional healer, that it was when they joined CNRD that he produced documents proving that he had been an ex-FAR and then they allowed him to go to study in a military academy (ESM) where he graduated as second lieutenant. All this proves that BIZIMANA Cassien belonged to FDLR-FOCA.

329. The Court, considering the fact BIZIMANA Cassien himself admitted during the hearing of the case on merits that he had a member of FLN until his arrest, and the statements of NIZEYIMANA Marc who was one of the FLN commanders, as well as the statements of his accomplices in the attacks in Rusizi, namely MATAKAMBA who said before the magistrates that BIZIMANA Cassien and BUGINGO told him that theywere no longer members of FDLR, that they had joined CNRD, the court finds that, considering that he remained a member of CNRD until they formed with other parties a coalition they called MRCD which created the armed group FLN, proves that he was a member of the FLN armed group.

330. The Court finds, in accordance with the provisions of the mentioned Organic Law 459 in force at the time BIZIMANA Cassien joined those groups, that, as it has been explained in NSABIMANA Callixte alias Sankara's and RUSESEBAGINA Paul's cases, membership in those groups does not constitute an offence of creating an irregular armed group because his actions do not qualify as offences that undermine national security and other countries; and that he did not commit them  on purpose of supporting an armed attack by an irregular armed force. Thus, considering the way the acts he is being accused of were committed, the court should consider whether they do not constitute the offence of membership in a terrorist group.

➢ Determining whether BIZIMANA Cassien, MATAKAMBA Jean Berchmans, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Simeon and NSABIMANA Jean Damascene have been members of the terrorist group MRCD-FLN

• The view of the Court

331. The Court finds that, BIZIMANA Cassien, during the case hearing on merits, and even during his interrogation by the Judicial Police, and during the hearing on detention

and provisional release, admitted that he was a member of the armed group FLN, and that he even commanded the attacks in Rusizi District in which vehicles where set on fire, that he was responsible for the delivery of the equipment used in those attacks, a request he had received from Général HAKIZIMANA Antoine JEVA who told him that a certain Justin Bugingo in Bukavu had young men who were willing to launch attacks in Rusizi but who needed equipment delivered to them.

332. The court finds that during the case hearing on merits, MATAKAMBA Jean Berchmas also admitted that one time he went to Bukavu in DRC with NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude, after having been tasked by BUGINGO Justin and BIZIMANA Cassien to go and look for them, that these people told him that they were no longer in FDLR but had joined CNRD which had a military wing called FLN they asked them to join it and they accepted. The court finds that, he also admitted that they had accepted to help them in committing terrorism, by providing information and helping their combattants to cross the Rusizi river because they lived close to it; and then BIZIMANA Cassien told NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude that they would be the ones to look after the equipment that they would give to MATAKAMBA and that everyone woul receive one hundred dollars (100 $) per month.

333. The Court finds that, during the case hearing on merits, SHABANI Emmanuel admitted that on the request by BUGINGO Justin who had promised to pay him five thousand dollars (5000 $), he accompanied an FLN combatant called BIZIMANA Cassien from Congo up to Rusizi river. When they arrived, they called people in Rwanda to come and help them get across but BIZIMANA Cassien refused him to go back lest he should disclose the information, then they swam and arrived together in Rwanda. The court finds that he also admitted that one time he was asked by BUGINGO Justin to escort a boat telling him that he was going to transport some freight, but when he arrived, he found out the boat was carrying around one hundred (100) FLN combatants from DRC heading to Nyungwe forest in Rwanda and that at that time he was paid fifty dollars (50 $). The Court finds that he said that when he

started working with Bugingo Justin, he did not know that he was working with FLN, that he came to know it after he hired him and told him that the armed group FLN belonged to CNRD; that with regard to MRCD, he said he learned about it in court. The court finds that his statement in courts corresponds to his statement during the interrogation at the Judicial Police and during the trial on detention and provisional release.

334. The Court finds that during the hearing NTIBIRAMIRA Innocent also admitted having been a member of FLN, that after being told that he would be paid a lot of money, he accepted to work with the FLN combattant BIZIMANA Cassien alias Passy, knowing and fully aware that the plan was to launch attacks in Rusizi District.

335. The Court finds that BYUKUSENGE Jean Claude admitted during the hearing that he was a member of FLN and confessed that he accepted to work with MATAKAMBA Jean Berchmans, BUGINGO Justin and BIZIMANA Cassien, helping them to transport equipment across the Rusizi river and launch attacks to make it known that FLN was around, and he was paid one hundred dollars (100 $).

336. The Court finds that, during the case hearing on merits, NSABIMANA Jean Damascène also admitted that one time they went to DRC to look for equipment, and when they arrived at the Rusizi river, they met SIBOMANA and BYUKUSENGE Claude, and after crossing they were welcomed by a certain SHABANI Emmanuel and BIZIMANA Cassien who gave them a bag; when they arrived in Rwanda, they looked inside and found grenades, ammunition, guns and military uniforms.

337. The court finds that he also said that they had handed that equipment over to MATAKAMBA who told them that it belonged to FLN, an armed group fighting the Rwandan Government. He hid them in his sugarcane field but says that when he started working with them he did not know that he was working for FLN because the persons he knew were BYUKUSENGE and MATAKAMBA, and that his only goal was money and the motorbike that MATAKAMBA had promised him. He also said that

their relations were limited to carrying out attacks that were aimed at proving FLN's presence and therefore force the Government of Rwanda to accept negotiations.

338. The Court finds that NSABIMANA Jean Damascène's confessions during the case hearing are confirmed by his statement during the investigation in which he explained that MATAKAMBA had encouraged him to join the armed group FLN and had introduced him to the other persons he would work with, namely BYUKUSENGE Jean Claude, NTIBIRAMIRA Innocent, SHABANI, SIBOMANA and another one he ignores the name; that, moreover, on various occasions he had transported firearms, grenades and lots of ammunition (about 300 bullets) and had handed them over to MATAKAMBA who hid them in his sugarcane field at a place called Muri kariyeri. It finds that, even during the investigation, he had admitted participating in attacks; that he was the one who transported on his motorbike FLN combatants coming from attacks in various places in Rusizi District. He also admitted keeping in a safe place some of the equipment used in the attacks like one fire arm of the type of pistol.

339. The Court finds that when NIKUZWE Siméon was arguing his case on merits admitted getting across the river and keeping grenades but he denied having been a member of the terrorist organisation FLN and having been encouraged by anyone to join it, because when BIZIMANA Cassien and MATAKAMBA Jean Berchmas gave him grenades and he hid them, he did not know that they worked for FLN.

340. The Court, after examining the case arguing of  BIZIMANA Cassien, MATAKAMBA Jean Berchimas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Siméon and NSABIMANA Jean Damascène, and their statements during investigation and court hearings on detention and provisional release, finds that they are confirmed by the fact that they have been accusing one another of having all together been members of FLN with intent to launch attacks in Rusizi District in order to prove the FLN presence.

341. The Court, considering their confessions during the court hearings, finds that they have been members of the terrorist organization MRCD-FLN. Thus, based on the provisions of the aforementioned article 18 of law no 46/2018 of 13/08/2018, BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude, NIKUZWE Siméon and NSABIMANA Jean Damascène must be convicted of the offence of membership in a terrorist organization.

342. The Court finds NIKUZWE Siméon's assertions during the court hearings that he accepted to transport the grenades under duress to be unfounded because BIZIMANA Cassien confirmed before the court that they used to work together, that he was among the first persons BUGINGO introduced him to after introducing him to his elder brother SHABANI Emmanuel and telling him that each time they would cross over into Rwanda, he would be the one who would help him know the plans and the paths in Rwanda.  The court finds that BIZIMANA Cassien also said that he was once shot and he gave him money to buy a swimming safety jacket, and that NIKUZWE accepted to work with them because he wanted to be appointed commander of Gishoma area, that even when he gave him a grenade he gave him also a telephone with a sim card registered in DRC because they did not use the Rwandan communication network.

   ➢ Determining whether they are guilty of conspiracy to commit murder, arson of a person's building, means of transportation as acts of terrorism

   • The view of the Court

343. Concerning the attacks launched in Rusizi District, the Court finds that BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène admitted during the court hearing that they had participated in the attack in Karangiro at the

maize mill, they threw a grenade on a vehicle with intent to set it on fire but it did not explode, they also fired six (6) gunshots; they also admitted that they had participated in the attack in Rubondwe with intent to ambush vehicles and set them on fire, and when they reached the place they fired several gunshots; that they launched another attack in Karangiro and set a vehicle on fire; they also attacked a place called ku Cyapa in Nyakarenzo and fired on a truck; they launched another one in Kamembe Sector where they set a booby trap at the sector office and exploded another near Stella's pub in Kamembe town in which persons were injured and a vehicle damaged..

344. The Court finds that BIZIMANA Cassien admitted that he brought from RDC military equipment that included firearms, ammunition and grenades that were to be used in raids. He handed them over to MATAKAMBA Jean Berchmas who hid them on his farm, and he would give them to them before the attacks. The court finds that even MATAKAMBA confirmed it in his case hearing and explained that it was BIZIMANA Cassien who brought the equipment and that he was paid five hundred (500 $) dollars per month for his farm that was used to hide the equipment. He also said that the persons with whom he had signed a contract were FLN combattants who were in Congo, namely BUGINGO Justin, BIZIMANA Cassien and Général JEVA who had told him that FLN had started a subversion war to prove their presence on the Rwandan soil and thus force the Government of Rwanda to negotiate.

345. The court finds that during the case hearing on merits, SHABANI Emmanuel admitted that he used to accompany BIZIMANA Cassien coming over from Bukavu in RDC with equipment or on attack missions. NTIBIRAMIRA Innocent also admitted that he used to help BIZIMANA Cassien cross over on attack missions or when he was bringing equipment, that he was also among those who participated in the attacks in Kamembe where a grenade attack was launched at Stella's pub in which there were customers. He also admited that after being informed that MATAKAMBA had been arrested, he and BYUKUSENGE Jean Claude went to hide the equipment they had, including a pistol and grenades on MATAKAMBA's farm.

346. BYUKUSENGE  Jean  Claude admitted also during the case hearing on merits that he worked with FLN combatants in RDC who had promised him a reward of one hundred dollars (100$) whenever he would help them transport the equipment over to the other side, and he also admitted that one time MATAKAMBA and himself went to welcome SHABANI Emmanuel and BIZIMANA Cassien and they met on MATAKAMBA's farm, and from there they went into the attack in Rubondwe; and he also indicates that he was accompanied by NTIBIRAMIRA Innocent and BIZIMANA Cassien in the Karangiro attack where  they found a Daihatsu vehicle; he blocked the road and opened fire, and then BIZIMANA, after talking with people he could not identify, drew some petrol from the vehicle's petrol tank and set it on fire; after that, they immediately left together for DRC.

347. The court finds also that in the attack on ku cyapa  in Nyakarenzo, BYUKUSENGE Jean Claude  admited being the one who fired on the car window and smashed it while  the driver managed to get out and hide himself ; that during that attack he was also with NTIBIRAMIRA Innocent, SIBOMANA and MATAKAMBA and that they had three (3) guns; he also admits that he exploded the grenade in Kamembe town on Stella's pub and damaged a car and that the grenade had been brought over by NSABIMANA Jean Damascène who immediately took him away on a motorbike after the explosion.

348. NSABIMANA Jean Damascène has also admited that MATAKAMBA asked him to transport military equipment from FLN combatants in DRC; that one time they were going to look for them in Congo and when they arrived at Rusizi river they met SIBOMANA and BYUKUSENGE Jean Claude and they crossed over together. When they arrived, they met SHABANI Emmanuel and BIZIMANA Cassien who gave them a bag containing a grenade, ammunition, firearms and military uniforms that they handed over to MATAKAMBA who told them that they were for FLN, a group that fights the Government of Rwanda, and he hid them in his sugarcane field. He has also admitted that during the attack in Nyakarenzo, he was the one who took MATAKAMBA on a motorbike and when they arrived, they found BYUKUSENGE

Jean Claude, SIBOMANA and NTIBIRAMIRA Innocent; that another time he went to DRC to bring equipment and when he arrived, BIZIMANA Cassien gave him a pistol, four (4) grenades, abig telephone and clothes which Byukusenge Jean Claude and himself brought to MATAKAMBA's place.

349. The court finds that NSABIMANA Jean Damascène has also admitted having given at MATAKAMBA's request a grenade to BYUKUSENGE Jean Claude that was thrown on Stella's pub in Kamembe City and that after MATAKAMBA's arrest, BYUKUSENGE came to ask him to keep his grenade and he refused; instead, he showed him a place where to hide it in his field; that, he also hid a pistol and a grenade, but afterwards informed his wife who in turn informed the authorities.

350. Considering the pleas of BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène, in which they talked about their respective roles in the attacks that were carried out in Rusizi District, and their collaboration in smuggling military equipment, concealing and passing them on from one person to another, and their participation in the attacks that set a vehicle on fire, and how they fired on another one in which there were persons but luckily not injuring any one; throwind a grenade on a pub in which there were people, the court finds that they constitute unequivocal proof of their role in the attacks that were carried out in Rusizi District.

351. The Court, considering also the manner in which they carried out these acts, their mutual collaboration as well as their collaboration with those in Bukavu in DRC and the five (5) times or so they carried out attacks at various places in Rusizi District using weapons that included firearms and grenades proves that they had the will to commit terrorism with intent to terrorise the population.

352. The Court finds that even if they have committed those acts, as it was explained in NSABIMANA Callixte alias Sankara and RUSESABAGINA Paul's cases relating to the proper qualification of those acts, they should not be convicted on them as

attempts to commit murder, deliberate arson against another person's house and means of transport means as forms of terrorism in accordance with their qualification in the penal code in addition to the act of terrorism, instead, they should be convicted of those acts as constituting offences of committing and participating in terrorist acts as provided in the above mentioned article 19 of law no 46/2018 of 13/08/2018, because those acts were committed with intent to commit terrorism ;

353. The court finds therefore, that BIZIMANA Cassien, SHABANI Emmanuel, BYUKUSENGE Jean Claude cannot be convicted of the specific offence of attempt to commit murder as a terrorst act and that of deliberate arson against another person's house and means of transport as forms of terrorism. The court finds also that MATAKAMABA Jean Berchmas and NSABIMANA Jean Damascène cannot either be convicted of the specific offence of attempt to commit murder as a form of terrorism. The court finds also that they must be convicted for their role in committing and participating in acts of terrorism basing solely on their attempt to commit murder ; however, it cannot be based on deliberate arson as it is the case with his companions, because they have not been charged with that offence ; as for NTIBIRAMIRA Innocent, his role in that offence of committing and participating in acts of terrorism must be based on other acts that have been explained, except the attempt to commit murder because he has not been charged with it.

➢ Determining whether they are guilty of illegally using explosives in a public place and of committing and participating in terrorist acts

• The view of the Court

354. The Court, considering the acts commited by BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE JeanClaude and NSABIMANA Jean Damascène; acts that they admitted themselves

during the case hearing and during their respective interrogations by the investigators, and during the case hearing on detention and provisional release, acts which include a grenade attack on Stella's pub with people inside in Kamambe town, a grenade attack in Karangiro near the maize mill and at ku Cyapa in Nyakarenzo, setting a booby trap at Kamembe Sector office, opening fire on vehicles travelling on the road and distribution of grenades and firearms that were used in attacks, finds that these acts constitute the offence of illegal use of an explosive device in a public place.

355. The Court finds that this offence is provided for in article 24 of law n° 46/2018 of 13/08/2018 on counter terrorism which states that a person who illegally gives, plants, throws or blasts an explosive or any other device with noxious substance in a public place for terrorist act purposes, commits an offence.  The meaning of a public place and an explosive device is given in article 2 paragraph 1o and 5o of law n° 46/2018 of 13/08/2018 aforementioned[44]

356. The court finds that concerning the penalities for acts of terrorism using explosive devices, that they are also provided in The International Convention for the Suppression of Terrorists using high explosives adopted by the United Nations General Assembly Resolution on 15/12/1997 as ratified by Presidential Order n° 40/01 of 14/04/2002;

357. Considering the provisions of the above mentioned article 24, the court finds that BIZIMANA Cassien, MATAKAMBA Jean Berchmas, NTIBIRAMIRA Innocent, BYUKUSENGEJean Claude and NSABIMANA Jean Damascène must be convicted of illegal use of an explosive device in a public place.

---

[44]Article 2, 1o of law n° 46/2018 of 13/08/2018 on counter terrorism states that a public place is part of any building, part of land, roads, airspace, waterway or other location that is accessible or open to members of the public, whether continuously, periodically or occasionally, including a commercial, business, cultural, historical, educational, religious, governmental, entertainment, recreational or similar place that is so accessible or open to the public

358. The Court finds that they must be convicted of that offence and of committing and participating in terrorist acts, because even if both offences are based on the same acts, nonetheless as explained in similar cases decided in other countries such as France, for instance Ben Haddadi's case, the person who commits those acts puts in danger different resources  including human lives and property[45] and others, and for that reason they must not be considered as one offence; instead, they must be considered as two (2) that were committed at the same time using the same means.

> ➤ Determining whether BIZIMANA Cassien, MATAKAMBA Jean Berchmans, SHABANI Emmanuel and NTIBIRAMIRA Innocent have committed the offence of conspiracy and incitement to commit terrorist acts.

- The view of the the Court

359. The Prosecution bases its accusations of conspiracy and incitement to commit acts of terrorism against BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel and NTIBIRAMIRA Innocent on the fact that BIZIMANA Cassien in conjunction with BUGINGO Justin and Jeva who was the FLN focal point in Bukavu

---

[45]"Whereas if the law punishes with the death penalty the destruction by the effect of an explosive of an inhabited building or used for housing, because this fact endangers human lives, this crime is not not less primarily established for the protection of property; that it is constituted in all its elements as soon as its author has acted voluntarily, knowing that he was destroying or attempting to destroy a building of this kind, without it being necessary that he had any homicidal design; - That it follows from there that if the author of such an attack has in sight, independently of the destruction of the building, the death of people, whether or not they live in the premises subjected to the action of the explosive, he commits a second crime, the material element of which is undoubtedly constituted by the same fact, but which is distinguished from the first by its intentional element, which is the will to kill.; - That it is not, in such a case, a single crime, the prosecution of which under two different qualifications would be contrary to the wishes of the law, but two simultaneous crimes, committed by the same means, but characterized by essentially different guilty intentions; - Whereas it is rightly, therefore, that the military court ruled on the double accusation before it; that his answer in the affirmative to the questions relating to both is not vitiated by any irregularity ; whereas, moreover, the provision of article 5 of the Penal Code has been observed, and only one sentence has been pronounced;- From which it follows that the plea must be rejected .. "; CCass Criminal Chamber, March 3, 1960, Goulam et Ben Haddadi, Bull. crim., n° 138 p.286. Also refer to court ruling n°554 of April 16, 2019 (18 -84.073) – Cassation Court – Criminal chamber.

have devised a plot to carry out terrorist acts in Rusizi District; BIZIMANA Cassien persuaded SHABANI Emmanuel, MATAKAMBA Jean Berchmans and NIKUZWE Siméon to join in their plot to carry out their terrorist acts. MATAKAMBA Jean Berchmas in turn persuaded NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude to join them, SHABANIEmmanuel also persuaded his younger brother NIKUZWE Siméon to join them; as for NTIBIRAMIRA Innocent, he persuaded NSABIMANA Jean Damascène who was a motorcyclist.

360. It appears in the statements of the accused that BUGINGO Justin who was in Bukavu in RDC has introduced BIZIMANA Cassien to MATAKAMBA Jean Berchmas and that they discussed the plot to launch attacks in Rusizi District ; they also asked MATAKAMBA to look for ex-FDLR combattants who would help them in that plot. MATAKAMBA Jean Berchams came back to Rwanda and contacted NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude, took them to Bukavu to meet BUGINGO Justin and BIZIMANA Cassien and worked out the details of the attacks in Rusizi District. They accepted to help them in those terrorist acts by providing information, helping their combattants to cross the Rusizi river, and looking after the equipment that would be used in those raids. They also told them that they would be paid one hundred dollars (100 $) a month.

361. The Court finds that this constitutes unmistakable evidence that BIZIMANA Cassien, MATAKAMBA Jean Berchmas, NTIBIRAMIRA Innocent and SHABANI Emmanuel have connived to carry out attacks in Rusizi District; they also agreed on the equipment they would use. It was brought from DRC; some was kept at MATAKAMBA Jean Berchmas' place. The Court finds that their actions constitute acts of conspiracy to commit terrorism but not an incitment to commit terrorism because even BYUKUSENGE Jean Claude, NSABIMANA Jean Damascène and NIKUZWE Siméon accpted to be part of the plot and they even accepted to be rewarded whenever they committed a terrorist act.

362. Pursuant to the provisions of the mentioned[46] article 20 of law n⁰ 46/2018 of 13/08/2018 and relating it to the act of conspiracy and carrying out attacks in Rusizi, the Court finds that NTIBIRAMIRA Innocent must be convicted of the offence of conspiracy and incitement to commit terrorism

363. The Court finds also that, in consideration of the way they have devised the conspiracy to carry out attacks in Rusizi District, how they have progressively joined in, accepted a reward for each act of terrorism they would commit, demonstrate that they had the intention to commit acts of conspiracy because they knew that they aimed at commiting terrorism as they themselves stated that they did it in order to undermine the national security by terrorizing the population in order to prove that FLN was present on the Rwandan soil. The fact that conspiracy is viewed under the consideration that the conspirators are aware of the purpose of their act meets the explanation provided in the judgement rendered by the Special Tribunal of Appeal for Lebanon[47].

364. The Court finds BIZIMANA Cassien's assertions that he did not consider their attacks as acts of terrorism, that they aimed at undermining the national security and proving the presence of FLN are groundless because if you consider that they launched attacks which targeted the population indiscriminately, ambushed vehicles and fired on them, threw grenades in crowded places, they constitute acts of terrorism like the ones that were carried out in the Districts of Nyabimata and Nyamagabe.

365. The Court also finds that MATAKAMBA Jean Berchmas's assertions that what he did was for BUGINGO Justin personally, that he was not aware he was working for the terrorist organisation MRCD-FLN is groundless because during the hearing and in his

---

[46]Article 20 of law n⁰ 46/2018 of 13/08/2018 states that: "A person who conspires, incites others to commit a terrorist act directly or indirectly, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

[47]STL-11-01/1 of 16/2/2011, p. 107, para.200 : "… Conspiracy is an intentional crime. The intent must relate to the object of the conspiracy: the perpetrators are aware that the purpose of the conspiracy is to engage in criminal conduct against State security. Further, the mere existence of the agreement fulfils the criminal intent…."

submissions  he stated that they went to DRC to meet with BUGINGO Justin and
BIZIMANA Cassien who told them they were no longer with FDLR, that they had
joined CNRD which had a military wing/FLN, that they asked them to work for that
group and they accepted, that they provided them with information, helped the
combatants to cross Rusizi river because they lived nearby; he also said that one
time BIZIMANA Cassien went to meet with JEVA, the FLN Commander to discuss
their plan of attacking Rwanda and that it was decided that he would collect the
equipment and keep it until they would come to get it for attacks.

366. The Court also finds that SHABANI Emmanuel's assertions that when BUGINGO
Justin hired him he did not know that he was working with FLN, that when he learned
about it he told him that it was CNRD which had an armed group called FLN cannot
change what he admitted before since even after learning that he worked for that
group he did not leave it.

➢ Determining whether NTABANGANYIMANA Joseph has been a member of the
terrorist organization MRCD-FLN

• The Prosecution's arguing of the case

367. The Prosecution says that NTABAGANYIMANA Joseph has participated in the act of
the terrorist group MRCD-FLN because in 2019, together with BUGINGO Justin they
helped them to find a boat and a harbor which were used by that group's combatants
from Kalehe in DRC and who were coming to engage in terrorist acts in Rwanda via
lake Kivu.

368. They also say that even if NTABANGANYIMANA Joseph said during his interrogation
in the Prosection office that he thought that they were transporting materials
(matieres) and not combatants, during the interrogation by the Judicial Police

however, he admitted his role in helping FLN combatants to cross the Rusizi river, and he explained that in his job he became acquainted with a certain BUGINGO who used to give him odd jobs; then after some time he told him that he needed a boat to buy and he put him in contact with people who made boats for sale, and after he bought one he told him that he had people who wanted to come into Rwanda from Karehe in DRC and asked him to find him a harbor; after finding it, a man who was sent by BUGINGO came with several armed people coming from Kalehe forest and they entered the boat.

369. The Prosecution concludes by saying that the purpose of Ntabanganyimana Joseph's acts was to terrorise innocent civilians and to compel the Government of Rwanda to adopt or abandon its standpoint and principles, that they constitute an offence of membership in a terrorist organisation.

- NTABANGANYIMANA Joseph's defense.

370. Assisted by his lawyer NGAMIJE KIRABO Guido, NTABANGANYIMANA Joseph, denies the accusation, he asserts that he lives in Bukavu where he works for different people as a truck driver; that, in January 2019, he came across a certain BUGINGO Justin who hired him to carry construction materials such as sand from a quarry to a place called Fizi; that, in February 2019 he came back to see him and he asked him to find a boat for sale to transport for him merchandise from Minova; he looked for it and put him in contact with the owner and he liked it and they agreed on the price of one thousand two hundred dollars (1200 $), and, with two other persons he signed as a witness; that he had not known Bugingo before, that they only met because of work; that he did not even know that he was a soldier or that he belonged to a terrorist organisation, that he did not find for the combatants who launched attacks in Rwanda a harbor for landing; that apart from hearsay even the Prosecution did not provide concrete evidence that he was aware that the boat had transported people.

371. He alleges that the content of his statement during his interrogation which says that he helped BUGINGO Justin to find an embarkation place from Kalehe to Rwanda is not his, that the boat he knows of was bought in Bukavu, and that BUGINGO as the boat owner should answer for the rest; that he cannot comment on the plea of SHABANI Emmanuel who said he had identified the harbor for the boat that transported them, because he does not know anything about it. He also says that he was detained in an uknown place, that he accepted to put his fingerprint on those statements, but that he does not agree with their content because he is illiterate, and that he was even denied the right to have someone read it for him; that, for instance, in the statement of 16/07/2020 at the Judicial Police, it is written that after reading the statement he had accepted to sign while he cannot read neither write.

372. As a conclusion, he requests that SHABANI Emmanuel and NIZEYIMANA Marc's statements which the Prosecution has produced as evidence should not be considered because they do not prove that they were together on the journey they talked about; that even during the interrogation he disputed them.

- The view of the Court

373. The Court finds that the act upon which the Prosecution bases its accusation of NTABANGANYIMANA Joseph of membership in a terrorist organization consists in that, in 2019 he identified a harbor that was used by MRCD-FLN combattants from Kalehe in DRC to Rwanda via lake Kivu on terrorist missions.

374. NTABANGANYIMANA Joseph, during the case hearing on merits denied the accusation of membership in a terrorist organization; he alleges that in February 2019, he helped a certain BUGINGO Justin to find a boat for sale, he put him in contact with the owners, they agreed on the price of one thousand two hundred dollars (1200 $), He also says that, apart from helping him to find a boat for sale, he

never helped those who carried out attacks in Rwanda to find a harbour; that he did not know that BUGINGO Justin was a soldier; he also said that there is no concrete evidence, apart from his own statements, proving that he knew that the boat transported combattants.

375. He also said that the written statement of his interrogation by the Judicial Police on 16/07/2020 should not be considered because what they wrote that he signed it after reading it is not true given that he is illiterate, that the proof that he never signed it is the fact that he used his fingerprint, and therefore the assertion that he helped BUGINGO Justin find an embarkation harbor for his boats from  Kalehe zone to Rwanda is not his. The Court finds that he also said that the boat he knows of is the one which was bought in Bukavu, and that the owner BUGINGO Justin should answer for the rest, and that the statements of SHABANI Emmanuel and NIZEYIMANA Marc that the Prosecution uses as evidence should not be based on because they do not prove that they went together on that journey.

376. The Court finds that, during the hearing on detention and provisional release, NTABANGAYIMANA Joseph denied having been an FLN member, explaining that he only helped BUGINGO Justin to find aboat to use in his business and that he was not aware that he was a member of the FLN armed group, and neither that the boat was gong to be used to carry combattants; that in addition he asked him to find him a better place for loading his goods tosmuggle into Rwanda. Because he was familiar with that route, he proposed Kalehe because it is far away from a military position and he was paid one hundred dollars (100$) for what he did for him but he did not know that the contraband would change into harmful acts.

377. The Court finds that even during the interrogation by the Prosecution he also denied the accusation, explaining that he identified for BUGINGO Justin a harbor that he would use to load his goods, and after finding it he asked him to go and show it to him but he went with another person sent by BUGINGO; when they arrived in the middle of the night, between one hundred and fifty (150) and two hundred (200)

soldiers in black outfit with guns and radios turned up and boarded the boat and the last person to get on board gave him one hundred dollards (100$).

378. The Court finds that even during the interrogation by the Judicial Police he said that after buying the boat that he had negotiated for him, BUGINGO asked him to find a location where the boat would dock far from military posts, that he had people who wanted to come to Rwanda from Kalehe He indicated it to him because he was already familiar with the place. In June or July 2019, he went to visit the place with a man that he had sent, and when they arrived, he immediately left but after a short while he came back with several armed people who boarded the boat. Their commander gave him one hundred dollars (100 $) and his companion also received one hundred dollars (100 $).

379. NTABANGANYIMANA Joseph also contended that the reason why he did not inform the Congolese security authorities after he saw those armed persons was because he did not know any Congolese soldier and that he did not know anyone in Rwanda he could inform. The Court finds that he also said that even if he identified the route that these people were to take, he did not know that they were armed; that, neither was he informed that these people had carried out attacks in Rwanda because he last saw them in Kalehe when they were boarding the boat; besides, he helped them but he did not know that they were FLN/MRCD combattants.

380. The Court finds, after examining NTABANGANYIMANA  Joseph's plea and his statements during investigation and also during the hearing on detention and provisional release, that he has helped BUGINGO Justin to secure a boat and find a dock that was used by FLN to attack Rwanda because, even if during the hearing he denied it, in the interrogation by the Prosecution he admitted that he indicated the boat and the dock to him, and that he had admitted it during the interrogation by the Judicial Police in which he explained that BUGINGO had told him that the persons from Karehe forest who disembarked at that dock were armed and would go to

Rwanda. He had also admitted it during the hearing on detention and provisional release.

381. The Court finds that other pieces of evidence which further prove that a boat from Kalehe in Congo transported MRCD-FLN combatants who were going to attack Rwanda are the statements made by SHABANI Emmanuel during the investigation and the hearing on merits, in which he confirmed that he had been hired by BUGINGO Justin to escort the boat transporting combatants via lake Kivu, that he left them at Kirimbi river in Nyamasheke Disctrict and went back to Bukavu with the boat pilot, and NIZEYIMANA Marc's statement in which he explained that about one hundred and five (105) FLN combatants under the command of Lt Col. Appolinaire came by boat from Kivu and headed to Nyamasheke and Karongi.

382. Pursuant to the provisions of article 108 of law Nº 027/2019 of 19/09/2019 relating to criminal procedure on the burden of proof, and article 119 of law no 15/2004 of 12/06/2004 relating to evidence and its production, and relating them with the acts commited, the court finds that NTABANGANYIMANA Joseph could not have looked for a boat and later a dock for the disembarkment of the combatants and be present at the dock at the time they were getting on the boat without being a member of MRCD –FLN armed group; and all of this proves that he was a member of the terrorist organisation. Therefore, pursuant to the provisions of the aforementioned article 18 of law no 46/2018 of 13/08/2018, the Court finds that NTABANGANYIMANA Joseph must be convicted of the offence of membership in a terrorist organisation.

383. The Court finds that NTABANGANYIMANA Joseph's claim that he was not aware that the boat and the harbor that he was looking for were to be used by MRCD-FLN combatants who carried out attacks in Rwanda is unfounded, because in his statements he contradicted himself: one time saying that BUGINGO had told him that the boat would transport persons going to Rwanda, and other time that it would be used for business, transporting goods made up of minerals.

384. The Court finds that his claim that the written statement from the Judicial Police should not be considered because he did not read it and neither had someone read it for him because he is illiterate is also unfounded, because it finds that the content of the statement matches with his statements during the interrogation by the Judicial Police and during the case hearing on detention and provisional release, and with some of his statements during the case hearing on merits relating to securing the boat, the harbour in Kalehe and the people they helped to cross into Rwanda. The fact that it is mentioned in that statement that he read it before signing it is, the Court finds it to be the usual typographical errors because his illiteracy is confirmed by the fact that he put his fingerprint on it.

➢ Concerning NSANZUBUKIRE Felicien, MUNYANEZA Anastase, IYAMUREMYE Emmanuel. NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA Andre, HAKIZIMANA Theogene, NDAGIJIMANA Jean Chretien and MUKANDUTIYE Angelina.

• The Prosecution's arguing on this case

385. The Prosecution states that it accuses NSANZUBUKIRE Felicien, Munyaneza Anastase, IYAMUREMYE Emmanuel, NIYIRORA MARCEL, NSHIMIYIMANA Emmanuel, KWITONDA Andre and HAKIZIMANA Théogène of joining FDLR's illegal armed group called FOCA since its creation until 2016 when one faction joined CNRD and created FLN, an illegal armed group; that it also accuses NDAGIJIMANA Jean Chrétien of having also joined that same illegal armed group FLN.

386. It also states that it accuses NSANZUBUKIRE Félicien and MUNYANEZA Anastase of being members of the terrorist coalition  FDLR-FOCA, and HAKIZIMANA Théogène of membership in the terrorist coalitions FDLR-FOCA and MRCD-FLN, that it also accuses IYAMUREMYE Emmanuel, NIYIRORA Marcel, NSHIMIYIMA NA

Emmanuel and KWITONDA André of being members the terrorist organisations FDLR-FOCA and MRCD-FLN ; it also accusesNDAGIJIMANA Jean Chrétien and MUKANDUTIYE Angelina of membership in the terrorist organisation MRCD-FLN.

387. It also states that the the evidence based on are their statements during the investigation in which they admitted being members of those groups. It further states that NSAMUHIRE Felicien admitted during his interrogation by the Judicial Police and the Prosecution and during the case hearing on detention and provisional release, that he had been a member of the illigal armed groups FDLR-FOCA and CNRD; he also admited having been a member of the terrorist group FDLR-FOCA, mentioning that as a member of those armed groups he had exercised various responsibilities such as being a Battalion Commander.

388. It also states that his membership in the terrorist organisation FDLR-FOCA is also confirmed by the fact that he appears on the UN Security Council Consolidated List which shows that Colonel NSANZUBUKIRE Félicien was put on that list on 01/12/2010, that the list shows also armed groups and individuals who incurred sanctions by the same Council, and that he was also put on the list of wanted individuals by the International Police or Interpol.

389. It also states that the evidence based on to accuse MUNYANEZA Anastase is that during the interrogation by the Judicial Police and by the Prosecution and during the case hearing on detention and provisional release, he admitted having been a member of the irregular armed groups FDLR-FOCA and CNRD, and that he had been a member of the terrorist organization FDLR-FOCA.

390. It also states that IYAMUREMYE  Emmanuel admitted also during the interrogation by the Judicial Police and by the Procecution, and during the case hearing on detention and provisional release, having been a member of FDLR from 2000 till he left it in 2016 to join CNRD until his arrest in 2019; that he admitted being one of the combattants who left FDLR and joined FLN; that he participated in the creation of the

armed group FLN; that he was also involved in FDLR-FOCA and MRCD –FLN terrorist acts, explaining that the armed group he joined was first called ALIR which later became FDLR, that they then left it and joined the armed group CNRD.

391. The Prosecution states that NIYIRORA Marcel admitted also during his interrogation by the Judicial Police and the Prosecution, that he was also involved in FDLR-FOCA and MRCD–FLN terrorist acts and mentioned that he had been a member of FDLR since its creation until 2016, that he was in FLN until his arrest in July 2019 having exercised various responsibilities with different promotions. It states that his membership in those groups was confirmed by NIZEYIMANA Marc during his interrogation on 13/10/2020 in which he said that Lieutenant Colonel NIYIRORA Marcel alias BAMA Nicholas was the FDLR S5' of the Kanani Sub-Sector in Northen Kivu, while in CNRD-Ubwiyunge he worked as the in charge of protocol at the office of the CNRD president.

392. The Prosecution further states that NSHIMIYIMANA Emmanuel has also been repectively a member of FDLR and FLN, two irregular armed groups until his arrest on 22/02/2020 and that he participated in their terrorist acts. It also states that during his interrogation on 31/05/2016, he mentioned that there were disagreements among FDLR commanders that led to its splitting into two factions, and then he joined the CNRD faction because he felt comfatable with its ideology, and after secondary school he joined the military academy (ESM) in September 2017 and graduated in 25/03/2018 as a Second Lieutnant.

393. It also states that during interrogation by the Judicial Police on 17/07/2020 and by the Prosecution on 24/09/2020 and on 13/08/2020, he admitted being a member of the irregular armed groups FOCA and CNRD, and that he was also a member of the terrorist organisations FDLR-FOCA and MRCD-FLN as an FDLR combattant from 1998 until 2016, then he joined CNRD which he left in November 2018.

394. It also states that during his interrogation by the Judicial Police on 15/ 07/2020 and by the Prosecution on 24/09/2020, and on 13/08/2020, HAKIZIMANA Théogène admitted being a member of the irregular armed groups FDLR-FOCA after the formation by CNRD-Ubwiyunge and other armed groups of the coalition known as MRDC. He also admitted being a member of the terrorist coalitions FDLR-FOCA and MRCD-FLN, in which he exerised several responsibilities and received promotions in those groups until his arrest by the DRC soldiers on 29 May 2018 having the rank of Second Lieutenant.

395. It also states that NDAGIJIMANA Jean Chrétien admitted during his interrogation by the Judicial Police on 16 /07/ 2020 and by the Prosecution on 14/08/2020, 28/09/2020 and on 05/11/2020, that he had been a member of the armed group FLN since 2016, and a member of the the terrorist organization MRCD-FLN until his arrest by DRC army with the rank of Second Lieutenant.

396. The Prosecution states that the evidence upon which it bases its claim that MUKANDUTIYE Angelina was a member of the terrorist organization MRCD-FLN is that she admitted herself during her investigation, having been a member of the CNRD party, one of the parties which formed the MRCD–FLN armed group, as the Commisioner in charge of Family Affairs and Women's Advancement; that she also sensitized people to join it, and that her statement was also confirmed by Colonel NIZEYIMANA Marc during his interrogation by the Judicial Police on 15/07/2020.

397. It also states that the claims by MUKANDUTIYE Angelina and NIZEYIMANA  Marc about her involvement in the activities of that terrorist organization complement those made by some of the people that MUKANDUTIYE Angelina had sensitized to join the group, including those by a certain Asifiwe Marie Claire, Nyirahabimana Donatilla and NIZABAYO Benita, who testified that MUKANDUTIYE Angelina wrote their names promising them that they were going to receive military trainings, and that indeed they were trained,

398. The Prosecution concludes stating that the aim of their acts was to terrorise innocent civilians and compel the Government of Rwanda to adopt or abandon its standpoint and principles; that on the part of NSANZUBUKIRE Félicien, MUNYANEZA Anastase and HAKIZIMANA Théogène, they also constitute the offence of joining an irregular armed group and of membership in a terrorist coalition; on the part of IYAMUREMYE Emmanuel, NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA Andréna and NDAGIJIMANA Jean Chrétien, they constitute the offence of joining an irregular armed group and a terrorist organization, while for MUKANDUTIYE Angelina's acts constitute the offence of membership in a terrorist organisation.

- The defendants' defense

1. NSANZUBUKIRE Félicien's plea

399. Assisted by his lawyer TWAJAMAHORO Herman, NSANZUBUKIRE Félicien states that the he pleads guilty to the offence of joining an irregular armed group. He claims that he left Rwanda in 1994 as a second lieutenant in the former Rwandan army, fled to DRC, continued until Bangui in Central Africa Republic, and in 1999, they were brought back to DRC and they joined the Congolese army; that in 2002 he joined FDLR in Southern Kivu but without having wanted it. He goes on alleging that on 31/05/2016 he left FDLR and joined CNRD which was formed by Wilson IRATEGEKA alias Lumbago after breaking away from FDLR and he remained there until he was arrested by the FARDC on 09/02/2017 and extradited to Rwanda, and that he was detained before the creation of FLN.

400. He also contends that, even if he admits having been a member or irregular armed groups FDLR and CNRD, on the basis of the Lusaka Agreement of 10/07/1999 in which the Government of Rwanda was part, and on Ministerial Order no 066 of 13/09/2002 and on the Nairobi Declaration of 09/11/2007, he finds that the

accusation contradicts the content of those agreements, for instance article 1 paragraph 22 of the Lusaka Agreement on disarming armed groups operating in DRC, where it is stipulated that those who will be prosecuted are those who have committed genocide, war crimes and crimes against humanity and that he should not be prosecuted for those crimes. He explains that the purpose of those agreements was to sensitise people to return home, that it was never mentioned that the returnees would be prosecuted, that on the basis of the provisions of the above mentioned Ministerial Order  stipulating that members of the opposition groups to the Rwandan government should be demobilized and reintegrated into ordinary life and that there are some who have returned home from congo who passed through the Mutabo Transit Centre without going through the court and who have integrated the ordinary life. He finds that his prosecution to contradict the Rwandan constitution which says that all people are equal before the law, that the Prosecution claim on prosecutorial discretion was not what the law was meant for.

401. He concludes stating that he disputes the offence of membership in a terrorist coalition because, when he was arrested, he was no longer a member of FDLR as he had willingly joined CNRD, and that he cannot answer for the group's actions when he has deliberately left it, considering that article 503 of Organic law no 01/2012/OR of 02/05/2012 provides sanctions to any person who is or accepts to be a member of a terrorist organisation, and that he never participated in the attacks that were carried out on the Rwandan soil.

### 2.  MUNYANEZA Anastase's plea

402.  Represented by Barrister TWAJAMAHORO Herman ,MUNYANEZA Anastase says that he admits he joined an illicit army, and he explains that he left Rwanda in 1994; he was then a member of the Rwanda Army; that he fled to the DRC and went on to Bangui in the Central African Republic; that they were brought back to the DRC in 1999, joined the Congo Army; that they joined the FDLR in 2002, the year he joined the FDLR till 2016 when the organization split into two because of disputes among its

leaders and then Wilson HATEGEKA formed CNRD-Ubwiyunge which he joined; he remained there till he was captured by the soldiers of the DRC on 10/2/2017 when he was in UVIRA in South Kivu on his way to Burundi, he was detained, then was sent back to Rwanda, that therefore when he was captured, the FLN had not yet been created.

403. He also says that was when admits he became a fighter in the illicit armed groups, but that he does not admit being in terrorist groups, based on his activities within those groups, and that he requests his role to be examined in the light of his occupation as since he went into exile in 1994 he never went back to Rwanda, that therefore he played no role in the attacks that were led against that country.

404. He adds that the Prosecution is accusing him of being a member of a terrorist organization based on his having been a FDLR and CNRD member and having, in 2005, the US Department published a report which ranks the FDLR among terrorist organizations, but that he does not know that report, that he joined the organization as a second-best solution and accepted to do the work of a fighter without being a member of the organization; he went on to say that he did not take decisions, that he eventually left the organization and joined the CNRD as a fighter only, that there is nowhere his name appears on the list of members of terrorist organizations shown by the UNO.

405. He concludes saying that he too should be given the opportunity to lead a normal life as he meets the same requirements as those former members of the organizations who have been taken to Mutobo rehabilitation camp without being taken to courts first, that the court which should provide their protection should be based on the Lusaka convention of 10 June 1999, the 9 November 2007 Nairobi Declaration to which Rwanda and the DRC were co-signatories, and even on the Ministerial decree N°66 of the 13th September 2002. He explained that these laws stipulate that the former infiltrators should go back home and resume normal life; that those being prosecuted before the courts of law, those suspected of genocide, crimes against

humanity and war crimes are also protected by these laws as they protect all other humans, as provided under law N°15 of the Republic of Rwanda which stipulates that all human beings are equal before the law, that therefore, although he was not an infiltrator, as someone who was a member of FOCA and CNRD, he should not be refused what others like him benefited from.

### 3.  IYAMUREMYE Emmanuel's plea

406. IYAMUREMYE Emmanuel, represented by Barrister URAMIJE James, says that he admits the offence of joining the illicit armed group of FDLR-FOCA and that of FLN but that he did not join them on his own freewill because he left Rwanda in 1994 and fled to the RDC and joined its Army up to 1999 when the [refugee] camps were dismantled; he then went to Brazzaville; he went back to DRC and joined its Army; in 2003 he joined FDLR-FOCA in Masisi where he performed various functions of Platoon commander and company commander till 2016 when [the organization] split up into two and he joined the CNRD; on 31 May 2016 when SINAYOBYE Barnabas alias Morani told him that they had left the FDLR-FOCA and they were joining the CNRD and he requested him to keep the fighters under his command, he was commandant till 2019; up to that time they were called CNRD fighters because the name FLN came later.

407. He went on saying that he was in the FLN without knowing that it was a terrorist organization because they were being told that their objective was to protect the refugees and fight the Government of Rwanda so that the refugees may return in dignity, after talks or at the victory over the Rwanda army. He said that he had not joined any attack on Rwanda territory, that he heard about the Nyabimata and Nyabimata attacks over the radio and was told about them by the sector commandant He also said that on 20 March 2020 JEVA told him that he must cross over with the fighters who were going to attack Rwanda; that they had to go and meet Wilson IRATEGEKA the chief of the CNRD and they would be told about their mission; that

they would join others in Nyungwe Forest and sensitise the members of the population into joining them; that he did not accept taking those fighters because he thought he would be going to commit various crimes but Major Appolinaire, his second-in-command , accepted and crossed-over into Rwanda, commanding those fighters.

408. He also explained that, after crossing over, those fighters became hostile towards him and he even got information that he will be harmed; he told his wife to write to him, and send a copy to his superiors, telling him that she and the children were sick; that he went to the Presidency and told one Alphonse who was the chief of intelligence that he was going to Burundi to have his children and wife treated; he got permission but from the 31/07/2019 he was arrested at Uvira when he went to get travel papers; on 03/08/2019 he was brought to Rwanda. He explained that this is known by Colonel NZEYIMANA to whom he spoke as a confidant who can stand for him so that he may travel and quit CNRD; that MUKANDUTIYE Angeline and NSENGIMANA Herman, co-accused, had heard that he had left the military.

409. He concluded saying that he was not in MRCD-FLN because he was not a politician or a member of MRCO, that he was a CNRD fighter, and was also a FLN fighter but that he never went to attacks, whether sent there or at his own initiative; that he admits he joined these groups but that he was well-intentioned. He adds that he is requesting the court for a reduction of penalty because of his admission of guilt, and to return to normal life.

### 4.  NIYIRORA Marcel's plea

410. NIYIRORA Marcel is represented by Barrister URAMUJE James says that he joined the FDLR-OCA, an illegal armed group in which he got many promotions and posts of responsibility like the command of North Kivu, in Masisi and elsewhere in the DRC, that he was member of this from its foundation in March 2003 up to 2016 when it split into two (2), one remained in FDLR and the other founded the CNRD which he joined

with the rank of Captain; that although he was member of those groups, he never took part in the attacks; he joined them with no ill intention. He goes on saying that after joining that new group CNRD, its President told them that a new group had been created, the PDR-IHUMURE led by RUSESABAGINA Paul, they joined-up with effect from 01/07/2017; later on in 2018, the RRM party led by NSABIMANA Callixte alias SANKARA also joined this forum of parties, that they were told that the leaders of those parties will take turns in leading the forum; that the name of FLN came into being after those other parties had joined up with the CNRD; that he got this information because he worked in that party's office.

411. He also said that when he was arrested on 20/07/2019 he had left it and was in his home in Masisi, DRC, that he finds that having been a leader of an illicit armed group should be treated like a member of a terrorist group as he joined without knowing they are terrorist groups. He also said that his pleading guilty should be a mitigating factor leading to a reduction of the punishment, and have it remitted in case the Court finds that belonging  to those parties constitutes an offence, if necessary return to normal life, be taken to Mutobo rehabilitation centre and be given civic training  with other former fighters from those groups.

## 5.   NSHIMIYIMANA Emmanuel's plea

412. NSHIMIYIMANA Emmanuel  represented by Barrister  URAMUJE James says that he was forced into joining the armed groups in 2010 when he was seventeen years old (17), he had no alternative; the fact that the youth were forced into the armed forces without taking their age into account is confirmed by General Mberabahizi, former G3 Gatabazi, Colonel Niyonzima Arthemon and Lieutenat-Colonel Kagemana during their questioning during investigation, and even Uwamahoro Perusi who confirmed that they were forced into joining the armed forces and trained them for one (1) month then let them return home.

413. He claims that he never joined the MRCD-FLN and that it was different from CNRD-Ubwiyunge it had an armed wing called FLN as explained by Colonel Niyonzima Arthemon who was its quartermaster-general. He concluded saying that having committed an offense forcefully should not be taken as an offense, that he should be in rehabilitation so that he may reintegrate normal life like the others; and he should be given special care for having forcefully made to join the armed forces when he was still a schoolboy.

### 6.   KWITONDA Andrë's plea

414. KWITONDA André is represented by Barrister MUGABO Sherif Yussuf; he admitted joining an illicit armed group called FOCA and he was also a member of the CNRD till it joined other parties to form a forum of parties called MRCO which created an armed wing called FLN that these groups are not terrorist groups but were armed groups, that he was a member of the FDLR from 2000 to2010 but was not aware it was a terrorist organization. He claims that his remaining in these groups was due to the fear of severe punishment incurred by deserters such as poisoning, firing squad, the fear that their families would suffer at the hands of officials who purveyed the hate ideology which spread rumours that whoever returned to Rwanda is either imprisoned or killed.

415. He goes on saying that the way MRCD recruited its members was nothing special, except that it emphasized the armed struggle as its motive and that was why he was involved in it for four (4) months, was arrested in Goma, DRC. On the way home, that he was never involved in terrorist activities, be it in the DRC, or in Rwanda and that he came to know about the attacks launched on Rwanda by the FLN after he had been taken to Rwanda, that he came to know the FLN after the formation of the Forum of the parties: MRCD of NSABIMANA Callixte alias SANKARA, RUSESABAGINA Paul and General Wilson IRATEGEKA.

416. He concludes saying that he should not have been brought to Court. That he should instead be returned to normal life like his colleagues he had left behind fighting including Brigadier-General Mberabahizi David who was adviser to the CNRD Presidency, Colonel Gatabazi Joseph, Colonel Ntamuhanga Arsene who was Defence Secretary and Colonel Musa, also adviser to the CNRD especially as he had left that group as confirmed by Colonel NIZEYIMANA Marc one of his superiors and even NDAGIJIMANA Jean Chretien who confirms it, according to the agreement on the retirement of fighters and because humans are equal before the law and without taking some to court and leaving others go scot-free.

### 7.  HAKIZIMANA Théogène's plea

417. HAKIZIMANA Théogène is represented by his defense, Barrister MUGABO Sherif Yussuf, admitted that he was a member of FDLR-FOCA from its foundation to 2010 when it split into two, one remained in FDLR while the other went to CNRD-Ubwiyunge. He explained that he joined all those groups and remained in them because of harassment and the fear of brutal punishment including death inflicted on attempted desertion and lack of anywhere else to turn and even songs denigrating the Rwanda Government, that he suffered a handicap in the left arm and that put him at disadvantage to the point that even if he dared to attempt desertion or refuse to join those groups where one must fend for oneself he would not have made it; that he did not even want to join the army  because of that handicap.

418. He also said that when he joined the CNRD armed group it had no other name and that he has never been a member of MRCD-FLN like the CRND joined the MRCD after he had left it and was in detention; that he was only in the CNRD-Ubwiyunge and FDLR-FOCA and that he never knew that those groups were terrorist groups, that he never witnessed terrorist activities in DRC or in Rwanda which he left in 1994 and returned in 2018, that even in the talks they had in their leaders they never told them that those groups were terrorist groups, that therefore he should not be

prosecuted but should instead be given the opportunity to reintegrate normal life like the one afforded his colleagues in the Mutobo rehabilitation camp where they are given civic training .

419. He concludes saying that the Prosecution's allegation that he was in the FDLR=FOCA since its foundation is wrong because he joined it in 2003 after leaving the DRC army which he hd joined after leaving Rwanda in 1994, he was a soldier; he remained in the group till 31/05/2016 when he remained with the faction which went the CNRD; in 2017 he went on a course at the officers' training institute and finish the training on 24/05/2018 as 2nd Lieutenant; that during that period the sector commandant called him and gave him a computer to take to General Morani but on reaching a place called Kamanyola, he could not find him; on 15/06/2018 he was arrested at Uvira when he was trying to join him in Burundi.

### 8. NDAGIJIMANA Jean-Chretien's plea

420. NDAGIJIMANA Jean-Chretien is represented by Barrister MUGABO Sherif Yussuf; he admitted that he joined the FLN illicit armed group from its foundation till he was arrested. He explained that though he joined the group under duress from his father, General HATEGEKA Wilson, he initially refused. He says that after the closure of the CNRD the FDLR went on attacking them, which made them decide that every eighteen-year (18) old youth must be a fighter of the CNRD, that it was under those circumstances he joined the military wing and attended the officers' school where he graduated as 2nd Lieutenant, he was deployed under General Shemeki where he worked for one year as a Secretary.

421. He says that remaining in that group was not on his own volition, he had no choice; anyone who wanted to quit was threatened with severe punishment he could receive as well as untold suffering; another reason he did not leave the group was that they were told that if they returned to Rwanda they would be tortured to death; that he

remained there, he felt he could not abandon his parents and he has nowhere else to go; that therefore he should not be punished for offences he committed forcefully and under duress.

422. He concludes saying that, concerning MRCD-FLN, in 2018 there was a meeting of senior leaders of that group and they were told that CNRD has become a forum of the MRCD with an armed wing called FLN led by RUSESABAGINA Paul, and that his capture was due to his father; the latter sent him to get money from Goma town in the DRC, but he did not know the sender of the money; that he went up to three (3) times to collect money from Belgium and Zambia, but that he does not remember the names of the senders, all he knows is that the money was for his father.

### 9. MUKANDUTIYE Angeline's plea

423. MUKANDUTIYE Angeline who is represented by Barrister MUKARUZAGIRIZA Chantal pleads saying that she admits belonging to a terrorist organization for which she is being prosecuted. She explains that after fleeing to the DRC she joined the FDLR group because she thought that, among the objectives it had, was bringing unity among Rwandans and bring refugees back home; that after joining the organization, it split into two (2) factions; some remained in FDLR, others founded the CNRD in 2018 and had an armed wing called FLN led by General Wilson HATEGEKA; she joined that faction and was appointed Commissioner for the promotion of women.

424. She goes on saying that after she was given those responsibilities, she decided to go and meet the leader of the group and told him about the idea she had, that girls should also join the military, and the idea was accepted and thereafter the girls joined with enthusiasm as confirmed before the investigation and one among those MUKANDUTIYE Angeline encouraged to join military training, who said that MUKANDUTIYE Angeline who told the girls that they were undergoing military training in order to be able to defend themselves against enemy aggression. She said

that after sensitizing them she drew up a list and submitted it; there were even parents whose daughters with a good physique who wanted them to join despite their being minors, but the recruitment was a military matter and concerned the military and the sensitization exercise took place when they were still in the CNRD before they joined other groups, that she did it because of dedication and because she wanted to show that even girls are capable of doing it.

425. She explained that in 2017, General Wilson HATEGEKA called a meeting of commissars and told them that there were other people who were willing to join the CNRD including Paul RUSESABAGINA, but because she was not on good terms but was with the leader of her group, that Paul RUSESABAGINA's group joined that group on 04/07/2017 they created the MRCO forum with the FLN forces while that of NSABIMANA Callixte alias Sankara joined the forum of parties on 18/03/2018.

426. She ended by admitting she was a member of MRDC-FLN but that she did not know it was a terrorist organization, that she learnt about it when I began facing the prosecution; concerning attacks which were launched on Rwanda, she learnt about it from young men who prayed with her in the charismatic group who I had not seen for some time and when she asked about them she was told that they had joined others in those attacks, when she asked General IRATEGEKA Wilson he told her that they attacked to show that they are present, to at that time she left for a place called Falinga and on to Kalehe in DRC, and from there to Rwanda; concerning her role in criminal activities committed, she denied committing any and that one is answerable for one's acts; and that among those she was with in CNRD and MRCD-FLN and with whom she is being accused there was Colonel  NIZEYIMANA Marc NIYIRORA Marcel, Nsengimana Herman and the son of their President Ndagijimana Jean Chrétien.

➢ Determining whether the acts that NSANZUBUKIRE Felicien and MUNYANEZA Anastase are charged with constitute an offence of membership in the irregular armed groups FDLR-FOCA and CNRD

• The view of the Court

427. The Prosecution is charging NSANZUBUKIRE Félicien and MUNYANEZA Anastase with belonging to an illicit armed group because they were members of FDLR's armed group called FOCA from its foundation to 2016 when it split into two factions, one went to form the CNRD armed wing which became the FLN.

428. NSANZUBUKIRE Félicien admitted having belonged to the FDLR-FOCA but that he had left it and gone to CONGO. MUNYANEZA Anastase also admitted that he was a fighter in the FDLR-FOCA armed wing and in CNRD. This is what they said before the investigation and Prosecution and even in court when they were pleading provisional detention and release.

429. Pursuant to the provisions of Article 459 of the organic law mentioned above and Force when NSANZUBUKIRE Félicien and MUNYANEZA Anastase joined those groups, the Court finds that even though they were members of FDLR-FOCA and CNRD as it appears in their statements, but, as explained in the case of NIZEYIMANA Marc and others, that being in  the group does not constitute the offense of illegally creating an armed group becausewhen they joined, it iwas not with intent to commit offenses that destabilize the Government and other countries and that they did not do it in order to support an attack by troops other than national ones; instead, such acts were aimed at sowing terrorism.

➢ Determining whether the offences they are accused of constitute an offence of membership in the terrorist association FDLR

• The view of the Court

430. The Court notes that the Prosecution charged NSANZUBUKIRE Félicien and MUNYANEZA Anastase in court pursuant to Organic Law N° 01/05/2012 02/05/2012 establishing the penal Code because at the time they were in FDLR-FOCA it was the law in force, pursuant to the provisions of Article 503 of that Organic Law. It found that, pursuant to the provisions of Article 503 of that Organic Law, it was an offence to belong to a terrorist organization. The law on the fight against terrorism of 2018 calls it a group that practices terrorism; it was an offense.

431. The Court finds NSANZUBUKIRE Félicien and MUNYANEZA Anastase appearing on merit, in questioning during investigation, pleading on Provisional detention and release; they also admitted having been members of FLN-FOCA but that they had left it at the time of their capture and that they were not involved in  terrorist activities and they played no role in terrorist activities, they were carried out by the FLN, because the activities occurred after their capture and that being members of  of FDLR-FOCA does not mean taking part in those terrorist activities.

432. Having noted that at different time, FDLR carried out terrorist raids on Rwanda territory and elsewhere, killed people, destroyed basic infrastructures and government pr or other property, shows it is a terrorist organization as explained. Thus, NSANZUBUKIRE Félicien and MUNYANEZA Anastazs having belonged to the FDLR from 2012 till they left it in 2016 must be found guilty of belonging to a terrorist organization pursuant to article 503 of the organic law N° 01/2012/OL of05/2012 above mentioned in force at the time they committed the act.

433. The Court finds what NSANZUBUKIRE Felicien and MUNYANEZA Anastase are saying that they were arrested when they were no longer in the FDLR, that they should not be punished for being in a terrorist organization because the provision of the law the Prosecution evokes in charging them, which punishes anyone who belongs or believes in a terrorist organization, and they were not in FDLR, is unfounded because when the provisions of that article were examined, the court found that what the lawmaker wanted to punish is not to be or accept to be in a terrorist organization, rather what is wanted is to punish anyone who belonged to it if belonging to it constituted an offense. Moreover, there is no evidence to show that they have abandoned terrorist activities which were going on.

➢ Determining whether IYAMUREMYE Emmanuel, NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA Andre and HAKIZIMANA Theogene have been members of the irregular armed groups FDLR-FOCA and FLN and of the terrorist groups FDLR-FOCA and MRCD-FLN.

• The view of the Court

434. The Court finds that the Prosecution is charging IYAMUREMYE Emmanuel alias Engambe Iyamusimb, NIYIRORA Marcel alias Bama Nicholas, NSHIMIYIMANA Emmanuel, KWITONDA André and HAKIZIMANA Théogène, with joining an illicit armed group and belonging to a terrorist organization; they belonged to FDLR-FOCA since its foundation to 2016 when it split into two factions and they remained with the faction which formed CNRD-Ubwiyunge's armed wing, which eventually became FLN.

435. The Court finds IYAMUREMYE Emmanuel appeared in court and admitted he joined FDLR-FOCA in 2003; in 2010 he left and joined CNRD armed forces which later became the FLN. This is what he said when he was questioned during investigation

and the prosecution; he even pleaded about provisional detention and release. The court found that although he admitted being in those organizations, he claimed that he was not involved in terrorist activities because everything he did was at the injunction of his superiors; the chief of FLN armed forces can give information about my various tasks.

436. The Court also finds that NIYIRORA Marcel also joined FDLR-FOCA from 2003 to2016 when the organization split into two (2); he remained in the faction which formed the CNRD with the grade of captain; their President told them that they joined with the other to form one forum called MRCD, with a military wing called FLN. The Court also said that though he was in those groups, he did not join any attacks, that if he joined them, he did it unaware they were terrorist organizations, and even when he was captured on 20/07/2019 he had left (the FLN). That is what he had said during questioning during investigation, debating provisional detention and release; that he was a soldier in the FDLR and his service in CNRD headquarters, was confirmed by NIZEYIMANA Marc who was in FLN leadership.

437. The Court finds NSHYIMANA Emmanuel admits he was in FDLR-FOCA and claims he joined by force and was thrown in by its soldiers after picking him from school; he was seventeen (17) years old, he also confirms he was in the FLN army command. The Court also finds that he said that he never in MRCD-FLN because it differs from the CNRD and because those groups were different was explained by Colonel NIYONZIMA Arthemon who was quartermaster--general of CNRD-Ubwiyunge according to his statements before the investigation. That he joined the FDLR and later-on went to FL, he explained it during questioning in investigation and in court arguing provisional detention and release.

438. The Court also finds KWITONDA André who is arguing the case in judicando, admitted he was in FDLR-FOCA and in CNRD till it joined other organizations to form a forum called MICD which created the their military wing called the FLN, he also says that those organizations were not terrorist organizations because even when the

CONGO army was fighting them, they said that they were fighting armed groups, therefore when he joined them he did not know they were terrorist organizations, that he even knew the FLN after the creation of the MRCD party forum but he left it because it promoted war; he was eventually arrested in Goma in the DRC, on his way home. He also said that he was there because of fear of severe punishments or their families which suffer the consequences; they were even told that if you returned to Rwanda, you would be either killed or imprisoned.

439. The Court finds, that during the investigation and prosecution KWITONDA André admitted that he was a fighter in both groups and argued about provisional detention and release; although he admitted joining the FDLR, but left it when he learnt it commits atrocities, and joined the CNRD which he also left when he learnt it committed criminal acts such as setting vehicles on fire; he went to stay with his relatives in Rutshuru; that he never committed any act of terrorism, because in FLN he was in charge of medical matters.

440. The Court finds that in arguing his case admitted he was in FDLR-FOCA and in CNRD-Ubwiyunge but was not aware they were terrorist organizations; that he stayed there under duress and for fear of terrible punishments including death, for those who tried to leave, and songs designed to hate the Rwanda Government; but he did not show any attempt to leave because he had a handicapped arm; he says that he never left the MRCD-FLN; this is what he explained during questioning during investigation and prosecution, and he even argued on provisional detention and release.

441. On examining the pleas of IYAMUREMYE Emmanuel, of NIYIRORA Marcel, of NSHIMIYIMANA Emmanuel, of KWITONDA André and HAKIZIMANA Théogène, their statements during investigation and in court arguing on detention and release, they admit acts constituting the offenses they are charged with, of belonging to FDLR-FOCA and FDLR organizations.

442. The court thus is in consonance with the provisions of Article 453 of the above-mentioned Organic Law which was in force when they were joining the organizations as was explained to others who did not commit the offense of creating an illicit armed group because that act of being a member of was done with intent to create terrorism , they did not do it with intent to destabilize the State and other countries or support troops other than those recognized by the government.

443. Pursuant to the provisions of Article 18 of Law N°46/2018 of 13/08/2018 on the fight against terrorism and the fact that the groups FDLR-FOCA and even MRCD-FLN are terrorist organizations as explained earlier, the Court finds those acts of being members of those groups as they admit it, constitute the offence of belonging to a terrorism. Therefore, IYAMUREMYE Emmanuel, NIYIRORA Marcel, NSHIMIYIMANA Emmanuel, KWITONDA André must be found guilty of being members of a terrorist group.

444. Concerning HAKIZIMANA Théogène charged with belonging to a terrorist group, pursuant to the provisions of Article 503 of Organic Law N° 01/2012/OL of 02/05/2012 establishing the Civil Code[48] the court finds that he must be punished for the period the offense he is being prosecuted was committed, for being a member of a terrorist organization.

445. What NSHIMIYIMANA Emmanuel says that he joined FDLR-FOCA forcefully because soldiers removed from school is unfounded because apart from mentioning it, the court has no locus standi to confirm what he is saying is true while what he is claiming that CNRD is different from MRCD-FLN is unfounded as well since he remained with the CNRD even after it joined other groups to form MIRCD which founded the FLN group.

---

[48] **Article 503 of Organic Law N°01/2012/OL of 92/05/2012 establishing the Civil Code stipulates that anyone who is or accepts to become a member of terrorist organizations is punishable with fifteen (15) to twenty (25) years imprisonment.**

446. It also finds what HAKIZIMANA Théogène is claiming is unfounded too, that he did not know that FDLR-FOCA and FCRD-FLN were terrorist organizations because as it was explained, based on their activities, those organizations were terrorist organizations and even the FDLR was on the list of terrorist organizations and it formed a security committee for the organization since 2012.

447. It also finds unfounded his claim that he joined those organizations against free will and remained their member because of the fear of punishment and the indoctrination they were given, as the court would have no locus stand it to confirm that he personally joined them under duress and remained there against his free will as there were others who left those organizations and went back to Rwanda and were given the opportunity to resume normal life, as his colleagues he was with in court confirm it.

➢ Determining whether NDAGIJIMANA Jean Chretien has been a member of the irregular armed group FLN and whether he has been a member of the terrorist group MRCD-FLN

• The view of the Court

448. The Court finds the acts on which the prosecution is based to charge NDAGIJIMANA Jean Chretien with those offenses are that he was in the FLN armed group and having belonged to the MRCD-FLN terrorist group from 2016 till he was arrested on 13/02/2019.

449. The Court finds NDAGIJIMANA Jean Chretien had been tried on merit and had admitted he had belonged to the FLN armed group and had remained there till he was arrested' he also says he did not joined it on his own volition, that he remained

in the group out of the fear for punishment and because of the indoctrination they underwent, that he should not pay for offenses he committed under duress. He admitted having joined the FLN and he admitted it in his statements during investigation, during prosecution and even admitted it once again during trial arguing on provisional detention and release.

450. On examining his statements and even those of MUKANDUTIYE pleading in court that among those he was with in CNRD and MRCD-FLN as co-accused, there was NDAGJIMANA Jean Chretien, the Court found it was incontrovertible evidence he was in the FLN group and was also in the MRCD-FNL terrorist organization

451. Considering that NDAGIJIMANA Jean Chretien joined an armed group and considering the provisions of article 459 of Organic Law mentioned, in force when he joined the FLN as explained to others, does not constitute the offence of illegally creating an armed group because that act of being in that group, he created it with intent to creating terrorism, and he did not do it aiming at destabilizing the Government and other counties, or aimed at supporting an invasion of an illicit army. It instead constitutes the offense of being a member of a terrorist group, provided for under article 18 of Law 46/2018 of 13/08/2018 on the fight against terrorism. Therefore, he must be punished for belonging to a terrorist organization. It finds that the claims made by NDAGIJIMANA Jean Chretien that he joined the group against his free will and keeps being a member out of fear for punishment and due to indoctrination, and that he should not be punished for an offense committed under duress is unfounded for the Court has no locus stand to confirm he did not join the FLN.

452. The court finds the claims made by NDAGIJIMANA Jean Chretien, that he joined the groups by force, and even remained there out of fear of punishment and due to the ndoctrination they received; and that he should not be punished for offenses committed under duress; they are not founded, and the court would have no sound reason to confirm he did not join the FLN on his own volition because someone who

moved from where they were and went to Goma often sent by his father Wilson HATEGEKA to withdraw money  cannot say he had no chance to escape or to gather information about how others managed to separate from those groups.

453. Moreover, during questioning in investigation, he indicated his father often told him that it would be good to go home with a grade of 2nd lieutenant. The court found that he would not encounter ant problem in returning to Rwanda because he did not know the country; there is the primary school that he attended in a place called Nyirangarama, he finished in 2007 then went to join his father Wilson HATEGEKA in CONGO as he explained during investigation.

> Determining whether MUKANDUTIYE Angelina has been a member of the terrorist group MRCD-FLN

454. MUKANDUTIYE Angelique is being charged with having belonged to a terrorist group based on the fact that she took part in activities of MRCD-FLN terrorist group.

455. The court finds that MUKANDUTIYE Angelique arguing on merit, admitted having been a member of the MRCD-FLN as commissar for family and women affairs; she encouraged girls to join military service but that she did not know the group was a terrorist group; she admitted it during investigation, prosecution and n court, arguing on provisional detention and release.

456. The court finds that these statements confirm that of NIZETMANA Marc during investigation, when he confirms that the commissar for women is called MUKANDUTIYE Angeline and that she incited girls to join the FLN military service. It was Colonel GATABAZI Joseph alias Gathos who said that Angelina had requested that girls should undergo military training so that they may provide security to their families when the soldiers will have moved to Nyungwe Forest and even language

should be oriented towards inciting and even the list of those she moblilized to join the military included the following: UWAMALIYA Clémentine, UMUHOZA Francine, ASIFIWE Marie Claire and NYIRAHABIMANA Donatile.

457. Pursuant to article 18 of Law n°46/2018 of 15/08/2018 on the fight against terrorism, as explained earlier, the Court finds the act of being a member of that organization constitutes the offense of being a member of a terrorist group. So, MUKANDUTIYE Angeline should be found guilty of the offense of being a member of terrorist group.

458. The Court finds her utterances that he was in the MRCD-FLN organization without knowing that it was a terrorist group ; and that she even came to learn about the attacks which was launched against Rwanda when she asked the whereabout of young men she used to pray with and was told they had gone with others to stage attacks on Rwanda with General Wilson IRATEGEKA and and he told him that they had attacked with the intention of showing that FLN exists; all this is unfounded because, as has been explained; let people see terrorist acts that you have committed on Rwandan territory, MRCD-FLN is a terrorist organization.

459. And when one saw the position of commissar of family and women's welfare she held in the group, how she held meetings with FLN's officials including Wilson IRATEGEKA, and having incited young girls to join the FLN military so that they may provide security for their families after the men will have moved to Nyungwe Forest, all this is evidence she had been in the MRCD-FLN as an insider. So, it shows the will to commit that offense of being a member of a terrorist organization.

  ➢ Concerning the request of some of the defendants to be not prosecuted but rather be reintegrated into ordinary life

460. The accused, including   NDANZUBUKIRE Félicien, MUNYANEZA Anastase, NSABIMANA Herman, KWITONDA André and NSHIMIYIMANA Emmanuel who are

former members of the FDLR-FODA and FLN referred to the Lusaka agreements of 10/07//1999 aimed at stopping the fighting to argue that the agreement involves the Democratic Republic of the Congo  and the Government of Rwanda and was signed in Nairobi on 09/11/2007 and was aimed at ending the problems of insecurity in both countries and in the Great Lakes in general and referring also to the Ministerial decree n°13/09/2002 establishingguidelines in receiving and implementing the program designed for retired soldiers, and they claim that prosecuting such people is in breach of both the Agreement and the Decree.

461. They also claim that according to those agreements, people to be prosecuted are genocidaires, war crimes and crimes against humanity, crimes they are not charged with.  They request that, just like their fellow retirees, former members of terrorist groups and returnees, should be taken to Mutobo and be rehabilitated. They also claim that them having been prosecuted while others in the same situation are not, constitues a breach of the Constitution of the Republic of Rwanda, which stipulates that everybody is equal before the law, and it protects them without favour.

462. The Prosecution says that the claims made by the accused that they should not be prosecuted because their fellow mates former members of terrorist groups were not, and that prosecuting them is a breach of the Constitution, is unfounded because the provisions of the Lusaka [49]  the  Nairobi communiqué[50] and of the Ministerial Decree, have no provisions that former members of those groups who committed offences are not prosecuted for them, as they did not abide  by any provision of those laws they talk about, like laying down up, up to their capture. Moreover, the Prosecution has the power to prosecute or no to prosecute any suspect if it deems it necessary.

---

[49]Cease-fire agreement and attached annexes concerning the Democratic Republic of Congo, signed by regional leaders at Lusaka (Zambia), on 10 July 1999.
[50] Joint communiqué of the Democratic Republic of the Congo and the Republic of Rwanda on a common approach to put an end t0 threat for peace and stability for both countries and for the Great Lakes Region, Nairobi, 09//11/2007.

- The view of the Court

463. The Court finds, whether in the 10/07/1999 Lusaka Agreement or in the Joint Communiqué between the Democratic Republic of Congo and the Government of Rwanda signed in Nairobi on  09/11/2007[51] and even in the Ministerial Decree n° 066 of 13/09/2002 establishing the modalities of the reception and implementation of the program for returnee rebels, it is not indicated anywhere that those suspected of other offenses among members of those groups should not be prosecuted for them, for what is important is that people being prosecuted for the crimes of genocide, crimes against humanity and war crimes must be handed over to justice.

464. Concerning former members of armed militia being prosecuted for other offenses which were not mentioned in those agreements were confirmed by the Supreme Court, Case RPA 055/12/CS of INGABIRE UMUHOZA Victoire et al. of 13/12/2013 where the Court reiterated that the fact that there was no mention of other offenses outside the crimes of genocide, war crimes and crimes against humanity does not mean that other offenses could not be prosecuted. The Court therefore finds that nothing should prevent a suspect from being prosecuted if the prosecution deems it necessary, pursuant to Article 92 of Law N°027/2017 of 19/09/2019 governing criminal procedure. So, what they are saying that if they are prosecuted while some others who were not prosecuted were released to normal life instead would amount to unfair treatment before the law is unfounded.

---

[51] Joint communiqué of the Democratic Republic of the Congo and the Republic of Rwanda on a common approach to put an end t0 threat for peace and stability for both countries and for the Great Lakes Region, Nairobi, 09//11/2007

## II.2. ON THE FILING OF A LEGAL ACTION

465. The Court finds there are people who used the Prosecution's charges to sue for damages in this case and claimed that in these attacks carried out on Nyabimata, Kivura and Ruheru Sectors in Nyaruguru Districts, one carried out t in Nyungwe Forest, in Kitabi Sector, Nyamagabe District and those led on Rusizi Sector, in Kamembe and Nyakarenzo Sector, where their relatives and friends were killed and injured and their properties were destroyed through burning and looting; they explained that they were suing for damages in this case, against members of the FLN, who mounted these attacks; all members of the FLN and their leaders some of who, though they did not reach the scene of the crime, because if the FLN had not been there, they would not have been subjected to inhuman treatment.

466. The Court noted that in suing for damages, some sued individually while others sued jointly claiming that they have common interest in the case as the consequences of the attacks came from the attacks in which those they are suing took part. The Court noted that, while the court was in session they submitted attestation of indigence, they said that if the court finds they do not have common interest, their attestation would be accepted and be taken as though each of them had sued according to the law.

467. In general, the Court finds if the defendant requests the complainants to get together and pay one single security their complaints would not be received because they did not follow the procedure because even their certificate of indigence were submitted after their case was under trial, as for others who filed their cases duly, their complaints would not be heard because their requests had no evidence.

➢ Determining whether parties with shared interests who institute a civil action can deposit joint court fees and if their court actions can be received if they provide documents exonerating them of court fees after proceedings have started

468. NSABIMANA Callixte alias Sankara and his mates submit that filing a suit for damages against them jointly on one common bail saying they have common interest and afterwards while the case is under trial, tender official proof of indigence, their plaint would not be heard because they have no common interest, because each claim for damages individually, based on his destroyed property.

469. They also said that even proof of exemption from court costs given after the indictment had been read; the law provides that a bail that exempts them from the costs must be submitted to the court clerk before he/she registers the plaint, that they submitted them on 14/07/2021 after they filed the plaint on 15/02/2021 which also would not get their plaint accepted as they were submitted after the trial of their case had begun.

470. HAVUGIMANA Jean Marie Vianney et al. represented by Barrister UMULISA Alice, Barrister MUNYAMAHORO René and Barrister MUKASHEMA M.Louise submit that they were affected by the acts of terrorism perpetrated by MRCD-FLN; that that was the reason they paid one bail of costs together because they have joint interests, that according to the provisions of article 33 of Law N°22/2018 of 29/24/2018 governing civil, commercial, labor and administrative procedure, it is clear that was what the lawmaker meant, but that if the court found another way of finding out that they produced official proof of exemption from court costs, it would ensure that a civil case linked to a criminal case, is submitted any time before the trial has not begun.

- The view of the Court

471. Article 113 of Law no 027/2019 of 19/09/2019 relating to the Criminal Procedure states that: "When a civil action is instituted before a criminal court, the court hears such action in accordance with laws governing civil procedure for cases heard on the merits".

472. The Court finds that eighty-five (85) persons who filed complaints have jointly paid one filing fee arguing that they have shared interests in this case. The Court finds that article 33 paragraph 1 of law no22/2018 of 29/04/2018 relating to the civil, commercial, labour and administrative procedure provides that If several parties have shared interests in a case, and sue or are sued, each of them assumes the rights and obligations of parties to proceedings to his/her own behalf. However, persons with shared interests in a case file their claims in one motion instituting proceedings and pay only one filing fee.

473. The Court, after examining this article provisions and comparing them with the civil parties' claims that they have one shared interest because the acts that have affected them are MRCD-FLN's terrorist acts, finds that having been affected by those attacks does not justify their claim of shared interests because everyone has filed a complaint because of the damage done to him/her, e.g, loved ones who were killed, or property that was damaged. Moreover, if one has also to consider the provisions under paragraph 2 of the same article, filing a joint claim can be done, for instance, by successors or members of an association.

474. The Court finds, therefore, that, the fact that the claimants have paid only one filing fee while they do not have shared interests, this should make their claim inadmissible; however, considering that, before the closing of the proceedings they had submitted administrative proof that they are vulnerable, their petitions must be received considering that they have based on a criminal complaint and filed their complaint in

accordance with the provisions under article 116 of law no 027/2019 of 19/09/2019 relating to the Code of Criminal Procedure which states that a victim of an offence may file a civil action to a competent court in order to be indemnified, from the time when the court is seized with the criminal action to the time when the proceedings are closed at first instance.

475. Therefore, considering the provisions under that article, the Court finds that a civil action that is based on a criminal action can be filed as long as the legal proceedings are still going on and this practice differs from what happens in civil cases where the Court Clerk cannot receive a lawsuit before a deposit court fee has been paid, or, there is proof of exemption as provided under article 21of law no22/2018 of 29/04/2018 relating to the civil, commercial, labour and administrative procedure

➢ Determining whether those claiming for damages deserve them

• The way the claimants for civil action argue their case

1. Concerning the damages resulting from the attacks in Nyabimata Sector

476. NSENGIYUMVA Vincent, in his complaint says that, on 19/06/2018, an FLN armed group attacked his house, burnt his car,  a RAVA4/RAD802K, worth twenty-five million Rwandan francs (RwF25.000.000), they also burnt household materials worth thirty million Rwandan francs (RwF30,000,000); he was severely injured in the head and spent one million five hundred thousand Rwandan francs for treatment (RwF1,500,000); he is requesting for a refund and compensation for the money he has spent in hospital that amounts, in total, to (RwF4,000,000). He also requests the Court to award him twenty-one million six hundred thousand Rwandan francs (Rwf21,600,000), in other words, twenty million (RwF20,000) per day, starting from the day his car was burnt until the case is closed, because he relied on his car in his

every day activities. He should also be awarded twenty million (Rwf 20,000,000) in damages plus five hundred and forty thousand Rwandan francs (544,000) as a representation fees.

477.  HAVUGIMANA Jean Marie Vianney says that attackers in Nyabimata beat him, burnt his motorbike and his official papers, forced him to carry on his head their loot, took twenty-eight thousand Rwanda francs (Rwf28,000) from him; he therefore asks for compensation for his stolen goods and damages amounting to one million one hundred thousand Rwandan francs (Rwf1,100,000).

478.  RUGERINYANGE Dominique and NTABARESHYA Dative say that their 25-year-old child called Habarurema Joseph was killed in the attack on Nyabimata, and that he also lost money, a telephone and a TV which were in his shop. RUGERINYANGE Dominique has filed a civil complaint requesting ten million in damages (10.000.000 Frw) and compensation for his damaged property worth seven million Rwandan francs (Rwf7.000.000); as for NTABARESHYA Dative, she has filed a complaint for damages worth forty-five million Rwandan francs (45.000.000 Frw) and five million (Fwf 5,000,000).

479. BAPFAKURERA Venuste says that he was watching football with friends when armed people came in and attacked them, they took away his telephone worth thirteen thousand Rwandan francs thirty-one thousand (Frw 31.500) as well as his motorbike's papers. He asks for a compensation of five million (5,000,000) which includes the value of his motorbike that he had bought thanks to a loan from SACCO, as well as any another pecuniary loss.

480. HABYARIMANA Jean Marie Vianney says that people came during the night calling him by name and when he opened, they seized him and tied him up and took him to BARAYANDEMA's field to dig up potatoes; after that, they asked him to carry them on his head up to Nyungwe forest; he also says that they robbed him of various items for which he is asking for compensation of  five and sixty thousand  (Frw 560,000)

and one million Rwandan francs (Frw 1,000,000) in damages. That would amount to one million hundred and sixty thousand in total.

481. INGABIRE Marie Chantal says that on 19/06/2018, a raid was carried out in Nyabimata during which her husband MANIRAHO Anathore who was Director of Studies at Nyabimata Complex School was killed while he was going to intervene; that is why she is asking thirty million (Frw30,000,000) in damages, seventy million (Frw 70,000,000) in compensation for pecuniary loss, fifty million (50,000,00) for her children who have been orphaned.

482. SHUMBUSHA Damascène says that armed people attacked him at home, took away various items such as foodstuffs, clothes and a telephone and four thousand francs (4.000); and he is asking, in total, six hundred and fifty-four thousand francs (654,000) in damages.

483. NSABIMANA Anastase says that he is a businessman; that armed people found him at home and threatened to cut his wife's throat and he gave them one hundred and fifty thousand francs (Frw150,000) from a cow that he had sold, so that they may not kill her; they also looted various items such as foodstuffs, a telephone and clothes, all of them worth sixty-three thousand (Rwf63,000); they had him carry them on his head like a hostage; he came back early in the morning. For that reason, he is asking for one million (Frw 1,000,000) in damages; in total, he's asking for one million two hundred and thirteen thousand francs (1,230,000).

484. MUKASHYAKA Joséphine says that her husband MUNYANEZA Fidèle who was a teacher and herself, heard gunshots near the house of the Sector Executive Secretary and her husband went out to intervene and he bumped into criminals who shot him in the chest, in the leg and in the arm; he was taken to hospital but he succumbed to his wounds; and she is asking one hundred million (100.000.000 Frw) Rwandan francs in damages because she has been widowed and has been left with

two small children; that her husband earned one hundred thousand (100,000) a month and he was the bread provider and also provided for their parents.

485. SIBORUREMA Venuste says that armed people came at his house at night, broke the door open, pointed a gun at him, asked him money, and looted various items, had him carry them on his head up to Nyungwe forest; then they let him go, giving him a written warning to the Executive Secretary and the Priest; for that reason, he is requesting compensation for his looted property which included foodstuffs, milk, clothes and a telephone worth, all of them, seventy thousand five hundred Rwandan francs (70.500) plus five hundred thousand Rwandan francs in damages (500.000 Frw). This will amount to five hundred and seventy thousand five hundred Rwandan francs (Frw570,500).

486. NGEDAKUMANA David says that when he heard that his neighbour had been attacked, he went to intervene and they pointed a gun at him, then they took his telephone and looted various items such foodstuffs and clothes worth twenty-eight thousand four hundred francs (28.400 Frw); they also had him carry their loot up to Nyungwe forest. For that reason, he is asking for five hundred thousand francs in damages (Rwf 500,000). In total, this makes five hundred and twenty-eight thousand four hundred (Rwf528.400).

487. HABIMANA Viateur says that on 19/6/2018 when armed people attacked Nyabimata Sector, he was watching a football match in a pub. They killed the pub's owner who was called Habarurema Joseph; as for him, they hit him in the head and injured him. He spent two months (2) having medical treatment, unable to do anything else; for that reason, he is asking for five million two hundred and ten francs (Frw 5,210, 000) in damages, plus a pecuniary loss compensation for his property that was damaged worth thirty thousand Rwandan francs (30,000), and one hundred and eighty thousand (180,000) for spending two months inactive, and five million thousand in damages.

488. NGIRUWONSANGA Vénuste says that on 01/07/2018 at night, armed people carried out attacks in Nyabimata Sector; they found him at home and took him away, they had him carry their loot on his head up to Nyungwe forest; they also looted some of his items such as foodstuffs, clothes and money. For that reason, he is asking for two million one hundred and forty thousand francs (2.140.000Frw) in compensation.

489. BENINKA Marceline says that during that raid, they took her telephone and that she was even traumatized because the assailants had her walk all night; therefore, she is asking for two million fifty-four thousand (Frw2,054,000) in damages and for her telephone that was stolen.

490. NYIRAMINANI Mélanie says that the attackers abducted her husband who was on a security patrol, they had him carry on his head their loot and he came back home after two (2) months that she spent in anguish; for that reason, she is asking five hundred thousand francs (Frw 500,000) in damages.

491. NYIRAHORA Godelive is asking for a compensation of five hundred thousand francs (Rwf 500,00) because of the raid on his house and her door that was broken, and her clothes and foodstuffs that were looted.

492. RUHIGISHA Emmanuel says he was a farmer who worked with Rwanda Agricultural Board (RAB) in seed/plant propagation, that he had five houses in which he stocked his crops which were looted, they also took his clothes. For that reason, he is asking for a pecuniary loss compensation and damages) totaling seven million six hundred and ninety thousand (Rwf7,690,000).

493. MUNYENTWARI Cassien says that criminals attacked him, broke his door open, took ten thousand francs (10,000), looted some of his items, then they had him carry them on his head; he is asking for a compensation (pecuniary loss and damages) amounting to five hundred and seventy-one thousand (Rwf571,000).

494. BANGAYANDUSHA Jean Marie Vianney says that he was on a security patrol when armed people came and tied him up and asked them to tell them where the Sector's Executive Secretary and SACCO's accountant live. They took his security patrol uniform, twenty-eight thousand francs, two telephones and they obliged him to carry on his head their loot. On the way, they were threatening him because they had just learned he was head of the security guards in the Sector; for that reason, he is asking for six hundred and forty-one thousand (641.000 Frw) in compensation (pecuniary loss and damages).

495. NSABIMANA Straton says that he owns a pub and that is where he lives; that the assailants came to his house and took beer and drank and took the rest; they also looted some of the materials in the pub; during all that night, his wife, the children and himself were hiding; he is asking for one million one hundred and forty-nine thousand (Frw1,149,000) in compensation (pecuniary loss and damages).

496. SEBAGEMA Simon says that he was a businessman; that the attacker took goods and money, that in his business he used money borrowed from SACCO; this forced him to sell some of his property to repay the loan; he is asking three million five hundred thousand (3,500,000) in compensation including pecuniary loss and damages.

497. BARAYANDEMA Viateur also says that he was a businessman; that on 19/6/2018, armed people came to his shop, looted several items including money (fifteen thousand francs (15,000), that a fighting took place in his potato field; he is asking for a compensation for his looted and damaged property and damages amounting, in total, to fifteen million fifty thousand (Rwf15,050,000).

498. KARERANGABO Antoine is asking for one million five hundred (Rwf 1,500,000) in compensation for all the time he has spent undergoing medical treatment and damages. He explains that armed people attacked the house of the Executive Secretary of Nyabimata Sector; and when he was going to see what was going on,

he bumped into them and they hit him on the head and he fell down, since then, he cannot carry anything on his head.

499. NYIRAGEMA Joséphine says that on 01/07'2018 at night, armed people cam and broke the door open and went in, they beat them, and took five thousand and two hundred francs (Rwf5,200) plus other items for which she is asking for two million francs (Rwf 2,000,000) in compensation (pecuniary loss and damages).

500. NSAGUYE Jean says that he heard his neighbour crying for help and when he went to intervene, he met armed people who beat him, and he asking for one million francs (1,000,000) in damages.

501. NYIRAZIBERA Dative says that in July 2018, armed people came to her house, took money plus other items; she is asking for one million (1,000,000) in compensation including pecuniary loss and damages.

502. NDIKUMANA Viateur says that around seven in the evening, he heard several gunshots and went into hiding. In the morning when he arrived home, he found his child called Munyentwari was with Rwandan soldiers, but he was traumatized because he had seen his younger brother NyandwiVitar being killed. He is asking fifty million (50,000,000) for all the pain he has endured.

503. NDIKUMANA Callixte says that armed people came to his house; they took his wife and themselves and tied them up and they looted several items that they obliged him to carry on his head up to Nyungwe forest; he is asking for five hundred and eighty-one thousand (581,000) in compensation (pecuniary loss and damages).

504. NYIRASHYIRAKERA Théophila said that armed people attacked her house, broke the door open and went in, took her husband away and beat him and this resulted in physical incapacity; she is asking for seven hundred and seventy-eight thousand one

hundred (Rwf 778,100) in compensation including damages, pecuniary loss compensation and money for medical treatment.

505.  KANGABE Christine says that armed people found her at home asked her and the children to get up and they looted several items; that is why she is asking for five hundred and forty thousand (Frw 540,000) in damages and compensation for her looted property.

506. NANGWAHAFI Callixte says that armed people attacked him at home, broke the door and a window, looted several items and even obliged him to carry them on his head; he is asking for six hundred and fifty thousand (Frw650.000) in damages and pecuniary loss compensation for his looted property.

507. NYIRAHABIMANA   Vestine says that armed people attacked her and looted several items for which she is asking a compensation of five hundred and thirty-four thousand francs (Frw534,000).

508. NYIRAMANA Bellancille says that she was attacked by armed people who looted several items for which she is asking for five hundred and thirty-six thousand (Frw 530,400) in damages and pecuniary compensation for her looted property.

509. HABYARIMANA Damascène says that armed people found her at home at night and beat her and forced her to go and show them Nyabimata SACCO's bookkeeper's house but she refused, then they took her telephone and obliged her to carry the items they had looted up to Nyungwe forest; they released her in the morning; she is asking for five hundred and twenty thousand francs (520,000) in damages and compensation for her telephone.

2. Concerning claims arising from the attack in Ruheru Sector

510. MANIRAHO Théogène maintains that on 17/07/2020 at night armed persons launched attacks in Ruheru Sector, fired bullets that pierced tiles on his house and both he and his wife were traumatized, and that he is therefore seeking compensation for the damaged tiles and for moral damages, all totaling one million and five hundred thousand francs (1,500,000 Rwf).

511. GASHONGORE Samuel seeks compensation for his damaged property amounting to two hundred thousand (200,000 RWF) francs and one million (1,000,000Rwf) francs for moral damages due the attack of 17/07/2020 night carried out by armed persons in Ruheru Sector. They fired several bullets and when he heard them he took cover, when they came out, they found tiles and the wood on his house damaged.

512. NZABARINDA Viateur said that he lives near a military camp, that armed persons attacked that camp and engaged in fight and damaged his house, his crops and livestock and that for his damaged property he is seeking a compensation amounting to five hundred thousand (500,000 Rwf) francs and five hundred thousand (500,000 Rwf) more for moral damages.

513. NIYOMUGABA contends that armed persons fired several bullets and they took cover in the house, and in the morning they found out that his pregnant cow had aborted and his house was damaged, and that he is seeking compensation for his damaged property and death allowances, all totaling one million and two hundred thousand (1,200,000 Rwf) francs.

514. NDAYISENGA Edouard seeks compensation for his damaged property and for moral damages amounting to six hundred and forty-seven thousand (647,000 Rwf) because his property was damaged including tiles on his house.

515. BIGIRIMANA Fanuel asserts that from where he lived they heard shots and got frightened and then they stayed inside the house, and his pregnant cow felt also threatened and escaped and the next morning they found out that it had aborted and tiles of his house had been damaged, and that he is therefore seeking compensation for the damaged property and for moral damages amounting to one million one hundred and fifty thousand (1,150,000 Rwf) francs.

516. BARAGAMBA maintains that on 17/07/2020 at night they heard shots and a whistle and became frightened and then they took cover, that those bullets damaged the irons sheets of his house, and then in the morning he found also three dead insurgents at his place and that it frightened him and he is seeking compensation for his damaged property and for moral damages equal to two million (2,000,000 Rwf) francs.

517. RUTIHUNZA Enos says that on 17/07/2020 at night they heard shots and became frightened and then they heard somebody knocking at the door but they refused to open, then the person fired several rounds on the roof of his house and the roof tiles were broken, and in the morning they found a dead person in front of their house and became frightened, and that he therefore seeks compensation for the damaged property and for moral damages of one million (1,000,000 Rwf) francs.

518. BARIRWANDA Innocent says that in the night of 17/07/2020 shots were heard in the Ruheru attack and his house tiles broke into pieces and that he is seeking compensation of one million (1,000,000 Rwf) francs comprising the damaged tiles and moral damages.

519. NSABIYAREMYE Pascal says that he spent that night on patrol, and when he came home in the morning he found the tiles of his house broken into pieces, and he is seeking compensation for the broken tiles as well as for moral damages equal to eight hundred thousand (800,000 Rwf) francs.

520. HABIMANA Innocent says that the tiles of his house were damaged in the night of 17/07/2020 because of bullets falling on his house which made him sell his two cows in order to repair the roof of his house and for that he is seeking a compensation of one million (1,000,000 Rwf) francs.

521. SEBARINDA Emmanuel says that in the night of 17/07/2020, armed persons attacked a military camp and fired several rounds and as a result his house was damaged and that he is seeking compensation for the damaged property and for moral damages amounting to three hundred and fifty thousand and five hundred (350,500) francs.

522. NZAJYIBWAMI Joramu says that in the night of 17/97/2020 there were hostilities in his area which damaged his property and he is seeking compensation for moral damages and for the value of the damaged property, both amounting to eight hundred thousand (800,000) francs.

523. NKUNDIREMA Damascene, he too says that on 17/07/2020 at night, armed persons attacked a military camp in his area in Ruheru Sector and there were serious hostilities which damaged his property and that because of it he is seeking a compensation amounting to one million one hundred thousand (1,100,000) francs for both physical damages and moral damages.

524. HABAKURAMA Gratien says that he lives next to a military camp which was attacked by armed persons, that in those hostilities his house was damaged and that he is therefore seeking a compensation of one million and sixty-two thousand and five hundred (1,062,500) francs.

525. HARERIMANA Emmanuel says that armed persons attacked a military camp in Wimbogo and there were hostilities which destabilized his property and that he is seeking a compensation valued at five hundred and nineteen thousand and five hundred (519,500) francs for the damaged property as well as for moral damages.

3.  On compensation claims arising from effects of Kivu Sector attacks

526. NGAYABERURA Emmanuel says that armed persons attacked in Kivu Sector and abducted his son Nsengimana Claude who was on a night patrol and who until today has not returned home, and that he is seeking compensation for moral damages of six million (6,000,000) francs.

527. DUSENGIMANA Solange says that on 16/08/2018 at night, her husband Bizumuremyi Damien went on a citizen night patrol and was abducted and he never came back home, and given that they were farmers who had an income of four hundred thousand (400,000) francs, she is seeking compensation for moral damages for all of that – the loss of a husband - amounting to ten million (10,000,000) francs and twelve million and two hundred thousand (12,200,000) francs for pecuniary loss, the total amounting to twenty one million and two hundred thousand (21,200,000) francs.

528. KANYANDEKWE Venant says that in the night of 16/08/2018, armed persons broke their door and entered the house, looted different items including forty kilos of potatoes and five goats worth five hundred thousand (500,000) francs for which he is seeking compensation, and in addition he is seeking compensation for moral damages of five hundred thousand (500,000) francs, the total amounting to a compensation of one million (1,000,000) francs.

529. NYIRAMYASIRO Verediana says that she also was assaulted by eight persons who entered in the house and ate the food she had just prepared and looted other things including clothes and that she is seeking thirty thousand (30,000) francs for the things they looted and a compensation for moral damage of five hundred thousand (500,000) francs.

530. HAGENIMANA Patrice says that in the night of 16/08/2019, armed persons assaulted him at home and looted foodstuff and clothes worth thirty three thousand (33,000) francs and they made him transport what they had robbed, and that he is seeking to be compensated for the items looted and an additional compensation for moral damage of one million (1,000,000) francs.

531. NSANGIYEZE Emmanuel says that on 16/08/2019 armed persons broke into his compound and looted different pieces of his property including food items worth one hundred and twenty thousand and four hundred (120,400) francs, that he is seeking to be compensated for the property robbed and for moral damages amounting to six hundred thousand (600,000) francs.

532. NYIRAKOMEZA Claudine says also that armed persons assaulted her at her home and looted different things including food and clothes worth forty seven thousand and five hundred (47,500), and that she is seeking to be compensated for the value of the items looted and for moral damage equal to five hundred thousand (500,000) francs.

4. Compensation claims arising from effects of the Nyungwe forest attack in Kitabi Sector

533. NDUTIYE Yussuf maintains that he was driving from Rusizi and when he arrived in Nyungwe forest, he came across armed persons who stopped him. He got out of the vehicle he was driving – a Golf VW with plate number RAC 547 A and hid in the forest. When he came out, he found the vehicle had been burned. He says that he managed to know that those who set it on fire were FLN combatants, and it is for that reason that he is asking all the accused to pay a compensation for damages amounting to eight million (8,000,000) francs as the equivalent of the vehicle value, a compensation for moral damages of two million (2,000,000) francs and representation fees of one million (1,000,000) francs. And in addition, he claims an indemnity of twenty thousand

(20,000) francs per day from the day his vehicle was burned until the conclusion of the case given that the vehicle helped him in everyday life.

534. He also says that the evidence on which he bases to make the claims include a pro-forma invoice delivered by KAMECAR Motors Ltd on 24/01/2020 indicating that the vehicle had a value of eight million (8,000,000) francs, the vehicle insurance certificate delivered on 23/12/2019, a picture of the vehicle before it was burned, pictures contained in the case file showing burned vehicles, and even a report of the local administration authorities mentioning that on 15/12/2018 armed combatants set on fire different vehicles in Nyungwe forest.

535. The OMEGA EXPRESS Ltd passenger transport company has also filed for compensation for its two Coaster passenger transport vehicles with plates numbers RAC 357 J and RAD 201 N which were set on fire in Nyungwe forest. It specifies that the evidence on which it bases its claims include the vehicles identification documents and purchase receipts delivered by "Akagera Business Group" which sold them, indicating that a Coaster vehicle with frame No JTFGFB 51820-1053253 (RAC 357 J), which was burned after five years of service, cost 51,809,000 francs and the one with frame No GFB518901981521, (RAD N) which was burned after one year in service, cost 52,079,986 francs, that they claim for compensation for the loss of the vehicles, and for pecuniary loss of 662,000,000 francs for those two vehicles on the basis of their incomes and those they were expected to bring, considering that passenger transport vehicles have a life span of twenty years, and that in addition they are claiming for representation fees and court deposit fees of 1,240,000 francs and even 20,000,000 francs of moral damages because as a company, OMEGA lost credit which incurred loss to it, that the total amount of claims for damages amounts to 737,128,986 francs.

536. The passenger transport company ALPHA EXPRESS COMPANY Ltd equally claims for compensation for its TOYOTA Coaster vehicle with plate number RAC 341 U which was set on fire in Nyungwe forest, for a total of 341,000,000 francs comprising

52,000,000 francs for its cost, pecuniary loss of 288,000,000 francs and 1,000,000 francs of representation. It specifies that the evidence on which it bases its claims include the vehicle identification documents, a purchase receipt of 09/01/2015 and a report of the local administration authorities confirming that passenger transport vehicles were set on fire in Nyungwe forest.

537. RUDAHUNGA Ladislas and his four (4) children whom he represents have filed a civil action against the death of his child MUTESI Jacqueline who was killed in the attack that set fire to the vehicle in which she was, in Nyungwe forest, amounting to 33,620,000 francs combining funeral expenses of 2,620,000 francs, representation fees of 1,000,000 francs, 4,000,000 frs for moral damages for each person, 5,000,000 frs of death allowances for the parent, 9,000,000 frs for infringement to the child-parent relationship, 2,400,000 frs for infringement of sibling to sibling relationship for all of them, and 20,200 frs for the payment of official documents. He says that the evidence on which the claims are based include Mutesi Jacqueline's death certificate, certificate of her salary, certificate of the relationship they had with the deceased, birth certificate and certificates attesting that the claimants are alive, receipts of funeral expenses and a copy of the case file attesting that RUDAHUNGA Ladislas is the inheritor of MUTESI Jacqueline.

538. KAREGEYA Phenias has also filed for compensation for moral damages amounting to 63,000,000 frs arising from the death of his child NIWENSHUTI Isaac who was killed by the attack of FLN fighters which set on fire a OMEGA vehicle in which he was, 3,000,000 frs for funeral expenses and mourning ceremonies and 1,000,000 frs for representation.

539. NYIRAYUMVE Eliane has filed for a civil action against the death of her husband NTEZIRYAYO Samuel who was killed by the attacks launched by FLN fighters in Nyungwe forest, indicating that he has left her with five children, for which she is seeking compensation of 23,500,000 frs combining 10,000,000 frs for moral damage for being a widow and her children made orphans, 10,000,000 frs of compensation

for pecuniary loss, 2,500,000 frs used as funeral expenses and 1,000,000 frs of representation in court. She also says that the evidence she bases on to make the claims include a medical death certificate attesting that her husband NTEZIRYAYO Samuel died of a gunshot, and a marriage certificate.

540. NGIRABABYEYI Desire maintains that he was driving from Rusizi an ALPHA Express passenger vehicle, and when he arrived in Nyungwe forest, he came across FLN fighters lying in wait, they killed some of the passengers, others were wounded including himself, and that he is seeking compensation for moral damages totaling 137,600,000 frs combining 50,000,000 frs for the disability he suffered, 20,000,000 frs for moral damage, 66,600,000 frs and 1,000,000 frs of representation in court. He also says that the evidence he bases on includes medical documents attesting to the physical suffering he went through.

541. HABIMANA Zerothe has filed a claim of 139,400,000 frs combining 50,000,000 frs for medical expenses, 20,000,000 for moral damages, 68,400,000 frs for pecuniary loss due to being shot by FLN rebels while in an Omega Ltd vehicle when they arrived in Nyungwe forest, and the ensuing various effects he endured, and that he is in addition seeking 1,000,000 frs of representation in court. He also says that the evidence he produced includes a medical document issued on 27/05/2021 attesting that he received treatment, and that grenade fragments were removed from his body.

542. NIYONTEGEREJE Azele says that she left Kigali for Rusizi together with young children including one she was holding on the laps, and when they arrived in Nyungwe forest, they met armed persons who fired at the OMEGA Coaster in which they were and a bullet hit her on the shoulder. They ordered them to go in the forest but she managed to escape, and therefore she is seeking compensation for moral damages of 5,000,000 frs and 500,000 frs for the disability she suffered in that attack.

543. KAYITESI Alice says that when she arrived in Nyungwe forest on her way from Rusizi, they ran into an attack of armed persons who fired at the vehicle she was in, and she

was seriously wounded to the extent that she still carries grenade fragments in her thigh, and that those persons took from her different  things including clothes worth 500,000 frs, two laptops worth 560,000 frs, for which she is seeking compensation, that she is seeking compensation for damages related to her loss of beauty, depression, money spent on medical treatment and compensation for moral damages, the total of it amounting to 50,000,000 frs.

544. NYIRANDIBWAMI Mariane says that the 15/12/2018 attack in Nyungwe forest killed her twenty-three (23) years old daughter NIYOBUHUNGIRO Jeanine who was coming from school going to Rusizi, that because of it she is seeking compensation for moral damages of 15,000,000 frs and 5,000,000 frs for expenses related to the death of her child.

545. UWAMBAJE Francoise says that on 15/12/2018, her husband HABYARIMANA Dominique on his way from work at Kigali to Rusizi came across an attack in Nyungwe forest, they fired at them and he later died of wounds at the hospital. She adds that her husband was a businessman who had a monthly income of at least 1,500,000 frs, and that she is filing a combined claim of 100,000,000 frs including compensation for moral damages, pecuniary loss and the expenses she incurred.

546. MBONIGABA Richard, Mukeshimana Diane, Ndikumana Isaac, Mukandutiye Alphonsine, Uzayisenga Liliane, Habakubaho Adeline, Vugabagabo JMV, Murengerantwari Donat, Hakizimana Denis, Rwamihigo Alex, Nyiragabire Valerie, Semigabo Deo filed a claim for compensation for the death of MUKABAHIZI Hilarie, a parent for some and a sibling for others, who died of gunshots in the attack launched in Nyungwe forest on 15/12/2018. They say that they claim for compensation for the expenses amounting to 1,000,000 frs, 10,000,000 frs for moral damages for each one of the deceased's children, 5,000,000 frs for moral damages for each one of the deceased's siblings and compensation for loss of earnings equal to 14,000,000 because she was a farmer.

547. YAMBABARIYE Vedaste says that when he was coming from work at Gisakura Tea factory going home at Kitabi, he ran into an attack in Nyungwe forest and they stopped the vehicle he was in and set fire on it and he was shot in the leg, and since then he does no longer work, thus losing a monthly salary of 64,000 frs, and that on the basis of that he has filed a claim of 20,000,000 frs for compensation for all the damages.

548. NYAMINANI Daniel says that he met an attack on 15/12/2018 that was lying in wait for them at a place called 'mu wa Senkoko' in Nyungwe forest. They shot him in the back and on the leg and that left him with a permanent disability. It rendered him incapable of paying back a bank credit he had taken because of the lengthy illness, which further led to auctioning his property, that he is seeking for compensation for all of his property that was auctioned including a house valued at 5,000,000 frs, a land whose value is 600,000 frs, a 3,000,000 frs for the financial loss of his trade, a reimbursement of 5,000,000 frs bank credit he was not able to use, and a compensation for moral damage of 45,000,000 frs.

549. MUGISHA Gashumba Yves says that on 15/12/2018, as he was traveling in a passenger vehicle going to Kigali from work in Rusizi, they met an attack of armed persons in Nyungwe forest and they fled into the forest. Later, they were rescued by the Rwandan armed forces but having been shot and wounded, he was taken to the hospital. He says that he is seeking compensation for damages of 50,000,000 frs for his laptop, a camera and a telephone looted in the vehicle he was in, compensation for loss of beauty and for moral damages.

550. BWIMBA Vianney says also that on 15/12/2018, as he was traveling in a passenger vehicle from Rusizi to Kigali, armed persons lay in wait for them in Nyungwe forest and fired at them. He was wounded and suffered consequences to the extent that he cannot continue his work of mobilization, and because of that he is seeking compensation for his different belongings including his laptop worth 700,000 frs, a telephone valued at 250,000 frs and his clothes, and that in addition he is seeking compensation for moral damages of 150,000,000 frs for the deterioration of physical

appearance and reduced chance of finding a wife, and 50,000,000 frs  for disability at a young  age of twenty four (24).

551. NTIBAZIYAREMYE  Samuel  says  that  he  is  seeking  compensation  for  the deterioration  of  physical  appearance  and  reduced  chances  of  finding  a  wife amounting  to  150,000,000  frs  and  for  moral  damages  of  50,000,000  frs  for  being wounded by the attack launched in Nyungwe forest.


5.  On claims by those affected by attacks in Rusizi District

552. NKURUNZIZA Jean Nepomuscene alleges that he was wounded on 19/10/2019 by a hand grenade launched on Stella bar which wounded him on the arm and on the side  and  left  him  with  a  6%  permanent  disability,  and  he  is  seeking  a  total compensation for moral damage of 30,000,000 frs.

553. NSABIMANA Joseph alleges that on 19/10/2019 he was wounded on his thigh by a hand grenade exploded at Stella bar, that he still has fragments in his body and was left with a 8% disability and he is seeking compensation for disability of 6,000,000 frs and for moral damage of 9,000,000 frs.

554. RUTAYISIRE Felix alleges that on 19/10/2019 he was wounded on the right shoulder by  a  hand  grenade  exploded  at  Stella  bar  and  suffered  some  trauma,  and  that because of it he is seeking compensation for moral damage of 5,000,000 frs.

555. MAHORO Jean Nepomuscene alleges that in the attack launched at the maize and cassava  processing  plant  in  Karangiro,  Nyakarenzo  Sector,  his  vehicle  with  plate number RAC 943 B parked there was set on fire and that incurred him a loss and a setback in his business because he had bought it on a credit from a bank, and thus he is seeking a compensation of 11,000,000 frs for the damaged property, 29,000,000 frs for the loss he incurred and 10,000,000 frs for moral damage.

556. NIZEYIMANA Paulin alleges that on 19/10/20219 he was wounded by a hand grenade exploded at Stella bar which also damaged his vehicle and that he is seeking compensation for two broken windows costing 90,000,000 frs, 15,000 frs for the mechanic who replaced them and a moral damage of 5,000,000 frs.

557. GAKWAYA Gerard alleges that armed persons set on fire a vehicle in the attack at the maize processing plant in Karangiro where he worked, that he broke his back as he was trying to flee from the attack and that he is seeking compensation of 11,000,000 frs for damages.

- The way the accused defend themselves against the civil action

558. NSABIMANA Callixte alias Sankara, with the assistance of Mr NKUNDABARASHI Moise, argues that even though he does not deny the right of the attack victims to compensation, but that in general they have not provided evidence to the court as required by law.

559. NSENGIMANA Herman, with the assistance Mr RUGEYO Jean, contains that he should not be prosecuted for compensation because he never set foot where the attacks took place, that the fact of being an FLN member has no close relationship with the acts committed by its fighters to the extent of incurring civil liability, that the aggrieved persons should rather institute a civil action against that group.

560. NIZEYIMANA Marc, with the assistance of Ms MUREKATETE Henriette, argues that he has never committed any offence against those who have instituted the civil action, that the liability of what happened should rest with the terrorist group that launched the attacks, given that the offence of being a member of an irregular armed group, which he admits, has not caused damage to anybody.

561. BIZIMANA Cassien, with assistance of Ms MUREKATETE Henriette, argues that for him he accepts the principle of compensation, but that he possesses nothing, that if he is released he would find work and pay compensation for what he damaged or if need be he would do community service as an alternative penalty to imprisonment in order to pay for what he damaged.

562. MATAKAMBA Jean Berchmans, with assistance of MUKARUZAGIRIZA Chantal, argues that he should not be liable for damages caused by attacks carried out in Nyabimata and other places he does not know, since they took place before he even became acquainted with the FLN group members.

563. SHABANI Emmanuel, with assistance of Ms UWIMANA Shanny, remarks that even though he does not oppose compensation for damages, the parties who instituted the civil action have not provided evidence of ownership of what they claim compensation for, that the rest should be left to the court's competence.

564. NTIBIRAMIRA Innocent, with assistance of Mr NGAMIJE KIRABO Guido, argues that he should not be liable for Rusizi attacks, but that the liability should rather rest with FLN leaders because, as of him, he joined it because of poverty and ignorance, and that on top of it, he has no means to pay the compensation, disregarding the fact that the parties instituting the civil action have not provided evidence of ownership of what was damaged, and with regard to compensation for moral damages for the murdered persons , the court should decide what is appropriate.

565. BYUKUSENGE Jean Claude, with assistance of Mr NGAMIJE KIRABO Guido, argues that he is not the one who looted Nyabimata, Nyungwe, Rusizi and other places, that the liability for the claims should rest with all FLN members, including those who have already been arrested and those who have not yet been arrested, that if the court finds him responsible in those acts, it should forgive him and decide the amount he has to pay so that he goes and works for it.

566. NIKUZE Simeon argues that with regard to compensation, it should be verified if the time the offences were committed he had joined the terrorist group FLN, and that he should not be held liable for compensation because the prosecution has not proven that he committed those offences since an offence is personal.

567. NTABANGANYIMANA Joseph, with assistance of Mr NGAMIJE KIRABO, argues that the prosecution has not provided any evidence proving that he committed an offence, and that he should not therefore be liable for compensation for offences he has not committed.

568. NSANZUBUKIRE Felicien, with the assistance of Mr TWAJAMAHORO Herman, argues that  he should not be held liable for compensation for what has happened because he was not part of the terrorist group that launched attacks and committed those acts for which compensation is sought, that the liability should rest with the masterminds of those attacks, considering that the results of the investigation do not expose any acts constituting an offence he would have committed against the parties seeking compensation and since they were committed in 2018 when he was in prison.

569. MUNYANEZA Anastase, with assistance of Mr TWAJAMAHORO Herman, argues that even though he does not deny that those seeking compensation for damages deserve it, he should not personally be held liable for compensation for what happened as he was in prison since his arrest on 10/02/2017, while attacks started in June 2018 after he had been in prison for a year and half, and since he does not even know how they were planned, that he therefore finds that the compensation should rest with MRCD-FLN.

570. IYAMUREMYE Emmanuel, with assistance of Mr URAMIJE James, argues that he should not be liable for compensation because he has not committed any of the acts serving as a basis for seeking compensation since he has not participated in or led any attack.

571. NIYIRORA Marcel, with assistance of Mr URAMIJE James, argues also that he should not be held liable for compensation for damages of what happened since he did not play any role in the attacks of Nyabimata, Nyakarenzo and other places, that he has no knowledge of what took place there.

572. NSHIMIYIMANA Emmanuel, with assistance of Mr URAMIJE James, argues that the accusations against him have no grounds since he was not in the group that carried out attacks and therefore should not be liable for what it did since he did not play any role in those attacks, more so considering that the prosecution itself has not proven his role in the acts of murder, looting or damages to property carried out in those attacks, that the parties seeking compensation themselves have not produced evidence proving ownership of what they are seeking compensation for.

573. KWITONDA Andre, with assistance of Mr MUGABO Sharif Yussuf, argues that he should not be held liable for compensation because he joined FLN by force, and that he did not take part in any of the acts they base on to seek compensation, that to hold him liable would be contrary to the law since an offence is personal, that liability should rest with the perpetrators themselves or with the leaders who gave them instructions.

574. HAKIZIMANA Theogene, with assistance of Mr MUGABO Sharif Yussuf, argues that he too should not be held liable for compensation for the damages he is accused of since the acts on which the claims are made were carried out in attacks that took place in Nyaruguru and in Nyungwe forest when he was in prison.

575. NDAGIJIMANA Jean Chretien, with the assistance of Mr MUGABO Sharif Yussuf, argues that the court will examine whether someone like him who was forced to join the group should be liable to pay compensation, in particular taking into considering that he did not play any role whatsoever in the acts that compel the victims to seek compensation, that for him the liability for compensation should rest with those who participated in them.

576. MUKANDUTIYE Angelina, with the assistance of Ms MUKARUZAGIRIZA Chantal, asserts that she should not be liable for any compensation because she did not go into any attack on the Rwandan soil, that those who have any responsibility in the acts committed should be the ones to pay for damages since they were not sent by CNRD, and that she does not have any asset from which to pay compensation.

577. NSABIMANA Jean Damascene, with the assistance of Ms UWIMANA Channy, maintains that the acts he took part in are those of Rusizi, that he should not therefore be liable for attacks carried out in Nyungwe forest and other places since it was long after they were committed that he learned about them at his work place where he was involved in passenger transport, and that moreover they took place before he got involved with FLN.

- The view of the court

578. Concerning compensation for damages in this case, the court shall examine if those who have filed a civil action have provided evidence on which they base their claims including proofs of existence for the persons killed by the attacks, the wounded, the kidnapped, those whose property was looted or damaged and proofs of property ownership.

### 1. Concerning attacks carried out in Nyabimata Sector

579. The court finds that NSENGIYUMVA Vincent, who was the Executive Secretary of Nyabimata sector, bases his claim on evidence, including the report of the local administration authorities mentioning that on 19/06/2018 he was assaulted at his place, was shot and seriously injured, his vehicle set on fire and household items damaged. The other proofs he gives are pictures of his car which was burned, medical certificates and even statements given by witnesses during the investigation.

580. When the court examines those pieces of evidence, it finds they prove that NSENGIYUMVA Vincent was wounded by that attack, that it set fire on his car which was parked at home, that he received treatment at King Faisal hospital where he was transferred by Butare University Hospital. The ownership of the vehicle is corroborated by the proofs provided. Since it was burned, he should receive a compensation of fifteen million (15,000,000) frs, determined on the basis of the court's judgment because the proofs he provided do not indicate that the vehicle had the value of twentyfive million (25,000,000) frs.

581. The court finds also that on the basis of what is provided by article 12 of Law no 22/2018 of 29/04/2018 relating to the civil, commercial, labour and administrative procedure stipulating that the claimant must prove a claim, and on article 3 of Law no 15/2004 relating to evidence and its production stipulating that each party has the burden of proving the facts it alleges, therefore, since NSENGIYUMVA Vincent has not proven that the  household items he says he owned had a value of thirty million (30,000,000) frs, he cannot obtain it, particularly considering that even the report produced by the authorities of Nyabimata Sector does not mention items being looted from his house.

582. Moreover, the court finds that he cannot be accorded the amount of five million and five hundred thousand (5,500,000) frs he claims to have used for medical treatment and other hospitalization expenses given that he did not provide evidence that he was hospitalized and for how long.

583. The court finds that in consideration of the fact that NSENGIYUMVA Vincent was assaulted at his home, was shot and his vehicle set on fire, resulting in being unable to use it in his everyday life, he must be accorded a compensation for moral damages of six million (6,000,000) frs on the basis of the court's judgment because the amount he claims is high, and he must be accorded five hundred thousand (500,000) frs for representation, thus, the total amount of compensation is twenty one million (21,000,000) frs.

584. The court finds that there are no grounds to grant HAVUGIMANA Jean Marie Vianney compensation for the amount of money he claims to have been robbed and for moral damages arising from having been abducted and forced to transport some stuff since he has not provided evidence for it, but that he should rather be granted compensation for the cost of his motorcycle that was burned as proven by the report of Nyabimata sector executive secretary, and the pictures proving that it was burned, therefore, he must be accorded six hundred thousand (600,000) frs determined on the basis of the court's judgment since he did not provide any proof of the true value of the motorcycle at the time it was set on fire.

585. The court finds that RUGERINYANGE Dominique and NTABARESHYA Dative have not provided evidence that there were items looted at the place where their son HABARUREMA Joseph exercised his trading activity and what their value was, that there are no grounds for the court to accord them the compensation they claim. Concerning compensation for moral damages they are seeking, the court finds that there is a report of Nyabimata Sector executive secretary confirming that HABARUREMA Joseph was killed in the 19/06/2018 attack, and a 06/11/2018 death certificate indicating that RUGERINYANGE Dominique and NTABARESHYA Dative are his parents; thus, due to the loss of their son, they must obtain compensation for moral damage to be determined by the court since it finds the amount they are seeking to be too high, and thus five million (5,000,000) frs must be accorded to RUGERINYANGE Dominique and five million (5,000,000) frs to NTABARESHYA Dative.

586. The court finds that there are no grounds to accord BAPFAKURERA Venuste compensation for the value of the telephone he claims and the amount of money he alleges to have been taken from him since he did not provide any evidence for it, and concerning the claim for compensation for the value of the motorcycle, the court finds that he cannot have the whole amount but that in its judgment, given that there is a report of the Nyabimata Sector executive secretary and pictures proving that the motorcycle was burned, it accords him six hundred thousand (600,000) frs, but with

regard to the expected earnings, he has not provided its daily income at the time it was in service for the court to base on to justify the amount sought.

587. The court finds that, in consideration of the report of the Nyabimata Sector Executive Secretary mentioning local citizens who were abducted and forced to transport looted items into Nyungwe forest, HABYARIMANA Jean Marie Vianney should be accorded compensation for moral damages amounting to three hundred thousand (300,000) frs for the looting of his property and being forced to transport the looted items, but that he cannot receive compensation for his alleged stolen property because he has not provided evidence for it.

588. The court finds that the report of the Nyabimata Sector Executive Secretary mentions that MANIRAHO Anatole, INGABIRE Marie Chantal's late husband was killed in the 19/06/2018 attack, and that she should be accorded compensation for moral damage determined in accordance with the court's judgment of ten million (10,000,000) frs for the loss of her husband who left her with children to bring up. It finds however that INGABIRE Marie Chantal cannot be accorded pecuniary damages because she has not provided evidence of what her husband's income was.

589. The court finds that the report of the Nyabimata Sector Executive Secretary mentions that SHUMBUSHO Damascene is also one of the local persons kidnapped by the terrorists and forced to transport what they had looted into Nyungwe forest. Based on that report, he should be accorded compensation for moral damages amounting to three hundred thousand (300,000) frs for the kidnapping and being forced to transport looted items, but that he cannot receive compensation for his alleged looted property comprising of foodstuff, clothes, a telephone and money because he has not provided evidence for it.

590. The court finds that the report of the Nyabimata Sector Executive Secretary mentions that NSABIMANA Anastase was also one of the local persons kidnapped by the rebels and forced to transport what they had looted into the Nyungwe forest. Thus,

basing on that report, it finds that he should be accorded compensation for moral damages of three hundred thousand (300,000) frs for kidnapping and being forced to transport stolen items, but that he cannot receive compensation for his alleged looted property comprising foodstuff, clothes, a telephone and money since he has not provided evidence for it.

591. Again on the basis of the report of the Nyabimata Sector Executive Secretary mentioning that MUNYANEZA Fidele, MUKASHYAKA Josephine's husband was killed by the 19/06/2018 attack, the court finds that MUKASHYAKA Josephine, on the basis of the court's judgment, must be accorded compensation for moral damages equal to ten million (10,000,000) frs for the pain of losing a husband and being left with two children to bring up. It finds however that she cannot be accorded compensation for pecuniary loss because the court has nothing to base on to determine it since she has not provided any evidence that her husband had the salary of one hundred thousand (100,000) frs for the court to base on to confirm it was his true salary.

592. The court finds that the mentioned Sector Executive Secretary's report indicates that SIBORUREMA Venuste is one of the local citizens who were kidnapped by the terrorists who took them into Nyungwe forest after forcing them to transport what they had looted. On the basis of that report, it finds that he should also be accorded compensation for moral damages of three hundred thousand (300,000) frs for being kidnapped and forced to transport looted items, but cannot not accorded compensation for his allegedly taken away property comprising of foodstuff, clothes, a telephone because he did not provide any evidence for it.

593. The mentioned Sector Executive Secretary's report mentions also NGENDAKUMANA David as one of the citizens kidnapped by the terrorists and taken into Nyungwe forest carrying looted things. Basing on that report, the court finds that he too should be accorded compensation for moral damages of three hundred thousand (300,000) frs for being kidnapped and forced to transport looted items, but

that he cannot be accorded compensation for his allegedly taken away property comprising foodstuff, clothes, a telephone and other things since he has not provided evidence for it.

594. On the basis of article 12 of Law no 22/2018 of 29/04/2018 relating to the civil, commercial, labour and administrative procedure stipulating that the claimant must prove a claim, it finds that HABIMANA Viateur, NGIRUWONSANGA Venuste, BENINKA Marcelline, NYIRAMINANI Melanie, NYIRAHORA Godelieve, RUHIGISHA Emmanuel, MUNYENTWALI Cassien, BANGAYANDUSHA Jean Marie Vianney, NSABIMANA Straton, SEBAGEMA Simon, BARAYANDEMA Viateur, KARERANGABO Antoine, NYIRAGEMA Josephine, NSAGUYE Jean, NYIRAZIBERA Dative, NDIKUMANA Viateur, NDIKUMANA Callixte, NYIRASHYIRAKERA Theophile, KANGABE Christine, NANGWAHAFI Callixte, NYIRAHABIMANA Vestine, NYIRAMANA Bellancille and HABYARIMANA Damascene cannot be accorded their claim since they have not provided evidence that their property was looted, that they were beaten, kidnapped and forced to transport looted items until Nyungwe forest, proof of the alleged time they spent without working, and in addition, the executive secretary's report used as a proof does not include them in the victims of those acts and does not mention the owners of the looted property either.

## 2. Concerning the attack launched in Ruheru Sector.

595. Those claiming for compensation in Ruheru Sector, namely MANARIYO Theogene, GASHONGORE Samuel, NZABIRINDA Viateur, NIYOMUGABA, NDAYISENGA Edouard, BIGIRIMANA Fanuel, BARAGAMBA, RUTIHUNZA Enos, BARIRWANDA Innocent, NSABIYAREMYE Pascal, HABIMANA Innocent, SEBARINDA Emmanuel, NZAJYIBWAMI Yoramu, NKUNDIZERA Damascene, HABAKURAMA Gratien and HARERIMANA Emmanuel  base their claim on the 17/07/2018 attack in the area from which they suffered various effects such that for some of them bullets damaged their property including houses, roof tiles, iron sheets, crops in the fields, livestock

including cows that had miscarriages, others traumatized and they seek compensation for their damaged property and for moral damages.

596. Basing again on the provision of the mentioned articles 12 of Law ni 22/2018 of 29/04/2018 and 3 of Law no 15/2004 of 12/06/2004, the court finds that they cannot be accorded any compensation, because, apart from stating that they suffered effects from that attack, there is no one among those of Ruheru Sector claiming for compensation who has provided evidence for property damaged by that attack, and there is no report of the local administration authorities in the case file indicating the damaged property and their owners.

### 3. Concerning the attack launched in Kivu Sector

597. Those claiming for compensation in Kivu Sector, namely NGAYABERURA Emmanuel, DUSENGIMANA Solange, KANYANDEKWE Venant, NYIRAMYASIRO Verediana, HAGENIMANA Patrice, NSANGIYEZE Emmanuel and NYIRAKOMEZA Claudine base their claims for compensation for moral damages and pecuniary loss on the fact that, on different dates, attacks were launched  and had effects on them, including their people who were kidnapped and who until today have not reappeared and some of their property that was looted, including foodstuff and clothes.

598. Basing on the provision of article 12 of law no 22/2018 of 29/04/2018 and article 3 of Law no 15/2004 of 12/06/2004 stipulating that a claimant must prove a claim, the court finds that they cannot be accorded any compensation since they have not provided evidence of ownership and the value of what they claim as their possession, and there is no basis to determine compensation for moral damages for persons whose whereabouts they do not know, and given that they are not included among those who were kidnapped.

4. Concerning the attack launched in Nyungwe forest in Kitabi Sector

599. After examining the evidence presented by NDUTIYE Yussuf, the court finds that it proves he owned the vehicle for which he is seeking compensation - a Golf VWvehicle with plate number RAC 547 A manufactured in 2001, and that it was burned in Nyungwe forest. On consideration however of the pro-forma invoice NDUTIYE Yussuf bases on to determine its value which was delivered on 24/01/2020 after the vehicle was burned, it finds that it cannot serve as a basis, because it does not indicate its value at the time of purchase and how long he had had it. Thus, he cannot be compensated for his claim on the sole basis of the pro-forma invoice, however that on the basis of the court's judgment, he should be accorded four million (4,000,000) frs.

600. Concerning his other claims, the court finds that, the fact that NDUTIYE Yussuf's vehicle was burned, that he was intimidated by that attack and was deprived of his right to use his vehicle in everyday life, entitles him to a compensation for moral damages of two million and five hundred thousand (2,500,000) frs determined on the court's judgment, because it finds the claims he was seeking to be too high while he has not provided any basis to justify the twenty thousand (20,000) frs of income per day from the vehicle, and five hundred thousand (500,000) frs for representation. Thus, he is in total accorded seven million (7,000,000) frs for compensation and representation.

601. Basing on the evidence presented by OMEGA Express Ltd, the court finds that there are two (2) passenger Coaster vehicles that were burned in Nyungwe forest by MRCD-FLN fighters. It finds that the loss incurred due to that attack must be compensated, whether for the value of the vehicles, the loss of income due to lack of use and the money spent on representation.

602. For that, considering that the vehicle for which the claim of 51,809,000 frs was made had been in service for five years (5) as the OMEGA representative said in court, the court finds that in its judgment, it should be compensated at the value of forty million (40,000,000) frs, and for the one that had been in service for a year whose compensation is put at 52,079,986 frs, it should be compensated for (45,000,000) frs instead. The court finds that OMEGA Express has not clearly argued the grounds on which it seeks compensation for pecuniary loss, because it is not sufficient to base on twenty (20) years life span allegedly each vehicle would be in service and on the daily income of each vehicle to determine the claims.

603. The court, basing on the fact that a passenger vehicle is not in service every day, and the fact that the daily income was given as an approximation, and since OMEGA Express Ltd was accorded the amount of the vehicle's value, it should only be accorded  compensation for pecuniary loss for thirty three (33) months, calculated from 15/12/2018 when the vehicle was burned until the case was concluded, because the court assumes that a vehicle would be in use twenty four (24) days a month with a daily income of fifty thousand (50,000) frs . Thus, it should be accorded a compensation of seventy-nine million and two hundred thousand (79,200,000) frs for its two vehicles, and five hundred thousand (500,000) frs for representation and deposit court fees. The total amount for compensation amounts to one hundred and sixty-four million and seven hundred thousand (164,700,000) frs.

604. In consideration of the evidence presented by Alpha Express Company Ltd, the court finds that its Coaster passenger vehicle was burned in the attack of Nyungwe forest on 15/12/2018. For that, it must be accorded a compensation for the loss it incurred due to the loss of its vehicle and the expected income if it weren't burned, and a compensation for the money spent on court action. Considering that the vehicle had been in service for four (4) years, it finds that it should not be compensated at the purchase value, but that on the court's judgment, it should be accorded forty million (40,000,000) frs.

605. Concerning the compensation for pecuniary loss claimed on the basis of sixteen years (16) the vehicle had yet to serve, and an assumed daily income of fifty thousand (50,000) frs, it finds that it should not be accorded any compensation based on the claims for the remaining service time since they were accorded the vehicle value's amount, but should rather be accorded compensation for a pecuniary loss for thirty-three (33) months calculated from 15/12/2018 when the vehicle was burned till the conclusion of the case. Thus, based on the court's assumption that a passenger vehicle would be in service for twenty-four (24) days a month with a daily income of fifty thousand (50,000) frs, it should be accorded a compensation of 39,000,000 frs, and representation fees of five hundred thousand (500,000) frs. The total compensation fees for ALPHA Express Company Ltd are eighty million and one hundred thousand (80,100,000) frs.

606. The court finds that the evidence presented by RUDAHUNGA Ladislas includes MUTESI Jacqueline's death certificate, a certificate attesting that he is the father of the deceased, birth certificates of the deceased's siblings and different receipts of funeral expenses for her daughter.

607. Considering the evidence, he presented, the court finds that it is evident that MUTESI Jacqueline who was killed in Nyungwe forest is the daughter of RUDAHUNGA Ladislas, the court action claimant, and that she was a sibling to KIRENGA Darius, UMURIZA Adeline, SHUMBUSHO David and RUDAHUNGA Dieudonne who have instituted a court action being represented by their father RUDAHUNGA Ladislas. It finds that their claims for compensation should be based on Presidential Order No 31/01 of 25/08/2003 determining modalities of paying compensation for bodily injuries arising from motor vehicles accidents, while their claims are not accident related, and the law cannot be applicable in this case dealing with a subject matter related to murders committed in the attacks that took place in Nyungwe forest.

608. Basing on the evidence that RUDAHUNGA Ladislas presented, it finds that he should be accorded a compensation for moral damages of five million (5,000,000) frs and for

each one of MUTESI Jacqueline's siblings two million (2,000,000) frs, determined on the basis of the court's judgment, because their claims were too high. It also finds that RUDAHUNGA Ladislas should be reimbursed a sum of two million and one hundred thousand (2,100,000) frs equal to the amount spent on the funerals and to buy documents as shown by receipts he provided, and five hundred thousand (500,000) frs of representation.

609. When the court considers the evidence presented by KAREGESA Phenias, including the 16/12/2018 medical report of Kigeme hospital certifying that NIWENSHUTI Isaac's body was examined and revealed that she was killed by heat after an investigation officer requested that the body be examined, it finds that KAREGESA Phenias' parent must be accorded a compensation for moral damages for the grief of his son's death equal to five million (5,000,000) frs, and five hundred thousand (500,000) frs for representation, determined on the basis of the court's judgment, the total of it amounting to five million and five hundred thousand (5,500,000) frs. It however finds that he should not be accorded the fees he alleges to have used for the funerals and mourning because he has not provided any evidence for it.

610. Concerning NYIRAYUMVE Eliane, the court finds that the evidence she provided, including the marriage certificate and the 16/01/2018 death certificate, proves that her husband NTEZIRYAYO Samuel was killed by the attack launched in Nyungwe forest. It finds that in its judgment, she should be accorded a compensation for moral damages of ten million (10,000,000) frs for the loss of her spouse and for being left with two small children, and five hundred thousand (500,000) frs for representation. It finds however that she has not presented to the court any evidence of her husband's income for the court to base on to justify a compensation for pecuniary loss of ten million (10,000,000) frs, and neither for the two million and half (2,500,000) frs she alleges to have spent as funeral expenses.

611. The court finds that NGIRABABYEYI Desire has not presented any proof of disability for the court to accord him the sixty-six million (66,000,000) he claims on the

allegations he can no long work, and has neither provided any proof that the treatment he needs requires fifty million (50,000,000) frs. It finds that the evidence he presented indicates that he was treated for a wound from a grenade on the left leg. Therefore, taking into account the pain he endured, the fact that he spent the night wandering in the forest after the vehicle he was driving was set on fire, he must be accorded compensation for moral damages of two million (2,000,000) frs, and another five hundred thousand (500,000) frs for representation. The total amounts to two million five hundred thousand (2,500,000) frs.

612. The court finds that the evidence presented by HABIMANA Zerothe does not establish the disability he had which prevents him from doing work as usual to the extent that the court should accord him the claim of sixty-eight million four hundred thousand (68,400,000) frs, and it does not prove the necessity of more advanced treatment beyond what he received to the extent that the court would accord him the claim of fifty million (50,000,000) frs. It finds nonetheless that the evidence HABIMANA Zerothe presented proves that he was treated for wounds sustained from a grenade blast.  Therefore, because of the beatings he suffered, being forced by the combatants to carry luggage, being forced to go into Nyungwe forest, he must be accorded compensation for moral damages for that of two million (2,000,000) frs since his claim is too high, and he must be accorded five hundred thousand (500,000) frs for representation. The total compensation amounts to two million five hundred thousand (2,500,000) frs.

613. The court finds that there is a medical certificate in the case file showing that on 16/12/2018, NIYONTEGEREJE Azele was examined by a medical doctor at Kigeme hospital in Nyamagabe at the request of an investigation officer on 16/12/2018. The certificate has established that he has a wound on the right shoulder. Thus, the fact that NIYONTEGEREJE Azele was wounded by FLN fighters in the attack launched in Nyungwe forest on 15/12/2018, he too must be accorded compensation for moral damages of two million (2,000,000) frs according to the court's judgment. It finds that

he cannot be accorded disability damages since the medical report does not establish that he suffers disability from the wounds of that attack.

614. Basing on the evidence contained in the case file, including a medical certificate indicating that KAYITESI Alice was examined on 16/12/2018 by a medical doctor at Kigeme hospital in Nyamagabe and which established that she has a wound on the right leg, it finds that due to having been wounded by FLN fighters in the attack they carried out on 15/12/2018 in Nyungwe forest as shown by the medical report, she must be accorded a compensation for moral damages of two million (2,000,000) frs according to its judgment. It finds that she cannot be accorded compensation for loss of beauty because she has not provided evidence of the extent of beauty she lost, and she cannot be accorded compensation for medical expenses because no evidence has been provided for it, and neither the compensation for the alleged property looted by that attack because there is no evidence for it.

615. The court finds that NYIRANDIBWAMI Marienne must be accorded a compensation for moral damages of five million (5,000,000) frs determined on the basis of the court's judgment because her daughter NIYOBUHUNGIRO Jeanine was killed in the attack launched in Nyungwe forest as established by the medical report of 16/12/2018, but that she cannot be accorded compensation for the things she allegedly lost due to the death of her child, since she has not explained what they are and has not provided evidence for it either.

616. The court also finds that the medical report from the University Hospital in Butare, dated 18/12/2018, and included in the file, indicates that HABYARIMANA Dominique died on 16/12/2018, that he had wounds on his body due to gunshots, and his wife UWAMBAJE Françoise must receive ten million Rwandan francs (RwF 10.000.000) in damages, determined according to judicial discretion considering the pain she went through because of her husband who was killed and left her with three children; however, she should not be awarded compensation for pecuniary loss that she is requesting because she has not provided any proof.

617. Considerng the report of 16/12/2018 from from Kigeme Hospital's physician that indicates that MUKABAHIZI Hilarie died from gunshots, the Court finds that her children, as they appear on the list of 21/06/2021 of vulnerable people in Giheke Sector, and whose names are: Mukeshimana Diane, Ndikumana Isaac, Mukankundiye Alphonsine, Uzayisenga Lillian, Habakubaho Adeline and represented by MBONIGABA Richard, must receive compensation for their mother who was killed by the raid that was carried out in a forest, and each one will receive five million Rwandan francs (RwF 5,000,000) in damages; as for her siblings whose names are, MBONIGABA Richard, VUGABAGABO JMV, MURENGERANTWALI Donat, HAKIZIMANA Denis, RWAMIHIGO Alex, NYIRAGABIRE Valerie and SEMIGABO Deo, they must receive two million Rwandan francs each. Finds that, however, they must not receive compensation for what they alledgedlly have spent and one million Rwandan francs (RwF 1,000,000) in compensation for the amount of money the deceased person would have earned, because they did not provide any proof.

618. Considering the report from Ngugu Cell of 06/11/2020 which indicates that YAMBABARIYE Védaste was shot during the attack that was carried out in Nyungwe forest on 15/12/2018, and since then has been undergoing medical treatment for those wounds, finds that he should receive two million Rwandan francs (2,000,000) in damges determined according to judicial discretion, because he has not provided any proof for other kinds of compensation.

619. The Court finds that, NYAMINANI Daniel, MUGISHA GASHUMBA Yves, BWIMBA Vianney and NTIBAZIYAREMYE Samuel, who are asking for different forms of compensation such as damages, compensation for pecuniary loss as well as compensation for incapacity and disfigurement, are not entitled to them because they did not provide any concrete proof before the Court that, either they had been injured by the raid that was carried out in Nyungwe forest, or, that their property had been taken away or damaged during the raid.

6.  Concerning the attacks that were carried out in Kamembe and Nyakarenzo
Sectors in Rusizi District

620. The Court, considering the medical report of 07/10/2020 which shows that
NKURUNZIZA Jean Népomuscène has permenant incapacity equivalent to 6% loss,
and a disfigurement equivalent to 2/6 degree, and the report from Kamembe Sector
of 22/10/2020 indicating that he is among the people who were injured by a grenade,
finds that he should receive civil damages due to the pain he suffered when he was
injured and left him incapacited and disfigured, amounting to three million Rwandan
francs (3.000.000 Frw) determined according to the Court's discretion.

621. Considering also the medical report of 06/10/2020 indicating that NSABIMANA
Joseph suffered permenant incapacity equivalent to 8% loss, and the report from
Kamembe Sector of 22/10/2020, finds that, he should receive three million Rwandan
francs (3.000.000 Frw) in damages determined according to judicial discretion, due
to the pain suffered and the incapacity that resulted from the injury caused by a
grenade.

622. It finds that, considering the medical report of 06/10/2020 which indicates that
RUTAYISIRE Félix has been incapacited permanently at 24 % and has been
disfigured at 2/6, and the report from Kamembe Sector of 22/10/2020, he is entitled
to civil damages due to the pain he has suffered and the incapacity that resulted from
a grenade injury, amounting to four million Rwandan francs (Rwf 4,000,000)
determined according to judicial discretion. However, he is not entitled to civil
damages for disfigurement because he did not provide any proof related thereto.

623. The Court finds that there is also a 21/10/2020 report from Karangiro Cell,
Nyakarenzo Sector which indicates that during the night of 08/07/2019, a DYNA van
that belonged to MAHORO Jean Damascène was burnt by an attack that was carried
out on the maize mill in Karangiro where it was stationed. Basing on that report, she

is entitled to civil damages because there is evidence that he owned that car; however, the fact that he did not provide evidence of its real value, the Court, relying on its discretionary powers, requests that he should receive five million Rwandan francs (5,000,000) in compensation, plus five hundred thousand Rwandan francs (Rwf 5,00,000) in damages for his car that was burnt, but should not receive any compensation for falling into bankruptcy because he did not provide any proof related to it.

624. The Court finds that the medical report of 19/10/2019 indicates that NZEYIMANA Paulin was injured by a grenade and that he was referred to a surgeon for treatment. Therefore, he should be awarded two million Rwandan francs (2.000.000 Frw) in damages as determined by judicial discretion because the amount for damages he had requested was too excessive; however, he should not receive any compensation for his alledgedly smashed car windows nor refunded for the service of the person who fixed them because he did not provide any proof of it.

625. The Court finds that GAKWAYA Gérard was examined by a medical doctor on 06/10/2020 at the Prosecutor's request, and in the report which is included in the file, he indicated that he suffered from mental problems, stating that « after the psychological examination and in consideration of his mental state, we conclude that he has chronic psychological problems which are complicated by a mental condition requiring psychosomatic treatment for more than six months. » The Court, after examination of this report produced on 07/10/2020, more than one year after the attack and in which GAKWAYA Gérard alleged that he was fleeing and broke his back, it should not be considered as an unequivocal proof  that his mental problems were caused by that back injury, because in this report, the doctor does not indicate that that the condition resulted from the attack that caused the back injury, and given also that the report from Karangiro Cell on 21/10/2020 does not mention him as one of the persons who had been affected by the attacks. Therefore, he is not entitled to the damges he is seeking.

- Finding out if all the accused members of the terrorist organisation MRCD-FLN must pay damages.

626. The civil parties state that all the accused must jointly pay all the damages they have applied for, that is, damages, compensation for damaged property, and other kinds of compensation to be paid by the accused, because all of them have been involved in the acts of terrorism committed by MRCD-FLN which carried out attacks that killed their loved ones, injured them and damaged their property.

627. Most of the accused say that they should not be asked to pay the damages applied for because they did not participate in those attacks which caused damages to the civil parties, because, the simple fact of beimg a member of the armed group FLN does not constitute the reason why they should be asked to pay those damages, instead, the civil parties should sue the group FLN and FLN commanders or the combatants who took part in the attacks.

628. The accused who were involved in the attacks that took place in Rusizi District say that they cannot be liable for damages resulting from the attacks in Nyaruguru and Nyamagabe Districts because they did not participate in them; that, at the time of those attacks, they had not yet started working with the FLN armed group; NSANZUBUKIRE Félicien and MUNYANEZA Anastase, on their part assert that they cannot be liable for damages caused by attacks that were carried out by a group they did not belong to; that those attacks occured when they had already been arrested .

- The view of the Court

629. Article 11 of law no027/2019 of 19/09/2019 relating to criminal procedure provides that civil action can be instituted against the principal offender, co-offender, accomplice and any other person with civil liability. A civil action can also be instituted against the offender's heirs.

630. The Court finds that, for the offender to be liable for damages, the offence committed must have caused injury to the victim. It finds that the governing principle in the legislation relating to the payment of damages states that every act by a person that causes damage to another person, compels the offender to pay for indemnisation. This principle is found in different countries' legislations[52] and in documents by legal experts[53].

631. To interpret this principle, the Court finds that there must be an act that caused damage to another person, the damage caused and the relation between two. To determine compensation, some people consider all cause which is in relation with the act that caused the injury[54], others consider only the last cause that contributed to the act that caused the injury[55], while others consider the principal cause that contributed to the act that caused the injury to another person [56] or the cause that is considered as the act that caused the injury or damage[57]. The Court finds also that in awarding

---

[52]See article 1240 of the French Civil Code which provides that any human act which causes damage to others obliges the person through whose fault it occured to repair it.

[53]"(…), the doctrine proves to be ingenious so as to legitimize as effectively as possible the principle of full compensation for damage. Also, the right to compensation of the victim of bodily injury would find its justification in the right to life and to physical integrity enshrined in the various declarations of fundamental rights, in particular the Declaration of the Rights of Man and of the Citizen, the Universal Declaration of Human Rights or the European Convention on Human Rights.
Some authors consider the right to physical integrity as a personality right which could be linked to the principle of the dignity of the human person. ", Marie Denimal. La réparation intégrale du préjudice corporel: réalités et perspectives. Droit. Université du Droit et de la Santé - Lille II, 2016. Français. p.17.

[54]According to the theory of the equivalence of conditions, all the facts which contributed to the production of the damage must be considered, in equal manner, as the legal causes of the damage, without there being any need to distinguish them, nor to prioritize. It is based on the idea that if one of the facts that gave rise to the injury had not occurred, the damage would not have occurred. Also, this justifies that all the facts which were necessary for the production of the damage are placed on an equal footing. ", https://aurelienbamde.com/2016/09/25/theorie-de-lequivalence-des-conditions-et-theorie-de-la-causalite-adequate/, consulté le 15/09/2021.

[55]« According to the causa proxima theory, only the closest cause in time to the damage must be admitted. » Christophe Quézel-Ambrunaz. Définition de la causalité en droit français: la Causalité dans le droit de la responsabilité civile européenne. La causalité dans le droit de la responsabilité civile européenne, Groupe de recherche européen sur la responsabilité civile et l'assurance (GRERCA), Mar 2010, Genève, Suisse, p.14.

[56]According to the theory of adequate causation, not all the facts which have contributed to the production of the damage are not legal causes. Not all are placed on an equal footing, as everyone has a different degree of involvement in the occurrence of the damage. Also, only the preponderant cause must be retained as the event giving rise to liability. It is, in other words, for the judge to select, among the multitude of causes which are presented to him, the one which played a major role in the realization of the damage,  idem.

[57]The theory of 'the continuous imprint of evil' (*empreinte continue du mal*), developed by Professor Dejean de la Bâtie, is a limiting theory of causality since it supposes the meeting of two elements : not only the defective fact must have played a role in the occurrence of the damage, but it is also its defect that must explain the occurrence of the damage, Aurelie Mure. *L'évolution du préjudice de la victime en droit de la responsabilité civile*. Droit. Université Grenoble Alpes,2019. Français, p. 289.

compensation, the person who commited injury must pay damages that are equivalent to the damage done, as this has been confirmed in judgements rendered in other countries[58] and in Rwanda[59].

632. Considering the explanations above, the Court finds that every cause that contributed to the act that caused another person's injury should be considered in awarding damages. It finds that the fact that the attacks carried out on the Rwandan soil were part of MRCD-FLN's intent to commit terrorism, as this has been explained, and that if that armed group had not existed those acts that affected the civil parties could not have been committed, and that those who committed them did so with the same intent as MRCD-FLN's, the persons convicted for the offence of membership, committing and participating in acts of terrorism are jointly liable for the payment of damages.

633. This principle according to which every cause that contributed to a person's is fundemental and tallies with the verdict rendered by the Court of Cassation in France which says that when all the causes that contributed to an offence are related, they are also considered when awarding damages[60]. However, the Court finds that NSANZUBUKIRE Félicien and MUNYANEZA Anastase should not pay any damages because they were never members of MRCD-FLN.

---

[58]"The peculiarity of civil liability is to restore as exactly as possible the balance destroyed by the damage, and to put the victim back in the situation he would have been in if the damaging act had not occurred", Cass.2 ème Civ.28 octobre 1954, J.C.P.1955,II,8765.

[59]RPA 0323/08/CS of  Sgt GATETE Innocent decided by the High Court on  13/08/2010  and CASE No RPAA 00007/2019/CA decided by the Copurtv of Appeal on 09/07/2020.

[60]Cass. 2e civ., 27 mars 2003 voir aussi Courtellemont, rendu par la Cour d'appel de Paris le 7 juillet 1989.

## II.3 CONCERNING PENALTIES

Penalties requested by the Prosecution

634. The Prosecution requests the Court to confirm that the accused are guilty of the offences they are being prosecuted for. They request that NSABIMANA Callixte alias Sankara should be sentenced to life imprisonment on all the charges against him that constitute a concurrence of offences; however, considering that he pleaded guilty to all the charges, a reduction of the penalty may be considered and he should be sentenced him to twenty-five years (25) of imprisonment. They also request that the Court orders that his forged identification card and passport issued by the Government of Lesotho be confiscated.

635. It also indicates that the offences NSENGIMANA Herman is being charged with constitute a concurrence of offences, that he should receive a maximum sentence for the most serious offence, i.e, twenty years (20) of imprisonment, because he has denied all the charges. It also indicates that the offences that RUSESABAGINA Paul is being charged with constitute a concurrence of offences, that he should be sentenced to the maximum penalty which is provided for the most serious offence, that is, life imprisonment, because he has denied all the charges and the charges against him constitute felony crimes.

636. It also requests that NIZEYIMANA Marcd be sentenced to a life sentence which is provided for the most serious of the offences he is being charged with because they constitute a concurrence of offences and because his admission of the charges against him is incomplete.

637. The Prosecution also indicates that the offences BIZIMANA Cassien, MATAKAMBA Jean Berchmas, BYUKUSENGE Jean Claude, NTIBIRAMIRA Innocent, SHABANI Emmanuel and NSABIMANA Jean Damascène are being charged with constitute a concurrence of offences, that they should receive a maximum sentence provided for

the most serious offence, i.e, twenty-five (25) years of imprisonment. It maintains that BIZIMANA Cassien, MATAKAMBA Jean Berchmas, BYUKUSENGE Jean Claude and SHABANI Emmanuel's penalities should not be reduced because their admissions of guilt were incomplete and the offences they are charged with are felonies ; as for NTIBIRAMIRA Innocent and NSABIMANA Jean Damascène, their penalties can be reduced and be sentenced to twenty-years (20) of imprisonment because they have pleaded guilty to the charges against them, and this was the first time they were being prosecuted. It also requests that NIKUZWE Siméon and NTABANGANYIMA NA Joseph be punished with a twenty-year (20) of imprisonment because their admission of guilt is incomplete.

638. The Prosecution also requests that the Court sentence NSANZUBUKIRE Félicien, MUNYANEZA Anastase, IYAMUREMYE Emmanuel, NSHIMIYIMANA Emmanuel, KWITONDA André, HAKIZIMANA Théogène, NDAGIJIMANA Jean Chrétien and MUKANDUTIYE Angelina to twenty years (10) of imprisonment because they have not admitted, beyond any reasonable doubt, the offences they are being charged with and because they are being charged with felony. It requests that NIYIRORA Marcel be sentenced to a fifiteen-year imprisonment because he has admitted guilt beyond any reasonable doubt.

What the defendants say about penalties requested for them

639. NSABIMANA Callixte alias Sankara says that he has admitted all the charges against him, by explaining the respective roles of his accomplices, that he is also ready to admit responsibility for all the offences committed by FLN if the law demands it. He also says that the offences he was first charged with by the Prosecution have been reclassified and were considered as if he had committed them alone, while he considered that he shared responsibilty with his accomplices.

640. NSENGIMANA Herman says that he cannot understand how twenty years (20) of imprisonment were requested for him despite his explanation on how he became a

member of FLN and also how when he was arrested, he was with more than four hundred other personse (400) who are currently in Mutobo in trainings aimed at preparing them to reintegrate normal life, and yet he was singled out without any reason ; that the Prosecution's claims that his admission of guilt is not complete is not true,  and aim at preventing a reduction of penalty despite pleading guilty to the offences he was charged with, and this constitutes a violation of  his right to due process of law.

641. NIZEYIMANA Marc argues that he wants to be cleared of the eight (8) charges against him because the Prosecution has not provided evidence for their accusation; as for the offence of membership in an irregular armed group, he pleads guilty and expresses regret; and for that reason, his sentence should be reduced to one-year imprisonment, and if the Court finds his request reasonable, it may consider suspension because this is his first time to be prosecuted.

642. BIZIMANA Cassien requests a reduction and suspension of penalties because he has pleaded guilty before all the organs of justice and provided information that was helpful during investigations.

643. MATAKAMBA Jean Berchmas observes that twenty-five-year imprisonment is too much; that he admits responsibility for the charges against him; he, however, requests the Court examine carefully the motive behind his acts, and requests that his sentence be suspended because of the accident that caused him mental problems.

644. SHABANI Emmanuel apologizes because he has pleaded guilty and and states that has changed, and requests a reduction and suspension of sentence.

645. NTIBIRAMIRA Innocent observes that the prison sentence is too long; that, since his arrest, he has provided information that was used during the investigation, and if he were to be imprisoned, he requests that it be near his family if possible.

646. BYUKUSENGE Jean Claude claims that he has pleaded guilty to all the charges, he apologises and expresses regret, and he requests that his sentence of 25 years of imprisonment be reduced.

647. NIKUZWE Siméon requests a reduction and suspension of the sentence because he admits responsibility; moreover, he has provided information that was used during the investigation.

648. NTABANGANYIMANA Joseph requests to be cleared of the charges against him and be released because he did not commit the crime he has been charged with of membership in an irregular armed group; that, even the Prosecution could not prove it.

649. NSANZUBUKIRE Félicien requests that through the reinsertion programme he be helped to resume normal life; but if this is not possible; to consider a reduction of the sentence by considering the time he has already spent in jail because he was arrested on 09/02/2017.

650. MUNYANEZA Anastase argues that he should not be sentenced to twenty years (20) in prison; that instead they should help him reintegrate civilian life; however, should the Court deem it otherwise, they should consider his admission of guilt and reduce the sentence; they should also take into consideration the time of his arrest.

651. IYAMUREMYE Emmanuel also argues that instead of requesting a prison sentence for him, he should be taken to Mutobo Transit Centre and join his superiours in tranings; however, should the Court deemit it necessary to impose a sentence, the penalties should be suspended.

652. NIYIRORA Marcel requests that he should not receive the sentence that the Prosecution has proposed; instead, they should help him resume civilian life and be taught national history like other people.

653. NSHIMIYIMANA Emmanuel argues that he should not be held accountable for the charges againt him because he was forced to commit those acts; that instead of sanctions, he should be taught national history and be treated like his former companions in the Congo forests who are receiving trainings that will help them to resume the normal life.

654. KWITONDA André argues that he shoud not be sentenced for the crimes he is being accused of because there are also his companions who committed the same offences but who have not been prosecuted, and that the reason why he continued to be in those groups was because they were told that whoever returns to Rwanda is put in jail.

655. HAKIZIMANA Théogène observes that he should not be sentenced because he joined FDLR and CNRD under duress, that he should be offered the opportunity to be trained and resume normal life; just like his superiours who are receiving trainings in Mutobo.

656. NDAGIJIMANA Jean Chrétien argues that he should not receive a twenty-year (20) prison sentence as proposed by the Prosecution because he was born into the group he is being accused of belonging to; he had no other alternatives; that instead, he should be offered the opportunity to return to normal life; that he is even ready to sensitise the youth who are still in the Congo forests to return home.

657. MUKANDUTIYE Angelina requests that they should consider her age and be offered the opportunity to reintegrate normal life so that she may prove that she has changed; or else, the Court should consider her cooperation with justice as mitigating circumstance.

658. NSABIMANA Jean Damascène asks for a penalty reduction because he has pleaded guilty to his offence and has understood its gravity; he also requests a suspension of the sentence. He also requests that if he is to be sentenced to imprisonment, he would request a prison term near his family like in Rusizi prison.

659. RUSESABAGINA Paul did not appear in court to comment on the sentence proposed by the Prosecution.

The view of the court

1. Concerning NSABIMANA Callixte alias Sankara

660. The Court finds that, as this has been explained, NSABIMANA Callixte alias Sankara is found guilty of membership in a terrorist organisation, committing and participating in acts of terrorism and genocide denial and revisionism; he is also found guilty of fraudulent acquisition, counterfeit and use of counterfeit documents and papers issued by competent authorities.

661. The Court finds however that he cannot be convicted for the formation of an irregular armed group, maintaining relations with a foreign government with intent to wage war, donating, receing or inciting to receive proceeds of terrorism for political interests, conspiracy and incitement to commit acts of rerrorism and spreading false information or harmful propaganda with intent to cause a hostile international opinion against the Rwandan Government; as for the other acts of terrorism committed during the attacks he is being charged with, it has been found that they constitute the offence of committing and participating in acts of terrorism.

662. Pursuant to the provisions of article 61 paragraph 2o of section 3 of law no68/2018 of 30/08/2018 determining offences and penalties in general, the Court finds NSABIMANA Callixte guilty of the offences of membership in a terrorist organization and of committing and participating in terrorist acts as provided by article 18 and 19

of law nº 46/2018 of 13/08/2018 relating to couter terrorism and  that they constitute a concurrence of offences because they were committed with intent to commit terrorism

663. It also finds that these offences constitute a real concurrence with offences of genocide denial and revisionism as provided under article 5 and 6 of law nº 59/2018 of 22/8/2018 on the crime of genocide ideology and related crimes and the offence of fraudulent acquisition or counterfeit and use of counterfeit documents and papers issued by the competent authority as provided under article 277 of law no 68/2018 of 30/08/2018 determining offences and penalties in general.

664. Pursuant also to the provisions of article 62 of the same law, paragraph 2 which provides that, if there is real concurrence of offences, the most severe penalty shall be the one whose maximum range is the highest; and in paragraph 3 of the same article which provides that, in case of real concurrence of offences, the judge imposes penalties for each offence and combines them; the combination of penalties of fixed-term imprisonment cannot be more than twice the maximum of the most severe penalty;

The Court finds that NSABIMANA Callixte alias Sankara should be sentenced to a term of imprisonment of twenty-five (25) years because this is the penalty for a serious offence to which should be added other penalties for other offences for which he has been convicted; however, since the offence of committing and participating in acts of terrorism has caused death, as provided under 37 of law nº 46/2018 of 13/08/2018, the Court finds that he should be sentenced to a term of life imprisonment because it is the most severe penalty because, when there is a real concurrence of offences, the penalty of life imprisonment outweighs other penalties of imprisonment[61].

---

[61]Article 62 section 3, paragraph 1o of law no 68/2018 of 30/08/2018 relating to offences and penalties in general provides that:

"In case of real concurrence of offences, the penalty of life imprisonment outweighs other penalties of imprisonment".

665. The Court finds that, even if NSABIMANA Callixte alias Sankara has committed acts that resulted in death, the fact that he has pleaded guilty to all the charges, since the investigation until the case hearing on merits and cooperated with justice organs by providing information that helped during the investigation; and that this was his first time to be prosecuted, his sentence can be reduced due to all those mitigating circumstances.

666. The Court finds that when there are mitigating circumstances, article 60 section 1, paragraph 1o of law no 68/2018 of 30/08/2018 relating to offences and penalties in general as amended to date, provides that, subject to the provisions of article 92 and 133 of this law, the penalty of life imprisonment can be reduced but not below twenty-five (25) years.

667. The Court also finds that there are other cases where the judge could reduce the penalty and go below the penalty provided by the law when there are mitigating circumstances. Among them, there is CASE No RS/INCOST/SPEC/00003/2019/SC that was rendered by the Supreme Court on 04/12/2019 when they confirmed that article 133 of law no 68/2018 of 30/08/2018 aforementioned contradicts the Constitution of the Republic of Rwanda because it is provided that the sentence of life imprisonment cannot be reduced even when there is a mitigating circumstance.

668. During that case, the Supreme Court has found that reducing the sentence contradicts the mentioned article 49 of law no 68/2018 of 30/08/2018 according to which the judge determines a penalty according to the gravity, consequences of, and the motive for committing the offence, the offender's prior record and personal situation and the circumstances surrounding the commission of the offence. The Court finds that the Supreme Court has shown that if the judge does not reduce the sentence, his competence is limitited to only declaring that the person has been found guilty but he/she has no power over the factors that have to be taken into account to

determine a penalty. The Supreme Court has also shown that to prevent a judge from taking into account mitigating circumstamces when they are available so that he/she may reduce the sentence, contradicts the principle according to which every person has the right to due process of law as regards the penalties[62].

669. The Court finds that, apart from the judgement that was pronounced by the Supreme Court, there is also another case pronounced by the Court of Appeal that confirmed that long-term sentences could be reduced to be less than the minimum sentence provided for the offence committed, when there are mitigating circumstances, because they have found that article 60 section 1, paragraph 2 aforementioned which prevents the court from imposing less than the minimum sentence provided for the offence when there are mitigating circumustances, should not be applied because it contradicts the principles of due process of the law and the independence of the judge[63].

670. The Court finds that the purpose of the penalty should not be viewed only through the gravity of the offence committed; it should also consider the interests of the population including the victim, that there is no recidivism, or that the same offence may not be committed by someone else, and the defendant's interests due to the specific nature of every case; and thus, may reduce the sentence of the accused if it is found that confirming the sentence prescribed by the law or imposed by a lower court is not in the best interest of justice, as it was explained by the Court of Appeal during NZAFASHWANIMANA Jean de Dieu's case abovementioned,  with reference to the court decisions during the case of State v, Homarede 1999 (2) SACR 319 (w)[64], and

---

[62]RS/INCONST/SPEC 00003/2019/SC KABASINGA Florida c/ Leta y'u Rwanda rwaciwe kuwa 04/12/2019

[63]RPAA 00032/2019/CA MP C/ NZAFASHWANIMANA Jean de Dieu rwaciwe n'Urukiko rw'Ubujurire kuwa 28/02/2020.

[64] "… The correct approach in excercising the discretion conferred upon the Court is the following : (1) the starting point is that a prescribed sentence must be imposed; (2) Only if the Court is satisfied that substantial and compelling circumstances exist, which justify the imposition of a lesser senstence may it do so; (3) Deciding whether substantial and compelling circumstances exist, each case must be decided on its own facts and the Court is required to look at all factors and consider them cumulatively; (4) If the Court concludes in a particular case that a minimum prescribed

also referred to during the case of Lt. MUTABAZI Joël and his companions[65]. This aspect which takes into account the purpose of the penalty has also been brought up by the Supreme Court during BAHIRWE Geoffrey's case where it was indicated that the judge must consider first the penalty provided by law, if he finds that there are factors that can contribute to its reduction, he/she will do it taking into consideration the specific nature of every case, with a view to impose a fair penalty[66].

671. Pursuant to the provisions of article 60 section 1o of law no 68/2018 of 30/08/2018 aforementioned, and to the explanations that has been provided during those cases, the Court finds that NSABIMANA Callixte alias Sankara should be sentenced to twenty years (20) of imprisonment (20) due to the mitigating circumstances aforementioned.

672. The Court, pursuant to the provisions of article 37 of the same law[67], finds that the items that are mentioned in the recorded writings of seizure on 13/04/219, namely, the identification card, a passport that were issued by the Government of Lesotho and telephones that were found with NSABIMANA Callixte alias Sankara at the moment of his arrest, should be confiscated

---

sentence is so disproportionate to the sentence is so disproportionate to the sentence which would have been appropriate, it is entitled to impose a lesser sentence", State v.Homareda 1999 (2) SACR 319 (W).

[65]RPA 00012/2019/CA MP C/ Lt MUTABAZI Joël na bagenzi rwaciwe n'Urukiko rw'Ubujurire ku wa 21/11/2019, igika cya 22.

[66]RS/REV/INJUST/PEN 0001/17/CS-RP 0001/2017/SC BAHIRWE Geoffrey C/ MUKAGATOYA Marie rwaciwe n'Urukiko rw'Ikirenga kuwa 13/04/2017, igika cya 41.

[67]Article 37 of law no 68/2018 of 30/08/2018 relating to offences and penalties in general provides that : "In case a felony or a misdemeanour is committed, confiscation of items regarded as forming the corpus delicti, those used or intended for use in the commission of the offence, or those regarded as the proceeds from the commission of the offence is imposed as an accessory penalty in addition to the principal penalty if such items belong to the convict. If such items do not belong to the convict or if the offence committed is a petty offence, the confiscation is ordered only in cases specified by the law.".

### 2.  Concerning RUSESABAGINA Paul

673. Pursuant to article 18 and 19 of law on counter terrorism, the Court finds RUSESABAGINA Paul, as it has been explained, guilty of membership in a terrorist organization and committing and participating in acts of terrorism, but not guilty of the crime of forming an irregular armed group; as for other terrorist acts which were committed during the attacks and his support of terrorism, as this has been explained, they constitute the offence of committing and participating in acts of terrorism.

674. Pursuant to the provisions of article 61 paragraph 2o section 3 of law no68/2018 of 30/08/2018 determining offences and penalties in general, the Court finds RUSESABAGINA guilty of both membership in a terrorist organization and committing and participating in acts of terrorism, as provided under articles 18 and 19 of law nº 46/2018 of 13/08/2018 on counter terrorism, and that they constitute an ideal concurrence of offences, because they were committed with the same intent of committing terrorism. It finds that, in consideration of the fact that the offence of committing and participating in acts of terrorism has caused death, he should be sentenced to life imprisonment, as provided under article 37 of law nº 46/2018 of 13/08/2018 above mentioned,

675. The Court, considering the manner in which the crimes RUSESABAGINA Paul is found guilty of were committed, and also how during the investigation and the case hearing on  detention and provisional release he admitted having committed some offences and explained how they were committed and even expressed apologies, and since this is the first time he is being prosecuted, his sentence should be reduced to a term of imprisonment of 25 years, in accordance with article 60 of law no 68/2018 of 30/08/2018 determining offences and penalties in general which provides for penalty reduction when there are mitigating circumstances; the Court finds that, even if the Court could impose an imprisonment of less than twenty-five years (25), as this has been explained, the fact that RUSESABAGINA Paul did not appear in

court during the hearings so that the Court could ascertain whether he continues to plead guilty to the charges against him, the Court cannot impose a lesser sentence.

### 3.  Concerning NIZEYIMANA Marc

676. The Court finds that, as this has been explained after examination of the charges against him, NIZEYIMANA Marc is guilty of membership in a terrorist organization and participating in acts of terrorism; however, he is not guilty of forming an irregular armed group, nor of having relations with a foreign State with intent to wage war; as for the other acts of terrorism he is being charged with and which were committed during the attacks as this has been explained, they constitute offences of committing and participating in acts of terrorism.

677. Pursuant to the provisions of article 61 paragraph 2o section 3 of law no 68/2018 of 30/08/2018 determining offences and penalties in general,  the Court finds that the offences of membership in a terrorist organization and committing and participating in acts of terrorism as provided under article 18 and 19 of law nº 46/2018 of 13/08/2018 on counter terrorism that NIZEYIMANA Marc has been found guilty of constitute an ideal concurrence of offences because they were committed with intent to commit terrorism. Considering that the offences of committing and participating in acts of terrorism have caused death, he should be sentenced to life imprisonment, as provided under article 37 of law nº 46/2018 of 13/08/2018 above mentioned

678. The Court, considering the manner in which the crimes NIZEYIMANA Marc is found guilty of were committed, that he pleaded guilty to some charges during the case hearing on merits in CASE No, and during investigation and the case hearing on detention and provisional release, and that this is his first time to be prosecuted, his sentence of life imprisonment should be reduced because among the offences he is charged with one has caused death, and be sentenced to an imprisonment of twenty years (2) in accordance with the provisions of article 60 of law no 68/2018 of 30/08/2018 aforementioned and the court decisions above mentioned.

4.  Concerning BIZIMANA Cassien, MATAKAMBA Jean Berchimas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène.

679. The Court finds BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude na NSABIMANA Jean Damascène guilty of membership in a terrorist organisation, committing and participating in acts of terrorism, and of illegal use of explosive devices in public places ; it finds also BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel and NTIBIRAMIRA Innocent guilty of conspiracy and incitement to commit terrorism, as this has been previously mentioned, and all these offences constitute an ideal concurrence of offences because they were committed with intent to commit terrorism.

680. The Court finds that, as it has been demonstrated, the other acts of terrorism they are being charged with and were committed during the attacks include attempt to commit murder and deliberate arson against another person's house and means of transport, constitute an offence of committing and participating in acts of terrorism. BIZIMANA Cassien is not found guilty of the formation of an irregular armed group.

681. The Court finds however that, even if they pleaded guilty to the charges they are being prosecuted for; considering the manner in which the attacks were carried out at various places in Rusizi District; how they transported weapons across Rusizi into Rwanda, kept them and their ties with FLN leadership, and how those raids injured people and damaged property, BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène must be sentenced for the most serious offences among the offences they have been found guilty of; and every one will be sentenced to twenty years (20) of imprisonment.

5.  Concerning NIKUZWE Siméon

682. The Court finds NIKUZWE Siméon guilty of membership in a terrorist organization, an offence provided for under article 18 of law nᵒ 46/2018 of 13/08/2018 aforementioned, which states that belonging to a terrorist organization is punishable by fifteen years (15) up to twenty (20) of imprisonment. The Court finds that he also should have 15-year sentence of imprisonment but, considering the manner in which the offence he is being charged with was committed, and also that the acts he commited have not had any serious consequences, because he did not participate in any attacks and even the grenade he kept had not been used yet until the time of his arrest, and that he admitted to some of the chrges during investigation, and that this is the first time he is being prosecuted, his sencentence must be reduced in accordance with the provisions of article 60 of the law determining offences and penalties in general and the court decisions by the Supreme Court and the Court of Appeal on cases aforementioned, and sentences him to ten years (10) of imprisonment

6.  Concerning NSANZUBUKIRE Félicien, MUNYANEZA Anastase and
HAKIZIMANA Théogène

683. The Court finds that, as this has been explained, pursuant to the provisions of article 503 of Organic Law No 01/2012/OL of 02/05/2012 instituting the Penal Code in force when NSANZUBUKIRE Félicien, MUNYANEZA Anastase and HAKIZIMANA Théogène were committing the acts they are being charged with, which stated that belonging to a terrorist organization incurs a penalty of imprisonment from fifteen years (15) to twenty (20) years, they are found guilty of membership in a terrorist organization but not of the formation of an irregular armed group that was provided for under article 459 of the same law.

684. The Court, considering the manner in which the offences NSANZUBUKIRE Félicien, MUNYANEZA Anastase and HAKIZIMANA Théogène are found guilty of were committed, considering also that they made some admissions during the hearing on merits and on dentention and provisional release, and considering that this was the first time they were prosecuted; they should have their sentence reduced and each one be sentenced to five years of imprisonment in accordance with articles 77 and 78 paragraph 2 of Organic Law No 01/2012/OL of  02/05/2012 aforementioned because the Court finds that it is that article which provides for the minimum penalty.

### 7. Concerning NSENGIMANA Herman, IYAMUREMYE Emmanuel, NIYIRORA Marcel, KWITONDA André and MUKANDUTIYE Angelina

685. The Court finds, as this has been explained, NSENGIMANA Herman, IYAMUREMYE Emmanuel, NIYIRORA Marcel, KWITONDA André and MUKANDUTIYE Angelina guilty of membership in a terrorist organisation. Ut finds that they should be sentenced to fifteen (15) years of imprisonment but, considering that they have pleaded guilty and assisted the justice organs and that it is their first time to to be prosecuted; they should have their sentence reduced in accordance with the provisions under article 60 of the law relating to offences and penalties in general, and the court decisions aforementioned that were rendered by the Supreme Court and the Court of Appeal, and each one be sentenced to five years (5) of imprisonment. It finds however NSENGIMANA Herman, IYAMUREMYE Emmanuel, NIYIRORA Marcel and KWITONDA André, not guilty of the formation of an irregular armed group.

### 8. Concerning NTABANGANYIMANA Joseph

686. The Court finds, as this has been explained, NTABANGANYIMANA  Joseph guilty of membership in a terrorist organisation, and thus should be sentenced to fifteen years (15) years of imprisonment but, considering his role which was limited only to looking for a boat and a dock, that he did not participate in the attacks and that it was his first

time to be prosecuted, his sentence should be reduced to three years of imprisonment, in accordance with article 60 of law relating to offences and penalties in general and the court decisions during the cases aforementioned by the Supreme Court and the Court of Appeal .

9. Concerning NSHIMIYIMANA Emmanuel and NDAGIJIMANA Jean Chrétien

687. The Court finds NSHIMIYIMANA Emmanuel and NDAGIJIMANA Jean Chrétien guilty of membership in a terrorist organisation, and they should be sentenced to fifteen years (15) of imprisonment ; however, considering the way they joined the armed groups they are accused of belonging to, and their age-NSHIMIYIMANA Emmanuel was still in secondary school while NDAGIJIMANA Jean Chrétien joined it because his father was one of the leaders of MRCD-FLN, the fact that they pleaded guilty to belonging to those groups, assisted justice by providing information, and also that it is their first time to be prosecuted, their sentence must be reduced in accordance with the provisions of article 60 relating to offences and penalties in general and the court decisions aforementioned as rendered by the Supreme Court and the Court of Appeal, and be sentenced to three (3) years of imprisonment. It finds them, as this has been explained, not guilty of the formation of an irregular armed group.

688. The Court finds that, considering the manner in which the offences they are charged with were committed, that they have no known residence, and the gravity of the terrorist offences they have been found guilty of, the request for a sentence suspension by the following defendants: NIZEYIMANA Marc, BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, IYAMUREMYE Emmanuel and NSABIMANA Jean Damascène cannot be granted.

**III.THE COURT'S DECISION**

The Court,

689. Decides that NSABIMANA Callixte alias Sankara be found guilty of: membership in a terrorist organization, committing and participating in acts of terrorism, genocide denial, genocide minimization and fraudulent acquisition or counterfeit and use of counterfeit documents and papers issued by the competent authority.

690. Decides that he is not guilty of: the formation of an irregular armed group, having relations with a foreign government with intent to wage war, donating, receing or inciting to receive proceeds of terrorism for political interests, conspiracy and incitement to commit acts of rerrorism and spreading false information or harmful propaganda with intent to cause a hostile international opinion against Rwandan Government,

691. Sentences NSABIMANA Callixte alias Sankara to twenty years (20) of imprisonment.

692. Orders that the identity card, the passport, and the telephones NSABIMANA Callixte alias Sankara was found with be confiscated.

693. Decides that RUSESABAGINA Paul be found guilty of membership in a terrorist organization and committing and participating in acts of terrorism, but not guilty of the formation of an irregular armed group.

694. Sentences RUSESABAGINA Paul to twenty-five years (25) of imprisonment (25).

695. Decides that NIZEYIMANA Marc be found guilt of membership in a terrorist organization and of committing and participating in acts of terrorism; that, however, he is not guilty of the formation of an irregular armed group and entertaining relations with a foreign Government with intent to wage a war.

696. Sentences NIZEYIMANA Marc to twenty (20) years in prison

697. Decides that BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène be found guilty of membership in a terrorist organization, committing and participating in terrorist acts; illegal use of an explosive device in a public place and conspiracy and incitement to commit terrorism.

698. Decides that BIZIMANA Cassien is not guilty of the formation of an irregular armed group.

699. Sentences BIZIMANA Cassien, MATAKAMBA Jean Berchmas, SHABANI Emmanuel, NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and NSABIMANA Jean Damascène to twenty (20) years of imprisonment each.

700. Dicides that NIKUZWE Siméon be found guilty of membership in a terrorist organisation.

701. Sentences NIKUZWE Siméon to ten (10) years of imprisonment.

702. Decides that NSANZUBUKIRE Félicien, MUNYANEZA Anastase and HAKIZIMAN Théogène be found guilty of membership in a terrorist coalition but not guilty of the formation of an irregular armed group.

703. Sentences NSANZUBUKIRE Félicien, MUNYANEZA Anastase and HAKIZIMANA Théogène to five years of imprisonment each.

704. Decides that NTABANGANYIMANA Joseph, NSENGIMANA Herman, IYAMUREMYE Emmanuel, NIYIRORA Marcel, KWITONDA André, NSHIMIYIMA NA

Emmanuel, NDAGIJIMANA Jean Chrétien and MUKANDUTIYE Angelina be found guilty of membership in a terrorist organisation.

705. Decides that NSENGIMANA Herman, IYAMUREMYE Emmanuel, NIYIRORA Marcel, KWITONDA André, NSHIMIYIMANA Emmanuel and NDAGIJIMANA Jean Chrétien are not guilty of the formation of an irregular armed group.

706. Sentences NSENGIMANA Herman, IYAMUREMYE Emmanuel, NIYIRORA Marcel, KWITONDA André and MUKANDUTIYE Angelina to five (5) years of imprisonment each.

707. Sentences NTABAGANYIMANA Joseph NSHIMIYIMANA Emmanuel and NDAGIJIMANA Jean Chrétien to three (3) years of imprisonment each.

708. Orders that all the accused, except NSANZUBUKIRE Félicien and MUNYANEZA Anastase jointly pay damages to NSENGIYUMVA Vincent twenty-one million, five hundred thousand (21.500.000 Frw), HAVUGIMANA Jean Marie Vianney six hundred thousand (600.000 Frw), BAPFAKURERA Vénuste six hundred thousand (600.000 Frw), RUGERINYANGE Dominique and NTABARESHYA Dative five million each one (5.000.000 Frw), HABYARIMANA Jean Marie Vianney three hundred thousand (300.000 Frw), INGABIRE Marie Chantal ten million (10.000.000 Frw), SHUMBUSHA Damascène three hundred thousand (300.000 Frw), NSABIMANA Anastase three hundred thousand (300.000 Frw), MUKASHYAKA Joséphine ten million (10.000.000 Frw), SIBORUREMA Vénuste three hundred thousand (300.000 Frw), NGENDAKUMANA David three hundred thousand (300.000 Frw).

709. Orders them also to joinly pay NDUTIYE Yussuf seven million in damages (7.000.000 Frw), OMEGA Express Ltd one hundred sixty-four million, seven hundred thousand (164.700.000 Frw), ALPHA Express Company Ltd eighty million one hundred thousand (80.100.000 Frw), RUDAHUNGA Ladislas seven million, six hundred and ninety thousand, two hundred (7.690.200 Frw), KIRENGA Darius, UMURIZA Adeline,

SHUMBUSHO David na RUDAHUNGA Dieudonné represented by RUDAHUNGA Ladislas two million each  (2.000.000 Frw), KAREGESA Phénias five million  five hundred thousand (5.500.000 Frw),NYIRAYUMVE Eliane ten million five hundred thousand (10.500.000 Frw), NGIRABABYEYI Désiré two million five hundred (2.500.000 Frw), HABIMANA Zerothe two million five hundred thousand (2.500.000 Frw), NIYONTEGEREJE Azele two million (2.000.000 Frw), KAYITESI Alice two million (2.000.000 Frw), NYIRANDIBWAMI Mariane five million (5.000.000 Frw), UWAMBAJE Françoise ten million (10.000.00 Fr), MUKABAHIZI Hilarie's  five children represented by MBONIGABA Richard whose names are : MUKESHIMANA Diane, NDIKUMANA Isaac, MUKANKUNDIYE Alphonsine, UZAYISENGA Liliane na HABAKUBAHO Adeline five million each (5.000.000 Fw), MUKABAHIZI Hilarie's seven sibling, namely :MBONIGABA Richard, VUGABAGABO Jean Marie Vianey, MURENGERANTWALI Donat, HAKIZIMANA Denis, RWAMIHIGO Alexis, NYIRANGABIRE Valerie na SEMIGABO Déo two million each (2.000.000 Frw).

710. Orders that they jointly pay NKURUNZIZA Jean Népomuscène three million (3.000.000 Frw), NSABIMANA Joseph three million (3.000.000 Frw), RUTAYISIRE Félix four million (4.000.000 Frw), MAHORO Jean Damascène five million (5.000.000 Frw), NZEYIMANA Paulin two million (2.000.000 Frw).

711. Decides that no damages will be paid to the following persons who had applied for them because of the attacks that took place in Nyungwe forest in Kitabi Sector : YAMBABARIYE Védaste, NYAMINANI Daniel, MUGISHA GASHUMBA Yves, BWIMBA Vianney, NTIBAZIYAREMYE Samuel; the following people from Nyabimata Sector : HABIMANA Viateur, NGIRUWONSANGA Venuste, BENINKA Marceline, NYIRAMINANI Mélanie, NYIRAHORA Godelive, RUHIGISHA Emmanuel, MUYENTWALI Cassien, BANGAYANDUSHA Jean Marie Vianney, NSABIMANA Straton, SEBAGEMA Simon, BARAYANDEMA Viateur, KARERANGABO Antoine, NYIRAGEMA Joséphine, NSAGUYE Jean, NYIRAZIBERA Dative, NDIKUMANA Viateur, NDIKUMANA Callixte, NYIRASHYIRAKERA Théophila, KANGABE

Christine, NANGWAHAFI Callixte, NYIRAHABIMANA Vestine, NYIRAMANA Bellancille and HABYARIMANA Damascène.

712. Decides that no damages will be paid to the following people from Ruheru Sector : MANARIYO Théogène, GASHONGORE Samuel, NZABIRINDA Viateur, NIYOMUGABA, NDAYISENGA Edouard, BIGIRIMANA Fanuel, BARAGAMBA, RUTIHUNZA Enos, BARIRWANDA Innocent, NSABIYAREMYE Pascal, HABIMANA Innocent, SEBARINDA Emmanuel, NZAJYIBWAMI Yoramu, NKUNDIZERA Damascène, HABAKURAMA Gratien na HARERIMANA Emmanuel, as well as the following people from Kivu Sector : NGAYABERURA Emmanuel, DUSENGIMANA Solange, KANYANDEKWE Vénant, NYIRAMYASIRO Verediana, HAGENIMANA Patrice, NSANGIYEZE Emmanuel and NYIRAKOMEZA Claudine, even GAKWAYA Gérard from Nyakarenzo Sector.

713. Decides that the accused are exempted from paying the court fees because they appeared in court from detention.

714. Decides that vulnerable people from the civil party are exempted from paying court fees

715. Reminds that appeal application is done within thirty days (30) starting from the day the judgement is pronounced.

**THUS DECIDED AND PRONOUNCED IN PUBLIC ON 20/09/2021.**

| **Sé** | **Sé** | **Sé** |
|---|---|---|
| **NDAGIJIMANA Eugène** | **MUHIMA Antoine** | **MUKAMURENZI Béatrice** |
| Judge | Presiding Judge | Judge |

**Sé**

**NYAMUTAMA Hypax**

Court Clerk