Exhibit A



**REPUBLIC OF RWANDA**
**NATIONAL PUBLIC PROSECUTION AUTHORITY**
**ORGANE NATIONAL DE POURSUITE JUDICIAIRE**
**UBUSHINJACYAHA BUKURU**
**P.O. Box 1328 KIGALI-RWANDA**



**E-mail: info@nppa.gov.rw**          **Web site: www.nppa.gov.rw**

# INDICTMENT FILE: *NYUNGWE CASE*

> *The total number of suspects in this case is 21. This translated indictment concerns 18 suspects, including Paul Rusesabagina. After filing this case, the court, at the request of the prosecution, joined it to other two related cases of two FLN spokespersons (Nsabimana Callixte and Herman Nsengimana), which were in process in court. The prosecution later submitted to court another related case of Nsabimana Jean Damascène alias Motard, another wanted FLN member involved in the FLN attacks and who was arrested after other suspects. Note that the original version of this indictment is in Kinyarwanda.*

# Table of contents

I. THE DEFENDANTS' IDENTIFICATION ..................................................................6

II. CHARGES AGAINST THE DEFENDANTS AND THE LEGISLATION PROVIDED .........10

  2.1. Concerning RUSESABAGINA Paul ...............................................................10

  2.2 Concerning NIZEYIMANA Marc .................................................................11

  2.3. Concerning BIZIMANA Cassien, alias BIZIMANA Patience, alias Passy, alias Selemani ....................................................................................................11

  2.4. Concerning MATAKAMBA Jean Berchmans ...................................................12

  2.5. Concerning SHABANI Emmanuel ................................................................12

  2.6. Concerning NTIBIRAMIRA Innocent ...........................................................13

  2.7. Concerning BYUKUSENGE Jean Claude .......................................................13

  2.8. Concerning NIKUZE Siméon.....................................................................13

  2.9. Concerning NTABANGANYIMANA Joseph alias Combe Barume Matata ...................13

  2.10. Concerning NSANZUBUKIRE Félicien alias IRAKIZA Fred...............................14

  2.11. Concerning MUNYANEZA Anastase alias RUKUNDO Job KURAMBA....................14

  2.12. Concerning IYAMUREMYE Emmanuel alias Engambe IYAMUSIMBA ...................14

  2.13. Concerning NIYIRORA Marcel alias BAMA Nicholas.......................................14

  2.14. Concerning NSHIMIYIMANA Emmanuel......................................................14

  2.15. Concerning KWITONDA André .................................................................15

  2.16. Concerning HAKIZIMANA Théogène...........................................................15

  2.17.Concerning NDAGIJIMANA Jean Chrétien ....................................................15

  2.18. Concerning MUKANDUTIYE Angelina .........................................................15

II. HOW OFFENCES WERE COMMITTED ..............................................................15

  3.1 Introduction ........................................................................................15

    **3.1.1. Definition of terrorism and of terrorist group** ............................................16

    **3.1.2. FDLR – FOCA as a terrorist organization**..................................................24

    **3.1.3. MRCD – FLN as a terrorist organization** ..................................................29

  3.2 Procedural matters................................................................................39

  3.3 Brief overview of how the crimes were committed ..........................................41

IV. CHARGES AGAINST THE DEFENDANTS AND SUPPORTING EVIDENCE.................45

  4.1 Concerning RUSESABAGINA Paul .............................................................45

    **4.1.1 Formation of an illegal armed group** ......................................................45

**4.1.2. Membership of a terrorist group** ......................................................49

**4.1.3 Financing terrorism** ................................................................53

**4.1.4. Murder as an act of terrorism** ................................................73

**4.1.5 Abduction as an act of terrorism** ...........................................83

**4.1.6 Armed robbery as an act of terrorism** ...................................86

**4.1.7 Arson as an act of terrorism** .................................................91

**4.1.8. Attempted murder as an act of terrorism** .............................94

**4.1.9. Assault and battery as an act of terrorism** ...........................99

4.2. Concerning NIZEYIMANA Marc ..............................................102

**4.2.1. Membership of an illegal armed group**...............................102

**4.2.2. Membership of a terrorist group** .......................................104

**4.2.3. Maintaining relations with foreign governments 'officials with an intention to support war** ............................................................................105

**4.2.4. Murder as an act of terrorism**............................................107

**4.2.5. Abduction as an act of terrorism** ......................................113

**4.2.6. Armed robbery as an act of terrorism** ...............................116

**4.2.7. Arson as an act of terrorism** .............................................120

**4.2.8. Attempted murder as an act of terrorism** ..........................123

**4.2.9. Assault and battery as an act of terrorism** ........................128

4.3. Concerning BIZIMANA Cassien a.k.a BIZIMANA Patience a.k.a Passy ......................131

**4.3.1. Membership of an illegal armed group**...............................131

**4.3.2. Membership of a terrorist group** .......................................133

**4.3.3. Conspiracy and incitement to commit a terrorist act** ..............................134

**4.3.4. Attempted murder as an act of terrorism** ..........................137

**4.3.5. Arson as an act of terrorism**..............................................141

**4.3.6. Illegal use of an explosive in public place** .........................144

4.4. Concerning MATAKAMBA Jean Berchmans ..............................146

**4.4.1. Conspiracy and incitement to commit a terrorist act** ..............................146

**4.4.2. Attempted murder as an act of terrorism** ..........................148

**4.4.3. Membership of a terrorist group** .......................................153

**4.4.4. Illegal use of an explosive in public place** .........................157

4.5. Concerning SHABANI Emmanuel .............................................159

**4.5.1. Conspiracy and Incitement to commit a terrorist act**..............................159

**4.5.3. Arson as an act of terrorism**..............................................164

**4.5.4. Membership of a terrorist group** ...............................................................167

**4.5.5. Illegal use of an explosive in a public place** ........................................169

4.6. Concerning NTIBIRAMIRA Innocent ..............................................................170

**4.6.1. Membership of a terrorist group** ...............................................................170

**4.6.3. Arson as an act of terrorism**.........................................................................174

**4.6.4. Illegal use of an explosive in a public place** ........................................176

4.7. Concerning BYUKUSENGE Jean Claude .......................................................177

**4.7.1. Membership of a terrorist group** ...............................................................177

**4.7.2. Arson as an act of terrorism**.........................................................................180

**a. Legal provision** .....................................................................................................180

**4.7.3. Attempted murder as an act of terrorism** ................................................182

**4.8. Concerning NIKUZWE Siméon** .......................................................................187

**4.8.1. Membership of terrorist group** ...................................................................187

4.9. Concerning NTABANGANYIMANA Joseph alias Combe Barume Matata ................189

**4.9.1 Membership of a terrorist group** .................................................................189

**4.10. Concerning NSANZUBUKIRE Félicien alias IRAKIZA Fred** ...............192

**4.10.2 Membership of a terrorist organization** ..................................................194

4.11. Concerning MUNYANEZA Anastase alias RUKUNDO Job KURAMBA.................195

**4.11.1 Joining an illegal armed group** ..................................................................195

**4.11.2 Membership of a terrorist organization** ..................................................197

4.12. Concerning IYAMUREMYE Emmanuel alias Engambe Iyamusimba .........................197

**4.12.1. Membership of an illegal armed group** ...................................................197

**4.12.2 Membership of a terrorist group** ...............................................................199

4.13. Concerning NIYIRORA Marcel alias Bama Nicholas ...................................200

**4.13.1 Membership of an irregular armed group** ...............................................200

**4.13.2 Membership of a terrorist group** ...............................................................201

4.14. Concerning NSHIMIYIMANA Emmanuel ...................................................203

**4.14.1 Membership of an illegal armed group** ...................................................203

**4.14.2 Membership of a terrorist group** ...............................................................205

4.15. Concerning KWITONDA André ........................................................................206

**4.15.1 Membership of an illegal armed group** ...................................................206

**4.15.2 Membership of a terrorist group** ...............................................................207

4.16. Concerning HAKIZIMANA Théogène ..........................................................208

**4.16.1. Joining an illegal armed group** ..................................................................208

**4.16.2 Membership of a terrorist organization** ....................................................................210

4.17. Concerning  NDAGIJIMANA Jean-Chrétien .................................................................211

**4.17.1. Membership of an illegal armed group**................................................................211

**4.17.2. Membership of a terrorist group** ........................................................................212

4.18. Concerning  MUKANDUTIYE Angelina .......................................................................213

**4.18.1 Membership of a terrorist group** ..........................................................................213

V. SEIZED ITEMS ............................................................................................................................ 216

VI. WITNESSES ............................................................................................................................... 216

VII. RECOMMENDATION OF THE PROSECUTION ............................................................... 216

VIII. FILE CONTENTS .................................................................................................................... 231

Pursuant to article 142 of the Constitution of the Republic of Rwanda of 2003 as revised in 2015;

Pursuant to article 42 of Law No 30/2018 determining the jurisdiction of courts;

Pursuant to articles 28, 29 and 30 of Law No 014/2018 of 04/04/2018 determining the organization, functioning and jurisdiction of the National Prosecution Authority and of the Military Prosecution Department;

Pursuant to articles 92 and 93 of Law No 027/2019 of 19/09/2019 on criminal case proceedings;

The National Public Prosecution Authority indicts the following persons in the High Court Specialized Chamber for International and Cross-Border Crimes:

## I. THE DEFENDANTS' IDENTIFICATION

1. **RUSESABAGINA Paul:** son of RUPFURE Thomas and NYIRAMPARA Kezia, born on 15/06/1954 in the former NYAKABUNGO cell, NKOMERO sector, MURAMA Commune, GITARAMA Prefecture, which is presently in Ruhango District, Southern Province of Rwanda; currently residing in KRAAINEM, a suburb of Brussels in Belgium. He holds a dual citizenship of both Rwanda and Belgium and is married to MUKANGAMIJE Tatiana; his profession is that of a hotel keeper. He is being prosecuted while in provisional detention.

2. **NIZEYIMANA Marc:** son of MBAVU Elie and MUKAMANZI Marthe, born on 27/2/1972 in former Kibuye Prefecture, Mabanza Commune, Kibirizi Sector, Rubona Cell, who was based in the Democratic Republic of the Congo in South Kivu Province, in Kalehe territory; he is married to UWAMBAJIMANA Donatille with whom they have five children (5). He is being prosecuted while in provisional detention.

3. **BIZIMANA Cassien Alias BIZIMANA Patience Alias Passy Alias Selemani:** son of GASIGWA Donatien and NYIRAHAVUGIMANA Leoncie, born on 18/06/1974

6

in former Cyangugu Prefecture, Gafunzo Commune, Mukoma Sector, who was based in the Democratic Republic of the Congo in South Kivu Province. He is married to MUKAMANA Chantal and is being prosecuted while in provisional detention.

4. **MATAKAMBA Jean Berchmans:** son of BYAKATSI Célestin and MUKANGANIZI Verediyana, born in 1962 in the Western Province in Rusizi District, Mururu Sector, Kagarama Cell, who resides in Kagarama Cell, Mururu Sector, Rusizi District, Western Province. He is married to MUKANDUTIYE Judith with whom they have ten children. He is being prosecuted while in a provisional detention.

5. **SHABANI Emmanuel** son of GASAMIRA Bernard and SIBOMANA Fortunée, born on 1/01/1971 in the former Cyangugu Prefecture, Cyimbogo Commune, Mutongo Sector, Rwimbogo Cell. He currently resides in Mutongo village, Tara Cell, Mururu Sector, Rusizi District, Western Province. He is married to UWIZEYIMANA Aziza. He is being prosecuted while in provisional detention.

6. **NTIBIRAMIRA Innocent:** son of SODA BERIKIMASI and NYIRANDEGE Melaniya, born on 1/01/1971 in the Western Province, Rusizi District, Mururu Sector, Kagarama Cell, currently residing in Kagarama Cell, Mururu Sector, Rusizi District, Western Province; married to NYIRAZANINKA Odette. He is being prosecuted while in provisional detention.

7. **BYUKUSENGE Jean Claude:** son of UWITONZE Abel and NYIRANTEZIRYAYO Séraphine, born in 1985 in the former Cyangugu Prefecture, Kagano Commune, Bushekeri Sector, Mpumbu Cell; currently residing in Karambi village, Mpumbu Cell, Bushikiri Sector, Kagano District, Western Province. He is being prosecuted while in provisional detention.

7

8. **NIKUZWE Siméon:** son of GASAMIRA Bernard and SIBOMANA Fortunée, born in 1981 in the former Cyangugu Prefecture, Kimbogo Commune, Mutongo Sector; currently residing in Gatamba village, Mushaka Cell, Rwimbigo Sector, Rusizi District, Western Province. He is being prosecuted while in provisional detention.

9. **NTABANGANYIMANA Joseph Alias COMBE BARUME MATATA:** son of BALINDA Yohana and NYIRAKAMANA Esperance, born in 1965 in the former Kibuye Prefecture, Gishyita Commune, who was based in the Democratic Republic of the Congo, South Kivu Province, Bukavu locality, married to MULEZI Rebecca with whom they have seven children. He is being prosecuted while in provisional detention.

10. **NSANZUBUKIRE Félicien Alias IRAKIZA Fred:** son of RWAMANYWA Léopold and NYIRARUBIBI Leocadia, born on 1/01/1966 in the former Greater Kigali, Rubungo Commune, Kinyinya Sector, Binunga Cell; married to MUKARWESA Joyce; was living in the Democratic Republic of the Congo. He is being prosecuted while in provisional detention.

11. **MUNYANEZA Anastase alias RUKUNDO JOB KURAMBA:** son of KANYANDEKWE Ladislas and MUKARUBIBI Bellancille, born on 03/02/1969 in the former Gitarama Prefecture, Mugina Commune, Bibungo Sector, Byenene Cell, who was living in the Democratic Republic of the Congo, South Kivu Province in Fizi territory. He is being prosecuted while in provisional detention.

12. **IYAMUREMYE Emmanuel alias IYAMUSUMBA Engambe:** son of SIMBAYOBEWE Paul and NYIRANGARUYE Marie, born on 01/04/1972 in the former Kibuye Prefecture, Kivumu Commune, Kibanda Sector, Mpanga Cell, who was living in the Democratic Republic of the Congo; married to BADUHIRE Jeanne d'Arc. He is being prosecuted while in provisional detention.

13. **NIYIRORA Marcel alias BAMA Nicolas:** son of MWAMBARI André and KABUTUMWA Suzana, born in 1975 in the former Kibuye Prefecture, Gisovu Commune, Kavumu Sector, Gahondo Cell, who was living in the Democratic Republic of the Congo; he is married to NYIRANEZA Jeanne. He is being prosecuted while in provisional detention.

14. **NSHIMIYIMANA Emmanuel:** son of KAGABA Modeste and KABEGA Stéphanie, born on 01⁄01⁄1993 in the Southern Province, Huye District, Rusatira Sector, Gafumbo Cell, Kigarama village who was known to be living in the Democratic Republic of the Congo in South Kivu Province, Karehe territory; he is married to MUJAWAYEZU Chantal with whom they have two children. He is being prosecuted while in provisional detention.

15. **KWITONDA André:** son of MUNYEZOGEYE Ezechias and MUKATABA Marisiyana, born on 01/01/1975 in the former Kibuye Prefecture, Rutsiro Commune, Kagano Sector, Tangabo Cell, who lived in the Democratic Republic of theCongo in North Kivu Province, Goma locality; he is married to MUKESHIMANA Divine. He is being prosecuted while in provisional detention.

16. **HAKIZIMANA Théogène alias MBUZANGWERA Jean Bruno:** son of BIHURARWANGO Ignace and MUKARWEGO Bibiyana, born on 01/01/1971 in the former Gisenyi Prefecture, Satinsyi Commune, who was living in the Democratic Republic of the Congo in South Kivu Province, Uvira territory. He is being prosecuted while in provisional detention.

17. **NDAGIJIMANA Jean Chrétien:** son of NDAGIJIMANA Laurent, alias Wilson IRATEGEKA and IRAGENA Joséphine, born on 04/06/1996 in the Democratic Republic of the Congo, South Kivu Province, Masisi Territory, Mweso locality; single. He is being prosecuted while in provisional detention.

18. **MUKANDUTIYE Angeline:** daughter of MUNYARUGAMBA Damas and NTORAGURWA Astérie, born on 12/01/1951 in the former Remera Cell, Kintarure Sector, Giciye Commune, Gisenyi Prefecture, who, in 1994 was a resident of the former Bwahirimba Cell, Rugenge Sector, Nyarugenge Commune, Kigali City Prefecture. A Rwandese, she is currently in Nyarugenge prison serving a life sentence after being convicted of the crime of genocide by Nyarugenge Gacaca court.

## II. CHARGES AGAINST THE DEFENDANTS AND THE LEGISLATION PROVIDED

### 2.1. Concerning RUSESABAGINA Paul

1. **Formation of an illegal armed group,** crime provided for and punished by Article 200 of the Law N° 68/2018 du 30/08/2018 determining offences and penalties in general.

2. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

3. **Financing terrorism,** crime provided for and punished by Article 24 of the Law n° 69/2018 of 31/08/2018 on prevention and punishment of money laundering and terrorism financing.

4. **Murder as an act of terrorism**, crime provided for and punished by Articles 2 and 37 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

5. **Abduction as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

6. **Armed robbery as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

7. **Arson as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

8. **Attempted murder as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

9. **Assault and battery as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

### 2.2  Concerning NIZEYIMANA Marc

1. **Membership of an illegal armed group,** crime provided for and punished by Article 200 of the Law N° 68/2018 of 30/08/2018 determining offences and penalties in general.

2. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism;

3. **Maintaining relations with foreign governments' officials with an intention to support war**, an offence provided for and punished by article 193 of Law No 68/2018 of 30/08/2018 determining offences and penalties in general.

4. **Murder as an act of terrorism**, crime provided for and punished by Articles 2 and 37 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

5. **Abduction as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

6. **Armed robbery as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

7. **Arson as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

8. **Attempted murder as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

9. **Assault and battery as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

### 2.3.  Concerning BIZIMANA Cassien, alias BIZIMANA Patience, alias Passy, alias Selemani

1. **Membership of an illegal armed group,** crime provided for and punished by Article 200 of the Law N° 68/2018 du 30/08/2018 determining offences and penalties in general.

2. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

3. **Conspiracy and incitement to commit a terrorist act**, an offence provided for and punished by article 20 of Law No 46/2018 of 13/08/2018 on counterterrorism.

4. **Attempted murder as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

5. **Arson as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

6. **Illegal use of an explosive in public place**, an offence provided for and punished under article 24 of Law No 46/2018 of 13/08/2018 on counterterrorism;

## 2.4.  Concerning MATAKAMBA Jean Berchmans

1. **Conspiracy and incitement to commit a terrorist act**, an offence provided for and punished by article 20 of Law No 46/2018 of 13/08/2018 on counterterrorism;

2. **Attempted murder as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism;

3. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

4. **Illegal use of an explosive in public place**, an offence provided for and punished under article 24 of Law No 46/2018 of 13/08/2018 on counterterrorism.

## 2.5.  Concerning SHABANI Emmanuel

1. **Conspiracy and incitement to commit a terrorist act**, an offence provided for and punished by article 20 of Law No 46/2018 of 13/08/2018 on counterterrorism.

2. **Attempted murder as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

3. **Arson as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

4. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

5. **Illegal use of an explosive in public place**, an offence provided for and punished under article 24 of Law No 46/2018 of 13/08/2018 on counterterrorism.

### 2.6.  Concerning NTIBIRAMIRA Innocent

1. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

2. **Conspiracy and incitement to commit a terrorist act**, an offence provided for and punished by article 20 of Law No 46/2018 of 13/08/2018 on counterterrorism.

3. **Arson as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

4. **Illegal use of an explosive in public place**, an offence provided for and punished under article 24 of Law No 46/2018 of 13/08/2018 on counterterrorism.

### 2.7.  Concerning BYUKUSENGE Jean Claude

1. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

2. **Arson as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

3. **Attempted murder as an act of terrorism**, crime provided for and punished by Articles 2 and 19 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

4. **Illegal use of an explosive in public place**, an offence provided for and punished under article 24 of Law No 46/2018 of 13/08/2018 on counterterrorism.

### 2.8.  Concerning NIKUZE Siméon

1. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

### 2.9.  Concerning NTABANGANYIMANA Joseph alias Combe Barume Matata

1. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

**2.10.  Concerning NSANZUBUKIRE Félicien alias IRAKIZA Fred**

1.  **Joining an illegal armed group**, an offence provided for and punished by article 459 of Organic Law No 01/2012/OL of 02/05/2012 instituting the penal code.

2.  **Membership in a terrorist organization**, an offence provided for and punished by article 503 of Organic Law No 01/2012/OL of 02/05/2012 instituting the penal code.

**2.11.  Concerning MUNYANEZA Anastase alias RUKUNDO Job KURAMBA**

1.  **Joining an illegal armed group**, an offence provided for and punished by article 459 of Organic Law No 01/2012/OL of 02/05/2012 instituting the penal code.

2.  **Membership in a terrorist organization**, an offence provided for and punished by article 503 of Organic Law No 01/2012/OL of 02/05/2012 instituting the penal code.

**2.12.  Concerning IYAMUREMYE Emmanuel alias Engambe IYAMUSIMBA**

1.  **Membership of an irregular armed group,** crime provided for and punished by Article 200 of the Law N° 68/2018 du 30/08/2018 determining offences and penalties in general.

2.  **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

**2.13.  Concerning NIYIRORA Marcel alias BAMA Nicholas**

1.  **Membership of an illegal armed group,** crime provided for and punished by Article 200 of the Law N° 68/2018 du 30/08/2018 determining offences and penalties in general.

2.  **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

**2.14.  Concerning NSHIMIYIMANA Emmanuel**

1.  **Membership of an illegal armed group,** crime provided for and punished by Article 200 of the Law N° 68/2018 du 30/08/2018 determining offences and penalties in general.

2.  **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

### 2.15.  Concerning KWITONDA André

1. **Membership of an illegal armed group,** crime provided for and punished by Article 200 of the Law N° 68/2018 du 30/08/2018 determining offences and penalties in general.

2. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

### 2.16.  Concerning HAKIZIMANA Théogène

1. **Joining an illegal armed group**, an offence provided for and punished by article 459 of Organic Law No 01/2012/OL of 02/05/2012 instituting the penal code.

2. **Membership of a terrorist organization**, an offence provided for and punished by article 503 of Organic Law No 01/2012/OL of 02/05/2012 instituting the penal code.

### 2.17. Concerning NDAGIJIMANA Jean Chrétien

1. **Membership of an irregular armed group,** crime provided for and punished by Article 200 of the Law N°68/2018 du 30/08/2018 determining offences and penalties in general;

2. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

### 2.18. Concerning MUKANDUTIYE Angelina

1. **Membership of a terrorist group,** crime provided for and punished by Article 18 of the Law n° 46/2018 of 13/08/2018 on counterterrorism.

## II. HOW OFFENCES WERE COMMITTED

### 3.1 Introduction

**[1].** In consideration of the defendants concerned in this case, the offences they are charged with as well as terrorist organizations to which they belong, the prosecution wishes to first make certain clarifications before presenting the offences and the way they were committed, as well as the supporting evidence.

### 3.1.1. Definition of terrorism and of terrorist group

**[2].** Terrorism is not a new phenomenon[1], it is about acts that have existed for a long time but which have evolved in the extent and nature they are being committed as it is here stated by specialists: "*Terrorism is a phenomenon of international politics that has a long history and appears in a variety of forms. Terrorism's causes and manifestations are varied and complicated. While terrorism is far from a recent phenomenon – its roots can be traced back at least two millennia – its modern incarnation is unprecedented in frequency, scope of activities and overall ferocity*"[2].

**[3]** From time immemorial, acts of terrorism have gone on being committed by individuals or different groups of people over various reasons as we are going to see it in the following paragraphs. Because of the increase of terrorist activities across the world, some being domestic and others transnational, counterterrorism legal instruments have been put in place at national and even international levels[3]. Those instruments define different types of acts of terrorism and terrorist groups.

---

[1] Todd Sandler: *Terrorism what everyone needs to know,* Oxford University Press, New York 2018, p.10 *"Terrorism has been around since the start of recorded history. For instance, the Zealots-Sicarii were Jewish terrorists who waged a terrorist campaign against the Romans who occupied Judea during the start of the first century. These terrorists also turned their attacks on compliant Jews and on the Greek population in Judea. In many instances, Zealots employed a dagger to assassinate an intended victim. Zealots aimed to cause an insurrection against the Romans. Actually, their rather short-lived campaign of terror (66- 73 ce) ended horribly for them with their temple destroyed and a mass suicide. A second important historic terrorist group was the Assassins, who carried on their terrorist campaign in Persia during 1090 – 1275 ce. Their political goal was to purify Islam by assassinating high profile infidels. The Assassins were Shiites whose alleged enemies included prominent Sunni figures, among others".*

[2] Cindy C. Combs & Martin Slann: Encyclopedia of terrorism, Revised edition, Facts on File Inc., New York 2007, p. xiii

[3] We can mention here some of those laws in particular international conventions:
The Convention on offences and certain other acts committed on board aircrafts, adopted in Tokyo in 1963;
The 1970 Convention for the suppression of unlawful seizure of aircraft;
The 1971 Convention for the suppression of unlawful acts against the safety of civil aviation;
The 1973 Convention on the prevention and punishment on crimes against internationally protected persons including diplomatic agents;
The 1979 International Convention against the taking of hostages;
The 1979 Convention on the physical protection of nuclear material;
The Convention for the suppression of unlawful acts against the safety of maritime navigation and its Protocol;
The 1998 Convention of Suppression of terrorist bombings;
The 1999 International Convention for the suppression of the financing of terrorism, etc…

**A. Act of terrorism**

**[4]** As we have just mentioned above, today, laws on prevention and combating terrorism have been instituted, and in many of them it is specified which act should be considered as a terrorist one. The African Union Convention on prevention and combating terrorism[4] gives in its article 1, third paragraph the definition of act of terrorism as follows: "*Terrorist act* " means:

**[5]***Any act which is a violation of the criminal laws of a State Party which may endanger the life, physical integrity or freedom of, or cause serious injury or death to, any person, any number or group of persons or cause or may cause damages to public or private property, natural resources, environment or cultural heritage and is calculated or intended to:*

> *(i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act, or to adopt or abandon a particular standpoint, or to act according to certain principles; or*
> *(ii} Disrupt any public service, the delivery of any essential service to the public or to create a public emergency; or*
> *(iii) Create general insurrection in a State.*

**[6].** *(b) Any promotion, sponsoring, contribution to, command, aid, incitement, encouragement, attempt, threat, conspiracy, organizing, or procurement of any person, with the intent to commit any act referred to in paragraph (a) (i) to (iii).*

**[7].** The definition given in this convention resembles the definition provided in Law No 46/2018 of 13/08/2018 on counterterrorism in its article 2, 4, which provides that *a terrorist act is:*

**[8].** *a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:*

---

[4] OAU Convention on prevention and combating terrorism, art. 1,3 "Terrorist act means":

*i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;*

*ii) disrupt any public service, the delivery of any essential services to the public or to create a public emergency;*

*iii) create general insurrection in a State;*

**[9]**. *b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a)*

**[10]** It is not only laws that have defined the act of terrorism but writers themselves have expressed what a terrorist act is. We can mention among others Todd Sandler[5] who has defined terrorism in these words: *"Terrorism is the premeditated use or threat to use violence by individuals or subnational groups against non-combatants to obtain a political objective through the intimidation of a large audience beyond that of the immediate victims".*

**[11]**. The way acts of terrorism have been defined contains two important elements:

**[12]**. (a) acts committed themselves are prohibited by criminal laws*;*

**[13]**. (b) the purpose of those acts *(which is most likely political, religious, ideological, etc…)*

**[14]**. Sandler[6] adds a third element related to those whom terrorist acts perpetrators want to intimidate. He explains it in these words: *"Another element of the definition of terrorism concerns the audience that terrorists seek to influence through the brutality of their violence. By trying to make their violence seem random, terrorists create a general atmosphere of anxiety wherein everyone feels at risk".*

---

[5] Todd Sandler: op.cit., p.1
[6] Idem, p.2.

[15] A terrorist act was furthermore defined by Cindy. C. Comb and company[7] in these words: *"....terrorism will be defined as a synthesis of war and theater, a dramatization of the most proscribed kind of violence – that which is perpetrated on innocent victims – played before an audience in the hope of creating a mood of fear for political purposes".* From this definition, other scholars have described components that must be present for an act to qualify as terrorist, *"There are, in this description of terrorism, a number of crucial components. Terrorism, by this definition, involves an act of violence, an audience, the creation of a mood of fear, innocent victims, and political motives or goals"[8].*

*[16]* As it was recalled in previous paragraphs, terrorism can be committed inside a country *(domestic terrorism)* or across national borders *(transnational/international terrorism).* Special Tribunal for Lebanon[9] has described the necessary components for an act to qualify as a transnational terrorist crime. *"As we shall see, a number of treaties, UN resolutions, and the legislative and judicial practice of States evince the formation of a general opinion juris in the international community, accompanied by a practice consistent with such opinion, to the effect that a customary rule of international law regarding the international crime of terrorism, at least in time of peace, has indeed emerged. This customary rule requires the following three key elements:*

*(i) the perpetration of a criminal act (such as murder, kidnapping, hostage-taking, arson, and so on) or threatening such an act;*

*(ii) the intent to spread fear among the population (which would generally entail the creation of public danger) or directly or indirectly coerce a national or international authority to take some action, or to refrain from taking it;*

*(iii) when the act involves a transnational element".*

[17] As Jerrold says, terrorist acts can be intended to achieve political, religious or ideological motives of their perpetrators. "*Violence against victims is intended to convey a message to the audiences of attention. And it is the fact that the victims are unarmed and the*

---

[7] Cindy C. Combs: op.cit,. p.320.

[8] Ibidem

[9] Special Tribunal for Lebanon: Interlocutory Decisions, 2011, para 85 available on https://www.uNodc.org/e4/en/terrorism/module-4/key-issues/difining-terrorism.html,      page visited on 7 October 2020

*randomness of the act that could occur to anyone, at anytime, anywhere – the extra normality of the act – that so compels horrified attention. Terrorism then is a particular species of political violence. It is violence or the threat of violence against non-combatants or property in order to gain a political, ideological, or religious goal through fear and intimidation. Usually symbolic in nature, the act is designed to have an impact on an audience that differs from the immediate target of the violence[10]".*

**[18]** As it can be seen in the previous paragraphs, terrorist acts are not aimed at only their direct victims, but they are rather committed to cause fear among more people; the direct victims seem to represent much more people. Because of that, most often terrorist acts are perpetrated on persons who have no particular reason to be targeted, for instance having any grievance with the terrorists. That is the reason why when a terrorist act is committed, it induces fear among many people because everyone feels that it can happen to them.

**[19]** Acts of terrorism can be carried out by individuals (*lone wolf terrorist*)[11] or groups of persons (*terrorist organizations*) referred to as "*terrorist organizations*[12]" that we are going to describe below.

---

[10] Jerrold M. Post: The mind of the terrorist: The psychology of terrorism from IRA to Al Qaeda, Palgrave Macmillan, New York 2007, p.12

[11] Todd Sandler, op.cit, p.1

[12] See also Dr. Edwin Bakker and Dr. Beatrice de Greaf: Lone Wolves How to Prevent This Phenomenon, Expert Meeting Paper, The Hague 2010, p.1: "These so called lone wolves are a nightmare for the police and intelligence community as they are extremely difficult to detect and to defend against. Compared to group terrorism or network – sponsored terrorists, lone operators have a critical advantage for avoiding identification and detection before and after their attacks, since most of them do not communicate with others with regard to their intentions. Although lone wolves might have the disadvantage of lacking the means, skills, and professional support of terrorist groups, some of them nevertheless have proven to be very lethal".

Paper available on http://www.icct.nl/download/file/ICCT-Bakker-deGraaf-EM-Paper-Lone-Wolves.pdf. page visited on October 2020.

**B. Terrorist group**

[20] As we had mentioned above, from the 18th century onwards acts of terrorism went on increasing, and as their number increased, so were different terrorist groups that were being formed across the world.

[21] Law No 46/2018 of 13/08/2018 on counterterrorism explains in its article 2, 11 that a terrorist group is "*a structured group of persons acting in concert and with intent to commit terrorist acts*".

[22] As it can be seen in this article, a terrorist group is made up of two key elements;
a) being structured
b) an intent to commit terrorist acts

[23] Sandler has described a terrorist group in these words: "*A terrorist group is a subnational collective of individuals who pursue a common political good through the practice of terrorist acts[13]*".

[24] The US Department of State lists terrorist groups[14]. When one considers the criteria[15] based on to put a given group on that list, it also provides an explanation of what a terrorist group is in US laws. *"An organization can be placed on the TEL (Terrorist Exclusive List} if the Secretary of State finds that the organization commits or incites to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity; prepares or plans a terrorist activity; gathers information on potential targets for terrorist activity, or provides material support to further terrorist activity"[16].*

---

[13] Idem, p.46
[14] Section411 of the USA PATRIOT ACT of 2001 (8 U.S.C. & 1182)
[15] Apart from the US Department of State, UN has also its own criteria on which it bases to establish a list of terrorist groups, Resolution 2253 (2015) of December 17, 2015, article 3. Al Qaeda and Taliban were listed on the basis of it
[16] US Department of State: Terrorist Exclusion List available on https://www.state.gov/terrorist-exclusion-list/, page visited on 8th October 2020

[25] Today, international organizations and several countries establish and make public lists of persons, as well as groups that commit terrorist activities. We can mention here UN, EU, AU and several other countries like the USA, Canada, UK, India, Russia and others.

[26] In Rwanda, Law No 46/2018 of 13 August 2018 on counterterrorism provides in its article 41 how a list of terrorists and terrorism sponsors is made public.

[27] As we have above given the explanation of a terrorist group, a terrorist group does not exist because it has been listed by an international organization or any given country, it is labeled as such when it fulfils what the law provides in its explanation of a terrorist group, comprising committing terrorist acts or having the intent to commit them.

[28] This corresponds to the court ruling on case RP 0027/11/HC/KIG – RP 0036/11/HC/KIG[17] in determining whether FDLR was a terrorist organization. The High Court ruled that in view of the fact that acts FDLR carries out are in nature terrorist on the basis of the explanation provided by the law, FDLR is a terrorist organization. This verdict was upheld in the appeal to the Supreme Court.[18]

[29] As we have above explained at length the definition of an act of terrorism, a terrorist group would be explained as an organization that has the intent to or commits acts of terrorism. Often however, these terrorist groups can resort to terrorist acts that are usually punished under criminal laws to reach their objectives *(the final purpose or end result)*, but they can also use these acts and add on others that are sometimes legitimate in order to justify the terrorism they commit, nevertheless all of them aim to fulfill their terrorist agenda.

---

[17] Court Case No. RP 0027/11/HC/KIG-RP 0036/11/HC/KIG decided by the High Court on 13/01/2012 which opposed the Prosecution against MUKESHIMANA Berchmans and company, paragraph 9-10
[18] Case No RPA 0090/12/CS/of 04/03/2016

[30] Sandler[19] has explained it in the following way: "…..*An inclusive definition concerns any subnational group that applies terrorist tactics to promote its political agenda. More exclusive definitions require that the group primarily or exclusively use terrorism as opposed to some combination of tactics that allows for terrorism, legitimate political protest, or guerrilla attacks against the military. Most terrorist groups resort to both terrorist and legitimate means to get their message across. For example, many terrorist groups have a political wing to pursue their political agenda. These groups include the Palestine Liberation Organization (PLO), the Irish Republican Army (IRA), and Euskadi Ta Askatasuna (ETA) (the Basque separatist terrorists in Spain). Many groups may also use urban guerrilla tactics to attack the police, the National Guard, or the military, as was true of the IRA, ETA, the Front de Liberation Nationale (FLN), Irgun Zvai Leumi (Zionist), and the Stern Gang (Zionist). Thus, basing the definition of terrorist group on its primarily or exclusively relying on terrorism would eliminate many important groups from consideration and, I believe, would serve no useful purpose*".

[31] Furthermore, in that context Sandler[20] goes on showing that in the intention of covering up the nature of their terrorist acts, many terrorist groups carry out many different activities: "*Most terrorist groups diversify their portfolio of attacks in order to be less predictable to the authorities charged with counterterrorism activities. Even though most groups use bombings as their primary mode of attack, they also execute armed attacks, assassinations, kidnappings, and other types of attacks to throw off the authorities*".

[32] Different scholars who have written on terrorism have talked about different motives terrorists put forward or reasons which are behind the terrorist acts they commit. Most often these are political, religious, or ideological[21].

[33] These are the very causes terrorists mention to justify their acts, often wanting to show that their acts are not terrorist but rather noble ones. It is in that context that several terrorist groups present themselves as national liberation movements or allege

---

[19] Todd Sandler, op.cit, p.47
[20] Idem, P.49
[21] See supra, Note. 10

that their objective is to fight for the rights of a given segment of the population, or to fight discrimination made against particular persons, etc.

[34] The UN Security Council[22] has determined that none of all those reasons can justify the acts being committed; it was expressed in these terms: "*Recalls that criminal acts, including against civilians, committed with the intent to cause death or serious bodily injury, or taking of hostages, with the purpose to provoke a state of terror in the general public or in a group of persons or particular persons, intimidate a population or compel a government or an international organization to do or to abstain from doing any act, which constitute offences within the scope of and as defined in the international conventions and protocols relating to terrorism, are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature*".

[35] It is in that context that terrorism perpetrators are nonetheless punished even when they try to find justification for their acts. Today, the UN Security Council has blacklisted and even imposed sanctions on persons and several terrorist groups despite the fact that each one of them has grounds to justify their actions.[23]

### 3.1.2. FDLR – FOCA as a terrorist organization

[36]. From October 1, 1990, Rwanda went through a liberation struggle. During that period, political parties formed militias whose purpose was to hunt down and kill Tutsi; here one can mention *Interahamwe* and *Impuzamugambi militias*.

This extremist polarization and genocide ideology resulted in the genocide against Tutsi. When the genocide was stopped by the Rwandan Patriotic Army (RPA) in July 1994, the ex – FAR[24] and *Interahamwe* fled to Zaire (now DRC).

---

[22] UN Security Council Resolution 1555 (2004)

See also UN Security Council Resolution 2253 (2015); UN GA Resolution 71/151 of 13 December 2016   [23] UN Security Council Resolution 1267 (1999) which listed and imposed sanctions on Taliban and Al-Qaida

UN Security Council Resolution 22/53 (2015) added ISIL and AL Nusrah Front to Al-Qaida List (1988 list)

See also United Nations Security Council Consolidated List, generated on 7 October 2020

[24] FAR (Forces armées Rwandaises) Interahamwe (was an MRND youth organization from 1993 which had received military training and was used in perpetrating genocide against Tutsi as

[37]  After the Ex-FAR, *Interahamwe* and others who had just committed genocide against Tutsi in Rwanda arrived in the former Zaire, they carried on their plan of launching attacks in Rwanda as they were at the same time continuing to provide   military training to civilians, including children. They created a political organization called PALIR with an armed wing called ALIR. As RAKIYA Omar explains, these combatants  used  Rwandan refugees  who  were  in  Zaire  as  a  pretext  and  they  even used them as a pool for their recruitment. "*For the rebel leaders, those refugees would become human shields, a pool for recruitment, and a source of income and political legitimacy*"[25].

[38] In the trial case of MURWANASHYAKA Ignace and MUSONI Straton[26], ALIR's creation, organization and agenda were explained in these terms*: "Under the designation of "Army for the Liberation of Rwanda", the acronym ALIR has developed into a stratified militia with several thousands of combatants, built on the model of the pre-genocide Rwandan army. Bases of operations were decided in the North and South Kivu, the most senior Ex-FAR officer remaining in the Kivu provinces becoming the leader of the movement. In addition to protecting Rwandan refugees in DRC, the organization viewed its primary objective as being the overthrow of the Rwandan government by military means and to take back authority in Rwanda and thus insure the return of the Rwandan refugees to their home country".*

[39] After ALIR was formed, it carried out several terrorist activities in DRC as well as in Rwanda. It is in that context that various attacks were conducted on the Rwandan territory in what became known as the "Abacengezi war" between 1995- 1998. They killed and wounded several people and destroyed a lot of infrastructure in areas close

---

demonstrated in case NoICTR-98-44-T of 02 February 2012 Prosecutor v Edouard KAREMERA and NGIRUMPATSE Mathieu, particularly in paragraphs 351-352 and 358-359
[25] Rakiya Omar cited by Nicolas Florquin: "Waning Cohesion: The rise and fall of the FDLR-FOCA", June 2015, 191 available on www.researchgate.net/publications, page visited on 08 October 2020
[26] OLG Stuttgart Decree of 28/9/2015, 5 − 3 StE 6/10, p.7

to the border with the Democratic Republic of the Congo (DRC). This was presented in the court case of MURWANASHYAKA[27] mentioned above.

[40] These attacks were also described in the African Rights report in these terms: "*From May 1997 onwards, groups of well-organized soldiers were behind daring attacks which were carried out in the open against government institutions, including commune offices and prisons, and which targeted specific groups and RPA positions with the goal of either toppling the government or weakening it to the point that it would have no option but to negotiate with the insurgents*".[28]

[41] In 1999, the USA placed ALIR on the list of terrorist groups.

[42] During that time, ALIR 2 was formed by those who had fled to the western parts of DRC and other countries like Central African Republic, Sudan, Angola and elsewhere. In 2000, FDLR was created as a political party affiliated to ALIR. Later on, PALIR-ALIR and FDRL-ALIR2 merged and formed FDLR as a political party having an armed wing called FOCA made up of more than 10,000 combatants[29].

[43] This merging of PALIR-ALIR and ALIR 2 came about mostly as a result of the USA which had just put ALIR on the list of terrorist groups, something that had consequences as RAKIYA Omaar has spelled it out in the report she made: "*The US responded by putting ALIR on the list of terrorist organizations which immediate political consequences for it had branded ALIR as an international outcast. In October 2000, Rwarakabije sent two of his officers, Theophile Gakara and Evariste Murenzi to Kinshasa to exchange views on common goals and strategies with ALIR2. The need to abandon the old name of ALIR-PALIR, in light of the action by the US came up for discussion. Gakara and*

---

[27] Idem, p.7-8
[28] Rwanda: *The Insurgency in the Northwest, African Rights, September 1998, p.426.*
[29] Nicolas Florquin: "Waning Cohesion: The rise and fall of the FDLR-FOCA" in Small Arms Survey 2015, June 2015, p.191-192 available on www.researchgate.net/publications, page visited on 08 October 2020

*Murenzi took this message back to the east, and eventually convinced their colleagues there to agree to call themselves FDLR".[30]*

**[44]** The consequences of being put on the list of terrorist organizations came up once again in the court case US v Mousa Muhammed Abu MARZOOK[31]. These consequences, which include sanctions against groups and their members, explain the reasons why they are constantly changing names with the aim to escape sanctions.

**[45]** Even though FDLR as a political organization and FOCA as an armed group had distinct names, they were in reality the same organization, having the same administration, and that is why it is referred to as FDLR-FOCA. That is also how Raymond Debelle[32] confirms it: *"While the organization's political (FDLR) and military (FOCA) wings have their own distinct names and acronyms, they are actually closely intertwined and part of a single organization. Political leaders who held key military positions were integrated into the organization's decision-making bodies alongside the military leaders".*

**[46]** This is further confirmed by the International Criminal Court (ICC)[33]: *"As to the organized structure of the FDLR, the group has a hierarchical structure with well-defined decision making processes. FDLR's political and military leadership were closely connected and conducted side-by-side an international media campaign in support of its political and military endeavors".*

**[47]** FDLR-FOCA put in place an administrative structure, but many of their leaders were based outside DRC as Nicolas indicates it[34]: *"Until 2009-10, the FDLR's senior*

---

[30] Rakiya Omaar: The leadership of Rwandan armed groups abroad with a focus on the FDLR and RUD/URUNANA, December 2008, p.44

[31] 383 F.Supp.2d 1056, United States of America, plaintiff v. Mousa Muhammed Abou MARZOOK, Muhammad Hamid Khalil Salah, and Abdelhaleem Hasan Abdelraziq Asshqar, Defendants., No 03 CR 0978. Aug.22, 2005

[32] Raymond Debelle cited by Nicolas Florquin: "Waning Cohesion: The rise and fall of the FDLR-FOCA" in Small Arms Survey 2015, June 2015, p.192 available on www.researchgate.net/publications, page visited on 08 October 2020

[33] ICC-01/04-01/12: Prosecutor vs. Mudacumura Sylvestre, The Hague 13 July 2012para. 24

[34] Raymond Debelle cited by Nicolas Florquin: "Waning Cohesion: The rise and fall of the FDLR-FOCA" in Small Arms Survey 2015, June 2015, p.192 available on www.researchgate.net/publications, page visited on 08 October 2020

*political leadership was based abroad, also exercising key military functions. Among them were the FDLR president and supreme commander of the armed forces, Ignace MURWANASHYAKA (based in Germany), the FDLR vice president and president of the military high command, Straton MUSONI (also in Germany), and the FDLR executive secretary and vice president of the high command, Callixte MBARUSHIMANA (based in France).*

**[48]** Concerning the creation of FDLR, the way it merged with PALIR-ALIR, the meetings they held and resolutions they took, the leadership structure and even those who were appointed into leadership positions, all of that is detailed in the court case of MURWANASHYAKA Ignace and MUSONI Straton.[35]

**[49]** From the time FDLR was formed, it carried on the activities that ALIR had started of launching terrorist attacks to the Rwandan territory. Several attacks took place in different times and at different places in the country, people were murdered, pieces of infrastructure were destroyed, public as well as private property was damaged and a lot more. It became evident that all those conducted attacks were acts of terrorism, and on 31/12/2012 the United Nations Security Council put FDLR on the list of terrorist groups as it transpires on *the UN Security Council Consolidated List.*

**[50]** Some of the FDLR fighters were captured and tried in Rwandan courts. We can mention here as an example court case No RP 0027/11/HC/KIG – RP 0036/11/HC/KIG of 13/01/2012 in which 30 FDLR combatants were tried and in which some of them were convicted of terrorist acts. That High Court case was decided in case No RPA0090/12/CS by the Supreme Court on 04/03/2016.

**[51]** It's not only in Rwanda that FDLR has committed crimes, even in the DRC where its combatants have bases they went on committing different crimes including war crimes, terrorist crimes as well as crimes against humanity. This led some of the FDLR

---

[35] OLG Stuttgart Decree of 28/9/2015, 5 – 3 StE 6/10, p.10-11, 40-47

leaders to be indicted by the International Criminal Court (ICC) and some foreign countries. Here we can mention among others:

-MUDACUMURA Sylvestre for whom the International Criminal Court had issued an arrest warrant;[36]

-MURWANASHYAKA Ignace and MUSONI Straton who were tried by Germany and sentenced to 13 and 8 years[37] respectively.

**[52]** Whether in Rwanda or DRC, FDLR goes on committing these crimes until today.

### 3.1.3. MRCD – FLN as a terrorist organization

**[53]** Since its creation, FDLR has had internal differences of opinions among its members, gradually some separating while other political and armed wings emanating from it were formed. We can mention here CNRD-Ubwiyunge, RUD- Urunana and various other groups.

**[54]** On the other hand, as FDLR continued to carry out terrorist activities in Rwanda, different political parties were in that time being created among Rwandan refugees scattered across the world, including FDU-Inkingi, PDR-Ihumure, PDP-Imanzi and others, the objective of all of them being to combat the Rwandan government.

**[55]** Political parties that operated outside DRC held different views from FDLR though it was the one that had an army. Because of that, some members of those organizations operating in Europe tried to find ways of recruiting within FDLR and to form armed wings affiliated to their organizations. That is what happened with INGABIRE UMUHOZA Victoire's FDU-Inkingi and Paul RUSESABAGINA's PDR-Ihumure, who, since around 2009 had both tried to recruit soldiers from FDLR to work with their political parties.

---

[36] ICC-01/04-01/12: Prosecutor vs. Mudacumura Sylvestre, The Hague 13 July 2012
[37] OLG Stuttgart Decree of 28/9/2015, 5 – 3 StE 6/10

**[56]** In that context of the proliferation of political parties, Paul RUSESABAGINA, as he has explained in his September 11, 2020 interrogation before the Prosecution, formed, on 17 June 2006 in Washington DC in the United States, together with Dr NTAKIRUTIMANA Eliel, NAYIGIZIKI Jérôme, HAKIZIMANA Emmanuel, MUHINDURANSHURO, NGIRIKESHA Pie and some others, a political party he named Ishyaka Nyarwanda Riharanira Demokarasi (PDR-Ihumure) (*Rwandan Political Party for Democracy*). That political party was officially launched in Belgium on December 15, 2012, on which occasion RUSESABAGINA Paul was made its president as he has himself confirmed in his August 31, 2020 statement at the prosecution, saying: "*It is true I am one of those who gave instructions in those activities because instructions were given by the Presidents college (given we were MRCD presidents) of MRCD coalition parties, namely I RUSESABAGINA Paul, president of PDR-Ihumure, IRATEGEKA Wilson, president of CNRD-Ubwiyunge and NSABIMANA Callixte, president of RRM*".

**[57]** Three years after the creation of PDR-Ihumure, RUSESABAGINA started thinking of ways of setting up an armed wing.

**[58]** On 22/09/2009[38], the Burundi government arrested in Bujumbura two FDLR senior officers namely:
1. Lt Col NDITURENDE Tharcisse alias HATARI MULINDE Henri
2. Lt Col HABIYAREMYE Noel alias BANGA MBANZA Lambert

**[59]** Prior to their arrest, these military officers had both been received by Maj. Gen. Adolphe NSHIMIRIMANA who was in charge of intelligence in Burundi (Administrateur Général du Service de Renseignement) given that he was acquainted with Lt Col NDITURENDE Tharcisse as somebody they had worked with in FDD[39],

---

[38] Letter of 22/09/2009 written by the General Administrator of the National Intelligence Service
[39] Forces for the Defense of Democracy

Maj. Gen Adolphe NSHIMIRIMANA as a battalion commander and Lt. Col Tharcisse NDITURENDE as a deputy commander[40].

[60] After their meeting with Gen. Adolphe NSHIMIRIMANA, it became clear that these officers were planning to destabilize the security of Rwanda. On the basis of the conversation Lt Col HABIYAREMYE Noel had with Paul RUSESABAGINA, and in addition to the money Paul RUSESABAGINA had sent to Lt Col HABIYAREMYE Noel, the Burundi authorities confirmed that Paul RUSESABAGINA was the mastermind of those activities intended to destabilize the Rwandan security[41].

[61] The Burundi government thus took the decision to arrest those two officers and they were immediately sent to Rwanda.[42] After they arrived in Rwanda, an investigation was started, which revealed the following:

[62] When Lt Col HABIYAREMYE Noel was being questioned, either by Rwanda Investigation Bureau, the Public Prosecution authorities or even in court[43], he confessed that he collaborated with Paul RUSESABAGINA, that they met through somebody called MINANI Innocent who lived in Brussels with whom he used to talk. He explained that Paul RUSESABAGINA had told him that doing politics without having an army would lead to nothing. He had proposed him that they recruit soldiers from FDLR and form an armed group affiliated to PDR-Ihumure.

[63] Lt Col HABIYAREMYE Noel started recruiting from FDLR officers who could understand the plan of defecting from FDLR and who could join Paul RUSESABAGINA's PDR-Ihumure armed wing, telling them however that things

---

[40] Letter of 22/09/2009 written by the General Administrator of the National Intelligence Service of Burundi; statement of Lt. Col. Habiyaremye Noel at the Public Prosecution on 24/04/2010
[41] Letter of 22/09/2009 written by the General Administrator of the National Intelligence Service of Burundi
[42] Letter of 22/09/2009 written by the General Administrator of the National Intelligence Service of Burundi
[43] Supreme Court, case No RPA 0255/12/CS of 13 December 2013

should go slowly because they had to be careful lest Gen MUDACUMURA Sylvestre came to know it, something that could get them killed.

[64] Lt Col HABIYAREMYE Noel went on explaining that he told Paul RUSESABAGINA that forming an armed group would require means to buy equipment, and he said that Paul RUSESABAGINA had replied that there wouldn't be any problem of means, that what was requested of him was to find people and he (Paul RUSESABAGINA) was going to provide the means.

[65] LT Col HABIYAREMYE Noel explained that after getting information that Lt Col NDITURENDE Tharcisse was planning to go to meet Maj Gen Adolphe NSHIMIRIMANA, he immediately informed Paul RUSESABAGINA and told him that it would be better if he accompanied Lt Col Tharcisse NDITURENDE in that mission. He said that right away Paul RUSESABAGINA told him that he should rather hurry and go with him.

[66] Lt Col HABIYAREMYE Noel explained that it was Paul RUSESABAGINA who gave him money to use in that trip to Bujumbura. He explained that when they arrived in Dar Es Salaam, MINANI Innocent sent him $2,000 on Paul RUSESABAGINA's request.

[67] Lt Col HABIYAREMYE Noel confirmed that when he was in Bujumbura, Paul RUSESABAGINA sent him $1,870 and that the amount was intended to buy communication equipment (satellite phones) to be used by soldiers who were in Congolese forests where they could not be reached and who were involved in the activities of Lt Col HABIYAREMYE Noel and Paul RUSESABAGINA of trying to recruit from FDLR senior officers to form an armed group affiliated to Paul RUSESABAGINA's PDR-Ihumure.

**[68]** On the basis of evidence obtained from the investigation, the General Prosecution opened case file No RONPJ 0664/10/KGL/NM in which Paul RUSESABAGINA is indicted.

**[69]** On 24/11/2010, the Rwanda Prosecution Authority requested from Belgium assistance in the investigation, requesting that Paul RUSESABAGINA be questioned in regard to those activities, and that the accounts of Paul RUSESABAGINA and MINANI Innocent be as well investigated.

**[70]** On 20/06/2011, In cooperation with the Belgian Prosecution Authority, the Rwandan Prosecution Authority had Paul RUSESABAGINA make a statement, and in it he denied knowing Lt Col HABIYAREMYE Noel alias BANGA MBANZA Lambert and having ever personally sent him any money, and he said that the Western Union documents shown to him were falsified in order to incriminate him.

**[71]** On 10/01/2012[44], after realizing that Paul RUSESABAGINA could not be sent to Rwanda for trial given that from 27/07/2000 he had Belgian nationality, the Rwandan Prosecution Authority sent to the Belgian Prosecution Authority a case file in which Paul RUSESABAGINA was indicted, and requested that he be tried on those offences by Belgian courts.[45]

**[72]** Again on 20/03/2012, the Rwandan Prosecution Authority sent to the Belgian Prosecution Authority an additional case file containing evidence.

**[73]** In March/2019, Belgian prosecutors came to Rwanda to do investigation into Paul RUSESABAGINA's case and both Lt Col HABIYAREMYE Noel and Lt Col NDITURENDE Tharcisse were interrogated.

---

[44] Request of Judicial assistance to competent judicial authorities of the Kingdom of Belgium signed by the Prosecutor General of the Republic of Rwanda of 10/01/2012
[45] Additional file to the request of judicial assistance to the competent judicial authorities of the Kingdom of Belgium signed by the Prosecutor General of the Republic of Rwanda on 20/03/2012

**[74]** On 13/03/2013[46], the Rwandan Prosecution Authority requested from the Burundi judicial authorities' assistance in the investigation, asking that they be given the withdraw slip of the money Lt Col HABIYAREMYE Noel received from Paul RUSESABAGINA. On 17/04/2013[47], the Burundi judicial authority sent to the Rwandan Prosecution Authority evidence clearly showing that Lt Col HABIYAREMYE Noel alias BANGA MBANZA Lambert had withdrawn $1870 sent by Paul RUSESABAGINA in San Antonio, USA.

**[75]** On 14/01/2011[48], the Rwandan Prosecution Authority requested cooperation from the USA judicial authorities in the investigation, asking them to indicate whether it was Paul RUSESABAGINA who had sent to Lt Col HABIYAREMYE Noel alias BANGA MBANZA Lambert $1,870. On 04/10/2013,[49] the US Department of Justice sent to the Rwandan Prosecution the proof attesting that it was Paul RUSESABAGINA who had personally sent to Lt Col HABIYAREMYE Noel alias BANGA MBANZA Lambert $1,870.

**[76]** What we have just described above clearly shows that for a long time Paul RUSESABAGINA had a desire to own an armed group affiliated to his political party PDR-Ihumure, with the intention to carry out terrorist attacks into Rwanda. The fact that it did not materialize in that time was not of his own will, but the arrest and transfer to Rwanda of Lt Col HABIYAREMYE Noel alias BANGA MBANZA Lambert whom he used in that plot created a setback.

**[77]** Paul RUSESABAGINA maintained the idea of having an army affiliated to PDR-Ihumure, and that is how he started negotiations with Gen NDAGIJIMANA Laurent

---

[46] Urgent request of judicial assistance (R Commission), signed by the Prosecutor General of the Republic of Rwanda on 15th March 2013

[47] Letter No 204.02.08∕ ∕RE∕2013 signed by the Minister of foreign affairs of the Republic of Burundi on 17th April 2013

[48] Request for mutual legal assistance from the Republic of Rwanda to the United States of America, in matter of Public Prosecution vs Mr Paul RUSESABAGINA, signed by the Prosecutor General of the Republic of Rwanda on 14th January 2011

[49] Letter Re: Request for Assistance in the matter of Public Prosecution v. Paul RUSESABAGINA (File Ref.No RONPJ 0664∕10∕KGL∕NM), Signed by Dan E. Stigall, Trial Attorney on 04th October 2013

alias Wilson IRATEGEKA Lumbago, who had broken up with FDLR, taking with him soldiers with whom he had collaborated to form CNRD-Ubwiyunge. Their negotiations led on 4/7/2017 to the integration of the armed groups they headed, PDR-Ihumure for Paul RUSESABAGINA and CNRD-Ubwiyunge for Gen IRATEGEKA Wilson, and then they formed a coalition of political parties called MRCD. Thus, the integration enabled Paul RUSESABAGINA and his PDR-Ihumure to have an army since they had just made an alliance with CNRD-Ubwiyunge that had an army.

[78] On 18/3/2018[50], RRM of NSABIMANA Callixte alias Sankara was incorporated into MRCD. After joining, RRM for its part brought in 30 young men who integrated CNRD's army, and following that, a decision was taken to change the name from MRCD armed forces to FLN (National Liberation Forces).

[79] The FLN military force was given means in terms of equipment and it went on increasing the number of its fighters through recruitments that were mainly done in refugee camps of Rwandans in different countries, including DRC, Burundi, Uganda and others.

[80]. In these recruitments done in refugee camps, children of under 18 years of age were also included. This is confirmed by some of those children themselves (their statements are in the dossier) who explained how they were taken into FLN army by force and received military training. The fact that children were enrolled into MRCD-FLN activities is also confirmed by NIZEYIMANA Marc, who was deputy commandant and S3 in Sector 2 in FLN where he had the rank of colonel. In his questioning by Rwanda Investigation Bureau on July 15, 2020 and by the Prosecution Authority on September 23, 2020, he explained that for the recruitment, they requested from the presidency authorization to go and take children from refugee camps, and once they had that authorization, they formed a team of soldiers to go and fetch all the children of 18 years of age, but starting with June 2019 they did not consider age

---

[50] Press Release No. 2018/03/01 of 18th March 2018

because they needed enough combatants. The fact that children were in MRCD-FLN is also confirmed by MUKANDUTIYE Angelina who was the commissioner in charge of family and gender promotion within MRCD-FLN. In her interrogation on September 28, 2020, she confirmed that in MRCD-FLN there were children who were brought into FLN activities and she was even among those who mobilized children to join, girls in particular.

[81] The main FLN sponsor was Paul RUSESABAGINA as he admitted it himself in his August 31, 2020 questioning in front of Rwanda Investigation Bureau, where he explained that on his part he provided financial support and that he did different forms of advocacy for it to build capacity.

[82] The FLN military group had its base in DRC, North and South Kivu, but later, it acquired other bases in Burundi.

[83] At different times in 2018, FLN launched attacks on Rwandan territory in which it killed and wounded civilians, set fire to buildings and means of transport including vehicles and motorcycles, persons were illegally kidnapped, property of different kinds belonging to persons was looted. In different media and social media, NSABIMANA Callixte alias Sankara was heard boasting and claiming that those attacks were FLN's, and even Paul RUSESABAGINA himself was heard in his capacity as MRCD-FLN president, claiming responsibility for those attacks and for the communiqués they had signed.

[84] Those terrorist acts were inflicted on civilians in different districts, namely Nyaruguru, Nyamagabe and Rusizi, and were launched at different times. Among the victims and others who bore their consequences, no one of them had any particular issue with MRCD-FLN, instead those attacks were carried out with the intent to instill fear among all Rwandan citizens in general and not particularly those victimized. This is one of the components of acts of terrorism shown above: to commit acts of terrorism against persons or a section of the population that seems to represent several others.

**[85]** This also corresponds to Professor Rianne Letschert's conclusions which by the way served as a basis for the Special Court of Lebanon[51] in which she makes a distinction between terrorist crimes and ordinary offences in these words: "*the main difference between terrorism and other crimes lies in the context in which terrorist victimization occurs, and its audience. Victims of terrorism, by definition, are attacked as representative of a larger group. In her view, with these crimes, we don't only talk about the direct victim but we talk about actually the entire population, and we could stretch it even further, the entire international community.*"

**[86]** The fact that MRCD-FLN plan was to instill fear in persons outnumbering those who were victims of those attacks is evident in the communiqués that were issued following those attacks; some were signed or issued by NSABIMANA Callixte alias Sankara who was FLN spokesperson, others were signed or issued by RUSESABAGINA Paul who was MRCD-FLN president. We can give a few examples here, the rest of the evidence is included in the charges and their evidence.

**[87]** On March 19, 2019 NSABIMANA Callixte alias Sankara, the spokesperson of FLN and Vice President of MRCD-FLN, put out press release No 2019∕03/19 in which he warned Rwandans, particularly those living close to the south west border and the northern border of Nyungwe forest to avoid circulating at night in areas where military activities were taking place.

**[88]** On March 21, 2019, NSABIMANA Callixte, as FLN spokesperson and Vice President of MRCD-FLN, put out press release No 2019/03/21 calling Rwandans and the international community to avoid going into areas of fighting and for the population to stop nightly rounds.

---

[51] The Special Tribunal for Lebanon, Trial Chamber: The Prosecutor v. Salim Jamil AYYASH, Hassan Habib MERHI, Hussein Hassan ONEISSI, Assad Hassan Sabr, 18 August 2020, para.1557

**[89]** On April 30, 2019, RUSESABAGINA Paul also put out press release No 2019/04/30 in which he was asking Rwandans and the international community to avoid going into areas of fighting. In what RUSESABAGINA Paul and NSABIMANA Callixte alias Sankara referred to as areas of fighting, there was no engagement other than terrorist acts launched on civilian populations as proofs contained in the file show.

**[90]** All of these press releases were put out following terrorist attacks that MRCD-FLN had committed against civilian populations. As we have shown above, these committed acts as well as the press releases attest to the MRCD-FLN plan, which was to instill fear among the local population and even foreigners planning to come to Rwanda.

**[91]** This is moreover expressed by some of those who were involved in terrorist attacks when they say that they directed those attacks at civilians in order to make the presence of FLN known; here we can also give examples.

**[92]** The one called MATAKAMBA Jean Berchmans is among those who took part in terrorist acts carried out in Rusizi District; he is the one who took delivery of arms used which came from DRC (guns, ammunition and grenades) and he would store them and distribute them to those taking part in attacks. He himself participated in some of those attacks. In his interrogation on July 16, 2020 at the Prosecution on question/answer no 5 where he was asked what he thought after seeing those grenades, guns and ammunition, he answered in the following words: *"I knew those were illegal things, and that they were to be used to disrupt the security of the country, but on the other hand I had just been taught who the enemy was, they told me that they were going to be used to launch attacks, after they would ask for negotiations".* On question/answer 8, he goes on explaining the plan they had in these words: *"The plan was to continue to launch attacks, and thereafter for FLN to ask for negotiations with the government, and to show that they were inside the country."*

[93] This matches what is provided for in article 2, paragraph 4 of Law No 46/2018 of 13/08/2018 on counterterrorism, where it highlights some of the aims of terrorist acts, including intimidation, causing fear among the population, coerce or induce any government, to do or abstain from doing any act, to adopt or abandon a particular standpoint or to act according to certain principles. This confirms that activities carried out by MRCD-FLN during its attacks on Rwandan territory are terrorist activities.

[94] What MATAKAMBA Jean Berchmans explained coincides with what NTIBIRAMIRA Innocent who is also among those who carried out terrorist attacks in Rusizi District said. In his interrogation at the Public Prosecution on July 16/2020, he explained about the grenades they were going to launch in Kamembe Sector, saying that their leaders had told them that since the place had a big concentration of people, it was going to make it known that FLN was in Rwanda.

[95] Furthermore, some of the FLN combatants who carried out attacks in Rusizi, in their statements contained in the file, reveal how they would indiscriminately launch attacks on the civilian population, giving as an example where they would go alongside a road and indiscriminately shoot at any passing vehicle.

[96]  All of what have been presented shows that MRCD-FLN is a terrorist organization, because, apart from terrorist acts it committed, starting back in 2009 when Paul RUSESABAGINA began to think of how he would get combatants from FDLR as it has been shown, the plan was to create an armed group whose objective was terrorism in Rwanda.

### 3.2 Procedural matters

[97] On the basis of those terrorist acts and various other offences committed, the Prosecution has opened an investigation and a case file has been prepared in which 23 persons are indicted, including Paul RUSESABAGINA, NSABIMANA Callixte alias Sankara, Gen IRATEGEKA Wilson and others.

[98] On November 9, 2018, an international arrest warrant was issued, requesting that Paul RUSESABAGINA be arrested and prosecuted for acts constituting various crimes he committed, on the basis of his role in creating and financing MRCD-FLN, as well as the attacks MRCD-FLN carried out at different times on Rwandan territory. International arrest warrants were also issued asking to arrest other different persons, including NSABIMANA Callixte alias Sankara, Gen IRATEGEKA Wilson and others.

[99] With cooperation of the Comoro Islands, NSABIMANA Callixte alias Sankara and FLN spokesperson was arrested on April 13, 2019 and was sent to Rwanda to be prosecuted in Rwandan courts. In his interrogation, he pleaded guilty to his crimes and explained how they were committed taking into consideration his role and the role of his accomplices. Included among those who played a role in those crimes that he revealed was Paul RUSESABAGINA.

[100] Besides, this MRCD-FLN group did not carry out terrorist acts and other crimes in Rwanda only, it also committed them in DRC. It is in that context that DRC armed forces started fighting the group, and that is how in different times members of FLN army and other armed groups operating in DRC were repatriated to Rwanda, and that is how NSENGIMANA Herman who had replaced NSABIMANA Callixte as FLN spokesperson as well as other combatants of this group were brought over. Some of them are among those who are being prosecuted in this court case.

[101] Based on evidence contained in the case file and the statement made by NSABIMANA Callixte alias Sankara, the Rwandan prosecution requested on March 30, 2019 legal assistance from the Belgian judicial authorities, requesting that a search be conducted in the houses and vehicles belonging to Paul RUSESABAGINA, Eric MUNYEMANA and Marie Claire INGABIRE, and that the latter be also questioned.

[102] On October 18, 2019, Paul RUSESABAGINA was questioned by the Belgian Organ in charge of Investigation in the presence of the Rwandan Prosecution

Authority. In his questioning, Paul RUSESABAGINA denied any involvement in all the acts he was questioned about.

**[103]** On October 21, 2019, the Belgian police carried out a search[52] at Paul RUSESABAGINA's place in Brussels and several items were seized, including two telephones, a computer and several documents. The telephones and the computers were inspected by Belgian police experts with the purpose of obtaining different pieces of information. On the same date, a search was also conducted at the domiciles of MUNYEMANA Eric and INGABIRE Marie Claire, and telephones and computers were taken and checked by Belgian police experts with the aim of extracting different pieces of information.

**[104]** The Belgian Organ in charge of Investigation conducted also inquiries into money transfer agencies, including Western Union, Money Gram and Ria and indications were obtained on how MRCD-FLN leaders used to send money to FLN combatants based in Kivu/DRC and in Burundi in order to support them in military activities, as well as how they used to send money to NSABIMANA Callixte alias Sankara to help and support him in his role as the FLN spokesperson.

**[105]** On May 13/2020[53], the Belgian Prosecution Authority sent to their Rwandan counterpart all testimonies together with other pieces of evidence obtained from the inspection of the computers and telephones which had been seized.

**[106]** On August 28, 2020, Paul RUSESABAGINA was arrested in Kigali and the Rwandan judicial authorities started to prosecute him on charges of terrorism and other crimes.

### 3.3  Brief overview of how the crimes were committed

**[107]** Starting in 2009, Paul RUSESABAGINA, who, in collaboration with his colleagues had just formed a political party operating outside Rwanda (PDR-

---

[52] Subsequent Minutes 036077/2019-21-10-2019
[53] See Verbal note of the embassy of the Belgian Kingdom

Ihumure), developed a strong desire for the party to have an armed force affiliated to it with the intention of launching attacks in Rwanda. It was in that context that he started devising ways of recruiting from FDLR-FOCA as we have indicated above.

[108] After realizing that his plan of forming an armed group together with Lt. Col HABIYAREMYE Noel was not materializing, Paul RUSESABAGINA never gave up the idea of persevering till fulfilling his objective of having an armed group affiliated to PDR-Ihumure, given that he continued to look for other persons to cooperate with. It is during that time that he started discussions with Gen NDAGIJIMANA Laurent alias Wilson IRATEGEKA LUMBAGO who too had broken away from FDLR-FOCA and had formed his own party of CNRD-Ubwiyunge, which had fighters.

[109] After teaming up with Gen NDAGIJIMANA Laurent alias Wilson IRATEGEKA LUMBAGO, RUSESABAGINA Paul and his party PDR-Ihumure created an organization called MRCD (Mouvement Rwandais pour le Changement Démocratique) (*Rwandan movement for democratic change)*, and on March 18, 2018, they extended it by integrating NSABIMANA Callixte alias Sankara and his party RRM. After uniting those three organizations, they also brought together the fighters who, together with 'Gen NDAGIJIMANA Laurent alias Wilson IRATEGEKA LUMBAGO had left FDLR-FOCA, and 30 fighters led by NSENGIMANA Herman from RRM, and then they formed in May 2018 an illegal armed organization named FLN/NLF (Forces de Libération Nationale/ *National Liberation Forces*). Thus, Paul RUSESABAGINA had realized his dream of having an armed force that would help him in his plan to launch attacks on Rwanda and remove the existing leadership. Later, in June 2019, MRCD-FLN formed a union with TWAGIRAMUNGU Faustin and his political party RDI-Rwanda Rwiza. Today, FLN is a military branch of a coalition of four political parties mentioned above, which form MRCD.

[110] The leaders of those political parties rotate on the governance of MRCD-FLN but Paul RUSESABAGINA became MRCD-FLN president from July 2017 to June 2019. In that period, it was also Paul RUSESABAGINA who presided over the college of the

presidents, a level of authority of MRCD-FLN which took decisions and broad lines of actions for FLN and which received reports of FLN achievements on the battlegrounds.

[111] As shown above, from 2018, MRCD-FLN launched terrorist attacks on the Rwandan territory, killing and wounding civilians, setting fire to buildings and means of transportation comprising vehicles and motorcycles, looting property of the people, illegally kidnapping persons and a lot more.

[112]  Paul RUSESABAGINA is one the founders of FLN, an illegal armed group that carried out terrorist acts in Rwanda, particularly in the southern region in Nyaruguru and Nyamagabe districts and in the western region in Rusizi district. He is also an important funder of this group, considering that he personally gave money to support it in its activities, did advocacy for it in various ways, organized fundraising to finance it, and in addition his political party PDR-Ihumure used to make monthly contributions to it.

[113] In the context of planning and launching attacks on Rwanda, FLN, which normally had its bases in the Democratic Republic of the Congo (DRC) sought to have bases in Burundi, close to the border with Rwanda, and then in October 2017, FLN chief of staff, Gen HABIMANA Hamada sent Maj Gen NSANZUBUKIRE Félicien alias IRAKIZA Fred to go and represent the organization in Burundi. In that mission, he was accompanied by Maj Gen MUNYANEZA Anastase alias RUKUNDO Job KURAMBA who was an FLN commander in South Kivu (Southern Sector) and who had introduced him to Burundian authorities. However, they were both arrested by the Armed Forces (FARDC) of the Democratic Republic of the Congo in Uvira as they were heading to Burundi where they had been invited.

[114] The arrest of both Maj Gen NSANZUBUKIRE Félicien and Maj Gen MUNYANEZA Anastase did not halt MRCD-FLN preparations to launch attacks into Rwanda from Burundi. It is in that context that in 2018, Col NIZEYIMANA Marc who

was deputy commander of North Kivu FLN armed forces (Northern Sector), selected the best fighters, trained them, and arranged for them the path to use to reach the Kibira forest which is contiguous with Nyungwe Forest in Rwanda in the southern province, from where they were planning to attack the districts of Nyamagabe and Nyaruguru.

[115] In that context, FLN fighters launched various attacks into Rwanda in the southern province in the districts of Nyaruguru and Nyamagabe, including the June 19, 2018 attack and that of July 1, 2018 launched in Nyabimata Sector in Nyaruguru District, the July 13, 2018 attack in Kivu Sector, Nyaruguru District and the December 15, 2018 attack in Nyungwe forest in Kitabi Sector, Nyamagabe District. Those attacks had many consequences on people and properties, including the death of nine persons and several others who were wounded, while others were illegally kidnapped and people's possessions were damaged or looted.

[116] Subsequent to the attacks mentioned above and wanting to show the population and even the international community that indeed MRCD-FLN existed and had gone nowhere, between March and October 2019, MRCD-FLN prepared five terrorist attacks In Rusizi District using one of its fighters named S/Lt. BIZIMANA Cassien alias BIZIMANA Patience alias Passy Selemani who happened to be the attacks leader, two other persons named Corporal BYUKUSENGE Jean Claude and Private NTIBIRAMIRA Innocent who had been FDLR soldiers. In those attacks, the arrested civilians who played a role and who are prosecuted in this case are the ones named SHABANI Emmanuel, MATAKAMBA Jean Berchmans, NIKUZWE Siméon and NTABANGANYIMANA Joseph who helped FLN fighters to cross Lake Kivu as they were coming to launch terrorist attacks in Rwanda. Those attacks had many consequences, including several persons who were severely wounded with some becoming permanently incapacitated, a lot of property was damaged, comprising houses and vehicles.

44

**[117]** All those above mentioned acts carried out by MRCD-FLN had many and different consequences on the Rwandan society, considering that some persons lost their lives, others were left with physical disabilities and psychological trauma, while for others, their property was looted as it comes to light in the witnesses' statements.

## IV. CHARGES AGAINST THE DEFENDANTS AND SUPPORTING EVIDENCE

### 4.1 Concerning RUSESABAGINA Paul

### 4.1.1 Formation of an illegal armed group

a. Legal provision

**[118]** Article 200 of Law No 68/2018 of 30/08/2018 providing for offences and penalties in general provides that:

**[119]** Any person who by donations, remunerations, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an illegal armed group or signs an agreement with this group for the purpose of supporting an armed attack of illegal forces, commits and offence. Upon conviction, he/she is liable to imprisonment for a term of not less than ten (10) years and not more than fifteen (15) years.

**[120]** Any person who deliberately agrees to be hired or recruited to join an illegal armed force, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than seven (7) years and not more than ten (10) years.

**[121]** The offences mentioned in paragraph one and paragraph two of this article are prosecuted when the complaint if filed or permission given by the General Prosecutor or the Military General Prosecutor depending on the accused.

b. Acts constituting the offence and evidence:

**[122]** RUSESABAGINA Paul is one of the founders of an illegal armed group called FLN, affiliated to the coalition of political parties called MRCD. In addition, in different times RUSESABAGINA Paul incited other people to join it.

**[123]** In Rwanda, the only accepted armed force is the Rwandan Defense Force (RDF) as provided by article 159 of the 2003 Rwandan constitution which was revised in 2015. This means that as an illegal armed force on the basis of the Rwandan legislation, FLN is an illegal armed force.

**[124]** This also meets what is written in a USA[54] military document where an illegal force is defined in these terms: "*By definition, illegal forces are armed individuals or groups who are not members of the legal armed forces, police, or other internal security forces*".

**[125]** The fact that RUSESABAGINA Paul is one of the founders of an illegal armed force of FLN is confirmed by the following various proofs:

**[126]** In his August 31, 2020 statement on page 4 in his interrogation before the Public Prosecution, RUSESABAGINA Paul stated with regard to the justification of the offence of creating an illeagal armed force: "*It is true I formed that irregular armed force of FLN in cooperation with NSABIMANA Callixte alias Sankara who was head of the Rwandese Revolutionary Movement (RRM) and IRATEGEKA Wilson, head of Conseil National pour Renouveau et la Démocratie (CNRD-Ubwiyunge).*

**[127]** RUSESABAGINA Paul once again admitted this in front of the Public Prosecution on September 1, 2020, in the second answer where he acknowledged that he was one of the founders of the FLN armed force (Forces de Libération Nationale) and that he was the MRCD coalition president when that force was being formed.

---

[54] US Army *Training and Doctrine Command: Irregular forces*, December 2019. P.14

**[128]** RUSESABAGINA Paul's accounts of his role in the creation of FLN coincide with what NSABIMANA Callixte alias Sankara explained on August 31, 2020 in front of Rwanda Investigation Bureau, in the first answer where he explained the creation of  FLN and the role RUSESABAGINA Paul played in it. He said it in these words*: "...that FLN was a military wing of the coalition of MRCD parties which are the three parties that we jointly own, namely RRM headed by NSABIMANA Callixte, CNRD of Lt Gen IRATEGEKA Wilson and PDR-Ihumure of Paul RUSESABAGINA".*

**[129]** The other thing that shows RUSESABAGINA Paul's role in the creation of FLN is the July 15, 2018 press release No 2018/07/01 of MRCD signed by NSABIMANA Callixte alias Sankara who was FLN second Vice President and spokesperson, announcing the creation of FLN as an armed force. This press release was found in RUSESABAGINA Paul's computer at the time of the search conducted by the Belgian police. On the second page of that press release they wrote this: "*We have created an armed force FLN, Forces de Liberation Nationale/Ingabo zo Kubohora Igihugu/National Liberation Forces, and we have given it a firm task of overthrowing RPF and Kagame's regime without delay.*

**[130]** Furthermore, the MRCD April 30, 2019 press release No  2019/04/30 obtained  from RUSESABAGINA Paul's computer at the time of the search conducted by the  Belgian police shows a passage where its president RUSESABAGINA Paul saying*: "Our young men and women making up our FLN armed force are carrying on the struggle with military activities that oppose them to RPF government forces"..*

**[131]** All of these proofs complement what is contained in a radio talk show aired on "*the Roch*" in which RUSESABAGINA Paul and TWAGIRAMUNGU Faustin talked about the formation of FLN force. In that talk show, RUSESABAGINA explained how

they formed FLN being three political parties, and how they gave it a name in May 2018[55].

[132] The fact that RUSESABAGINA Paul is one of the founding members of the illegal FLN armed force is also confirmed by Col. NIZEYIMANA Marc in his August 13, 2020 statement when he was interrogated at the Public Prosecution, on question and answer 5 where he talked about the formation of FLN as a military force affiliated to MRCD, and MRCD itself being made up of four political parties - PDR- Ihumure headed by RUSESABAGINA Paul, CNRD-Ubwiyunge of Gen. Wilson IRATEGEKA, RRM of NSABIMANA Callixte alias Sankara and RDI-RWANDA Rwiza headed by TWAGIRAMUNGU Faustin. He said it in these words: *"Those political organizations joined other parties, namely RRM, PDR-Ihumure, RDI-RWANDA NZIZA and then formed the coalition MRCD-Ubumwe, the one that had a military force called FLN (Forces de Liberation Nationale)"*.

[133] All the proofs already laid out demonstrate that RUSESABAGINA Paul is one of the founding members of FLN, an illegal armed force.

*c.  Intent to commit an offence and its evidence*

[134] RUSESABAGINA Paul violated the law when together with his colleagues they formed FLN, an illegal armed force affiliated to MRCD. Furthermore, RUSESABAGINA Paul planned to support war attacks.

[135] That intent is expressed in the MRCD press release No 2018/07/01 of July 15,  2018 issued by MRCD under the leadership of RUSESABAGINA Paul and signed by NSABIMANA Callixte alias Sankara, FLN second Vice President and its spokesperson where it says: *"We have created an armed force FLN, Forces de Liberation Nationale/Ingabo zo Kubohora Igihugu/National Liberation Forces and we have given it a firm task of*

---

[55] Talk: "CNRD must not use the military term FLN because it belongs to MRCD"/Mr RUSESABAGINA and TWAGIRAMUNGU, available in
http://www.youtube.cm/wwatch?y=4zBNg8DKVZO

*overthrowing RPF and Kagame regime without delay. FLN must use all means available, including armed conflict, given that RPF has refused all other peaceful means".*

### 4.1.2. Membership of a terrorist group

a) <u>Legal provision</u>

**[136]** Article 18 of Law No 46/2018 of 13/08/2018 on counterterrorism provides that "A person who is a member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years".

b) <u>Act constituting the offence and evidence</u>

**[137]** As it was explained in paragraphs 53-96, MRCD-FLN activities demonstrate that it is a terrorist group. Between June 2018 and October 2019, MRCD-FLN launched attacks on civilian populations in Nyaruguru, Nyamagabe and Rusizi districts. These attacks killed people, damaged their property with the aim of instilling fear among the population and coercing or inducing the government to adopt or abandon a particular standpoint or to act according to certain principles.

**[138]** RUSESABAGINA Paul is a member of MRCD-FLN, a terrorist group because he is one of its founders and up until today he has never parted from it as it can be seen in paragraph 126.

**[139]** Furthermore, RUSESABAGINA Paul is among those who played a role in MRCD-FLN terrorist acts, including providing support to it in different forms, comprising the financial one as it appears in paragraphs 153-215 on the particular offence of sponsoring a terrorist group.

**[140]** In different declarations and press releases put out by RUSESABAGINA Paul at different times, he kept stating that he was one of the MRCD-FLN members.

**[141]** The other thing that shows that RUSESABAGINA Paul is a member of the terrorist group MRCD-FLN is the fact that he was its leader from July 1, 2017 to June 30, 2019 as he himself admitted in his September 11, 2020 statement at the Public Prosecution on question/answer 6 where he stated: *"I became president right at the beginning from July 1, 2017. In the second year, 2018, it was Wilson of CNRD who was to be president, but at that time he said: 'Because of where I am and communication problems I have, I don't want to be president, in the meantime we could let you stay another term'. But from July 1, 2019, CNRD assumed the leadership under Wilson until his disappearance in November 2019 when CNRD replaced him with a lady called UMUBYEYI Francine. Their term ended after we had separated following CNRD break away from MRCD".*

**[142]** The fact that RUSESABAGINA Paul is one of the members of the terrorist group MRCD-FLN is also demonstrated by a declaration retrieved from his computer at the time of the search conducted by the Belgian police referenced as No 2019/04∕30 of April 30, 2019. In his capacity as MRCD-FLN president, RUSESABAGINA Paul says this in that declaration: *"Our young men and women making up our FLN armed force are carrying on the struggle with military activities that oppose them to RPF government forces".* We should remind here that, as it was demonstrated above, what he termed military activities in which they were opposed to RPF armed forces were terrorist acts launched on civilian populations.

**[143]** Again on a YouTube[56] video, RUSESABAGINA Paul is heard declaring that he was in the terrorist organization of MRCD-FLN where he says: *"...Since the beginning of July 2018, NLF launched a military struggle to liberate the Rwandan people until today. It is imperative that in 2019 we speed up the liberation struggle, Rwandan people can no longer stand the cruelty and all kind of ill-treatment directed to us by RPF regime. The time has come*

---

[56] https://www.youtube.com/watch?y=Xhcgk4Sog3c: RUSESABAGINA claims deadly attacks on Rwandan territory

*for us to use any means possible to bring about change in Rwanda. As all political means have been tried and failed it is time to attempt our last resort. Hence, I plead my unreserved support that our youth, the National Liberation Forces, NLF launches against Kagame army in order to free the Rwandan people. As Rwandans, it is important to understand that this is the only way to bring about change in the whole country. For this fact, I call upon all Rwandans, all political and civil society organizations to support those young women and men who took a lead in this struggle and to mobilize".*

**[144]** This kind of talk on the part of RUSESABAGINA Paul clearly shows that he was a MRCD-FLN member, he was pledging his full support and even calling all Rwandans to support it.

**[145]** What has just been demonstrated is corroborated by one piece of evidence the Belgian police retrieved from RUSESABAGINA Paul's telephone and that is Chat 136. This chat reveals the discussions RUSESABAGINA Paul held with TWAGIRAMUNGU Faustin between December 29, 2018 and October 13, 2019 on the functioning of MRCD-FLN, particularly with regard to meetings he was invited to as one of its leaders. One of those discussions is the one of December 30, 2018 in which he says: "*Good morning?* **My boys are under fire**, *and myself am caught up in different matters. I wanted to ask you that we postpone the other meeting to another day we shall agree on. Have a good Sunday.*" On that same date there is another message he sent to TWAGIRAMUNGU Faustin saying: "*Presently I am not close to Stockel, I am running from left and right* **trying to find ways of solving that problem including securing for them means to defend themselves.** *Unfortunately, I am not around*".

**[146]** When questioned about that chat and who his boys were, RUSESABAGINA Paul answered that his boys were FLN. This is clear in questions/answers 10-12 in RUSESABAGINA Paul's statement in his September16, 2020 interrogation by the Public Prosecution authority. He said it in these words: *"Those I call my boys are FLN".* This also is another proof that he was a member of MRCD-FLN, a terrorist group, to the extent that he called its fighters his boys!!

[81]   Apart from being a member of a terrorist group MRCD-FLN, RUSESABAGINA Paul also played a role in its acts by personally providing his support as he explains in his statement made in front of Rwanda Investigation Bureau on August 31, 2020, and in front of the Public Prosecution on September 11, 2020 where he admitted having done advocacy that helped in fundraisings. He subsequently admitted it in court when he was being tried on detention and provisional release in the first instance court of Kagarama on September 14, 2020 as it is shown by the trial record on page 7.

[82]   This statement by RUSESABAGINA Paul that he supported MRCD-FLN is also consistent with Chat 106 of March 08, 2019 which exposes a discussion between RUSESABAGINA Paul and Lt Gen IRATEGEKA Wilson who was the leader of CNRD-Ubwiyunge. In their discussion, Lt Gen IRATEGEKA Wilson  told RUSESABAGINA Paul: *"For us we are trying to send cultivators to the field and you, you are sending money to a place we don't know*!!! *Do you want to divide the cultivators using money*?" In RUSESABAGINA Paul 's statement in his interrogation by the Organ in charge of Investigation on September 05, 2020, on answer 26 he gave this explanation: "*we called fighters cultivators, guns were hoes, ammunition seeds, as for battle fields we called them fields".*

[83]   This discussion between RUSESABAGINA Paul and Lt Gen IRATEGEKA Wilson and the way RUSESABAGINA Paul explained that coded language they used and what it meant, serves also as another piece of evidence proving that RUSESABAGINA Paul was a member of the MRCD-FLN terrorist group, as it demonstrates his role in its activities which include sending money. In addition to that, the way he explains that coded language, first he wouldn't have known its meaning if he didn't happen to be part of that organization; secondly, in his explanation he includes himself into it by saying: '**we** called them…' highlighting that he was one of them.

**[84]**  In concluding this part, the Public Prosecution demonstrated that MRCD-FLN is a terrorist organization, and it also demonstrated the role RUSESABAGINA Paul played in its creation and its activities. This establishes that RUSESABAGINA Paul is a member of the terrorist group MRCD-FLN. It conforms to what the Interpol General Assembly[57] has concluded for a person charged with the offence of membership of a terrorist group to be put on red notice, that the country wanting him must demonstrate:

- ✓  That a given group is a terrorist group
- ✓  A clear role that person has played in that group.

c. Intent to commit the offence and its evidence

**[85]**  RUSESABAGINA Paul is in violation of the provisions of article 18 of Law 46/2018 of 13/8/2018 on counterterrorism, he is a member of a terrorist group MRCD-FLN, and moreover he played a role in the activities of that group.

**[86]**  In paragraphs 136-151, evidence was provided establishing how RUSESABAGINA Paul is one of the members of the terrorist group MRCD-FLN, as well as the role he played in its activities, this constituting evidence that proves RUSESABAGINA Paul's intent to violate the law.

### 4.1.3 Financing terrorism

a) Legal provision

**[87]**  Article 24 of Law 69/2018 of 31/08/2018 on prevention and punishment of money laundering and terrorism financing provides for offence of terrorism financing and punishes any person who supports terrorism in the following words:

---

[57] UNODC: Digest of Terrorist Cases, New York 2019, para.73

**[88]**   Any person who finances terrorism commits an offence. Upon conviction, he/she is liable to imprisonment for a term of no less than seven (7) years but not more than ten (10) years and a fine of three (3) to five (5) times the amount of money given.

**[89]**   The same penalties apply to a person who knowingly makes an agreement or has interest in it to acquire funds or any other assets, or enables another person to acquire money or support, knowing or having reasonable grounds to believe that they can be used for terrorist purpose.

**[90]**   When prosecuting the offence of terrorism financing, it is not required that the suspect be previously convicted of felony or misdemeanor.

**[91]**   This offence is also provided by article 2 of the International Convention on the Suppression of the Financing of Terrorism adopted by the United Nations on December 09, 1999, and ratified by Presidential decree No 43/01 of 14/04/2002[58].

b. Act constituting an offence and evidence

**[92]**   RUSESABAGINA Paul has personally financed the terrorist group MRCD-FLN by giving money and means that helped in MRCD-FLN activities.

**[93]**   RUSESABAGINA Paul also played a role in mobilizing funds intended for MRCD-FLN through *fundraisings* in which he personally mobilized different persons to finance MRCD-FLN.

---

[58] Art.2 Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

    a)   An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or

    b)   Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation or armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

[94]   Apart from the personal financial support RUSESABAGINA Paul provided, PDR-Ihumure which was under his leadership, also made contributions to MRCD-FLN activities. That also proves that RUSESABAGINA Paul sponsored FLN in its terrorist activities.

That is attested by the following proofs:

[95]   RUSESABAGINA Paul's October 31, 2020 statement at his questioning by Rwanda Investigation Bureau in which he personally admitted having financed FLN with twenty thousand Euros (€20,000), in addition to playing a role in organizing fundraisings for FLN. In his own words, RUSESABAGINA Paul said this: "*On my part, I contributed 20,000 Euros and on top of that there were fundraisings we organized, and people would give financial support to FLN. In general, the amount of money we used to finance FLN and MRCD was known by the treasurers who were three, namely MUNYEMANA Eric, Emilien, the other one I don't recall his name. The amount of money I recall we had just sent is close to $300,000, however I wouldn't know the totality since the money sent to FLN did not go through our funders or the presidency. I was one of the main FLN funders, the other big amount came from Australia; the person in charge of the whole coordination was Jean Baptiste NSHIMIYIMANA alias Kalinijabo, a member of CNRD-Ubwiyunge. Other funds came from individual contributions across the world. After mobilizing our contributions, we asked MUNYEMANA Eric, the treasurer to go and collect it and he was the one who knew how to send it over.*

[96]   RUSESABAGINA Paul also admitted his financial support when he was interrogated by the Public Prosecution on September 11, 2020 on question/answer 2 and again in court when he was being tried on detention and provisional release in the first instance court of Kagarama on September 14, 2020 as it appears on the trial record on page 7.

[97]   Regarding the financing of MRCD-FLN, RUSESABAGINA Paul mentioned it again in his September 05, 2020 statement on question/answer 2,3, and 15 when he was interrogated by the Public Prosecution. On question/answer 2 he said: "(….)*regarding the other persons we worked with to provide financial support, they are persons with whom we cooperated in governing MRCD-FLN and each one of us made their*

55

*monthly contributions regularly. It is possible that there were other sponsors, but they were probably known by the MRCD-FLN treasurer, I wouldn't really know the names of all of them since each political party did its own fundraising and the money was given to the MRCD general treasurer named Eric MUNYEMANA.*

[98]   On question/answer 3, when RUSESABAGINA Paul was asked about the persons he worked with to mobilize contributions, he said this: "*Sincerely speaking I wouldn't know all their names, given that each political party did its own fundraising and after funds were transferred to the MRCD-FLN general treasurer called Eric MUNYEMANA.* **The persons I would know are the party chairmen because they made individual contributions and those are I, RUSESABAGINA Paul, Wilson IRATEGEKA and NSABIMANA Callixte alias Sankara. These are not the ones who received funds in a party that had a treasurer."**

[99]   Asked how they used to send money to MRCD-FLN on question/answer 15, RUSESABAGINA Paul said*: "When there was a request from General IRATEGEKA Wilson in Congo for funds for certain needs, each MRCD-FLN coalition party member gave, through its treasurer, its contribution to Eric MUNYEMANA, the general treasurer who then would transfer it to where it was needed without any other consultation."*

[100] All these RUSESABAGINA Paul's confessions on his role in financing FLN is consistent with Col NIYONZIMA Arthemon's February 06, 2020 explanation at Rwanda Investigation Bureau (he was CNRD's treasurer) on a question related to persons and even countries that provided financial support, in which he said: *"People who made personal contributions through Eric were CNRD's friends, whereas those in the coalition like RUSESABAGINA Paul, TWAGIRAMUNGU Faustin and Sankara would send it through their treasurers who in turn would transfer it to the Finance Officer who finally was the one to send it to CNRD President…".*

[101] Apart from RUSESABAGINA Paul's questions and answers, NSABIMANA Callixte alias Sankara also admitted that RUSESABAGINA Paul had financed MRCD-FLN as contained in NSABIMANA Callixte alias Sankara's August 31, 2020 statement in his questioning on question/answer 2 before the Organ in charge of Investigation.

[102] When he was being interrogated by Rwanda Investigation Bureau on August 31, 2020, NSABIMANA Callixte alias Sankara described how FLN was financed and how RUSESABAGINA Paul had personally accepted to finance FLN in preparing to launch attacks on Rwanda. NSABIMANA Callixte said it in these words: *"(….) RUSESABAGINA Paul instructed MRCD's treasurer Eric MUNYEMANA to send fifteen thousand dollars to Issa who lived in Bujumbura and who was Lt Gen Hamada's young brother. Issa had to transfer that money to General Steven, the head of Burundi intelligence, in order to assist FLN fighters either in providing us with equipment or the path. That businessman, Issa, who lives in Bujumbura served as an intermediary between General Steven and Paul RUSESABAGINA".*

[103] In that statement, NSABIMANA Callixte further reveals in question/answer 3 that it was RUSESABAGINA Paul who provided $ 6,000 which he sent to Lt Gen Wilson IRATEGEKA, an amount that was used to send thirty (30) RRM young men from Uganda to FLN military base under the guidance of Herman NSENGIMANA. They went in different waves.

[104] That same version had again been given by NSABIMANA Callixte alias Sankara when he was interrogated at the Public Prosecution in his March 20, 2019 statement on question/answer 14.

[81] RUSESABAGINA Paul's role in financing terrorism is, in addition, confirmed by NDAGIJIMANA Jean Chretien, who, in his July 16, 2020 statement in front of Rwanda Investigation Bureau in answering a question about politicians who supported FLN he said: *"I know RUSESABAGINA Paul because he used to talk on the phone with my father*

*who is Gen IRATEGEKA Wilson; and he used to send him money, and Sankara also. I know*
*them by the photos he used to show us but personally I did not see them in Congo".*

[105] Again in his September 28, 2020 written statement on page five and six when he
was questioned by the Public Prosecution about the role of RUSESABAGINA Paul in
financing FLN, NDAGIJIMANA confirmed that there were times RUSESABAGINA
talked with Lt Gen IRATEGEKA, then afterwards his father would send him to go to
bring the money.

[106]NDAGIJIMANA Jean Chretien's account on the fact that he used to go and
withdraw money sent to his father as a support to FLN is consistent with what is on
Cote 19 of the file from Belgium where $ 1,246.03 appear as one of the transfers done
by Eric MUNYEMANA, MRCD-FLN general treasurer and received by NDAGIJIMANA
Jean Chretien.

[107] In his questioning by the Belgian police, witness BALOKA Christian said in his
January 24, 2020 statement that there was money he sent to different places on
MUNYEMANA Eric's request. He explained it in these words*: "…I worked directly with*
*MUNYEMANA Eric in the same team…he asked me to use Western Union because as he said*
*he had forgotten his identification card… I am almost certain that it was never more than 2,000*
*Euros. …Regarding the recipient of the money sent through Western Union, in Madagascar*
*it was always the same person, in the DRC, the person who had to receive money lived in the*
*eastern part of the country. For Rwanda I don't remember".*

[108] BALOKA's testimony is consistent with RUSESABAGINA's words reported above
in which he said that the financial support collected was given to MRCD-FLN general
treasurer MUNYEMANA Eric who then would send it to where it was needed.

[109] Another proof of RUSESABAGINA Paul's role in financing terrorism is the July 16,
2018 *RIA Money Transfer (Transfer slip)* found in his room when the Belgian police
conducted a search at his house on October 21, 2019, which showed that his wife

MUKANGAMIJE Tatiana sent 1,000 Euros to one called MLINDE Msoubout Soighir in Comoros. In RUSESABAGINA Paul's statement of September 05, 2020 in front of the Public Prosecution on question/answer 9 related to that 1,000 Euros, he answered in these words: "*I personally don't know this person you are talking about, however my wife sent to Sankara 1,000 Euros and she did it through that person who handed it over to Sankara. Sankara gave a call to my wife as someone he trusted, given that Sankara's mother is from the same area as my wife's parents. They are from the same area and they grew up together though Sankara's mother was older*".

[110] Even though RUSESABAGINA Paul wants to show that the 1,000 Euros were sent by his wife to Sankara as an acquaintance of hers, in his questioning by Rwanda Investigation Bureau on October 16, 2020 on question/answer 2 related to the 1,000 Euros, NSABIMANA Sankara said: *"After becoming FLN spokesperson and in addition to giving interviews on different radio stations, things went public (they were talked about a lot) and people would call and tell me to vanish from sight otherwise Inyenzi were going to kill me. There is a friend who was in South Africa who asked me whether I was in the Comoro Islands given that he had heard news from Europe that I was there. I became afraid and right away I bought an air ticket from Comoro to Tanzania to be able to return to South Africa. I asked a friend who was at Dar Es Salaam airport if I could go through, and he warned me not pass there as it was not safe. I right away went to the airline agency to have my ticket changed and use another route but at the agency office they told me that the procedure for refund would take two weeks, and in that time I had only 500 Euros remaining in my pocket, and it was impossible to wait two weeks in Comoros. Then I called RUSESABAGINA Paul on the phone and explained to him how things were, and I found out that he himself was worried about my safety, and I asked him to send me a ticket to get out of Comoros. He then immediately sent me 1,000 Euros using the names of his wife MUKANGAMIJE Tatiana"*. NSABIMANA Callixte went on answering question/answer 3 in these words: *"The money that MUKANGAMIJE Tatiana sent is that amount of 1,000 Euros that I had asked RUSESABAGINA Paul to buy a ticket that could get me out of Comoros. I have never received any other money from MUKANGAMIJE and in my life there is no other time that she has helped me"*.

**[111]** On Cote 17 of the file from Belgium, one can see the report made by an investigator named GRARD Jean Yves which shows 14,979.44 Euros sent by BALOKA Christian in 32 transfers he made sending money to different individuals. This so called BALOKA Christian has Congolese nationality. He is one of the persons to whom the MRCD-FLN treasurer MUNYEMANA Eric used to send money as BALOKA Christian explained in his January 24, 2020 statement (Cote 47 of file from Belgium) when he was being questioned by the Belgian police. He said that MUNYEMANA Eric lied to him about the persons to whom he sent money as well as the reasons for sending money.

**[112]** Those funds sent to DRC were financial support to FLN in the name of MRCD whose leader was RUSESABAGINA Paul, the one who also was given activity reports. This is confirmed by NSABIMANA Callixte alias Sankara on his March 27, 2019 questioning at the Prosecution where he revealed that MUNYEMANA Eric, MRCD treasurer, gave reports to the Board of Presidents made up of RUSESABAGINA Paul as PDR-Ihumure president and president of MRCD-FLN, Gen Wilson IRATEGEKA as CNRD-Ubwiyunge President and first Vice President of MRCD-FLN and NSABIMANA Callixte alias Sankara as RRM President and Second Vice President of MRCD-FLN.

**[113]** The table below shows how the 14,979.44 Euros sent by BALOKA Christian were shown by Western Union in the 32 transfers he made when he was sending money to different places as it can be seen in the report on cote 17 of the file from Belgium.

| | Money transferred and date | Sender and location | Recipient and location |
|---|---|---|---|
| 1 | 2390 12/09/2018 | BALOKA Christian **Belgium** | ANDRIANTSIMIAVONTSOA Jose Philip **Madagascar** |
| 2 | 435 18/10/2018 | BALOKA Christian **Belgium** | ANDRIANTSIMIAVONTSOA Jose Philip |

| | | | Madagascar |
|---|---|---|---|
| 3 | 890<br><br>02/11/2018 | BALOKA Christian<br><br>**Belgium** | ANDRIANTSIMIAVONTSOA Jose Philip<br><br>**Madagascar** |
| 4 | 795<br><br>01/12/2018 | BALOKA Christian<br><br>**Belgium** | ANDRIANTSIMIAVONTSOA Jose Philip<br><br>**Madagascar** |
| 5 | 875<br><br>02/02/2019 | BALOKA Christian<br><br>**Belgium** | ANDRIANTSIMIAVONTSOA Jose Philip<br><br>**Madagascar** |

[114] In his interrogation at the Public Prosecution on May 27, 2019, NSABIMANA Callixte alias Sankara explained that when he was in Madagascar, he used a youth called Philip to withdrawal for him money sent him by money transfer agencies like Western Union or MoneyGram.

[115]  That one ANDRIANTSIMIAVONTSOA Jose Philip, who appears to have received money on several occasions in Madagascar, is moreover revealed by the investigation carried out by the Belgian Organ in charge of Investigation as the one who received a parcel containing a telephone sent on September 11, 2018 and delivered by DHL. NSABIMANA Callixte alias Sankara on his part confirmed that, that it was in that way he received the telephone and that they came in a set of five (5) BLACK PHONE sent by MUNYEMANA Eric, having been purchased in England by Olivier with money given by RUSESABAGINA Paul, as he explains in his May 17,  2020 interrogation at the Public Prosecution.

[116] This also is consistent with what RUSESABAGINA Paul said in his August 31, 2020 interrogation during Investigation in which he explained how those telephones were purchased and for whom, considering that there is even a receipt seized at his home during a search conducted by the Belgian police on October 21, 2019 proving it. These

telephones constitute another support RUSESABAGINA Paul provided to MRCD-FLN.

Other persons to whom BALOKA Christian sent money out of that sum of 14,979 Euros

| | Amount of money sent and date | Sender and location | Recipient and location |
|---|---|---|---|
| 1 | €1,820 20/08/2019 | BALOKA Christian **Belgium** | AINA Viviane Siliriame **Madagascar** |
| 2 | €92.87 27/03/2018 | BALOKA Christian **Belgium** | NIZEYIMANA Ali **South Africa** |
| 3 | €2,940 23/05/2019 | BALOKA Christian **Belgium** | Justin KUMBUKA BIKUBA **Bukavu (DRC)** |
| 4 | €2,499 17/01/2019 | BALOKA Christian **Belgium** | SIKUBWABO Jean de Dieu **Gitega (Burundi)** |
| 5 | €513.63 27/03/2018 | BALOKA Christian **Belgium** | NKUSI UWIMANA Agnes **Rwanda** |
| 6 | €363.73 20/09/2018 | BALOKA Christian **Belgium** | NZARORA Pascal **Rwanda** |

[117] As it can be seen on a CD containing the content of the investigation conducted into Western Union in Belgium, there are 21 other transfers of less than 130 Euros on each one of them which were sent to different locations by BALOKA Christian and which do not appear on this table. He did 13 transfers to DRC, 4 to Rwanda, 1 to South Africa and 3 others whose destination is not visible.

[118] On Cote 19 from Belgium, one can see $29,016.29 for 33 transfers done through *Western Union* by Eric MUNYEMANA, $7,892.84 for 21 transfers done by Eric

MUNYEMANA's wife UWIRAGIYE Odette. The funds sent to DRC account for the financial support given to FLN on behalf of MRCD which was under the leadership of RUSESABAGINA Paul who received activity reports as confirmed by NSABIMANA Callixte alias Sankara in his May 27, 2019 interrogation at the Public Prosecution.

**[119]** The following table shows the funds transferred through *Western Union* by BALOKA Christian, MUNYEMANA Eric and UWIRAGIYE Odette (MUNYEMANA Eric's wife).

|  | **Funds transferred and date** | **Sender and location** | **Recipient and location** |
|---|---|---|---|
| 1 | **$105.59** 30/11/2018 | BALOKA Christian **Belgium** | NZEYIMANA Ali **South Africa** |
| 2 | **$739.19** 12/04/2018 | MUNYEMANA Eric **Belgium** | Justin KUMBUKA BIKUBA **Bukavu (DRC)** |
| 3 | **$496.30** 16/05/2018 | MUNYEMANA Eric **Belgium** | Justin KUMBUKA BIKUBA **Bukavu (DRC)** |
| 4 | **$126.71** 04/02/2019 | MUNYEMANA Eric **Belgium** | Justin KUMBUKA BIKUBA **Bukavu (DRC)** |
| 5 | **$2,638.52** 04/05/2019 | MUNYEMANA Eric **Belgium** | Justin KUMBUKA BIKUBA **Bukavu (DRC)** |
| 6 | **$1,589.82** 20/05/2019 | MUNYEMANA Eric **Belgium** | Justin KUMBUKA BIKUBA **Bukavu (DRC)** |
| 7 | **$523.01** 26/05/2018 | MUNYEMANA Eric **Belgium** | Jean de Dieu BITAFANA NSENGA **Goma (DRC)** |
| 8 | **$2,152.24** 25/02/2019 | MUNYEMANA Eric Belgium | Jean de Dieu BITAFANA NSENGA **Goma (DRC)** |
| 9 | **$2,117.52** 04/03/2019 | MUNYEMANA Eric **Belgium** | Jean de Dieu BITAFANA NSENGA **Goma (DRC)** |
| 10 | **$1,382.24** | MUNYEMANA Eric | Jean de Dieu BITAFANA NSENGA |

|    |              |                      |                              |
|----|--------------|----------------------|------------------------------|
|    | 05/03/2019   | **Belgium**          | **GOMA (DRC)**               |
| 11 | **$565.36**  | MUNYEMANA Eric       | MLINDE MSOUBOUTI SOIGHIR     |
|    | 16/07/2018   | **Belgium**          | **Moroni (COMOROS)**         |
| 12 | **$687.39**  | MUNYEMANA Eric       | MOUSSA MVANO NDEZE           |
|    | 18/08/2018   | **Belgium**          | **Goma (DRC)**               |
| 13 | **$1,117.80**| MUNYEMANA Eric       | MOUSSA MVANO NDEZE           |
|    | 15/10/2018   | **Belgium**          | **Goma (DRC)**               |
| 14 | **$1,111.57**| MUNYEMANA Eric       | ELIPHAZI BAHATI IMANI        |
|    | 13/02/2019   | **Belgium**          | **Goma (DRC)**               |
| 15 | **$317.59**  | MUNYEMANA Eric       | ELIPHAZI BAHATI IMANI        |
|    | 19/02/2019   | **Belgium**          | **Goma (DRC)**               |
| 16 | **$2,110.82**| MUNYEMANA Eric       | Toussaint SICYONAZIRE        |
|    | 06/05/2019   | **Belgium**          | RWABAHENDA                   |
|    |              |                      | **Goma (DRC)**               |
| 17 | **$488.84**  | MUNYEMANA Eric       | Silas NDAYISHIMIYE           |
|    | 04/05/2018   | **Belgium**          | **Bujumbura (Burundi)**      |
| 18 | **$1,165.87**| MUNYEMANA Eric       | Jeannette KAHINDO SIBAMUPATE |
|    | 17/05/2019   | **Belgium**          | **Goma (DRC)**               |
| 19 | **$2,010.36**| MUNYEMANA Eric       | TWAGIRUMUKIZA Gregoire       |
|    | 21/01/2019   | **Belgium**          | **WINNIPEG (Canada)**        |
| 20 | **$1,246.03**| MUNYEMANA Eric       | Damas KAYIGIRE NZEYIMANA     |
|    | 27/04/2018   | **Belgium**          | **Goma (DRC)**               |
| 21 | **$1,246.03**| MUNYEMANA Eric       | Chretien NDAGIJIMANA         |
|    | 27/04/2018   | **Belgium**          | **Goma (DRC)**               |
| 22 | **$479.70**  | MUNYEMANA Eric       | Francois MUTUYEMUNGU         |
|    | 12/02/2019   | **Belgium**          | **Edmonton (Canada)**        |
| 23 | **$1,087.41**| INGABIRE      Marie  | Justin KUMBUKA BIKUBA        |
|    | 18/05/2019   | Claire               | **Goma (DRC)**               |
|    |              | **Belgium**          |                              |
| 24 | **$1,066.66**| UWIRAGIYE Odette     | Gloriose NTAKIRUTIMANA       |
|    | 18/04/2019   | **Belgium**          | **Bujumbura (Burundi)**      |

| 25 | **$750.39** 07/08/2019 | UWIRAGIYE Odette **Belgium** | Gloriose NTAKIRUTIMANA **Bujumbura (Burundi)** |
|----|------------------------|------------------------------|------------------------------------------------|
| 26 | **$803.61** 17/06/2019 | UWIRAGIYE Odette **Belgium** | BIFATANA NSENGA Jean de Dieu **Goma (DRC)** |
| 27 | **$1,120.28** 26/03/2019 | UWIRAGIYE Odette **Belgium** | ABDOU AHAMADA HATIM **Moroni (Comoros)** |
| 28 | **$535.04** 21/03/2019 | UWIRAGIYE Odette **Belgium** | Vincent BIZUMUREMYI **Bujumbura (Burundi)** |
| 29 | **$1,000.13** 27/12/2018 | UWIRAGIYE Odette **Belgium** | Jose                    PHILIPPE ANDRIANTSIMIAVOBTSOA **Antananarivo (Madagascar)** |

**[120]** On Cote 20 of the file from Belgium, Western Union showed that 8,147 Euros were sent to Madagascar, 1,474 Euros were sent to Comoros whereas 24,560 Euros were sent to the Democratic Republic of the Congo (DRC). The amount sent to DRC was a support to FLN on behalf of MRCD which was under the leadership of RUSESABAGINA Paul to whom an activity report was given as it was confirmed by NSABIMANA Callixte alias Sankara in his May 27, 2019 questioning by the Prosecution Authority. With regard to the money sent to Madagascar and Comoros, it was sent to NSABIMANA Callixte alias Sankara as the FLN spokesperson, therefore intended to finance terrorists.

**[121]** The following table shows the amount of money transferred by Western Union and its destination

| | **Total amount of money** | **Destination** | **Some of the recipients (those who received big amounts)** | **Senders and the amount sent** |
|---|------------------------|-----------------|-------------------------------------------------------------|--------------------------------|
| 1 | **8,147 Euros** | Madagascar | ANDRIANTSIMIAVONTSOA Jose Philip (6327 Euros) | BALOKA (5,385 Euros) UWIRAGIYE (942 Euros) |
| | | | AINiA Viviane Siliriame (1820 Euros) | BALOKA (1,820 Euros) |

| 2 | **1,474 Euros** | Comoros | MILINDE        MSOUBOUTI SOIGHIR | MUNYEMANA        Eric (484 Euros) |
| | | | ABDOU AHAMADA HATIM | UWIRAGIYE (990 Euros) |
| 3 | **24,560 Euros** | DRC | Justin   KUMBUKA   BIKUBA (8828 Euros) **BUKAVU (DRC)** | MUNYEMANA (4,912.7 Euros) INGABIRE (975 Euros) BALOKA (2,940 Euros) |
| | | | Jean   de   Dieu   BITAFANA NSENGA (6,143 Euros) **GOMA (DRC)** | MUNYEMANA (5,426.28 Euros) UWIRAGIYE        (716.81 Euros) |
| 4 | **694.96 Euros** | RWANDA | NKUSI UWIMANA Agnes **RWANDA** | BALOKA (513.63 Euros) MUNYEMANA    (181.33 Euros) |
| 5 | **1,014 Euros** | BURUNDI | Gloriose NTAKIRUTIMANA **Bujumbura  (BURUNDI)** | MUNYEMANA        (344 Euros) UWIRAGIYE (670 Euros) |

**[122]** As it can be seen on the above table, most of the money was sent to FLN in DRC, the rest to NSABIMANA Callixte alias Sankara in Madagascar and Comoros.

**[123]** On Cote 22 of the case file from Belgium, MoneyGram has shown that MINANI Innocent received in Burundi 120 Euros which was sent from Mayotte; INGABIRE Marie Claire received 3 transfers from Canada totaling 412.40 Euros, MoneyGram showed also that Eric MUNYEMANA made 5 transfers totaling 2,923 Euros and received 1,094.61 Euros in eleven transfers. That money sent to DRC was a financial support given to FLN on behalf of MRCD which was under the leadership of RUSESABAGINA Paul who was given activities report as NSABIMANA Callixte alias Sankara has confirmed it in his May 27, 2019 questioning at the Public Prosecution.

[124] The following table shows the way money was received and transferred by different persons via MONEYGRAM

|  | Amount | Recipient, time received and location | Sender and location |
|---|---|---|---|
| 1 | **120 Euros** | MINANI                Innocent 26/06/2018 **Belgium** | MAHORO    Marie    Claire d'Assise **Mayotte** |
| 2 | **412.15 Euros** | INGABIRE     Marie     Claire 30/03/2018,        27/04/2018. 10/04/2019 **Belgium** | UMUTONI Violette KANKINDI Philomene UMUTONI Violette **Canada** |
| 3 | **1,866.76 Euros** | KUMBUKA  BIKUBA  Justin 24/07/2019 **Bukavu (DRC)** | MUNYEMANA Eric **Belgium** |
| 4 | **280.49 Euros** | BUSHINGIZI  SHAMAMBA Pascal 26/08/2019 **Goma (DRC)** | MUNYEMANA Eric **Belgium** |
| 5 | 507.9 **Euros** | MUNYEMANA            Eric between    14/08/2018    and 28/01/2019 **Belgium** | BUHAYIRWA  Pascal **Canada** NDUWAYEZU Ildephonse **Canada** RWAMIHETO **Canada** |
| 6 | 302.72 **Euros** | MUNYEMANA Eric **Belgium** | NIYONKURU Thierry **Zambia** |
| 7 | 204.79 **Euros** | MUNYEMANA Eric **Belgium** | RUTAZIHANA  Romuald **Mozambique** |

[125] The investigation conducted by the Belgian Organ in charge of Investigation has shown that KUMBUKA BIKUBA Justin had received 10,694.47 Euros, and of the

26,472 Euros sent to Kivu by different persons, MUNYEMANA Eric alone had sent 21,795 Euros.

**[126]** The results of the investigation conducted by the Belgian police shown above correspond to what RUSESABAGINA Paul said in his August 31, 2020 and September 05, 2020 statements at the Public Prosecution in which he explained how funds to support MRCD-FLN were mobilized and passed on to MUNYEMANA Eric who would know how to transfer them to MRCD-FLN fighters.

**[127]** Concerning the money sent by the MRCD-FLN general treasurer Eric MUNYEMANA (as it appears on the above table), there is a six page document entitled: "MOUVEMENT RWANDAIS POUR LE CHANGEMENT DEMOCRATIQUE (MRCD); ORGANISATION ET ATTRIBUTIONS DES ORGANES" *(Rwandan movement for democratic change; structure and organs attributions)*, retrieved from RUSESABAGINA Paul's computer when a search was conducted in his house in Belgium, which in its third part (III) on point 14 talks about finances.

**[128]** As one can see from that document, the attributions of the accounts department contained in point 14 are the following:

- **Technical service directly attached to the presidency**
- Mobilize funds intended to finance various MRCD activities
- **Effect expenditures in accordance with instructions of the Presidency**
- Keep the state of receipts and expenditures in accordance with financial regulations
- Collaborate closely with the finance commission.

**[129]** These attributions of MUNYEMANA Eric show that he could not send any money without the instructions of the Presidency which, from July 1, 2017 to June 30, 2019, was exercised by RUSESABAGINA Paul.

**[130]** Though this document was retrieved from RUSESABAGINA Paul's computer, it also appears in his chats 60 and 376 as an attachment called *MRCD- nouv- org- 04- 2019* with title: MRCD: PROJET DE REFORMES DES ORGANES ( *MRCD: ORGANS REFORM PROJECT).*

**[131]** Another thing that shows that the general treasury acted on instructions from MRCD presidency is a document entitled MRCD-ORGANISATIONAL STRUCTURE which shows MRCD's structural organization. On this *chart the general treasury* is directly *attached* to the *presidency.* The document was retrieved from RUSESABAGINA Paul's computer when the Belgian police conducted a search at his house.

**[132]** All of this constitutes clear evidence that RUSESABAGINA Paul had a direct role in financing terrorist acts based on the money transferred by MUNYEMANA Eric and that transferred by those others he used as it has been detailed.

**[133]** A summary called "*Summary table of FLN funds transfers*" appearing in the file shows how MUNYEMANA Eric and other persons he used, including BALOKA Christian, INGABIRE Marie Claire and UWIRAGIYE Odette, used to send money to support FLN. As it can be seen on that table, a big amount of money was sent to Kivu/DRC where FLN fighters are based and to Madagascar and Comoros where NSABIMANA Callixte alias Sankara was. This table is one the proofs that the Belgian police has sent to the General Public Prosecution Authority.

**[134]** Chat 127 shows how RUSESABAGINA Paul was committed to securing financial support to FLN in its terrorist activities. The chat contains a conversation RUSESABAGINA Paul had with Brig Gen Antoine HAKIZIMANA alias Jeva, the FLN commander of the northern sector. In the conversation they had on January 29, 2019 there is a passage where RUSESABAGINA Paul told Brig Gen Jeva: "*Thank very much for that detailed report and keep it up, we are together. On our part we are going to pass the hat round……".*

[135] Chat 27 shows an MRCD *cadres WhatsApp group* called "Abadasigana-MRCD", including RUSESABAGINA Paul in which he uses a telephone having Number +32 485 03 24 01. This telephone number shows the phrase "pas besoin" (no need) in the chats he had with members of this WhatsApp group. The group was created on September 07, 2019 and it discloses a fund raising activity (fundraising/harambee) for the support of FLN terrorist activities.

[136] In the chats of this WhatsApp group, there is a passage where MUNYEMANA Eric says: *"Good day Basangirangendo! Thank you for this because no week passes by without cultivators asking for money. Today there is a place where we have to urgently sent 500, the money we had was sent the day before yesterday (Thursday) to buy food for the cultivators (it is understandable since most of the time they depend on us in those activities). We send money to buy hoes when they become available, we send money to buy pebbles, money to have cultivators helped to cross over to the fields, money to buy medicine and other things…. Presently as we speak, the account is empty.  I am going to be frank with you (you are cadres, the important thing is to avoid taking things to where they don't belong), this year (from January) we have sent 150,000 Euros, those from whom I have sought assistance are also tired".* MUNYEMANA Eric continued saying*: "the proposal I can give you is to choose among us  a treasurer, then we work together to mobilize resources, when contributions become available, we hand them over to him so that our account does not stay empty, and when there is something urgently needed I will communicate it to you and tell our treasurer where to send it".*

[137] This coded language MUNYEMANA Eric used is explained by RUSESABAGINA Paul in his statement during his September 05, 2020 questioning by Rwanda Investigation Bureau on question/answer 26 where he says: "*the combatants we called them farmers, guns were hoes, ammunitions were seeds, while the battlefield was field".*

[138] During his September 16, 2020 questioning by the Prosecution Authority, RUSESABAGINA Paul admitted that his telephone which was connected to the WhatsApp group "Abadasigana-MRCD" was the one he used in Belgium. The fact that it was a group uniting MRCD cadres, including himself as MRCD president,

proves that he was in the same plot together with other persons involved in the activity of mobilizing (*fundraising/harambee*) financial support to FLN in its terrorist activities.

**[139]** All the evidence presented above proves the role RUSESABAGINA Paul played in financing terrorism either through his personal contributions or those he made through the fundraisings he organized, or through the political party PDR-Ihumure of which he was president, including what he gave through MRCD-FLN of which he was also president.

### c. Intent to commit an offence and its evidence

**[140]** RUSESABAGINA Paul deliberately violated the law when he financed a terrorist group. In financing this group, he also knew well that the support was going to be used for terrorist acts because as we have demonstrated in the section entitled "MRCD-FLN as a terrorist group", since its creation, its aim was to carry out terrorist acts in Rwanda using all means possible, and as a matter of facts all the acts it carried out in Rwanda following its creation were terrorist acts.

**[141]** RUSESABAGINA Paul was aware of and even supported all of this as demonstrated by the following evidence:

**[142]** RUSESABAGINA Paul has explained it in a video called "**RUSESABAGINA claims deadly attacks on Rwandan territory".**

**[143]** Two unsigned pages were retrieved from RUSESABAGINA Paul's computer in Belgium when his house was searched by the Belgian police on October 21, 2019. One page has this heading: **"Blueprint for MRCD target action: Period of July 01, 2019 to June 30, 2020"** in which there is a sentence that stipulates **to intensify FLN operations**

**inside the country in order to extend the area of operations and gain the donors'
sympathy (without delay).**

**[144]** Press release No. 2019/04/30 of April 30, 2019 signed by RUSESABAGINA Paul
in which he shows that FLN fighting is still going on, that the struggle is continuing,
that the arrest of NSABIMANA Callixte alias Sankara has not discouraged FLN
fighters and that FLN armed forces had risen with fire. This communiqué was issued
following different MRCD-FLN military campaigns on Rwandan territory, and it
shows that RUSESABAGINA Paul understood well what his financial contribution
was meant to do.

**[145]** RUSESABAGINA Paul's statement of September 04, 2020 in his questioning by
Rwanda Investigation Bureau on question/answer 8 shows the following: *"(….) Concerning
FLN armed forces operations, FLN was in charge of them under the command of HABIMANA
Hamada who had been made chief of staff. In our capacity as MRCD leaders, among others
myself as MRCD president since June 30, 2019, reports were given to us after they had been
carried out to avoid leakage of information".* This is also another proof showing that when
he financed MRCD he knew well that that financial support was going to be used in
terrorist acts, more so considering that as he himself says it, he was one of those who
were given reports of FLN activities.

**[146]** All the above proofs demonstrate that from the time RUSESABAGINA Paul and
his associates formed MRCD-FLN, he knew about the terrorist plans. It demonstrates
also that when FLN was conducting terrorist activities, RUSESABAGINA Paul was
informed because he was given reports. During all that time, from the beginning till
after the attacks launched on Rwandan territory, RUSESABAGINA Paul continued to
finance FLN and to find sponsors for it.

### 4.1.4. Murder as an act of terrorism

#### a.  <u>Legal provision</u>

[**214** ] Article 2, Item 4, of Law No 46/2018 of 13/08/2018 on counterterrorism provides that a terrorist act is:

[**215**] a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:

    i)      intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

    ii)     disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

    iii)    create general insurrection in a State;

[**216**] b) a] Any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

[**217**] Article 19 of Law No. 46/2018 of 13/08∕2018 on counterterrorism provides that:

[**218**] A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence.

[**219**] Upon conviction, he/she shall be liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years.

**[220]** If the offence referred to in Paragraph one of this article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty five (25) years.

**[221]** Article 37 of Law No. 46/2018 of 13/08/2018 on counterterrorism provides that if the acts referred to under this Law result in death, the offender in liable to life imprisonment.

**b) Act constituting an offence and evidence**

**[222]** MRCD-FLN committed deliberate acts of killing; murder is usually against the Rwandan criminal law where it is provided as an offence in article 107 of Law No. 68/2018 of 30/08/2018 determining offences and penalties in general. This is an act that causes death.

**[223]** MRCD-FLN committed acts of killing in Nyarumata sector, Nyaruguru district and in Kitabi sector, Nyamagabe district, being financed by and under the leadership of RUSESABAGINA Paul.

**[224]** MRCD-FLN fighters launched terrorist attacks in Nyaruguru and Nyamagabe districts killing 9 persons by bullets as it was confirmed by the autopsy performed by medical doctors who produced a related autopsy report. RUSESABAGINA Paul happens to be one of the MRCD-FLN founders and he has provided it with the necessary financial support by mobilizing funds to support it in its terrorist activities. During his interrogation and trial for detention and provisional release on September 14, 2020, RUSESABAGINA Paul admitted that he was one of the persons who formed FLN and who charted its course of action.

**[225]** The forensic medical expertise and death certificates contained in the case file indicate that 9 persons were killed by bullets. The 9 persons for whom expertise was

done are MUTESI Jackline, ATETE SINE Ornella, MUKABAHIZI Heralie, NTEZIRYAYO Samuel, NIYOBUHUNGIRO Jeanine, NIWENSHUTI Isaac, HABARUREMA Joseph, MANIRIHO Anatole and MUNYANEZA Fidele.

[226] Testimonies given by some members of the local population who witnessed the attacks FLN launched in Nyaruguru and Nyamagabe districts complement what was mentioned in the previous paragraph where they describe how they launched attacks on Nyaruguru and Nyamagabe districts and committed acts constituting different offences, including killing people.

[227] Persons who were interviewed among those who saw the attacks are the late MUNYANEZA Fidele, HABIMANA Venuste and HAVUGIMANA Jean Marie Vianney.

[228] In his June 21, 2018 testimony before Rwanda Investigation Bureau, the late MUNYANEZA Fidele explained that around midnight on June 19, 2018, he was called by one HABIMANA who told him that a vehicle and a house were on fire in their neighborhood and then right away he and other persons rushed over to put out the fire. While they were extinguishing the fire, the Executive Secretary called him and he went to the side to answer the call, and then at that right moment he saw persons in military uniforms who told him to hand his telephone over to them and after they told him to leave. He immediately ran off but they shot him on the left leg and on the shoulder, and he fell down. They kicked him to see if he was still alive and then they left thinking he was dead. MUNYANEZA Fidele subsequently succumbed to those bullet wounds in CHUB hospital as indicated in the *forensic medical expertise* which is in this case file.

[229] The late MUNYANEZA Fidele's account is consistent with that of HAVUGIMANA Jean Marie Vianney where in his July 20, 2018 statement before Rwanda Investigation Bureau he testified that on June 19, 2018 at around eleven thirty in the evening while he was on his way home on a motorcycle, he heard sounds of gunshots as he was

reaching Rwerere bridge. When he reached the corner by the house of Nyabimata sector executive secretary he saw a vehicle on fire. When he reached where it was, he saw soldiers by the roadside and decided not to stop thinking that they were the ones who had fired. He went on saying that when he passed them they fired two shots at him but both passed over head. He rode on and when he reached below close to his house he met a military attack and he thought was a military intervention to help as the executive secretary's vehicle was on fire, but they rather beat him and walked him and when they reached the place where that vehicle was they met there MUNYANEZA Fidele, Nyabimata's consultative council president and they shot him twice and he fell down. Further away they met an old man called SAVIYO, they slapped him and told him to go home. Further ahead again they met MANIRAHO Anatole who, seeing them cried for help and they immediately shot him and he died.

[230] Once again, the killings committed by MRCD-FLN fighters in the terrorist attack they launched on Nyabimata sector on June 19, 2018 is confirmed by HABIMANA Venuste. In his statement before Rwanda Investigation Bureau on July 20, 2018, he explained that on July 19, 2018, armed individuals attacked Rwerere village and HABARUREMA Joseph, who was in a pub at MUNYARUGENDO Aloys's place, is the first person they met and they asked him to go and show them where the sector's leader lived. He told them that he didn't know where it was and then one of them told his colleague to shoot him, and he shot him and he fell down and died there.

[231] The other proof that complements witnesses stories which have already been mentioned is Nyabimata sector report of the attacks of June 03 and 19, 2018 and July 01, 2018 which shows that in the night of June 19, 2018, criminals numbering between 60 and 80 launched an attack on Nyabimata sector in which two civilian persons, namely MANIRAHO Anatole and HABARUREMA Joseph, were killed.

[232] As it has been mentioned above, MRCD-FLN carried out terrorist attacks in Nyaruguru, Nyamagabe and Rusizi districts. It is not only in Nyaruguru attacks that persons were killed but also in Nyamagabe's attacks people died.

[233] In the following paragraphs, we are going to show to the court evidence of killings as terrorist acts committed in Nyamagabe district.

[234] The persons among those who saw the attacks who were interviewed are NGIRABABYEYI Desire, BWIMBA Vianney and UWIMANA Stappin.

[235] In his statement before Rwanda Investigation Bureau on May 09, 2019, NGIRABABYEYI Desire said in his testimony that he was driving an ALPHA Agency Coaster with plate number RAC 341 U and then when he arrived in Nyungwe, Nyamagabe district, he saw them burning and shooting an OMEGA Coaster and he was stopped by a log that they used to block the road. Then one of them said that they had also just shot him. When he made about 100 meters further ahead, they fired an explosive at him that was like a grenade and it lifted the vehicle up off the ground and threw it off into the forest. He went on saying that a young girl of about twenty-five years of age, whose name he didn't know and was sitting in the second seat, was shot in the head and died immediately.

[236] BWIMBA Vianney is also one of those who witnessed the attack carried out in Nyamagabe district. In his statement made before Rwanda Investigation Bureau on May 08, 2019, he explained in his testimony that they were coming from Rusizi and when they reached Kitabi, they came upon persons in military uniforms, others in police uniforms while others had civilian clothes. They had put up a trunk across the road and there were three vehicles over there. They told them to stop and they started firing at the vehicle. Some persons started getting out through the windows while others were killed, as of him he was shot in the thigh.

77

[237] BWIMBA Vianney's testimony matches that of UWIMANA Stappin who was with them in the vehicle in which persons were fired at as indicated in his July 05, 2019 testimony before Rwanda Investigation Bureau.

[238] Attacks in which acts of killing were committed as described by the witnesses mentioned above were committed by MRCD-FLN. This is mostly indicated by the fact that right after they were committed, that terrorist group boasted about it in the words of its spokesperson NSABIMANA Callixte alias Sankara in the following audios:

- Audio called "*Sankara boasting about Nyabimata attacks*".[59]

Being interviewed on the telephone on August 14, 2018 by radio Ubumwe news reporter Mukashema Esperance who asked him whether he could tell her about the attacks they had launched in Nyaruguru district, NSABIMANA Callixte alias Sankara answered as the FLN spokesperson in these words: "(…) but *it is true, yesterday we went to Nyabimata and we shot them yeah…!*".

-An audio called *"Sankara affirming that the armed forces have taken Nyungwe".* In that audio NSABIMANA Callixte alias Sankara is heard telling a news reporter that they are in Nyungwe, and he even says that they had warned people not to use Nyungwe road because it was a combat zone.

[239]  RUSESABAGINA Paul must be held accountable for the killings committed by MRCD-FLN and shown by the evidence, because he financed and led the terrorist group MRCD-FLN, which makes him accountable as provided for under article 2, item 4 (b), of law No. 46/2018 of 13/08/2018 on counterterrorism[60].

---

[59] https://www.youtube.com/watch?v=ac9etRWUik How is FLN war viewed by the International community see FLN war, page visited on 22/10/2020

[60] b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a)

[240] In his August 31, 2020 questioning by Rwanda Investigation Bureau, RUSESABAGINA Paul confessed that, together with NSABIMANA Callixte alias Sankara who was RRM leader and IRATEGEKA Wilson who was CNRD-Ubwiyunge leader, they formed the illegal armed group of FLN.

[241] Furthermore in that statement when RUSESABAGINA Paul was responding to the offence of giving instructions in a terrorist act, he confessed that together with his associates in the college of the presidents they were the ones who gave instructions. He said it in these words: *"I am among the persons who gave instructions in those acts because instructions were given by the college of the presidents who headed the political parties which formed MRCD coalition, and those are I RUSESABAGINA Paul, president of PDR-Ihumure, IRATEGEKA Wilson president of CNRD-Ubwiyunge and NSABIMANA Callixte of RRM".*

[242] Besides, RUSESABAGINA Paul does not deny the acts of killings FLN committed as an armed MRCD group. In his questioning by Rwanda Investigation Bureau on September 05, 2020 and in his first questioning by the Public Prosecution on September 11, 2020, and even during the court proceedings on detention and provisional release on September 14, 2020, RUSESABAGINA Paul said that he recognized the acts FLN committed and that he was asking forgiveness for them, but that he had however never asked them to commit them and therefore he wasn't going to be answerable to them given that he had never been on the battle field.

[243] These defense arguments cannot remove his criminal responsibility of the killings as terrorist acts committed by FLN, because, besides financing those terrorist acts, he was moreover its leader and was a member of the college of presidents who gave orders as we have shown above. Thus, based on the article of the law mentioned above, this is sufficient for RUSESABAGINA Paul to be punished for those terrorist acts committed by MRCD-FLN.

**[244]** The Supreme Court of Colombia[61] in a court case in which leaders of a terrorist group were indicted for the acts committed by those who were under their leadership expressed that it would be a grave contradiction to accept that acts were committed on orders from leaders and to disregard the consequences those acts incurred, and therefore it found them guilty of the offences, including killing, wounding and others. "*The Chamber of Penal Cassation found that it would be contradictory to accept the undeniable proof that ELN leaders issued the order for the pipeline attack and then to ignore the consequences of their criminal act. The Chamber rejected the argument that because those leaders did not desire or foresee the deaths and injuries of the villagers of Machuca they could not be convicted for causing those harms. Under the doctrine of dolus eventualis, or indirect intent, the leaders were held responsible for the unplanned consequences flowing from the reckless and dangerous action they ordered.*"

**[245]** Criminal responsibility of terrorist group leaders was moreover explained in different terrorism related cases.

**[246]** In case RG P.08.0408.N[62] the Supreme Court of Appeal of Belgium equally ruled that terrorist groups leaders must be punished for terrorist acts committed by those under their leadership even if they do not themselves play a direct role in carrying out  the offence. The court decided it in these terms*: "A terrorist group leader is punishable if it is established that it is a terrorist group and subsequently <u>that the concerned person is the leader of the group</u>. The incrimination does not require that the person in particular must have had the intention to commit any given terrorist offence in Belgium or elsewhere or <u>that he was involved when it was committed</u>".*

**[247]** In a compilation of decisions taken on terrorism cases produced by UNODC[63], it is made clear that for terrorist acts to be punished in a fair way, it should not be only the perpetrators but also the planners, the organizers, the trainers and all the others

---

[61] Supreme Court of Justice of Columbia; Penal Cassation Chamber: Nicolas Rodriguez Bautista and others, No 23825, 7th March 2007 cited by UNoDC: Digest of terrorist cases, New York 2010, p. 10

[62] Cassation Court (Belgium): RG P.08.0408.N, Decree of 24th June 2008

[63] UNoDC: Digest of Terrorist Cases, New York 2010, p.9

who played a role that enabled those terrorist acts to be possible must be punished: *"Virtually all major terrorist incidents, and certainly movements employing terrorist tactics over a period of time, involve the combined resources and action of a group. Such a group is inherently more dangerous than a single individual could be. Its effective repression requires imposition of criminal liability on persons who organize and direct but do not themselves commit physical acts of violence. To combat terrorism one must reach beyond the person who actually places the bomb or seizes the aircraft. Criminal responsibility must also be imposed on the network of instigators, financiers, recruiters, trainers and logistical supporters who make such acts possible through their joint efforts"*.

**[248]** Furthermore, in a case decided by Tokyo District Court and confirmed by the Japanese Supreme Court[64], the Court found Shoko Asahara, the leader of Aum Shinrikyo sect guilty of killing acts committed at different places by persons he commanded in that group.

**[249]** All of these cases we have brought up solidify what we demonstrated above that RUSESABAGINA Paul must be held accountable for murder as a terrorist act committed by MRCD-FLN fighters, he must personally account for it due to the fact that he was a leader, he sponsored those acts and even gave orders in those acts as he admitted it himself.

### c. Intent to commit an offence and its evidence

**[250]** RUSESABAGINA Paul violated the law when he sponsored and even commanded the terrorist group MRCD-FLN which committed murder in Nyabimata and Kitabi as a terrorist act.

**[251]** The killings committed in Nyabimata and Kitabi aimed to cause fear among the population and force the Rwandan government to adopt or abandon a particular standpoint or act according to certain principles. This intent is illustrated by the acts

---

[64] Idem, p.10

committed themselves including those killings in which civilian people were killed at different times and in different places and there was no particular reason for them to be killed.

[252] Furthermore, this intent to commit terrorism is demonstrated by press releases put out by MRCD-FLN, of which some were even issued after those attacks as we are going to show it.

[253] Press Release No. 2018/07/01 of 15/07/2018 reveals that the group FLN was set up by MRCD with the aim to change authority in Rwanda using any means possible. In those means they opted for terrorism.

[254] Again press release No. 2019/03/21 of 21/02/2019 signed by NSABIMANA Callixte, alias Sankara, as the MRCD-FLN spokesperson invited Rwandans and the international community to avoid going into the combat zone, and for the population to abandon nightly rounds. This also shows a terrorist intent in the acts they carried out.

[255] In Press release No. 2019/03/19 of 19/03/2019, NSABIMANA Callixte, alias Sankara, as the MRCD-FLN spokesperson was calling on Rwandans in particular those living close to the south western border as well as those on the north border of Nyungwe forest to avoid going out at night, in particular in districts where there were military operations. This was also the same intent of continuing to cause fear among the population.

[256] In Press release No. 2019/04/30 of 30/04/2019, RUSESABAGINA Paul incited Rwandans and the international community to avoid going into combat zones, though however what he called combat were terrorist attacks that MRCD-FLN, which was under his leadership, was launching on civilians.

**[257]** All the evidence shown above confirms that all MRCD-FLN attacks which killed people were launched on civilian population in the intention of causing fear among the population and to force the Rwandan government to adopt or abandon a  particular standpoint or act according to certain principles.

### 4.1.5 Abduction as an act of terrorism

## a. Legal provision

**[258]** Article 2, 4 of Law No 46/2018 of 13/08/2018 on counterterrorism provides that a terrorist act is:

**[259]** a) Any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity of freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:
i) Intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;
ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;
iii) create general insurrection in a State;

**[260]** b)any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[261]** Article 19 of Law No. 46/2018 of 13/03/2018 on counterterrorism provides that:

**[262]** A person who commits, attempts to commit, participates to or supports terrorist acts commits an offence.

**[263]** Upon conviction, he/she shall be liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years.

**[264]** If the offence referred to in paragraph one of this article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term or not less than twenty (20) years but not more than twenty-five (25) years.

**b. Act constituting an offence and evidence**.

**[265]** In this offence the deliberately committed act is an illegal abduction of a person. This act is usually a violation of the criminal law since it is provided for and punishable under article 151 of Law No. 068/2018 of 30/08/2018 determining offences and penalties in general.

**[266]** This act also inconveniences the freedom of the person unlawfully abducted given that during the abduction the person does no longer enjoy any freedom.

**[267]** MRCD-FLN committed acts of unlawfully abducting persons in Nyabimata sector, Nyaruguru district and in Kitabi sector, Nyamagabe district, with the support of RUSESABAGINA Paul who was at the same time its leader.

**[268]** RUSESABAGINA Paul must account for these acts as someone who was the leader of MRCD-FLN as we have demonstrated with regard to murder as a terrorist act.

Acts referred to above are proven by the following evidence:

**[269]** The report produced by Nyabimata sector on attacks launched on June 03, 2018 and on July 01, 2018 indicates that armed criminals launched attacks in that sector during the months of June and July 2018 and that they committed different acts

including abducting persons whom they used to carry property they looted as they fled into Nyungwe forest.

[270] The content of that report also complements testimonies contained in the file which were given by some of the local abducted persons and which show how FLN fighters took those local persons and forced them to go with them and to carry loads of things they had looted in the population and later they released them and they returned home. They explained it in the following account:

[271] In his July 20, 2018 statement before Rwanda Investigation Bureau, NDIKUMANA Viateur explained that on June 19, 2018 at eight o'clock in the evening he met on his way home about fifty persons who were all armed and they asked him why he was returning home at night. He replied that it was still early, then they immediately took from him the wrist watch he was wearing, tied him up and ordered him to go and show them where the sector's executive secretary lived. When they reached the place, they did not find him. They continued with him together with other local persons they had arrested. They looted things and they made those local persons carry them and they walked for three hours. When they reached close to Nyungwe forest, they put down the loads they were carrying and then those fighters held a meeting with them and after they let them go home.

[272] Besides the act of unlawfully abducting persons in Nyaruguru district, MRCD-FLN committed that same offence in Nyamagabe district. One of the abducted is SEMUSHI David. In his December 16, 2018 statement before Rwanda Investigation Bureau, he explained that as he was coming from Nyamasheke going to Kigali on December 15, 2018 at 7h 30 he was abducted by persons carrying guns who called themselves government armed forces and who spoke Kinyarwanda, Kirundi and Lingala. He said he was abducted together with the persons he was with in an OMEGA bus. They stripped them of their belongings and then they picked out men and they took them to Nyungwe forest. Then at about six o'clock in the morning they

released them and they went home apart from one man who seemed to be acquainted with those fighters who remained with them.

**[273]** What those two witnesses said about those two attacks in which unlawful acts of abducting persons were committed matches the declarations contained in the case file of the following witnesses: HAVUGIMANA JMV, HABYARIMANA Léonard, HABYARIMANA Damascène, NTAKIRUTIMANA Sylvain, NGENDAKUMANA David, SHUMBUSHO Damascène, SIBORUREMA Vénuste, NDIKUMANA Callixte, MUNYENTWALI Cassien, HABYARIMANA Vianney, NSABIMANA Anastase and NTANGWAHAFI Callixte.

### c. Intent to commit an offence and its evidence

**[274]** RUSESABAGINA Paul violated the law by sponsoring and commanding a terrorist group of MRCD-FLN which unlawfully abducted persons in Nyabimata and Kitabi as terrorist acts.

**[275]** The unlawfully abduction of persons carried out in Nyabimata and Kitabi aimed to cause fear among the civilian population which had nothing to do with military operations and to coerce the Rwandan government to adopt or abandon a particular standpoint or to act according to certain principles.

**[276]** The proofs of this particular intent have been shown above in paragraphs 84-96.

### 4.1.6 Armed robbery as an act of terrorism

### a. Legal provision

**[277]** Article 2, Item 4, of Law No. 46/2018 of 13/08/2018 on counterterrorism provides that a terrorist act is:

**[278]** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity of freedoms of, or cause serious injury or death

86

to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i)   Intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii)   disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii)   create general insurrection in a State;

[279] b)any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

[280] Article 19 of Law No. 46/2018 pf 13/03/2018 on counterterrorism provides that:

[281] A person who commits, attempts to commit, participates to or supports terrorist acts commits an offence.

[282] Upon conviction, he/she shall be liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years.

[283] If the offence referred to in paragraph one of this article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term or not less than twenty (20) years but not more than twenty-five (25) years.

**b) Act constituting an offence and evidence**

**[284]** In this offence, the deliberate act committed is armed robbery and it is a violation of criminal law since it is provided for and punishable under article 170 of Law No. 068/2018 of 30/08/2018 determining offences and penalties in general.

**[285]** MRCD-FLN committed acts of armed robbery (people's property comprising money, telephones, small livestock, foodstuffs and others) in Nyabimata sector, Nyaruguru district and in Kitabi sector, Nyamagabe district.

**[286]** MRCD-FLN committed these acts under the leadership and sponsorship of RUSESABAGINA Paul. Thus he has to be personally held accountable for them as it was said above.

**[287]** The acts referred to above are shown by the evidence below:

**[288]** The report produced by Nyabimata sector in Nyaruguru district states that in the night of June 30 creeping into July 1, 2018, people's livestock (12 sheep and 2 goats), clothes, money and potatoes were stolen in Ruhinga cell.

**[289]** The content of this report matches also testimonies contained in the file which were given by some of the local persons whose goods were stolen and they show how armed FLN fighters robbed from them. They explained it as follows:

**[290]** In his July 20, 2018 written statement of the testimony he made before Rwanda Investigation Bureau, NSABIMANA Anastase, as one of those whose goods were robbed by FLN fighters, explained that on July 01, 2018 at ten o'clock in the evening, individuals armed with guns in military uniforms found him at his place and ordered him to open the door of his house and then they entered and told him to give them money, food and even a telephone and then ordered him to transport all of that to

Nyungwe forest where they were heading together with other persons who were transporting items they had looted.

[291] Armed robbery committed by FLN fighters is moreover explained by MUGISHA GASHUMBA Yves in his May 08, 2019 statement , in the testimony he gave before Rwanda Investigation Bureau where he explained on question 4 that they took his iPhone which was worth Rwf 70,000, his clothes which were in a bag as well as $250.

[292] What these witnesses say coincide with the declarations contained in the file of these other witnesses: HABIMANA Viateur, the late MUNYANEZA Fidèle, NSAGUYE Yohani, KARERANGABO Antoine, NSABIMANA Straton, BARAYANDEMA Viateur, SEBAGEMA Simon, MUKAMANA Théodette, HAVUGIMANA JMV, HABYARIMANA Léonard, KANGABE Christine, NYIRAHORANA Godelive, NYIRAGEMA Joséphine, RUSINGIZANDEKWE Léandre, NYIRAMANA Belancille, NYIRAZIBERA Dative, NGENDAKUMANA David, SHUMBUSHO Damascène, SIBORUREMA Venuste, NDIKUMANA Callixte, MUNYENTWALI Cassien, HABYARIMANA Vianney, NTANGWAHAFI Callixte, BWIMBA Vianney, JUMAPILI Issa, UWIMANA Stappin, KAYITESI Alice, BAKERA Ally and NDUTIYE Youssuf.

[293] Attacks in which armed robbery was committed which are described by witnesses mentioned above were committed by FLN taking into account that as shown the FLN spokesperson NSABIMANA Callixte, alias Sankara, boasted about them.

### c. Intent to commit an offence and its evidence

[294] RUSESABAGINA Paul violated the law when he sponsored and commanded the terrorist group MRCD-FLN which robbed persons' property using arms as a terrorist act in Nyabimata and Kitabi sectors.

[295] Armed robbery that took place in Nyabimata and Kitabi aimed to cause fear among civilian populations who had nothing to do with military operations and to coerce the Rwandan government to adopt or abandon a particular standpoint or to act according to certain principles.

[296] The evidence of this particular intent was shown above where we presented MRCD-FLN as a terrorist group. In addition to this evidence presented, with regard to this particular offence of armed robbery, we want to add another one that shows that it was not a usual robbery but rather robbery as a terrorist act. It was shown that in places where this robbery was committed, MRCD-FLN fighters robbed what they could carry and damaged what they could not carry. This shows that the plan was not simply to steal but that robbery was rather a terrorist plan.

[297] What was said in the previous paragraph is confirmed by some of the victims of this offence. In his July 03, 2019 statement, in the testimony he gave before the Public Prosecution, NDUTIYE Youssuf explained that he was coming from a wedding in Rusizi driving a  VW Golf vehicle with plate number RAC 547 A, and when they arrived in Nyungwe forest about to reach Gikongoro, they were stopped by armed people on the road. They took his Samsung telephone, his official documents (identity card, driver's license and his barrister's membership card) and then they set his vehicle on fire, he added.

[298] Then another witness named MUNYARUGENDO Aloys explained in his June 20, 2018 statement in the testimony he gave before Rwanda Investigation Bureau that he heard gunshots when they were in a pub and then he ran out and went into the bush. When he came back, he found the Executive Secretary's car burned and dead bodies around, a motorcycle that was there was burned, a television set and a solar panel were broken. They even broke the door down, took all the money the employees had made and beat them.

### 4.1.7 Arson as an act of terrorism

#### a. Legal provision

[299] Article 2, Item 4, of Law No. 46/2018 of 13⁄08⁄2018 on counterterrorism provides that a terrorist act is:

[300] a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity of freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:

i) Intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

[301] b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

[302] Article 19 of Law No. 46/2018 pf 13⁄03/2018 on counterterrorism provides that:

[303] A person who commits, attempts to commit, participates to or supports terrorist acts commits an offence.

[304] Upon conviction, he/she shall be liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years.

[305] If the offence referred to in paragraph one of this article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term or not less than twenty (20) years but not more than twenty-five (25) years.

**b) Act constituting an offence and evidence**

[306] In this offence, the deliberate act committed is arson and it is a violation of criminal law since it is provided for and punished under article 180 of Law No. 068/2018 of 30/08/2018 determining offences and penalties in general. This act has also damaged the property of some individuals.

[307] MRCD-FLN committed acts of arson (house, vehicle and motorcycle) in the districts of Nyaruguru, Nyamagabe and Rusizi. In the time MRCD-FLN was committing these acts it was commanded by RUSESABAGINA Paul who in addition sponsored it and who therefore should be punished for it.

The acts mentioned are proven by the following evidence:

[308] The report produced by the authorities of Nyabimata sector, Nyaruguru district details how armed criminals launched attacks in that sector on June 19, 2018 and set fire to a house, a vehicle and two motorcycles.

[309] That report is corroborated by pictures contained in the file with explanation showing the means of transport and the house burned in Nyabimata sector, Nyaruguru district.

[310] One can also see in that file photographs showing the vehicles which were burned in Nyungwe forest in Kitabi sector, Nyamagabe district.

[311] In addition to the photographs of the vehicles burned which are in the file, there are also identification documents of some of those vehicles (yellow cards copies). Plate numbers of those vehicles are: Toyota RAV4 RAD belonging to NSENGIYUMVA Vincent, Coaster RAD 201 N and RAC 357 J belonging to OMEGA SARL, Coaster RAC 341 U belonging to ALPHA Express Company Ltd, Minibus RAA 777 W belonging to URAYENEZA Léonard, VW Golf RAC 547 A belonging to NDUTIYE Youssuf, Motorcycle TVS RD 001 K belonging to HAVUGIMANA JMV and Motorcycle TVS RC 278 Y belonging to BAPFAKURERA Vénuste.

[312] In his July 24, 2020 questioning by Rwanda Investigation Bureau, witness MAHORO Jean Damascene proved that the July 8, 2019 attack burned his vehicle with plate number RAC 443 B.

[313] In his October 7, 2020 statement before the Public Prosecution witness INGABIRE Joyeux said that the October 19, 2019 grenade attack burned an RAV4 vehicle with plate number RAC 403 A belonging to HABARUREMA Venuste, alias Rwandema.

[314] In the same way, NDUTIYE Youssuf is one of those whose vehicles were burned. In his July 3, 2019 testimony before the Public Prosecution NDUTIYE Youssuf explained that he was coming from a wedding in Rusizi driving a VW Golf vehicle with plate number RAC 547 A, and when they arrived in Nyungwe forest about to reach Gikongoro they were stopped by armed people on the road. They took his Samsung telephone, his official documents (identity card, driver's permit and his barrister's membership card). He went on saying that they also set his vehicle on fire and there is another Coaster vehicle he saw they also set on fire.

**c. Intent to commit an offence and its evidence**

**[315]** RUSESABAGINA Paul violated the law when he financed and even commanded the terrorist group MRCD-FLN which set people's property on fire as terrorist acts in sectors of the districts of Nyaruguru, Nyamagabe and Rusizi.

**[316]** Arson of the property belonging to people committed in some sectors of Nyaruguru, Nyamagabe and Rusizi districts intended to cause fear among the civilian population who had nothing to do with military operations, and to coerce the Rwandan government to adopt or abandon a particular standpoint or act according to certain principles.

**[317]** This is proven by the fact that in the attacks they carried out they set fire on people's property in different places in the sectors of Nyaruguru, Nyamagabe and Rusizi, the intention being only to cause fear among the population.

**[318]** That intent is also affirmed by some of those who launched those attacks which burned people's property who said that the intention was to sabotage and show that FLN existed. Those are the declarations of BIZIMANA Cassien, alias PASSY, when he was being questioned at the Public Prosecution on September 24, 2020 and of BYUKUSENGE Jean Claude when he was questioned at the Public Prosecution on September 28, 2020.

**4.1.8. Attempted murder as an act of terrorism**

**a. Legal provision**

**[319]** Article 2, Item 4, of Law No. 46/2018 of 13/8/2018 on counterterrorism provides that an act of terrorism as:

**[320]** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death

to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[321]** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in a).

**[322]** Article 19 of Law No. 46/2018 of 13/8/2018 on counterterrorism provides that:

**[323]** A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence

**[324]** Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[325]** I f the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years

**b. Act constituting an offence and evidence**

**[326]** In this offence, the deliberate act that was committed is the attempt to commit murder; this act constitutes already a violation of the criminal laws because it is

provided for and punishable as an offence by articles 21 and 107 of Law No. 068/2018 of 30/8/2018 determining offences and penalties in general.

[327] MRCD-FLN carried out acts that aimed to kill civilians in Nyaruguru, Nyamagabe and Rusizi districts. These acts were committed when Paul RUSESABAGINA was the sponsor and chairman of MRCD-FLN and therefore he should be held accountable for his role.

The following constitutes evidences for the above mentioned acts:

[328]. Forensic examination reports that are in the case file show that a big number of people were shot and others were hit with grenades during the attacks perpetrated by MRCD-FLN fighters.

[329]. Those who were shot include NDAHAYO Noel, KIMANGA Faustin, KABUTUMWA Zerida, NIYOMUGABO Emmanuel, MUNGANYINKA Vérène, BASWAYI Clément, UWIMFURA Bernard, SHEMA Philbert, NTEZIRYAYO Claude, NYIRANZIZA Christine, UWIMANA Stappin, BAKERA Ally, HAKIZIMANA  Zachie, NDUWAYO Arnaud, KAYITESI Alice, NIYONTEGEREJE Azela, KULIMUSHI Byamungu, NIYITEGEKA Emmanuel, JUMAPILI Juma and NSENGIYUMVA Vincent. If these people are still alive, it is not because of the will of those  who  attacked  them  with gunfire  and  grenades.

[330]. Testimonies of some of the victims and eyewitnesses of the attacks explain how the criminals perpetrated attacks in Nyaruguru, Nyamagabe and Rusizi districts shooting people and throwing grenades at others.

[331]. In her statement of August 5, 2019 during the investigation, KAYITESI Alice, one of the victims of the gunfire in Kitabi sector, Nyamagabe district, explained how they were attacked when they were traveling from Rusizi to Kigali in a public transport van owned by ALPHA Company on December 15, 2018. She explained that

when they reached a place in Nyungwe forest they found that people had blocked the road with a tree trunk and when the driver tried to drive over, people started firing at the vehicle and the tires exploded. According to Kayitesi Alice, the criminals also fired at the passengers and some were injured while others lost their lives.

**[332].** The attack in Nyungwe is also narrated by NGIRABABYEYI Désiré, BWIMBA Vianney, MUGISHA GASHUMBA Yves and UWIMANA Stappin in the same way as KAYITESI is describing it.

**[333]**. In his statement of June 24, 2019 before the prosecution, NSENGIYUMVA Vincent who was shot in the attack perpetrated in Nyabimata sector, Nyaruguru district also explains what happened as follows:

**[334].** *"It was on June 19, 2018 and I was at home in my bed. I was staying in Rwerere village in Nyabimata cell. Around 9:30 pm, a man named Aloys MUNYARUGENDO from Rwerere village whom I knew before and who was staying in the vicinity phoned me to inform me that there were soldiers who wanted to see me. He asked me to come over if possible and meet them but he also added that they were violent for they were beating civilians. I replied to him that none of our soldiers beat civilians. I accepted his request and got up because Aloys was telling me that the soldiers wanted me to go with them for some operations. I got up and proceeded to a vehicle that was parked outside but before opening the door of the vehicle, I heard gunshots and went back into the house and stood in the sitting room.  While I was wondering about what was happening, in about two minutes I heard footsteps of people around the house where I was staying. So I moved towards the front door and opened the curtains to see who they were. I immediately saw guns pointed to the door and windows. By looking at the mixed clothes the assailants were wearing, I realized they were none other than soldiers. The person who was in front and whose gun was pointed to me ordered me to open the door or otherwise they would open it themselves. I kept quiet. The ones who were behind him were saying "this place is not yours". After a while, the others at the back door immediately shot me in the head. After that I was unconscious for some time, then after I crawled into the bedroom and hid under the bed. It is after some time that I realized I was shot at because it was hurting. After they shot at me,*

*gunshots continued around the house because even in the other room where I was hiding they fired in the windows of that room…"*

**[335].** Some of the victims of the grenade attacks perpetrated by FLN in Rusizi district between May and October 2019, also narrate what happened.

**[336]**. In his statement of October 6, 2019 before the prosecution, a certain RUTAYISIRE Félix explained how he was injured by a grenade. This is evidenced by a forensic examination report of July 2, 2019 that showed he had 2 grenade fragments in the right shoulder. Another forensic examination report of October 6, 2019 revealed that he was left with a permanent disability of 24% due to a grenade attack he had sustained.

**[337].** In his statement of October 6, 2020 before the prosecution, NSABIMANA Joseph stated that he was one of the victims of the attack given that he was hit by a grenade fragment which is still lodged in his body. This is also confirmed by a medical report which shows that he still has a grenade fragment in the right hip which has caused him a permanent disability of 8%.

**[338].** NKURUNZIZA Jean Népomuscène in his statement of October 7, 2020 before the prosecution testified that during the attack a grenade was hurled at him and he was injured by its fragments that caused him a permanent disability of 6% as confirmed by a medical report.

**[339].** BIZUMUREMYI Célestin also confirmed in his October 6, 2020 statement before the prosecution that the victims of the grenade attack perpetrated near Stella Bar include NIZEYIMANA Paulin, NKURUNZIZA Jean Nepo, NSABIMANA Joseph and RUTAYISIRE Joseph.

**[340].** All the above mentioned pieces of evidences complement each other to confirm that MRCD-FLN fighters attempted to commit murder as an act of terrorism.

### c. Intent to commit an offence and its evidence

**[341].** Paul Rusesabagina violated the law when he sponsored and even led a terrorist group (MRCD-FLN) which attacked civilians with fire arms and grenades as an act of terrorism in some sectors of the districts of Nyaruguru, Nyamagabe and Rusizi.

**[342].** The aim of the attacks with fire arms and grenades to civilians in some sectors of the districts of Nyaruguru, Nyamagabe and Rusizi was to intimidate civilians who had nothing to do with military operations and to coerce the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles.

**[343].** The evidence is that in their attacks in different sectors of the districts of Nyamagabe, Nyaruguru and Rusizi, the criminals indiscriminately fired and threw hand grenades at civilians.

### 4.1.9. Assault and battery as an act of terrorism

### a. <u>Legal provision</u>

**[344].** Article 2, Item 4, of Law No. 46/2018 of 13/8/2018 on counterterrorism provides that an act of terrorism as:

**[345].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[346].** any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in a) above

**[347].** Article 19 of Law No. 46/2018 of 13/8/2018 on counterterrorism provides that a person who commits, attempts to commit, participates in or supports terrorist acts commits an offence.

**[348].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**b. Act constituting an offence and its evidence**

**[349].** In this offence, the deliberate act that was committed is assault and battery; this act constitutes already a violation of the criminal laws because it is provided for and punishable as an offence by article 121 of Law No. 068/2018 of 30/8/2018 determining offences and penalties in general.

**[350].** MRCD-FLN carried out acts of assault and battery against civilians in Nyabimata and Kitabi Sectors in Nyaruguru and Nyamagabe districts respectively. Those acts were committed by MRCD-FLN fighters when Paul RUSESABAGINA was the sponsor and chairman of MRCD-FLN and therefore he should be answerable for his role in this.

The following constitutes evidence for the above mentioned acts:

**[351].** Forensic examination reports that were conducted which are in the case file show that there is a number of people who were assaulted by MRCD-FLN fighters and who endured different levels of suffering. Cases included in the medical reports are those of BUSWAYI Clément, HAKIZIMANA Zachée, KABUTUMWA Zerida, KIMANAGA Faustin, MUNGANYINKA Vérène, NDAHAYO Noel, NIYOMUGABO Emmanuel, NTEZIRYAYO Claude, UWIMANA Stappin and JUMAPILI Issa.

**[352].** The following is what both medical reports and eyewitnesses confirm. KARERANGABO Antoine is one of the survivors of Nyabimata attack. In his July 20, 2018 statement during the investigation he testified that he was on his way to the rescue of his fellows when he was attacked by criminals. He stated that the assailants hit him in the head and when he fell down they kicked him in the ribs.

**[353].** Also JUMAPILI Issa, who survived the Nyungwe attack, stated in his August 5, 2019 statement during the investigation, that the assailants attacked them in Nyungwe forest when they were traveling from Rusizi to Kigali. They pulled them out of the vehicle and beat him seriously with sticks.

**[354].** This testimony is consistent with those of other witnesses who were also assaulted during the attacks. The victims include HABIMANA Viateur, HABYARIMANA Léonard, HABYARIMANA Damascène and HABYARIMANA Vianney who described how the assailants indecently assaulted them.

**[355].** MRCD-FLN boasted of these attacks that were carried out and characterized by acts of assault and battery as evidenced by the above-mentioned witnesses.

### c. Intent to commit an offence and its evidence

**[356].** The assault and battery that were committed in the districts of Nyaruguru and Nyamagabe were in the broader plan of MRCD-FLN to intimidate civilians and to

force the government of Rwanda to enter into negotiations with MRCD-FLN and to change its standpoint.

**[357].** This is evidenced by the fact that civilians were beaten without any reason; they were indiscriminately beaten in different places and at different times. This is proof that it was not an act of ordinary offence.

### 4.2. Concerning NIZEYIMANA Marc

### 4.2.1. Membership of an irregular armed group

### a. <u>Legal provision</u>

**[358].** Article 200 of Law No. 68/2018 of 30/8/2018 determining offences and penalties in general provides that:

**[359].** Any person who by donations, remuneration, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular armed group or signs an agreement with this group for the purposes of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than ten (10) years and not more than fifteen (15) years.

**[360]**. Any person who deliberately agrees to be hired or recruited to join an irregular armed force, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than seven (7) years and not more than ten (10) years.

**[361].** The legal action against offences referred to in Paragraph One and 2 of this Article is instituted upon complaint or on the authorization of the Prosecutor General or the Military Prosecutor General, depending on their authors.

**b. Acts constituting an offence and their evidence**

**[362].** NIZEYIMANA Marc used to be in the FDLR armed wing called FOCA from its creation in 2000 to 2016 when it split into two, one group remaining in FDLR and the other in CNRD. Later, the latter became an armed wing of FLN (Forces de Libération Nationale) when CNRD fused with other political organizations to form a coalition called MRCD. All these groups are irregular armed groups.

Below is the evidence:

**[363].** In his July 15, 2020 statement while answering question No. 22 during the investigation and in his August 13, 2020 statement and that of September 23, 2020 before the prosecution, NIZEYIMANA Marc confessed to have been in both FOCA and FLN armed groups.

**[364].** NIZEYIMANA also admitted this before the court during his pre-trial for provisional detention or provisional release as indicated in court ruling RDP 00583/2020/TB/GASABO, paragraph 99.

**c. Intent to commit an offence and its evidence**

**[365].** NIZEYIMANA Marc violated the law when he joined FOCA and FLN armed groups.

**[366].** This is evidenced by the fact that NIZEYIMANA Marc, during the investigation on July 15, 2020 and before the prosecution on August 13, 2020 and on September 23, 2020, stated himself that he had been one of the FOCA leaders especially as he had left that organization with the rank of Lt. Colonel. It is the rank he kept when he joined FLN in 2016 before he was promoted to Col and assigned the task of sector Deputy Commandant and at the same time that of the in-charge of operations (S3).

## 4.2.2. Membership of a terrorist group

### a. <u>Legal provision</u>

**[367].** Article 18 of Law No. 46/2018 of 13⁄8/2018 on counterterrorism provides that: "a person who is a member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years".

### b) Act constituting an offence and its evidence

**[368].** NIZEYIMANA Marc has been a member of and took part in the acts of FDLR-FOCA and MRCD-FLN terrorist groups.
Evidence:

**[369]** NIZEYIMANA Marc was a member of FDLR-FOCA from its creation to 2016. He was also a member of CNRD armed force which later became MRCD-FLN armed group until when he was captured on July 28, 2020 as mentioned in his July 15, 2020 and August 13, 2020 statements before Rwanda Investigation Bureau and the Public Prosecution respectively.

**[370].** In the two statements NIZEYIMANA Marc also states that he was captured when he was involved in the activities of moving MRCD-FLN fighters from DRC to Burundi to join their colleagues in their defenses in Kibira forest.

### c. Intent to commit an offence and its evidence

**[371].** NIZEYIMANA Marc violated the law when he joined FDLR-FOCA and MRCD-FLN terrorist groups and participated in their acts as mentioned in the previous two paragraphs.

### 4.2.3. Maintaining relations with foreign governments 'officials with an intention to support war

**a) <u>Legal provision</u>**

**[372].** Article 193 of Law No. 68/2018 of 30/8/2018 determining offences and penalties in general provides that:

**[373].** Any person who collaborates, maintains or strengthens relations with a foreign Government, its institutions or their officials, with an intention to wage or support a war, a military attack or any other serious acts against the Republic of Rwanda, commits an offence.

**[374].** Upon conviction, he/she is liable, in wartime, to a term of life imprisonment. In peacetime, he/she is liable to imprisonment for a term of not less than twenty (20) years and not more than twenty-five (25) years.

**b) Act constituting an offence and its evidence**

**[375].** NIZEYIMANA Marc collaborated with some commandants of Burundi armed forces. We can mention for example the Commandant of the 114th Battalion that was operating in Cibitoke Province. He used to host FLN forces that were moving from DRC to Kibira forest. There is also  warrant officer NIYONZIMA who was working for G2 (Military Intelligence) in the Burundi defense forces military staff and who supplied them with ammunitions.

**[376].** When he was interrogated by Rwanda Investigation Bureau on July 15, 2020, about the person with whom he was in touch in Burundi and who was supposed to assist him on his way to joining his colleagues, he answered in the following words: *"On February 18, 2020 together with soldiers we left Kahanda and moved to Cibitoke province in 114th Battalion barracks where we spent a week. Then one Sunday, a certain warrant officer*

*NIYONZIMA who worked for G2 brought us 15 boxes of ammunitions of which 9 boxes of Kalashnikovs and 6 boxes of machine guns. The coordination between NIYONZIMA and myself was facilitated by Lt Col. Fabien from FLN who was in charge of Logistics and was based in Bujumbura. We had paid 300 dollars for 3 boxes, the rest was given to us for free/as a support".*

**[377].** Concerning the collaboration with Burundi government Officials, he explained it as follows: *"In Burundi, it is an individual responsibility. This is the case for example of warrant officer NIYONZIMA, a Military Intelligence staff who brought us ammunitions, and a Brigadier General named Agricole who hosted LT Col. Fabien, FLN coordinator in Burundi. There is also NIYONZIMA, a civilian resident of Rugombo who guided people from Burundi to Congo or vice versa".*

## C) Intent to commit an offence and its evidence

**[378].** NIZEYIMANA Marc collaborated with officials of a foreign government in the intention of supporting an attack or serious acts against the Republic of Rwanda. In addition to the above mentioned relations with officials of the government of Burundi, NZEYIMANA carried out acts that supported attacks and serious acts against the Republic of Rwanda as he, himself confessed.

**[379].** NIZEYIMANA Marc confessed that when he was captured he was carrying military equipment supply to FLN fighters deployed in Kibira forest where they were planning to launch attacks on Rwanda. This is what he personally confessed in his July15, 2020 statement before Rwanda Investigation Bureau. He said: *"I was captured on February 28, 2020 in Uvira, South Kivu near Rusizi River. I was coming from Kahanda below Remera heading to Kibira forest in Burundi. I was going to join FLN fighters under the command of Col JEVA (....). I had 15 fighters, a heavy machine gun (Gatimba), 01 PKM, 15 SMG, a long-range transmitter and receiver, 06 Motorola and a medical kit (medicines against malaria and intestinal worms, Bactrim and bandages). They were first aid medicines (....)".*

**[380].** The plan to launch attacks into Rwanda is also reflected in these preliminary activities prior to the attacks as he himself mentioned in the following account: *" It was on February 27, 2020 that I once again saw a guide from Burundi coming to get some combatants (elements) to cross over to the other side of the river. They gave me 13 people and other equipment. We were 15 in total, the guide included, but there were five others whose mission was to conduct pathway reconnaissance and then go back. On February 28, 2020, we were hiding near Rusizi River and I was talking to Gwado who was in Kibira forest and to a Burundian named NIYONKURU, a resident of Rugombo who had to bring over a car (….)".*

**[381].** Another indication of their intention to commit the crime is their plan to launch attacks on the Republic of Rwanda, as NIZEYIMANA Marc explains it here: *"we were fighting to overthrow the Kigali regime and seize power ourselves. Our first ideology was: in the past Hutus exercised power now let's fight and get it back. We wanted to have full control of the power and feel strong in the country. Even if one does not become president but at least he/she is in the top five influential people in the ruling party."* He said this in his statement answering to question No 11 during interrogation before Rwanda Investigation Bureau on July 15, 2020.

### 4.2.1. Murder as an act of terrorism

### a) Legal provision

**[382].** Article 2, 4o of the law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[383].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State

**[384].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[385].** Article 19 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that: a person who commits or attempts to commits, participates in or supports terrorist acts commits an offence. Upon conviction he/she shall be liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years.

**[386].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**[387].** Article 37 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that: If the acts referred to under this law result in death, the offender is liable to life imprisonment.

## b). Act constituting an offence and its evidence

**[388].** MRCD-FLN carried out deliberate acts of murder; the act of murder normally constitutes a violation of the Rwandan criminal laws where it is provided for as an offence under Article 107 of Law No. 068/2018 determining offences and penalties in general. This is also an act that causes the death of a person.

**[389].** MRCD-FLN carried out acts of killing in Nyabimata and Kitabi sectors in the districts of Nyaruguru and Nyamagabe respectively, when NIZEYIMANA Marc was

FLN deputy commander of the Northern Sector from which deployed the fighters who carried out terrorist attacks in Rwanda at different times. NIZEYIMANA Marc was also involved in terrorist acts by organizing some of the FLN fighters who carried out terrorist attacks in Rwanda.

**[390].** FLN fighters carried out terrorist attacks in Nyaruguru and Nyamagabe districts, killing 9 persons by shooting them down according to medical reports. NIZEYIMANA Marc, was one of FLN senior officers with the rank of Colonel and was deputy commander of sector North from which also deployed fighters who carried out the terrorist attacks that killed people in the above areas.

**[391].** NIZEYIMANA Marc is also the senior officer who was in charge of selecting fighters who l a u n c h e d attacks in Rwanda.

**[392].** During his interrogation before Rwanda Investigation Bureau, NIZEYIMANA Marc also admitted to his involvement in the killings. In his July 15, 2020 statement while answering questions No 14 and 23, he admitted that he was involved in the transport of FLN fighters from Congo to Kibira forest via Cibitoke from where they went to attack Rwanda through Nyungwe. In addition, NIZEYIMANA Marc admitted that the FLN army of which he was one of the leaders murdered civilians and he apologized for that.

**[393].** The murder of the 9 civilians is confirmed by forensic examinations and death certificates submitted with the case file. The 9 victims murdered are MUTESI Jackline, ATETE SINE Ornella, MUKABAHIZI Heralie, NTEZIRYAYO Samuel, NIYOBUHUNGIRO Jeanine, NIWENSHUTI Isaac, HABARUREMA Joseph, MANIRIHO Anatole and MUNYANEZA Fidèle.

**[394].** Testimonies from some of the residents who witnessed FLN attacks launched in Nyaruguru and Nyamasheke districts also confirm that these people were murdered

by FLN fighters. They described how the fighters attacked the areas and carried out various acts including murder.

**[395].** Some of the eye witnesses of Nyaruguru attacks that were interrogated include the late MUNYANEZA Fidèle, HABIMANA Vénuste and HAVUGIMANA Jean Marie Vianney.

**[396].** In his June 21, 2018 statement before Rwanda Investigation Bureau, the late MUNYANEZA Fidèle, explained that on June 19, 2018, at midnight, HABIMANA called him and told him that in their neighborhood there was a vehicle and a house that were burning. Together with the neighbors they went to extinguish the fire and  as they were doing it the Nyabimata Sector Executive Secretary called him. So, he went to the side to answer the phone and at that right moment he saw people in military uniforms. They ordered him to give them his phone and they told him to leave. He immediately ran away but they shot him in the left leg and in the shoulder; and he fell to the ground. Then they came and kicked him to make sure he was dead and finally they walked away believing he was dead. MUNYANEZA Fidèle later succumbed to his injuries at the CHUB hospital due to gunshot wounds, according to forensic examinations.

**[397].** The testimony of the late MUNYANEZA Fidèle is similar to that of HAVUGIMANA Jean Marie Vianney, where he explained in his July 20, 2018 statement before Rwanda Investigation Bureau that on June 19, 218 when he arrived at Rwerere bridge on his way back home on his motorcycle at about 23:30 pm. he heard gunshots; and when he reached the crossroads where the Nyabimata Sector Executive Secretary lives, he saw the latter's vehicle burning. There were soldiers on each side and he continued his way without stopping, thinking that they were the ones who were shooting. He further added that when he passed them they fired at him twice but both bullets passed over his head. As he moved on down near his house, he was attacked by soldiers whom he thought were going to the rescue of the Executive Secretary's car that was burning. They hit him instead and dragged

him to where the vehicle was. When they arrived there they found MUNYANEZA Fidèle, the president of Nyabimata Council and shot him dead with two bullets. He went on saying that a short distance away they met an old man named SAVIYO and they slapped him and ordered him to return home. And further ahead they met MANIRAHO Anatole and when he shouted they shot him dead.

**[398].** Another witness of the murder perpetrated by MRCD-FLN fighters in Nyabimata sector is HABIMANA Vénuste. In his July 20, statement before Rwanda Investigation Bureau, he explained that on June 19, 2018, some armed men attacked Rwerere village and surprised HABARUREMA Joseph who was in the bar of MUNYARUGENDO Aloys. They then asked him to show them where the Sector Executive Secretary lived. When he replied that he did not know, one of the armed men immediately told his colleague to shoot him. He was shot and fell dead to the ground.

**[399].** The Report of Nyabimata Sector on the June 3, 19 and July 1, 2020 attacks shows that in the night of June 19, 2018 between 60 and 80 assailants carried out an attack in Nyabimata Sector that killed 2 civilians namely MANIRAHO Anatole and HABIMANA Joseph.

**[400].** There are as well other witnesses who testified killings carried out by MRCD-FLN fighters in Nyamagabe district. Some of those eye witnesses of the attacks include NGIRABABYEYI Désiré, BWIMBA Vianney and UWIMANA Stappin.

**[401].** In his statement before investigation organ on May 9, 2019, NGIRABABYEYI Désiré testified that he was driving a coaster bus with plate number RAC341U owned by Alpha transport company and when he arrived in Nyungwe forest, Nyamagabe District he found people burning and firing at a Coaster bus owned by OMEGA transport company. He was stopped by a tree trunk that was put in the road. One of the assailants right away ordered to bring over the vehicle with the driver, but NGIRABABYEYI Désiré straightaway drove over the tree trunk that was blocking the road, and when

he was about 100 meters away they threw a grenade-like explosive at him and the vehicle fell into the forest. He further added that an unidentified 25-year-old girl that was sitting on seat No. 2 was shot in the head and died instantly.

[402] NGIRABABYEYI Désiré's testimony on the above mentioned attack is consistent with that of BWIMBA Vianney. In his May 8, 2019 statement before Rwanda Investigation Bureau he explained that they were coming from Rusizi and when they arrived at Kitabi they met persons dressed in military uniforms, others in police uniforms and others in civilian clothes. They had blocked the road with a tree and there were three vehicles. They ordered the drivers to stop and they started shooting at the vehicles. Some passengers started to escape through the windows while others were shot dead. BWIMBA Vianney was shot in the thigh.

[403]. BWIMBA Vianney's testimony is also consistent with that of UWIMANA Stappin whom they were together in the vehicle in which some passengers were shot dead, according to his July 5, 2019 statement before Rwanda Investigation Bureau.

[404]. The all above mentioned attacks which were characterized by criminal acts as we have demonstrated with evidence were perpetrated by MRCD-FLN as boasted about by his spokesman NSABIMANA Callixte aka Sankara. Therefore, NIZEYIMANA Marc should be punished for those acts because of his involvement as we have shown above with evidence.

a) **Intention to commit an offence and its evidence**

[405]. NIZEYIMANA Marc violated the law when he led and organized FLN fighters who carried out terrorist attacks that killed civilians in Nyamagabe and Nyaruguru districts.

[406]. The killings carried out in Nyaruguru and Nyamagabe districts aimed to intimidate civilians and force the government of Rwanda to adopt or abandon a particular

standpoint or to act according to certain principles. This particular intention of MRCD-FLN on launching terrorist attacks on Rwandan territory was highlighted in the previous paragraphs.

### 4.2.2. Abduction as an act of terrorism

**a. Legal provision**

**[407].** Article 2, 4o of Law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism as:

**[408].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[409].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[410].** Article 19 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that:

**[411].** A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence

113

**[412].** Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[413].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**b) Act constituting an offence and its evidence**

**[414].** In this offence, the deliberate act that was committed is the abduction of a person; this act constitutes already a violation of the criminal laws because it is provided for and punishable as an offence by article 151 of Law No 068/2018 of 30/8/2018 determining offences and penalties in general.

**[415].** This act also jeopardizes the freedom of the abducted person because during the abduction the victim is deprived of his/her freedom.

**[416].** FLN carried out abduction operations in Nyabimata and Kitabi sectors in Nyaruguru and Nyamagabe districts respectively, when NIZEYIMANA Marc was deputy commander of the FLN Northern Sector from which deployed fighters who carried out terrorist attacks in Rwanda at different times. Ind addition, NIZEYIMANA Marc commanded the FLN fighters who carried out terrorist attacks in Rwanda.
The following constitutes evidence for the above-mentioned acts:

**[417].** The report of Nyabimata sector of June 3, 2018, June 19, 2018 and July 1st, 2018 attacks shows that armed criminals attacked the sector in June and July 2018 and carried out various acts including abducting civilians to help them transport looted goods in their escape into Nyungwe forest.

**[418].** The content of the report is also confirmed by some of the abducted persons who were interrogated in this case. Their testimony shows how FLN fighters arrested villagers and forced them to accompany them and transport goods looted from the local community. Later, the villagers were released and returned home.

They described it as follows:

**[419].** In his July 20, 2018 statement before Rwanda Investigation Bureau, NDIKUMANA Viateur explained that on June 19, 2018 at 2:00 pm when he was on his way home, he met a group of 50 people armed with guns. They asked him why he was coming back home late and he replied that it was still early. Then they stripped him of the watch he was wearing and tied him up before they ordered him to lead them to the address of Nyabimata sector Executive Secretary. When they arrived there, they found that the executive secretary was not at home. So, they continued their way and other arrested villagers whom the fighters forced to transport goods they were looting. They walked for three hours and when they arrived near Nyungwe forest they were ordered to put down the loads they were carrying and the fighters conducted a meeting with the villagers before releasing them.

**[420].** Concerning SEMUSHI David, he confirms the attack that abducted people in Nyamagabe district. In his statement before Rwanda Investigation Bureau on December 16,2018 at 5.30 pm, he explained that when he was on his way to Kigali from Nyamasheke, he was abducted by people armed with guns, who were calling themselves the national army and were speaking Kinyarwanda, Kirundi and Lingala. He also said he was abducted together with other passengers with whom they were traveling in a bus owned by OMEGA Transport Company. The attackers stripped them of their belongings and picked up some men and took them to Nyungwe Forest. However, around 6:00 am they were all released and they returned home except for one man who remained with the fighters because he seemed to be their acquaintance.

**[421].** The statements of these two witnesses are consistent with those contained in the case files of these following witnesses: HAVUGIMANA JMV, HABYARIMANA Léonard, HABYARIMANA Damascène, NTAKIRUTIMANA Sylvain, NGENDAKUMANA

David, SHUMBUSHO Damascène, SIBORUREMA Vénuste, NDIKUMANA Callixte, MUNYENTWARI Cassien, HABYARIMANA Vianney, NSABIMANA Anastase, and NTANGWAHAFI Callixte.

**[422].** Both of these attacks that abducted people were carried out by MRCD-FLN as it was boasted afterwards.

**c. Intention to commit an offence and its evidence**

**[423].** NIZEYIMANA Marc violated the law when he led and commanded FLN fighters who carried out terrorist attacks in Nyamagabe and Nyaruguru districts on various occasions and abducted civilians as an act of terrorism.

**[424].** The abduction of people in Nyamagabe and Nyaruguru districts aimed to intimidate civilians who had nothing to do with military operations and to force the government of Rwanda to adopt or abandon any particular standpoint or to act according to certain principles;

**[425].** This specific intent that characterized MRCD-FLN when it carried out various attacks in different places and at different times on Rwandan territory has already been proven with evidence.

**4.2.3. Armed robbery as an act of terrorism**

**a. Legal provision**

**[426].** Article 2, 4o of Law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[427].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[428].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[429].** Article 19 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that:

**[430].** A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence

**[431].** Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[432].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**b. Act constituting an offence and its evidence**

**[433].** In this offense, the deliberate act which was actually carried out is armed robbery, which is against the law because it is normally provided for and punishable under Article 170 of Law No 068/2018 determining offenses and penalties in general.

**[434]**. MRCD-FLN carried out armed robbery (property belonging to civilians including money, telephone, small livestock, agricultural products etc.) in Nyabimata and Kitabi sectors in Nyaruguru and Nyamagabe districts respectively. These acts were carried out when NIZEYIMANA Marc was the deputy commander of the FLN North Sector from which deployed the fighters that launched terrorist attacks in Rwanda at different times. In addition, NIZEYIMANA Marc commanded some of the FLN fighters who carried out terrorist attacks in Rwanda.

The following constitutes evidence for the above-mentioned acts:

**[435].** A report by Nyabimata sector administration in Nyaruguru district shows that on the night of July 30 to July 1, 2018 armed criminals stole livestock (12 sheep and two goats), clothes, money and Irish potatoes in Ruhinga cell.

**[436].** The content of this report is consistent with testimonies submitted with the case files of some of the civilians whose belongings were stolen. The testimonies show how FLN armed fighters robbed their belongings. They described this as follows:

**[437].** In his July 20, 2018 statement before investigation organ, NSABIMANA Anastase as one of the victims whose belongings were stolen by the FLN fighters, explained that on July 1, 2018 at 10:00pm armed persons dressed in military uniforms came to his home and ordered him to open the door. They entered the house and ordered him to give them money, food and a phone. They also ordered him together with other villagers to transport the items looted to Nyungwe Forest where they were going.

**[438].** In his May 8, 2019 statement before Rwanda Investigation Bureau, MUGISHA GASHUMBA Yves explained in his answer to question 4 that FLN armed fighters robbed his iPhone worth 70,000 Frw, his clothes that were in a bag and $250.

**[439].** The statements of the above mentioned witnesses are consistent with those contained in the case files of the following witnesses: HABIMANA Viateur, the late MUNYANEZA Fidèle, NSAGUYE Yohani, KARERANGABO Antoine, NSABIMANA Straton, BARAYANDEMA Viateur, SEBAGEMA Simon, MUKAMANA Théodette, HAVUGIMANA JMV, HABYARIMANA Léonard, KANGABE Christine, NYIRAHORANA Godelive, NYIRAGEMA Joséphine, RUSINGIZANDEKWE Léandre, NYIRAMANA Belancille, NYIRAZIBERA Dative, NGENDAKUMANA David, SHUMBUSHO Damascène, SIBORUREMA Vénuste, NDIKUMANA Callixte, MUNYENTWALI Cassien, HABYARIMANA Vianney, NTANGWAHAFI Callixte, BWIMBA Vianney, JUMAPILI Issa, UWIMANA Stappin, KAYITESI Alice, BAKERA Ally and NDUTIYE Youssuf.

**[440].** The terrorist attacks in which occurred the armed robbery were carried out by MRCD-FLN as it was boasted about afterwards.

### c. Intent to commit an offence and its evidence

**[441].** NIZEYIMANA Marc violated the law when he led and organized MRCD-FLN fighters who launched attacks that resulted in the robbery of civilians' belongings in Nyamagabe and Nyaruguru districts as an act of terrorism.

**[442].** As indicated above, this armed robbery in both Nyamagabe and Nyaruguru districts was part of a broader MRCD-FLN plan to intimidate civilians who had nothing to do with military operations and to force the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles;

### 4.2.4.   Deliberate arson against another person's house and transport means as an act of terrorism

**a. Legal provision**

**[443].** Article 2, 4o of Law No 46/2018 of 13∕8∕2018 on counter terrorism provides that an act of terrorism is:

**[444].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[445].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing  or procurement of any person, with the intent to commit any act referred to in point a).

**[446].** Article 19 of Law No 46/2018 of 13/8∕2018 on counter terrorism provides that:

**[447].** A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence

**[448].** Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[449].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

### b. Act constituting an offence and its evidence

**[450].** For this offence, the intentional act that was carried out was a deliberate arson of another person's house, means of transport or other personal property as an act of terrorism which is against the criminal law because it is provided for and punishable as a crime under Article 180 of Law No 068/2018 of 30/08/2018 determining offences and penalties in general.

**[451].** MRCD-FLN carried out deliberate arson against another person's house and transport means (houses, vehicles and motorcycles) in Nyabimata sector in Nyaruguru district, Kitabi sector in Nyamagabe district and in Rusizi district. When MRCD-FLN was carrying out these acts, NIZEYIMANA Marc was one of its leaders as the Deputy Commandant of the Northern Sector from which deployed the fighters who carried out terrorist attacks. Moreover, NIZEYIMANA Marc was the one who organized the fighters who committed these acts of terrorism, and he should therefore be held accountable.

The following is evidence for the above mentioned acts:

**[452].** Following the various attacks in Nyabimata sector, the sector authorities produced a report explaining how armed criminals had attacked the sector on June 19, 2018 and set fire to a house, a car and 2 motorcycles.

**[453].** The report was corroborated by photographs included in the case file containing information on the vehicles and houses burnt in Nyabimata sector, Nyaruguru district.

**[454].** The case file also includes photos of vehicles burnt in Nyungwe forest in Kitabi sector, Nyamagabe district.

**[455].** The above-mentioned pieces of evidence complement each other with documents of the burnt vehicles (copies of Yellow Cards) submitted with the case file. The identification of these vehicles are: Toyota RAV4 RAD 802 K belonging to NSENGIYUMVA Vincent, Coaster bus RAD 201N and RAC 357 J owned by Omega SARL, Coaster bus RAC 341 U owned by

ALPHA Express Company Ltd, Minibus RAA 777 W owned by URAYENEZA Léonard, VW Golf RAC 547 A owned by NDUTIYE Youssuf, Motorcycle TVS RD 001 K owned by HAVUGIMANA JMV

and Motorcycle TVS RC 278 Y owned by BAPFAKURERA Vénuste.

**[456].** There were also witnesses who were interrogated and indicated the vehicles burned during the MRCD-FLN attacks. Some of them are the owners of the vehicles, others are the ones who witnessed how the vehicles were set on fire.

**[457]. During his** statement before Rwanda Investigation Bureau on July 24, 2020, MAHORO Jean Damascène stated that the attack had set fire to his car whose plate number was RAC 443 B;

**[458].** A witness named INGABIRE Joyeux in his statement before the Prosecution on October 7, 2020 testified that the grenade attack of October 19, 2019 burned a RAV4 vehicle RAC 403 A belonging to HABARUREMA Vénuste a.k.a Rwandema.

**[459].** In his July 3, 2019 statement before the Prosecution, NDUTIYE Yussuf explained that he was coming from a wedding ceremony in Rusizi driving a RAC 547 A VW Golf. As they arrived in Nyungwe Forest near Nyamagabe they saw persons armed  with guns in the road who stopped him. They took his Samsung phone, his documents (identity card, driver's license and bar membership card). He continued witnessing that the attackers also burned his car, among other things and that he saw another vehicle

(Coaster bus) burnt by the assailants.

**[460].** The attacks that set fire to people's properties identified by the above-mentioned witnesses were carried out by MRCD-FLN as boasted about by its spokesperson NSABIMANA Callixte alias Sankara.

**[461].** NIZEYIMANA Marc violated the law by leading and organizing MRCD-FLN fighters who carried out attacks that burnt civilians' properties in Nyamagabe, Nyaruguru and Rusizi districts.

**[462].** Arson is one of the various acts carried out by MRCD-FLN on Rwandan territory to intimidate civilians who had nothing to do with military operations, and to force the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles.

This specific intent has already been demonstrated with evidence.

### 4.2.5. Attempted murder as an act of terrorism

**a. Legal provision**

**[463].** Article 2, 4o of Law No 46/2018 of 13/8/2018 on counter terrorism provided that an act of terrorism is:

**[464].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

**[465].** i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain

123

principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[466].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[467].** Article 19 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that: a person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[468].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

## b. Act constituting an offence and its evidence

**[469]. For** this offense, the deliberate criminal act committed is the attempt to commit murder; this act normally constitutes a violation of Criminal Laws as it is provided for and punishable under Article 21 and 107 of Law No 068/2018 of 30/08/2018 determining offences and penalties in general,

**[470].** MRCD-FLN attempted to murder civilians in Nyabimata sector in Nyaruguru District, Kitabi sector in Nyamagabe district and in Rusizi district. Such acts were carry out when NIZEYIMANA Marc was one of the MRCD-FLN leaders as the Deputy Commandant of the Northern Sector from which deployed the fighters who carried out terrorist attacks in Rwanda.

[471]. NIZEYIMANA Marc was also involved in terrorist attacks since he commanded the fighters who launched the attacks, and he should therefore be held liable. The following constitutes evidence for the above-mentioned acts:

[472]. Forensic examinations conducted and submitted with the case file show that there are many persons shot and others hit by grenades during attacks launched by FLN fighters.

[473]. The victims of gunshots are NDAHAYO Noël, KIMANGA Faustin, KABUTUMWA Zerida, NIYOMUGABO Emmanuel, MUNGANYINKA Vérène, BASWAYI Clément, UWIMFURA Bernard, SHEMA Philbert, NTEZIRYAYO Claude, NYIRANZIZA Christine, UWIMANA Stappin, BAKERA Ally, HAKIZIMANA Zachée, NDUWAYO Arnaud, KAYITESI Alice, NIYONTEGEREJE Azèle, KULIMUSHI Byamungu, NIYITEGEKA Emmanuel, JUMAPILI Juma and NSENGIYUMVA Vincent. The fact that the victims did not die was not due to the will of the assailants who attacked them with gunfire and grenades.

[474]. The testimonies of some of the gunshot victims and eyewitnesses reveal how the perpetrators carried out attacks in Nyaruguru, Nyamagabe and Rusizi, firing at people, and hurling grenades at others.

[475]. In her testimony during interrogation before the investigation organ on August 5, 2019, KAYITESI Alice, one of the gunfire victims in Kitabi sector, Nyamagabe district, explained how the attack took place. On December 15, 2018 they were traveling in a public bus belonging to Alpha company from Rusizi to Kigali, and when they arrived in Nyungwe forest they met people who had blocked the road with a trunk. The driver tried to go over the trunk but the vehicle was suddenly shot at and the car had flat tires. The assailants also fired at the passengers who were in the vehicle, some were injured, and others had lost their lives;

126

**[476]** The attack in Nyungwe was equally described by NGIRABABYEYI Désiré, BWIMBA Vianney, MUGISHA GASHUMBA Yves and UWIMANA Stappin.

**[477]. In addition**, in his June 24, 2019 statement before the Prosecution, NSENGIYUMVA Vincent, who was shot in the attack of Nyabimata sector, Nyaruguru district, gave the following account of what happened:

**[478].** *"It was on June 19, 2018 and I was at home in my bed. I was staying in Rwerere village in Nyabimata cell. Around 9:30 pm, a man called Aloys MUNYARUGENDO from Rwerere village whom I knew and who was staying in the vicinity phoned me to inform me that there were soldiers who wanted to see me. He was asking me to come over if possible and meet them but he also added that they seemed violent given that they were beating civilians. I replied that our soldiers do not beat civilians. I accepted his request and got up because Aloys was insisting that the soldiers wanted me to go with them for some operations. I was about to open the door of the vehicle that was parked outside when I heard gunshots and I went back into the house and stood in the sitting room. While I was asking myself what was happening, two minutes later I heard sounds of footsteps around the house where I was in. So, I moved towards the front door and opened the curtains to see who they were. I immediately saw guns pointed to the door and the windows. By looking at the mixed clothes the assailants were wearing I realized they were none other than soldiers. The person who was in front and whose gun was pointed at me ordered me to open the door or otherwise they would open it themselves. I kept quiet. The ones who were behind him were saying "this place is not yours". After a while the others who were at the back door shot me in the head. After shooting me, I became unconscious for some time, then after that I crawled into the bedroom and hid under the bed. It is after some time that I realized I was shot because it was hurting. After shooting me gunshots continued around the house because even in the other room where I was hiding, they fired in the windows of that room…"*

**[479].** It is not only witnesses who testified about the attacks that resulted in the attempt to commit murder in Nyabimata sector; since the case file includes as well testimonies from eyewitnesses of similar acts in the attacks perpetrated in Rusizi

127

district. Some of the victims of the FLN grenade attacks in Rusizi district between May and October 2019, described how it happened.

**[480].** In his October 6, 2020 statement before the prosecution, RUTAYISIRE Félix explained how he had been injured by a grenade as confirmed by the forensic examination report of July 2, 2019which shows that he had two grenade fragments in his right shoulder. Another medical report of October 6, 2020 revealed that he was left with a permanent disability of 24% caused by a grenade attack he had sustained.

**[481].** NSABIMANA Joseph testified in his October 6, 2020 statement before the Prosecution that he was one of the victims of attacks. He stated that he had been hit by a grenade the fragment of which is still inside his body. This is also confirmed by a forensic examination report which showed that he still has a grenade fragment  in his right hip and that this has resulted in his permanent disability of 8%.

**[482]** In October 7, 2020 statement before the Prosecution, NKURUNZIZA Jean Népomuscène testified that he had been hit with a grenade in that attack and that he sustained grenade fragments which left him with severe effects. A medical report confirmed that the attack had left him with a permanent disability of 6%.

**[483].** The statements by these witnesses are also confirmed by BIZIRUREMA Célestin in his October 6, 2020 statement before the Prosecution where he testified that the casualties in the grenade attack near Stella Bar included NIZEYIMANA Paulin, NKURUNZIZA Jean Nepo, NSABIMANA Joseph and RUTAYISIRE Joseph.

**[484].** These gunfire and grenade attacks which killed some civilians and injured others were perpetrated by MRCD-FLN as proven above by the presented evidence.

## c. Intention to commit an offense (mens rea) and its evidence

**[485].** NIZEYIMANA Marc violated the law by leading and organizing FLN fighters who attacked civilians with gunfire and grenades in some of the sectors of Nyaruguru, Nyamagabe and Rusizi districts.

**[486].** The acts of firing and throwing grenades at the above-mentioned civilians was part of MRCD-FLN's plan to intimidate the population and force the Government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles;

**[487].** The specific deliberate attempt to intimidate civilians was proven with evidence; but we can add that this is moreover corroborated by the way they carried out attacks in different places and at different times, indistinctly shooting and throwing grenades in the population.

## 4.2.6. Intentional assault and battery as an act of terrorism

## a. Legal provision

**[488].** Article 2, 4o of Law No 46/2018 of 13⁄8/2018 on counter terrorism provides that an act of terrorism is:

**[489].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[490].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[491].** Article 19 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that: a person who commits, attempts to commit, participates in or supports terrorist acts commits an offence.

**[492].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

## b. Act constituting an offence and its evidence

**[493]. With regard to** this offense, the intentional criminal act committed was intentional assault and battery; this act is normally a violation of the Criminal Laws because it is provided for and punishable under Article 121 of Law No 068/2018 of 30/08∕2018 determining offences and penalties in general.

**[494].** MRCD-FLN carried out acts of assault and battery in Nyabimata sector in Nyaruguru district and in Kitabi sector in Nyamagabe district. When such acts were being done NIZEYIMANA Marc was the Deputy Commandant of the Northern Sector from which deployed the fighters who carried out the above-mentioned attacks. He is also the one who commanded the fighters before they were sent to launch the attacks. Therefore, he should be liable for his role as a leader in those acts.

The following constitutes evidence for the above-mentioned acts:

**[495].** Forensic examinations report included in the case file show that there are people who were beaten by MRCD-FLN fighters and this resulted in various pains. The medical reports included in the case file are those of BASWAYI Clément, HAKIZIMANA Zachée, KABUTUMWA Zéride, KIMANAGA Faustin, MUNGANYINKA Vérène, NDAHAYO Noël, NIYOMUGABO Emmanuel, NTEZIRYAYO Claude, UWIMANA Stappin and JUMAPILI Issa.

**[496].** Those forensic examination reports are complementary with testimonies of the victims of those attacks. In his July 20, 2018 statement before Rwanda Investigation Bureau KARERANGABO Antoine, a survivor of the Nyabimata attack, testified that he was on his way to the rescue of his neighbors when he bumped into criminals who hit him in the head with an unidentified object and when he fell on the ground; and they kicked him in the ribs.

**[497].** In his August 5, 2019 statement before Rwanda Investigation Bureau, JUMAPILI Issa, a survivor of the Nyungwe attack, confirmed that the criminals ambushed them in the Nyungwe Forest when they were on their way from Rusizi to Kigali. The assailants pulled them out of the vehicle and beat him seriously with sticks.

**[498].** The testimony above is consistent with that of other people who explained how they were beaten during the attacks by the criminals. These people are HABIMANA Viateur, HABYARIMANA Léonard, HABYARIMANA Damascène and HABYARIMANA Vianney.

**c. Intention to commit an offence and its evidence**

**[499].** NIZEYIMANA Marc violated the law by leading and organizing the FLN fighters who carried out terrorist attacks that assaulted civilians in the above-mentioned areas.

**[500].** Intentional assault or battery in the aforementioned areas were not an isolated act, but one of the many acts of the MRCD-FLN broader plan aiming to intimidate the public and to force the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles as we have already demonstrated with evidence.

### 4.3. Concerning BIZIMANA Cassien aka BIZIMANA Patience aka Passy

### 4.3.1. Membership of an irregular armed group

### a. Legal provision

**[501].** Article 200 of Law No 68/2018 of 30/8/2018 determining offences and penalties in general provides that:

**[502].** Any person who by donations, remuneration, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular armed group or signs an agreement with this group for the purposes of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than ten (10) years and not more than fifteen (15) years.

**[503].** Any person who deliberately agrees to be hired or recruited to join an irregular armed force, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than seven (7) years and not more than ten (10) years.

**[504].** The legal action against offences referred to in Paragraph One and 2 of this Article is instituted upon complaint or on the authorization of the Prosecutor General or the Military Prosecutor General, depending on their authors.

**b. Acts constituting an offence and their evidence**

**[505].** BIZIMANA Cassien joined the FDLR armed wing called FOCA (Forces Combatantes Abacunguzi) from its formation until 2016 when it split into two factions. One faction remained in the FDLR and the other in the CNRD which later became FLN (Forces de Libération Nationale) .

This is evidenced by the following:

**[506].** In his July 16, 2020 statement before Rwanda Investigation Bureau, BIZIMANA Cassien explained how he had been given the responsibility of fighting and nursing from FDLR-FOCA to MRCD-FLN and graduated from military academy with the rank of Second- lieutenant.

**[507].** He described this as follows: *" (...) I fled the country in 1994 as a soldier, and when I arrived in Congo I went to live in the refugee camp. When KABILA attacked Congo we fled but we went fighting until I arrived in Kisangani where I got injured and returned to Masisi where I spent the whole year receiving treatment due to gunshots. Then I joined FDLR where I was nursing fighters who were injured. I belonged to the group of those refugee camp guards referred to as "résistants". When CNRD was formed in 2016 by factions split from FDLR, I joined that part led by General IRATEGEKA Wilson which was CNRD. In 2016 I entered the CNRD military academy and graduated with the rank of Second Lieutenant on May 31, 2017."*

**[508].** This is also how he explained it in his September 24, 2020 statement before the Prosecution.

**[509].** His statement is confirmed by NIZEYIMANA Marc in a statement made before the Prosecution on October 13, 2020 while answering to question 17. He explained it in these words*:".....I know him. He was a tradi-practitioner nurse. When we were still in FDLR he was a civilian who was treating all the patients, but when we joined CNRD-Ubwiyunge he revealed that he was an Ex-FAR soldier then he produced his identification and was admitted*

*to ESM where he graduated with the rank of Second Lieutenant. Classes started in October 2016 in Rutshuru (…)”.*

### c. Intention to commit an offence and evidence

**[510].** BIZIMANA Cassien violated the law when he joined the irregular armed groups, FOCA and FL,  as we have already shown.

### 4.3.2. Membership of a terrorist group

### a). Legal provision

**[511].** Article 18 of Law No 46/2018 of 13/8∕2018 on counter terrorism provides that " a person who is a member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years”.

### b). Act constituting an offence and its evidence

**[512].** BIZIMANA Cassien joined a terrorist group, MRCD-FLN and  was involved in its acts.

**[513].** In his July 16, 2020 statement before the investigation Organ he stated: *"I joined CNRD when it was founded by General IRATEGEKA after it separated from FDLR in 2016 (….). When CNRD was formed in 2016, it separated from FDLR and I joined that faction of General IRATEGEKA Wilson,CNRD, and in that same year of 2016 I joined the CNRD military academy and graduated with the rank of Second Lieutenant on May 31, 2017.”*

**[514].** The fact that he had been in MRCD-FLN, BIZIMANA Cassien explained it in his September 24, 2020 statement before the Prosecution. When he was asked what he did after graduating from the military academy he replied in these words: *"I was a nurse at the North Kivu Operational Sector General Headquarter (HQ). The commandant of North Kivu Operational Sector General Headquarter was JEVA assisted by Col. NIZEYIMANA Marc. We lived in Faringa in Rutshuru at that time. I served at this post until September 2018 when I was sent to Bukavu with the mission to plan and organize attacks into Rwanda in Rusizi area. I continued to go to Bukavu and carried out attacks in Rusizi until I was arrested on October 23, 2019".*

**[515].** BIZIMANA Cassien also acknowledged in his statements of July 16, 2020 before the investigation Organ and before the prosecution on September 24, 2020 that he planned and carried out terrorist attacks on behalf of FLN in Rusizi between May and October 2019.

**[516].** The fact that BIZIMANA Cassien had been a member of MRCD-FLN and his involvement in its acts, it is also illustrated by BYUKUSENGE Jean Claude's statement of July 16, 2020 before Rwanda Investigation Bureau and the statement of September 28, 2020 before the prosecution where he confirmed that BIZIMANA Cassien alias Passy was the one who provided them with guns and ammunition used in the FLN terrorist attacks launched in RUSIZI district.

**c. Intention to commit an offence and its evidence**

**[517].** BIZIMANA Cassien violated the law by joining MRCD-FLN, a terrorist group, and being involved in its acts.

**4.3.3. Conspiracy and incitement to commit a terrorist act**

**a) Legal provision**

**[518].** Article 20 of Law No 46/2018 of 13/2018 on Counter terrorism provides that:

[519]. A person who conspires, incites others to commit a terrorist act directly or indirectly, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than (20) twenty-five (25) years.

**b). Act constituting an offence and its evidence**

[520]. BIZIMANA Cassien who was an FLN fighter with the rank of Second Lieutenant and BUGINGO Justin who was in charge of the FLN office in Bukavu both conspired to carry out terrorist attacks in Rusizi district on behalf of FLN at the request of Brigadier General Antoine HAKIZIMANA alias Jeva.

[521]. After the conspiracy, BIZIMANA Cassien incited SHABANI Emmanuel, MATAKAMBA Jean Berchmans and NIKUZWE Siméon (SHABANI Emmanuel's young brother) to adhere to their plan of organizing terrorist acts that were launched in Rusizi district between May and October 2019. He also provided them with grenades, guns and ammunition. The following are evidence of BIZIMANA Cassien's involvement in this offense:

[522]. In his July 16, 2020 statement before Rwanda Investigation Bureau, he explained this in the following words: *"After talking to people I was to work with, I called General JEVA and told him that we needed equipment, and he told me to go and collect it at Nyabibwe. I went there and brought 3 Kalashnikov guns, 2 grenades, 160 munitions. I brought them in a charcoal bag to Bukavu and stored them at BUGINGO Justin's house, where they remained for a week. Then we took them to KIBONGE's place where they could be kept. BUGINGO told me that he had a brother called MATAKAMBA Jean Berchmans who would help us get the equipment across to Rwanda. He informed him and we met in a place called Nyawera in Congo. He came and we talked in the presence of Justin. After the talk MATAKAMBA told us that he had other people he was going to bring to us for discussion. He brought them and we met and they asked us to bring the equipment so that they took it to*

*the other side of the river. On the agreed day SHABANI and myself went to collect the weapons and brought them to the river bank where we found them waiting for us. MATAKAMBA, SIBOMANA, AND INNOCENT took the weapons and wrapped them in a large bag before putting them in a boat that was to cross Rusizi river to Rwanda. They carried 2 grenades, three guns, and 160 munitions."*

**[523].** In his August 14, 2020 statement before the prosecution, BIZIMANA Cassien explained how BUGINGO Justin arranged his meeting with SHABANI Emmanuel and MATAKAMBA Jean Berchmans and how SHABANI Emmanuel introduced him to his brother NIKUZWE Siméon. BIZIMANA Cassien also explained how they planned and carried out terrorist attacks in Rusizi District between May and October 2019 and that it was himself (BIZIMANA Cassien) who was personally supplying his other companions with the equipment consisting of grenades, guns and ammunition used in the operations.

**[524].** This statement by BIZIMANA Cassien is complementary with the statement of SHABANI Emmanuel because when the latter was interrogated by the prosecution on September 24, 2020 he confirmed that he got involved in the terrorist acts at the instigation of BUGINGO Justin who introduced him to BIZIMANA Cassien. He also confirmed that BIZIMANA Cassien requested him to be his guide who would show him the way to Rusizi river when he was going to conduct operations in Rwanda. The operations BIZIMANA Cassien was referring to were the terrorist attacks launched in Rusizi District between May and October 2019.

**[525].** Another witness who highlighted BIZIMANA Cassien's role in the crime of conspiracy and incitement to terrorism is MATAKAMBA Jean Berchmans. In his September 24, 2020 statement before the prosecution, he testified that he was not aware of the existence of FLN until he met with BIZIMANA Cassien and BUGINGO Justin. He said that he first met BUGINGO Justin in Bukavu, DRC.  When these three persons met, BIZIMANA Cassien and BUGINGO Justin requested him to collaborate with them, and he agreed.  After they agreed to work together, they first asked him

to provide them with information that would help their FLN troops to cross into Burundi via Rusizi River; and they later requested him to team up with them in the attacks that would be carried out in Rusizi District.

**[526].** Another witness that BIZIMANA Cassien incited to commit acts of terrorism is NIKUZWE Siméon. He admitted it himself and also highlighted the role of BIZIMANA Cassien in this crime. In his statements of July 16, 2020 before Rwanda Investigation Bureau and statement  of August 14, 2020 before the prosecution, NIKUZWE Siméon accused BIZIMANA Cassien to have called him and told him that he wanted to give him a job and met at NYANGEZI in Bukavu/DRC. BIZIMANA Cassien told him that the job he wanted to give him was to throw grenades and he replied that he had never been a soldier and therefore, did not know how to throw grenades. He went on saying that BIZIMANA Cassien had then requested him to recruit for him a former soldier and if he found someone, he would pay him 100 USD. NIKUZE Siméon, as he went on explaining, looked for the person and found him and linked him up with BIZIMANA Cassien.

## c). Intention to commit an offence and its evidence

**[527].** BIZIMANA Cassien violated the law when he plotted with BUGINGO Justin and also incited MATAKAMBA Jean Berchmans, SHABANI Emmanuel and NIKUZWE Siméon to commit acts of terrorism.

## 4.3.4. Attempted murder as an act of terrorism

## a. Legal provision

**[528].** Article 2, 4o of Law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[529].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death

to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[530].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[531].** Article 19 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that a person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[532].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

### b. Act constituting an offence and its evidence

**[533]. With regard to this** offence, the deliberate act committed is the attempt to commit murder; this act is normally illegal under Criminal Laws as it is provided for and punishable under Article 21 and 107 of Law No 068/2018 of 30/08/2018 determining offences and penalties in general.

**[534].** BIZIMANA Cassien as one of the FLN fighters brought into the country firearms (guns, ammunition and grenades) some of which he used personally to attempt to kill civilians by shooting them. He also distributed others to fellow FLN fighters who used them to shoot and throw grenades at civilians.

The following constitutes evidence for the above-mentioned acts:

**[535].** In his September 24, 2020 statement before the prosecution, BIZIMANA Cassien admitted that he was the one, together with SHABANI Emmanuel, who brought the equipment, including grenades, guns and ammunition, used to launch terrorist attacks in Rusizi between May and October 2019. He further said that the equipment was received by MATAKAMBA Jean Berchmans who in turn was in charge of their transport to Rwanda via Rusizi River.

**[536].** BIZIMANA Cassien also confirmed this in his July 16, 2020 statement before Rwanda Investigation Bureau where he admitted having gone to the FLN base in a place called Nyabibwe to bring equipment. He brought three Kalashnikov guns, two grenades and 160 munitions given to MATAKAMBA.

**[537].** BIZIMANA Cassien's confession was confirmed by MATAKAMBA Jean Berchmans in his September 24, 2020 statement before the prosecution where he stated that BIZIMANA was the one who brought him the equipment consisting of guns, ammunition and grenades that were used in the attacks in Rusizi district. In his July 16, 2020 statement before Rwanda Investigation Bureau MATAKAMBA Jean Berchmans stated that both BIZIMANA Cassien and SHABANI Emmanuel crossed Rusizi River with guns and ammunition and he went to receive it. He went on saying that for the second time, PASSY (BIZIMANA Cassien) and SHABANI Emmanuel crossed Rusizi River with two guns and ammunition and hid in a field. At the night fall, they launched an attack in a place called Rubondwe where they fired at vehicles that were passing on the tarmac road. He added that he did not know

if there were people who lost their lives at that time. This suggests that firing at the vehicles was intended to kill people.

**[538].** In the grenade attack carried out by BYUKUSENGE Jean Claude at Umuganda village, Kamashangi cell, Kamembe sector near Stella Bar, he used some of the grenades brought by BIZIMANA Cassien. During the attack, various people were injured by grenade fragments.

**[539].** Some of the injured in the attacks include RUTAYISIRE Félix as attested by his testimony, before the Prosecution, included in his statement of October 6, 2020 and forensic examination report of July 2, 2019 show that he had two grenade fragments inside his right shoulder. His other forensic examination report of October 6, 2020 also shows that he was left with permanent disability of 24%. Such disability is a result of the grenade attack he had sustained.

**[540].** Another victim of the attacks in which firearms brought in by BIZIMANA Cassien were used is NSABIMANA Joseph. In his October 6, 2020 statement before the Prosecution he testified that he was one of the victims of the attack because he was hit by one of the grenade fragments hurled at him. This is also confirmed by a forensic examination report that shows he still has a grenade fragment inside his right hip and he suffers a permanent disability of 8%.

**[541].** The launch of this attack was also confirmed by NKURUNZIZA Jean Népomuscène in his October 7, 2020 statement before the Prosecution. He identified himself as one of the victims of the attack since he was hit by some grenade fragments which physically impacted him. According to a medical report this attack left him with a permanent disability of 6%.

**[542].** BIZIRUREMA Célestin, a eye witness of the attack, also joined the aforementioned witnesses in his October 6, 2020 statement before the prosecution by confirming that those who were injured by the grenade attack perpetrated near Stella

Bar included NIZEYIMANA Paulin, NKURUNZIZA Jean Nepo, NSABIMANA Joseph and RUTAYISIRE Joseph.

## c. Intention to commit an offence and its evidence

**[543].** BIZIMANA Cassien violated the law when he shot people and provided equipment used by FLN fighters who fired and threw grenades at civilians in Rusizi district.

**[544].** These acts of firing and throwing grenades at people were carried out by the above FLN fighters and were also part of MRCD-FLN's broad plan to intimidate the general public and force the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles.

**[545].** We have proved with evidence the specific intention of MRCD-FLN to commit acts of terrorism when we demonstrated how it is a terrorist group.

## 4.3.5. Deliberate arson against another person's house or transport means as an act of terrorism

### a) Legal provision

**[546].** Article 2, 4o Law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[547].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[548].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[549].** Article 19 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that: A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[550].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

### b). Act constituting an offence and its evidence

**[551].** For this offence, the intentional act that was carried out is a deliberate arson against another person's house or transport means as an act of terrorism which is a violation of the criminal laws because it is provided for and punishable as a crime under Article 180 of Law No 068/2018 of 30/08/2018 determining offences and penalties in general. This act also damaged individuals' properties.

**[552].** MRCD-FLN carried out deliberate arson against another person's house, transport means (houses and vehicles) in Rusizi district. The arson was carried out by BIZIMANA Cassien himself and other acts were carried out by his fellow fighters using weapons he supplied to them. The following is evidence for the above-mentioned acts:

**[553].** A witness called INGABIRE Joyeux in his October 7, 2020 statement before the Prosecution testified that the October 19, 2019 grenade attack set fire to a RAV4 vehicle with plate number RAC 403 A belonging to HABARUREMA Vénuste a.k.a Rwandema.

**[554].** In his interrogation before investigation organ, the witness MAHORO Jean Damascène explained that on the night of July 8, 2019 at midnight criminals set fire to his car with plate number RAC 443 B that was parked and its its cabin was completely burnt. This was happened in Karangiro near the maize flour processing factory. The statement by this witness about the attack in Karangiro is consistent with  the one of BIZIMANA Cassien and his co-accused .

**[555].** In his statements of July 16, 2020 before the investigation organ and the statement of September 24, 2020 before the prosecution, BIZIMANA Cassien admitted that he was the one who led the attack at the maize flour processing factory in Karangiro and that he was the one who set fire to a Daihatsu vehicle.

**[556].** This statement of BIZIMANA Cassien is also consistent with the statement of BYUKUSENGE Jean Claude who was also involved in the attack. In his interrogation before investigation organ dated on July 6, 2020 and the statement of September 24, 2020 before the prosecution, BYUKUSENGE Jean Claude confirmed that he was with BIZIMANA Cassien during the attack in Karangiro where they burned a Daihatsu vehicle. He said that BIZIMANA Cassien broke the windshield of a Daihatsu vehicle and set fire to it.

### c). Intention to commit an offence and its evidence

**[557].** BIZIMANA Cassien violated the law by organizing attacks, supplying equipment and even participating in attacks that set fire to individuals' property in Rusizi district.

**[558].** These acts of arson are also part of the MRCD-FLN's acts aiming to intimidate

civilians who had no connection with military operations and to force the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles.

**[559].** The specific intention to commit acts of terrorism has been shown in the paragraphs above with evidence.

### 4.3.6. Illegal use of an explosive in public place

#### a). Legal provision

**[560].** Article 24 of the law No 46/2018 of 13/8/2018 on counter terrorism provides that: a person who illegally gives, plants, throws or blasts an explosive or any other device with noxious substance in a public place for terrorist act purposes, commits an offence.

**[561].** Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25).

#### b). Act constituting an offence and its evidence

**[562].** BIZIMANA Cassien alias PASSY gave explosives (grenades) to MATAKAMBA Jean Berchmans and Damascène which were used in terrorist acts. The grenade was launched in a public place (at Stella Bar) in Kamembe sector, Rusizi district, on October 19, 2019.

**[563]. During his** interrogation before investigation organ on July 16, 2020, BIZIMANA, Cassien admitted that he was the one who supplied the equipment consisting of Kalashnikov guns, grenades and ammunition to MATAKAMBA Jean Berchmans who received and stored them;

**[564].** Concerning the grenade attack at Stella Bar, MATAKAMBA Jean Berchmans, in his statement of July 16, 2020 before investigation organ, he also pointed out that the grenade that was thrown at Stella Bar was one of those they had received from BIZIMANA Cassien. He explained it in the following words: "*[.    ] just before the fifth attack, Damascène went to Congo to bring grenades and I hid them in my field but out of them I took three to NTIBIRAMIRA's house and stored the rest which included also a pistol and its ammunitions. I was later instructed to give one grenade to NIKUZWE Siméon and after two days Damascène also came and took one grenade. He took it to Kamembe where he met Damascène the motorcyclist and together they launched one grenade in Kamembe. The other one and the pistol were taken by NTIBIRAMIRA to Gihundwe but the grenade was lost on the way*".

**[565].** According to BIZIRUREMA Célestin statement of October 6, 2020 before the prosecution, he confirmed that among the people injured in the grenade attack near Stella Bar include NIZEYIMANA Paulin, NKURUNZIZA Jean Nepo, NSABIMANA Joseph and RUTAYISIRE Joseph.

### c). Intention to commit an offence and its evidence

**[566].** BIZIMANA Cassien violated the law by supplying explosives (grenades) thrown in public places.

**[567].** When BIZIMANA Cassien alias Passy supplied explosives to be thrown in public places, it was within the MRCD-FLN's broader plan to intimidate the general public and force the government to adopt or abandon a particular standpoint or to act according to certain principles;

### 4.4. Concerning MATAKAMBA Jean Berchmans

### 4.4.1. Conspiracy and incitement to commit a terrorist act

**a). Legal provision**

**[568].** Article 20 of Law No 46/2018 of 13/8/2018 on counter terrorism provides that: a person who illegally gives, plants, throws or blasts an explosive or any other device with noxious substance in a public place for terrorist act purposes, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25).

**b). Act constituting an offence and its evidence**

**[569].** Both MATAKAMBA Jean Berchmans and BIZIMANA Cassien plotted to launch an attack in Rusizi district and eventually persuaded NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude to adhere to the plan.

**[570].** These acts constituting the offence MATAKAMBA Jean Berchmans was involved in have been proven with the following evidence:

**[571].** When MATAKAMBA Jean Berchmans was interrogated by the Prosecution on September 24, 2020, he confessed to the offense and explained how BUGINGO Justin had introduced him to BIZIMANA Cassien. He explained the agreement they reached in the following words: *"It is BIZIMANA Cassien alias Passy and BUGINGO Justin who informed me about FLN. I first met with BUGINGO Justin at Bukavu market. We were actually neighbors before the Genocide but he fled and did not return to Rwanda. In early May 2019, he sent me to a certain NTIBIRAMIRA Innocent with the mission to bring him with me on the pretext that he had a message for him. I delivered the message to NTIBIRAMIRA who accepted to come with me to Bukavu market. When we got there, we found BUGINGO together with BIZIMANA Cassien. They introduced each other and BUGINGO asked NTIBIRAMIRA if he had ever been an FDLR member, and he answered positively. BUGINGO and*

147

*BIZIMANA straightway told us that they were no longer FDLR members; they said they had joined another group, CNRD which had an armed wing called FLN. They proposed us to work together and in exchange they promised to give us money. We accepted the proposal".* He went on saying: *"They asked us to provide them with information and help their FLN troops cross over to Burundi via Rusizi river".* He continued explaining that when they met for the second time, the plan to show them the way through Burundi had changed into the plan to launch attacks in Rusizi district. *"BUGINGO told us that they had changed the plan to pass through Burundi; instead he asked us if we could help them launch an attack in Rusizi district....we accepted their request but I pointed out to him that I was not a soldier. So, BUGINGO requested me to find him someone with military skills. I went and found a certain BYUKUSENGE Jean Claude, a former FDLR soldier. I introduced them one to the other and BYUKUSENGE Jean Claude accepted to adhere to their plan".* When interrogated on what the plan was, he replied in the following words: "the plan was to launch war attacks in Rusizi district".

**[572].** He also explained this in his statement of July 16, 2020 before the investigation organ.

**[573].** After MATAKAMBA Jean Berchmans, BUGINGO Justin and BIZIMANA Cassien agreed on every detail of the plan to launch attacks in Rusizi district, MATAKAMBA Jean Berchmans encouraged NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude to join the plan, as evidenced by their statements below:

**[574].** In his statement of September 24, 2020 before the prosecution, NTIBIRAMIRA Innocent confirmed that MATAKAMBA Jean Berchmans was the one who introduced him to BIZIMANA Cassien over their plan to organize and carry out attacks in Rusizi District.

**[575].** This statement is also consistent with that of BYUKUSENGE Jean Claude during his interrogation of July 16, 2020 before the investigation organ and before the prosecution on September 24, 2020 where he confirmed that MATAKAMBA Jean Berchmans was

the one who introduced him to BIZIMANA Cassien over their plan to organize and carry out attacks in Rusizi District.

**c). Intention to commit an offence and its evidence**

**[576].** MATAKAMBA Jean Berchmans violated the law when he plotted with BUGINGO Justin and BIZIMANA Cassien to launch a terrorist attack in Rusizi district between May and October 2019 and when he encouraged NTIBIRAMIRA Innocent and BYUKUSENGE Jean Claude to join the plan.

**[577].** This is proven by the fact that in their statements MATAKAMBA Jean Berchmans and even his aforementioned colleagues admitted the fact as it was demonstrated in the preceding paragraphs.

**4.4.2. Attempted murder as an act of terrorism**

**a). Legal provision**

**[578].** Article 2, 4o of the law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[579].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:
i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;
ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[580].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in point a).

**[581].** Article 19 of the law No 46/2018 of 13/8/2018 on counter terrorism provides that: A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[582].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years

### b) Act constituting an offence and its evidence

**[583].** For this offence, the deliberate act committed is the attempt to commit a murder; this act is normally illegal under the Criminal Laws as it is provided for and punishable under Articles 21 and 107 of Law No 068/2018 of 30/08/2018 determining offences and penalties in general.

**[584].** MATAKAMBA Jean Berchmans stored weapons (guns, ammunitions and grenades) of which some were used in the attacks launched on civilians in which he was involved, including the attack that was carried out in a place called "Ku Cyapa cya Nyakarenzo", while others were distributed to his colleagues who used them to fire and throw grenades at civilians in different places in Rusizi district. The following constitute evidence for the above-mentioned acts:

**[585].** In his s t a t e m e n t  o f  July 16, 2020 before investigation organ, MATAKAMBA Jean Berchmans admitted that BIZIMANA Cassien and SHABANI Emmanuel crossed the Rusizi River bringing guns and ammunition and that he went to receive them. He explained this as follows: *"In August 2019 Passy (BIZIMANA Cassien) and SHABANI crossed the Rusizi River with guns and ammunition and I went to collect them at the r i v e r bank together with NTIBIRAMIRA Innocent. […] for the second time, PASSY and SHABANI crossed Rusizi with two guns and ammunition and hid in my field with the equipment. At the night fall, , I went to see them and we launched an attack in Rubondwe …. then on that day  PASSY told me it was I who would keep the guns and ammunition because he was afraid that NTIBIRAMIRA and colleagues would use the weapons for robbery …. Just before the fifth attack  Damascene went to Congo to bring grenades of which three were sent to  NTIBIRAMIRA's house and I kept the rest, that included also a pistol and its ammunition, and they were hidden in my field. I was later instructed to give one grenade to NIKUZWE Siméon and after two days Damascène came as well and took another. He took it to Kamembe where he met Damascène the motorcyclist and together they launched it in Kamembe. The other grenade and the pistol were taken by NTIBIRAMIRA to Gihundwe but the grenade was lost on the way. Those are the attacks I well know they were perpetrated. So, I was left with 4 grenades, 4 guns and ammunition."*

**[586].** MATAKAMBA Jean Berchmans' statement on his role in the attacks is consistent with that of BIZIMANA Cassien. During his interrogation of July 16, 2020 before the investigation organ he confirmed that MATAKAMBA Jean Berchmans was the one who was receiving and keeping the weapons consisting of firearms, grenades and ammunition. These are the weapons used with the intention to kill people.

**[587].** The role of MATAKAMBA Jean Berchmans in the attacks confessed by himself is also confirmed by NTIBIRAMIRA Innocent. In a statement dated on 16/07/2020 before investigation organ, he confirmed, in his answer to question three that MATAKAMBA Jean Berchmans was the one who was keeping the weapons used in the attacks. He went on to explain in his answer to the fourth question that some weapons had been brought by PASSY SELEMANI (BIZIMANA Cassien) and

SHABANI Emmanuel, and together with MATAKAMBA they received them and hid them in his field. Other weapons came later.

**[588].** MATAKAMBA Jean Berchmans also commented on the attack on a vehicle that was carrying people. In his statement of September 24, 2020 before the Prosecution, he explained it in the following words: *".... the second attack is that of Ku Cyapa cya Nyakarenzo at Mibirizi near the military detachment. The attack took place in August 2019. The attackers included BYUKUSENGE Jean Claude, NTIBIRAMIRA Innocent, a motorcyclist named Damascène and myself. We fired at a lorry and broke its windshield but the driver got out without injury".*

**[589].** He had also confirmed  this in his statement of July 16, 2020  before the investigation organ.

**[590].** In his statement of September 24, 2020 before the Prosecution, NTIBIRAMIRA Innocent explained that they were with MATAKAMBA in the attack of Ku Cyapa in Nyakarenzo. He explained it in these words: *"The fourth attack took place towards the end of September 2019 in Nyakarenzo sector in a place called Ku Cyapa near a military detachment. Our target was not the soldiers. Instead, we were going to ambush vehicles that were passing by. The group included myself, MATAKAMBA, BYUKUSENGE, NSABIMANA Damascène and SIBOMANA Jean Bosco. During the attack, we stopped a lorry and the driver refused to stop and when we fired at it the driver stopped and got out. As we were preparing to burn it, soldiers on patrol heard the shots and fired at us and we immediately ran away without doing anything. This is how the attack ended without causing any harm".* His statement on the attack of Ku Cyapa in Nyakarenzo sector is similar to MATAKAMBA Jean Berchmans' above explanation of the attack.
.

**[591].** Their statements on the attack are also consistent with page three of the statement by BYUKUSENGE Jean Claude dated on September 28, 2020.

**[592].** The role of MATAKAMBA Jean Berchmans in various attacks in Rusizi district is reiterated by BYUKUSENGE Jean Claude. During his interrogation of July 16,

before the investigation organ, BYUKUSENGE explained in his answer to question two, that the grenade used in the attack in Kamembe town was brought from MATAKAMBA Jean Berchmans house by Damascène the motorcyclist. This is how he put it: *"we went to Mukadasomwa on a motorcycle and when we arrived, Damascène told me they had given him a grenade from MATAKAMBA's house to be launched at Kamembe town. So, I immediately called PASSY [BIZIMANA Cassien] on his Congo phone number and asked him how the attack was organized. He told me that I was to be paid $ 400 immediately after I hurled the grenade in the city. We went to Kamembe and I threw the grenade in a place called Ku rya Gatatu near the muslim mosque"*.

[593]. The grenade mentioned above was exploded in Umuganda village, Kamashangi cell, in the Kamembe Sector near Stella Bar.

[594]. In addition to exploding a grenade in a public place, it also injured people. In his statement of October 6, 2020 before the prosecution, BIZIRUREMA Célestin testified that those injured by the grenade attack near Stella Bar included: NIZEYIMANA Paulin, NKURUNZIZA Jean Népo, NSABIMANA Joseph and RUTAYISIRE Joseph.

[595]. Some of the victims of the grenade attack were also interrogated during the investigation and they confirmed that they were negatively impacted by the attack.

[596]. Among them include RUTAYISIRE Félix who, in his statement of October 6, 2020 before the prosecution, described the consequences he is enduring because of the grenade attack. The consequences explained by the victim are also confirmed by forensic examinations of both July 2, 2019 and October 6, 2020 which showed that he had two grenade fragments inside his right shoulder. He has also been diagnosed with a permanent disability of 24% caused by the grenade attack.

[597]. Another victim of the grenade attack is NSABIMANA Joseph. In his statement of October 6, 2020 before the Prosecution, he stated that he had been hit by one of the grenade fragments which is still l inside his body. This is also confirmed by forensic

examination report which showed that he still had a fragment of a grenade inside his right hip and that it has caused him an 8% permanent disability.

**[598].** NKURUNZIZA Jean Népomuscène also in his statement of October 7, 2020 before the Prosecution testified that he was hit by some grenade fragments. This is also confirmed by a medical report showing that he was diagnosed with a permanent disability of 6%.

### c. Intention to commit an offence and its evidence

**[599].** MATAKAMBA Jean Berchmans violated the law by assisting FLN fighters in keeping their firearms, ammunition and grenades used in the attacks between May and October 2019,

**[600].** Another act committed by MATAKAMBA Jean Berchmans is to participate in the attacks launched in Rusizi district, including the one that fired at a lorry and broke its windshield at Ku Cyapa in Nyakarenzo.

**[601].** The grenade attacks on civilians that were carried out in the above-mentioned areas, intended to intimidate civilians who had no connection with military operations and to force the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles.

**[602].** We have proven with evidence the specific intention to commit these acts of terrorism.

### 4.4.3. Membership of a terrorist group

### a). Legal provision

**[603].** Article 18 of Law No 46/2018 of 13/08/2018 on counter terrorism provides that: "a person who is member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which

contributes to the capacity-building of another terrorist group, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years.

**b). Act constituting an offence and its evidence**

**[604].** MATAKAMBA Jean Berchmans was involved in MRCD-FLN activities when he was personally involved in some of the terrorist attacks that the group carried out in Rusizi district between May and October 2019. He was also involved in the acts of terrorism by keeping military equipment that included firearms, ammunition and grenades brought by BIZIMANA Cassien and used in the attacks.

**[605].** In his statements of July 16, 2020 before the investigation organ, MATAKAMBA Jean Berchmans confessed his role in the acts of a terrorist group. This is how he expressed it: *"In August 2019 I went to BUKAVU because that is where we did our shopping. Once there, I met a man named BUGINGO Justin who used to live next door before the genocide. We talked and he told me he was in touch with someone who wanted to meet me. I went back home. In the same month, when I returned to Bukavu I met BUGINGO and another man named PASSY [BIZIMANA Cassien]. I don't know his other name but BUGINGO introduced him to me as the one who wanted to meet me and as an FLN combatant. I asked him if by FLN he meant FDLR and he replied that FDLR had split into two factions and that PASSY was an FLN member. I also asked why he wanted to see me since I was not a soldier. BUGINGO replied that they had information about me on the fact that I sustained a loss, especially because they knew and could see from Congo the quarry from which I used to extract stones. Then PASSY requested me to bring to them a former FDLR combatant named NTIBIRAMIRA Innocent. Since they were looking for former FDLR combatants, I told them that there was someone else I knew by the name of BYUKUSENGE Jean Claude. I looked for them and took them to BUKAVU the next day. When we arrived in BUKAVU, we talked and PASSY told them that they were the ones to take care of the equipment they would be giving me; that they will be paid $100 per month. In the same month of August 2019 PASSY and SHABANI crossed Rusizi with two guns and ammunition. So, together with NTIBIRAMIRA Innocent we went to collect the weapons at the river bank and went to store the equipment at*

155

*NTIBIRAMIRA's house. NTIBIRAMIRA Innocent and another former soldier named SUGABO attacked a place called Karangiro and returned home. When I learnt they were the ones who had launched the attack. I went to enquire about it and they confessed to me that it was them who had done it."*

**[606].** "*For the second time PASSY and SHABANI crossed Rusizi with two guns and ammunition and they hid themselves in my field. At night I went to see them and we launched an attack in Rubondwe. PASSY asked me and I showed him the location of the soldiers' position in the area. So, we went to the tarmac road and they shot at the vehicles that were passing by. I don't know if there were people who died at that time. It was on that day that PASSY told me I was the one who was going to keep those guns and ammunition because he was afraid that NTIBIRAMIRA and colleagues would use them for robbery. After the attack BYUKUSENGE and I escorted them back."*

**[607].** "*After the attack, they gave us $100, and they even asked us to meet with General JEVA, the FLN commandant. I went there and met him. We talked about his plan to attack Rwanda because as he told me the government had refused negotiations. I was then requested to play the role of coming and pick up weapons, store and distribute them for use in the attacks.*"

**[608].** "*The third attack took place while I was hospitalized, and it was carried out by BYUKUSENGE, PASSY, and SHABANI in Karangiro whereby they set fire to a vehicle."*

**[609].** "*Another attack I was involved in was perpetrated in Nyakarenzo in September last year. PASSY called me and asked why we were not carrying out any attack and yet they had paid us. I replied to him that we were planning to conduct an attack in Nyakarenzo (…) we stopped on the road and opened fire on a lorry and ran away. We were together with NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and a certain motorcyclist called Damascène."*

[610]. "*Just before the fifth attack Damascene went to Congo to bring grenades of which three were sent to NTIRAMIRA and I kept the rest, including also a pistol and its ammunition, hidden in my field. I was later instructed to give one grenade to NIKUZWE Siméon and after two days Damascène also came and took another. He took it to Kamembe where he met*

*Damascène the motorcyclist and together they launched it in Kamembe. The other grenade and the pistol were taken by NTIBIRAMIRA to Gihundwe but the grenade was lost on the way. Those are the launched attacks that I know well. So, I was left with 4 grenades, 4 guns and ammunition."*

**[611].** MATAKAMBA Jean Berchmans repeated the same statement during his interrogation of September 24, 2020 before the prosecution.

**[612].** The role of MATAKAMBA Jean Berchmans is also highlighted by those with whom they participated in the acts of terrorism as it will be shown in the following paragraphs.

**[613].** BIZIMANA Cassien in his statement of July 16, 2020 before the investigation organ confirmed that he was with MATAKAMBA at Rubondwe attack. BIZIMANA also confirmed that MATAKAMBA was the one who received from Congo the weapons that were used in the terrorist attacks in Rusizi district.

**[614].** BYUKUSENGE Innocent in his statement of September 28, 2020 before the Prosecution also explained that they were together with MATAKAMBA in both the attacks of Karangiro in August 2019 and Nyakarenzo ku Cyapa in September 2019.

**[615].** NTIBIRAMIRA Innocent in his statement of September 24, 2020 before the Prosecution also confirmed that they were together with MATAKAMBA in both the attacks in Rubondwe in June 2019, and in Nyakarenzo ku Cyapa near the military detachment in September 2019.

**[616].** SHABANI Emmanuel, in his statement of September 24, 2020 before the Prosecution, testified that they were together with MATAKAMBA in the Rubondwe attack, where he (Shabani) was serving as a guide to BIZIMANA Cassien.

**[617].** NIKUZWE Siméon, in his statement of July 16, 2020  before the investigation organ, also explained that MATAKAMBA called and asked him to meet at a bus stop in a place called Kuri Avoka. Once there, MATAKAMBA gave him a bag (a sack used for flour packaging) containing a grenade that he kept for use in the terrorist attacks.

**[618].** All the above statements of those who  w e r e  i n v o l v e d  in the acts of terrorism together with MATAKAMBA Jean Berchmans are consistent by showing the role of the latter in those acts.

**c) Intention to commit an offence and its evidence**

**[619].** MATAKAMBA Jean Berchmans violated the law by participating in terrorist acts perpetrated by MRCD-FLN in Rusizi district between May and October 2019. **[620].** That role as described above makes him a member of the MRCD-FLN terrorist group.

**4.4.4. Illegal use of an explosive in public place**

**a) Legal provision**

**[621].** Article 24 of Law No 46/2018 of 13/08/2018 on counter terrorism provides that: "A person who illegally gives, plants, throws or blasts an explosive or any other device with noxious substance in a public place for terrorist act purposes, commits an offence."

**[622].** Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**b) Act constituting an offence and its evidence**

**[623]** MATAKAMBA Jean Berchmans gave explosives (grenades) to NTIBIRAMIRA Innocent; Damascene; BYUKUSENGE Jean Claude and NIKUZWE Siméon for use in terrorist acts and they were thrown in public places.

**[624]** MATAKAMBA Jean Berchmans, in his statement of July 16, 2020 before the investigation organ, described how he had been supplying grenades that were used in terrorist attacks in Rusizi district, as follows: *"[….] Just before the fifth attack Damascene went to Congo to bring grenades of which three were sent to NTIRAMIRA and I kept the rest, and that included also a pistol and its ammunition which were hidden in my field. I was later instructed to give [one grenade] to NIKUZWE Siméon and after two days Damascene also came and took another. He took it to Kamembe where he met Damascène the motorcyclist and together they exploded it in Kamembe city. The other grenade and the pistol were taken by NTIBIRAMIRA to Gihundwe but the grenade was lost on the way."*

**[625]** BIZIMANA Cassien in his statement of July 16, 2020 before the investigation organ, explained that the equipment consisting of Kalashnikov guns, grenades and ammunition, was received and kept by MATAKAMBA Jean Berchmans;

**[626]** BYUKUSENGE Jean Claude, in his statement of July 16, 2020 statement before the investigation organ, w h e n answering to the second question, explained that the grenade used in the attack in Kamembe town was brought by Damascène the motorcyclist from MATAKAMBA Jean Berchmans' house. He gave the following account: *"... we went to Mukadasomwa on a motorcycle and when we arrived Damascène told me they had given him a grenade from MATAKAMBA's house to be launched in Kamembe town. So, I immediately called PASSY [BIZIMANA Cassien] on his Congo phone number and asked him how the attack was organized. He told me that I was to be paid $400 immediately after I launched the grenade in the city. We went to Kamembe and I launched the grenade in a place called Ku rya Gatatu near the Islamic mosque".*

**a) Act constituting an offence and its evidence**

**[623].** MATAKAMBA Jean Berchmans gave explosives (grenades) to NTIBIRAMIRA Innocent; Damascène; BYUKUSENGE Jean Claude and NIKUZWE Siméon for use in terrorist acts and they were launched in public places.

**[624].** MATAKAMBA Jean Berchmans, in his July 16, 2020 statement during the investigation described how he had been supplying grenades that were used in terrorist attacks in Rusizi district, as follows: *"[….] Just before the fifth attack Damascene went to Congo to bring grenades of which three were sent to NTIRAMIRA and I kept the rest, and that included also a pistol and its ammunition which were hidden in field. I was later instructed to give [one grenade] to NIKUZWE Siméon and after two days Damascène also came and took a grenade. He took it to Kamembe where he met Damascène the motorcyclist and together they exploded it in Kamembe city. The other grenade and the pistol were taken by NTIBIRAMIRA to Gihundwe but the grenade was lost on the way."*

**[625].** BIZIMANA Cassien in his July 16, 2020 statement, during the investigation, explained that the equipment consisting of Kalashnikov guns, grenades and ammunition, was received and kept by MATAKAMBA Jean Berchmans;

**[626].** BYUKUSENGE Jean Claude, in his July 16, 2020 statement during the investigation, on answer to the second question, explained that the grenade used in the attack in Kamembe town was brought by Damascène the motorcyclist from MATAKAMBA Jean Berchmans' place. He gave the following account: *"... we went to Mukadasomwa on a motorcycle and when we arrived Damascène told me they had given him a grenade from MATAKAMBA's to be exploded in Kamembe town. So, I immediately called PASSY on his Congo phone number and asked him how the attack was organized. He told me that I was to be paid $400 immediately after I exploded the grenade in the city. We went to Kamembe and I exploded the grenade in a place called Ku rya 3 near the Islamic mosque".*

**b). Intent to commit an offence**

**[627].** MATAKAMBA Jean Berchmans violated the law by handing out explosives (grenades), which were launchedin public places.

**[628].** When MATAKAMBA Jean Berchmans distributed explosives to be thrown in public, it was part of the MRCD-FLN's broader plan to intimidate the general public and force the government to adopt or abandon a particular standpoint or to act according to certain principles.

### 4.2. Concerning SHABANI Emmanuel

### 4.2.1. Conspiracy and Incitement to commit a terrorist act

**a. Legal provision**

**[629].** Article 20 of Law No 46/2018 of 13/2018 on counter terrorism provides that: A person who conspires, incites others to commit a terrorist act directly or indirectly, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than (20) twenty-five (25) years.

**b. Act constituting an offence and its evidence**

**[630].** SHABANI Emmanuel incited his younger brother NIKUZWE Siméon to take part in terrorist attacks in Rusizi district between May and October 2019.

The following are pieces of evidence:

**[631].** When SHABANI Emmanuel was interrogated during the investigation on July 16, 2020 he admitted that he was the one who incited his brother NIKUZWE Siméon to take part in the terrorist attacks in Rusizi district between May and October 2019. He described it as follows*: "In October 2019 when we were in Bukavu, Justin BUGINGO and PASSY told me they were looking for a zone for operations and move from Mururu sector*

*to Bugarama road. I called my brother NIKUZWE Siméon from Rwimbogo sector in Rusizi district and asked him to meet me in Bukavu. When he came I shared the idea with him and requested him to assist PASSY in his activities intended to destabilize the country. He did not respond right away but a few days later he came back and I took him over to Justin BUGINGO, who gave him instructions and showed him colleagues to work with."* He repeated this on page 4 of his September 24, 2020 statement before the prosecution.

[632].The statement of SHABANI Emmanuel is also confirmed by NIKUZWE Siméon in his answer to question 2 in his of July 16, 2020 statement during investigation. He also explained that it was his elder brother SHABANI who had incited him to take part in the preparations of terrorist attacks.

### c. Intent to commit an offence and its evidence

[633]. SHABANI Emmanuel violated the law when he incited his brother NIKUZWE Siméon to carry out terrorist acts in Rusizi district between May and October 2019.

[634]. The acts that SHABANI Emmanuel incited his younger brother NIKUZWE Siméon to engage in are acts of terrorism as shown above. Also, in his answer to question 2 in his July 16, 2020 statement, he personally explained that the purpose was to destabilize the country.

### 4.2.2. Attempted murder as an act of terrorism

### a) Legal provision

[635]. Article 2,4º of Law Nº 46/2018 of 13∕8∕2018 on counter terrorism provides that an act of terrorism is:

[636]. a) Any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, cause serious injury or death

to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[637].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in a).

**[638].** Article 19 of Law N° 46/2018 of 13/8/2018 on counter terrorism provides that: A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[639].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

## b). Act constituting an offence and its evidence

**[640].** In this offence, the deliberate act that was committed is the attempt to commit murder; this act constitutes already a violation of the criminal laws because it is provided for and punishable as an offence by articles 21 and 107 of the law N° 068/2018 of 30/8/2018 determining offences and penalties in general.

**[641].** SHABANI Emmanuel, as a person who was guiding BIZIMANA Cassien (an FLN fighter) on the route through which he used to get weapons (guns, ammunition and grenades) into Rwanda, and even guided him to the area where he perpetrated terrorist attacks; provided assistance that led to the shooting  and attacking with grenades civilians in an attempt to murder them as a terrorist act.

This role of SHABANI Emmanuel is proven by the following:

**[642].** In his September 24, 2020 statement before the prosecution, SHABANI Emmanuel admitted to have accompanied BIZIMANA in his operations in Rwanda. When  interrogated about operations he participated in, he replied:  *"In the  first operation I accompanied him up to the Rusizi river, and when I wanted to go back he told me that I had to escort him to Rwanda. Actually, he forced me to cross over since we had only agreed to accompany him up to the bank of Rusizi on the side of Congo. We had then to cross the river by swimming and when we arrived to the other side of the river, we found four persons waiting for us. These were MATAKAMBA Jean Berchmans, NTIBIRAMIRA Innocent, SIBOMANA and BYUKUSENGE Jean Claude. They took us to Mururu sector  on the road  above  the Rubondwe swamp. Then BIZIMANA instructed his companions that the purpose of the operation was to stop vehicles, order the passengers to get out with their belongings and burn vehicles only. Then a vehicle passed by and they shot at it but in vain. The operation ended in failure without reaching its objective (.   ). I accompanied him in the second attack in July 2019*
*and I was left at the riverbank on the side of Congo. The third time I accompanied him when he was going to deliver weapons to the team he was working with in Rwanda but we both stayed on the side of Congo. It was the team from Rwanda that crossed over and took the equipment and we went back."*

**[643].** When asked if he acknowledged his role in the attacks that injured people and  damaged their property in Rusizi, he replied*: "I acknowledge that I was a co-offender in the acts because of my role as a guide to BIZIMANA Passy who was coming to perpetrate the attacks".*

**[644].** BIZIMANA Cassien also pointed out the role of SHABANI Emmanuel in the terrorist attacks in Rusizi district. In his September 24, 2020 statement before the prosecution, he explained that he was the one who brought the equipment in collaboration with SHABANI Emmanuel; and that the equipment that included grenades, guns and ammunition was used to carry out terrorist attacks in Rusizi between May and October 2019. He also added that the equipment was received and transported to Rwanda via Rusizi river by MATAKAMBA Jean Berchmans.

**[645].** In his July 16, 2020 statement during the investigation, MATAKAMBA Jean Berchmans accused BIZIMANA Cassien and SHABANI Emmanuel of having crossed Rusizi with guns and ammunition which he went to receive. He went on to explain that for the second time, PASSY (BIZIMANA Cassien) and SHABANI Emmanuel crossed Rusizi river with two guns and ammunition and hid themselves in a field, where they left at night and attacked Rubondwe. They went to the tarmac road and fired at vehicles that were passing by. He added however, that he did not know whether there were people who died in the attack at that time. This suggests that the shooting at the vehicles was intended to kill people.

**[646].** Some of the grenades brought over to Rwanda via Rusizi river by BIZIMANA Cassien who was guided by SHABANI Emmanuel, were used in the attack that was carried out by BYUKUSENGE Jean Claude and which injured several persons in Umuganda village, Kamashangi cell, Kamembe Sector near Stella Bar.

**[647].** SHABANI Emmanuel's role as BIZIMANA Cassien's guide was instrumental in transporting to Rwanda via Rusizi river the weapons used in terrorist attacks in Rusizi district. He also assisted in the attacks per se, some of which were aimed at killing people. If these people are still alive, it is not because of the will of those who attacked them with firearms and grenades. The fact that he deliberately assisted the conduct of those terrorist acts makes us conclude that his involvement makes him personally liable in the attempt to commit murder as provided for in section b) of Article 2,4º above.

**c) Intent to commit an offence and its evidence**

**[648].** SHABANI Emmanuel violated the law when he assisted BIZIMANA Cassien by showing him the easiest way to get across the weapons used in terrorist attacks and to guide and escort him to places where he was to carry out the attacks.

**[649].** The firing and grenade attack in the above-mentioned area was carried out with the participation of SHABANI Emmanuel as it has been highlighted and the aim of the attacks was to intimidate civilians who had no connection with military operations and to coerce the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles. This was in line with the broader plan of MRCD-FLN which was specifically to commit acts of terrorism on Rwandan territory as we have shown it with proofs.

**4.2.3. Arson as an act of terrorism**

**a. Legal provision**

**[650].** Article 2, 4º of Law Nº 46/2018 of 13∕8∕2018 on counter terrorism provides that an act of terrorism is:

**[651].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

166

iii) create general insurrection in a State;

**[652]** b) any promotion, sponsoring, contribution to, command, **aid**, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in section a).

**[653].** Article 19 of Law Nᵒ 46/2018 of 13/8/2018 on counter terrorism provides that: A person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[654].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years

Act constituting an offence and its evidence:

**[655].** In this offence, the intentional act that was carried out is a deliberate arson against another person's house, means of transport or other person's property as an act of terrorism which is against the criminal law because it is provided for and punishable as a crime under Article 180 of Law Nᵒ 068∕2018 of 30/08 ∕ 2018 determining offences and penalties in general.

**[656].** SHABANI Emmanuel, as a person who was showing BIZIMANA Cassien (FLN fighter) the way to the place where he was going to perpetrate terrorist attacks including the attack that burnt a vehicle inKarangiro, assisted in the arson of civilians' property as an act of terrorism.

The following are proofs for the above acts:

**[657].** In his September 24, 2020 statement before the Prosecution, SHABANI Emmanuel admitted having escorted BIZIMANA in his operations in Rwanda. When questioned about the operations he participated in, he replied: *"In the first operation I accompanied him up to the Rusizi river, and when I wanted to go back he told me that I had to escort him over into Rwanda. Actually, he forced me to cross over because we had agreed to accompany him to Rusizi riverbank on the side of Congo. We had then to cross the river by swimming and when we arrived to the other side of the river, we found four people waiting for us. These were MATAKAMBA Jean Berchmans, NTIBIRAMIRA Innocent, SIBOMANA and BYUKUSENGE Jean Claude.*
*They took us to Mururu sector on the road  above  the Rubondwe swamp. Then BIZIMANA informed  his companions that the purpose of the operation was to stop vehicles, order the passengers to get out with their belongings and burn only the vehicles. Then a vehicle passed by and they shot at it but in vain. The operation ended in failure without reaching its objective (.   ). I accompanied him*
*in the second attack in July 2019 and I was left at the riverbank on the side of Congo. The third time I accompanied him when he was going to deliver weapons to the team he was working with in Rwanda but we both stayed on the side of Congo. It was the team from Rwanda that crossed over and took the equipment and we went back."*

**[658].** In his September 24, 2020 statement before the prosecution, BIZIMANA Cassien admitted also that he was the one who, in collaboration with SHABANI Emmanuel, brought the equipment (that included grenades, guns and ammunition) used to perpetrate terrorist attacks in Rusizi between May and October 2019.

### c. Intent to commit an offence and its evidence

**[659].**SHABANI Emmanuel violated the law when he assisted BIZIMANA Cassien by showing him the easiest way to get across the weapons used in the terrorist attacks as well as guiding and escorting him to the place where he was to carry out the attacks.

**[660].** SHABANI Emmanuel assisted BIZIMANA Cassien (an FLN fighter) by showing him the way to the place where he was to burn civilians 'property in order to intimidate them and force the government to adopt or abandon a particular standpoint or to act

according to certain principles;

**[661].** The plan to intimidate the population and force or compel the government to adopt or abandon a particular standpoint or to act according to certain principles is outlined by SHABANI Emmanuel himself in his August 14, 2020 statement. When asked why FLN fighters requested his assistance, he replied: *"They didn't tell me anything but according to the operations we conducted together I could see it was nothing other than sabotage."* When he was interrogated during the investigation on July 16, 2020 about his views on the FLN forces plan in Nyungwe, he replied: *"I thought they were going to make war to Rwanda."*

**[662].** The plan is also indicated by the statements of some of the perpetrators of the attacks that burned civilians' property. According to them, the purpose was sabotage and to prove the existence of FLN. The statements were made by BIZIMANA Cassien alias PASSY in his interrogation by the Prosecution on September 24, 2020; and by BYUKUSENGE Jean Claude, in his interrogation by the Prosecution on September 28, 2020.

### 4.2.4. Membership of a terrorist group

**a. Legal provision**

**[663].** Article 18 of Law N° 46/2018 of 13/8/2018 on counter terrorism provides that " a person who is a member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years".

**b. Act constituting an offence and its evidence**

**[664].** SHABANI Emmanuel was involved in the attacks carried out by the MRCD-FLN terrorist group in Rusizi District, between May 2019 and October 2019 where he served as BIZIMANA Cassien's guide and as a participant in the attacks.

**[665].** This is shown by the following: In his September 24, 2020 statement before the prosecution, SHABANI Emmanuel admitted that he was responsible for guiding BIZIMANA Cassien in his operations of terrorist attacks in Rwanda. He also added that he himself participated in Rubondwe attack after crossing the Rusizi River by swimming. In other attacks, he said that he escorted BIZIMANA Cassien up to Rusizi river bank on the side of Congo.

**[666].** BIZIMANA Cassien also portrayed the role of SHABANI Emmanuel as his guide. In his of September 24, 2020 statement before the Prosecution, he pointed out that SHABANI Emmanuel served as his guide who showed him where to cross Rusizi river and carry out various attacks in Rusizi District and that he accompanied him in three different attacks.

**[667].** Another witness of the role SHABANI Emmanuel played in terrorist activities is NTIBIRAMIRA Innocent. In his statements of July 16, 2020 during the investigation and before the prosecution on September 24, 2020, he confirmed that he accompanied SHABANI in the July 2019 attack at the maize flour processing factory and that they were accompanied by BYUKUSENGE Jean Claude, BIZIMANA Cassien and SIBOMANA.

**[668].** BYUKUSENGE Jean Claude also, in his statements during the investigation on July 16, 2020 and before the Prosecution on September 28, 2020, explained that SHABANI was involved in the July 2019 attack together with MATAKAMBA Jean Berchmans, NTIBIRAMIRA Innocent, SIBOMANA and BIZIMANA Cassien. They stopped a vehicle but the driver refused to stop and BIZIMANA Cassien fired three shots

at the vehicle and BYUKUSENGE Jean Claude fired two in vain. After the attack, BIZIMANA Cassien went to spend the night in Congo while BYUKUSENGE Jean Claude spent the night at MATAKAMBA Jean Berchmans' place.

**c). Intent to commit an offence and its evidence**

**[669].** SHABANI Emmanuel violated the law when he participated in the terrorist acts committed by MRCD-FLN in Rusizi District as a guide to one of the perpetrators of the attacks namely BIZIMANA Cassien.

**4.2.5. Illegal use of an explosive in a public place**

**a). Legal provision**

**[670].** Article 24 of Law N° 46/2018 of 13/8/2018 on counter terrorism provides that A person who illegally gives, plants, throws or blasts an explosive or any other device with noxious substance in a public place for terrorist act purposes, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**b). Act constituting an offence and its evidence**

**[671].** SHABANI Emmanuel in collaboration with BIZIMANA Cassien alias PASSY distributed explosives (grenades) to MATAKAMBA Jean Berchmans, NTIBIRAMIRA Innocent and NIKUZWE Siméon for use in terrorist acts and they were launched in public places in sectors of Rusizidistrict.

**[672].** NTIBIRAMIRA Innocent, one of the suspects in the grenade attack in various parts of Rusizi district, said that SHABANI Emmanuel was one of the suppliers of grenades and other weapons. When interrogated on July 16, 2020 during the investigation, he answered question 6 as follows: *"We had 5 Kalashnikov rifles, a large number of bullets (I cannot tell the number), and 7 grenades. All these weapons were kept at*

*MATAKAMBA's house. They were brought by Passy and SHABANI to Rusizi river bank and it was from there we were going to collect them."*

**[673].** This is also explained by MATAKAMBA Jean Berchmans in his July 16, 2020 statement when questioned during the investigation. He explained it as follows*: "In that month of August 2019 PASSY and SHABANI crossed Rusizi river with two guns and ammunition. So, I went to collect the weapons together with NTIBIRAMIRA Innocent at the river bank and we went to keep the equipment at his place. NTIBIRAMIRA Innocent and another former soldier named SUGABO attacked a place called Karangiro and returned home. When I learnt they were the ones who perpetrated the attack I went to enquire about it and they said it was them who had done it."*

**c). Intent to commit an offence and its evidence**

**[674].** SHABANI Emmanuel violated the law by distributing explosives (grenades), which were launched  in public places.

**[675].** When SHABANI Emmanuel distributed explosives to be launched on public places, it was part of the MRCD-FLN's broader plan to intimidate the general public and force the government to adopt or abandon a particular standpoint or to act according to certain principles.

**4.3. Concerning NTIBIRAMIRA Innocent**

**4.3.1. Membership of a terrorist group**

**a) Legal provision**

**[676].** Article 18 of Law N° 46/2018 of 13/8/2018 on counter terrorism provides that " a person who is a member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group, commits an offence.

Upon conviction, he/she is liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years".

**b). Act constituting an offence and its evidence**

[677]. NTIBIRAMIRA Innocent participated in the acts of MRCD-FLN terrorist group.

[678]. According to his statements in both his interrogations of July 16, 2020 during the investigation, and that of September 24, 2020 before the prosecution, NTIBIRAMIRA Innocent admitted to have participated in five different attacks; he described it as follows: *"The first attack took place in June 2019 at a cassava processing factory in Karangiro at the Mururu-Nyakarenzo border at the former SOPECYA petrol station. The attackers included myself with a gun and SIBOMANA Jean Bosco with a hand grenade. In that attack, SIBOMANA threw a grenade at a vehicle but it did not explode and I fired about six shots into the air and we immediately went back home. No damage was recorded. The second attack took place at the end of June 2019 in Rubondwe in Mururu sector near the coffee plant. It was led by BIZIMANA Cassien, myself, MATAKAMBA, SHABANI Emmanuel, SIBOMANA Jean Bosco and BYUKUSENGE Jean Claude. At that time we stopped a lorry but the driver refused to stop and continued. The same happened with the second vehicle. When we realized that the plan was not working and we went back home (…). The third attack also took place in Karangiro at the cassava processing factory in July 2019. I participated in it but my role was that I, together with SIBOMANA and BYUKUSENGE Jean Claude, had to assist BIZIMANA Passy to cross over to Rwanda. After that, SIBOMANA and I went back home whereas BIZIMANA and BYUKUSENGE Jean Claude remained and attacked a Toyota Stout and burnt its cabin. The fourth attack, which took place at the end of September 2019, was carried out in Nyakarenzo sector at a place called ku Cyapa near the military detach. The attack was not targeting soldiers, we were rather going to ambush vehicles. The attackers included myself, MATAKAMBA, BYUKUSENGE, NSABIMANA Damascène and SIBOMANA Jean Bosco. In that attack we stopped a lorry and the driver refused to stop but when we fired he stopped. As we were preparing to set it on fire, soldiers on patrol heard the shots and fired at us and we ran away without doing anything. So, the attack ended without causing any damage (….) . The fifth attack took place in the city of Kamembe. At that time we*

*had planned to explode grenades in two places, i.e. at the office of Kamembe Sector and in the city center. The grenade attack at the Kamembe sector office was to be led by MATAKAMABA and carried out by SIBOMANA and myself. Since we were on foot and himself in a car, the mission aborted because we failed to meet and we couldn't reach MATAKAMBA on the phone. However, we left the grenade activated down the sector office, but when I was arrested I went to show where we left it but it was no longer there. I don't know who deactivated it. We had planned to explode the second grenade in Kamembe city and the attack was carried out by BYUKUSENGE with the help of NSABIMANA Jean Damascène who took him on a motorcycle".*

**[679].** The role of NTIBIRAMIRA Innocent in the MRCD-FLN group terrorist acts is again brought out by BYUKUSENGE Jean Claude. In his two statements of July 16, 2020 during the investigation and before the prosecution on September 28, 2020, he also expressed the role of NTIBIRAMIRA Innocent in the various attacks they carried out.

### b). Intent to commit an offence and its evidence

**[680].** NTIBIRAMIRA Innocent violated the law when he participated in terrorist attacks in Rusizi district between May and October 2019.

**[681].** NTIBIRAMIRA Innocent participated in the acts that were part of the MRCD-FLN's broader plan to intimidate the population and force the government to adopt  or abandon a particular standpoint or to act according to certain principles;

### 4.3.2. Conspiracy and incitement to commit a terrorist act
### a). Legal provision

**[682].** Article 20 of Law N° 46/2018 of 13/2018 on Counter terrorism provides that:
a person who conspires, incites others to commit a terrorist act directly or indirectly, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than (20) twenty-five (25) years.

**b. Act constituting an offence and its evidence**

**[683].** NTIBIRAMIRA Innocent incited SIBOMANA Jean Bosco and NSABIMANA Jean Damascène who was a motorcyclist to carry out terrorist acts in Rusizi between May and October 2019.

This is proven by the following:

**[684].** In his of July 16, 2020 statement during the investigation, NTIBIRAMIRA Innocent expressed in the following words how he encouraged SIBOMANA Jean Bosco and NSABIMANA Jean Damascene to commit acts of terrorism: *"When I arrived home in Mururu, I thought about the deal and the money involved and because I had been requested to look for other people, I approached SIBOMANA, a former RDF soldier and NSABIMANA Jean Damascène and shared with them our plans and operations for which we wanted their cooperation and they accepted the deal."*

**[685].** He reiterated this in his interrogation as reflected in his statement of September 24, 2020.

**c. Intent to commit an offence and its evidence**

**[686].** NTIBIRAMIRA Innocent violated the law when he encouraged SIBOMANA Jean Bosco and NSABIMANA Jean Damascène to engage in acts of terrorism.

**[687].** The acts that NTIBIRAMIRA Innocent encouraged SIBOMANA Jean Bosco and NSABIMANA Jean Damascène to commit are acts of terrorism perpetrated by the MRCD-FLN group. As we have demonstrated, these acts aimed to intimidate and force the government to adopt or abandon a particular standpoint or to act according to certain principles;

### 4.3.3. Arson as an act of terrorism

**a. Legal provision**

**[688].** Article 2,4º of Law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[689].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[690].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in a).

**[691].** Article 19 of Law Nº 46/2018 of 13/8/2018 on counter terrorism provides that: a person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[692].** I f the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

176

**b). Act constituting an offence and its evidence**

**[693].** In this offence the intentional act that was carried out is deliberate arson against another person's house, transport means or other person's property as an act of terrorism which is against the criminal law because it is provided for and punishable as a crime under Article 180 of Law N° 068/2018 of 30/08 / 2018 determining offences and penalties in general.

**[694].** NTIBIRAMIRA Innocent, helped BIZIMANA Cassien (FLN fighter) cross from Congo over to Rwanda where the terrorist attack that set fire to a vehicle in Karangiro took place.

The following constitutes evidence for the above mentioned acts:

**[695].** In his two statements, the one of July 16, 2020 during the investigation and that of September 24, 2020 before the prosecution, NTIBIRAMIRA Innocent admitted his role in helping BIZIMANA Cassien cross over to Rwanda. He also admitted to have done it together with BYUKUSENGE Jean Claude and to have taken BIZIMANA Cassien to the place where the attack that burnt a vehicle in Karangiro was carried out.

**[696].** In his statements during the investigation on July 24, 2020, and before the prosecution on October 7, 2020, MAHORO Jean Damascène explained that in the July 8, 2019 attack in Karangiro (Nyakarenzo Sector, Rusizi District) a vehicle of the Toyota DYNA type with plate number RAC 943B was attacked and its cabin completely burnt. Only the rear part of the vehicle remained.

### c). Intent to commit an offence and its evidence

**[697].** NTIBIRAMIRA Innocent violated the law by helping BIZIMANA Cassien (an FLN fighter) to cross from Congo over to Rwanda and escorting him to where he burned a civilian's vehicle in Karangiro.

**[698].** NTIBIRAMIRA Innocent assisted BIZIMANA Cassien in the act of burning a civilian's vehicle in the broader plan of MRCD-FLN to intimidate the population and force the government to adopt or abandon a particular standpoint or to act according to certain principles;

### 4.3.4. Illegal use of an explosive in a public place

### a). Legal provision

**[699].** Article 24 Law N° 46/2018 of 13/8/2018 on counter terrorism provides that: A person who illegally gives, plants, throws or blasts an explosive or any other device with noxious substance in a public place for terrorist act purposes, commits an offence. Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25).

### b. Act constituting an offence and its evidence

**[700].** NTIBIRAMIRA Innocent together with SIBOMANA threw in June 2019 a grenade in a public place (on the border between Mururu and Nyakarenzo sectors) in Rusizi district,.

**[701].** In his July 16, 2020 statement during investigation, NTIBIRAMIRA Innocent acknowledged his role in the attacks. He expressed it as follows: *"We carried out the first attack in June 2019 on the border between Mururu and Nyakarenzo sectors where we targeted vehicles in the parking at 9pm. I was armed with a gun and SIBOMANA had a*

*grenade which he threw at a vehicle with the aim of burning it but the grenade failed to explode."*

This was also repeated in his September 24, 2020 statement before the Prosecution.

**c. Intent to commit an offence and its evidence**

**[702].** NTIBIRAMIRA Innocent violated the law when together with his colleague SIBOMANA threw a grenade in a public place.

**[703].** NTIBIRAMIRA Innocent and his colleague threw an explosive in a public place, which was part of the MRCD-FLN's broader plan to intimidate the population and force the government to adopt or abandon a particular standpoint or to act according to certain principles;

**4.4. Concerning BYUKUSENGE Jean Claude**

**4.4.1. Membership of a terrorist group**

**a). Legal provision**

**[704].** Article 18 of Law N° 46/2018 of 13/8/2018 on counter terrorism provides that " a person who is a member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than fifteen (15) years but not more than twenty (20) years".

**b). Act constituting an offence and its evidence**

**[705].** BYUKUSENGE Jean Claude participated in the attacks that were carried out by the MRCD-FLN terrorist group in Rusizi district between May and October 2019.

**[706].** In his September 28, 2020 statement before the prosecution, BYUKUSENGE Jean Claude described the attacks he took part in in the following words: *"(...) it was in July 2019 when MATAKAMBA approached me and told me there was an offer of a job for me. So, he introduced me to BIZIMANA Cassien in Bukavu. Bizimana told me that the job we were going to do together was to cause insecurity and that I would be paid $100 per month. I accepted the deal and went back home. When we left Bukavu I was staying at MATAKAMBA's place. In the same month I went back to Nyamasheke and towards the end of July 2019, MATAKAMBA called me and told me that we were going to do the job they asked us to do. So, I came and found that BIZIMANA had already arrived and we met at MATAKAMBA's house. Around midnight we went to Rubondwe near the coffee factory. When we arrived there BIZIMANA told us that the mission was to stop a vehicle and later he would tell us what to do with it."*

**[707].** He continued: *"We were together with MATAKAMBA, BIZIMANA PASSY, SHABANI EMMANUEL, NTIBIRAMIRA Innocent, SIBOMANA. PASSY and I had a Kalashnikov each. We stopped a vehicle but the driver refused to stop Passy had a Kalashnikov gun  and I had another  , and he fired three bullets and I shot two but we failed to stop the vehicle. So, the mission immediately failed and PASSY returned to Congo and I spent the night at MATAKAMBA's house."*

**[708].** *"The next attack was in Karangiro near Mururu sector office in front of the maize flour processing factory. The attack took place in August 2019 and it included myself, BIZIMANA Passy, NTIBIRAMIRA Innocent and SIBOMANA. MATAKAMBA was absent because he was hospitalized in Kigali (...)."*

**[709].** We found over there a parked Daihatsu, then PASSY opened the tank and poured petrol into the cabin and set it on fire but only the front seats burned because they immediately extinguished it after we had run. We fired about seven shots, but no one was injured.

**[710].** *"Another attack I took part in was in Nyakarenzo sector in a place called ku Cyapa where there is a road leading to Nyakarenzo hospital. To the other side there is a military detach. The attack took place in September 2019 and we carried it out together with MATAKAMBA,*

*NTIBIRAMIRA, SIBOMANA and Damascène the motorcyclist. We stopped a Tanzanian lorry, the driver stopped and got out of the lorry scared but I reassured him. But after the soldiers on patrol heard the bullets they came to the scene and we immediately ran away without any action especially because the objective was to show to the international community the presence of FLN soldiers."*

**[711].** *"Another attack I carried out is that of a grenade I exploded in Kamembe city ku rya gatatu next to a mosque. It was on October 19, 2019 and we carried out the attack together with Damascène who brought me the grenade and I exploded it. I threw it onto a parked car and its front windshield broke. I don't know if there were casualties recorded because I was immediately arrested and taken away."*

**[712].** That is also what he said in his July 16, 2020 statement during the investigation.

**[713].** The role of BYUKUSENGE Jean Claude is also highlighted by NTIBIRAMIRA Innocent. In the two statements, one of July 16, 2020 during the investigation and the other before the prosecution on September 24, 2020, NTIBIRAMIRA Innocent explained that there was an attack they carried out together with BYUKUSENGE Jean Claude, BIZIMANA Cassien and SIBOMANA in July 2019 at a maize flour processing factory.

**[714].** This is also confirmed by MATAKAMBA Jean Berchmans in his July 16, 2020 statement during the investigation where he stated that there was an attack they carried out in Nyakarenzo in September last year (2019), whereby they fired at a lorry and ran away. He stated that he was accompanied by NTIBIRAMIRA Innocent, BYUKUSENGE Jean Claude and a motorcyclist named Damascène.

**c). Intent to commit an offence and its evidence**

**[715].** BYUKUSENGE Jean Claude violated the law by participating in the MRCD-FLN terrorist attacks in Rusizi district between May and October 2019.

**[716].** The attacks that BYUKUSENGE Jean Claude participated in are part of the terrorist attacks perpetrated by the MRCD-FLN group in its broader plan to intimidate the general public and to force the government to take or abandon a particular line or to follow certain principles.

### 4.4.2. Arson as an act of terrorism

**a. Legal provision**

**[717].** Article 2,4° of Law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[718].** a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[719].** b)any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in section a) above

**[720].**Article 19 of the law N° 46/2018 of 13/8/2018 on counter terrorism provides that: a person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he∕she shall be liable to imprisonment for a term

not less than fifteen (15) years but not more than twenty (20) years.

**[721].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**b). Act constituting an offence and its evidence**

**[722].** In this offense the intentional act that was committed is a deliberate arson against another person's house, means of transport or other person's property as an act of terrorism which is against the criminal law because it is provided for and punishable as a crime under Article 180 of Law No 068/2018 of 30/08/2018 determining offences and penalties in general.

**[723].** In July 2019 BYUKUSENGE Jean Claude and his colleagues set fire to a vehicle that was parked in Karangiro near a maize flour processing factory and burnt its cabin in the attack.

**[724].** In his September 28th, 2020 statement before the prosecution BYUKUSENGE admitted to have participated in the July 2019 attack in Karangiro where they set fire to a vehicle. He explained it as follows: *"The next attack was perpetrated in August 2019 in Karangiro near Mururu sector office in front of the maize flour processing factory. The attackers included BIZIMANA Passy, NTIBIRAMIRA Innocent, SIBOMANA and myself. MATAKAMBA was not present in the attack because he was hospitalized in Kigali (..,). We found over there a Daihatsu pickup which was parked and PASSY opened the tank, poured petrol into the cabin and set it on fire but only the front seats burned because they immediately extinguished it after we had run away. We fired about seven shots but no one was injured."* That is how he had explained it during the investigation on July 16, 2020.

**[725].** This is also confirmed by BIZIMANA Cassien who participated in that attack as he explained it in his statement before the prosecution on August 24, 2020.

**[726].** In his July 16, 2020 statement before the prosecution MATAKAMBA also accused him of this attack. He stated that BYUKUSENGE, PASSY [BIZIMANA] and SHABANI carried out an attack in Karangiro and burnt a vehicle.

**[727].** In his July 24, 2020 statements during the investigation and before the prosecution on October 7, 2020, witness called MAHORO Jean Damascène explained that on July 8, 2019 in Karangiro (Nyakarenzo Sector, Rusizi District) a criminal attack set fire to his Toyota DYNA pickup with plate number RAC 943 B and burnt completely its cabin. Only the rear part of the vehicle remained.

**[728].** This was again confirmed by witness HABIYAREMYE Martin, who was present at the time of the crime. He confirmed this in his October 8, 2020 statement before the prosecution. The attack was also narrated by NTEZIRYAYO Théogène and GAKWAYA Gérard on October 6, 2020 before the Prosecution.

### c). Intent to commit an offence and its evidence

**[729].** BYUKUSENGE Jean Claude violated the law when he and his colleagues set fire to a vehicle in the attack perpetrated in Karangiro in July 2019.

**[730].** BYUKUSENGE Jean Claude and his colleagues set fire to a civilian vehicle in a broader MRCD-FLN plan to intimidate and coerce or cause the government to adopt or abandon a particular standpoint or to act according to certain principles;

### 4.4.3. Attempted murder as an act of terrorism

### a). Legal provision

**[731]**. Article 2,4° of the law No 46/2018 of 13/8/2018 on counter terrorism provides that an act of terrorism is:

**[732].**a) any deliberate act which is a violation of the criminal laws and which may endanger the life, physical integrity or freedoms of, or cause serious injury or death to, any person, any number or group of persons or causes or may cause damage to public or private property, natural resources, environmental or cultural heritage and  is calculated or intended to:

i) intimidate, put in fear, force, coerce or induce any government, body, institution, the general public or any segment thereof, to do or abstain from doing any act or to adopt or abandon a particular standpoint or to act according to certain principles;

ii) disrupt any public service, the delivery of any essential service to the public or to create a public emergency;

iii) create general insurrection in a State;

**[733].** b) any promotion, sponsoring, contribution to, command, aid, incitement, teaching, training, attempt, encouragement, threat, conspiracy, organizing or procurement of any person, with the intent to commit any act referred to in a) above

**[734].**Article 19 of Law Nº 46/2018 of 13/8/2018 on counter terrorism provides that: a person who commits, attempts to commit, participates in or supports terrorist acts commits an offence. Upon conviction, he/she shall be liable to imprisonment for a term not less than fifteen (15) years but not more than twenty (20) years.

**[735].** If the offence referred to in Paragraph One of this Article involves a leader of the group or any other person who played a role in its formation, the penalty is an imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25) years.

**b). Act constituting an offence and its evidence**

**[736].** In this offence the deliberate act committed is the attempt to commit murder. This act is normally illegal under the criminal laws as it is provided for and punishable

Under Articles 21 and 107 of Law N° 068/2018 of 30/08/2018 which provides for crimes and punishments in general.

**[737].** On October 19, 2019 BYUKUSENGE Jean Claude threw a grenade that injured various people in Umuganda village, Kamashangi cell, Kamembe sector near Stella Bar.

**[738].** In his September 28, 2020 statement before the Prosecution, BYUKUSENGE Jean Claude described how he threw the grenade in Kamembe ku rya Gatatu in the following words : *"Another attack I carried out is that of a grenade I exploded in Kamembe city ku rya gatatu next to a mosque. It was on October 19, 2019 and we carried out the attack together with Damascène who brought me the grenade and I exploded it. I threw it on a parked car and its front windshield broke. I don't know if there were casualties because I was immediately arrested and taken away."* This is also what he acknowledged in his statement of July 16, 2020 during the investigation.

**[739].** BIZIRUREMA Célestin also confirmed what happened in this attack where BYUKUSENGE Jean Claude and his colleagues threw a grenade and wounded people. In his October 6, 2020 statement before the prosecution, BIZIRUREMA Célestin testified that the casualties of the grenade attack perpetrated near Stella Bar included NIZEYIMANA Paulin, NKURUNZIZA Jean Népo, NSABIMANA Joseph and RUTAYISIRE Joseph.

**[740].** Additionally, some of the wounded in the grenade attack described it in their statements as follows:

**[741].** In his October 6, 2020 statement before the prosecution, RUTAYISIRE Félix explained how he was hit by a grenade fragment. This is also confirmed by forensic examination reports of July 2, 2019 and October 6, 2020 which revealed the presence of two grenade fragments in his right shoulder and that he was left with a permanent disability of 24%..

**[742].** Another victim of the grenade attack is NSABIMANA Joseph. He testified in his October 6, 2020 statement before the prosecution that he was one of the victims of the attack. He stated that he was hit by a grenade fragment which was still lodged in his body. This is also confirmed by a forensic examination that showed that he still had a grenade fragment in his right hip and that it has resulted in a permanent disability of 8%.

**[743].** The grenade also wounded NKURUNZIZA Jean Népomuscène. In his October 7, 2020 statement before the prosecution, NKURUNZIZA Jean Népomuscène identifies himself as one of the victims of the attack. According to a medical report he was hit by some of the grenade fragments and the attack caused him a permanent disability of 6%.

### c). Intent to commit an offence and its evidence

**[744].** BYUKUSENGE Jean Claude violated the law when he hurled a grenade into civilians in Rusizi district, Kamembe sector, with the intention to kill them.

**[745].** The act of throwing grenades at civilians in the above-mentioned areas was intended to intimidate civilians who had no connection with military operations and to coerce the government of Rwanda to adopt or abandon a particular standpoint or to act according to certain principles.

### 4.4.4. Illegal use of an explosive in a public place

### a) Legal provision

**[746].** Article 24 of Law No 46/2018 of 13/8/2018 on counterterrorism provides that: A person who illegally gives, plants, throws or blasts an explosive or any other device with noxious substance in a public place for terrorist act purposes, commits an offence.

Upon conviction, he or she is liable to imprisonment for a term of not less than twenty (20) years but not more than twenty-five (25).

**b). Act constituting an offence and its evidence**

**[747].** On October 19, 2019 BYUKUSENGE Jean Claude threw an explosive (grenade) in a public place (at Stella Bar) in Kamembe sector in Rusizi district.

**[748].**In his September 28, 2020 statement before the Prosecution, BYUKUSENGE Jean Claude described in the following words how he threw a grenade in the town of  Kamembe ku rya gatatu: *"Another attack I carried out is that of a grenade I exploded in Kamembe town ku rya gatatu next to a mosque. It was on October 19, 2019 and we carried out the attack together with Damascène who brought me the grenade and I exploded it. I threw it on a parked car and its front windshield broke. I don't know if there were casualties recorded because I was immediately arrested and taken away."*
That is also what he acknowledged in his July 16, 2020 statement during the investigation.

**[749].** In his July 16, 2020 statement before the Prosecution, a witness named BIZIRUREMA Célestin, testified that the injured in the grenade attack perpetrated near Stella Bar, included NIZEYIMANA Paulin, NKURUNZIZA Jean Népo, NSABIMANA Joseph and RUTAYISIRE Joseph. The victims were also interviewed and they confirmed they had been injured by the grenade, as it was also shown by forensic examinations.

**[750].** In his October 7, 2020 statement before the prosecution, a witness named INGABIRE Joyeux described in the following words how the grenade attack of October 19, 2019 was carried out: *"for the last terrorist attack of October 19, 2019 at 7:07 p.m. the terrorist acts targeted the places I communicated to you. On that day, the criminals or those terrorists threw a grenade near Stella Bar which was crowded with people. It injured*

*five persons and damaged a RAV4 RAC 403 vehicle belonging to HABARUREMA Vénuste aka Rwandema".*

### c). Intent to commit an offence and its evidence

**[751].** BYUKUSENGE Jean Claude violated the law when on October 19, 2019 he threw an explosive in a public place at a bar called Stella in Kamembe sector, Rusizi district.

**[752]** The act of throwing an explosive in a public place committed by BYUKUSENGE Jean Claude as part of the MRCD-FLN terrorist acts, was perpetrated with the intention to intimidate civilians and to force the government to adopt or abandon a particular standpoint or to act according to certain principles. The evidence above confirms that this was the motive behind all the acts carried out in the attacks perpetrated by MRCD-FLN.

### 4.5. Concerning NIKUZWE Simeon

### 4.5.1. Membership of terrorist group

### a) Legal provisions

**[753]** Article 18 of Law N° 46/2018 0f 13/08/2018 on the fight against terrorism stipulates that: "A person belonging or who agrees to belong to a terrorist organization or takes part in terrorist activities or who commits any act that enhances another terrorist organization commits an offence. Upon conviction, he/she is liable to a term of imprisonment not less than fifteen (15) years but not more than twenty (20) years."

### b) Act constituting the offence and its evidence

**[754].** NIKUZWE Simeon took part in activities of the MRCD-FLN terrorist organization when he introduced into the country, and even kept grenades which

were destined to be used by the organization in terrorist activities which were being prepared in Rusizi district.

[755] This is shown by the fact that in his statements during his examination in the course of investigation on 16 July 2020 and during prosecution on 14 August 20220 and on the 24 September 2020 when he admitted and explained how he was given grenades on two occasions, that he received the first from PASSY [BIZIMANA Cassien] when they met at Nyangezi near Bukavu in DRC and he crossed the border with it to Rwanda; that the second [grenade] was brought to him by MATAKAMBA Jean Berchmans, and all of them told him to keep **_those grenades_** till they come back to use them in terrorist attacks they were preparing.

[756] NIKUZWE explains this as follows: "*on 29 September 2019, PASSY Selemani called me and asked whether I was SHABANI's brother, I said I am; then he asked me to meet him, that I was going to find him at Nyangezi at a bar by a motor-park; I went and we met. Then he told me that my mission was to stage grenade attacks in the area where I lived in Rwimbogo Rusizi […], then I asked him how I could go on such a mission since I have never been a soldier and therefore do not know how to throw grenades. I told him that I will not be able to do it […] he told me that since I cannot do it I should go on a mission for him for a 100 Dollars. He told me to hold the dollar and take it to my house, that he will give me 100 […]dollars when he would return to see it, I said that he had put me to test; I said I will do it and it will seem as though I am doing it for my elder brother. He wrapped it with super-net string and put it inside a paper-bag and told me I should not put my hand inside where he had put it, that I should take it where he told me (…). I went home (…). When I reached home I dug up a hole inside a bush near the compound. (…) Soon after, on 16 October, there was a phone call for me. Then a voice asked me if I am Simeon; I replied in the affirmative; it asked me if I had something from Passy Selemani and I said yes; he/she called me; I asked her/him who he/she is. He said that he is Old MATAKAMBA Jean Berchmans. He told me to hurry up and find him in Mururu sector, in Karangiro center at Ivoka bus-stop (..). I waited for transport…and found MATAKAMBA Jean-Berchmans standing by the bus-stop. I did not know him…I first could not recognize him, then told him how I was dressed (…) The old man saw me, and he handed-over to me a paper- bag made out of flour bag with clothing and rough hats. He told me that he did not talk to him*

*this time, that PASSY himself would come and tell me what was going to happen. On arriving home, out of curiosity, I wanted to know what was inside…I opened the paper-bag to see the contents; there was a grenade wrapped inside the old clothing."* This is what he said during prosecution, on 14 August 2020.

[757] This is also in consonance with what is said by his brother SHABANI Emmanuel in his statement during prosecution on 24 September 2020 where he explained that he introduced him into activities that were preparing terrorist attacks in Rusizi in the following words: "NIKUZWE Siméon is my younger brother, same father same mother… I introduced him to BUGINGO, who in turn introduced him to a team that was operating inside Rwanda, on being promised a reward".

### c) Intent to commit an offence and its evidence

[758] **NIKUZWE** Siméon was in breach of the law when he participated in the activities of MRCD-FLN terrorist organization by introducing and keeping *grenades* destined to be used in attacks of that organization in Rusizi district.

[759] **NIKUZWE** Siméon's act of introducing and keeping grenades destined to be used in MRCD-FLN's attacks was part of that organization's wider plan to terrorize the population and force the State to adopt or abandon a policy or follow such and such principle.

### 4.6. Concerning NTIBANGANYIMANA Joseph alias Combe Barume Matata

### 4.9.1 Membership of a terrorist group

### a) <u>Legal provision</u>

[760] Article 18 of Law N° 46/2018 0f 13/08/2018 on the fight against terrorism stipulates that: " "A person who belongs or who agrees to belong to a terrorist organization or takes part in terrorist activities or who commits any act that enhances another terrorist organization commits an offence. Upon conviction, he/she is liable

to a term of imprisonment of not less than fifteen (15) years but not more than twenty (20) years".

**b) Act constituting an offence and evidence.**

**[761] NTIBANGANYIMANA** Joseph participated in acts of the MRCD-FLN terrorist organization when he looked for a boat and a passage which were used by fighters of that organization to cross from Kalehe through Lake Kivu in DRC and engage in  terrorist activities, in Rwanda in 2019.

**[762]**  This is shown by the fact that, in his statements during examination at investigation on 16 July 2020 , NTIBANGANYIMANA Joseph admitted the above as follows: "*it was in the course of my duties I came to get acquainted with a man called Justin BUGINGO who sent me on errands (...). He told me that he wanted to buy a boat and I put him in contact with Bashi people from Idjwi who made a boat for sale and he bought it. After buying the boat, he told me that he had people who wanted to cross-over through Kalehe, that since I was used to that area and I often cross to load planks, I should cross and find a place where a boat can land in Kalehe, not close to Kalehe military position; I accepted and promised I will do it (...). I went to Kalehe on the lakeside and found a location for them. I was with another man he sent to see the location. After seeing it, the man whom I did not know, left immediately. Shortly after, the man came with a large number of people who had weapons and the boat arrived; they started to board it*".

**[763]** Asked where those people went and where they came from, he answered as  follows: "*Those people came from Kalehe Forest and BUGINGO had told me that they will go to Rwanda*".

**[764]** Asked on the fact that he knew that the person he had helped to buy a boat was a member of the FLN and that the boat was going to be used by fighters who wanted to come to Rwanda to foment insecurity, he answered in the following words*: "I admit I am guilty of helping to find the way used by those people, although I first did not know they had weapons, and failing to pass on the information after knowing it".*

**[765]** Concerning this attack of the FLN fighters who crossed Lake Kivu with the help of NTABANGANYIMANA Joseph who got them a boat and where to station it in Kalehe not near the positions of the FARDC, this is explained by SHABANI Emmanuel who accompanied those fighters from Kalehe in Congo to Nyamasheke; in his statement of 16th July 2020. He explains it in the following terms: *"In April 2019, Justin BUGINGO once again called me on the telephone; he asked me where I was; I told him that I was home because I live in Bukavu too; he told me to join him at Beach Muhanzi in Bukavu. I took a motorcycle and joined him; he paid the motorcycle fare. He told me he had called him to accompany a boat which was going to bring soldiers from North Kivu, that they had called him because they did not trust Didier, the boat driver, and the boat's engine was still new, it could be swapped. I boarded the boat together with the driver; we left Bukavu on the boat in Lake Kivu and headed for North Kivu; I heard people saying that we were going to Kalehe. We reached where he had been told to go. There were soldiers; approximately eighty (80) and one hundred (100). They boarded and we returned, heading for South Idjwi; because the soldiers were late, it became necessary for the driver to stop, and we spent the day there. Towards 20h00, we boarded the boat again heading for Rwanda. We reached Kirimbi River in Nyamasheke District on the border of former Kibuye and Cyangugu. He left them there and I returned with the driver and the boat and we reached Bukavu early in the morning. At Bukavu, the boat was handed back to Justin BUGINGO and we went home".*

**[766]** This attack is again mentioned by Col. NZEYIMANA Marc when he was explaining three MRCD-FLN attacks on Rwandan territory and those who were leading them; he said: *"(…) we planned another attack in April 2019. They had to cross Lake Kivu and go in Nyamasheke and Karongi. It was led by Lt. Col. Apollinaire alias Max/ Jerusalem. They were sent by Sector 2 of General JEVA. He goes on to explain his role as follows: "(…) the attack in which I participated was that of those who crossed Lake Kivu; they were one hundred and five (105). They crossed in a boat (…), my role was to select strong men capable of fighting and to make them cross the lake (…)".*

**[767]** Although NTABANGANYIMANA Joseph changed his statement during prosecution saying that the boat he indicated and for which he found crossing space

was carrying fighters to Rwanda where he said he was aware it was carrying material, this change of statement should not be given importance. His statement during investigation explained in detail the chain of events. It should be considered as more important as it is in consonance with other witness statements on the FLN fighters who crossed from DRC to attack Rwanda as we explained above.

[768] Again we find the statement made by NTABANGANYIMANA Joseph during investigation should be given due importance, bearing in mind the instruction given by Rwanda Supreme Court on an accused who keeps changing statements in Case RPA 0010-0011-0012/06/CS of 18 July 2008 between the Prosecutor and Sergeant NTAGANIRA Gilbert et al., where in paragraph 45-46 of the case, the Supreme Court cited the writing of legal expert Michel FRANCHIMONT, [65] and decided that "a judge trying a case on merit shall determine the value of a statement admitting guilt made during investigation, even if it was changed before court". [66]

**c) The intent to commit the offence and its evidence**

[769] NTABANGANYIMANA Joseph was in breach of the law when he participated in activities of MRCD-FLN terrorist organization in finding a boat and a passage used by the fighters to carry out a terrorist attack in Rwanda.

[770] The activities in which NTABANGANYIMANA Joseph took part were part of a wider plan of the MRCD-FLN to terrorize the population and force the State into taking or abandoning a policy or adopt such principles.

**4.7.   Concerning NSANZUBUKIRE Félicien alias IRAKIZA Fred**

**4.10.1 Joining an irregular armed group**

---

[65] M. Franchimont, Manuel de procédure, Ed. Collection scientifique, de la  faculté de Liège, 1989, pp. 772
[66] Icyegeranyo cy'ibyemezo by'Urukiko rw'Ikirenga, 2008. P. 310.

## a) **Legal provisions**

**[771]** Article 459 of Organic law N°01/2012/OL of 02∕05/2012 establishing the Penal Code at the time **NSANZUBUKIRE Félicien** was committing acts for which he is being prosecuted stipulated that: "Any person who carries out recruitment or incites or makes an agreement with the armed group other than the regular force of the State, by gifts, remuneration, threats, abuse of authority or power, shall be liable to a term of imprisonment of ten (10) years to fifteen (15) years. "

**[772]** Any person who willingly, engages or is recruited in an army other than the regular force of the State national one shall incur the punishment of seven (07) to ten (10) years imprisonment.**"**

[773] Legal action against offences under paragraphs 1 and 2 of this Article shall be instituted only upon complaint or authorization.

## b) **Acts constituting an offence and their evidence**

**[774] NSANZUBUKIRE Félicien** has been in the FDLR forces called FOCA (Forces combattantes Abacunguzi) since its inception up to 2016 when it split into two, one remained in FDLR while the other joined CNRD which later became FLN armed forces (Forces de Libération Nationale) [National Liberation Forces]. These last organizations are irregulararmies.

**[775] NSANZUBUKIRE Félicien** admitted belonging to irregular armed forces of FOCA and FLN in his first statement before the Investigation team where he said: "*(...) we lived here till 2000 when there was a meeting between MURWANASHYAKA and others and  it was decided to form the FDLR which joined and I was given the command of one company.*
*... We left this area and moved to Walungu zone and I was later promoted to battalion commander. I continued working for FDLR and continued being given various assignments till I joined CNRD. I joined CNRD from its foundation on 31 May 2016".*

**[776]** He also explained this before the Prosecution during the examination of 13 August 2020, and even during his pleading on provisional detention/release as can be seen in the court ruling number RDP 00583∕2020/TB∕GSBO which confirmed that NSANZUBUKIRE Félicien should be detained provisionally in its paragraph 25.

**c) The intent to commit an offence and its evidence:**

**[777]** NSANZUBUKIRE Félicien breached the law in joining FOCA and FLN irregular armed groups.

**4.10.2 Membership in a terrorist organization**

**a) <u>Legal provision</u>**

**[778]** Article 503 of Organic Law N° 01/2012/OL of 02/05∕2012 establishing the Penal Code stipulated that: Any person who joins or accepts to be a member in a terrorist organization shall be liable to a term of imprisonment of fifteen (15) years to twenty (20) years.

**b) Act constituting an offence and its evidence**

**[779]** NSANZUBUKIRE Félicien belonged to FDLR-FOCA terrorist organization. This can be found in his statement during investigation on the 15 July 2020 where he says: " **(…)** *we stayed here till 2000 when there was a meeting between Ignace MURWANASHYAKA and others and it was decided to form the FDLR which joined and I was given the command of one company. ... We left this area and moved to Walungu zone and I was later promoted to battalion commander. I continued working for FDLR and kept receiving various assignments*. He repeated this during questioning by the prosecution on 13∕08/2020, during questions and answers of 4 and 5.

**[780]** NSANZUBUKIRE Félicien's being a member of FDLR-FOCA terrorist organization is also confirmed by his being on the list of the *U N Security Council called "UN Security Council Consolidated List where it is clear that* NSANZUBUKIRE Félicien was put on that list on 01 December 2010; it shows organizations and individuals who have been penalized by the UN Security Council for various offences. [67]As can be seen on that list, NSANZUBUKIRE Félicien was in FDLR-FOCA organization where he had the grade of Colonel as well as *Sub-Sector Commander;* this is in consonance, as we have shown, that he himself admitted being given various posts of responsibility in FDLR-FOCA.

**[781]**  Again, after being put on that list, NSANZUBUKIRE Félicien was put on Interpol's Red Notice[68.]

**c) Intent to commit offences and evidence**

**[782]** NSANZUBUKIRE Félicien breached the law because he belonged to FDLR-FOCA terrorist organization, and was even in its leadership.

**4.8.   Concerning MUNYANEZA Anastase alias RUKUNDO Job KURAMBA**

**4.11.1 Joining an irregular armed group**

**a) Legal provision**

**[783]** Article 459 of Organic law N°01/2012/OL of 02/05/2012 establishing the Penal Code at the time MUNYANEZA Anastase was committing acts for which he is being prosecuted stipulated that:

**[784]** "Any person who by donations,, remuneration,, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular

---

[67] UN Security Council Consolidated List available at
http//www/un.org/securitycouncil/conent/un.sec. consolidated list.page visited on 7th October 2020
[68] www.interpol:.int/en/how-wc-wokN°tice-individuals, page visited on 7th October 2020

armed group or signs an agreement with this group for the purpose of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to imprisonment of not less than (10) ten years but not more than fifteen (15) years."

[785] Any person who deliberately joins or accepts to be recruited to join any army other than the national one is liable to a term of imprisonment of seven (07) to ten (10) years imprisonment."

[786] The offences mentioned in paragraphs 1 and 2 of this article are prosecuted upon a complaint or upon authorization.

### b) Acts constituting an offence and their evidence

[787] MUNYANEZA Anastase was in FDLR forces called FOCA (Forces Combattantes Abacunguzi) from its foundation to 2016 when it split into two , one faction remained in FDLR and the other joined CNRD and later became FLN armed wing (Forces de Libération Nationale). The above organizations are irregular armed organizations.

[788] This is evidenced by the fact that MUNYANEZA Anastase alias RUKUNDO Job KURAMBA admitted that he belonged to FOCA CNRD-Ubwiyunge irregular armed organizations. When questioned by the Prosecution on 14 August 2020 on question and answer 4 MUNYANEZA said: *"I was in FDLR from its foundation in 2000 till 2016, then joined CNRD from May 2016."* That is what MUNYANEZA Anastase said when he was questioned during investigation on the 15 July 2020 and before the Prosecution on 23 September 2020 and on the 15 October 2020.

### c) Intent to commit an offence and its evidence

[789] MUNYANEZA committed an offence when he accepted to belong to FOCA and CNRD-Ubwiyunge irregular armed organizations.

**4.11.2 Membership in a terrorist organization**

**a) <u>Legal provision</u>**

**[790]** Article 503 of Organic Law N° 01/2012/OL of 02/05/2012 which established the Penal Code stipulated that: "Any person who joins or accepts to be member in a terrorist organization shall be liable to a term of imprisonment of fifteen (15) years to twenty (20) years."

**b) Act constituting an offence and its evidence**

**[791]** MUNYANEZA Anastase alias RUKUNDO Job KURAMBA belonged to FDLR-FOCA terrorist organization.

**[792]** This can be seen during MUNYANEZA Anastase's questioning by the Prosecution on the 14 August 2020 on question and answer 4 when he said: *"I was in FDLR from its foundation, from 2000 till 2016 then joined CNRD from May 2016."* That is what MUNYANEZA Anastase said when he was questioned by the investigation on 15 August 2020 and by the Prosecution on 23 September 2020 and on 15 October 2020.

**c. <u>Intent to commit an offence and its evidence</u>**

**[793]** MUNYANEZA Anastase was in the breach of the law when he belonged to the FDLR-FOCA terrorist organization and even was in its leadership.

**4.9.   Concerning IYAMUREMYE Emmanuel alias Engambe Iyamusimba**

**4.9.1.   Membership of an irregular armed group**

**a) <u>Legal provision</u>**

**[794]** Article 200 of Law N° 68/2018 of 30/08/2018 providing offences and penalties in general stipulates that: "Any person who by donations, remuneration,, intimidation, abuse of power or promise of another interest, forms, incites or arranges

for the formation of an irregular armed group or signs an agreement with this group for the purpose of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than (10) ten years but not more than fifteen (15) years."

[795] Any person who deliberately agrees to be hired or recruited to join an irregular armed force commits an offence, upon conviction, he/she is liable to imprisonment for a term of not less than seven (7)years and not more ten (10) years.

[796] The legal action against offences referred to in paragraphs 1 and 2 of this article shall be instituted only upon complaint or upon authorization by the Prosecutor General or the Military Prosecutor General depending upon the author.

**b) Acts constituting an offence and their evidence:**

[797] **IYAMUREMYE Emmanuel was in** was in FDLR forces called FOCA (Forces Combattanttes Abacunguzi) from its foundation to 2016 when it split into two , one faction remained in FDLR and the other joined CNRD and later became FLN armed wing (Forces de Libération Nationale). The above organizations are illegal armed organizations.

[798] The evidence is that on 13 August 2020 during examination by the Prosecution in question and answer 5, when asked when he was in FDLR, IYAMUREMYE said: " *In 2000 and I left it in 2016 to join CNRD and up to 2019 when I was arrested*." Questioned by the Prosecution on 23rd September on page 3, IYAMUREMYE Emmanuel replied as follows*: "I admit I was with the FDLR and when they were no more we went to create the FLN. I was called and I went with some of the fighters I commanded and other commanders took along their fighters and FLN was formed; therefore I admit I played a role in the creation of an irregular armed group, the FLN"*. This was also the reply IYAMUREMYE Emmanuel gave to the Investigation on 15 July 2020.

**c) Intent to commit an offence and its evidence:**

**[799]** IYAMUREMYE Emmanuel committed an offence when he accepted to join illegal armed groups of FDLR-FOCA and MRCD-FLN.

### 4.12.2 Membership of a terrorist group

**a) Legal provision**

**[800]** Article 18 of Law N° 46/2018 0f 13/08/2018 on the fight against terrorism stipulates that: "A person who belongs or who agrees to belong to a terrorist organization or takes part in terrorist activities or who commits any act that enhances another terrorist organization commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than (15) years imprisonment but not more than twenty (20) years."

**b) Act constituting the offence and evidence**

**[801]** IYAMUREMYE Emmanuel was used and took part in activities of FDLR-FOCA terrorist organizations and in MRCD-FLN organizations.

**[802]** This can be seen when, during his examination by the Prosecution on 13 August 2020, on question answer 4 IYAMUREMYE Emmanuel answered in the following wor*ds: "The organization was first called ALIR then later it was changed to FDLR, later we quit FDLR and we joined an organization which was called CNRD".* Asked when he joined the FDLR on question 5, IYAMUREMYE Emmanuel answered in these words*: "I joined it in 2000 and left it in 2016; I then joined CNRD till 2019 when I was captured.* This was his answer before the Investigation on 15 July 2020 and to the Prosecution on 23 September 2020.

**c) Intent to commit an offence and evidence**

**[803]** IYAMUREMYE Emmanuel was in breach of the law when he joined FDLR-FOCA and MRCD-FLN terrorist organizations

**4.10. Concerning NIYIRORA Marcel alias Bama Nicholas**

**4.13.1 Membership of an irregular armed group**

**a. <u>Legal provision</u>**

**[804** Article 200 of Law N°68/2018 of 30/08/2018 providing offences and penalties in general stipulates that: **"**Any person who by donations, remuneration, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular armed group or signs an agreement with this group for the purpose of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to imprisonment of not less than (10) ten years but not more than fifteen (15) years."

**[805]** Anyone who accepts to join or to be recruited into forces other than the national forces commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than seven (07) years and not more than ten (10) years.

**[806]** The offences mentioned in paragraph one and two of this article are prosecuted upon a complaint or upon authorization by the Prosecutor General or the Military Prosecutor General, depending upon the author.

**b) <u>Acts constituting the offence and their evidence</u>**

**[807]** NIYIRORA Marcel was in FDLR armed group called FOCA (Forces Combattantes Abacunguzi) from its inception to 2016 when it split into two, one faction remained in the FDLR and the other joined the CNRD and later became the FLN armed group (Forces de Libération Nationale).

[808] What is being clarified is that NIYIRORA Marcel, in a statement he made before the investigation in a questioning of 16 July 2020, he explained how he was given positions of responsibility and promotions from the time he was in the FDLR-FOCA to MRCD-FLN. He stated that in the following words when responding to question and answer 8: *"From 1999 to 2002 I was platoon commander in FDLR-FOCA IKERA in Equateur. From 2002 to 2011 I was FDLR-FOCA Company Commander in North Kivu in Masisi and elsewhere. From 2011 to2016, I was S5 in what was known as Sous-secteur in FDLR-FOCA and where I was in North Kivu. I was captured when I was working in the Presidence of the CNRD and I was in charge of protocol and public and where I was in North Kivu"*. This is what NIYIRORA Marcel stated when he was questioned by the Prosecution on 13 August 2020 and on 24 September 2020.

[809] What was confirmed by NIYIRORA Marcel during examination and was also confirmed by NIZEYIMANA Marc in his statement before the Prosecution on 13 October 2020 answering question and answer 22 where he said: *"As for Lt Col. NIYIRORA Marcel alias BAMA Nicholas, he was FDLR S5 of KANANI Sous-secteur in North Kivu. In CNRD-Ubwiyunge he was in the protocol service in CNRD Presidence."*

## c) Intent to commit an offence and evidence

[810] NIYIRORA Marcel was in breach of the law when he accepted to join FOCA and FLN illegal armed groups.

## 4.13.2 Membership of a terrorist group

### a) Legal provision

[811] Article 18 of Law N° 46/2018 0f 13/08/2018 on the fight against terrorism stipulates that: "A person who belongs or who agrees to belong to a terrorist organization or takes part in terrorist activities or who commits any act that enhances another terrorist organization commits an offence. Upon conviction, he/she is liable

to a term of imprisonment of not less than (15) years imprisonment but not more than twenty (20) years.

**b) Act constituting an offence and evidence**

**[812] NIYIRORA Marcel** was used and took part in activities of FDLR-FOCA terrorist organizations and in MRCD-FLN organizations.

**[813]**  This is clarified by his statement during investigation on 16 July 2020,  NIYIRORA Marcel admitted that he was in the FDLR from its  inception to 2016 and  that he was also in  MRCD-FLN till he was captured in July 2019. He answered that question in the following words in question and answer 8: "*From 1999 to 2002 I was platoon commander in FDLR-FOCA IKERA in Equateur. From 2002 to 2011 I was FDLR- FOCA Company Commander in North Kivu in Masisi and elsewhere. From 2011 to 2016, I was S5 in what was known as Sous-secteur in FDLR-FOCA and where I was in North Kivu. I was captured when I was working in the Presidence of the CNRD and I was in charge of protocol and public and where I was in North Kivu".* This is what NIYIRORA Marcel stated when he was questioned by the Prosecution on 13 August 2020 and on 24 September 2020.

**[814]** What was confirmed by NIYIRORA Marcel during examination and was also confirmed by  NIZEYIMANA  Marc  in  his  statement  before  the  Prosecution  on  13 October 2020 answering question and answer 22 where he said: ***"As for Lt Col. NIYIRORA Marcel alias BAMA Nicholas, he was FDLR S5 of KANANI Sous-secteur  in North Kivu. In CNRD-Ubwiyunge he was in the protocol service in CNRD Presidence."***

**c) Intent to commit an offence and its evidence:**

**[815] NIYIRORA Marcel was** in breach of the law when he joined FDLR-FOCA and **MRCD-FLN terrorist organizations as shown above.**

### 4.2.   Concerning NSHIMIYIMANA Emmanuel

### 4.14.1 Membership of an irregular armed group

#### a) <u>Legal provision</u>

[805] Article 200 of Law N° 68/2018 of 30/08/2018 providing offences and penalties in general stipulates that: "Any person who by donations, remuneration, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular armed group or signs an agreement with this group for the purpose of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than (10) ten years but not more than fifteen (15) years."

[806] Any person who deliberately agrees to be hired or recruited to join an irregular armed force commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than seven (7) years and not more than ten (10) years.

[807] The legal action against offences referred to in paragraphs 1 and 2 of this Article is instituted upon complaint or on authorization by the Prosecutor General or the Military Prosecutor General, depending upon their authors.

#### b) Acts constituting an offence and their evidence

[808] NSHIMIYIMANA Emmanuel was in the FDLR armed organization called FOCA (Forces Combattantes Abacunguzi) from its inception to 2016 when it split into two, one faction remained with the FDLR while the other faction joined the CNRD which later became FLN armed group (Forces de Libération Nationale).

**[809]** NSHIMIYIMANA Emmanuel was in FDLR-FOCA irregular armed group from 2012 to 2016 when FOCA split into two, one faction remained with the FDLR and the other faction formed the FLN faction which he l a t e r joined.

**[810]** After CNRD-Ubwiyunge had joined other groups and formed the MRCD coalition NSHIMIYIMANA Emmanuel was in the FLN irregular armed group till he was captured on 22 February 2020.

**[822].** That is shown by NSHIMIYIMANA Emmanuel's statement he made before the investigation organ in his questioning of 15 July 2020, he stated that he was given various responsibilities and promotions from the FDLR to the MRCD-FLN. He is quoted as the following on question and answer 4: *"I joined FDLR military in 2012, underwent a refresher course in ICB (Instruction Commune de Base) in a place called Kabingo and graduated as a private. Because I was in my third year of secondary school, I was authorized to carry on with my education and go on duty during the holidays. Because our base area was a war zone, fighting with the Mai-Mai. We did not go far from Walikale, but even in Walikale the conditions were hard. We then went to Rutshuru at a place called Mahuku. There, I attended a school called Institut Gikuku. We stayed there till I finished my secondary education. There was split between the FDLR and the CNRD on 31 May 2016. I joined the CNRD because we had similar aspirations. After secondary school I joined the military school (ESM) in September 2017. We completed the training on 25 March 2018. I graduated as Second Lieutenant".* This is what NSHIMIYIMANA Emmanuel repeated when he was questioned by the Prosecution on 14 August 2020 and on 24 September 2020.

### c) Intent to commit an offence and its evidence

**[823]** NSHIMIYIMANA Emmanuel was in breach of the law when he accepted to join FOCA and FLN irregular armed organizations.

### 4.14.2 Membership of a terrorist group

**a) Legal provision**

**[824]**  Article 18 of Law N° 46/2018 of 13/08/2018 on counter terrorism stipulates that: "A person who is member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than (15) years but not more than twenty (20) years".

**b) Act constituting an offence and its evidence**

**[825]** NSHIMIYIMANA Emmanuel was used and took part in activities of FDLR-FOCA terrorist groups and in MRCD-FLN group.

**[826] NSHIMIYIMANA Emmanuel** was a member of FDLR-FOCA and MRCD-FLN and both are terrorist groups.

**[827]** The proof is that NSHIMIYIMANA Emmanuel was a member of FDLR-FOCA from 2012 to 2016 and was also a member of the MRCD-FLN till he was captured on 22 February 2020  as he admitted in his statement from the Investigation organ of 15 July 2020  on question  and  answer 4; he is quoted as follows: "*I joined FDLR military in 2012, underwent a refresher course in ICB (Instruction Commune de Base) in a place called Kabingo and graduated as a private. Because I was in my third year of secondary school, I was authorized to carry on with my education and go on duty during the holidays. Because our base area was a war zone, fighting with the Mai-Mai. We did not go far from Walikale, but even in Walikale the conditions were hard. We then went to Rutshuru at a place called Mahuku. There, I attended a school called Institut Gikuku. We stayed there till I finished my secondary education. There was split between the FDLR and the CNRD on 31 May 2016. I joined the CNRD because we had similar aspirations. After secondary school I joined the military school (ESM) in September 2017. We completed the training on 25 March 2018. I graduated as Second Lieutenant.*" This

is what NSHIMIYIMANA Emmanuel repeated when he was questioned by the Prosecution on 14 August 2020 and on 24 September 2020.

**c) Intent to commit an offence and its evidence:**

**[828]** NSHIMIYIMANA Emmanuel was in breach of the law by being a member of FDLR- FOCA and MRCD-FLN terrorist group as we have explained above.

### 4.3.   Concerning KWITONDA André

### 4.15.1 Membership of an irregular armed group

**a) Legal provision**

**[829]** Article 200 of Law N° 68/2018 of 30/08/2018 providing offences and penalties in general stipulates that: "Any person who by donations, remuneration, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular armed group or signs an agreement with this group for the purpose of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than (10) ten years but not more than fifteen (15) years."

**[830]** Any person who deliberately agrees to be hired or recruited to join an irregular armed force, commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than seven (7) years but not more than ten (10) years.

**[831]** The legal action against offences referred to in paragraphs 1 and 2 of this article is instituted upon complaint or on authorization by the Prosecutor General or the Military Prosecutor General depending upon their authors.

**a. Acts constituting an offence and their evidence**

[832] KWITONDA André was a member of FOCA armed group from its inception to 2016 when FOCA split into two factions, one remaining in FDLR and the other joining FLN; he joined the latter.

[833] When CNRD joined other groups to form the MRCD coalition which created the FLN armed group, KWITONDA was in the new irregular armed group till he was captured on 08 December 2019.

[834] This is shown by the way KWITONDA André responded when questioned by the Prosecution on 24 September 2020 on page one; he answered in the following words: "(…) *FDLR, I was a member of that group from 1998 till 2016 when I joined CNRD. I also left them in November 2018."* When asked whether he was ever an FDLR or CNRD fighter, KWITONDA André responded as follows: "*I became a member of both them as a fighter."* Those were KWITONDA André's explanations when questioned by the Investigation organ on 15 July 2020 and by the Prosecution on 13 August 2020.

**b. Intent to commit an offence and its evidence**

[835] KWITONDA André was in breach of the law when he decided to be one of the members of the irregular armed groups of FOCA and FLN.

**4.15.2 Membership of a terrorist group**

**a) Legal provision**

[836] Article 18 of Law N° 46/2018 0f 13/08/2018 on counter terrorism stipulates that : "A person who is member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group commits an offence. Upon conviction, he/she shall be

liable to an imprisonment term of not less than (15) years but not more than twenty (20) years.

**b) Act constituting an offence and its evidence**

**[837].** KWITONDA André was a member of FDLR-FOCA and MRCD-FLN while both are terrorist group.

**[838].** This is shown by the way KWITONDA André responded when questioned by the Prosecution on 24 September 2020 on page one; he answered in the following words: *" (...) FDLR, I was a member of that group from 1998 till 2016 when I joined CNRD. I also left them in November 2018.* When asked whether he was ever an FDLR or CNRD fighter, KWITONDA André responded as follows. "*I became a member of both them as a fighter."* Those were KWITONDA André's explanations when questioned by the Investigation on 15 July 2020 and by the Prosecution on 13 August 2020.

**c) Intent to commit an offence and its evidence**

**[839]** KWITONDA André was in breach of the law when he accepted to join FDLR-FOCA and MRCD-FLN which are terrorist organizations.

**4.4.   Concerning HAKIZIMANA Théogène**

**4.4.1.   Joining an irregular armed group**

**a) Legal provision**

**[840]** Article 459 of Organic law N°01/2012/OL of 02/05/2012 establishing the Penal Code at the time stipulated that: "Any person who carries out recruitments or incites or makes an arrangement with the armed groups other than the regular forces of the states, by gifts, remuneration, threats, abuse of authority or power, shall be liable to a term of imprisonment of ten (10) ten years to fifteen (15) years."

[841] Any person who willingly, engages or is recruited in an army other than the regular force of the State, shall be liable to a term of imprisonment of seven (7) years to ten (10) years.

[842] Legal action against offences under paragraphs 1 and 2 of this article shall be instituted only upon complaint or authorization of the Prosecutor General or the Military Prosecutor General depending on the case.

**b) Acts constituting an offence and their evidence**

[843] HAKIZIMANA Théogène was a member of FOCA armed group from its inception to 2016 when FOCA split into two factions, one remaining in FDLR and the other joining FLN; he joined the latter.

[844] After CNRD-Ubwiyunge joined other groups to form the MRCD coalition which formed FLN armed group HAKIZIMANA Théogène was in that group till he was captured by the FARDC on 29 May 2018.

[845] This is shown in the statement HAKIZIMANA Théogène made before the the Investigation organ in the questioning of 15 July 2000 where he explained that he went on being given positions of responsibility and promotions in both FOCA and FLN thereafter. In responding to question and answer 5, HAKIZIMANA Théogène answered in the following words: "(…) *We reached Eastern Congo in 2003 as members of FDLR-FOCA groups,. I was Sergeant by then. Throughout that time I was attached to the office of Reserve Brigade Command up to when I joined the CNRD in 2016 where I trained at the Officers Training School and graduated as Second Lieutenant; I was captured with that grade.*" That is what HAKIZIMANA Théogène explained before the Prosecution on 13 July 2020 and on 24 September 2020.

### c) Intent to commit an offence and its evidence

[846] HAKIZIMANA Théogène was in breach of the law when he decided to join FOCA and FLN which are irregular armed groupss as shown in the previous paragraph.

### 4.16.2 Membership of a terrorist organization

### a) Legal provision

[847] Article 503 of Organic-Law N° 01/2012/OL of 05/2012 establishing the Penal Code stipulates that: "Any person who joins, or accepts to be member in a terrorist organization, shall be liable to a term of imprisonment of fifteen (15) to twenty (20) years."

### b) Act constituting an offence and its evidence

[848] HAKIZIMANA Théogène was respectively a member of FDLR-FOCA and MRCD-FLN terrorist organizations.

[849]. That is shown by the fact that HAKIZIMANA Théogène was a member of FDLR-FOCA from its inception to 2016 and was even a member of MRCD-FLN till he was captured by FARDC on 29 May 2018 as indicated in the Investigation organ statement of 15 July 2020. When questioned, on question and answer 5, HAKIZIMANA Théogène answered in the following words: "*We reached Eastern Congo in 2003 as members of FDLR-FOCA groups. I was Sergeant by then. Throughout that time I was attached to the office of Reserve Brigade Command up to when I joined the CNRD in 2016 where I trained at the Officers Training School and graduated as Second Lieutenant; I was captured with that grade.*" That is what HAKIZIMANA Théogène explained before the Prosecution on 13 July 2020 and on 24 September 2020.

**c) Intent to commit an offence and its evidence**

**[850] HAKIZIMANA Théogène** was in breach of the law when he accepted to be a member of FDLR-FOCA and MRCD-FLN terrorist organizations.

**4.5.   Concerning NDAGIJIMANA Jean- Chrétien**

**4.5.1.   Membership of an irregular armed group**

**a) Legal provisions**

**[851]** Article 200 of Law N° 68/2018 of 30/08/2018 providing offences and penalties in general stipulates that: "Any person who by donations, remuneration, intimidation, abuse of power or promise of another interest, forms, incites or arranges for the formation of an irregular armed group or signs an agreement with this group for the purpose of supporting an armed attack of irregular forces, commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than (10) ten years but not more than fifteen (15) years."

**[852]** Any person who deliberately agrees to be hired or recruited to join an irregular armed force, commits an offence. Upon conviction, he/she is liable to imprisonment for a term of not less than seven (07) years and not more than ten (10) years.

**[853]** Legal action against offences referred to in paragraph 1 and 2 of this article shall be instituted upon complaint or authorization of the Prosecutor General or the Military Prosecutor General depending on their authors.

**b) Acts constituting an offence and their evidence**

**[854]** NDAGIJIMANA Jean- Chrétien was a member of the FLN from 2016 till he was captured by the FARDC on 13 February 2019 as he explained it under questioning by the Prosecution on 14 August 2020.

[855] It is shown by the way NDAGIJIMANA Jean Chrétien explained how he joined the FLN. During the questioning by the investigation organ on 16 July 2020 on question  and answer 4 and 5, he answers as follows: "*I was Second Lieutenant in the FLN/CNRD forces which joined other groups to form the MRCD coalition. I remained in the FLN forces. (…). In 2016 when I finished my secondary education at MWESO Institute, I went to FARINGA for training at Higher Military College (HMC). We trained for six months, then I went for internship in various military units. The internship lasted four weeks; I graduated as Second Lieutenant in 2017. From that time till I was captured I was still at that rank of Second Lieutenant.*" These were his explanations when questioned by the Prosecution on 14 August 2020, on 28 September 2020 and on 05 October 2020.

### c) Intent to commit an offence and evidence

[856] NDAGIJIMANA Jean Chrétien was in breach of the law when he decided to be one of the members of the FLN irregular armed group as we have mentioned.

### 4.5.2.  Membership of a terrorist group

### a) <u>Legal provision</u>

[857] Article 18 of Law No. 46/2018 of 13/08/2018 on the counter terrorism stipulates that: "A person who is member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than (15) years but not more than twenty (20) years."

### b) Act constituting an offence and evidence

[858] NDAGIJIMANA Jean Chrétien was a member of MRCD-FLN which is a terrorist group

**[859]** This is shown by the fact that NDAGIJIMANA Jean Chrétien explained how he joined the FLN. In the questioning of Investigation organ on 16 July 2020 on question and answer 4 and 5, he explained in the following words: "*I was Second Lieutenant in the FLN/CNRD forces which joined other groups to form the MRCD coalition. I remained in the FLN forces. (...). In 2016 when I finished my secondary education at MWESO Institute, I went to FARINGA for training at Higher Military College (HMC). We trained for six months, then I went for internship in various military units. The internship lasted four weeks; I graduated as Second Lieutenant in 2017. From that time till I was captured I was still at that rank of Second Lieutenant.*" These were his explanations when questioned by the Prosecution on 14 August 2020, on 28 September 2020 and on 05 October 2020.

**c) Intent to commit an offence and evidence:**

**[860]** NDAGIJIMANA Jean Chrétien was in breach of the law when he decided to become a member of the MRCD-FLN terrorist group.

**4.6.   Concerning MUKANDUTIYE Angelina**

**4.18.1 Membership of a terrorist group**

**a) Legal provisions**

**[861]** Article 18 of Law N° 46/2018 0f 13/08/2018 on counter terrorism stipulates that: "A person who is member of a terrorist group or accepts to join a terrorist group or who deliberately participates in the acts of a terrorist group or a group which contributes to the capacity-building of another terrorist group commits an offence. Upon conviction, he/she is liable to a term of imprisonment of not less than fifteen (15) years but not more than twenty (20) years.

**b) Act constituting an offence and its evidence**

**[862] MUKANDUTIYE Angelina** was used and took part in activities of MRCD-FLN terrorist group.

[863] As she admitted during her questioning before the Prosecution on 28 September 2020, MUKANDUTIYE Angelina admitted that she was a member of CNRD (one of the groups which joined to form MRCD-FLN coalition) where she held the position of Commissioner in charge of the family and women development. She said: "*I was the Chief Commissioner of the Commission (Ministry) in charge of the family and women development. [...] I was responsible for the promotion of the family in general and of women in particular.*"

[864] MUKANDUTIYE Angelina's position of Commissioner for the development of the family and women is confirmed by NIZEYIMANA Marc in his statement of 15 July 2020 before the Investigation organ in question and answer 9.

[865] MUKANDUTIYE Angelina also was involved in activities of the MRCD-FLN terrorist group by encouraging people to join it.

[866] MUKANDUTIYE Angelina admitted her involvement in the activities of the MRCD-FLN when she was questioned by the Prosecution on 28 September 2020. As demonstrated in her statement of that date, when she was asked whether she was responsible of encouraging girls to join FLN forces, she replied in the following words: "*I liked the military profession during my childhood, but it as was not easy for girls to join the armed forces; I encouraged one of my daughters but she was not interested. When I became CNRD Commissioner in charge of women development I encouraged women and girls to join FLN forces.*"

[867] MUKANDUTIYE's role in encouraging people to join the MRCD-FLN is again affirmed by NIZEYIMANA Marc who was Colonel in the FLN forces where, in his questioning of 15 July 2020 by the investigation organ, on question and answer 9, he said: "*[...] on the case of girls, Angelina, the then Commissioner in charge of women and girls called encouraged them and they joined (the armed forces) and we trained them in the sector.*"

[868] The statements of MUKANDUTIYE Angelina herself and NIZEYIMANA Marc on the role MUKANDUTIYE played in the activities of MRCD-FLN terrorist

organization are complementary with those made by some of the people MUKANDUTIYE Angelina incited to join that group.

[869] In her questioning by the investigation organ on 4 February 2020, ASIFIWE Marie Claire explained how she joined the armed forces in the following terms:" *A woman called Angelina used to come home to register us by telling us that they were going to give us military training; they took us to a place for the training and on arrival they immediately recruited into military forces."*

[870] The statement of ASIFIWE Marie Claire is again similar to that of NYIRAHABIMANA Donatille who, at her questioning by investigation organ on 31 January 2020 explained how they were incited to join the military forces by MUKANDUTIYE Angelina. on the question and answer 2 she said: "*When I grew up enough, I started school in Masisi, in the sixth year I sat for the examination and passed it and was promoted to secondary school. I did only one week of my secondary school first year, then a woman called Angelina (I do not know her other name) came home and said anyone aged 15 and above should join the military and that it was compulsory. That is when we joined the military; it was in 2018."*

[871] Another person who testified for the role played by MUKANDUTIYE Angelina in inciting people into activities of the terrorist group is MANIZABAYO Benita. In her questioning at investigation organ on 3 February 2020, on question and answer 5, on how she joined the CNRD military group, she replied as follows: "*It was  a woman called Angelina who incited us into joining military group; however it was compulsory, we would end up joining anyway."*

[872] The evidence which has been presented so far affirm that MUKANDUTIYE Angelina was one of the member of MRCD-FLN and that she played an active role in the activities of that group.

**c) Intent to commit an offence and its evidence.**

**[873] MUKANDUTIYE Angelina** was in breach of the law by being a member of MRCD-FLN terrorist group, and even participating in its activities.


**IV. SEIZED ITEMS**
**1. Computer**
**2.Telephones**
**3. Various documents.**

**V.  WITNESSES**
**See file**

**VI.  RECOMMENDATION OF THE PROSECUTION**

Pursuant to Organic Law N° 01/2012/OL of 02/05/2012 instituting the Penal Code especially in its articles 459 and 503;

Pursuant again to Law N°30/2018 of 02/06/2018 determining the jurisdiction of courts especially in its article 42;

Pursuant to Law Nº 46/2018 of 13/08/2018 on counter terrorism , especially in its articles 2, 4, 18, 19, 20, 24, 33, 37;

Pursuant to Law N° 68/2018 of 30/08/2018 providing offences and penalties in general especially in its article 21,61, 62, 193, 200 as modified and complemented to date,
Pursuant to Law N° 69/2018 of 31/08/2018 on prevention and punishment of money laundering and terrorism financing especially in its article 24;

Pursuant to Law N° 027/2019 of 19/19/2019 relating to criminal procedures especially in its articles 24 part 1, article 92 and 93;

The Prosecution hereby request the High Court, Chamber for international crimes and cross-border crimes to receive the count of indictment submitted by the Prosecution and confirm that it is founded;

✓ To decide that:

**1. RUSESABAGINA Paul,**

➢ Is guilty of forming an irregular army group, and sentence him to 12 years imprisonment;

➢ Is guilty of being a member of a terrorist group, and sentence him to 17 years imprisonment;

➢ Is guilty of supporting terrorism, and sentence him to 10 years imprisonment;

➢ Is guilty of murder as an act of terrorism, and sentence him to life imprisonment;

➢ Is of abduction of a person as an act of terrorism, and sentence him  to 17 years imprisonment;

➢ Is guilty of armed robbery as an act of terrorism, and sentence him to 16 years imprisonment;

➢ Is guilty of deliberately causing arson to another person's buildings, means of transport or property as an act of terrorism, and sentence him to 16 years imprisonment;

➢ Is guilty of attempted murder as an act of terrorism, and sentence him to 19 years imprisonment;

➢ Is guilty of deliberately inflicting battery and injury as an act of terrorism, and sentence him  to 17 yearsimprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general stipulates that

219

concurrence of offences occurs when:

- One single act constitutes several offences;

- Separate acts which constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent.

We find that the offences which RUSESABAGINA Paul is suspected of committing make up an ideal concurrence of offences, because they are related among themselves as they are aimed at accomplishing a single criminal intent, therefore, pursuant to article 62 paragraph 2 of the law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of life imprisonment for him.

**2. NIZEYIMANA  Marc.**

✓ Is guilty of being a member to an irregular armed group, and sentence him to 12 years imprisonment;

✓ Is guilty of being a member terrorist group and, and sentence him to 17 years imprisonment;

✓ Is guilty of maintaining a relationship with a foreign State with a view to wage a war, and sentence him to 22 years of imprisonment;

✓ Is guilty of murder as an act of terrorism, and sentence him to life imprisonment;

✓ Is guilty of abduction as an act of terrorism, and sentence him to 17 years imprisonment;

✓ Is guilty of armed robbery as an act of terrorism, and sentence him to 16 years imprisonment;

✓ Is guilty of deliberately causing arson to another person's buildings, means of transport or property as an act of terrorism, and sentence him to 16 years imprisonment;

✓ Is guilty of attempted murder as an act of terrorism, and sentence him to 18 years imprisonment;

✓ Is found guilty of deliberately inflicting battery and injury as an act of terrorism, and sentence him toh 15 years imprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general stipulates that concurrence of offences occurs when:

- One single act constitutes several offences;

- Separate acts which constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent.

We find that the offences which NIZEYIMANA Marc is suspected of committing make up an ideal concurrence of offences, because they are related among themselves as they are aimed at accomplishing a single criminal intent, therefore, pursuant to article 62 paragraph 2 of the law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of life imprisonment for him.

## 3. BIZIMANA Cassien alias BIZIMANA Patience alias Passy alias Selemani

✓ Is found guilty of forming or joining an irregular armed group, and sentence him to 12 years imprisonment;

✓ Is guilty of being a member of a terrorist group and sentence him to 17 years imprisonment;

✓ Is guilty of treason and of inciting others to terrorism and sentence him to 22 years imprisonment;

✓ Is guilty of illegal use of explosives in public places, and sentence him to 25 years of imprisonment;

✓ Is of guilty of attempted murder as an act of terrorism, and sentence him to 20 years of imprisonment;

✓ He is guilty of deliberately causing arson on another person's buildings, means of transport or property, and is liable to 20 years imprisonment,

- Pursuant to article 61 paragraph 3, paragraph 1° and 2° of Law N° 086/2018 of 30/08/ 2018 determining offences and penalties in general provides that concurrence of offences occurs when:

  o a single act constitutes several offences;

  o separate acts comprise different offences are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences Cassien is suspected of committing make up an ideal concurrence because because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, based on article 62, paragraph 2 of that law 62 paragraph 2 of the law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty-five years (25) imprisonment for him.

4. Deciding that **MATAKAMBA Jean Berchmans**

✓ Is guilty of the crime of treason and of inciting others to terrorism and is liable to 20 years imprisonment;

✓ Is guilty of attempted murder as an act of terrorism, and sentence him to 17 years of imprisonment,

✓ Is guilty being a member of a terrorist group, and sentence him to 17 years imprisonment;

✓ Is guilty of illegal use of explosives in public, and sentence him to 17 years imprisonment.

Pursuant to article 61, paragraph 3, section 1° and 2° of Law N°086/2018 of 30/08/2018 determining offences and penalties, stipulates that concurrence of offences occurs when:

- One single act constitutes several offences;

- Separate acts which constitute separate offences are related among themselves as they are aimed at accomplishing a single criminal intent.

We find that the offences MATAKAMBA Jean Berchmans is suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty-five years (25) imprisonment for him.

## 5. SHABANI Emmanuel

✓ Is guilty of treason and inciting others to terrorism, and sentence him to twenty (20) years imprisonment;

✓ Is guilty of illegal use of explosives in public, and sentence him to 17 years imprisonment;

✓ Is guilty of being a member of terrorist group, and sentence him to 17 years imprisonment

✓ Is guilty of deliberately causing arson to someone else's buildings, means of transport or property, and sentence him to 20 years of imprisonment,

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/ 2018 determining offences and penalties in general provides that concurrence of offences occurs when:

   o a single act constitute several offences;

   o separate acts which constitute separate offences are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences SHABANI Emmanuel is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 6. NTIBIRAMIRA Innocent

✓ Is guilty of being member of terrorist group, and sentence him to 17 years of imprisonment;

✓ Is guilty of treason and inciting others to terrorism, and sentence him to twenty (20) years imprisonment;

✓ Is guilty of deliberately causing arson to another person's buildings, means of transport or property, and sentence him to 17 years imprisonment,

✓ Is guilty of illegal use explosives in public, and sentence him to 17 years imprisonment;

Pursuant to article 61 paragraph 3,part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence offences occurs when:

  o a single act constitutes several offences;

  o separate acts which constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences NTIBIRAMIRA Innocent is being suspected of having committed make up an ideal concurrence because they are they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 7. BYUKUSENGE Jean Claude

✓ Is guilty of being a member of a terrorist group, and sentence him to 17 years imprisonment;

✓ Is guilty of deliberately causing arson to another person's buildings, means of transport or property, and sentence him to 17 years imprisonment,

✓ Is guilty of attempted murder as an act of terrorism, and sentence him to 20 years imprisonment;

✓ Is guilty of illegal use explosives in public, and sentence him to 17 years imprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

o a single act constitutes several offences;

o separate acts which constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences BYUKUSENGE Jean Claude is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

**8. NIKUZWE Siméon**

✓ Is guilty of being a member of a terrorist group, and sentence him to seventeen years imprisonment (17);

**9. NTABANGANYIMANA Joseph alias Combe Barame Matata**

✓ Is guilty of being a member of a terrorist group, and sentence him to seventeen years imprisonment (17);

### 10. NSANZUBUKIRE Félicien alias IRAKIZA Fred

- ✓ Is guilty of being a member of irregular armed group, and sentence him to 8 years imprisonment;

- ✓ Is guilty of being a member of a terrorist organization, and sentence him to 17 years imprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

- o a single act constitutes several offences;

- o separate acts which constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences NSANZUBUKIRE Jean Claude is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

### 11. MUNYANEZA Anastase alias Job KURAMBA

- ✓ Is guilty of joining an irregular armed group, and sentence him to 8 years imprisonment;

- ✓ Is guilty of being a member of a terrorist organization, and sentence him to 20 years imprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

- a single act constitutes several offences;

- separate acts which constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences MUNYANEZA Anastase is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 12. IYAMUREMYE Emmanuel alias Engambe IYAKUSIMBA

- ✓ Is guilty of joining an irregular armed group, and sentence him to 17 years imprisonment;

- ✓ Is guilty of being a member of a terrorist organization, and sentence him to 20 years imprisonment;

 Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

- a single act constitute several offences;

- separate acts constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences IYAMUREMYE Emmanuel is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at one criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been

requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 13. NIYIRORA Marcel alias BAMA Nicholas

- ✓ Is guilty of joining an irregular armed group, and sentence him to seventeen (17) years imprisonment;
- ✓ Is guilty of being a member of a terrorist organization, and sentence him to twenty (20) years imprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

- o   a single act constitutes several offences;

- o   separate acts constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences NIYIRORA Marcel is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 14. NSHIMIYIMANA Emmanuel

- ✓  Is guilty of joining an irregular armed group, and sentence him to seventeen (17) years imprisonment;

- ✓  I s guilty of being a member of a terrorist organization, sentence him to twenty (20) years imprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

- o a single act constitutes several offences;

- o separate acts which constitute separate offences are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences which NSHIMIYIMANA Emmanuel is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 15. KWITONDA André

- ✓ Is found guilty of joining an irregular armed group, and sentence him to seventeen (17) years imprisonment;

- ✓ Is guilty of being a member of a terrorist organization, and sentence him with twenty (20) years imprisonment;

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

- o a single act constitutes several offences;

- o separate acts which constitute separate offences are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences KWITONDA André is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 16. HAKIZIMANA Théogène

✓ Is guilty of joining an irregular armed group, and s e n t e n c e h i m to eight (8) years imprisonment;

✓ Is guilty of being a member of a terrorist organization, and sentence him to twenty (20) years imprisonment.

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

o a single act constitutes several offences;

o separate acts constitutes separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences HAKIZIMANA Théogène is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of twenty years (20) imprisonment for him.

## 17. NDAGIJIMANA Jean Chrétien

✓  Is guilty of joining an irregular armed group, and s e n t e n c e h i m  to fifteen years imprisonment

✓  Is guilty of being a member of a terrorist organization, and sentence him  to fifteen (15) years imprisonment.

Pursuant to article 61 paragraph 3, part 1° and 2° of Law N° 086/2018 of 30/08/2018 determining offences and penalties in general provides that concurrence of offences occurs when:

- a single e act constitutes several offences;

- separate acts which constitute separate offences, are related among themselves as they are aimed at accomplishing a single criminal intent;

We find that the offences NDAGIJIMANA Jean Chrétien is being suspected of having committed make up an ideal concurrence because they are related among themselves as they are aimed at accomplishing a single criminal intent; therefore, pursuant to article 62 paragraph 2 of that Law a maximum penalty provided for the heaviest offence has been requested for him. For the above reasons, the Prosecution is requesting a penalty of fifteen (15) years imprisonment for him.

## 18. MUKANDUTIYE  Angelina

✓  Is guilty of being a member of a terrorist organization, and sentence her to fifteen (15) years imprisonment.

## VII.  FILE CONTENTS

1. **RP – RIB: Notice Statement**

2. **RP – RIB: Statement of Witness NIYONZIMA ARTHEMON of 06/02/2020 at 15:00**

3. **RP – RIB: Statement of Witness Lt Col HABIYAREMYE Noel of 23/04/2010**

4. **RP – RIB: Statement of RUSESABAGINA Paul N° 1 of 31/08/2020**

5. **RP – RIB: Statement of RUSESABAGINA Paul N° 3 of 05/09/2020**

6. **RP – RIB: Statement of RUSESABAGINA Paul N° 2 of 04/09/2020**

7. **RP – RIB: Statement of Witness Brigadier MBERABAHIZI David of 6/2/2010**

8. **RP – RIB: Statement of Witness NAMBAJIMANA Joseph of 07/2/2020**

9. **RP – RIB: Statement of Witness NIYITURINZE Emmerance of 4/2/2020**

10. **RP – RIB: Statement of Witness Col MUSABYIMANA Narcisse of 6/2/2020**

11. **RP – RIB: Statement of Witness TUYISHIME Josephine of 4/2/2020**

12. **RP – RIB: Statement of Witness NTANGWAHAFI Callixte of 20/7/2018**

13. **RP – RIB: Statement of Witness KWIBUKA Védaste of 4/2/2020**

14. **RP – RIB: Statement of Witness ASIFIWE Marie Claire of/2/2020**

15. **RP – RIB: Statement of Witness NSHIMIYIMANA Anastase alias Marinette of 7/2/2020**

16. **RP – RIB: Statement of Witness BAZIKI Anastase of 7/2/2020**

17. **RP – RIB: Statement of Witness NIYOMUGABO Michel of 31/1/2020**

18. **RP – RIB: Statement of Witness INGABIRE AIMEE Confiance of 4/2/2020**

19. **RP – RIB: Statement of Witness Lt Col HAKIZIMANA Uzziel of 6/2/2020**

20. **RP – RIB: Statement of Witness NYIRANSABIMANA Vestine of 4/2/2020**

21. **RP – RIB: Statement of Witness BIZIMANA GASANA of 4/2/2020**

22. **RP – RIB: Statement of Witness NSABIMANA Callixte alias SANKARA OF 31/08/2020**

23. **RP – RIB: Statement of Witness SAFARI OLIVIER of 5/2/2020**

24. **RP – RIB: Statement of Witness MUNGUYIKO EMMANUEL of 5/2/2020**

25. **RP – RIB: Statement of Witness Col GATABAZI JOSEPH ALIAS GATHOS of 6/2/2020**

26. **RP – RIB: Statement of Witness RUMVA AJENEZA CONSOLEE of 4/2/2020**

27. **RP – RIB: Statement of Witness ITANGISHAKA ERIC of 31/1/2020**

28. **RP – RIB: Statement of Witness UWIZEYIMANA CLEMENTINE of 1/2/2020**

29. **RP – RIB: Statement of Witness MUJAWIMANA DOMINA of 4/2/2020**

30. **RP – RIB: Statement of Witness SEBAHUTU Jean de Dieu of 7/2/2020**

31. **RP – RIB: Statement of Witness NYIRANTEZIRYAYO BEATHA of 4/2/2020**

32. **RP – RIB: Statement of Witness NIZEYIMANA MAURICE of 31/1/2020**

33. **RP – RIB: Statement of RUSESABAGINA Paul N°4 of 9/8/2020**

34. **RP – RIB: Statement of Witness HAKIZIMANA ERIC of 2/2/2020**

35. **RP – RIB: Statement of Witness INGABIRE FLORIDA of 3/2/2020**

36. **RP – RIB: Statement of Witness INGABIRE CLEMENTINE OF 4/2/2020**

37. **RP – RIB: Statement of Witness DUKUZIMANA REPONSE of 31/1/2020**

38. **RP – RIB: Statement of Witness UWAMBAJIMANA JUDITH of 5/2/2020**

39. **RP – RIB: Statement of Witness UWINEZA JUSTINE of 3/2/2020**

40. **RP – RIB: Statement of Witness NYIRAHABIMANA DONATILE of 31/1/2020**

41. **RP – RIB: Statement of Witness UWAMAHORO PERUTH of 4/2/2020**

42. **RP – RIB: Statement of Witness NGENDAKUMANA David of 20/7/2020**

43. **RP – RIB: Statement of Witness NDAYISHIMYE Joseph of 2/2/2020**

44. **RP – RIB: Statement of Witness UWIMANA GAETAN of 1/2/2020**

45. **RP – RIB: Statement of Witness HABYARIMANA LEONARD of 19/7/2020**

46. **RP – RIB: Statement of Witness NYIRASHUMBUSHO CLAUDINE of 5/2/2020**

47. **RP – RIB: Statement of Witness NIYONIRINGIRA VALENS of 5/2/2020**

48. **RP – RIB: Statement of Witness UWASE YVETTE of 31/1/2020**

49. **RP – RIB: Statement of Witness ASIFIWE CLEMENTINE of 2/2/2020**

50. **RP – RIB: Statement of Witness BIZIMUNGU ALPHONSE of 5/2/2020**

51. **RP – RIB: Statement of Witness MUHAWENIMANA FLORIDA of 3/2/2020**

52. **RP – RIB: Statement of Witness TWAMBAZIMANA SOLANGE of 2/2/2020**

53. **RP – RIB: Statement of Witness MUSABYIMANA CHANTAL of 4/2/2020**

54. **RP – RIB: Statement of Witness Col NTAMUHANGA Anthere alias GONZAGUE of 6/2/2020**

55. **RP – RIB: Statement of Witness UWAMAHORO ELINA of 3/2/2020**

56. **RP – RIB: Statement of Witness UWIMPUHWE FAUSTINE of 3/2/2020**

57. RP – RIB: Statement of Witness UWIMANA CONFIANCE of 3/2/2020

58. RP – RIB: Statement of Witness MANISHIMWE HERITIER of 1/2/2020

59. RP – RIB: Statement of Witness TUYIZERE MARTHA of 2/2/2020

60. RP – RIB: Statement of Witness MAHIRWE MONIQUE of 1/2/2020

61. RP – RIB: Statement of Witness MUSHIMIYIMANA MEDIATRICE of 31/1/2020

62. RP – RIB: Statement of Witness UMUHOZA FRANCINE of 2/2/2020

63. RP – RIB: Statement of Witness MUKANDAYISABA ZAWADI of 5/2/2020

64. RP – RIB: Statement of Witness MUTONI SARAH of 2/2/2020

65. RP – RIB: Statement of Witness RUKUNDO JEAN D'AMOUR of 1/2/2020

66. RP – RIB: Statement of Witness NYANDWI FRODUARD of 3/2/2020

67. RP – RIB: Statement of Witness Lt Col KAGEMANA SIMON PIERRE of 7/2/2020

68. RP – RIB: Statement of Witness BIKORIMANA JEAN CLAUDE of 1/2/2020

69. RP – RIB: Statement of Witness NTIRENGANYA GASPARD of 1/2/2020

70. RP – RIB: Statement of Witness UWIMANA IMMACULEE of 2/2/2020

71. RP – RIB: Statement of Witness NEMA MICHELINE of 4/2/2020

72. RP – RIB: Statement of Witness MVUYEKURE Samuel 3/2/20202

73. RP – RIB: Statement of Witness NIYONZIMA EMMANUEL of 31/1/2020

74. RP – RIB: Statement of Witness MUNYENTWARI CASSIEN of 19/7/2018

75. RP – RIB: Statement of Witness NYIRAHABIMANA JEANNE of 3/2/2020

76. **RP – RIB: Statement of Witness BYAMUNGU BAHATI of 3/2/2020**

77. **RP – RIB: Statement of Witness RUSANGANWA GASPARD of 7/2/2020**

78. **RP – RIB: Statement of Witness DUSABIMANA JEANNETTE of 4/2/2020**

79. **RP – RIB: Statement of Witness MASENGESHO Jacqueline of 5/2/2020**

80. **RP – RIB: Statement of Witness SIBORUREMA Venuste of 20/7/2018**

81. **RP – RIB: Statement of Witness NTAKIRUTIMANA Sylvan of 20/7/2020**

82. **RP – RIB: Statement of Witness INGABIRE MARIE of 5/2/2020**

83. **RP – RIB: Statement of Witness IYAMUREMYE VINCENT of 3/2/2020**

84. **RP – RIB: Statement of Witness UWIMANA Claudette of 4/2/2020**

85. **RP – RIB: Statement of Witness UWIMPUHWE Marie Josée of 4/2/2020**

86. **RP – RIB: Statement of Witness NZASENGA BARAKA of 3/2/2020**

87. **RP – RIB: Statement of Witness MUKANTWARI MARIE ROSE of 5/2/2020**

88. **RP – RIB: Statement of Witness UWINGENEYE Florence of 4/2/2020**

89. **RP – RIB: Statement of Witness NIYOMUGABO JEAN FELEX of 1/2/2020**

90. **RP – RIB: Statement of Witness MUKAKARISA DOMINA of 5/2/2020**

91. **RP – RIB: Statement of Witness UZABAKIRIHO INNOCENT of 31/1/2020**

92. **RP – RIB: Statement of Witness MUKAMANA BEATRICE of 02/20/2020**

93. **RP – RIB: Statement of Witness MUKAMANA THEODETTE of 19/07/2028** *[SIC]*

94. **RP – RIB: Statement of Witness NIYONKURU JUSTIN of 1/2/2020**

95. **RP – RIB: Statement of Witness UWIMANA FLORENCE of 1/2/2020**

96. **RP – RIB: Statement of Witness MUSANABERA MARIE CHANTAL of 2/2/2020**

97. **RP – RIB: Statement of Witness BARAKA FAUSTIN of 5/2/2020**

98. **RP – RIB: Statement of Witness NIYOMUSHUMBA HELENE of 31/1/2020**

99. **RP – RIB: Statement of Witness HABUMUGISHA Viateur of 1/2/2020**

100. **RP – RIB: Statement of Witness NIYOMUGABO JULES of 2/2/2020**

101. **RP – RIB: Statement of Witness HABYARIMAA VIANNEY of 20/7/2028** *[SIC]*

102. **RP – RIB: Statement of Witness MANIZABAYO BENITHA of 3/2/2020**

103. **RP – RIB: Statement of Witness MUKARUKUNDO RACHEL of 4/2/2020**

104. **RP – RIB: Statement of Witness NSABIMANA JEROME of 2/2/2020**

105. **RP – RIB: Survivors of Mille Collines Letter to Lantos Foundation about the award to Rusesabagina published October 28th 2011**

106. **RP – RIB: Statement of Witness MUHIRWA MEDARD of 20/7/2018**

107. **RP – RIB: Statement of Witness NDIKUMANA VIATEUR 20/7/2018**

108. **RP – RIB: Statement of Witness SHUMBUSHA DAMASCENE of 20/7/20/2018**

109. **RP – RIB: Statement of Witness HAVUGIMANA JMV of 20/7/2018**

110. **RP – RIB: Statement of Witness RUSINGIZANDEKWE LEANDRE of 19/7/2018**

111. **RP – RIB: Statement of Witness NSABIMANA ANASTASIE of 20/7/2018**

112. **RP – RIB: Statement of Plaintiff UWIMANA STAPPIN of 7/5/2019**

113. **RP – RIB: Statement of Witness NDIKUMANA Callixte of 19/7/2018**

114.    RP – RIB: Statement of victim KAYITESI ALICE of 8/5/2019

115.    RP – RIB: Statement of Witness HAKIZIMANA Innocent of 31/1/2020

116.    RP – RIB: Statement of Witness HABIMANA VIATEUR of 20/7/2018

117.    RP – RIB: Statement of Witness S SGT MUTAGA PIERRE CLAVER of 15/10/18

118.    RP – RIB: Statement of Witness SEMUSHI DAVID on 16/12/2018

119.    RP – RIB: Statement of Witness NSABIMANA STRATON of 20/7/2018

120.    RP – RIB: Statement of Witness BAHATI NZAYITURIKI of 2/2/2020

121.    RP – RIB: Statement of Witness BARAYANDEMA VIATEUR of 20/7/2018

122.    RP – RIB: Statement of Witness HAKUZIMANA FAUSTIN of 5/2/2020

123.    RP – RIB: Statement of Witness MUKASHYAKA JOSEPHINE of 20/7/2018

124.    RP – RIB: Statement of Witness NCIYIMIHIGO VENUSTE of 18/7/2018

125.    RP – RIB: Statement of Witness NZARAMYIMANA THEOGENE of 19/7/2018

126.    RP – RIB: Statement of Witness SEBAGEMA DAMASCENE of 19/7/2018

127.    RP – RIB: Statement of Witness NYIRAGEMA JOSEPHINE of 19/7/2018

128.    RP – RIB: Statement of victim BWIMBA VIANNEY of 8/5/2019

129.    RP – RIB: Statement of Witness KARERANGABO ANTOINE of 20/7/2018

130.    RP – RIB: Statement of Witness UWAMARIYA Clementine of 5/2/2020

131.   RP – RIB: Statement of Witness NYIRMANA BERANCILE of 20/7/2018

132.   RP – RIB: Statement of Witness NYIRAZIBERA Dative of 20/7/2018

133.   RP – RIB: Statement of Witness NYIRAHORANA Godelive of 19/7/2018

134.   RP – RIB: Statement of Victim MAHORO Jean Damascene of 24/7/2018

135.   RP – RIB: Statement of Witness NYIRASENGIYUMVA OLIVE of 30/1/2020

136.   RP – RIB: Statement of Witness HABIMANA VENUSTE of 20/7/2018

137.   RP – RIB: Statement of Witness KANGABE CHRISTINE of 19/7/2018

138.   RP – RIB: Statement of Victim JUMAPILI ISSA of 8/5/2019

139.   RP – RIB: Statement of Victim MUGISHA YVES GASHUMABA of 8/5/2018

140.   RP – RIB: Statement of Witness RIBAKARE CALLIXTE MINANI of 19/7/2018

141.   RP – RIB: Statement of Victim NGIRABABYEYI Desire of 9/5/2019

142.   RP – RIB: Statement of Witness HABYARIMANA DAMASCENE of 22/6/2018

143.   RP – RIB: Statement of Witness NSEGUYE YOHANI of 20/7/2018

144.   RP – RIB: Statement of Witness SINUMVAYABO JOSEPHA of 18/7/2018

145.   RP – RIB: Statement of Victim MUNYANEZA FIDELE of 21/6/2018

146.   RP – RIB: Statement of Witness MUNYARUGENDO ALOYS of 20/6/2018

147.   RP – RIB: Statement of Witness GOMBANIRO MATHIAS of 2/7/2018

148. **RP – RIB: PVA RUSESABAGINA Paul of 28/8/2020**

149. **RP – RIB: Statement of Witness MUHITIRA Emmanuel of 2/7/2018**

150. **RP – RIB: Letter requesting for defense lawyers Ref 1924-RIB-JRK- SG-GS-2020 of 3/9/2020.**

151. **RP- RIB Letter showing names of RUSESABAGINA Paul's defense lawyers dated 03-9-2020 Ref. Let 136-Bat-KJC-09-2020**

152. **RP – RIB Leave to begin investigation N° I-538-D11-A-NPPA-CAB of 31/08/2020**

153. **RP – RIB C 19 Transfer Western Union (contd.)**

154. **RP – RIB C 17 Transfer Western Union BALOKA**

155. **RP – RIB C22 Transfer Money Gram**

156. **RP – RIB photographs taken in Nyungwe**

157. **RP – RIB Government project for democratic change**

158. **RP – RIB C 20 Transfer Western Union**

159. **September 2019 WhatsApp chats, THEY ARE ENCOURAGING PEOPLE TO MAKE CONTRIBUTIONS TO BE USED IN TERRORISM ACTIVITIES**

160. **RP – RIB MANIRAHO Anatole's medical report**

161. **RP – RIB NIWENSHUTI Isaac's medical report**

162. **RP – RIB ATETE SINE Onella's medical report**

163. **RP – RIB RUSESABAGINA'S CHATS WITH WILSON IRATEGEKA**

164. **RP – RIB MRCD correspondence of 30/08/2018**

165. **RP – RIB NYIRANZIZA's Medical report**

166. **RP – RIB NIYONTEGEREJE's Medical report**

167.    **RP – RIB RIA MONEY TRANSFER OF 22-09-2009**

168.    **RP – RIB MUTESI DANE's Medical report**

169.    **RP – RIB NTEZIRYAYO SAM'S MEDICAL REPORT**

170.    **RP – RIB Press release N° 2009-6-10**

171.    **RP – RIB HAKIZIMANA Zahee's Medical report**

172.    **RP – RIB KALIMUSHI BYAMUNGU Bayard's Medical report**

173.    **RP – RIB BASWALI Clement's Medical report**

174.    **RP – RIB KABUTURWA Zereda's Medical report**

175.    **RP – RIB UWIMFURA Bernard's Medical report**

176.    **RP – RIB NTEZIRYAYO CLAUDE's Medical report**

177.    **RP – RIB NIYITEGEKA Emmanuel's Medical report**

178.    **RP – RIB KAYITESI Alie Medical's report**

179.    **RP – RIB NIYOMUGABO EMMANUEL's Medical report**

180.    **RP – RIB SHEMA Philbert's Medical report**

181.    **RP – RIB NDUWAYO Arnold's Medical report**

182.    **RP – RIB NIYOBUHUNGIRO JEANINE's Medical report**

183.    **RP – RIB NDAHAYO Noel's Medical report**

184.    **RP – RIB MUNGANYINKA Verena's Medical report**

185.    **RP – RIB UWIMANA's Medical report**

186.    **RP – RIB BAKERA Ally's Medical report**

187.    **RP – RIB KIMANGA Faustin's Medical report**

188.    **RP – RIB JUMAPILI Issa's Medical report**

189.   **RP – RIB MUKABAHIZI Heralie's Medical report**

190.   **RP – RIB Press release  N° 2019-04-30**

191.   **RP – RIB MRCD announcement N°2018'07'01**

192.   **RP – RIB Press release N°2018'07'01**

193.   **RP – RIB MUNYANEZA's Medical report**

194.   **RP – RIB Announcement for the General Public N°2019'03'21**

195.   **RP – RIB Local Administration report**

196.   **RP – RIB MRCD Management Plan of Action**

197.   **RP – RIB Request for the hearing of 9/5/2017**

198.   **RP – RIB Request for the hearing of 19-10-2018**

199.   **RP – RIB MRCD Announcement N°2018'03'01**

200.   **RP – RIB RIA MONEY TRANSFER OF 16-2-018**

201.   **RP – RIB Press release N°2018'03'01**

202.   **RP – RIB Press release N°2019'03'19**

203.   **RP – RIB Death certificate, Habarurema**

204.   **RP – RIB Table showing MRCD members and how they received support**

205.   **RP – RIB Chat Link from Belgium Police**

206.   **RP – RIB Document of the Umbrella association, Survivors of Genocide.**

207.   **RP – RIB Document for preliminary investigation closing of 16/10/2020**

208.   **RP – RIB Statement of accused MUKANDUTIYE Angelina of 12/10/2020**

209.   **RP – RIB Statement of witness NSABIMANA Callixte of 16/10/2020**

210.   **RP – RIB Statement of witness NSABIMANA Callixte of 19/10/2020**

211.   **RP-NPPA MAP Rusesabagina**

212.   **RP-NPPA Statement Rusesabagina of 09.09.20**

213.   **RP-NPPA Statement Rusesabagina of 11.09.20**

214.   **RP-NPPA STATEMENT RUSESABAGINA OF 16.09.2020**

215.   **RP-NPPA Statement Paul Rusesabagina of 17.09.2020**

216.   **RP-NPPA Statement Rusesabagina of 22.09.2020**

217.   **RP-NPPA CHAT SIGNE 27**

218.   **RP-NPPA CHAT SIGNE 106**

219.   **RP-NPPA CHAT SIGNE 127**

220.   **RP-NPPA CHAT SIGNE 136**

221.   **RP-NPPA Witness statement BIZIMANA Cassien of 24.9.2020**

222.   **RP-NPPA Witness statement MATAKAMBA Jean Berchimans of 24.9.2020**

223.   **RP-NPPA Witness statement NTIBIRAMIRA Innocent of 24.9.2020**

224.   **RP-NPPA Witness statement MUKANDUTIYE Angelina of 28.9.2020**

225.   **RP-NPPA Witness statement SHABANI Emmanuel of 24.9.2020**

226.   **RP-NPPA Witness statement BYUKUSENGE Jean Claude of 28.9.2020**

227.   **RP-NPPA Witness statement NDAGIJIMANA Jean Chrétien of 28.9.2020**

228.   **RP-NPPA Witness statement NTABANGANYIMANA Joseph of 28.9.2020**

229.   **RP-NPPA GAKWAYA Gerard's Medical report**

230.   **RP-NPPA RUTAYISIRE Felix's Medical report**

231.   **RP-NPPA NSABIMANA Joseph's Medical report**

232.   **RP-NPPA UWAMBAJE Françoise's Medical report**

233.   **RP-NPPA NKURUNZIZA Jean Népomuscène's Medical report**

234.   **RP-NPPA NZEYIMANA Paulin's Medical report**

235.   **RP-NPPA HABIMANA Joseph's Medical report**

236.   **RP-NPPA Submission requesting provisional detention**

237.   **RP-NPPA PAUL RUSESEBAGINA's Defense Submission (Me RUGAZA David)**

238.   **RP-NPPA PAUL RUSESEBAGINA's Defense submission (Me NYEMBO Emeline)**

239.   **RP-NPPA Case law 1**

240.   **RP-NPPA Case law 2**

241.   **RP-NPPA Record of hearing of 14.04.2020 (10:00)**

242.   **RP-NPPA Record of hearing of 14.04.2020 (13:30)**

243.   **RP-NPPA Record of case pronouncement - Objections**

244.   **RP-NPPA Judgement copy- objections**

245.   **RP-NPPA Record of Detention Pronouncement**

246.   **RP-NPPA Detention judgment copy**

247.   **RP-NPPA APPEAL SUBMISSION (Me. RUGAZA David)**

248.   **RP-NPPA Decision on appeal on provisional detention of RUSESABAGINA ( Me NYEMBO Emeline)**

249.   **RP-NPPA Additional submission on** Appeal on Provisional Case RDPA 00447 (Me RUGAZA David)

250.   **RP-NPPA Submission against the appeal of RUSESABAGINA Paul (NPPA)**

251.   **RP- NPPA record of hearing on the provisional detention appeal of 25.09.2020 ( 09:00)**

252.   **RP-NPPA Statement of witness ST NDAGIJIMANA Jean Chretien of 5/10/2020.**

253.   **RP-NPPA Statement of witness ST NDAGIJIMANA Jean Chretien of 13/10/2020.**

254.   **RP-NPPA Statement of accused MUKANDUTIYE Angelina of 13/10/2020**

255.   **RP-NPPA Statement of accused Colonel NIZEYIMANA Marc of 13/10/2020**

256.   **RP-NPPA Statement of witness MASENGESHO Jacqueline of 6/10/2020**

257.   **RP-NPPA Statement of witness DUSABEMUNGU Adrien of 6/10/2020**

258.   **RP-NPPA Statement of witness GATERA Augustin of 7/10/2020**

259.   **RP-NPPA Statement of witness IMANIZABAYO Benita of 7/10/2020**

260.   **RP-NPPA Statement of witness NEEMA Miheline of 6/10/2020**

261.   **RP-NPPA Statement of witness NIYIBIZI Martin of 7/10/2020**

262.   **RP-NPPA Statement of witness NKEZIMFURA Jean Baptiste of 7/10/2020**

263.   **RP-NPPA Statement of witness ASIFIWE Clementine of 7/10/2020**

264.   **RP-NPPA Statement of witness DUSABIMANA Jeannette of 7/10/2020**

265.   **RP-NPPA Statement of witness HABIMANA Innocent of 7/10/2020**

266. **RP-NPPA Statement of witness NIYOMUGABO Jules of 7/10/2020**

267. **RP-NPPA Statement of witness NSABIMANA Jean Bosco of 6/10/2020**

268. **RP-NPPA Statement of witness NSENGIYUMVA Emmanuel of 6/10/2020**

269. **RP-NPPA Statement of witness NTITENGUHA Manassee of 7/10/2020**

270. **RP-NPPA Statement of witness NYEMAZI Isaie of 6/10/2020**

271. **RP-NPPA Statement of witness NYIRANSABIMANA Vestine of 7/10/2020**

272. **RP-NPPA Statement of witness SERUGO Felix of 6/10/2020**

273. **RP-NPPA Statement of witness UWASE Yvette of 7/10/2020**

274. **RP-NPPA Statement of witness MUSHIMIYIMANA Mediatrice of 7/10/2020**

275. **RP-NPPA Statement of BIZIMANA Cassien of 15.10.2020**

276. **RP-NPPA Statement of BYUKUSENGE Jean Claude of 15.10.2020**

277. **RP-NPPA Statement of MAJ. GEN. MUNYANEZA Anastase AKA RUKUNDO Job Kuramba of 15.10.2020**

278. **RP-NPPA Statement of MATAKAMBA Jean Berchimans of 15.10.2020**

279. **RP-NPPA STATEMENT OF NIKUZWE SIMEON OF 15.10.2020**

280. **RP-NPPA Statement of NTIBIRAMIRA Innocent of 15.10.2020**

281. **RP-NPPA Statement of SHABANI Emmanuel of 15.10.2020**

282. **RP-NPPA Statement of GAKWAYA Gerard of 6.10.2020**

283. **RP-NPPA Statement of HABIYAMBERE Martin of 8.10.2020**

284. **RP-NPPA Statement of NKURUNZIZA Jean Nepomuscene**

285.   **RP-NPPA Statement of BIZIRUREMA Celestin of 6/10/2020**

286.   **RP-NPPA Statement of INGABIRE Joyeux of 7/10/2020**

287.   **RP-NPPA Statement of MAHORO Jean Damascene of 7/10/2020**

288.   **RP-NPPA Statement of RUTAYISIRE Felix of 6/10/2020**

289.   **RP-NPPA Statement of NSABIMANA Joseph of 6/10/2020**

290.   **RP-NPPA Statement of NTEZIRYAYO Theogene of 6/10/2020**

291.   **RP-NPPA Request for remand on provisional detention of 16 Oct 2020.**

292.   **RP-EVID_MLA_RWANDA-USA: Request for mutual legal assistance from the Republic of Rwanda to the USA.**

293.   **RP-EVID_MLA_RWANDA-USA: US Department of Justice Response to Request for Assistance 4 Oct 2013**

294.   **RP-EVID_MLA_RWANDA- BURUNDI 1 Letter to SG of NISS informing the arrest of HABIYAREMYE Noel and his colleagues**

295.   **RP-EVID_MLA_RWANDA-BURUNDI 2 Requesting legal assistance NPPA to PGR Burundi 3 March 2013**

296.   **RP-EVID_MLA_RWANDA- BURUNDI 3 Burundi Reply on Legal Assistance requested by Rwanda**

297.   **RP-EVID_MLA_RWANDA- BURUNDI 4 Copies of documents of money transfer between RUSESABAGINA and different persons**

298.   **RP-EVID_MLA_RWANDA-BELGIUM C1-Federal Magistrate's request+Annex**

299.   **RP-EVID_MLA_RWANDA-BELGIUM C2.1-Request for legal assistance**

300. RP-EVID_MLA_RWANDA-BELGIUM C2.2-MINAFET-correspondence with the Embassy of the Kingdom of Belgium

301. RP-EVID_MLA_RWANDA- BELGIUM C2.3-Courrier of MINAFET with the Kingdom of Belgium

302. RP-EVID_MLA_RWANDA- BELGIUM C2 –Transmission of the rogatory commission's service to JI

303. RP-EVID_MLA_RWANDA—BELGIUM C3–Transmission SPF Foreign affairs to SPF Justice

304. RP-EVID_MLA_RWANDA- - BELGIUM C4-Courrier SPF Justice to Federal Prosecutor

305. RP-EVID_MLA_RWANDA- BELGIUM C5- Transmitted from Federal magistrate to the JI

306. RP-EVID_MLA_RWANDA- BELGIUM C6-PV 026587-19 Section CRI- MUNYEMANA

307. RP-EVID_MLA_RWANDA- BELGIUM C7-PV026903-19 Section CRI- INGABIRE

308. RP-EVID_MLA_RWANDA- BELGIUM C8-Task IJ

309. RP-EVID_MLA_RWANDA- BELGIUM C9-PV 027229-19   Section CRI-Analysis- suggestion of complementary tasks

310. RP-EVID_MLA_RWANDA- BELGIUM C10 –Task- Request IJ

311. RP-EVID_MLA_RWANDA- BELGIUM C11 –Task- Request IJ

312. RP-EVID_MLA_RWANDA- BELGIUM C12 –Task- Request IJ

313. RP-EVID_MLA_RWANDA- BELGIUM C13-PV 027904-19- Section CRI Done

314. RP-EVID_MLA_RWANDA- BELGIUM C14- Task- Request IJ

315.   RP-EVID_MLA_RWANDA- BELGIUM: C15 –PV027997-19 Section CRI-Request WU and Moneygram done

316.   RP-EVID_MLA_RWANDA- BELGIUM: C16-030630613 section CRI-Transmission and use of results

317.    RP-EVID_MLA_RWANDA- BELGIUM: CR17-PV 032226-19 section CRI-Transmission and use of results WU- Part BALOKA

318.   RP-EVID_MLA_RWANDA- BELGIUM: CR18-PV 032489-19 Section CRI- Transmission and use of results WU- First request

319.   RP-EVID_MLA_RWANDA- BELGIUM: CR19-PV 032874-19 Section CRI-Transmission and exploitation of results WU-first request positive results

320.   RP-EVID_MLA_RWANDA- BELGIUM: C20-PV 032884-19 section CRI- Transmission and exploitation of results WU first request positive summary

321.   RP-EVID_MLA_RWANDA- BELGIUM: C21-PV 033170-19 Section CRI- Information

322.   RP-EVID_MLA_RWANDA- BELGIUM:  C22-PV 024809-19 section CRI- transmission and exploitation of results MOMEYGRAM- FIRST REQUEST

323.   RP-EVID_MLA_RWANDA- BELGIUM: C23-First execution of search of 36-2 a 9571 Lierde- saisie

324.   RP-EVID_MLA_RWANDA- BELGIUM: C23 Seizure Order MUNYEMANA Eric and UWIRAGIYE Odette 1400 Nivelles Rue Marlet 3 -1

325.   RP-EVID_MLA_RWANDA- BELGIUM: C24-PV 35352-19 section CRI-DELIVERY OF SUMMONS AND ATTACHED COPY

326. RP-EVID_MLA_RWANDA- BELGIUM: C25-PV 35352-19 section CRI D delivery of summons and attached copy

327. RP-EVID_MLA_RWANDA-BELGIUM: C26-PV 036161-19 Implementation of search order of MUNYEMANA Eric

328. RP-EVID_MLA_RWANDA- BELGIUM: CV27-PV 035655-19 Hearing of MUNYEMANA Eric of 17/10/2019

329. RP-EVID_MLA_RWANDA- BELGIUM: C28-PV 035762-19 Hearing of INGABIRE Marie Claire of 17/10/2019

330. RP-EVID_MLA_RWANDA- BELGIUM: C29-PV 035809-19 Hearing of RUSESABAGINA Paul of 18/12/2019

331. RP-EVID_MLA_RWANDA- BELGIUM C30-PV 035900-19 Hearing of UWIRAGIYE Odette of 18/10/2029

332. RP-EVID_MLA_RWANDA- BELGIUM C31-PV 036018-19 Search of RUSESABAGINA's house in Belgium on

333. RP-EVID-MLA-RWANDA-BELGIUM: C32-PV 036038-19 Non-execution of the search order

334. RP-EVID_MLA_RWANDA-BELGIUM: C33-PV 036077-19 Inventory of items seized in RUSESABAGINA Paul Domicile

335. RP-EVID_MLA_RWANDA- BELGIUM: C34-PV 036580-19 CRI Inventory of seized items from MUNYEMANA Eric and UWIRAGIYE Odette domicile

336. RP-EVID_MLA_RWANDA-BELGIUM: C35-PV 036544-19 Technical Hearing of MUNYENYAMA Eric

337. RP-EVID_MLA_RWANDA- BELGIUM: C36-PV 039311-19: Examination of a laptop ACER Aspire 5536 (Ref RCCU 3491-2019)

338.   RP-EVID_MLA_RWANDA-   BELGIUM   :   C37-PV   038220-19   : Examination of USB 4GB (CCU3487-2019)

339.   RP-EVID_MLA_RWANDA-   BELGIUM:   C38-PV   038219-19 Examination of USB Philips (CCU3486-2019)

340.   RP-EVID_MLA_RWANDA-   BELGIUM:   C39-PV   038484-19 Examination of a laptop HP (CCU 3484-2019)

341.   RP-EVID_MLA_RWANDA-   BELGIUM:   C40-PV   04177-19 Examination of a Desktop HP Compact (CCU 3489-2019)

342.   RP-EVID_MLA_RWANDA-   BELGIUM:   C41-PV   039214-19 Examination of a laptop HP Elitebook (CCU 3490-2019)

343.   RP-EVID_MLA_RWANDA-   BELGIUM   :   C42-PV   039673-19   : Examination of a laptop HP (CCU 3485-2019)

344.   RP-EVID_MLA_RWANDA-   BELGIUM:   C43-PV   039304-19 Downloading of data from10 GSM (Ref RCCU 3474 A 3483-19)

345.   RP-EVID_MLA_RWANDA- BELGIUM: C44-PV 039346-19 of an Apple MacBook pro laptop

346.   RP-EVID_MLA_RWANDA-   BELGIUM   C45-PV   039704   -19 Examination of flash-disc 4GB (Ref CCU 3492-2019)

347.   RP-EVID_MLA_RWANDA-   BELGIUM   C46-PV   000891-20   New transfers by Mr. BALOKA Christian

348.   RP-EVID_MLA_RWANDA- BELGIUM C47-PV002777-20 BALOKA hearing

349.   RP-EVID_MLA_RWANDA- BELGIUM C48-PV 00362-20 Request for purchase of hard disk for court costs

350.   RP-EVID_MLA_RWANDA- BELGIUM: C49-PV 4720-20 Court costs for preserving electronic data

351.   RP-EVID_MLA_RWANDA- BELGIUM: C50-Task IJ

352.   RP-EVID_MLA_RWANDA- BELGIUM: C51-PV 004866-20 copy on hard disk for copying seized electronic data

353.   RP-EVID_MLA_RWANDA-  BELGIUM: C52-PV  002776-20 Destination of MUNYEMANA – UWIRAGIYE Documents

354.   RP-EVID_MLA_RWANDA-  BELGIUM:  C53-PV  038007  -20 Destination of INGABIRE's documents

355.   RP-EVID_MLA_RWANDA-  BELGIUM  C54-PV  03823-20 Destination of RUSESABAGINA's electronic equipment

356.   RP-EVID_MLA_RWANDA- BELGIUM: C55-PV 03986-20 Destination of the documents seized in RUSESABAGINA's home

357.   RP-EVID_MLA_RWANDA- BELGIUM: C56-PV04092-20 CRI-RW part of MUNYEMANA's information and communication equipment

358.   RP-EVID_MLA_RWANDA- BELGIUM: C57-PV 04383-20 CRI-RW Computer material for INGABIRE-Destination

359.   RP-EVID_MLA_RWANDA-BELGIUM:       C58-PV    05394-20 DR1-INFORMATION TO BE DEPOSITED AT THE CLERK'S USB CONTAINING PICTURES  AND INFORMATION.

360.   RP-EVID_MLA_RWANDA- BELGIUM: C59-PV 05447-20 CRI-RW Operation Data entry after Inquiry was made

361.   RP-EVID_MLA_RWANDA- BELGIUM: C60- Tasks of the IJ

362.   RP-EVID_MLA_RWANDA- BELGIUM: C61-PV 005768-2020 CRI-RW Apostille return –Execution of Search orders

363.   RP-EVID_MLA_RWANDA- BELGIUM: C62- Duty of IJ

364.   RP-EVID_MLA_RWANDA- BELGIUM: C63- PV 05796-20 Apostille return-WU Execution of search order and MONEY GRAM –

BALOKA Christian

365. RP-EVID_MLA_RWANDA- BELGIUM: C64-Task of IJ

366. RP-EVID_MLA_RWANDA- BELGIUM: C65-PV 05843-20 CRI-RW- Apostille Return : Extraction of data of computer material

367. RP-EVID_MLA_RWANDA- BELGIUM: C66-PV 05912-20 CRI-RW- Inventories of closed accomplished tasks

368. RP-EVID_MLA_RWANDA- BELGIUM: CPV 00362-20 Request purchase hard disk with court fees

369. RP-EVID_MLA_RWANDA- BELGIUM: Inventory documents on the file

370. RP-EVID_MLA_RWANDA- BELGIUM: Letter of Notes from the Embassy of Belgium in Kigali

371. RP-EVID_MLA_RWANDA- BELGIUM: Delivery of N o t e Letter: from the Embassy of Belgium in Kigali

372. RP-EVID-27 SEP 2020: EVIDENCES RP 27 Sep 2020

373. RP-EVID-Money transfer: Summary Table Transfer Funds FLN

374. RP-EVID-Money transfer: C17 Transfer Western Union BALOKA Christian

375. RP-EVID-Money transfer: C19 Transfer Western Union (contd)

376. RP-EVID-Money transfer: C20 Transfer Western Union

377. RP-EVID-Money transfer: C22 Transfer MONEYGRAM

378. RP-EVID-Money transfer: Lt Col HABIYAREMYE Noel Testimony

379. RP-EVID-Money transfer statement RP 1 of (31/08/2020)

380. RP-EVID-Money transfer statement RP 2 of (04/09/2020)

381. RP-EVID-Money transfer statement RP 3 of (05/09/2020)

382. **RP-EVID-Money transfer: statement RP Belgian Police FDLR Financing**

383. **RP-EVID-Money transfer: SANKARA STATEMENT 2 of 31/08/2020**

384. **RP COMP: A LETTER BY SG MRCD SEEKING SUPPORT FROM SWEDISH GOVT**

385. **RP COMP: MRCD BACKGROUND INFORMATION**

386. **RP COMP: AMBASSY OF CONGO IN TANZANIA**

387. **RP COMP: Request for appointment with the President of the President of BURUNDI NKURUNZIZA P**

388. **RP COMP: CNRD-UBWIYUNGE: APPOINTMENT OF MEMBERS OF THE EXECUTIVE COMMITTEE**

389. **RP COMP: Communiqué Rusesabagina FLN**

390. **RP COMP: CREATION MRCD**

391. **RP COMP: MRCD ACKNOWLEDGING LAUNCHING ATTACK IN NYARUGURU**

392. **RP COMP: FLN WARNING JOURNALISTS NOT TO ACCESS NYUNGWE WAR ZONE**

393. **RP COMP: HOTEL RWANDA**

394. **RP COMP: INTELLIGENCE analysis**

395. **RP COMP: ITANGAZO PDR, CNRD AND RRM**

396. **RP COMP:  KAGANGO ON MRCD EXECUTIVE COMMITTEE MISSION IN SADC**

397. **RP COMP: Kikwete advocates talks**

398. **RP COMP:  Belgium Advisory Committee in support to Belgium Administrative Committee**

399.   RP COMP:  Addresses

400.   RP COMP: Letter to Chairman, CCM

401.   RP COMP: LIST OF RWANDAN INVITEES TO ATTEND PDR-IHUMURE MEETING

402.   RP COMP: MCRD ON COLLABORATION WITH P5

403.   RP COMP:  MEMORANDUM OF UNDERSTANDING BETWEEN MRCD-UBUMWE AND RDI-RWANDA-RWIZA

404.   RP COMP: GOVERNANCE PROJECT 01 April 2019 Version

405.   RP COMP: CALLING ON FLN COMBATTANTS TO BE VIGILANT

406.    RP COMP: MRCD LETTER TO H.E DEMANDING SANKARA'S FAIR TRIAL

407.   RP   COMP: LETTER TO UN SG PREDICTING NEGATIVE CONSEQUENCES OF IMMINENT MILITARY OPERATIONS IN DRC

408.   RP COMP: MRCD LOBBYING TO SECURE APPOINTMENT WITH SWEDISH PARLIAMENT

409.   RP COMP: MEDIA PROPAGANDA STRATEGY

410.   RP COMP: MRCD-FLN STRUCTURE

411.   RP COMP: MRCD-FLN

412.   RP    COMP: MUTARAMBIRWA'S ADVICE LETTER TO RUSESABAGINA ON HOW TO OVERTHROW GoR

413.   RP COMP: NEGOTIACIONS BETWEEN MRCD AND RRM

414.   RP COMP : PDR - Mobilisation – Contacts France

415.   RP COMP: Management Action Plan to Implement

416.   RP COMP: RUSESA MRCD –FLN DETERMINATION TO TAKE OVER POWER BY FORCE

417.   RP COMP: RUSESA REPLY

418.   RP COMP: RUSESA WARNING FOREIGNERS NOT TO BE CAUGHT BY THEIR MRCD-FLN WAR AROUND NYUNGWE AREAS

419.   RP COMP: RUSESABAGINA AND RADIO IKONDERA

420.   RP COMP: RUSESA-MRCD LETTER TO SG CNDD SEEKING COLLABORATION

421.   RP COMP: RUSESA MRCD PRESS RELEASE ON APPEARANCE OF SANKARA BEFORE COURT

422.   RP COMP: RUSESA-MRCD SIGNED PRESS RELEASE APPOINTING CAPT HERMAN NSENGIMANA AS FLN SPOKESPERSON

423.   RP COMP: RUSESA- NKURUNZIZA

424.   RP COMP: RUSESA- TRUMP

425.   RP COMP:  RUSESA- ZUMA

426.   RP COMP: SANKARA –MRCD PRESS-RELEASE ADVISING PEOPLE AND FOREIGNERS NOT TO ACCESS NYUNGWE WAR ZONE.

427.   RP COMP: SANKARA-MRCD PRESS RELEASE INDICATING THAT FLN WAS MEANT TO OVERTHROW THE GoR THROUGH MILITARY MEANS.

428.   RP COMP: SUPPORT FLN

429.   RP PHONE: chat-1

430.   RP PHONE: chat-2

431.　**RP PHONE: chat-3**

432.　**RP PHONE:  chat-4**

433.　**RP PHONE:  chat-5**

434.　**RP PHONE: chat-6**

435.　**RP PHONE:  chat-7**

436.　**RP PHONE: chat-8**

437.　**RP PHONE :  chat-9**

438.　**RP PHONE: chat-10**

439.　**RP PHONE: chat-11**

440.　**RP PHONE: chat-12**

441.　**RP PHONE: chat-13**

442.　**RP PHONE: chat-14**

443.　**RP PHONE: chat-15**

444.　**RP PHONE: chat-16**

445.　**RP PHONE: chat-17**

446.　**RP PHONE: chat-18**

447.　**RP PHONE: chat-19**

448.　**RP PHONE: chat-20**

449.　**RP PHONE: chat-21**

450.　**RP PHONE: chat-22**

451.　**RP PHONE: chat-23**

452.　**RP PHONE: chat-24**

453.   **RP PHONE: chat-25**

454.   **RP PHONE: chat-26**

455.   **RP PHONE: chat-27**

456.   **RP PHONE: chat-28**

457.   **RP PHONE: chat-29**

458.   **RP PHONE: chat-30**

459.   **RP PHONE: chat-31**

460.   **RP PHONE: chat-32**

461.   **RP PHONE: chat-33**

462.   **RP PHONE: chat-34**

463.   **RP PHONE: chat-35**

464.   **RP PHONE: chat-36**

465.   **RP PHONE: chat-37**

466.   **RP PHONE: chat-38**

467.   **RP PHONE: chat-39**

468.   **RP PHONE: chat-40**

469.   **RP PHONE: chat-41**

470.   **RP PHONE: chat-42**

471.    **RP PHONE: chat-43**

472.   **RP PHONE: chat-44**

473.   **RP PHONE: chat-45**

474.   **RP PHONE: chat-46**

475. **RP PHONE: chat-47**

476. **RP PHONE: chat-48**

477. **RP PHONE: chat-49**

478. **RP PHONE: chat-50**

479. **RP PHONE: chat-51**

480. **RP PHONE: chat-52**

481. **RP PHONE: chat-53**

482. **RP PHONE: chat-54**

483. **RP PHONE: chat-55**

484. **RP PHONE: chat-56**

485. **RP PHONE: chat-57**

486. **RP PHONE: chat-58**

487. **RP PHONE: chat-59**

488. **RP PHONE: chat-60**

489. **RP PHONE: chat-61**

490. **RP PHONE: chat-62**

491. **RP PHONE: chat-63**

492. **RP PHONE: chat-64**

493. **RP PHONE: chat-65**

494. **RP PHONE: chat-66**

495. **RP PHONE: chat-67**

496. **RP PHONE: chat-68**

497.  **RP PHONE: chat-69**

498.  **RP PHONE: chat-70**

499.  **RP PHONE: chat-71**

500.  **RP PHONE: chat-72**

501.  **RP PHONE: chat-73**

502.  **RP PHONE: chat-74**

503.  **RP PHONE: chat-75**

504.  **RP PHONE: chat-76**

505.  **RP PHONE: chat-77**

506.   **RP PHONE: chat-78**

507.  **RP PHONE: chat-79**

508.  **RP PHONE: chat-80**

509.  **RP PHONE: chat-81**

510.  **RP PHONE: chat-82**

511.  **RP PHONE: chat-83**

512.  **RP PHONE: chat-84**

513.  **RP PHONE: chat-85**

514.  **RP PHONE: chat-86**

515.  **RP PHONE: chat-87**

516.  **RP PHONE: chat-88**

517.  **RP PHONE: chat-89**

518.  **RP PHONE: chat-90**

519. **RP PHONE: chat-91**

520. **RP PHONE: chat-92**

521. **RP PHONE: chat-93**

522. **RP PHONE: chat-94**

523. **RP PHONE: chat-95**

524. **RP PHONE: chat-96**

525. **RP PHONE: chat-97**

526. **RP PHONE: chat-98**

527. **RP PHONE: chat-99**

528. **RP PHONE: chat-100**

529. **RP PHONE: chat-101**

530. **RP PHONE: chat-102**

531. **RP PHONE: chat-103**

532. **RP PHONE: chat-104**

533. **RP PHONE: chat-105**

534. **RP PHONE: chat-106**

535. **RP PHONE: chat-107**

536. **RP PHONE: chat-108**

537. **RP PHONE: chat-109**

538. **RP PHONE: chat-110**

539. **RP PHONE: chat-111**

540. **RP PHONE: chat-112**

541.   **RP PHONE: chat-113**

542.   **RP PHONE: chat-114**

543.   **RP PHONE: chat-115**

544.   **RP PHONE: chat-116**

545.   **RP PHONE: chat-117**

546.   **RP PHONE: chat-118**

547.   **RP PHONE: chat-119**

548.   **RP PHONE: chat-120**

549.   **RP PHONE: chat-121**

550.   **RP PHONE: chat-122**

551.   **RP PHONE: chat-123**

552.   **RP PHONE: chat-124**

553.   **RP PHONE: chat-125**

554.   **RP PHONE: chat-126**

555.   **RP PHONE: chat-127**

556.   **RP PHONE: chat-128**

557.   **RP PHONE: chat-129**

558.   **RP PHONE: chat-130**

559.   **RP PHONE: chat-131**

560.    **RP PHONE: chat-132**

561.   **RP PHONE: chat-133**

562.   **RP PHONE: chat-134**

563. **RP PHONE: chat-135**

564. **RP PHONE: chat-136**

565. **RP PHONE: chat-137**

566. **RP PHONE: chat-138**

567. **RP PHONE: chat-139**

568. **RP PHONE: chat-140**

569. **RP PHONE: chat-141**

570. **RP PHONE: chat-142**

571. **RP PHONE: chat-143**

572. **RP PHONE: chat-144**

573. **RP PHONE: chat-145**

574. **RP PHONE: chat-146**

575. **RP PHONE: chat-147**

576. **RP PHONE: chat-148**

577. **RP PHONE: chat-149**

578. **RP PHONE: chat-150**

579. **RP PHONE: chat-151**

580. **RP PHONE: chat-152**

581. **RP PHONE: chat-153**

582. **RP PHONE: chat-154**

583. **RP PHONE: chat-155**

584. **RP PHONE: chat-156**

585.   RP PHONE: chat-157

586.   RP PHONE: chat-158

587.   RP PHONE: chat-159

588.   RP PHONE: chat-160

589.   RP PHONE: chat-161

590.   RP PHONE: chat-162

591.   RP PHONE: chat-163

592.   RP PHONE: chat-164

593.   RP PHONE: chat-165

594.   RP PHONE: chat-166

595.   RP PHONE: chat-167

596.   RP PHONE: chat-168

597.   RP PHONE: chat-169

598.   RP PHONE: chat-170

599.   RP PHONE: chat171

600.  RP PHONE:  chat-172

601.  RP PHONE:  chat-173

602.  RP PHONE:  chat-174

603.  RP PHONE:  chat-175

604.  RP PHONE:  chat-176

605.  RP PHONE:  chat-177

606.  RP PHONE: hat-178

607. **RP PHONE: chat-179**

608. **RP PHONE: chat-180**

609. **RP PHONE: chat-181**

610. **RP PHONE: chat-182**

611. **RP PHONE: chat-183**

612. **RP PHONE: chat-184**

613. **RP PHONE: chat-185**

614. **RP PHONE: chat-186**

615. **RP PHONE: chat-187**

616. **RP PHONE: chat-188**

617. **RP PHONE: chat-189**

618. **RP PHONE: chat-190**

619. **RP PHONE: chat-191**

620. **RP PHONE: chat-192**

621. **RP PHONE: chat-193**

622. **RP PHONE: chat-194**

623. **RP PHONE: chat-195**

624. **RP PHONE: chat-196**

625. **RP PHONE: chat-197**

626. **RP PHONE: chat-198**

627. **RP PHONE: chat-199**

628. **RP PHONE: chat-200**

**629.**   **RP PHONE: chat-201**

**630.**   **RP PHONE: chat-202**

**631.**   **RP PHONE: chat-203**

**632.**   **RP PHONE: chat-204**

**633.**   **RP PHONE: chat-205**

**634.**   **RP PHONE: chat-206**

**635.**   **RP PHONE: chat-207**

**636.**   **RP PHONE: chat-208**

**637.**   **RP PHONE: chat-209**

**638.**   **RP PHONE: chat-210**

**639.**   **RP PHONE: chat-211**

**640.**   **RP PHONE: chat-212**

**641.**   **RP PHONE: chat-213**

**642.**   **RP PHONE: chat-214**

**643.**   **RP PHONE: chat-215**

**644.**   **RP PHONE: chat-216**

**645.**   **RP PHONE: chat-217**

**646.**   **RP PHONE: chat-218**

**647.**   **RP PHONE: chat-219**

**648.**   **RP PHONE: chat-220**

**649.**   **RP PHONE: chat-221**

**650.**   **RP PHONE: chat-222**

651.    **RP PHONE: chat-223**

652.    **RP PHONE: chat-224**

653.    **RP PHONE: chat-225**

654.    **RP PHONE: chat-226**

655.    **RP PHONE: chat-227**

656.    **RP PHONE: chat-228**

657.    **RP PHONE: chat-229**

658.    **RP PHONE: chat-230**

659.    **RP PHONE: chat-231**

660.    **RP PHONE: chat-232**

661.    **RP PHONE: chat-233**

662.    **RP PHONE: chat-234**

663.    **RP PHONE: chat-235**

664.    **RP PHONE: chat-236**

665.    **RP PHONE: chat-237**

666.    **RP PHONE: chat-238**

667.    **RP PHONE: chat-239**

668.    **RP PHONE: chat-240**

669.    **RP PHONE: chat-241**

670.    **RP PHONE: chat-242**

671.    **RP PHONE: chat-243**

672.    **RP PHONE: chat-244**

673. **RP PHONE: chat-245**

674. **RP PHONE: chat-246**

675. **RP PHONE: chat-247**

676. **RP PHONE: chat-248**

677. **RP PHONE: chat-249**

678. **RP PHONE: chat-250**

679. **RP PHONE: chat-251**

680. **RP PHONE: chat-252**

681. **RP PHONE: chat-253**

682. **RP PHONE: chat-254**

683. **RP PHONE: chat-255**

684. **RP PHONE: chat-256**

685. **RP PHONE: chat-257**

686. **RP PHONE: chat-258**

687. **RP PHONE: chat-259**

688. **RP PHONE: chat-260**

689. **RP PHONE: chat-261**

690. **RP PHONE: chat-262**

691. **RP PHONE: chat-263**

692. **RP PHONE: chat-264**

693. **RP PHONE: chat-265**

694. **RP PHONE: chat-266**

695. **RP PHONE: chat-267**

696. **RP PHONE: chat-268**

697. **RP PHONE: chat-269**

698. **RP PHONE: chat-270**

699. **RP PHONE: chat-271**

700. **RP PHONE: chat-272**

701. **RP PHONE: chat-273**

702. **RP PHONE: chat-274**

703. **RP PHONE: chat-275**

704. **RP PHONE: chat-276**

705. **RP PHONE: chat-277**

706. **RP PHONE: chat-278**

707. **RP PHONE: chat-279**

708. **RP PHONE: chat-280**

709. **RP PHONE: chat-281**

710. **RP PHONE: chat-282**

711. **RP PHONE: chat-283**

712. **RP PHONE: chat-284**

713. **RP PHONE: chat-285**

714. **RP PHONE: chat-286**

715. **RP PHONE: chat-287**

716. **RP PHONE: chat-288**

717.   **RP PHONE: chat-289**

718.   **RP PHONE: chat-290**

719.   **RP PHONE: chat-291**

720.   **RP PHONE: chat-292**

721.   **RP PHONE: chat-293**

722.   **RP PHONE: chat-294**

723.   **RP PHONE: chat-295**

724.   **RP PHONE: chat-296**

725.   **RP PHONE: chat-297**

726.   **RP PHONE: chat-298**

727.   **RP PHONE: chat-299**

728.   **RP PHONE: chat-300**

729.   **RP PHONE: chat-301**

730.   **RP PHONE: chat-302**

731.   **RP PHONE: chat-303**

732.   **RP PHONE: chat-304**

733.   **RP PHONE: chat-305**

734.   **RP PHONE: chat-306**

735.   **RP PHONE: chat-307**

736.   **RP PHONE: chat-308**

737.   **RP PHONE: chat-309**

738.   **RP PHONE: chat-310**

739. **RP PHONE: chat-311**

740. **RP PHONE: chat-312**

741. **RP PHONE: chat-313**

742. **RP PHONE: chat-314**

743. **RP PHONE: chat-315**

744. **RP PHONE: chat-316**

745. **RP PHONE: chat-317**

746. **RP PHONE: chat-318**

747. **RP PHONE: chat-319**

748. **RP PHONE: chat-320**

749. **RP PHONE: chat-321**

750. **RP PHONE: chat-322**

751. **RP PHONE: chat-323**

752. **RP PHONE: chat-324**

753. **RP PHONE: chat-325**

754. **RP PHONE: chat-326**

755. **RP PHONE: chat-327**

756. **RP PHONE: chat-328**

757. **RP PHONE: chat-329**

758. **RP PHONE: chat-330**

759. **RP PHONE: chat-331**

760. **RP PHONE: chat-332**

761.   **RP PHONE: chat-333**

762.   **RP PHONE: chat-334**

763.   **RP PHONE: chat-335**

764.   **RP PHONE: chat-336**

765.   **RP PHONE: chat-337**

766.   **RP PHONE: chat-338**

767.   **RP PHONE: chat-339**

768.   **RP PHONE: chat-340**

769.   **RP PHONE: chat-341**

770.   **RP PHONE: chat-342**

771.   **RP PHONE: chat-343**

772.   **RP PHONE: chat-344**

773.   **RP PHONE: chat-345**

774.   **RP PHONE: chat-346**

775.   **RP PHONE: chat-347**

776.   **RP PHONE: chat-348**

777.   **RP PHONE: chat-349**

778.   **RP PHONE: chat-350**

779.   **RP PHONE: chat-351**

780.   **RP PHONE: chat-352**

781.   **RP PHONE: chat-353**

782.   **RP PHONE: chat-354**

783.   **RP PHONE: chat-355**

784.   **RP PHONE: chat-356**

785.   **RP PHONE: chat-357**

786.   **RP PHONE: chat-358**

787.   **RP PHONE: chat-359**

788.   **RP PHONE: chat-360**

789.   **RP PHONE: chat-361**

790.   **RP PHONE: chat-362**

791.   **RP PHONE: chat-363**

792.   **RP PHONE: chat-364**

793.   **RP PHONE: chat-365**

794.   **RP PHONE: chat-366**

795.   **RP PHONE: chat-367**

796.   **RP PHONE: chat-368**

797.   **RP PHONE: chat-369**

798.   **RP PHONE: chat-370**

799.   **RP PHONE: chat-371**

800.   **RP PHONE: chat-372**

801.   **RP PHONE: chat-373**

802.   **RP PHONE: chat-374**

803.   **RP PHONE: chat-375**

804.   **RP PHONE: chat-376**

805.   **RP PHONE: chat-377**

806.   **RP PHONE: chat-378**

807.   **RP PHONE: chat-379**

808.   **RP PHONE: chat-380**

809.   **RP PHONE: chat-381**

810.   **RP PHONE: chat-382**

811.   **RP PHONE: chat-383**

812.   **RP PHONE: chat-384**

813.   **RP PHONE: chat-385**

814.   **RP PHONE: chat-386**

815.   **RP PHONE: chat-387**

816.   **RP PHONE: chat-388**

817.   **RP PHONE: chat-389**

818.   **RP PHONE: chat-390**

819.   **RP PHONE: chat-391**

820.   **RP PHONE: chat-392**

821.   **RP PHONE: chat-393**

822.   **RP PHONE: chat-394**

823.   **RP PHONE: chat-395**

824.   **RP PHONE: chat-396**

825.   **RP PHONE: chat-397**

826.   **RP PHONE: chat-398**

827. **RP PHONE: chat-399**

828. **RP PHONE: chat-400**

829. **RP PHONE: chat-401**

830. **RP PHONE: chat-402**

831. **RP PHONE: chat-403**

832. **RP PHONE: chat-404**

833. **RP PHONE: chat-405**

834. **RP PHONE: chat-406**

835. **RP PHONE: chat-407**

836. **RP PHONE: chat-408**

837. **RP PHONE: chat-409**

838. **RP PHONE: chat-410**

839. **RP PHONE: chat-411**

840. **RP PHONE: chat-412**

841. **RP PHONE: chat-413**

842. **RP PHONE: chat-414**

843. **RP PHONE: chat-415**

844. **RP PHONE: chat-416**

845. **RP PHONE: chat-417**

846. **RP PHONE: chat-418**

847. **RP PHONE: chat-419**

848. **RP PHONE: chat-420**

849.   **RP PHONE: chat-421**

850.   **RP PHONE: chat-422**

851.   **RP PHONE: chat-423**

852.   **RP PHONE: chat-424**

853.   **RP PHONE: chat-425**

854.   **RP PHONE: chat-426**

855.   **RP PHONE: chat-427**

856.   **RP PHONE: chat-428**

857.   **RP PHONE: chat-429**

858.   **RP PHONE: chat-430**

859.   **RP PHONE: chat-431**

860.   **RP PHONE: chat-432**

861.   **RP PHONE: chat-433**

862.   **RP PHONE: chat-434**

863.   **RP PHONE: chat-435**

864.   **RP PHONE: chat-436**

865.   **RP PHONE: chat-437**

866.   **RP PHONE: chat-438**

867.   **RP PHONE: chat-439**

868.   **RP PHONE: chat-440**

869.   **RP PHONE: chat-441**

870.   **RP PHONE: chat-442**

871.    **RP PHONE: chat-443**

872.    **RP PHONE: chat-444**

873.    **RP PHONE: chat-445**

874.    **RP PHONE: chat-446**

875.    **RP PHONE: chat-447**

876.    **RP PHONE: chat-448**

877.    **RP PHONE: chat-449**

878.    **RP PHONE: chat-450**

879.    **RP PHONE: chat-451**

880.    **RP PHONE: chat-452**

881.    **RP PHONE: chat-453**

882.    **RP PHONE: chat-454**

883.    **RP PHONE: chat-455**

884.    **RP PHONE: chat-456**

885.    **RP PHONE: chat-457**

886.    **RP PHONE: chat-458**

887.    **RP PHONE: chat-459**

888.    **RP PHONE: chat-460**

889.    **RP PHONE: chat-461**

890.    **RP PHONE: chat-462**

891.    **RP PHONE: chat-463**

892.    **RP PHONE: chat-464**

893.   **RP PHONE: chat-465**

894.   **RP PHONE: chat-466**

895.   **RP PHONE: chat-467**

896.   **RP PHONE: chat-468**

897.   **RP PHONE: chat-469**

898.   **RP PHONE: chat-470**

899.   **RP PHONE: chat-471**

900.   **RP PHONE: chat-472**

901.   **RP PHONE: chat-473**

902.   **RP PHONE: chat-474**

903.   **RP PHONE: chat-475**

904.   **RP PHONE: chat-476**

905.   **RP PHONE: chat-477**

906.   **RP PHONE: chat-478**

907.   **RP PHONE: chat-479**

908.   **RP PHONE: chat-480**

909.   **RP PHONE: chat-481**

910.   **RP PHONE: chat-482**

911.   **RP PHONE: chat-483**

912.   **RP PHONE: chat-484**

913.   **RP PHONE: chat-485**

914.   **RP PHONE: chat-486**

915. **RP PHONE: chat-487**

916. **RP PHONE: chat-488**

917. **RP PHONE: chat-489**

918. **RP PHONE: chat-490**

919. **RP PHONE: chat-491**

920. **RP PHONE: chat-492**

921. **RP PHONE: chat-493**

922. **RP PHONE: chat-494**

923. **RP PHONE: chat-495**

924. **RP PHONE: chat-496**

925. **RP PHONE: chat-497**

926. **RP PHONE: chat-498**

927. **RP PHONE: chat-499**

928. **RP PHONE: chat-500**

929. **RP PHONE: chat-501**

930. **RP PHONE: chat-502**

931. **RP PHONE: chat-503**

932. **RP PHONE: chat-504**

933. **RP PHONE: chat-505**

934. **RP PHONE: chat-506**

935. **RP PHONE: chat-507**

936. **RP PHONE: chat-508**

937.   **RP PHONE: chat-509**

938.   **RP PHONE: chat-510**

939.   **RP PHONE: chat-511**

940.   **RP PHONE: chat-512**

941.   **RP PHONE: chat-513**

942.   **RP PHONE: chat-514**

943.   **RP PHONE: chat-515**

944.   **RP PHONE: chat-516**

945.   **RP PHONE: chat-517**

946.   **RP PHONE: chat-518**

947.   **RP PHONE: chat-519**

948.   **RP PHONE: chat-520**

949.   **RP PHONE: chat-521**

950.   **RP PHONE: chat-522**

951.   **RP PHONE: chat-523**

952.   **RP PHONE: chat-524**

953.   **RP PHONE: chat-525**

954.   **RP PHONE: chat-526**

955.   **RP PHONE: chat-527**

956.   **RP PHONE: chat-528**

957.   **RP PHONE: chat-529**

958.   **RP PHONE: chat-530**

959.   **RP PHONE: chat-531**

960.   **RP PHONE: chat-532**

961.   **RP PHONE: chat-533**

962.   **RP PHONE: chat-534**

963.   **RP PHONE: chat-535**

964.   **RP PHONE: chat-536**

965.   **RP PHONE: chat-537**

966.   **RP PHONE: chat-538**

967.   **RP PHONE: chat-539**

968.   **RP PHONE: chat-540**

969.   **RP PHONE: chat-541**

970.   **RP PHONE: chat-542**

971.   **RP PHONE: chat-543**

972.   **RP PHONE: chat-544**

973.   **RP PHONE: chat-545**

974.   **RP PHONE: chat-546**

975.   **RP PHONE: chat-547**

976.   **RP PHONE: chat-548**

977.   **RP PHONE: chat-549**

978.   **RP PHONE: chat-550**

979.   **RP PHONE: chat-551**

980.   **RP PHONE: chat-552**

**981.  RP PHONE: chat-553**

**982.  RP PHONE: chat-554**

**983.  RP PHONE: chat-555**

**984.  RP PHONE: chat-556**

**985.  RP PHONE: chat-557**

**986.  RP PHONE: chat-558**

**987.  RP PHONE: chat-559**

**988.  RP PHONE: chat-560**

**989.  RP PHONE: chat-561**

**990.  RP PHONE: chat-562**

**991.  RP PHONE: chat-563**

**992.  RP PHONE: chat-564**

**993.  RP PHONE: chat-565**

**994.  RP PHONE: chat-566**

**995.  RP PHONE: chat-567**

**996.  RP PHONE: chat-568**

**997.  RP PHONE: chat-569**

**998.  RP PHONE: chat-570**

**999.  RP PHONE: chat-571**

**1000.  RP PHONE: chat-572**

**1001.  RP PHONE: chat-573**

**1002.  RP PHONE: chat-574**

**1003.  RP PHONE: chat-575**

**1004.  RP PHONE: chat-576**

**1005.  RP PHONE: chat-577**

**1006.  RP PHONE: chat-578**

**1007.  RP PHONE: chat-579**

**1008.  RP PHONE: chat-580**

**1009.  RP PHONE: chat-581**

**1010.  RP PHONE: chat-582**

**1011.  RP PHONE: chat-583**

**1012.  RP PHONE: chat-584**

**1013.  RP PHONE: chat-585**

**1014.  RP PHONE: chat-586**

**1015.  RP PHONE: chat-587**

**1016.  RP PHONE: chat-588**

**1017.  RP PHONE: chat-589**

**1018.  RP PHONE: chat-590**

**1019.  RP PHONE: chat-591**

**1020.  RP PHONE: chat-592**

**1021.  RP PHONE: chat-593**

**1022.  RP PHONE: chat-594**

**1023.  RP PHONE: chat-595**

**1024.  RP PHONE: chat-596**

1025.  **RP PHONE: chat-597**

1026.  **RP PHONE: chat-598**

1027.  **RP PHONE: chat-599**

1028.  **RP PHONE: chat-600**

1029.  **RP PHONE: chat-601**

1030.  **RP PHONE: chat-602**

1031.  **RP PHONE: chat-603**

1032.  **RP PHONE: chat-604**

1033.  **RP PHONE: chat-605**

1034.  **RP PHONE: chat-606**

1035.  **RP PHONE: chat-607**

1036.  **RP PHONE: chat-608**

1037.  **RP PHONE: chat-609**

1038.  **RP PHONE: chat-610**

1039.  **RP PHONE: chat-611**

1040.  **RP PHONE: chat-612**

1041.  **RP PHONE: chat-613**

1042.  **RP PHONE: chat-614**

1043.  **RP PHONE: chat-615**

1044.  **RP PHONE: chat-616**

1045.  **RP PHONE: chat-617**

1046.  **RP PHONE: chat-618**

1047. **RP PHONE: chat-619**

1048. **RP PHONE: chat-620**

1049. **RP PHONE: chat-621**

1050. **RP PHONE: chat-622**

1051. **RP PHONE: chat-623**

1052. **RP PHONE: chat-624**

1053. **RP PHONE: chat-625**

1054. **RP PHONE: chat-626**

1055. **RP PHONE: chat-627**

1056. **RP PHONE: chat-628**

1057. **RP PHONE: chat-629**

1058. **RP PHONE: chat-630**

1059. **RP PHONE: chat-631**

1060. **RP PHONE: chat-632**

1061. **RP PHONE: chat-633**

1062. **RP PHONE: chat-634**

1063. **RP PHONE: chat-635**

1064. **RP PHONE: chat-636**

1065. **RP PHONE: chat-637**

1066. **RP PHONE: chat-638**

1067. **RP PHONE: chat-639**

1068. **RP PHONE: chat-640**

1069.  **RP PHONE: chat-641**

1070.  **RP PHONE: chat-642**

1071.  **RP PHONE: chat-643**

1072.  **RP PHONE: chat-644**

1073.  **RP PHONE: chat-645**

1074.  **RP PHONE: chat-646**

1075.  **RP PHONE: chat-647**

1076.  **RP PHONE: chat-648**

1077.  **RP PHONE: chat-649**

1078.  **RP PHONE: chat-650**

1079.  **RP PHONE: chat-651**

1080.  **RP PHONE: chat-652**

1081.  **RP PHONE: chat-653**

1082.  **RP PHONE: chat-654**

1083.  **RP PHONE: chat-655**

1084.  **RP PHONE: chat-656**

1085.  **RP PHONE: chat-657**

1086.  **RP PHONE: chat-658**

1087.  **RP PHONE: chat-659**

1088.  **RP PHONE: chat-660**

1089.  **RP PHONE: chat-661**

1090.  **RP PHONE: chat-662**

1091. **RP PHONE: chat-663**

1092. **RP PHONE: chat-664**

1093. **RP PHONE: chat-665**

1094. **RP PHONE: chat-666**

1095. **RP PHONE: chat-667**

1096. **RP PHONE: chat-668**

1097. **RP PHONE: chat-669**

1098. **RP PHONE: chat-670**

1099. **RP PHONE: chat-671**

1100. **RP PHONE: chat-672**

1101. **RP PHONE: chat-673**

1102. **RP PHONE: chat-674**

1103. **RP PHONE: chat-675**

1104. **RP PHONE: chat-676**

1105. **RP PHONE: chat-677**

1106. **RP PHONE: chat-678**

1107. **RP PHONE: chat-679**

1108. **RP PHONE: chat-680**

1109. **RP PHONE: chat-681**

1110. **RP PHONE: chat-682**

1111. **RP PHONE: chat-683**

1112. **RP PHONE: chat-684**

1113.  **RP PHONE: chat-685**

1114.  **RP PHONE: chat-686**

1115.  **RP PHONE: chat-687**

1116.  **RP PHONE: chat-688**

1117.  **RP PHONE: chat-689**

1118.  **RP PHONE: chat-690**

1119.  **RP PHONE: chat-691**

1120.  **RP PHONE: chat-692**

1121.  **RP PHONE: chat-693**

1122.  **RP PHONE: chat-694**

1123.  **RP PHONE: chat-695**

1124.  **RP PHONE: chat-696**

1125.  **RP PHONE: chat-697**

1126.  **RP PHONE: chat-698**

1127.  **RP PHONE: chat-699**

1128.  **RP PHONE: chat-700**

1129.  **RP PHONE: chat-701**

1130.  **RP PHONE: chat-702**

1131.  **RP PHONE: chat-703**

1132.  **RP PHONE: chat-704**

1133.  **RP PHONE: chat-705**

1134.  **RP PHONE: chat-706**

1135.  **RP PHONE: chat-707**

1136.  **RP PHONE: chat-708**

1137.  **RP PHONE: chat-709**

1138.  **RP PHONE: chat-710**

1139.  **RP PHONE: chat-711**

1140.  **RP PHONE: chat-712**

1141.  **RP PHONE: chat-713**

1142.  **RP PHONE: chat-714**

1143.  **RP PHONE: chat-715**

1144.  **RP PHONE: chat-716**

1145.  **RP PHONE: chat-717**

1146.  **RP PHONE: chat-718**

1147.  **RP PHONE: chat-719**

1148.  **RP PHONE: chat-720**

1149.  **RP PHONE: chat-721**

1150.  **RP PHONE: chat-722**

1151.  **RP PHONE: chat-723**

1152.  **RP PHONE: chat-724**

1153.  **RP PHONE: chat-725**

1154.  **RP PHONE: chat-726**

1155.  **RP PHONE: chat-727**

1156.  **RP PHONE: chat-728**

1157.  **RP PHONE: chat-729**

1158.  **RP PHONE: chat-730**

1159.  **RP PHONE: chat-731**

1160.  **RP PHONE: chat-732**

1161.  **RP PHONE: chat-733**

1162.  **RP PHONE: chat-734**

1163.  **RP PHONE: chat-735**

1164.  **RP PHONE: chat-736**

1165.  **RP PHONE: chat-737**

1166.  **RP PHONE: chat-738**

1167.  **RP PHONE: chat-739**

1168.  **RP PHONE: chat-740**

1169.  **RP PHONE: chat-741**

1170.  **RP PHONE: chat-742**

1171.  **RP PHONE: chat-743**

1172.  **RP PHONE: chat-744**

1173.  **RP PHONE: chat-745**

1174.  **RP PHONE: chat-746**

1175.  **RP PHONE: chat-747**

1176.  **RP PHONE: chat-748**

1177.  **RP PHONE: chat-749**

1178.  **RP PHONE: chat-750**

1179.  **RP PHONE: chat-751**

1180.  **RP PHONE: chat-752**

1181.  **RP PHONE: chat-753**

1182.  **RP PHONE: chat-754**

1183.  **RP PHONE: chat-755**

1184.  **RP PHONE: chat-756**

1185.  **RP PHONE: chat-757**

1186.  **RP PHONE: chat-758**

1187.  **RP PHONE: chat-759**

1188.  **RP PHONE: chat-710**

1189.  **RP PHONE: chat-761**

1190.  **RP PHONE: chat-762**

1191.  **RP PHONE: chat-763**

1192.  **RP AUDIO & VIDEO RUSESABAGINA P.**

1193.  **RP AUDIO & VIDEO SANKARA C.**

1194.  **PV RP BELGIQUE: C27  Hearing of Eric MUNYEMANA of 17/10/2019**

1195.  **PV RP BELGIQUE: C28  Hearing of INGABIRE Marie Claire of 17/10/2019**

1196.  **PV RP BELGIQUE: C29 Hearing of RUSESABAGINA Paul of 18/10/2019**

1197.  **PV RP BELGIQUE: C30  Hearing of UWIRAGIYE Odette 18/10/2019**

1198.  **PV RP BELGIQUE: C33 Full search Report  of RUSESABAGINA's home**

1199.  **PV RP BELGIQUE: C47 Hearing BALOKA Christian 24/01/2020**

1200. **PV RP BELGIQUE: Joint announcement Rusesabagina 10 June 2019 FLN Search Belgium**

1201. **PV RP BELGIQUE: Link Chat-communication leaders**

1202. **PV RP BELGIQUE: MEMORANDUM OF UNDERSTANDING BETWEEN MRCD-UBUMWE AND RDI-RWANDA RWIZA`**

1203. **PV RP BELGIQUE: RIA Money Transfer of 16 July 2018**

1204. **PV RP BELGIQUE: RIA Money Transfer of 22 Sept 2009**

1205. **FLN-RIB Investigation Statements of 27/7/2020**

1206. **FLN-RIB STATEMENT of the Accused Maj. Gen. NSANZUBUKIRE Felicien of 15/7/2020**

1207. **FLN-RIB STATEMENT of the Accused Maj. Gen MUNYANEZA Anastase of 15/7/2020**

1208. **FLN-RIB STATEMENT of the Accused Col. NIZEYIMANA Marc of 13/7/2020**

1209. **FLN-RIB STATEMENT of the Accused      Col. IYAMUREMYE Emmanuel of 15/7/2020**

1210. **FLN-RIB STATEMENT of the Accused Lt. Col. NIYIRORA Marcel of 15/7/2020**

1211. **FLN-RIB STATEMENT of the Accused 2nd Lt BIZIMANA Cassien alias BIZIMANA Patience of 16/7/2020**

1212. **FLN-RIB STATEMENT of the Accused 2nd Lt. HAKIZIMANA Theogene alias MBUZAGWERA Jean Bruno of 15/7/2020**

1213. **FLN-RIB STATEMENT of the Accused 2nd Lt. KWITONDA André of 15/7/2020**

1214. **FLN-RIB STATEMENT of the Accused 2nd Lt. NDAGIJIMANA Chretien of 16/7/2020**

1215. FLN-RIB STATEMENT of the Accused 2nd Lt. NSHIMIYIMANA Emmanuel of 15/7/2020

1216. FLN-RIB STATEMENT of the Accused MATAKAMBA Jean Berchmas of 16/7/2020

1217. FLN-RIB STATEMENT of the Accused NIKUZWE Simeon of 16/7/2020

1218. FLN-RIB STATEMENT of the Accused NTIBIRAMIRA Innocent of 16/7/2020

1219. FLN-RIB STATEMENT of the Accused SHABANI Emmanuel of 16/7/2020

1220. FLN-RIB STATEMENT of the Accused NTIBANGANYIMANA Joseph alias COMBE BARUE MATATA of 16/7/2020

1221. FLN-RIB STATEMENT of the Accused BYUKUSENGE Jean Claude of 16/7/2020

1222. FLN-RIB Record of additional information

1223. FLN-RIB STATEMENT of Witness MUTONI Sarah of 02/02/2020

1224. FLN-RIB STATEMENT of Witness ASIFIWE Clementine of 02/02/2020

1225. FLN-RIB STATEMENT of Witness ASIFIWE Marie Claire of 04/02/2020

1226. FLN-RIB STATEMENT of Witness BAHATI NZAYITURIKI of 02/02/2020

1227. FLN-RIB STATEMENT of Witness BARAKA Faustin of 05/02/2020

1228. FLN-RIB STATEMENT of Witness BIKORIMANA Jean Claude of 01/02/2020

1229. FLN-RIB STATEMENT of Witness BIZIMANA GASANA of 04/02/2020

1230. FLN-RIB STATEMENT of Witness BIZIMUNGU Alphonse of 05/02/2020

1231. FLN-RIB STATEMENT of Witness BYAMUNGU BAHATI of 03/02/2020

1232. FLN-RIB STATEMENT of Witness DUKUZIMANA Response of 31/01/2020

1233. FLN-RIB STATEMENT of Witness DUSABIMANA Jeannette of 04/02/2020

1234. FLN-RIB STATEMENT of Witness HABUMUGISHA Viateur of 01/02/2020

1235. FLN-RIB STATEMENT of Witness HAKIZIMANA Eric 02/02/2020

1236. FLN-RIB STATEMENT of Witness HAKIZIMANA Innocent of 31/01/2020

1237. FLN-RIB STATEMENT of Witness HAKUZIMANA Faustin of 05/02/2020

1238. FLN-RIB STATEMENT of Witness INGABIRE Aimee Confiance of 04/02/2020

1239. FLN-RIB STATEMENT of Witness INGABIRE Clementine of 04/02/2020

1240. FLN-RIB STATEMENT of Witness INGABIRE Florida of 03/02/2020

1241. FLN-RIB STATEMENT of Witness INGABIRE Marie of 05/02/2020

1242. FLN-RIB STATEMENT of Witness IRUMVA AJENEZA Consolee of 04/02/2020

1243. FLN-RIB STATEMENT of Witness ITANGISHAKA Eric of 31/01/2020

1244. FLN-RIB STATEMENT of Witness IYAMUREMYE Vincent of 03/02/2020

1245.   FLN-RIB STATEMENT of Witness KWIBUKA Vedaste of 04/02/2020

1246.   FLN-RIB STATEMENT of Witness MAHIRWE Monique of 01/02/2020

1247.   FLN-RIB STATEMENT of Witness MANISHIMWE Heritier of 01/02/2020

1248.   FLN-RIB STATEMENT of Witness MANISHIMWE Mediatrice of 31/01/2020

1249.   FLN-RIB STATEMENT of Witness MANIZABAYO Benitha of 04/02/2020

1250.   FLN-RIB STATEMENT of Witness MASENGESHO Jacqueline of 05/02/2020

1251.   FLN-RIB STATEMENT of Witness MUHAWENIMANA Florida of 03/02/2020

1252.   FLN-RIB STATEMENT of Witness MUJAWIMANA Domina of 04/02/2020

1253.   FLN-RIB STATEMENT of Witness MUKAKALISA Domina of 05/02/2020

1254.   FLN-RIB STATEMENT of Witness MUKAMANA Beatrice of 02/02/2020

1255.   FLN-RIB STATEMENT of Witness MUKANDAYISABA Zawadi of 02/02/2020

1256.   FLN-RIB STATEMENT of Witness MUKANTWARI M. Rose of 05/02/2020

1257.   FLN-RIB STATEMENT of Witness MUKARUKUNDO Rachel of 04/02/2020

1258.   FLN-RIB STATEMENT of Witness MUNGUYIKO Emmanuel of 05/02/2020

1259. FLN-RIB STATEMENT of Witness MUSABYIMANA Chantal of 04/02/2020

1260. FLN-RIB STATEMENT of Witness MUSANABERA Marie-Chantal of 02/02/2020

1261. FLN-RIB STATEMENT of Witness MUSHIMIYIMANA Mediatrice of 31/0/2020 [sic]

1262. FLN-RIB STATEMENT of Witness MVUKIYEHE Samuel of 03/02/2020

1263. FLN-RIB STATEMENT of Witness NDAYISHIMIYE Joseph of 02/02/2020

1264. FLN-RIB STATEMENT of Witness NEEMA Micheline of 04/02/2020

1265. FLN-RIB STATEMENT of Witness NIYITURINZE Emerence of 04/02/2020

1266. FLN-RIB STATEMENT of Witness NIYOMUGABO Jean Felix of 01/02/2020

1267. FLN-RIB STATEMENT of Witness NIYOMUGABO Jules of 02/02/2020

1268. FLN-RIB STATEMENT of Witness NIYOMUGABO Michel of 31/01/2020

1269. FLN-RIB STATEMENT of Witness NIYOMUSHUMBA Helene of 31/01/2020

1270. FLN-RIB STATEMENT of Witness NIYONIRINGIRA Valens of 05/02/2020

1271. FLN-RIB STATEMENT of Witness NIYONKURU Justin of 01/02/2020

1272. FLN-RIB STATEMENT of Witness NIYONZIMA Emmanuel of 31/01/2020

1273. FLN-RIB STATEMENT of Witness NSABIMANA Jerome of 02/02/2010

1274. FLN-RIB STATEMENT of Witness NTIRENGANYA Gaspard of 02/02/2020

1275. FLN-RIB STATEMENT of Witness NYANDWI Frodouard of 01/02/2020

1276. FLN-RIB STATEMENT of Witness NYIRAHABIMANA Donatille of 31/01/2020

1277. FLN-RIB STATEMENT of Witness NYIRABIMANA Jeanne of 03/02/2020

1278. FLN-RIB STATEMENT of Witness NYIRANSENGIYUMVA Olive of 31/01/2020

1279. FLN-RIB STATEMENT of Witness NYIRANTEZIRYAYO Beatha of 04/02/2020

1280. FLN-RIB STATEMENT of Witness NYIRASHUMBUSHO Claudine of 05/02/2020

1281. FLN-RIB Statement of Witness NZAYISENGA BARAKA of 03/03/2020

1282. FLN-RIB Statement of Witness NZEYIMANA Maurice of 31/01/2020

1283. FLN-RIB Statement of Witness RUKUNDO Jean d'Amour of 01/02/2020

1284. FLN-RIB Statement of Witness SAFARI Olivier of 05/02/2020

1285. FLN-RIB Statement of Witness TUYISHIME Josephine of 04/02/2020

1286. FLN-RIB Statement of Witness TUYIZERE Marthe of 02/02/2020

1287. FLN-RIB Statement of Witness UMUHOZA Francine of 02/02/2020

1288.   FLN-RIB Statement of Witness UWAMAHORO Elina of 03/02/2020

1289.   FLN-RIB Statement of Witness UWAMBAJIMANA Judith of 05/02/2020

1290.   FLN-RIB Statement of Witness UWIMANA Claudette of 04/02/2020

1291.   FLN-RIB Statement of Witness UWIMANA Gaëtan of 01/02/2020

1292.   FLN-RIB Statement of Witness UWIMANA Immaculate of 02/02/2020

1293.   FLN-RIB Statement of Witness UWIMPUHWE M.Josee of 04/02/2020

1294.   FLN-RIB Statement of Witness UWINGENEYE Florance of 04/02/2020

1295.   FLN-RIB  Statement of Witness NYIRAHABIMANA Jeanne of 03/02/2020

1296.   FLN-RIB Statement of Witness TWAMBAZIMANA Solange of 02/02/2020

1297.   FLN-RIB Statement of Witness UWAMAHORO Peruth of 04/02/2020

1298.   FLN-RIB Statement of Witness UWAMARIYA Clementine of 05/02/2020

1299.   FLN-RIB Statement of Witness UWASE Yvette of 31/01/2020

1300.   FLN-RIB Statement of Witness UWIMANA Confiance of 03/02/2020

1301.   FLN-RIB Statement of Witness UWIMANA Florence of 01/02/2020

1302.   FLN-RIB Statement of Witness UWIMPHWE Faustine of 03/02/2020

1303.   FLN-RIB Statement of Witness UWINEZA Justine of 03/02/2020

1304.   FLN-RIB Statement of Witness UWIZEYIMANA Clementine of 01/02/2020

1305.   FLN-RIB Statement of Witness UZABAKIRIHO Innocent of 31/01/2020

1306.  FLN-NPPA Statement of the Accused Gen Maj NSANZUBUKIRE alias IRAKIZA Fred Felicien of 13/8/2020

1307.  FLN-NPPA Statement of the Accused Maj Gen MUNYANEZA alias RUKUNDO Job KURAMBA of 13/8/2020

1308.  FLN-NPPA Statement of the Accused NZEYIMANA Marc of 13/8/2020

1309.  FLN-NPPA Statement of the Accused IYAMUREMYE IYAMUSIMBA alias ENGAMBE Emmanuel of 13/8/2020

1310.  FLN-NPPA Statement of the Accused NIYIRORA alias BAMA Nicolas of 13/8/2020

1311.  FLN-NPPA Statement of the Accused 2ndLT NDAGIJIMANA Chretien of 14/8/2020

1312.  FLN-NPPA Statement of the Accused SLT KWITONDA Andre of 13/8/2020

1313.  FLN-NPPA Statement of the Accused 2nd LT NSHIMIYIMANA Emmanuel of 14/8/2020

1314.  FLN-NPPA Statement of the Accused 2nd LT HAKIZIMANA alias MBUZANGWERA Jean Bruno of 13/8/2020

1315.  FLN-NPPA Statement of the Accused MATAKAMBA Jean Berchmans of 14/8/2020

1316.  FLN-NPPA Statement of the Accused NIKUZWE Simeon of 14/8/2020

1317.  FLN-NPPA Statement of the Accused BIZIMANA alias BIZIMANA Patience alias Cassien of 14/8/2020

1318.  FLN-NPPA Statement of the Accused NTIBIRAMIRA Innocent of 14/8/2020

1319. FLN-NPPA Statement of the Accused SHABANI Emmanuel of 14/8/2020

1320.   FLN-NPPA Statement of the Accused NTIBANGANYIMANA alias Combe Barume Matata Joseph of 14/8/2020

1321.   FLN-NPPA Statement of the Accused BYUKUSENGE Jean Claude of 14/8/2020

1322.   FLN-NPPA Statement of the Complainant NYIRANDIBWAMI Mariane of 22/10/2020

1323.   FLN-NPPA Statement of the Complainant NYIRAYUMVE Eliane of 14/8/2020

1324.   Decision on provisional detention and release 01539/PPL GASA/2020/FMCU of 18/8/2020

1325.   Decision by the Gasabo Primary court RDP00583/2020/TB/GSBO of 01/09/2020

1326.   Reply to letter addressed to NIDA dated 19/10/2020 requesting photocopies of ID card

1327.   Photocopies of identity card, from 1 to 41

1328.   FLN- RIB Requesting for authorization to start investigation of 31-8-2020

1329.   NPPA -FLN-PV Statement of the Accused KWITONDA Andre of 04-11-2020

1330.   NPPA-FLN- PV Statement of the Accused MUNYANEZA Anastase of 04-11-2020

1331.   NPPA-FLN- PV Statement of the Accused NDAGIJIMANA Jean Chretien of 04-11-2020

1332.   NPPA-FLN- PV Statement of the Accused NIYIRORA Marcel of 04-11-2020-

1333.  NPPA-FLN- PV Statement of the Accused NIZEYIMANA Marc of 04-11-2020

1334.  NPPA-FLN- PV Statement of the Accused NTABANGANYIMANA Joseph of 04-11-2020

1335.  NPPA-FLN- PV Statement of the Accused NTIBIRAMIRA Innocent of 04-11-2020

1336.  NPPA-FLN- PV Statement of the Accused SHABANI Emmanuel of 04-11-2020

1337.  NPPA-FLN- PV Statement of the Accused BIZIMANA Cassien of 04-11-2020

1338. NPPA-FLN- PV Statement of the Accused BYUKUSENGE Jean Claude of 04-11-2020

1339.  NPPA-FLN- PV Statement of the Accused HAKIZIMANA Théogène of 04-11-2020

1340.  NPPA-FLN- PV Statement of the Accused IYAMUREMYE Emmanuel  of 04-11-2020

1341.  NPPA-FLN- PV Statement of the Accused NSHIMIYIMANA Emmanuel of 04-11-2020

1342.  NPPA-RP-PV Statement of MATAKAMBA of 05-11-2020

1343.  NPPA-RP-PV Statement of NIKUZWE Simon of 05-11-2020

1344.  NPPA-FLN- PV Statement of Second-Lieutenant BIZIMANA Cassien of 05-11-2020

1345. NPPA-RP PV Statements of BIZIMANA Cassien, BYUKUSENGE Jean Claude, SHABANI Emmanuel and NTIBIRAMIRA Innocent of 05- 11-2020

1346. **Letter to the High Court suing Chamber for international and trans-border crimes**

1347. **NPPA-RP-FLN- Indictment document.**


**Done at Kigali on 16 November 2020**


**RUBERWA Bonaventure**


**National Prosecutor.**



Lango, Inc.
1460 Broadway | New York, NY 10036
213.444.5373 | Hello@lango.co | www.lango.co

## Certificate of Translation Accuracy

### Proofreading from <u>Kinyarwanda</u> to <u>English</u>

Sarah Dunham, Global Operations Manager for Lango, Inc., hereby certifies that the below-mentioned document(s) are translated by experienced and qualified bilingual translators with comprehensive knowledge of their source and target languages, and that each translated document is prepared as an exact, accurate and true translation of the original document.

- Translated indictment of Paul Rusesabagina and co-accused- Final

*This is to certify the correctness of only the translation. We do not guarantee the original document to be genuine or that the statements in the original document are true. Lango, Inc. assumes no liability for the use of the translated document by the customer or any third party (including end users of the translation).*

 

Jeffrey Daniel Schmidt

Chief Revenue Officer – Lango, Inc

Date: May 5, 2022

Lango and its partners are members of the following associations:

 

 

