# EXHIBIT 2

may proceed," and requesting that "the Court issue an Order bifurcating Plaintiff's claim for declaratory judgment from [its] remaining claims for breach of contract and bad faith," the Court has no understanding of *how* the parties intend this bifurcation to be effective and *what* form it will take.  Is this bifurcation of claims intended to entail separate discovery schedules for the two types of claims, or merely separate trials?  (Or some other peculiar division of claims?)  Does bifurcation render the breach of contract claims dormant pending determination of the declaratory judgment claim, and if so, do those contract claims arise upon the Court ruling on American Family's dispositive motion, upon a verdict with regard to the declaratory judgment claim, upon the actual entry of judgment on the declaratory claim, or at some unspecified point thereafter?  Does the Court's resolution of American Family's dispositive motion on the terms set forth above affect the justification for bifurcation?  The parties' motion gives no clear indication of the answers to these questions.

Although the Court has no general reservations against bifurcating the claims in such a way as will promote the efficient and expeditious resolution of the controversy, the Court cannot say with any conviction that, on the record currently before it, the bifurcation requested in the motion will do so.  Accordingly, the motion is denied without prejudice.

## CONCLUSION

For the foregoing reasons, the parties' Joint Motion to Bifurcate (**# 12**) is **DENIED** without prejudice.  American Family's Motion for Summary Judgment (**# 21**) is **DENIED**.  The parties shall promptly contact the Magistrate Judge to resume proceedings in this matter consistent with his June 13, 2011 Order (**# 34**).



1) Madame **HABYARIMANA**, in her own capacity an don behalf of the estate of the deceased President of Rwanda, Juvénal Habyarimana; 2) Madame Ntaryamira; in her own capacity and on behalf of the estate of the deceased President of Burundi, Cyprien Ntaryamira;  Plaintiffs,

v.

1) General Paul **KAGAME**; 2) James Kabarebe; 3) Faustin Nyamwasa Kayumba; 4) Charles Kayonga; 5) Jackson Nkurunzia, a.k.a. Jack Nziza; 6) Samuel Kanyemera, a.k.a Sam Kaka; 7) Rose Kabuye; 8) Jacob Tumwine; 9) Franck Nziza;  and 10) Eric Hakizimana; Defendants.

No. CIV–10–437–W.

United States District Court,
W.D. Oklahoma.

Oct. 28, 2011.

**Background:**  Widows of deceased Presidents of Rwanda and Burundi brought action against recognized President and current head of state of Republic of Rwanda as well as others under his authority, alleging claims including wrongful death, crimes against humanity, and torture.  Defendant moved to dismiss on numerous grounds.

**Holdings:**  The District Court, Lee R. West, J., held that:

(1) plaintiffs did not substantially comply with federal or state requirements of service by personal delivery;

(2) President did not intentionally evade service of process;

(3) it was appropriate to grant plaintiffs additional time to effectuate proper service upon President; and

(4) President was immune from action.

Motion granted.

**1. Evidence ⟺26**

District Court would take judicial notice that litigant was recognized to be current President and head of state of Republic of Rwanda.

**2. Federal Courts ⟺95**

Prior to the filing of a motion for default judgment, it is generally improper for a district court to sua sponte consider defects in personal jurisdiction on behalf of parties who may choose to waive the defects or subject themselves to the court's jurisdiction.

**3. Federal Courts ⟺71**

Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.

**4. Federal Civil Procedure ⟺411**

Service of process in a manner consistent with the Federal Rules of Civil Procedure provides the mechanism by which a court having venue and jurisdiction over the subject matter of an action asserts jurisdiction over the person of the party served. Fed.Rules Civ.Proc.Rule 4, 28 U.S.C.A.

**5. Federal Civil Procedure ⟺511**
**Federal Courts ⟺96**

The plaintiffs bear the burden of demonstrating that the court has personal jurisdiction over the parties, including valid service of process.

**6. Federal Civil Procedure ⟺427**
**International Law ⟺10.43**

Widows of deceased Presidents of Rwanda and Burundi did not substantially comply with federal or Oklahoma state requirements of service by personal delivery in their action against recognized President and current head of state of Republic of Rwanda as well as others under his authority, alleging claims including wrongful death, crimes against humanity, and torture; plaintiffs did not deliver copy of complaint to President personally, their process servers never came within close proximity of President, and they never spoke with or came within speaking distance of single individual authorized to receive service on President's behalf. Fed. Rules Civ.Proc.Rule 4(e), 28 U.S.C.A.; 12 Okl.St.Ann. § 2004(C)(1)(c)(1).

**7. Process ⟺58**

In Oklahoma, as in other jurisdictions with similar provisions, an agent authorized by appointment to receive service of process must be one who has received specific authorization by his principal; general agency is not sufficient.

**8. Federal Civil Procedure ⟺532.1**

Where there has been no service of a lawsuit, or waiver thereof, the necessity of service is not dispensed with by the mere fact that the defendant may in some way learn of the filing of the suit.

**9. Federal Civil Procedure ⟺427**

Recognized President and current head of state of Republic of Rwanda did not intentionally evade service of process of action brought against him and others under his control by widows of deceased Presidents of Rwanda and Burundi, alleging claims including wrongful death, crimes against humanity and torture, absent any evidence that President altered his scheduled speech at Oklahoma university or his departure plans, or otherwise

actively evaded service efforts.  Fed.Rules Civ.Proc.Rule 4, 28 U.S.C.A.

**10. Federal Civil Procedure ⇐417**

It was appropriate to grant additional time to widows of deceased Presidents of Rwanda and Burundi to effectuate proper service of their action against recognized President and current head of state of Republic of Rwanda as well as others under his authority, alleging claims including wrongful death, crimes against humanity and torture; plaintiffs undertook a good faith attempt to serve President while he was in Oklahoma City, Oklahoma, although they failed to achieve service, plaintiffs' submissions demonstrated difficulties of delivering process in person to a dignitary whose position necessitated security measures, and in conjunction with extraordinary arrest, detention, and prosecution of plaintiffs' counsel, allegedly as a result of his representation of the plaintiffs herein, made justice best served by permitting plaintiffs additional time to effectuate service should they desire to do so.  Fed. Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

**11. Constitutional Law ⇐2551**

Separation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy.

**12. International Law ⇐10.33**

The Foreign Sovereign Immunities Act (FSIA) does not provide immunity to individual foreign officials; rather, such officials may look to traditional immunities such as that provided for heads of state. 28 U.S.C.A. § 1602 et seq.

**13. International Law ⇐10.40**

Pursuant to the common law procedure, a head of state may request a "suggestion of immunity" from the Department of State; however, in the absence of recognition of the immunity by the Department of State, a district court has authority to decide for itself whether all the requisites for such sovereign immunity existed.

**14. International Law ⇐10.40**

Recognized President and current head of state of Republic of Rwanda was immune from action brought against him and others under his control by widows of deceased Presidents of Rwanda and Burundi, alleging claims including wrongful death, crimes against humanity and torture; Republic formally requested that United States government proffer its suggestion that President of Rwanda be held immune from lawsuit, and Department of State stated that it recognized and allowed immunity of Rwandan President as sitting head of state from jurisdiction of District Court.

———

John P. Zelbst, Zelbst Holmes & Butler, Lawton, OK, for Plaintiffs.

Michael S. Cryan, Pierre R. Prosper, Robert C. O'Brien, Roy Z. Silva, Arent Fox–Los Angeles, Los Angeles, CA, William A. Edmondson, Gable & Gotwals, Oklahoma City, OK, for Defendants.

### ORDER

LEE R. WEST, District Judge.

On April 29, 2010, the plaintiffs filed their complaint alleging a number of federal and state-law claims including wrongful death, crimes against humanity, and torture.  Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, they had 120 days from that date in which to serve all defendants with a summons and a copy of the complaint.  When that time ran without any return of service being filed, and without any other action being taken, the Court ordered the plaintiffs to show cause why their complaint should not be dis-

missed. In their response, the plaintiffs conceded that they had failed to serve all defendants except Mr. Kagame. They argued that they had indeed served Mr. Kagame pursuant to Rule 4(e) of the Federal Rules of Civil Procedure and 12 Okla. Stat. § 2004(C). In its order dated September 2, 2010, the Court found that pursuant to Tenth Circuit authority, it was premature to consider whether service over Mr. Kagame had been effected. By order entered January 26, 2011, the Court gave the plaintiffs additional time to respond to its show cause order and the plaintiffs responded by seeking and obtaining a Clerk's Entry of Default against Mr. Kagame, and by filing the motion for default judgment (docket entry no. 9) which is now before the Court.

Upon learning of the Clerk's Entry of Default, Mr. Kagame appeared for the purpose of opposing the motion for default judgment, moving to strike and set aside the Clerk's Entry of Default (docket entry no. 19), moving to dismiss the complaint or stay the matter pending action by the United States Department of State (docket entry no. 18), and moving to correct the caption to reflect Mr. Kagame's status as the recognized president and current head of state of the Republic of Rwanda (docket entry no. 20). In response, the plaintiffs filed their Motion to Strike Defendant's Pleadings and Memorandum in Opposition to Motion to Dismiss. Pursuant to LCvR 7.1(c), "[a] response to a motion may not also include a motion … made by the responding party." Because the response filed by the plaintiffs violates LCvR 7.1(c)'s proscription against incorporating a motion into a response, said motion shall be stricken from the response and regard-

ed as of no legal consequence.[1] Although the plaintiffs' response is styled as a response to only Mr. Kagame's motion to dismiss, it appears also to address his motion to set aside the Clerk's Entry of Default. In any case, time for response has passed and the Court renders its ruling based upon the submissions properly before it.

### Background

As this litigation is yet in its earliest stages and the parties entertain dramatically divergent accounts of important events, the Court is hesitant to attempt even a broad outline of Rwanda's tragic recent history. According to the complaint, plaintiff Madame Habyarimana is the widow of the deceased president of Rwanda, Juvénal Habyarimana, and plaintiff Madame Ntaryamira is the widow of the deceased president of Burundi, Cyprien Ntaryamira. The plaintiffs sue on their own capacity and on behalf of the estates of their late husbands. They contend that in the early 1990s, Rwandan ethnic Tutsi expatriates formed a guerilla military unit intent on overthrowing the Rwandan government. This unit, the Rwandan Patriotic Army (the "RPA") was led by defendant Paul Kagame, the remaining defendants, according to the plaintiffs, were under his authority. The plaintiffs allege that in early 1994, the defendants planned and executed the assassination of Juvénal Habyarimana and Cyprien Ntaryamira.

It is undisputed that Juvénal Habyarimana and Cyprien Ntaryamira died on April 6, 1994, when the Rwandan Presidential jet airplane in which they were passengers exploded on its approach to

---

**1.** Although the plaintiffs' motion to strike was improperly filed and is, therefore, treated as a legal nullity, the Court notes that the motion is premised upon the plaintiffs' argument that the defendant was effectively served with pro-

cess while he was present in Oklahoma. Because the Court finds that the plaintiffs failed to substantially comply with the rules for service, the motion to strike would, in any event, be denied.

Kanombe International Airport in Kigali, Rwanda. The plaintiffs allege that upon the direct command of Mr. Kagame, defendants Franck Nziza and Eric Hakizimana fired SAM–16–type surface-to-air missiles at the plane, destroying it in flight. The plaintiffs further allege that the assassination of the Rwandan and Burundian presidents was intended by the defendants to incite Rwanda's Hutu ethnic majority to undertake "bloody reprisals against the Tutsi community" offering "a veneer of legitimacy for [Mr. Kagame's] renewal of hostilities and his seizing of State power in Rwanda by criminally violent means." *See* Complaint at ¶¶ 4–9.

Mr. Kagame counters that for the past 16 years, the United Nations and numerous governmental bodies have investigated the cause of the plane crash but have failed to reach a conclusion. He argues that the authoritative report on the matter was issued by an "Independent Committee of Experts," which concluded that "the plane was shot down from Kanombe Military Barracks by elements of the Rwandan Armed Forces which controlled that zone (and not by the RPF)." *See* Opening Brief in Support of Motion to Dismiss for Lack of Jurisdiction, Foreign Sovereign Immunity, Lack of Prosecution, and Insufficient Service of Process, or Stay Case; Strike and Set Aside Default; Response in Opposition to Motion for Default Judgment; Amend and Correct Caption; and Request for Judicial Notice Filed by Defendant His Excellency President Paul Kagame (hereafter simply the "Opening Brief") at p. 6, *see also* Exhibit 24 to Opening Brief. According to Mr. Kagame, Hutu extremist soldiers are responsible for the plane crash which was instantly seized upon as an excuse for the Hutu majority to perpetrate a genocide against Tutsi and moderate Hutu Rwandans.

## Discussion

**1. Defendant Paul Kagame is widely recognized to be the current head of state and president of the Republic of Rwanda.**

The Court first addresses Mr. Kagame's request that the Court take judicial notice of the fact that he is the president and current head of state of the Republic of Rwanda. Mr. Kagame offers a copious collection of articles from established news organizations, encyclopedia entries, and documents published and relied upon by the government of the United States, all reflecting the well-established and commonly-known fact that Mr. Kagame is recognized to be the current president of Rwanda. Included among the materials collected by the defendant is what is sworn to be a true and correct copy of the U.S. State Department Bureau of African Affairs' "Background Note: Rwanda," published January 3, 2011, which recognizes Paul Kagame to be the duly elected president of Rwanda. *See* Exhibit 1 to Declaration of Michael S. Cryan, attached as Exhibit E to Opening Brief.

**[1]** Federal Rule of Evidence 201(b) states: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The defendant's status as the current president of Rwanda is not disputed by the plaintiffs. The Court takes notice that the defendant is recognized to be the current president and head of state of the Republic of Rwanda. The defendant President Paul Kagame's motion to correct the caption of this case should, therefore, be granted.

**2. The plaintiffs have failed to establish that they effectively served President Kagame with process.**

[2] As discussed in the Court's January 26, 2011 order, prior to the filing of a motion for default judgment, it is generally improper for a district court to "*sua sponte* consider defects in personal jurisdiction on behalf of parties who may choose to waive the defects or subject themselves to the court's jurisdiction ..." *Williams v. Life Sav. and Loan,* 802 F.2d 1200, 1203 (10th Cir.1986). Thus, the Tenth Circuit Court of Appeals has held that a district court may not dismiss an action *sua sponte* for lack of personal jurisdiction except when a default judgment is to be entered. *Id.* At the time the plaintiffs responded to the Court's show cause order, the defendants had neither appeared nor responded to the plaintiffs' complaint. That failure to appear, however, did not amount to a waiver of jurisdictional issues. *Id., see also V.T.A., Inc. v. Airco, Inc.,* 597 F.2d 220, 225 (10th Cir. 1979). Once the plaintiffs obtained the Clerk's Entry of Default and moved for default judgment, there arose an affirmative duty on the part of the Court, to investigate its jurisdiction over both the parties and the subject matter. *Williams* at 1203. "In reviewing its personal jurisdiction, the court does not assert a personal defense of the parties; rather, the court exercises its responsibility to determine that it has the power to enter the default judgment." *Id.*

Although the plaintiffs' motion for default judgment triggered the Court's independent obligation to examine its jurisdiction over President Kagame regardless whether he appeared and challenged the plaintiff's purported service of the complaint, President Kagame has now come forward to challenge the Court's jurisdiction over his person. He asserts that even accepting as true their allegations, including hearsay allegations, the plaintiffs have wholly failed to establish that they effected service upon him while he was present at Oklahoma Christian University in the spring of 2010.

The factual allegations underlying the plaintiffs' assertion that they effected personal service upon Mr. Kagame are set forth in the affidavit of Professor Carl Peter Erlinder, III, one of the plaintiffs' attorneys herein. *See* Affidavit of Professor Carl Peter Erlinder, attached as Exhibit 1 to the plaintiffs' Supplemental Response to the Court's Show Cause Order. The pertinent facts as recounted by Professor Erlinder are as follows:

1. On May 1, 2010, Professor Erlinder and a licensed process server named Bryan Schubert approached the ticket booth to the auditorium at Oklahoma Christian University about a half hour before Mr. Kagame was scheduled to speak there. Mr. Schubert asked to speak to a person named "Bill," whom Mr. Schubert had met earlier.

2. Bill brought over the Director of Alumni Relations who was accompanied by a lawyer and Professor Brian Bush, a former Oklahoma City prosecutor.

3. Professor Erlinder and Mr. Schubert were taken along with Professor Brian Bush to a room near the entrance to the auditorium. There Professor Bush read a copy of the complaint for about ten minutes before handing it back to Professor Erlinder or Bryan Schubert.

4. They were joined by a person identifying himself as an agent of the Secret Service detail escorting President Kagame, as well as a person identifying himself as an Oklahoma City police officer assigned to "celebrity security."

5. Mr. Schubert explained his intent to serve President Kagame with a federal complaint and summons. Mr. Schubert

and Professor Erlinder provided the Secret Service Agent with their identification and a copy of the summons and complaint. The Agent took the papers and left the room for 15–20 minutes.

6.  When he returned the Secret Service Agent said he had confirmed that the summons and complaint were lawful and legitimate and that he would deliver the documents to President Kagame's entourage who were in the building and preparing to enter the auditorium.

7.  The Secret Service Agent confirmed that President Kagame was on the premises. Professor Erlinder had seen President Kagame enter the auditorium a few minutes earlier. The Secret Service Agent said that for security reasons, Professor Erlinder and Mr. Schubert could approach members of President Kagame's entourage, but not President Kagame himself.

8.  After another 15–20 minutes had passed, the Secret Service Agent returned without the summons and complaint, and informed Professor Erlinder and Mr. Schubert that President Kagame's staff was checking on what to do and that someone from the staff would come and speak with them.

9.  The Secret Service Agent left and returned a few minutes later saying he had been told to inform Professor Erlinder and Mr. Schubert that "the Ambassador had told him that no one in Kagame's party would accept service and that we should send the Summons and complaint to Mr. Kagame's address." The ambassador to whom the Secret Service Agent referred was the Rwandan Ambassador to the United States, Mr. Kimonyo of Washington, D.C. Mr. Kimonyo is personally known to Professor Erlinder.

10.  The Secret Service Agent informed Mr. Schubert and Professor Erlinder that they could wait in the public area and attempt to hand the documents to someone in Mr. Kagame's party as they passed.

Consistent with this suggestion, Professor Erlinder attempted to hand the documents to Mr. Kagame's driver/staff member near the car waiting for Mr. Kagame to exit the auditorium.

11.  Most of the foregoing events were captured on videotape or film by Mr. Schubert.

12.  Professor Erlinder was arrested in Rwanda on May 28, 2010. During an interrogation by the Rwandan prosecutor on June 3, 2010, a copy of the complaint filed herein was produced as evidence that Professor Erlinder was guilty of "spreading rumors to destabilize the Rwandan State."

13.  On July 14, 2010, A copy of the complaint was among the documents supplied by the Rwandan government to the registrar of the International Criminal Tribunal of Rwanda as the basis for criminal charges against Professor Erlinder.

14.  The Rwandan government has announced that it intends to continue its prosecution of Professor Erlinder for, among other alleged offenses, having published articles on the internet and having filed the complaint herein. Professor Erlinder risks life imprisonment in Rwanda should he again travel to that country.

The plaintiffs contend that the foregoing facts establish that they have achieved service upon Mr. Kagame under both Oklahoma and federal law. They argue first that Oklahoma law requires merely "substantial" compliance, and they have substantially complied with Oklahoma's statutory service requirements. They argue second that Mr. Kagame had actual knowledge of their action against him as evidenced by his government's use of the complaint as a basis for the arrest of Professor Erlinder. They also contend that Mr. President Kagame received actual notice of the attempted service while he was physically in the State of Oklahoma. They

argue thirdly that President Kagame actively evaded service, and that because any defects in plaintiffs' service were caused by his evasion, they are harmless and should be excused in light of his actual notice of the lawsuit filed against him. The Court rejects the plaintiffs' arguments for the reasons set forth below.

[3, 4] "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *see also Samantar v. Yousuf*, —— U.S. ——, 130 S.Ct. 2278 at 2292 n. 20, 176 L.Ed.2d 1047 (2010) (holding that the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 et seq., and its service of process provisions do not apply to suits against foreign officials, a point which the plaintiffs readily concede). Service of process in a manner consistent with Rule 4 of the Federal Rules of Civil Procedure provides the mechanism by which a court "having venue and jurisdiction over the subject matter of an action asserts jurisdiction over the person of the party served." *Oklahoma Radio Associates v. F.D.I.C.*, 969 F.2d 940, 943 (10th Cir.1992).

The plaintiffs claim to have served Mr. Kagame by means of personal delivery while he was on the premises of Oklahoma Christian University in Edmond, Oklahoma. The pertinent provisions of Rule 4(e) of the Federal Rules of Civil Procedure require that to constitute effective service, delivery of the summons and complaint to an individual within a judicial district of the United States must be accomplished by "(1) compliance with a method of service prescribed by the law of the state where the district court is located, (2) delivery of the summons to the defendant personally, . . . or (4) delivery of the summons to an authorized agent of the defendant." Similarly, Oklahoma law permits service by personal delivery " . . . by delivering a copy of the summons and of the petition personally or . . . by delivering a copy of the summons and of the petition to an agent authorized by appointment or by law to receive service of process." 12 Okla. Stat. § 2004(C)(1)(c)(1).

**A. The plaintiffs have failed to demonstrate that they substantially complied with the requirements of service by personal delivery.**

[5–7] The plaintiffs bear the burden of demonstrating that the court has personal jurisdiction over the parties, including valid service of process. *Claus v. Mize*, 317 F.3d 725, 727 (7th Cir.2003); *Carimi v. Royal Carribean Cruise Line, Inc.*, 959 F.2d 1344, 1346 (5th Cir.1992); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1353 (2d ed.1990). The Court has carefully reviewed the complaint and the materials submitted in support of its allegations. The plaintiffs have offered nothing to establish that they ever delivered a copy of the complaint to President Kagame personally. In fact, nothing in the plaintiffs' evidence establishes that President Kagame ever saw Professor Erlinder or Mr. Schubert, or was apprised of their presence. The plaintiffs' own evidence establishes that their process servers never came within close proximity of President Kagame. Similarly, the plaintiffs have failed to establish that they ever spoke with or came within speaking distance of a single individual authorized to receive service on President Kagame's behalf. In Oklahoma, as in other jurisdictions with similar provisions, an agent authorized by appointment to receive service of process must be one who has received specific authorization by his principal. General agency is not sufficient. *Graff v. Kelly*, 814 P.2d 489, 494 (Okla.1991); *see also Gazis v. John S. Latsis (USA) Inc.*,

729 F.Supp. 979, 991 (S.D.N.Y.1990); *Michelson v. Merrill Lynch Pierce, Fenner & Smith, Inc.,* 619 F.Supp. 727, 742 (S.D.N.Y.1985); *Whisman v. Robbins,* 712 F.Supp. 632, 636 (S.D.Ohio 1988) ("[i]n the absence of actual appointment, service of process is ineffective").

Clearly the plaintiffs have not shown that they met the requirements of Federal Rule 4(e)(2) or 4(e)(4) because they failed to establish that they delivered a copy of the complaint to President Kagame or to his "authorized agent." The plaintiffs argue, that they nonetheless have achieved service because they have met the requirements of Rule (4)(e)(1) which requires "compliance with a method of service prescribed by the law of the state where the district court is located." They contend that they are not required to show that they actually delivered the summons and complaint to Mr. Kagame or his agent because Oklahoma law requires only "substantial compliance" with its service provisions.

The Oklahoma Supreme Court definitively adopted the rule of substantial compliance in *Graff v. Kelly,* 814 P.2d at 495 ("We conclude and so hold that the Oklahoma Pleading Code requires substantial compliance in order for the trial court to have jurisdiction over the person of the defendant"). In *Graff,* the plaintiff attempted to serve the defendant by personal delivery. Rather than delivering the summons directly to the defendant, the process server left it with a receptionist at the defendant's business address. The defendant moved to set aside default judgment arguing that service on his receptionist was ineffective. The plaintiff countered that the receptionist was the defendant's agent and/or that the defendant had received actual notice of the lawsuit. The court applied a three-part test to determine whether service was effective. It looked first, at whether there is a statute

authorizing the method of service employed. It looked second, at whether the requirements of the statute had been observed. Finally, it looked at whether the fundamental requirements of due process had been met. *See Graff* at 493. The court answered the first question affirmatively, noting that § 2004(C)(1)(c)(1) provides for service of process on an agent appointed by the individual or by law. The court concluded, however, that the statutory requirements were not met because the receptionist was not an agent authorized by the defendant or by law to accept service. *Id.* at 494–95. "This result [made] addressing the third . . . question concerning whether fundamental due process requirements have been met, unnecessary." *Id.* at 496. Thus, pursuant to the substantial compliance analysis, despite the defendant's failure to deny that he had received actual notice, service was held invalid based upon the statutory requirements of personal delivery where the process server served "an employee, not the defendant, at that defendant's place of employment." *Id.* at 490.

The plaintiffs ask the Court to disregard *Graff's* holding that service by personal delivery is not effective where the summons and complaint are provided to a person not statutorily authorized to receive them. They cite to *Izen v. Catalina,* 256 F.3d 324 (5th Cir.2001), wherein the Fifth Circuit held that under Oklahoma law, notice need merely apprize a defendant of the claims against him. "No rigid formula exists as to the kind of notice that must be sent; the notice required will necessarily vary with the circumstances and conditions." *Id.* at 327. *Izen* purported to rely upon the Oklahoma Supreme Court's holding in *Shamblin v. Beasley,* 967 P.2d 1200 (Okla.1998), and the Oklahoma Court of Civil Appeals decision in *VanNort v. Davis,* 800 P.2d 1082 (Okla.Civ.App.1990). This Court's reading of *VanNort* under-

mines the plaintiffs' suggestion that statutory requirements may be ignored. In that case, the Oklahoma Court of Civil Appeals made plain that "[a] failure to follow procedures prescribed by statute for service of process will make the process on which the suit is predicated fatally defective." *Id.* at 1085. *Shamblin* does contain sweeping statements that, at first blush, appear to buttress the plaintiffs' argument. On closer analysis, however, it becomes clear that *Shamblin* does not minimize the importance of compliance with Oklahoma's Pleading Code.

In *Shamblin,* the Oklahoma Supreme Court evaluated the validity of a county's notice of a tax resale. The Court noted that the applicable statute for service by mail required that the notice be sent by certified mail, but did not require that delivery be restricted to the addressee or that a receipt be returned. The Court did not disagree with the trial court's conclusion that the county had met the statutory requirements, rather it considered whether despite having complied with the statutory requirements, the county nonetheless failed to obtain service when notice mailed to a wife was delivered to her husband instead. The Court stated:

> Service is not subject to invalidation for *any departure* from the mode prescribed by statute. When it is alleged that there was want of strict compliance with statutory requirements for service, the court must in every case determine whether the found departure offends the standards of due process and thus may be deemed to have deprived a party of its fundamental right to notice.

*Shamblin* at 1209.

This language was echoed the following year in *Vance v. Federal Nat. Mortg. Ass'n,* 988 P.2d 1275, 1279–80 (Okla.1999). In *Vance,* the Court considered whether service which satisfied the statutory requirements of personal delivery, was

nonetheless constitutionally invalid because the defendant's claimed mental disability prevented her from recognizing that she had been sued. The Court looked to *Shamblin* for the applicable test and found it required that "under *all the circumstances present in a case* there be a *reasonable probability* the service of process employed apprises its recipient of the plaintiff's pressed demands and the result attendant to default." *Vance* at 1280 (emphasis in the original).

Superficially, *Shamblin* and *Vance* appear to be in direct contradiction to *Graff's* teaching that actual knowledge of a suit is no substitute for substantial compliance with Oklahoma's notice provisions. The Tenth Circuit, in *Hukill v. Oklahoma Native American Domestic Violence Coalition,* 542 F.3d 794 (10th Cir.2008), addressed the apparent inconsistency.

In *Hukill,* the plaintiff brought suit against her former employers. Before attempting service of process, she contacted the defendants' lawyer to inquire whether he would accept service on behalf of his clients. The lawyer responded that his clients would not authorize him to do so. Pursuant to the Federal Rules 4(e)(1) and 4(h)(1)(A), the plaintiff elected to serve the defendants in accordance with Oklahoma's notice provision which permits notice may be accomplished by "mailing a copy of the summons and petition by certified mail, return receipt requested and delivery restricted to the addressee." 12 Okla. Stat. § 2004(C)(2)(b). The plaintiff mailed summonses to her employers' address. One of the summonses restricted delivery to the defendants' registered agent, one did not. The individual who signed both return receipts was not the registered agent. The defendants failed to respond to the complaint and default judgment was entered. The defendants moved to set aside the default judgment on the ground that they

were never properly served. The trial court denied the motion finding, in reliance on *Shamblin,* that the plaintiff had substantially complied with Oklahoma's Pleading Code, and that "[m]ore than a reasonable probability exists that defendants had actual notice of the action." *See Hukill* at 796. The trial court emphasized that the defendants did not assert that they did not receive the summons and complaint. It also focused on evidence that the defendants were aware of the pendency of the lawsuit as evidenced by their refusal to allow their counsel to accept service.

The Tenth Circuit reversed the trial court. It found that *Shamblin* and *Vance,* with their broad language regarding actual notice, are distinguishable from *Graff* and its progeny. The court reasoned that while *Shamblin* and *Vance* painted in very broad strokes an approach to be taken when a plaintiff fails to strictly comply with a service statute, actually at issue in those cases was "whether, despite technical compliance with the applicable statutory requirements, the service was nonetheless insufficient to satisfy fundamental due process requirements." *Id.* at 800. The circuit court found that the *Shamblin* line of cases is not applicable where the defendant is not raising a constitutional claim that service is invalid despite the plaintiff's technical compliance with the applicable statute. Where the defendant maintains, as in *Hukill,* that service is invalid *because* it did not satisfy the statutory requirements, it is not *Shamblin,* but *Graff* that applies. The appeals court found support for its conclusion in the fact that in its more recent treatment of the issue, the Oklahoma Supreme Court applied *Graff* to find that there was no effective service by mail when service was refused by a person authorized neither to accept nor refuse service. *See Ferguson Enterprises, Inc. v. H. Webb Enterprises, Inc.,* 13 P.3d 480 (Okla.2000).

While President Kagame separately attacks the constitutionality of service upon him, he in no way cedes that the plaintiffs have achieved technical compliance with Oklahoma's pleading provisions. He strenuously argues that the plaintiffs' method of service fails to conform to any statutory provision authorizing service. Thus, it is *Graff* that controls in this instance. Applying *Graff's* three-part test to determine whether service is effective, the Court first looks to whether there is a statute authorizing the method of service employed. While clearly, there is no statute authorizing service by delivery to persons who merely may come into contact with the defendant or his staff, Oklahoma does have a statute permitting service by delivery to persons "authorized by appointment or by law to receive service of process" on behalf of the defendant. *See* 12 Okla. Stat. § 2004(C)(1)(c)(1). It is that provision with which the plaintiffs claim to substantially complied. The Court must next determine whether the requirements of the statute were, in fact, observed. They were not. The plaintiffs allege that they delivered the documents to Professor Bryan Bush, who merely read and returned them, and to a Secret Service Agent who purportedly delivered the documents to members of President Kagame's staff. They also allege that they "attempted to hand the documents to defendant's driver/staff member near the car waiting for him to exit the auditorium." The plaintiffs do not contend that Professor Bush, the nameless Secret Service Agent, or the "driver/staff member" were authorized to receive service on behalf of President Kagame. They do not allege that the staff members to whom the Secret Service Agent claimed to deliver the summons and complaint were such authorized agents. Because the plaintiffs failed to substantially conform to Oklahoma's statutory requirements for service of process, the

Court need not examine whether the fundamental requirements of due process were met.

**B. President Kagame's actual knowledge of the plaintiffs' complaint is no substitute for service of process, and is not sufficient to establish jurisdiction over his person.**

[8] Pursuant to *Graff,* the plaintiffs have failed to effect service upon President Kagame. President Kagame's actual knowledge of the plaintiffs' lawsuit does not excuse them from substantial compliance with Oklahoma's requirements. *See Graff,* 814 P.2d at 492; *Hukill* at 794 (10th Cir.2008). In *Graff,* the Court reasoned that actual notice cannot by itself be sufficient to establish in personam jurisdiction, otherwise there would be no provision for challenging the mode of delivery or the lack of delivery of the summons and petition under 12 Okla. Stat. § 2012(B)(5). *Id.* at 492. "Coming into court with such a challenge would have to prove the party had actual notice of the lawsuit and the motion would always be denied." *Id.* The Court concluded that the rule must be that: "Where there has been no service of a suit, or waiver thereof, the necessity of service is not dispensed with by the mere fact that the defendant may in some way learn of the filing of the suit." *Id.* quoting *Piggly–Wiggly Georgia Co. v. May Investing Corp.,* 189 Ga. 477, 6 S.E.2d 579, 580 (1939).

President Kagame's actual knowledge of the plaintiffs' lawsuit does not dispense with the requirements of service under Oklahoma law. Nor does it substitute for proper service of process under Rule 4 of the Federal Rules of Civil Procedure. *See Mid–Continent Wood Products, Inc. v. Harris,* 936 F.2d 297, 301 (7th Cir.1991); *Way v. Mueller Brass Co.,* 840 F.2d 303, 306 (5th Cir.1988); *Sieg v. Karnes,* 693 F.2d 803, 807 (8th Cir.1982)); *see also LSJ*

*Inv. Co. v. O.L.D., Inc.,* 167 F.3d 320, 322 (6th Cir.1999); *Friedman v. Estate of Presser,* 929 F.2d 1151, 1155–56 (6th Cir. 1991); *Precision Etchings & Findings, Inc. v. LGP Gem, Ltd.,* 953 F.2d 21 (1st Cir.1992); *Echevarria–Gonzalez v. Gonzalez–Chapel,* 849 F.2d 24, 28 (1st Cir.1988).

**C. The plaintiffs have not established that President Kagame intentionally evaded service.**

In a final attempt to overcome their failure to comply with the general requirements for valid service of process, the plaintiffs allege that President Kagame intentionally evaded service. They cite *Western Farmers Elec. Co-op, Anadarko, Oklahoma v. Stephenson,* 873 P.2d 311 (OK.Civ.App.1994) for the proposition that a person may not avoid service of process for mere lack of actual "in hand" delivery. In *Stephenson,* a process server called the appellant at home and informed her of his intention to leave legal documents with her. She refused to speak to the process server and hung up the telephone. The appellant testified that she did not discover any documents until several days later when she threw the documents away without reading them. The process server later called the appellant from a mobile telephone while parked in her driveway. When the appellant identified herself, the process server informed her that he had documents for her. Once again, she hung up, and the process server knocked on her door. No one answered the door but someone looked out the window. The process server then left the notice at the appellant's front door. At trial, the appellant admitted she had been avoiding service of the notice, but moved to quash on the ground that she had not been properly served. The trial Court denied her motion to quash and the appeals court affirmed. It found that the appellant had attempted to avoid previous attempts at service and

that she knew the process server had come to serve her with notice. In light of those circumstances, the appeals court affirmed the trial court's refusal to quash.

The plaintiffs also cite *Doe v. Qi,* 349 F.Supp.2d 1258 (N.D.Cal.2004), for the proposition that a foreign dignitary may not defeat personal jurisdiction by deliberately avoiding service of process while having actual knowledge of plaintiff's suit. The defendant in *Doe* was the mayor of a Chinese City. A process server approached the defendant as he entered a screening area at the San Francisco airport. The process server advanced to approximately arms-length of the defendant and held out a copy of the summons and complaint while advising the defendant that the papers were legal documents from the U.S. District Court of California. When the defendant turned away without accepting the papers, the server told the him that whether or not he accepted the papers in hand, he had been formally served. The process server then offered the documents to members of the defendant's entourage, but they were not accepted. The Court found that under those circumstances, service had been effected.

The plaintiffs contend that their attempt to serve President Kagame is analogous to the scenarios set forth in *Stephenson* and *Doe.* However, unlike the situation in *Stephenson,* this was the plaintiffs' first attempt at service and they never spoke to or came within close physical proximity of President Kagame. They have presented no evidence that anyone on President Kagame's staff informed him of the attempted service. And certainly, President Kagame does not admit that he avoided service. Unlike the scenario in *Doe,* the plaintiffs have failed to show that their process servers ever came in close proximity to President Kagame. Nor have the plaintiffs shown that they ever spoke to him. Professor Erlin-

der states that at one point he saw President Kagame, but there is no indication that President Kagame ever saw or heard Professor Erlinder or Mr. Schubert. Neither Professor Erlinder nor Mr. Schubert ever informed President Kagame that they were attempting service. This situation is simply not analogous to the one in *Doe.* The plaintiffs have pointed the Court to no authority finding effective service of process under circumstances similar to those at hand.

The plaintiffs' burden in proving that President Kagame intentionally evaded service of process is not a light one. *See Light v. Wolf,* 816 F.2d 746, 751 (D.C.Cir. 1987) (holding that "the party on whose behalf service is made has the burden of establishing its validity when challenged"). While courts have often held that intentional evasion by a defendant will be sufficient to perfect the service, *see Nikwei v. Ross Sch. of Aviation, Inc.,* 822 F.2d 939, 945–46 (10th Cir.1987), the plaintiff must establish "clear and convincing evidence of evasion on the part of the defendant" in order to avoid the typical service requirements. *See Mid–Continent Wood Products,* 936 F.2d at 303. Moreover, proof of evasion of service cannot be inferred alone from "repeated, though faulty attempts at service." *Id.*

[9]  Here, the record does not sustain, by clear and convincing evidence, Plaintiffs' claim that Mr. Kagame intentionally evaded service of process. Plaintiffs point to a single effort to serve Mr. Kagame by in-hand delivery while President Kagame was present at Oklahoma Christian University. This attempt consisted of Professor Erlinder and Mr. Schubert providing the complaint first to Professor Bryan Bush of Oklahoma Christian University, and then to a purported secret service agent allegedly assigned to provide security to President Kagame. The plaintiffs

imply that one of these individuals, or some member of President Kagame's staff interrupted him just minutes before he was to make a speech to show him a copy of the summons and complaint, and to alert him the need to evade service. They have offered no evidence, however, that President Kagame altered his scheduled speech or his departure plans, or otherwise actively evaded their service efforts. The plaintiffs have failed to demonstrate by clear and convincing evidence any intentional evasion which would permit the Court to excuse compliance with the rules of service.

Based on the foregoing, the Court concludes that the plaintiffs failed to effectuate service upon President Kagame. The Court lacks personal jurisdiction over him and, pursuant to Rule 55(c), the Clerk's Entry of Default shall be set aside.

### 3. The Court has discretion to permit the plaintiffs additional time to effectuate service.

[10]    President Kagame states that because the plaintiffs failed to achieve service within the 120 days prescribed by Rule 4(m) of the Federal Rules of Civil Procedure, and because the plaintiffs failed to file proof of service as required by Rule 4(*l*), their complaint must be dismissed. While Rule 4(m) provides that a complaint may be dismissed for want of timely service, it makes clear that "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." The Court finds that the plaintiffs undertook a good faith attempt to serve President Kagame while he was in Oklahoma City. Although they failed to achieve service, the plaintiffs' submissions demonstrate the difficulties of delivering process in person to a dignitary whose position necessitates security measures. This in conjunction with the extraordinary arrest, detention, and prosecution of the plaintiffs' counsel, allegedly as a

result of his representation of the plaintiffs herein, convinces the Court that justice is best served by permitting the plaintiffs additional time to effectuate service should they desire to do so. The Court is mindful, however, that such opportunity will be futile if President Kagame is correct in his assertion that as head of state of Rwanda, he is absolutely immune from suit.

[11]    Although authority addressing the issue is sparse, the United States Supreme Court's recognition of heads of foreign states as immune to suit in the U.S. courts dates back nearly 200 years. In 1812, Chief Justice John Marshall authored the Court's opinion in *The Schooner Exchange v. McFaddon*, 7 Cranch 116, 11 U.S. 116, 3 L.Ed. 287 (1812). In *McFaddon*, the Court reasoned that although "the jurisdiction of the United States over persons and property within its territory 'is susceptible to no limitation not imposed by itself,' . . . as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign." *Republic of Austria v. Altmann*, 541 U.S. 677, 124 S.Ct. 2240, 2247, 159 L.Ed.2d 1 (2004) (quoting *McFaddon*, 11 U.S. at 136). In the wake of *McFaddon*, courts were "expected to 'defer[ ] to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities.' " *Ye v. Zemin*, 383 F.3d 620, 624 (7th Cir.2004) (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). The courts' deference is motivated by respect for the separation of powers as well as the caution incumbent upon the judiciary when the conduct of foreign affairs is involved. *Zemin* at 626. "Separation-of-

powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy." *Spacil v. Crowe*, 489 F.2d 614, 619 (Canal Zone 1974).

For most of the 165 years following *McFaddon*, the Executive Branch determined whether a foreign nation was entitled to immunity. *Zemin*, 383 F.3d. at 624. Upon determining that a nation was entitled to immunity, the State Department provided a court with a "suggestion of immunity" and the court thereupon dismissed the claims against it. *Id.* In 1952, in the face of increasingly important and complex international commerce, The State Department adopted the "restrictive" theory of sovereign immunity. This "restrictive" approach confined immunity to suits involving the foreign state's public acts while permitting claims based on purely commercial acts to proceed.

**[12, 13]** In 1976, Congress largely codified the restrictive theory of immunity when it enacted the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* The FSIA grants foreign states presumptive immunity while carving out exceptions for, among other things, purely commercial acts. The FSIA does not, however, address the immunity of foreign heads of state. In a recent case, the Supreme Court made clear that the FSIA does not provide immunity to individual foreign officials. *See Samantar v. Yousuf*, ––– U.S. –––, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010). Rather, such officials may look to traditional immunities such as that provided for heads of state. *Id.* at 2290, fn. 15. Those immunities remain under the governance of the common law that also pertained to foreign states prior to the enactment of the FSIA. *Id.* at 2285. Pursuant to the common law procedure, a head of state may request a "suggestion of immunity" from the State De-

partment. *See Id.; see also Lafontant v. Aristide*, 844 F.Supp. 128 (E.D.N.Y.1994). "But 'in the absence of recognition of the immunity by the Department of State,' a district court '[has] authority to decide for itself whether all the requisites for such immunity existed.' " *Samantar* at 2284 (quoting *Ex parte Republic of Peru*, 318 U.S. 578, 63 S.Ct. 793, 799, 87 L.Ed. 1014 (1943)); *see also Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667 (1938) (approving judicial inquiry into sovereign immunity when the Department of State declines to act); *Heaney v. Government of Spain*, 445 F.2d 501, 503 at n. 2 (2nd Cir.1971) (evaluating sovereign immunity when the State Department had not responded to a request for its views).

Here, the government of the Republic of Rwanda transmitted to the U.S. Government a request for the State Department to submit to this Court a statement of interest in the claims underlying this lawsuit, or a suggestion of immunity regarding President Kagame. The Court has not yet received any submission from the State Department. Because the applicable authorities make clear the primacy of the Executive Branch's interest in suits against heads of state, until the State Department has had sufficient time to register its interest, if any, in this matter, the Court should refrain from inquiring into the question of head of state immunity, as well as the questions of diplomatic immunity and justiciability. Thus, for the time being, there can be no determination that President Kagame is immune from suit or service of process. The Court finds, therefore, that the plaintiffs should be permitted additional time in which to attempt service upon President Kagame.

### Conclusion

On the basis of the foregoing, the Court:

1.   DENIES the plaintiffs' motion for default judgment;

2.   GRANTS President Kagame's motion to set aside the Clerk's Entry of Default;

3.   VACATES the Clerk's Entry of Default entered herein;

4.   GRANTS President Kagame's motion to amend and correct the caption of this case;

5.   ORDERS the Clerk of Court to amend the caption so that the defendant's name is reflected as Paul Kagame, President of the Republic of Rwanda;

6.   DENIES President Kagame's motion to dismiss;

7.   FINDS good cause why the plaintiffs' case against President Kagame should not be dismissed for lack of prosecution and failure of service;

8.   DISMISSES all remaining defendants as the plaintiffs have not attempted service upon them and admit that they have no intention of so doing;

9.   GRANTS the plaintiffs an additional 120 days in which to serve President Kagame; and

10.   ADVISES the plaintiffs that if at the conclusion of those 120 days they have filed no return of service, in the absence of further order of the Court, their complaint shall be dismissed.

## ORDER

On June 23, 2011, the Court entered its order ruling, among other things, that the plaintiffs had failed to establish that they had effected service upon defendant Paul Kagame, President of the Republic of Rwanda.   The Court carefully examined the plaintiffs' factual assertions regarding

their attempt to serve President Kagame in person while he was on the premises of Oklahoma Christian University.   Even accepting, for the sake of argument, the plaintiffs' various hearsay assertions that they delivered a copy of the summons and complaint to a "Secret Service Agent" who then delivered the documents to members of President Kagame's staff, the Court concluded that the plaintiffs failed to meet the requirements of either Federal Rule 4(e)(2) or 4(e)(4) because they failed to establish that they delivered a copy of the complaint to President Kagame or to his "authorized agent." [1]   The Court spent considerable time dissecting the plaintiffs' argument that their service attempt should be considered effective under Rule 4(e)(1) which requires "compliance with a method of service prescribed by the law of the state where the district court is located."   The Court's particular focus on Oklahoma's service requirements was prompted by the plaintiffs' contention that Oklahoma's requirements were less rigorous than those of the Federal Rules because the state mandates only "substantial compliance" with its service provisions. After examining the controlling Oklahoma authorities and comparing them to the plaintiffs' allegations regarding their service attempt, the Court concluded that, even under Oklahoma's arguably more lenient standards, the plaintiffs had failed to establish service of President Kagame.

Despite the plaintiffs' failure to effect service under the provisions of either the Federal Rules or the Oklahoma Pleading Code, the Court found good cause for the failure and, pursuant to Rule 4(m), extended an additional 120 days in which to serve President Kagame.   At the same time, the Court noted that such service efforts

---

**1.**   In their motion for reconsideration (docket entry no. 48), the plaintiffs assert that the Court failed to consider whether service complied with Rule 4(2)(A) of the Federal Rules of

Civil Procedure.   A cursory examination of the Court's June 23, 2011 order makes clear that the plaintiffs' assertion is without merit.

would prove futile if, as President Kagame asserts, he is immune from suit.

President Kagame argues that as a head of state recognized by the United States government, he is absolutely immune from suit. In addition, he argues that he is entitled to diplomatic immunity, and that the plaintiffs' case, because it implicates matters of national security and international diplomacy, ultimately raises issues reserved for resolution by the Executive Branch. President Kagame informed the Court that the government of the Republic of Rwanda had transmitted to the United States Government a request for the State Department to submit a statement of interest in the claims underlying this lawsuit, or a suggestion of immunity pertaining President Kagame. The Court concluded that because of the long-recognized primacy of the Executive Branch in matters involving suits against foreign heads of state, it should refrain from inquiring into the question of head of state immunity, as well as questions of diplomatic immunity and justiciability, until the Executive Branch had a reasonable opportunity to register its interest in the case. Thus, in addition to granting additional time for the plaintiffs to serve President Kagame, the 120–day extension also provided additional time for the Executive Branch to make its position known.

On August 29, 2011, the United States submitted its Suggestion of Immunity (docket entry no. 49). It informed the Court that the Executive Branch of the United States Government has determined that President Kagame is immune from this suit. The plaintiffs were given time to respond to the United States' submission and on September 12, 2011, they filed their objection (docket entry no. 51). The Court has received no further submissions from the United States or from President Kagame.

The United States maintains that incident to the exclusive responsibility for foreign relations granted it by the Constitution, the Executive Branch has "sole authority to determine the immunity from suit of sitting heads of state." [2] Suggestion of Immunity at ¶ 1. The United States asserts that the Executive Branch, upon "consideration of the relevant principles of customary international law, and in the implementation of its foreign policy and in the conduct of its international relations," has determined to recognize President Kagame's immunity from this suit while he is in office. *Id.* As the United States points out, such determinations by the Executive Branch have been found to be controlling and not subject to judicial review. *See Ex Parte Republic of Peru*, 318 U.S. 578, 589, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); *Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*, 303 U.S. 68, 74, 58 S.Ct. 432, 82 L.Ed. 667 (1938); *see also Spacil v. Crowe*, 489 F.2d 614, 617 (5th Cir.1974) ("The precedents are overwhelming. For more than 160 years American courts have consistently applied the doctrine of

---

**2.** The Court takes exception to the United States' position that it has "sole" authority to determine the immunity of a sitting head of state. It is clear that "in the 'absence of recognition of the immunity by the Department of State," a district court has "authority to decide for itself whether all the requisites for such immunity existed.' " *Samantar v. Yousuf*, ––– U.S. ––––, 130 S.Ct. 2278, 2284, 176 L.Ed.2d 1047 (2010) (*quoting Ex parte Republic of Peru*, 318 U.S. 578, 587, 63 S.Ct.

793, 87 L.Ed. 1014 (1943); *see also Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*, 303 U.S. 68, 74–75, 58 S.Ct. 432, 82 L.Ed. 667 (1938) (approving judicial inquiry into sovereign immunity when the Department of State declines to act); *Heaney v. Government of Spain*, 445 F.2d 501, 503 at n. 2 (2nd Cir.1971) (evaluating sovereign immunity when the State Department had not responded to a request for its views).

sovereign immunity when requested to do so by the executive branch. Moreover, they have done so with no further review of the executive's determination."); *Isbrandtsen Tankers, Inc. v. President of India,* 446 F.2d 1198, 1201 (2d Cir.1971) ("The State Department is to make [an immunity determination] in light of the potential consequences to our own international position. Hence once the State Department has ruled in a matter of this nature, the judiciary will not interfere.").

In its June 23, 2011 order, the Court discussed the origins and general parameters of the head of state immunity doctrine. The Court noted that the United States Supreme Court's recognition of heads of foreign states as immune to suit in the U.S. courts dates back to Chief Justice John Marshall's opinion in *The Schooner Exchange v. McFaddon,* 7 Cranch 116, 11 U.S. 116, 3 L.Ed. 287 (1812). In *McFaddon,* the Court reasoned that although "the jurisdiction of the United States over persons and property within its territory 'is susceptible to no limitation not imposed by itself,' . . . as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign." *Republic of Austria v. Altmann,* 541 U.S. 677, 688, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (*quoting McFaddon,* 11 U.S. at 136).

In the wake of *McFaddon,* courts were "expected to 'defer[ ] to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities.' " *Ye v. Zemin,* 383 F.3d 620, 624 (7th Cir.2004) (*quoting Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Such deference to the Executive Branch is

motivated by the caution due when the conduct of foreign affairs is involved. *See Zemin* at 626, *citing Republic of Mexico v. Hoffman,* 324 U.S. 30, 35, 65 S.Ct. 530, 89 L.Ed. 729 (1945) ("[I]t is a guiding principle in determining whether a court should [recognize a suggestion of immunity] in such cases, that the courts should not so act as to embarrass the executive arm in its conduct of foreign affairs. 'In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.' ") (*quoting United States v. Lee,* 106 U.S. 196, 209, 1 S.Ct. 240, 27 L.Ed. 171 (1882)); *Spacil* at 619. It is motivated by respect for the separation of powers as well as the caution incumbent upon the judiciary when the conduct of foreign affairs is involved. *Zemin* at 626. "Separation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy." *Spacil* at 619.

*McFaddon* established a pattern of extreme deference to the Executive Branch, and for most of the ensuing 165 years the Executive Branch determined whether a foreign nation was entitled to immunity. *Zemin* at 624. Upon making the determination that a nation was entitled to immunity, the State Department provided a court with a "suggestion of immunity" and the court thereupon surrendered its jurisdiction and dismissed the claims against said foreign nation. *Id.; see also Samantar v. Yousuf,* ___ U.S. ___, 130 S.Ct. 2278, 2280, 176 L.Ed.2d 1047 (2010). In 1952, in the face of increasingly important and complex international commerce, the State Department adopted the "restrictive" theory of sovereign immunity. This "restrictive" approach confined immunity to suits involving the foreign state's public acts, while permitting claims based on

purely commercial acts to proceed. "Inconsistent application of sovereign immunity followed, leading to the FSIA, whose primary purposes are (1) to endorse and codify the restrictive theory, and (2) to transfer primary responsibility for deciding "claims of foreign states to immunity" from the State Department to the courts." *Samantar* at 2281 *citing* the Foreign Sovereign Immunity Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*

The FSIA now governs the determination whether a foreign state is entitled to sovereign immunity. It grants foreign states presumptive immunity while carving out exceptions for, among other things, purely commercial acts. As *Samantar* recently made plain, the FSIA does not address the immunity of foreign heads of state. Rather, such officials may look to traditional immunities. *Id.* at 2290, fn. 15. Those immunities remain under the governance of the common law that had also pertained to foreign states prior to the enactment of the FSIA. *Id.* at 2285.

[14] In accordance with the common law procedure set forth above, the Republic of Rwanda formally requested that Government of the United States proffer its suggestion President Kagame be held immune from this lawsuit. *See* Suggestion of Immunity at ¶ 2; *see also Lafontant v. Aristide,* 844 F.Supp. 128 (E.D.N.Y.1994) (recognizing that a head of state may request a "suggestion of immunity" from the State Department). After receiving Rwanda's request, the Legal Adviser of the U.S. Department of State informed the Department of Justice that the "Department of State recognizes and allows the immunity of President Kagame as a sitting head of state from the jurisdiction of the United States District Court in this suit." *See* Suggestion of Immunity at ¶ 2, *citing* the letter from Harold Hongju Koh to Tony West, a copy of which is attached to the Suggestion of Immunity as Exhibit A.

Despite the United States' formal determination that President Kagame is immune from the plaintiffs' suit, and the considerable body of law establishing that deference be given that determination, the plaintiffs contend that this suit must not be dismissed. The plaintiffs' position appears to be based upon a misreading of *Samantar* and a misplaced reliance upon *Clinton v. Jones,* 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), a case which is does not in any way address the issue of a foreign head of state's immunity from suit in the federal district courts.

The plaintiffs concede that in *Samantar,* the Supreme Court held that the FSIA applied only to foreign states and that suits against foreign officials continued under the governance of the common law. They proceed to confuse *Samantar's* discussion of the restrictive theory of foreign state immunity, which confined immunity to suits involving the *foreign sovereign's* public acts as opposed to its purely commercial acts, with the common law immunities afforded foreign heads of state who fall outside the FSIA's provisions. In *Samantar,* the Court makes clear that the law that has developed with regard to foreign head of state immunity is unaffected by the FSIA. *Samantar* in no way undermines the common law procedure or tradition of deference to Executive Branch immunity determinations that traces to McFaddon. Samantar's discussion of the immunities afforded foreign officials who act in their official capacities is not pertinent here as President Kagame is not relying on immunity arising from the performance of official acts. Rather, he is relying on the immunity traditionally granted a sitting head of state recognized by the U.S. State Department. That immunity extends to unofficial acts undertaken prior to the head of state's assumption of office. As discussed above, it is grounded in a respect for the separation of pow-

ers and a determination that the courts should abstain from intrusion into matters that could trammel the Executive Branch's conduct of foreign policy.

It is true that separation of powers concerns also informed the Supreme Court's decision in *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997). There, however, the Court's separation of powers discussion illuminates the fundamental difference between the immunity claimed by President Clinton and the immunity traditionally granted heads of foreign states. The Court noted that from this country's inception, it was assumed that the president is subject to the laws of the nation. "[N]ot a single privilege is annexed to his character; far from being above the laws, he is amenable to them in his private character as a citizen, and in his public character by impeachment." *Clinton* at 696, 117 S.Ct. 1636, *quoting* James Wilson's remarks at the Pennsylvania Constitutional Convention as set forth in 2 J.Elliot, *Debates on the Federal Constitution* 480 (2d ed. 1863) (emphasis deleted).

The Court rejected President Clinton's assertion that given the nature of his office, exercise of jurisdiction by the federal judiciary over his private conduct amounted to an impermissible interference with the Executive Branch. It observed that the separation of powers doctrine is focused on the allocation of official power among the three coequal branches of government. The judiciary, of course, is empowered by Article III to decide cases and controversies. As the respondent was "merely asking the courts to exercise their core Article III jurisdiction," her case presented no threat to the separation of powers. *Id.* at 701, 117 S.Ct. 1636. Whatever the outcome of the case, there was no possibility that the decision would curtail the scope of the official powers of the Executive Branch. "The litigation of ques-

tions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power." *Id.*

According to the plaintiffs' interpretation of *Clinton*, this Court's adjudication of claims relating to President Kagame's unofficial conduct occurring prior to his becoming a head of state poses no risk of intrusion upon the powers of the Executive Branch. The plaintiffs' interpretation is untenable. As *Clinton* makes clear, nothing in the U.S. Constitution exempts a sitting president from oversight of even his official actions. Indeed, our system of checks and balances depends upon the president being subject to the rule of law. No such concerns for executive accountability underlie the doctrine of foreign head of state immunity. When faced with a suit against a foreign head of state, a court must investigate whether said litigation potentially intrudes upon, or even usurps the Executive Branch's constitutionally-vested responsibility for conduct of diplomacy and foreign relations.

*Clinton* is simply inapplicable to the matter at hand. In that case, the Supreme Court concluded that the doctrine of separation of powers does not require federal courts to stay all private actions against a sitting President of the United States until he leaves office. Such a holding provides no guidance to the only issue before this Court, namely, whether the Court is bound by tradition and applicable authorities to defer to the United States' determination that President Kagame is immune from the plaintiffs' suit.

### Conclusion

Where the United States' Executive Branch has concluded that a foreign head of state is immune from suit, and where it has urged the Court to take recognition of that fact and to dismiss the suit pending

against said head of state, the Court is bound to do so.

Accordingly, the Court:

1.  RECOGNIZES the United States' Suggestion that President Kagame is immune from the plaintiffs' suit;

2.  DEFERS to said suggestion of immunity;

3.  DEEMS the plaintiffs' motion for reconsideration to be moot;  and

4.  ORDERS the plaintiffs' action DISMISSED.



**Michael GARCIA, Plaintiff,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, an Ohio Corporation, Defendant.**

**Case No. 11–CV–84–S.**

United States District Court,
D. Wyoming.

Aug. 29, 2011.

**Background:** Insured brought action against insurer to recover uninsured motorist (UM) benefits under automobile liability policy. Parties filed cross-motions for summary judgment.

**Holding:** The District Court, Scott W. Skavdahl, United States Magistrate Judge, held that insurer was not entitled to offset worker's compensation payments paid to or on behalf of insured from amount of UM benefits it owed.

Insured's motion granted.

**1. Insurance ⟜1721**

Under Wyoming law, parties have right to embody in their insurance contract whatever lawful terms they wish, on condition that insurance agreement does not

conflict with pertinent statutes or public policy.

**2. Contracts ⟜153**

Under Wyoming law, it will not be supposed that parties entered into contract contemplating act amounting to violation of law, and contract will be construed as intending something for which they had power to contract.

**3. Contracts ⟜141(1)**

Under Wyoming law, if contract can be performed legally, it will be presumed by court that parties intended lawful mode of performance.

**4. Administrative Law and Procedure ⟜412.1**

**Statutes ⟜205, 206**

Under Wyoming law, in construing statute or regulation, all portions of act or regulation must be read in pari materia, and every word, clause and sentence of it must be considered so that no part will be inoperative or superfluous.

**5. Administrative Law and Procedure ⟜412.1**

**Statutes ⟜223.4**

Under Wyoming law, when two statutes or regulations directly conflict, the more specific governs over the more general.

**6. Insurance ⟜2807**

Under Wyoming law, insurer was not entitled to offset worker's compensation payments paid to or on behalf of insured from amount of uninsured motorist (UM) benefits it owed insured under his automobile liability policy, even though policy expressly prohibited benefits in excess of actual damages; state regulation prohibited insurers from including provision in UM endorsement requiring reduction in uninsured motorist benefits as result of award of worker's compensation benefits,