# EXHIBIT 3

our federal form of government. A dispute so doubtful and conjectural, so far removed from plain necessity, is unavailing to extinguish the jurisdiction of the states.").

### III

For the reasons stated, we conclude that Mr. Firstenberg's state-court complaint does not articulate a claim arising under federal law within the meaning of § 1331. We therefore **REVERSE** the district court's dismissal orders and resulting judgment and **REMAND** the case to the district court, with instructions to **VACATE** its judgment and remand the case to state court. We express no views on the merits of Mr. Firstenberg's state-law claim or on the federal preemption defense raised by the City and AT & T.



**Madame HABYARIMANA, in her own capacity and on behalf of the estate of the deceased President of Rwanda, Juvénal Habyarimana; Madame Ntaryamira, in her own capacity and on behalf of the estate of the deceased President of Burundi, Cyprien Ntaryamira, Plaintiffs–Appellants,**

v.

**Paul KAGAME, President of the Republic of Rwanda, Defendant–Appellee.**

**United States of America, Amicus Curiae.**

No. 11–6315.

United States Court of Appeals, Tenth Circuit.

Oct. 10, 2012.

**Background:** Widows of former Presidents of Rwanda and Burundi, who were killed during their presidencies when surface-to-air missiles brought down aircraft carrying them over Rwandan capitol, brought action against current President of Rwanda, seeking to hold him liable pursuant to Alien Tort Claims Act, Torture Act, Racketeer Influenced and Corrupt Organizations Act (RICO), and state and international laws. The United States, at request of Rwandan government, submitted suggestion of immunity on behalf of current President. The United States District Court for the Western District of Oklahoma, 821 F.Supp.2d 1244, deferred to suggestion of immunity and dismissed action. Widows appealed.

**Holding:** The Court of Appeals, Baldock, Circuit Judge, held that current President was immune from suit.

Affirmed.

**1. International Law** ⚙10.31

After enactment of Foreign Sovereign Immunities Act (FSIA), FSIA, and not pre-existing common law, governs determination of whether foreign state is entitled to sovereign immunity. 28 U.S.C.A. § 1330 et seq.

**2. International Law** ⚙10.31

Foreign Sovereign Immunities Act (FSIA) does not alter common-law precedents as they bear upon immunity of individual officials. 28 U.S.C.A. § 1330 et seq.

**3. International Law** ⚖10.40

Foreign Sovereign Immunities Act (FSIA) does not affect State Department's historical role in determinations regarding individual official immunity. 28 U.S.C.A. § 1330 et seq.

**4. International Law** ⚖10.40

It is not for the courts to deny an immunity which federal government has seen fit to allow, and courts must accept United States's suggestion that a foreign head of state is immune from suit, even for acts committed prior to assuming office, as a conclusive determination by the political arm of the federal government that continued exercise of jurisdiction interferes with the proper conduct of United States's foreign relations.

**5. International Law** ⚖10.40

In accordance with suggestion of immunity requested by Rwandan government and submitted by United States, current President of Rwanda was immune from suit in action in which widows of former Presidents of Rwanda and Burundi, who were killed during their presidencies when surface-to-air missiles brought down aircraft carrying them, sought to hold current President liable pursuant to Alien Tort Claims Act, Torture Act, Racketeer Influenced and Corrupt Organizations Act (RICO), and state and international laws. 18 U.S.C.A. §§ 1962 et seq., 2340A; 28 U.S.C.A. § 1350.

---

Submitted on the Briefs: *

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

John P. Zelbst, Zelbst, Holmes & Butler, Lawton, OK, and Peter Erlinder, Director, International Humanitarian Law Institute, William Mitchell College of Law, St. Paul, MN, for Plaintiffs–Appellants.

Pierre–Richard Prosper, Robert C. O'Brien, Michael S. Cryan, and Roy Z. Silva, Arent Fox LLP, for Defendant–Appellee.

Harold Hongju Koh, Legal Adviser, Department of State, Stuart F. Delery, Acting Assistant Attorney General, Sanford C. Coats, United States Attorney, and Mark B. Stern and Lewis S. Yelin, Attorneys, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., filed an Amicus Curiae Brief for the United States in support of Defendant–Appellee.

Before TYMKOVICH, BALDOCK, and GORSUCH, Circuit Judges.

BALDOCK, Circuit Judge.

On April 16, 1994, over the Rwandan capitol of Kigali, two surface-to-air missiles brought down an aircraft carrying then Rwandan and Burundi Presidents, Juvenal Habyarimana and Cyprien Ntaryamira, both of Hutu ethnicity. The killings fueled the Rwandan genocide, which spread violence across East Central Africa and cost upwards of one million innocent victims their lives. Some believe the then Tutsiled Rwandan Patriotic Front headed by current Rwandan President Paul Kagame was behind the killings. Others believe the then government-aligned Hutu Power extremists opposed to a peace accord with the rebel force are responsible.[1] *For pres-*

1. *See generally* Gerard Prunier, *The Rwanda Crisis: History of a Genocide* (Columbia Univ. Press 1995); *Africa's World War: Congo, the Rwandan Genocide, and the Making of a Continental Catastrophe* (Oxford Univ. Press 2009).

*ent purposes*, the identity of those responsible for downing the aircraft is inconsequential.

What matters is that the widows of the two former heads-of-state, Madame Habyarimana and Madame Ntaryamira, blame President Kagame for their husbands' deaths.[2] They filed suit in Oklahoma federal court seeking to hold him liable under the Alien Tort Claims Act, 28 U.S.C. § 1350, the Torture Act, 18 U.S.C. § 2340A, the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962, and a slew of state and international laws.[3] At paragraphs six and nine of their amended complaint, the widows allege:

> The final order to shoot down the Presidents' plane was given by Defendant Kagame, himself, during a meeting held in Mulindi, Rwanda on or about March 31, 1994, with the planning and the operational phase being entrusted to Col. James Kabarebe, who was specifically charged with the formation of a team specialized in the use of surface-to-air missiles furnished by Uganda in a conspiracy with members of the non-governmental Rwanda Patriotic Army....
>
> * * *
>
> Defendant Kagame deliberately chose a modus operandi that, in the context of the particular tension pervading both in Rwanda and [neighboring] Burundi between the Hutu and Tutsi communities, could only bring about bloody reprisals against the Tutsi community, and which offered him a veneer of legitimacy for his renewal of hostilities and his seizing of state power in Rwanda by criminally violent means.

Something else also matters. During the pendency of this action in the district court, the United States, at the request of the Rwandan Government, submitted a "Suggestion of Immunity" on behalf of President Kagame. Paragraph one states:

> The United States has an interest in this action because the ... Defendant, President Kagame, is the sitting head of state of a foreign state, thus raising the question of President Kagame's immunity from the court's jurisdiction while in office. The Constitution assigns to the U.S. President alone the responsibility to represent the Nation in its foreign relations.... The interest of the United States in this matter arises from a determination by the Executive Branch of the Government of the United States, in consideration of relevant principles of customary international law, and in the implementation of its foreign policy and in the conduct of its international relations, to recognize President Kagame's immunity from this suit while in office.

In a published opinion, the district court accurately measured the case, deferred to the United States Suggestion of Immunity, and dismissed the action against President Kagame. *Habyarimana v. Kagame*, 821 F.Supp.2d 1244 (W.D.Okla.2011). We exercise jurisdiction under 28 U.S.C. § 1291, and now affirm for substantially the reasons found at pages 1259–1264 of the district court's opinion.[4]

---

2. For a differing account consider *Rwanda Genocide: Kagame Cleared of Habyarimana Crash*, BBC News Africa (Jan. 10, 2012), http://www.bbc.co.uk/news/world-africa-16472013? (visited Oct. 6, 2012).

3. The widows allege suit is proper in Oklahoma because President Kagame has ongoing and substantial contacts with the State arising out of the Rwandan Government's affiliation with Oklahoma Christian University.

4. The district court's published opinion consists of two separate orders. The court entered the first order found at pages 1246–59 on June 23, 2011. At that time, the Rwandan Government had requested, but the United States had not yet submitted, its Suggestion of

**[1–3]** In the words of Judge Wisdom: "The precedents are overwhelming. For more than 160 years American courts have consistently applied the doctrine of sovereign immunity when requested to do so by the executive branch. Moreover, they have done so with no further review of the executive's determination." *Spacil v. Crowe,* 489 F.2d 614, 617 (5th Cir.1974) (Wisdom, J.). Of course, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–11, which addresses the question of a *foreign state's* entitlement to immunity, now supercedes many of those precedents to which Judge Wisdom referred: "After the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Samantar v. Yousuf,* ––– U.S. ––––, 130 S.Ct. 2278, 2285, 176 L.Ed.2d 1047 (2010). But the FSIA does not alter common law precedents as they bear upon "the immunity of individual officials." *Id.* at 2289. The FSIA does not affect the "State Department's [historical] role in determinations regarding individual official immunity." *Id.* at 2291. And that role is well established, despite the widows' contrary arguments.

**[4, 5]** Simply stated, "[i]t is ... not for the courts to deny an immunity which our government has seen fit to allow." *Republic of Mexico v. Hoffman,* 324 U.S. 30, 35, 65 S.Ct. 530, 89 L.Ed. 729 (1945). We must accept the United States' suggestion that a foreign head of state is immune from suit—even for acts committed prior to assuming office—"as a conclusive determination by the political arm of the Government that the continued [exercise of jurisdiction] interferes with the proper conduct of our foreign relations."[5] *Ex Parte Republic of Peru,* 318 U.S. 578, 589, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); *accord Ye v. Zemin,* 383 F.3d 620, 626 (7th Cir. 2004) ("[A] determination by the Executive Branch that a foreign head of state is immune from suit is conclusive and a court must accept such a determination without reference to the underlying claims of a plaintiff."). Judge Wisdom best explained the "compelling reasons" for such a rule:

> Separation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy. And the degree to which granting or denying a claim of immunity may be important to foreign policy is a question on which the judiciary is particularly ill-equipped to second-guess the executive. The executive's institutional resources and expertise in foreign affairs far outstrip those of the judiciary. Perhaps more importantly, in the chess game that is diplo-

---

Immunity. Then before the court was the widows' motion for default judgment against President Kagame for failure to answer the complaint. The court ruled that because the widows had failed to effect service on the President, the court lacked personal jurisdiction over him. For good cause shown, the court provided the widows an additional 120 days to effect service, but noted "such opportunity will be futile if President Kagame is correct in his assertion that as head of state of Rwanda, he is absolutely immune from suit." *Habyarimana,* 821 F.Supp.2d at 1257. Following receipt of the Suggestion of Immunity, the court on October 28, 2011 entered a second order found at pages 1259–1264 dismissing the action on the basis of President Kagame's immunity from suit as a sitting foreign head of state.

**5.** Paragraph seven of the Suggestion of Immunity observes that "[a]fter a head of state leaves office, however, that individual generally retains residual immunity only for acts taken in [an official capacity as head of state] and not for alleged acts predating the individual's tenure in office."

Appellate Case: 13-1517  Page: 4  Date Filed: 05/13/2013 Entry ID: 4034852

macy only the executive has a view of the entire board and an understanding of the relationship between isolated moves.

*Spacil,* 489 F.2d at 619 (internal citations omitted).

Accordingly, the judgment of the district court is AFFIRMED.



**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph Ray MENDIOLA, Defendant–Appellant.**

**No. 11–2209.**

United States Court of Appeals, Tenth Circuit.

Oct. 12, 2012.

**Background:** Government petitioned to revoke supervised release term for defendant previously convicted of being a felon in possession of ammunition. The United States District Court for the District of New Mexico entered revocation order and imposed a 2–year term of imprisonment. Defendant appealed.

**Holding:** The Court of Appeals, Briscoe, Chief Judge, held that district court's consideration of defendant's need to participate in prison-based drug rehabilitation program was plain error.

Reversed and remanded with directions.

Gorsuch, Circuit Judge, filed concurring opinion.

**1. Criminal Law ⚖1042.3(4)**

District Court's consideration of probationer's need to participate in 500-hour prison-based drug rehabilitation program, when sentencing him to a 24-month prison term for the violation of his term of supervised release, was plain error; the sentence was double the length of the upper limit of the recommended Sentencing Guidelines range, it was imposed for the express purpose of giving probationer enough time to participate in the rehabilitation program, which was barred by the Supreme Court decision in *Tapia*, and court likely would have imposed lesser sentence if it had not focused on the need for the prison-based program. 18 U.S.C.A. § 3583(e).

**2. Criminal Law ⚖1030(1)**

Under the plain error standard, the court of appeals may reverse only if a defendant demonstrates (1) error (2) that is plain, (3) that prejudices his substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings.

**3. Criminal Law ⚖1030(1)**

Plain error is measured at the time of appeal, and not as of the time of the district court's ruling being challenged on appeal.

**4. Sentencing and Punishment ⚖2033**

A district court imposing a sentence upon revocation of a supervised release term cannot take into account a defendant's rehabilitative needs.

———

Dennis J. Candelaria, Assistant Federal Public Defender, Las Cruces, NM, for Defendant–Appellant.

Jennifer M. Rozzoni, Assistant United States Attorney, (Kenneth J. Gonzales, United States Attorney, and David N.