UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL RUSESABAGINA, *et al.*,<br><br>Plaintiffs,<br><br>-against-<br><br>THE REPUBLIC OF RWANDA, *et al.*,<br><br>Defendants. | Civil Action No.: 22-00469 (RJL)<br><br><br><br>**ORAL ARGUMENT REQUESTED** |

**MOTION OF DEFENDANTS JOHNSTON BUSINGYE, JOSEPH NZABAMWITA AND JEANNOT RUHUNGA, HIGH GOVERNMENT OFFICIALS (COLLECTIVELY, THE "OFFICIALS") OF THE REPUBLIC OF RWANDA ("RWANDA"), TO DISMISS THE AMENDED COMPLAINT**

Defendants Johnston Busingye, Joseph Nzabamwita and Jeannot Ruhunga, high government officials (collectively, the "Officials") of the Republic of Rwanda ("Rwanda"), by and through their undersigned counsel, hereby move this Court, before the Hon. Richard J. Leon, United States District Judge, to dismiss Plaintiffs' Amended Complaint with prejudice as to the Officials.

The Officials are high government officials of a foreign state, sued here in their official capacities. As such, they are entitled to an immediate order of dismissal under Federal Rule of Civil Procedure 12(b)(6) on the grounds that they are immune from the jurisdiction of this Court under well-settled principles of foreign official sovereign and diplomatic immunity.

Further, the summons was never properly served on any of the Officials. For this additional reason, dismissal pursuant to Federal Rule of Civil Procedure 12(b)(5) is warranted.

Additionally, the Officials are not subject to either the general or specific jurisdiction of this Court. For this reason as well, dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6) is required.

Finally, Plaintiffs' claims are barred by the Foreign Sovereign Immunities Act and suffer from various other fundamental infirmities which require the dismissal of those claims with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6), as set forth in the Motion to Dismiss [D.E. 18] filed by the Republic of Rwanda, in which Motion the Officials hereby join.

A memorandum in support of the instant motion and a proposed order are filed herewith.

Dated: July 26, 2022

**ARENTFOX SCHIFF LLP**

By: */s/ Michael S. Cryan*
Michael.Cryan@afslaw.com
1717 K Street, NW
Washington, DC 200006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395

*Attorneys for Defendants*
*The Republic of Rwanda, &*
*His Excellency President Paul*
*Kagame, President of the Republic of*
*Rwanda, Ambassador Johnston*
*Busingye, Brigadier General Joseph*
*Nzabamwita, & Colonel Jeannot*
*Ruhunga*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL RUSESABAGINA, *et al.*,<br><br>        Plaintiffs,<br><br>     -against-<br><br>THE REPUBLIC OF RWANDA, *et al.*,<br><br>        Defendants. | Civil Action No.: 22-00469 (RJL)<br><br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS JOHNSTON BUSINGYE, JOSEPH NZABAMWITA AND JEANNOT RUHUNGA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

### TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

    A.    Factual Background Relevant to this Motion ...................................................... 1

        1.    The Claims in the Amended Complaint........................................... 1

        2.    The Officials Are High Government Officials of Rwanda. ..................... 2

        3.    The Allegations Against the Officials............................................ 3

    B.    Procedural Background Relevant to this Motion................................................ 4

LEGAL STANDARDS ........................................................................................................ 4

    A.    Legal Standard Pursuant to Rule 12(b)(1). ....................................................... 4

    B.    Legal Standard Pursuant to Rule 12(b)(2). ....................................................... 5

    C.    Legal Standard Pursuant to Rule 12(b)(6). ....................................................... 6

ARGUMENT ....................................................................................................................... 7

    A.    The Amended Complaint Must Be Dismissed as to the Officials Under the
        Doctrine Foreign Official Sovereign Immunity.................................................. 7

        1.    Conduct-based foreign official immunity applies to the Officials............. 9

                a.    The Officials are Public Ministers, Officials or Agents of
                      Rwanda. ..................................................................... 9

                b.    The Officials acted within the scope of their official duties. ....... 10

                c.    Exercising jurisdiction would enforce a rule of law against
                      Rwanda ..................................................................... 14

        2.    Status-based foreign official immunity applies to the Officials. ............. 17

        3.    No exception for alleged violations of *jus cogens* norms defeats
            foreign official immunity. ........................................................ 19

        4.    The Torture Victims Protection Act does not abrogate foreign
            official immunity. ................................................................... 21

    B.    The Amended Complaint Must Be Dismissed Due to the Lack of Personal
        Jurisdiction over the Officials. ......................................................................... 25

        1.    There Is No Basis For General Personal Jurisdiction. ........................... 27

        2.    There Is No Basis For Specific Personal Jurisdiction............................ 27

    C.    The Amended Complaint Is Subject to Dismissal Due to the Lack of
        Service of Process. .......................................................................................... 31

    D.    Joinder in Pending Motion to Dismiss filed by the Republic of Rwanda............ 33

CONCLUSION.................................................................................................................. 33

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asahi Metal Indus. Co. v. Superior Court,*
   480 U.S. 102 (1987) ..................................................................................................30

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................................................6

*Belhas v. Ya'alon,*
   515 F.3d 1279 (D.C. Cir. 2008) ...........................................................................4, 5, 19

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ....................................................................................................6

*Blue v. District of Columbia,*
   811 F.3d 14 (D.C. Cir. 2015) .......................................................................................6

*Browning v. Clinton,*
   292 F.3d 235 (D.C. Cir. 2002) .....................................................................................6

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985) .........................................................................................27, 28, 29

*Calder v. Jones,*
   465 U.S. 783 (1984) ...................................................................................................27

*Chicago & S. Air Lines v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ...................................................................................................24

*Cockrum v. Donald J. Trump for President, Inc.,*
   319 F.Supp.3d 158 (D.D.C. 2018) ..............................................................................31

*Crane v. N.Y. Zoological Soc'y,*
   894 F.2d 454 (D.C. Cir. 1990) .....................................................................................6

*Daimler AG v. Bauman,*
   571 U.S. 117 (2014) ...................................................................................................26

*Doe 1 v. Buratai,*
   318 F.Supp.3d 218 (D.D.C. 2018), *aff'd*, 792 F. App'x 6 (D.C. Cir. 2019) ................... *passim*

*Doe I v. Israel,*
   400 F.Supp.2d 86 (D.D.C. 2005) ...............................................................................13

*Doğan v. Barak*,
    932 F.3d 888 (9th Cir. 2019), *aff'g* Case No. 2:15-cv-08130-ODW(GSJx),
    2016 WL 6024416 (C.D. Cal. Oct. 13, 2016) ................................................................ *passim*

*Eades v. Clark Distrib. Co.*,
    70 F.3d 441 (6th Cir. 1995) ................................................................32

*Edwards v. Fed. Gov't of Nigeria*,
    Civ. A. No. 18-11133, 2018 WL 6619741 (D. Mass. Dec. 18, 2018) ....................................25

*Filarsky v. Delia*,
    566 U.S. 377 (2012) ................................................................19, 22, 23

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S.Ct. 1017 (2021) ................................................................27

*Freedom Watch, Inc. v. OPEC*,
    766 F.3d 74 (D.C. Cir. 2014) ................................................................32

*Giraldo v. Drummond Co.*,
    808 F.Supp.2d 247 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012) ....................19

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ................................................................26, 27

*Hashem v. Shabi*,
    Civ. A. No. 17-1645, 2018 WL 3382913 (D.D.C. Apr. 26, 2018) ....................................32

*United States ex rel. Head v. Kane Co.*,
    798 F.Supp.2d 186 (D.D.C. 2011) ................................................................7

*Heaney v. Gov't of Spain*,
    445 F.2d 501 (2d Cir. 1971) ................................................................10, 14

*Helicopteros Nacionales de Colombia, N.A. v. Hall*,
    466 U.S. 408 (1984) ................................................................27

*Hellenic Lines, Ltd. v. Moore*,
    345 F.2d 978 (D.C. Cir. 1965) ................................................................18

*Herbert v. Nat'l Acad. of Scis.*,
    974 F.2d 192 (D.C. Cir. 1992) ................................................................5

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ................................................................23

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ................................................................26, 29

*Jeong Seon Han v. Lynch*,
    223 F.Supp.3d 95 (D.D.C. 2016) ................................................................................5

*Jerome Stevens Pharm., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ................................................................................5

*Jungquist v. Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997) ................................................................................5

*Kentucky v. Graham*,
    473 U.S. 159 (1985) ................................................................................14, 15

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ................................................................................5

*Lewis v. Mutond,*
    918 F.3d 142 (D.C. Cir. 2019) ................................................................................16

*Madara v. Hall*,
    916 F.2d 1510 (11th Cir. 1990) ................................................................................31

*Malley v. Briggs*,
    475 U.S. 335 (1986) ................................................................................23

*Mann v. Castiel*,
    681 F.3d 368 (D.C. Cir. 2012) ................................................................................32

*Manoharan v. Rajapaksa*,
    845 F.Supp.2d 260 (D.D.C. 2012), *aff'd*, 711 F.3d 178 (D.C. Cir. 2013) ..........................9, 23

*Matar v. Dichter*,
    563 F.3d 9 (2d Cir. 2009) ................................................................................10, 13, 20, 22

*Metlife, Inc. v. Fin. Stability Oversight Council*,
    865 F.3d 661 (D.C. Cir. 2017) ................................................................................22

*Miley v. Hard Rock Hotel & Casino Punta Cana*,
    537 F.Supp.3d 1 (D.D.C. 2021) ................................................................................28, 29, 31

*Mohammadi v. Islamic Republic of Iran*,
    947 F.Supp.2d 48 (D.D.C. 2013), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015) ....................................28

*Monell v. New York City Dep't of Soc. Serv.*,
    436 U.S. 658 (1978) ................................................................................14

*Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*,
    461 F.Supp.2d 24 (D.D.C. 2006) ................................................................................6

*North v. Smarsh, Inc.*,
  265 F.Supp.3d 71 (D.D.C. 2017), *aff'd*, No. 17-7120, 2017 WL 6553385
  (D.C. Cir. Dec. 6, 2017)............................................................................................30, 31

*Odhiambo v. Republic of Kenya*,
  930 F.Supp.2d 17 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014).....................14, 16, 25

*Oetjen v. Cent. Leather Co.*,
  246 U.S. 297 (1918).........................................................................................................24

*Plaintiffs A, B, C, D, E, F v. Zemin*,
  282 F.Supp.2d 875 (N.D. Ill. 2003), *aff'd*, 383 F.3d 620 (7th Cir. 2004) .........................17, 29

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002)........................................................................................29, 30

*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004)...........................................................................................................20

*Rishikof v. Mortada*,
  70 F.Supp.3d 8 (D.D.C. 2014) ...............................................................................4, 7, 12, 13

*Rosasen v. Kingdom of Norway*,
  No. 21-cv-06811, 2022 WL 409679 (C.D. Cal. Feb. 10, 2022) ...............................8, 9, 12, 16

*Samantar v. Yousuf*,
  560 U.S. 305 (2010)................................................................................................ *passim*

*Second Amend. Found. v. U.S. Conf. of Mayors*,
  274 F.3d 521 (D.C. Cir. 2001)......................................................................................6, 30

*Shibeshi v. United States*,
  932 F.Supp.2d 1 (D.D.C. 2013) .............................................................................................6

*Sikhs for Justice v. Singh*,
  64 F.Supp.3d 190 (D.D.C. 2014) ..........................................................................................8

*Tachiona v. United States*,
  386 F.3d 205 (2d Cir. 2004)......................................................................................17, 18, 19

*Triple Up Ltd. v. Youku Tudou Inc.*,
  235 F.Supp.3d 15 (D.D.C. 2017), *aff'd*, No. 17-7033, 2018 WL 4440459
  (D.C. Cir. July 17, 2018)......................................................................................................6

*United States v. Texas*,
  507 U.S. 529 (1993)...........................................................................................................22

*Vasquez v. Whole Foods Mkt., Inc.*,
   302 F. Supp. 3d 36 (D.D.C. 2018) ..................................................................26

*Walden v. Fiore*,
   571 U.S. 277 (2014) ......................................................................................27

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) ......................................................................................29

**Constitution, Treaties & Statutes**

U.S. Const. art. III, § 2 ........................................................................................5

18 U.S.C. § 2511 ..................................................................................................2

28 U.S.C. § 1350, Note ..............................................................................21, 22

42 U.S.C. § 1983 ................................................................................................22

Torture Victims Protection Act, P.L. 102–256, 106 Stat. 73 (1992), *codified at* 28
   U.S.C. § 1350, Note ......................................................................................21

Fed. R. Civ. P. 4 ................................................................................................32

Fed. R. Civ. P. 4(f)(2)(C)(ii) ............................................................................32

Fed. R. Civ. P. 12(b)(1)................................................................................ *passim*

Fed. R. Civ. P. 12(b)(2)..................................................................1, 5, 26, 33

Fed. R. Civ. P. 12(b)(3)......................................................................................5

Fed. R. Civ. P. 12(b)(6)......................................................................................6

Vienna Convention on Diplomatic Relations, art. 29, Apr. 18, 1961, *United States
   accession*, Dec. 13, 1972, 23 U.S.T. 3227, 500 U.N.T.S. 95.................17, 18, 19

**Other Authorities**

4A Charles Alan Wright et al, *Federal Practice and Procedure* § 1083 (3d ed.
   2002 & Supp. 2012)........................................................................................33

Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79
   Fordham L. Rev. 2669 (2011)..........................................................................7

Harold Hongju Koh, *Foreign Official Immunity After Samantar: A United States
   Government Perspective*, 44 Vand. J. Transnat'l L. 1141 (2011) ..........................21

John B. Bellinger, III, *The Dog that Caught the Car: Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819 (2011) ......................................................20, 21

Restatement (Second) of the Foreign Relations Law of the United States § 66(f) (1965) ......................................................................................................................8, 9, 10, 14

Rwanda Directorate General of Immigration & Emigration, https://www.migration.gov.rw/our-services/e-passport/diplomatic-e-passport (last accessed July 24, 2022) ...............................................................................................19

Defendants Johnston Busingye, Joseph Nzabamwita and Jeannot Ruhunga, high government officials (collectively, the "Officials") of the Republic of Rwanda ("Rwanda"), by and through their undersigned counsel, submit this Memorandum of Points and Authorities in Support of their Motion to Dismiss Plaintiff's Amended Complaint (D.E. 17, "Am. Compl.") pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6) of the Federal Rules of Civil Procedure, and hereby state as follows:

## INTRODUCTION

Plaintiffs Paul Rusesabagina, Carine Izere Kanimba, Roger Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina (collectively, "Plaintiffs") commenced the present lawsuit against Rwanda; its current head of State, His Excellency President Paul Kagame; and the Officials.

### A.     Factual Background Relevant to this Motion

The facts set forth herein are based on the Amended Complaint and undisputed facts in the record.

#### 1.     The Claims in the Amended Complaint

On May 31, 2022, Plaintiffs filed the Amended Complaint [D.E. 17] seeking to collaterally attack the arrest, prosecution, conviction and incarceration of Paul Rusesabagina for terrorism. In Count I, Plaintiff Paul Rusesabagina alleged a purported claim for fraud. *Id.* ¶¶ 223-226. In Count II, Plaintiffs alleged a purported claim for civil conspiracy. *Id.* ¶¶ 227-233. In Count III, Plaintiffs Carine Izere Kanimba, Roger Rusesabagina, Taciana Mukangamije, Anaïse Umubyeyi Kanimba, Aimee-Lys Rusesabagina, Aimee-Diane Rusesabagina, and Trésor Rusesabagina alleged a purported claim for solatium. *Id.* ¶¶ 234-237. In Count IV, Plaintiff Paul

Rusesabagina alleged a purported claim for false imprisonment. *Id.* ¶¶ 238-240. In Count V, Plaintiff Paul Rusesabagina alleged a purported claim for assault. *Id.* ¶¶ 241-245. In Count VI, Plaintiff Paul Rusesabagina alleged a purported claim for battery. *Id.* ¶¶ 246-250. In Count VII, Plaintiffs alleged a purported claim for intentional infliction of emotional distress. *Id.* ¶¶ 251-254. In Count VIII, Plaintiffs Paul Rusesabagina and Taciana Mukangamije alleged a purported claim for loss of consortium. *Id.* ¶¶ 255-258. In Count IX, Plaintiffs alleged a purported claim for intrusion upon seclusion. *Id.* ¶¶ 259-263. In Count X, Plaintiffs alleged purported interception of certain wire, oral, and electronic communications allegedly in violation of 18 U.S.C. § 2511. *Id.*, ¶¶ 264-267. In Counts XI, XII and XIII, Plaintiffs alleged purported violations of international law allegedly cognizable under 28 U.S.C. § 1350. *Id.* ¶¶ 268-309.

### 2.   The Officials Are High Government Officials of Rwanda.

Ambassador Johnston Busingye is currently Rwanda's High Commissioner to the United Kingdom, Non Resident Ambassador to Ireland, and Non Resident High Commissioner to Malta. From 2014—2021, Ambassador Busingye was the Minister of Justice and Attorney General of Rwanda. *See* Am. Compl. ¶ 31 ("Defendant Johnston Busingye was the Rwandan Minister of Justice and Attorney General of Rwanda at all times relevant to the events discussed in this Complaint, since May 24, 2013 until September 2021.").

Brigadier General Joseph Nzabamwita is currently and has at all relevant times been the Secretary General of the Rwanda National Intelligence and Security Services ("NISS"). *See* Am. Compl. ¶ 33 ("Major General Joseph Nzabamwita, called 'Rwanda's spy chief' by the New York Times, was appointed by President Kagame as the Secretary General of Rwandan NISS on March 22, 2016.").

Colonel Jeannot Ruhunga is currently and has been since 2018 the head of the Rwandan Investigative Bureau ("RIB"). *See* Am. Compl. ¶ 32 ("Defendant Colonel Jeannot Ruhunga was appointed by President Kagame as the head of the RIB in 2018.").

### 3.    The Allegations Against the Officials

Plaintiffs in their Amended Complaint seek to impose liability upon Officials of Rwanda "acting within the scope of their office or employment" (Am. Compl. ¶¶ 269, 281 & 297).

Plaintiffs alleged that the Officials exercised supervisory, decision-making or operational authority and control over the law enforcement, penal, intelligence and investigative functions at issue (Am. Compl. ¶¶ 31-33, 239, 243, 247, 269, 278, 291, 292, 297, 300).

Plaintiffs also asserted their allegations against Rwanda, which Plaintiffs admit is a foreign state subject to the Foreign Sovereign Immunities Act ("FSIA"). *See* Am. Compl. ¶¶ 1; 6 ("The Rwandan government tracked, harassed, and ultimately kidnapped Paul Rusesabagina"); 12 ("This action arises from the deliberate and intentional campaign by agents, employees, and officials of the Rwandan government, acting at the direction of the Rwandan government."); 16 ("Rwanda is not immune for the series of torts committed against Mr. Rusesabagina"); 34 ("Rwanda is a 'foreign state' within the meaning of the FSIA. See 28 U.S.C. § 1603"); 93 ("the Rwandan government has used Pegasus to track and pursue targets"); 139 ("the Rwandan government kidnapped Mr. Rusesabagina and stole his phone"); 190 ("the Rwandan prison authorities have confiscated any documents brought by [Mr. Rusesabagina's] lawyers to prison"); & 192 ("[t]he Rwandan authorities have refused proper and consistent medical care for Mr. Rusesabagina").

(For a wider explanation of the factual setting of this pending lawsuit, see Rwanda's Memorandum in Support of its Motion to Dismiss Amended Complaint at 1-10 [D.E. 18].)

B.      **Procedural Background Relevant to this Motion**

On February 22, 2022, Plaintiffs filed the Original Complaint.

On May 9, 2022, Rwanda filed its Motion to Dismiss the Original Complaint [D.E. 13].

As noted above, on May 31, 2022, Plaintiffs filed the Amended Complaint [D.E. 17].

On June 14, 2022, Rwanda filed a Motion to Dismiss the Amended Complaint [D.E. 18].

On June 29, 2022, Plaintiffs filed a request [D.E. 23] pursuant to Federal Rule of Civil Procedure 4(f)(2)(C)(ii) for the Clerk of this Court to effect service of the summons and complaint via FedEx upon President Kagame as well as Johnston Busingye, Joseph Nzabamwita, and Jeannot Ruhunga. On June 29, 2022, the Certificate of Clerk [D.E. 24] was filed regarding the mailing, together with a copy of the waybill for each of President Kagame, Johnston Busingye, Joseph Nzabamwita, and Jeannot Ruhunga. On July 22, 2022, Plaintiffs filed a purported return of service as to Brigadier General Joseph Nzabamwita [D.E. 27] and Colonel Ruhunga [D.E. 28].

This timely Motion to Dismiss by the Officials followed.

## <u>LEGAL STANDARDS</u>

This Motion is filed under Rule 12(b)(1), (b)(2) and (b)(6) of the Federal Rules of Civil Procedure. The applicable legal standard differs depending on the specific subsection of Rule 12(b). Fed. R. Civ. P. 12(b)(1), (b)(2) & (b)(6).

A.      **Legal Standard Pursuant to Rule 12(b)(1).**

Under Rule 12(b)(1), a party may move to dismiss an action when the court lacks subject-matter jurisdiction, Fed.R.Civ.P. 12(b)(1), and foreign-official immunity is a question of subject-matter jurisdiction, *see Doe 1 v. Buratai*, 318 F.Supp.3d 218, 226 (D.D.C. 2018), *aff'd*, 792 F. App'x 6 (D.C. Cir. 2019); *Rishikof v. Mortada*, 70 F.Supp.3d 8, 11, 16 n.4 (D.D.C. 2014); *see also Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (evaluating foreign sovereign

immunity as a question of subject-matter jurisdiction). Because it is "presumed that a cause lies outside [the] limited jurisdiction" of the federal courts, the party invoking federal jurisdiction bears the burden of establishing it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Buratai*, 318 F.Supp.3d at 226.

"When ruling on a Rule 12(b)(1) motion, the court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F.Supp.3d 95, 103 (D.D.C. 2016) (internal quotation marks and citation omitted); *see also Buratai*, 318 F.Supp.3d at 226. Those factual allegations, however, receive "closer scrutiny" than they would in the Rule 12(b)(6) context, *id.*, and particularly because immunity "provides protection from suit and not merely a defense to liability, ... the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case." *Jungquist v. Al Nahyan*, 115 F.3d 1020, 1027–28 (D.C. Cir. 1997) (internal quotation marks and alteration omitted); *Buratai*, 318 F.Supp.3d at 226. "[U]nlike when evaluating a Rule 12(b)(6) motion, a court may consider materials outside the pleadings to evaluate whether it has jurisdiction, such as the complaint supplemented by undisputed facts in the record." *Buratai*, 318 F.Supp.3d at 226 (citing *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Belhas*, 515 F.3d at 1281. Without subject-matter jurisdiction, the court must dismiss the action. U.S. Const. art. III, § 2; Fed. R. Civ. P. 12(b)(1), 12(b)(3); *Buratai*, 318 F.Supp.3d at 225.

## B. Legal Standard Pursuant to Rule 12(b)(2).

Under Rule 12(b)(2), a party may move to dismiss an action when the court lacks personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "On such a motion, the plaintiff bears the burden of 'establishing a factual basis for the exercise of personal jurisdiction' over each defendant."

*Triple Up Ltd. v. Youku Tudou Inc.*, 235 F.Supp.3d 15, 20 (D.D.C. 2017), *aff'd*, No. 17-7033, 2018 WL 4440459 (D.C. Cir. July 17, 2018) (quoting *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)); *see also Buratai*, 318 F.Supp.3d at 225. "To meet this burden, a plaintiff cannot rely on conclusory allegations, *id.*, but rather must allege specific facts connecting the defendant with the forum." *Id. See also Shibeshi v. United States*, 932 F.Supp.2d 1, 2–3 (D.D.C. 2013) (internal quotation marks omitted) (citing *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)); *see also Buratai*, 318 F.Supp.3d at 225–26. "When ruling on a 12(b)(2) motion, the court 'may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts.'" *Buratai,* 318 F.Supp.3d at 226 (quoting *Triple Up Ltd.*, 235 F.Supp.3d at 20). "Ultimately, the [c]ourt must satisfy itself that it has jurisdiction to hear the suit." *Id.* (citation omitted).

### C.  Legal Standard Pursuant to Rule 12(b)(6).

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *see* Fed. R. Civ. P. 12(b)(6). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009) (alterations in original). The complaint need not include "detailed factual allegations," and a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). The court may consider "the facts contained within the four corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F.Supp.2d 24, 28 (D.D.C. 2006), along with "any documents

6

attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record." *United States ex rel. Head v. Kane Co.*, 798 F.Supp.2d 186, 193 (D.D.C. 2011).

## ARGUMENT

The Amended Complaint is subject to immediate dismissal for four separate and independent reasons. First, the Officials are immune from the jurisdiction of this Court under well-settled principles of foreign official sovereign immunity. Second, the Officials are not subject to the personal jurisdiction of this Court. Third, the Amended Complaint is subject to dismissal as it was never properly served on any of the Officials. Finally, this action is subject to dismissal for the reasons explained in Rwanda's Motion to Dismiss [D.E. 18] concerning the Foreign Sovereign Immunities Act and the various fundamental infirmities which require the dismissal of Plaintiffs' claims because Rwanda is the real party in interest.

### A.   The Amended Complaint Must Be Dismissed as to the Officials Under the Doctrine Foreign Official Sovereign Immunity.

Foreign-official sovereign immunity is a common-law doctrine. *See Samantar v. Yousuf*, 560 U.S. 305, 324–25 (2010); *Rishikof*, 70 F.Supp.3d at 11–12; *Buratai*, 318 F.Supp.3d at 230. At common law, "foreign officials were entitled to immunity in lawsuits in which a judgment would in fact be enforceable against the state." Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 Fordham L. Rev. 2669, 2677 (2011); *Buratai*, 318 F.Supp.3d at 230. Under the common law, a foreign official may be entitled to status-based or conduct-based immunity. *Buratai*, 318 F.Supp.3d at 230. Both forms of immunity apply to the Officials.

Conduct-based immunity, at issue on this Motion, is available to "any public minister, official, or agent of the foreign state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Id.* (quoting

Restatement (Second) of the Foreign Relations Law of the United States § 66(f) (1965)); *see also Sikhs for Justice v. Singh*, 64 F.Supp.3d 190, 193 (D.D.C. 2014) ("Conduct-based immunities shield individuals from legal consequences for acts performed on behalf of the state during their tenure in office." (alteration and internal quotation marks omitted)). Thus, it is well settled that "[c]ommon-law foreign sovereign immunity extends to individual foreign officials for acts performed in their official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Doğan v. Barak*, 932 F.3d 888, 893–94 (9th Cir. 2019) (quoting Restatement (Second) of Foreign Relations Law § 66(f) (1965) (internal quotation marks omitted)), *aff'g* Case No. 2:15-cv-08130-ODW(GSJx), 2016 WL 6024416 (C.D. Cal. Oct. 13, 2016); *Rosasen v. Kingdom of Norway*, No. 21-cv-06811, 2022 WL 409679, at *6 (C.D. Cal. Feb. 10, 2022). Status-based immunity "is available to diplomats and heads of state and shields them from legal proceedings by virtue of his or her current official position, regardless of the substance of the claim." *Buratai*, 318 F. Supp. 3d at 230 (internal quotation marks and citation omitted).

According to the common law, courts determine foreign-official immunity with a "two-step procedure." *Samantar*, 560 U.S. at 311–12; *Buratai*, 318 F.Supp.3d at 230. First, the foreign-official defendant can "request a 'suggestion of immunity' from the State Department." *Samantar*, 560 U.S. at 311; *Buratai*, 318 F.Supp.3d at 230. If the request is granted, "the district court surrender[s] its jurisdiction." *Id.* But "in the absence of recognition of the immunity by the Department of State," the district court moves to the second step, in which "a district court ha[s] authority to decide for itself whether all the requisites for such immunity existed." *Id.* (internal quotation marks omitted); *Buratai*, 318 F.Supp.3d at 230. "In making that decision, a district court inquire[s] whether the ground of immunity is one which it is the established policy of the

State Department to recognize." *Id.* at 312 (alterations and internal quotation marks omitted); *see also, e.g.*, *Manoharan v. Rajapaksa*, 845 F.Supp.2d 260, 262–63 (D.D.C. 2012), *aff'd*, 711 F.3d 178 (D.C. Cir. 2013) (applying the two-step procedure); *Buratai*, 318 F.Supp.3d at 230–31 (same). "District courts lack subject matter jurisdiction over claims to which common law foreign sovereign immunity applies." *Rosasen*, 2022 WL 409679, at *6.

Where, as here, there is an absence of recognition of the immunity by the Department of State, the district court decides for itself whether the following requisites for foreign official immunity exist. *See Buratai*, 318 F.Supp.3d at 230.

### 1. Conduct-based foreign official immunity applies to the Officials.

Conduct-based foreign official immunity is available to any public minister, official, or agent of the foreign state. *See Rosasen*, 2022 WL 409679, at *6. As applicable to ministers, officials and agents of a foreign government, courts examine three elements to determines whether the requisites for conduct-based foreign-official immunity are met. *See Buratai*, 318 F.Supp.3d at 231. First, the court considers whether the defendants are "public minister[s], official[s], or agent[s]" of a foreign state. *Id.*. Second, the court considers whether they acted in their "official capacit[ies]." *Id.* Third, the court considers whether exercising jurisdiction would "enforce a rule of law against the state." *Id.* (quoting Restatement (Second) of Foreign Relations Law § 66(f)). As shown below, all three requisites exist on this record and thus the Officials qualify for foreign-official immunity.

### a. The Officials are Public Ministers, Officials or Agents of Rwanda.

It is undisputed that the Officials are public ministers, officials or agents of Rwanda. The Amended Complaint alleges that they are public ministers, officials or agents of Rwanda; Rwanda acknowledges that they are public ministers, officials or agents of Rwanda; and each of

them expressly states that he is a public minister, official or agent of Rwanda. *See Buratai*, 318 F.Supp.3d at 233 ("the defendants are public ministers, officials, or agents of Nigeria").

As to Ambassador Johnston Busingye, currently Rwanda's High Commissioner to the United Kingdom, Non Resident Ambassador to Ireland, and Non Resident High Commissioner to Malta, he was "the Rwandan Minister of Justice and Attorney General of Rwanda at all times relevant to the events discussed in this Complaint, since May 24, 2013 until September 2021." Am. Compl. ¶ 31. As to Brigadier General Joseph Nzabamwita, he is currently and has at all relevant times been the Secretary General of the Rwanda NISS. *See* Am. Compl. ¶ 33. As to Colonel Jeannot Ruhunga, he is currently and has been since 2018 the head of the RIB. *See* Am. Compl. ¶ 32 ("Defendant Colonel Jeannot Ruhunga was appointed by President Kagame as the head of the RIB in 2018."). It is thus undisputed that the Officials are public ministers, officials, or agents of Rwanda. *See Buratai*, 318 F.Supp.3d at 233.

**b.  The Officials acted within the scope of their official duties.**

It is undisputed that the Officials acted within the scope of their office or employment. Courts consider the alleged conduct and whether the official was an employee and agent of the foreign state. *See Buratai*, 318 F.Supp.3d at 233 (defendants "acted in their official capacities"); *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (explaining that "the common law of foreign sovereign immunity recognized an individual official's entitlement to immunity for 'acts performed in his official capacity,'" and stating that a "plaintiff's concession that defendant was 'at all relevant times an employee and agent of the defendant Spanish Government' sufficed to dispose of the claim against the individual defendant" (quoting Restatement (Second) of Foreign Relations Law § 66(f) and *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971)).

Here, the Amended Complaint is asserted against each of these three Officials and leaves no doubt that the alleged conduct was within the scope of each Official's official capacity.

Plaintiffs in their Amended Complaint not only specifically allege each Official's official capacity (Am. Compl. ¶¶ 31-33), but also detail numerous acts allegedly performed in that Official's official capacity. Specifically, the Amended Complaint alleges that each of the Officials:

- "act[ed] through their employees, agents, and co-conspirators arbitrarily detained, restrained, and/or falsely imprisoned Plaintiff Paul Rusesabagina within Rwanda without his consent" (¶ 239);

- "act[ed] through their employees, agents, and co-conspirators acted in concert to intentionally put Plaintiff Paul Rusesabagina in imminent apprehension of such harmful contact" (¶ 243);

- "acting through their employees, agents, and co-conspirators acted intentionally to, and did cause harmful and offensive contact to Plaintiff" (¶ 247);

- "acted through their officials or employees who were acting within the scope of their office or employment" (¶ 269), "hatched and executed their conspiracy under the cloak of the authority of their respective offices, and thus acted 'under the color of law' [and] authorized and inflicted Rusesabagina's torture and cruel and degrading treatment under the cloak of the authority of their respective offices, and thus acted 'under the color of law' and continue to do so" in violation of the Torture Victims Protection Act (¶ 278);

- "acted through their officials or employees who were acting within the scope of their office or employment" (¶ 281) and "are liable for its [sic] acts and omissions that led to the injuries ... in violation of the law of nations" (¶ 292); and

- "acted through ... officials or employees who were acting within the scope of their office or employment" (¶ 297) and at the "instruction" (¶ 300) of the Officials, to interfere with the internal affairs of the United States "to falsely lure Mr. Rusesabagina from U.S. soil to execute their kidnapping plot" (¶ 305) and that each Official then "engaged in the continuing series of torts inflicted on Mr. Rusesabagina resulting from the illegal kidnapping" in violation of the Alien Tort Act (¶ 306).

The Officials were Rwandan public ministers, officials, or agents when they allegedly violated various statutes and committed alleged torts as alleged in the Amended Complaint, they allegedly acted within the scope of their official capacities, and thus the second requisite exists on this record. *See Buratai*, 318 F.Supp.3d at 233 (defendants "acted in their official capacities"); *Rosasen*, 2022 WL 409679, at *6 ("Because plaintiff alleges that the individual defendants acted in their official capacity, the only question left is whether the effect of exercising jurisdiction over them would be to enforce a rule of law against the state.").

All of the Officials held important positions within Rwanda's government. *Buratai*, 318 F.Supp.3d at 231 ("Even the defendants with the least authority, however, are hardly low-level—they command and supervise large Nigerian military units and police forces for entire Nigerian states."). Both high-level decision-making and actions of lower-level officials and agents are covered by immunity. *See id.* ("high-level 'decision-making authority is not ... required' for immunity and 'past case law has not focused on the degree of an official's "authority" to act on behalf of the foreign state' because 'conduct-based immunity may extend to an "agent" of a foreign state'" (quoting *Rishikof*, 70 F.Supp.3d at 13)). The rank of the agent who performed the act is not determinative. *See id.* ("[t]he rank of the agent who performed the act was not the

determining factor" (quoting *Rishikof*, 70 F.Supp.3d at 13)). Rather, "it has been the act itself and whether the act was performed on behalf of the foreign state and thus attributable to the state that has been the focus of the courts' holdings." *Id.* (quoting *Rishikof*, 70 F.Supp.3d at 13).

Even if Plaintiffs alleged that the action was against the Officials in their personal capacities, courts examine the allegations to determine whether the conduct reflects action taken within the scope of authority vested in that official. *See Buratai*, 318 F.Supp.3d at 232; *Doe I v. Israel*, 400 F.Supp.2d 86, 104 (D.D.C. 2005). Plaintiffs' allegations that the Officials exercised supervisory, decision-making or operational authority and control over the law enforcement, penal, intelligence and investigative conduct at issue (Am. Compl. ¶¶ 31-33, 239, 243, 247, 269, 278, 291, 292, 297, 300) do not describe private actions. *See Buratai*, 318 F.Supp.3d at 231 ("The defendants all 'exercised effective command and operational control' over the Nigerian military and police forces and the State Security Service, id. ¶¶ 12, 14, 24, 30, 32, 33, 35–42, or 'exercised command authority and control over the perpetrators' of the attacks, id. ¶¶ 16, 22, 28"). These allegations do not describe private actions."). Indeed, the Officials' alleged conduct concerns actions taken within the structure of the Rwandan government, law enforcement and judicial system, drawing on official powers and duties and relying on the governmental, law enforcement and judicial chains-of-command in investigating, apprehending, interrogating, prosecuting, convicting, sentencing and imprisoning a terrorist, Paul Rusesabagina—*i.e.*, within the Officials' official capacities; these allegations do not describe private actions. *See Buratai*, 318 F.Supp.3d at 232 ("These allegations do not describe private actions. Rather, as alleged by the complaint, the defendants acted within the structure of the Nigerian government and military, drawing on official powers and duties and relying on the governmental and military chains-of-command—*i.e.*, within their official capacities."); *Matar*, 563 F.3d at 14 (explaining that "the

common law of foreign sovereign immunity recognized an individual official's entitlement to immunity for 'acts performed in his official capacity,'" and stating that a "plaintiff's concession that defendant was 'at all relevant times an employee and agent of the defendant Spanish Government' sufficed to dispose of the claim against the individual defendant" (quoting Restatement (Second) of Foreign Relations Law § 66(f) and *Heaney*, 445 F.2d at 504).

### c.   Exercising jurisdiction would enforce a rule of law against Rwanda

For this Court to exercise jurisdiction here would have the effect of enforcing a rule of law against Rwanda. *See Buratai*, 318 F.Supp.3d at 233 ("exercising jurisdiction would have the effect of enforcing a rule of law against Nigeria"). Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 690, n.55 (1978)). Because the real party in interest is the entity not the individual, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166; *Odhiambo v. Republic of Kenya*, 930 F.Supp.2d 17, 35 (D.D.C. 2013) ("the Kenyan government is 'the real party in interest'"), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014). For this Court to exercise jurisdiction in this case would have the effect of enforcing a rule of law against Rwanda for five reasons.

First, the Amended Complaint itself states in no uncertain terms that it is expressly alleged against Rwanda because Rwanda is named as a defendant (Am. Compl. ¶ 29 ("Defendant the Republic of Rwanda ('Rwanda') is a foreign state.... At all times relevant herein, Rwanda acted through and is responsible for the tortious acts or omissions of its employees, officials, and agents acting at the direction of the Rwandan Government."). Throughout their Amended Complaint, Plaintiffs assert their allegations against the Rwandan Government. *See* Am. Compl.

¶¶ 1; 6 ("The Rwandan government tracked, harassed, and ultimately kidnapped Paul Rusesabagina"); 12 ("This action arises from the deliberate and intentional campaign by agents, employees, and officials of the Rwandan government, acting at the direction of the Rwandan government."); 16 ("Rwanda is not immune for the series of torts committed against Mr. Rusesabagina"); 93 ("the Rwandan government has used Pegasus to track and pursue targets"); 139 ("the Rwandan government kidnapped Mr. Rusesabagina and stole his phone"); 190 ("the Rwandan prison authorities have confiscated any documents brought by [Mr. Rusesabagina's] lawyers to prison"); & 192 ("[t]he Rwandan authorities have refused proper and consistent medical care for Mr. Rusesabagina"). By the plain language of their Complaint, Plaintiffs seek to enforce a rule of law against Rwanda in this action.

Second, the fact that Plaintiffs in their Amended Complaint seek to impose liability upon Officials of Rwanda "acting within the scope of their office or employment" (Am. Compl. ¶¶ 269, 281 & 297) clearly and unmistakably proves that Plaintiffs seek to enforce a rule of law against Rwanda.

Third, the specific allegations of the Amended Complaint reflect the fact that Plaintiffs seek to impose liability for actions related to core aspects of foreign sovereignty of Rwanda concerning law enforcement and the administration of justice. *See* Am. Compl. ¶¶ 31-33, 239, 243, 247, 269, 278, 291, 292, 297, 300. This Court is not the proper forum to adjudicate the propriety of a foreign state's arrest, prosecution, conviction and incarceration of a terrorist.

Fourth, Plaintiffs seek money damages that would necessarily have to be paid by Rwanda and thus would enforce a rule of law against Rwanda, because the Officials acted within the scope of their authority. *See Kentucky v. Graham*, 473 U.S. at 166 ("a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself");

*Odhiambo*, 930 F.Supp.2d at 35 (same); *Rosasen*, 2022 WL 409679, at *6 (because complaint against government officials sought money damages, "it is likely that any potential damages would be paid by the government of Norway given the nature of plaintiff's allegations"); *Buratai*, 318 F.Supp.3d at 233 ("the plaintiffs seek millions of dollars in compensatory and punitive damages from defendants throughout Nigeria's government, military, and police"). In any event, a decision by this Court exacting money damages would affect how Rwanda's government, law enforcement and judicial systems function, regardless whether the damages come from the Officials' own wallets or Rwanda's coffers, because such interference with Rwanda's government would effectively enforce a rule of law against Rwanda. *See id.* ("A decision by this Court exacting such damages would affect how Nigeria's government, military, and police function, regardless whether the damages come from the defendants' own wallets or Nigeria's coffers. By interfering with Nigeria's government, a decision would effectively enforce a rule of law against Nigeria."); *Odhiambo*, 930 F.Supp.2d at 35 ("the Kenyan government is 'the real party in interest' and the suit against the individual defendants will be treated as one against the Republic of Kenya" as "any damages that Odhiambo recovers in this suit will be payable by the Kenyan government and not from the individual defendants' 'own pockets'") (citation omitted).

Fifth, there is no dispute that Plaintiffs seek to enforce a rule of law against Rwanda. *See Buratai*, 318 F.Supp.3d at 233 (foreign state (Nigeria) acknowledged "authorized official actions" "attributable to the Government of Nigeria"). By contrast, the plaintiffs in *Lewis v. Mutond* did not seek to enforce a rule of law against the foreign state (Congo), asserting claims against the defendants in their individual capacities. 918 F.3d 142, 147 (D.C. Cir. 2019). A decision by this Court on the legality of the Officials' actions would amount to a decision on the

legality of Rwanda's actions in arresting, prosecuting and imprisoning Mr. Rusesabagina. *See Buratai*, 318 F.Supp.3d at 233 ("a decision by this Court on the legality of the defendants' actions would amount to a decision on the legality of Nigeria's actions"); *Doğan*, 2016 WL 6024416, at *9 (granting foreign-official immunity in part because "[i]f this Court passed judgment on the legality of the [official acts alleged to violate the Torture Victims Protection Act], it would likely affect our diplomatic relationship with Turkey, Israel, and the myriad other nations with strong feelings about who was right and who was wrong").

### 2. Status-based foreign official immunity applies to the Officials.

Status-based diplomatic immunity requires the immediate dismissal of this Complaint as to the Officials. *See* Fed. R. Civ. P. 12(b)(1) & (b)(6); *Samantar*, 560 U.S. at 312 n.6 (noting that "[d]iplomatic and consular officers could also claim the 'specialized immunities'"); *Tachiona v. United States*, 386 F.3d 205, 222 (2d Cir. 2004) ("the inviolability principle precludes service of process on a diplomat"). A head of state, secretary of state or foreign minister, ambassador or diplomat of a foreign sovereign are immune from service of legal process under the doctrine of diplomatic and consular immunity in the United States. *Plaintiffs A, B, C, D, E, F v. Zemin*, 282 F.Supp.2d 875, 884 (N.D. Ill. 2003) ("*Zemin*"), *aff'd*, 383 F.3d 620 (7th Cir. 2004).

Personal inviolability is a core attribute of diplomatic immunity. *Id.* at 884. In fact, "[p]ersonal inviolability is of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized. . . ." *Id.* (citation omitted). This cornerstone principle of international law has been enacted in a treaty, which was duly signed and ratified by the United States, the Vienna Convention on Diplomatic Relations, which provides that "[t]he person of a diplomatic agent shall be inviolable." Vienna Convention on Diplomatic Relations, art. 29, Apr. 18, 1961, *United States accession*, Dec. 13, 1972, 23 U.S.T. 3227, 500 U.N.T.S. 95 (hereinafter, the "Vienna Convention").

Pursuant to the Vienna Convention, inviolability means that the "diplomatic agent . . . shall not be liable to any form of arrest or detention.  The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity."  Vienna Convention, art. 29. In addition to protecting the person of diplomatic-level officials, the Vienna Convention "broadly immunizes diplomatic representatives from the civil jurisdiction of the United States courts" (*Tachiona*, 386 F.3d at 215), with certain narrowly-limited exceptions that are not at issue here.

Applying the principles underlying diplomatic immunity, the *Tachiona* Court held that the purpose of the rule is to allow the official "to perform his functions without hindrance from the government of the receiving state, its officials and *even private persons*." *Tachiona*, 386 F.3d at 223 (quoting Sen, A Diplomat's Handbook of International Law and Practice 107 (3d ed. 1988) (emphasis added)). The *Tachiona* Court found that this policy would be undermined in multiple ways by *any* service of process on an immune official:

> First, diplomats would feel "obliged to restrict [their] movements to avoid finding [themselves] in the presence of a process server."  Second, they would be diverted from their duties "by the need to devote time and attention to ascertaining the legal consequences" of the service of process. Third, the manner in which process is served could be "publicly embarrassing."  Finally, permitting service of process on foreign diplomats could be construed as a hostile act and, thus, could invite retaliatory practices in otherwise friendly countries.

*Tachiona*, 386 F.3d at 223–24 (*quoting Hellenic Lines, Ltd. v. Moore*, 345 F.2d 978, 979–81 & n.5 (D.C. Cir. 1965) (internal citations omitted)). The Second Circuit continued:

> Like the court in *Hellenic Lines*, we have no reason to doubt the Government's assertion that, as a practical matter, service of process on a person entitled to diplomatic immunity both interferes with that person's representative functions and constitutes an affront to his or her dignity.

*Id.* at 224. The *Tachiona* Court therefore invalidated the purported service of the complaint on President Mugabe.  *Id.*

18

*Tachiona* and the established body of case law it cites stand for the proposition that high officials of a foreign government are entitled to broad, absolute and categorical inviolability, subject only to the three narrow exceptions expressly enumerated in Article 31 of the Vienna Convention. The Officials are entitled to diplomatic treatment by virtue of their status as "high ranking officials" of the Rwandan Government. *See* Rwanda Directorate General of Immigration & Emigration, https://www.migration.gov.rw/our-services/e-passport/diplomatic-e-passport (last accessed July 24, 2022). None of the exceptions to the Vienna Convention are present here. Accordingly, the Officials are not properly subject to the jurisdiction of this Court based on their status.

### 3. No exception for alleged violations of *jus cogens* norms defeats foreign official immunity.

Foreign official immunity is not undermined by allegations that violations of *jus cogens* norms occurred, for five reasons. First, Congress never included a *jus cogens* exception in the statute, so engrafting one would be wholly inconsistent with settled international and United States law. *Buratai*, 318 F.Supp.3d at 234 (*citing Belhas*, 515 F.3d at 1287).

Second, a *jus cogens* exception would "eviscerate any protection that foreign official immunity affords" because an exception "merges the merits of the underlying claim with the issue of immunity." *Id.* (quoting *Giraldo v. Drummond Co.*, 808 F.Supp.2d 247, 250 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012) (quoting *Belhas*, 515 F.3d at 1292–93 (Williams, J., concurring)). "This would be particularly problematic in lawsuits arising from military operations, as any death resulting from such operations could give rise to a plausible allegation that *jus cogens* norms were violated;" such allegations would be enough to defeat immunity for the military officials and personnel involved. *Doğan*, 2016 WL 6024416, at *10; *cf. Filarsky v. Delia*, 566 U.S. 377, 391–92 (2012) (rejecting exceptions to qualified immunity in

19

the § 1983 context in part because exceptions would "create[] significant line-drawing problems" that "deprive state actors of the ability to reasonably anticipate when their conduct may give rise to liability," and "[a]n uncertain immunity is little better than no immunity at all"); *Buratai*, 318 F.Supp.3d at 235. And "merging the question of immunity with the merits also undermines the original purpose of foreign official immunity: to avoid affronting the sovereignty of a foreign nation by passing judgment on their official government acts, which would inevitably happen if courts had to reach the merits to resolve immunity." *Doğan*, 2016 WL 6024416, at \*10; *Buratai*, 318 F.Supp.3d at 235.

Third, the Executive Branch has never recognized a blanket *jus cogens* exception. *See Buratai*, 318 F.Supp.3d at 235 (*citing Matar*, 563 F.3d at 14; John B. Bellinger, III, *The Dog that Caught the Car: Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819, 833 (2011); *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004) ("In accordance with Chief Justice Marshall's observation that foreign sovereign immunity is a matter of grace and comity rather than a constitutional requirement, this Court has consistently deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over particular actions against foreign sovereigns and their instrumentalities." (internal quotation marks and alteration omitted))).

Fourth, to recognize an exception for alleged *jus cogens* violations would risk political, strategic, and legal considerations within the purview of the Executive Branch. *See Buratai*, 318 F.Supp.3d at 235 (*citing* Bellinger, 44 Vand. J. Transnat'l L at 833–35). The Executive Branch has expressed concerns that a *jus cogens* exception would threaten the immunity of U.S. officials, raising significant reciprocity concerns as recognized by the Legal Advisor to the State

Department. *See Buratai*, 318 F.Supp.3d at 235 (*citing* Bellinger, at 833–34). "[T]he State Department is best situated to evaluate the foreign policy and reciprocal consequences of subjecting a foreign official to suit in U.S. courts. In some settings, personal damage actions against foreign officials may unduly chill their performance of duties, trigger reciprocity concerns about the treatment of U.S. officials sued in foreign courts, and potentially interfere with the Executive Branch's conduct of foreign affairs." *Id.* at 235 n.6 (quoting Harold Hongju Koh, *Foreign Official Immunity After Samantar: A United States Government Perspective*, 44 Vand. J. Transnat'l L. 1141, 1151 (2011)).

Finally, the Executive Branch's position on a *jus cogens* exception therefore weighs heavily against this Court adopting an exception on its own, much less crafting the contours of an exception without an established Executive Branch policy from which to draw. *See Buratai*, 318 F.Supp.3d at 236; *Doğan*, 2016 WL 6024416, at *10.

> **4.     The Torture Victims Protection Act does not abrogate foreign official immunity.**

Foreign official immunity applies to all cases concerning foreign ministers, officials and agents – including cases alleging violations of the Torture Victims Protection Act (the "TVPA"), P.L. 102–256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350, Note). The TVPA provides the following as to liability:

> SEC. 2. ESTABLISHMENT OF CIVIL ACTION.
> (a) LIABILITY.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.
> (b) EXHAUSTION OF REMEDIES.—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

28 U.S.C. § 1350 (Note). The TVPA does not abrogate the doctrine of conduct-based foreign official immunity for four reasons.

First, "[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 674 (D.C. Cir. 2017) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)); *Buratai*, 318 F.Supp.3d at 236 (applying this rule to TVPA). "In such cases, Congress does not write upon a clean slate." *Buratai*, 318 F.Supp.3d at 236 (quoting *United States v. Texas*, 507 U.S. at 534). "In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law," *id.*, and "silence does not suffice." *Id.* (quoting *Matar*, 563 F.3d at 14, and *citing Filarsky*, 566 U.S. at 389 (stating, in the context of § 1983, that "we proceed on the assumption that common-law principles of immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so." (internal quotation marks and alterations omitted)). The TVPA contains language similar to Section 1983. *See* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable ...."). Nothing in the TVPA "speaks directly" to the question of common law foreign-official immunity. *Buratai*, 318 F.Supp.3d at 236–37.

The TVPA provision addresses liability only; it says nothing about jurisdiction generally, nor about the specific jurisdictional issue of foreign-official immunity. *Id.* at 237. The language regarding individuals who act with "actual authority" or "under color" of foreign law, which

could conceivably include even foreign officials acting within their official capacities who could otherwise claim immunity, also appears in § 1983, yet § 1983 leaves in place a host of common law immunities. *Id.* (citing *Filarsky*, 566 U.S. at 383–84; *Malley v. Briggs*, 475 U.S. 335, 339 (1986); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). Courts interpret the TVPA in light of § 1983, "the most analogous statute" and which was enacted and interpreted well before the TVPA. *Buratai*, 318 F.Supp.3d at 237 (quoting *Manoharan*, 711 F.3d at 180); *Doğan*, 2016 WL 6024416, at \*11–12. Therefore, the TVPA does not "speak directly" or make "evident" that it abrogates common law foreign-official immunity.

Second, a contrary interpretation of the TVPA would open a "Pandora's box of liability for foreign military officials." *Buratai*, 318 F.Supp.3d at 237 (*quoting Doğan*, 2016 WL 6024416, at \*12). Unless immunity extends to officials whose governments acknowledge that their acts were officially authorized, virtually "[a]ny military operation that results in injury or death could be characterized at the pleading stage as torture or an extra-judicial killing," thereby subjecting foreign law enforcement or military officials who acted with "actual authority" to suit under the TVPA "embroil[ing] the Judiciary in sensitive foreign policy matters." *Id.* (quoting *Doğan*, 2016 WL 6024416, at \*12). The TVPA does not evince an intent to transform federal courts into a forum for adjudicating foreign law enforcement or military actions. *Id.* "To avoid this 'slippery slope,' it makes sense that the Act leaves in place conduct-based immunity, which only immunizes foreign officials' acts when they are recognized by a foreign sovereign. *Id.* (citing *Doğan*, 2016 WL 6024416, at \*12).

Accordingly, the TVPA still imposes liability on officials who torture or kill under "actual" authority, "apparent" authority, or "color of law" of a foreign nation and are unable to invoke foreign-official immunity – meaning, "officials whose acts, while technically performed

in an official capacity, are clearly not acknowledged or condoned by the foreign sovereign." *Id.* (quoting *Doğan*, 2016 WL 6024416, at *12). This interpretation is the only one consistent with Congressional intent, because "it seems Congress saw liability for former officials arising only in that situation, for it acknowledged that immunity would bar suit where the foreign sovereign recognized the acts in question." *Id.* (quoting *Doğan*, 2016 WL 6024416, at *12). In other words, the TVPA imposes liability on "true outlaws," i.e., individuals who commit acts for which no foreign sovereign is willing to accept responsibility—but not individuals whose conduct is authorized. *Id* at 238.

Third, while courts have considered whether foreign official immunity may allow a foreign state to underhandedly immunize horrendous conduct by its official, courts reason that such concern is mitigated by the fact that the Executive Branch can file a suggestion of non-immunity based on its assessment of the alleged misconduct, an inquiry for which the executive branch is far better-equipped than the judiciary. *Id.* (citing *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial ... They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."). It is not the role of the Judicial Branch of the United States to probe the motives of foreign nations, nor question the policy balance struck by the TVPA. *Buratai*, 318 F.Supp.3d at 238 (citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the

government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.")).

Finally, any alleged exception is inapplicable to a lawsuit such as the present action, in which the foreign state itself is the real party in interest in the lawsuit and is immune from suit under the FSIA. Such an action must be dismissed "regardless of whether the official is immune or not under the common law." *Samantar*, 560 U.S. at 324–25. "[T]o determine whether a suit against a foreign official is governed by the FSIA," a court "must look to whether the suit is against the official personally or whether the state is 'the real party in interest.' If the suit is against the official personally, then the common law regarding sovereign immunity applies, but if the state is 'the real party in interest,' then the suit should be treated as an action against the foreign state itself to which the FSIA would apply." *Odhiambo*, 930 F.Supp.2d at 34 (quoting *Samantar*, 560 U.S. at 324–25). Here, it is clear that Rwanda is the real party in interest and is entitled to immunity under the FSIA because no exception to immunity applies for all of the reasons stated in Rwanda's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint. D.E. 18; *see Edwards v. Fed. Gov't of Nigeria*, Civ. A. No. 18-11133, 2018 WL 6619741, at *3 (D. Mass. Dec. 18, 2018).

**B.    The Amended Complaint Must Be Dismissed Due to the Lack of Personal Jurisdiction over the Officials.**

Even assuming the Officials were not protected by conduct-based foreign sovereign official immunity (which they are), the Officials would nevertheless be entitled to dismissal from this action, because this Court cannot properly exercise personal jurisdiction over them consistent with the requirements of due process and thus dismissal under to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6) is warranted. *See Samantar*, 560 U.S. at 324 n.20 ("a plaintiff seeking to sue a foreign official will not be able to rely on the [FSIA's] . . . jurisdictional

provisions. Thus, a plaintiff will have to establish that the district court has personal jurisdiction over an official without the benefit of the FSIA provision that makes personal jurisdiction over a foreign state automatic when an exception to immunity applies").

Personal jurisdiction "takes two forms: (1) general or all-purpose jurisdiction, or (2) specific or case-linked jurisdiction." *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 45 (D.D.C. 2018) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted)). General jurisdiction exists where a defendant has "continuous and systematic" contacts with the forum state such that the defendant is "essentially at home" in the forum. *Goodyear*, 564 U.S. at 919; *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

Personal jurisdiction over a nonresident defendant is only appropriate if the defendant has sufficient minimum contacts with the forum, and if the exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The plaintiff bears the burden of proving that the Court may exercise personal jurisdiction over the defendants consistent with the Constitution. *Buratai*, 318 F.Supp.3d at 230 ("the plaintiffs have not carried their burden of showing that the Court may exercise personal jurisdiction over the defendants consistent with the Constitution"), *aff'd*, 792 F. App'x 6 (D.C. Cir. 2019). Determination of the requisite "minimum contacts" depends on whether the type of personal jurisdiction being asserted is general or specific. *See id.*, 782 F. App'x at 9.

For tort claims, the Court's analysis will often focus on whether the defendant's conduct was intentional, was aimed at the forum state, and the defendant knew it would cause harm to the

plaintiff in the forum state. *See Walden v. Fiore*, 571 U.S. 277, 286–87 (2014); *Calder v. Jones*, 465 U.S. 783, 789–90 (1984).

Here, Plaintiffs have not alleged facts in the Amended Complaint to satisfy the requirements of either general or specific personal jurisdiction over the Officials.

### 1.      There Is No Basis For General Personal Jurisdiction.

General jurisdiction requires "continuous and systematic" contacts between the defendant and the forum state. *See Helicopteros Nacionales de Colombia, N.A. v. Hall*, 466 U.S. 408, 415 (1984); *Buratai*, 318 F.Supp.3d at 227. It is a high standard because once a forum may assert general jurisdiction over an individual, the individual is subject to suit in any cause of action in the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.15 (1985).

General personal jurisdiction is inapplicable here because Plaintiffs never alleged that the Officials have continuous and systematic contacts with the United States. *Buratai*, 318 F.Supp.3d at 227 ("General personal jurisdiction is not relevant here because the plaintiffs do not attempt to allege that the defendants had continuous and systematic contacts with the United States." (citing complaint)).

### 2.      There Is No Basis For Specific Personal Jurisdiction.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 564 U.S. at 919 (internal quotation marks and citation omitted). Specific jurisdiction therefore "covers defendants less intimately connected with a [forum], but only as to a narrower class of claims." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1024 (2021). The "'essential foundation' of specific jurisdiction" is the "relationship among the defendant, the forum, and the litigation." *Id.* at 1028 (quoting *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414). The plaintiff must meet three requirements to establish a basis

for the court's exercise of specific personal jurisdiction: (1) minimum contacts demonstrating that the defendant purposefully availed itself of the forum; (2) relatedness between the contacts and the claim; and (3) compliance with "fair play and substantial justice." *See Miley v. Hard Rock Hotel & Casino Punta Cana*, 537 F.Supp.3d 1, 6–7 (D.D.C. 2021) (plaintiff failed to establish specific jurisdiction over defendant).

Here, there can be no specific personal jurisdiction as to the Officials under any of the three required elements. First, Plaintiffs failed even to allege, much less establish, any contacts by any Official with the United States. Second, Plaintiffs failed to establish any conduct of any Official in the United States related to Plaintiffs' alleged claims. Plaintiffs do not even bother to pretend that any Official ever traveled to the United States with any connection to their claims. Accordingly, as a matter of elementary logic and chronology, Plaintiffs' claims do not relate to or arise from any Official's contacts with the United States. *Burger King*, 471 U.S. at 471–72; *Miley*, 537 F.Supp.3d at 7 (plaintiff failed to show any connection between defendant's purported forum contacts and the dispute in the case).

Plaintiffs' inability to show a nexus between any contacts of any Official with the United States, on one hand, and the alleged acts of which they complain, on the other hand, defeats the exercise of specific personal jurisdiction over them.

Even in cases in which it was alleged that torture was committed abroad against *American* citizens, such allegations are insufficient to establish personal jurisdiction without some further in-forum connection to the United States. *See Mohammadi v. Islamic Republic of Iran*, 947 F.Supp.2d 48, 73 n.26 (D.D.C. 2013), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002). For example, in *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit stated that "tortur[ing] two

American citizens in Libya" would be "insufficient to satisfy the usual 'minimum contacts' requirement" for personal jurisdiction. 294 F.3d at 95.

In an analogous case, the plaintiffs sued the former head of state of the People's Republic of China in Illinois under the Alien Tort Statute for alleged human rights abuses. *Zemin*, 282 F. Supp. 2d at 887. There, the plaintiffs alleged certain conduct within the United States had occurred, including "suppress[ing] [the plaintiffs'] demonstrations in Illinois through the assault of demonstrators, intimidation [at] Chicago hotels, and the destruction of leaflets and signs." *Id.* at 888. Even though the defendant allegedly engaged in wrongful conduct in the United States, the court found that the defendant's contacts with the United States were not sufficiently related to the claims in the litigation because plaintiffs' claims were based on atrocities ultimately inflicted in China, not within the United States. *Id.* at 888–89.

Here, as in *Zemin*, the Officials' contacts with the forum are completely unrelated to the supposed human rights violations alleged in the suit. Thus, as in those cases, this Court should find that it lacks personal jurisdiction over the Officials.

Finally, the exercise jurisdiction over the Officials in this action would offend traditional notions of fair play and substantial justice. *See Burger King Corp.*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). To determine whether it does, the court considers a range of factors, including the burden on the defendant, the forum's interests in adjudicating the case, the plaintiff's interests in "convenient and effective relief," and the judicial system's interest in the efficient resolution of the controversy. *Id.* at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)); *Miley*, 537 F.Supp.3d at 7 (plaintiff failed to show exercise of jurisdiction over defendant would comport with due process). Here, these factors weigh against exercising personal jurisdiction over the Officials.

First, defending this lawsuit in this Judicial District would place a substantial burden on the Officials, who lack any connection whatsoever to the United States or this Judicial District. Courts consider the burdens placed upon one who must defend oneself in a foreign legal system and assign significant weight to that factor in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987). Consequently, "[g]reat care and reserve should be exercised" before personal jurisdiction is exercised over the defendant in such a situation. *Id.* at 115. Here, that factor is magnified exponentially, because of the official capacities of the Officials, with their heavy political, administrative, diplomatic, and national security responsibilities.

Second, this Judicial District has little interest in allocating responsibility acts which have little or no connection to this Judicial District or to the United States. Plaintiffs' allegations concerning the Officials relate to conduct that occurred entirely abroad with the only jurisdictional contacts alleged being legal conclusions regarding a purported conspiracy to kidnap plaintiff Paul Rusesabagina. Plaintiffs' conspiracy allegations consist of mere speculation and barren conclusions without factual support to demonstrate communications between the alleged conspirators or facts to show any conspiracy whatsoever. Both the existence of the conspiracy and the overt action taken within the forum must be plead with particularity, *North v. Smarsh, Inc.*, 265 F.Supp.3d 71, 77 (D.D.C. 2017), *aff'd*, No. 17-7120, 2017 WL 6553385 (D.C. Cir. Dec. 6, 2017), which Plaintiffs failed to do. *Second Amend. Found.*, 274 F.3d at 524 ("bare allegation of conspiracy or agency is insufficient to establish personal jurisdiction[,]" "a plaintiff must allege specific acts connecting [the] defendant with the forum") (citation omitted). Subjecting the Officials to personal jurisdiction based on unspecified acts by unidentified third parties would offend traditional notions of fair play and substantial justice. *See Cockrum v.*

*Donald J. Trump for President, Inc.*, 319 F.Supp.3d 158, 187 (D.D.C. 2018) ("subjecting defendants to personal jurisdiction based on unspecified acts by unidentified third parties would offend traditional notions of fair play and substantial justice"); *North*, 265 F.Supp.3d at 77–78.

Third, Plaintiffs' interest in obtaining "convenient and effective" relief from this forum is weak because no Plaintiff lives in this Judicial District, or has any connection to this Judicial District at all. *See Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir. 1990) (finding that Florida did not provide convenient and effective relief for plaintiff because he did not reside there). Given the need to travel and the potential language barrier, as well as the inevitable difficulties in obtaining testimony and documents from relevant witnesses who are all located outside the United States, it can hardly be maintained that this Judicial District is "convenient."

Fourth, the judicial system's interest in the efficient resolution of the controversy is minimal in that Plaintiffs are for the most part foreign nationals complaining about alleged conduct occurring elsewhere. Thus, no factor supports the exercise of personal jurisdiction over the Officials here. *See Miley*, 537 F.Supp.3d at 7 (plaintiff failed to show exercise of personal jurisdiction over defendant would comport with due process).

### C.   The Amended Complaint Is Subject to Dismissal Due to the Lack of Service of Process.

Because this Court lacks personal jurisdiction over the Officials, it is irrelevant whether Plaintiffs effected service of process on any of them (*Doe 1 v. Buratai*, 318 F.Supp.3d at 227 (holding that personal jurisdiction would be unconstitutional regardless of whether service was effected on all defendants)), but the Amended Complaint is also subject to dismissal because there was insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(4) and 12(b)(5).

A federal court may assert personal jurisdiction over a defendant only if "the procedural requirements of effective service of process are satisfied." *Freedom Watch, Inc. v. OPEC*, 766 F.3d 74, 78 (D.C. Cir. 2014) (quoting *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (internal quotation marks omitted)). "Service of process 'notif[ies] a defendant of the commencement of an action against him' and 'marks the court's assertion of jurisdiction over the lawsuit.'" *Id.* (. "Federal Rule of Civil Procedure 4 generally 'governs the form, issuance, and service of summons in federal civil actions.'" *Id.* (quoting *Eades v. Clark Distrib. Co.*, 70 F.3d 441, 442 n.1 (6th Cir. 1995)). "If a defendant challenges the validity of service of process, the plaintiff bears the burden to 'demonstrate that the procedure employed to deliver the papers satisfies the requirements of the relevant portions of Rule 4.'" *Id.* (quoting *Mann*, 681 F.3d at 372 (quoting 4A Charles Alan Wright et al, *Federal Practice and Procedure* § 1083 (3d ed. 2002 & Supp. 2012))).

Plaintiffs' request [D.E. 23] was premised upon Federal Rule of Civil Procedure 4(f)(2)(C)(ii). By its terms, Rule 4(f)(2)(C) is inapplicable if "prohibited by the foreign country's law." Rule 4(f)(2)(C)(ii) provides for the use of "any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt". No receipt signed by any Official was provided by Plaintiffs, and Plaintiffs failed to establish mailing was not prohibited by Rwandan law. *See Hashem v. Shabi*, Civ. A. No. 17-1645, 2018 WL 3382913, at *3-4 (D.D.C. Apr. 26, 2018) (plaintiff failed to effect service of process pursuant to Rule 4(f)(2)(C)(ii) where plaintiff failed to provide a signed receipt and failed to establish mailing was not prohibited by foreign law); *Freedom Watch, Inc. v. OPEC*, 766 F.3d at 80 (plaintiff failed to provide a signed receipt and failed to establish mailing was not prohibited by foreign law). Accordingly, Plaintiffs failed

to satisfy Rule 4(f)(2)(C)(ii) with respect to the purported service. In light of the lack of proof of service of process, dismissal is warranted here.

### D.      Joinder in Pending Motion to Dismiss filed by the Republic of Rwanda.

For the reasons stated at A.1.c and A.4, *supra*, Plaintiffs' claims against the Officials are barred by the FSIA because Rwanda is the real party in interest and suffer from various other fundamental infirmities which require the dismissal of those claims with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6), as set forth in the Motion to Dismiss [D.E. 18] filed by Rwanda. The Officials join in that Motion to Dismiss.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants Johnston Busingye, Joseph Nzabamwita and Jeannot Ruhunga respectfully request that the Court enter an order granting this Motion to Dismiss the Amended Complaint with prejudice, and dismissing them from this action.

Dated: July 26, 2022

**ARENTFOX SCHIFF LLP**

By: */s/ Michael S. Cryan*
Michael S. Cryan
Michael.Cryan@afslaw.com
1717 K Street, NW
Washington, DC 200006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395

*Attorneys for Defendants*
*The Republic of Rwanda,*
*His Excellency President Paul Kagame,*
*President of the Republic of Rwanda,*
*Ambassador Johnston Busingye, Brigadier*
*General Joseph Nzabamwita, & Colonel*
*Jeannot Ruhunga*