**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PAUL RUSESABAGINA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 22-00469 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| THE REPUBLIC OF RWANDA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT THE REPUBLIC OF RWANDA'S MOTION TO DISMISS THE AMENDED COMPLAINT

TABLE OF CONTENTS

I. BACKGROUND ............................................................................................................. 2

    A.    Paul Rusesabagina, a world-wide hero due to his bravery in the Rwandan Genocide, moved himself and his family to the United States .............................. 2

    B.    Kagame has choked off any dissent and dissenters are murdered or forced to flee Rwanda ....................................................................................................... 3

    C.    Rwanda has exported its overseas machine of repression to the United States ................................................................................................................. 4

    D.    The conspiracy to kidnap Paul and silence his dissent ........................................... 6

    E.    Universal condemnation of Paul's kidnapping, torture, and show trial ................ 7

II. STANDARD OF LAW ................................................................................................... 9

III. ARGUMENT ............................................................................................................... 10

    A.    RWANDA IS NOT ENTITLED TO SOVEREIGN IMMUNITY ..................... 10

        1.    The Court has jurisdiction over Plaintiffs' claims under the commercial-activity exception to the FSIA ............................................. 10

            a.    Plaintiffs' claims satisfy either § 1605(a)(2)'s second or third prong ................................................................................... 12

                (1)    Under § 1605(a)(2)'s second and third prong, Plaintiffs need not show Rwanda's commercial activity is the gravamen of their claims ........................... 13

                (2)    Rwanda does not dispute that its fraudulent job offer was a commercial activity ....................................... 15

                (3)    Rwanda does not dispute that it committed the alleged torts "in connection with" its fraudulent job offer ........................................................................................ 17

                (4)    Rwanda does not dispute that its alleged torts were performed in or caused a direct effect in the United States ................................................................................. 19

            b.    Plaintiffs' fraud and civil conspiracy claims also fall within § 1605(a)(2)'s first prong ........................................................... 23

(1)      Rwanda's commercial activity forms the gravamen of Plaintiffs' fraud and civil conspiracy claims ............... 23

(2)      Rwanda's commercial activity had substantial contact with the United States ........................................... 24

2.      The Court has subject matter jurisdiction over Rwanda under the non-commercial tort exception to the FSIA ................................................. 25

(1)      Sufficient acts by Rwanda occurred entirely within the United States to create liability ................................... 27

(2)      Rwanda intentionally intruded, physically or otherwise ........................................................................ 28

(3)      Rwanda's conduct does not qualify as a "discretionary function" ................................................... 30

(4)      Rwanda's stalking, harassment, and surveillance of Paul does not qualify for the § 1605(a)(5)(B) exception ........................................................................ 32

B.      PERSONAL JURISDICTION EXISTS HERE .................................................... 34

C.      THE ACT OF STATE DOCTRINE DOES NOT PROVIDE GROUNDS FOR DISMISSAL ............................................................................................ 35

D.      THE AMENDED COMPLAINT MEETS THE REQUIREMENTS OF RULE 12(b)(6) .................................................................................................. 39

IV. CONCLUSION ............................................................................................................. 45

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adler v. Federal Republic of Nigeria*,
  107 F.3d 720 (9th Cir. 1997) ................................................................11, 13, 15, 17

*Agudas Chasidei Chabad of United States v. Russian Federation*,
  528 F.3d 934 (D.C. Cir. 2008) ...........................................................................35, 36

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) .........................................................................................41

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
  425 U.S. 682 (1976)....................................................................................................37

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................................9

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  813 F.3d 98 (2d Cir. 2016)...................................................................................19, 20

*\*Azima v. RAK Inv. Auth.*,
  305 F. Supp. 3d 149 (D.D.C. 2018) ...........................................11, 17, 18, 20, 22

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964)....................................................................................................35

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
  734 F.3d 1175 (D.C. Cir. 2013) ...................................................................................9

*Berkovitz v. U.S.*,
  486 U.S. 531 (1988).....................................................................................................31

*Bigio v. Coca Cola*,
  239 F.3d 440 (2d Cir. 2000)........................................................................................35

*Blaxland v. Commonwealth Dir. Of Pub. Prosecutions*,
  323 F.3d 1198 (9th Cir. 2003) .....................................................................................32

*BP Chems. Ltd. V. Jiangsu Sopo Corp.*,
  285 F.3d 677 (8th Cir. 2002) ......................................................................................24

*Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*,
  472 F. Supp. 2d 740 (E.D. Va. 2007) .......................................................................20

*Cases upon which Plaintiffs chiefly rely are marked with asterisks.

*In re Craftmatic Sec. Litig.*,
   890 F.2d 628 (3d Cir. 1989) ................................................................... 39

*Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*,
   600 F.3d 661 (D.C. Cir. 2010) ......................................................... 12, 19

*CYBERsitter, LLC v. People's Republic of China*,
   805 F. Supp. 2d 958 (C.D. Cal. 2011) .................................................... 18

*Daventree Ltd. V. Republic of Azerbaijan*,
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) ..................................................... 24

*de Csepel v. Republic of Hungary*,
   714 F.3d 591 (D.C. Cir. 2013) .......................................................... 9, 20

*District of Columbia v. Tulin*,
   994 A.2d 788 (D.C. 2010) ...................................................................... 42

*Doe I v. Unocal Corp.*,
   395 F.3d 932 (9th Cir. 2002), *vacated on other grounds*, 403 F.3d 708 (9th
   Cir. 2005) (en banc) ....................................................................... 14, 27

*\*Doe v. Federal Democratic Republic of Ethiopia*,
   851 F.3d 7 (D.C. Cir. 2017) ............................................................. 25, 27

*Doe v. United States*,
   83 F. Supp. 2d 833 (S.D. Tex. 2000) ................................................ 29, 30

*Dominicus Americana Bohio v. Gulf & W. Indus., Inc.*,
   473 F. Supp. 680 (S.D.N.Y. 1979) ......................................................... 38

*\*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
   894 F.3d 339 (D.C. Cir. 2018) ..................................................... 9, 15, 19

*Exxon Mobil Corp. v. Corporacion CIMEX S.A.*,
   534 F. Supp. 3d 1 (D.D.C. 2021) ........................................................... 19

*Frese v. City Segway Tours of Wash., D.C., LLC*,
   249 F. Supp. 3d 230 (D.D.C. 2017) ........................................................ 39

*Gill v. District of Columbia*,
   872 F. Supp. 2d 30 (D.D.C. 2012) ..................................................... 9, 10

*Guevara v. Republic of Peru*,
   468 F.3d 1289 (11th Cir. 2006) ............................................................. 16

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ............................................................... 41

*Harris v. D.C. Water & Sewer Auth.*,
   791 F.3d 65 (D.C. Cir. 2015) ................................................................................... 9

*Hunsinger v. 204S6Th LLC*,
   2022 WL 1102864 (N.D. Tex. 2022) ........................................................... 27, 28

*Hyewoong Yoon v. Seyeon Lee*,
   433 F. Supp. 3d 18 (D. Mass. 2019) ..................................................................... 19

*I.T. Consultants, Inc. v. Islamic Republic of Pakistan*,
   351 F.3d 1184 (D.C. Cir. 2003) ............................................................................. 22

*Janini v. Kuwait Univ.*,
   43 F.3d 1534 (D.C. Cir. 1995) ................................................................................ 16

*Jerez v. Republic of Cuba*,
   775 F.3d 419 (D.C. Cir. 2014) ................................................................................ 25

*Jimenez v. Aristeguieta*,
   311 F.2d 547 (5th Cir. 1962) .................................................................................. 37

*Kareem v. Haspel*,
   986 F.3d 859 (D.C. Cir. 2021) ................................................................................ 39

*Kashef v. BNP Paribas S.A.*,
   925 F.3d 53 (2d Cir. 2019) ..................................................................................... 37

*Kettey v. Saudi Ministry of Educ.*,
   53 F. Supp. 3d 40 (D.D.C. 2014) ............................................................... 11, 12, 15

*Khochinsky v. Republic of Poland*,
   1 F.4th 1 (D.C. Cir. 2021) ....................................................................................... 32

*Kurd v. Republic of Turkey*,
   374 F. Supp.3 d 37, 53 (D.D.C. 2019) ................................................................... 42

*Lagayan v. Odeh*,
   199 F. Supp. 3d 21 (D.D.C. 2016) ......................................................................... 40

*Lambros v. Federative Republic of Brazil*,
   2021 WL 1820206 (D.D.C. 2021) .......................................................................... 33

*Larijani v. Georgetown Univ.*,
   791 A.2d 41 (D.C.2002) .......................................................................................... 42

*Leffer v. Fed. Republic of Germany*,
   2021 WL 17773355 (D.D.C. 2021) ........................................................................ 33

*Letelier v. Republic of Chile,*
    488 F. Supp. 665 (D.D.C. 1980) ........................................................................27

*Liu v. Republic of China,*
    892 F.2d 1419 (9th Cir. 1989) ...........................................................................27

*Lizarbe v. Rondon,*
    642 F. Supp. 2d 473 (D. Md. 2009) ...................................................................37

*Loumiet v. United States,*
    828 F.3d 935 (D.C. Cir. 2016) ...........................................................................45

*\*Matos Rodriguez v. Pan Am. Health Org.,*
    29 F.4th 706 (D.C. Cir. 2022) ..............................................................10, 23, 24

*MTS Secs., Inc. v. Creditanstalt-Bankverein,*
    1997 WL 251482 (W.D.N.Y. 1997) ...................................................................15

*Nnaka v. Fed. Republic of Nigeria,*
    238 F. Supp. 3d 17 (D.D.C. 2017), *aff'd,* 756 F. App'x 16 ..........................17, 19

*Nnaka v. Federal Republic of Nigeria,*
    756 F. Appx 16 (D.C. Cir. 2019) (unpublished) ...........................................16, 17

*\*OBB Personenverkehr AG v. Sachs,*
    577 U.S. 27 (2015) ...........................................................................10, 12, 13, 23

*Ortberg v. Goldman Sachs Grp.,*
    64 A.3d 158 (D.C. 2013) ....................................................................................42

*Owens v. Rep. of Sudan,*
    924 F.3d 1256 (D.C. Cir. 2019) .........................................................................43

*Pablo Star Ltd. v. Welsh Government,*
    961 F.3d 555 (2d Cir. 2020) ..........................................................................16, 17

*Persinger v. Islamic Republic of Iran,*
    729 F.2d 835 (D.C. Cir. 1984) (Edwards, C.J dissenting) .................................25

*Peterson v. Aaron's, Inc.,*
    2017 WL 4390260 (N.D. Ga. 2017) ...................................................................20

*\*Republic of Argentina v. Weltover, Inc.,*
    504 U.S. 607 (1992) ...............................................................................12, 15, 19

*Republic of Sudan v. Owens,*
    194 A.3d 38 (D.C. 2018) ...............................................................................21, 43

*Riggs Nat. Corp. & Subsidiaries v. Comm'r*,
   163 F.3d 1363 (D.C. Cir. 1999) ........................................................................38

*Sack v. Low*,
   478 F.2d 360 (2d Cir. 1973)..............................................................................20

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ....................................................................................14, 24

*Schuchart v. La Taberna del Alabardero, Inc.*,
   365 F.3d 33 (D.C. Cir. 2004) ...............................................................27, 29, 40

*Shapiro v. Republic of Bolivia*,
   930 F.2d 1013 (2d Cir. 1991)............................................................................24

*Smith v. U.S.*,
   121 F. Supp. 3d 112 (D.D.C. 2015), *aff'd*, 843 F.3d 509 (D.C. Cir. 2016)..........................42

*Southway v. Cent. Bank of Nigeria*,
   198 F.3d 1210 (10th Cir.1999) .........................................................................15

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005) ..........................................................................34

*Turkmani v. Republic of Bolivia*,
   193 F. Supp. 2d 165 (D.D.C. 2002) ..................................................................24

*UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*,
   581 F.3d 210 (5th Cir. 2009) ............................................................................22

*United States ex rel. Tran v. Comput. Scis. Corp.*,
   53 F. Supp. 3d 104 (D.D.C. 2014) ....................................................................40

*United States v. Gaubert*,
   499 U.S. 315 (1991)..........................................................................................30

*United States v. Turkiye Halk Bankasi A.S.*,
   16 F.4th 336 (2d Cir. 2021) ..............................................................................15

*Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Cts.*,
   727 F.3d 10 (1st Cir. 2013)..........................................................................16, 17

*Voest-Alpine Trading USA Corp. v. Bank of China*,
   142 F.3d 887, 896 (5th Cir. 1998) ....................................................................22

*W.S. Kirkpatrick v. Env't Tectonics Corp., Int'l,*
  493 U.S. 400 (1990)................................................................34, 35, 36, 37

*Warfaa v. Ali,*
  33 F. Supp. 3d 653 (E.D. Va. 2014) ...............................................................37

*United States ex rel. Williams v. Martin-Baker Aircraft Co.,*
  389 F.3d 1251 (D.C. Cir. 2004)......................................................................39

*Wye Oak Tech., Inc. v. Republic of Iraq,*
  24 F. 4th 686 (D.C. Cir. 2022).....................................................................9, 11

**Statutes**

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* ....................... 1, 9-35, 44

The Wiretap Act, 18 U.S.C. § 2520(e) ..............................................................44

28 U.S.C. § 1330(b) ...........................................................................................34

Robert Levinson Hostage Recovery and Hostage-taking Accountability Act, Pub.
  L. No. 116-260..........................................................................................1, 7, 35

**Other Authorities**

Fed. R. Civ. P. 8 .................................................................................................24

Fed. R. Civ. Proc. 9(b) ......................................................................................39

H.R. Res. 892, 117th (2022) ..............................................................................36

Restatement (First) of Conflict of Laws § 377 (Am. L. Inst. 1934) ..............20

Restatement (Fourth) of the Foreign Relations Law of the United States § 432(b)
  (Am. L. Inst. 2018) ......................................................................................31

Restatement (Fourth) of The Foreign Relations Law of the United States § 441
  cmt. c (Am. L. Inst. 2018)...........................................................................38

Restatement (Second) of the Law of Torts § 46 cmt. l. (Am. L. Inst. 1977) ...............43

Rwanda Law Nº 68/2018 of 30/08/2018 Determining Offences and Penalties in
  General Art. 94, Art. 112, Art. 151 .............................................................38

## INTRODUCTION

The Republic of Rwanda engaged in decades of stalking and harassment—and more recently illegal surveillance—in the United States, targeting the Kagame regime's most prominent critic, Presidential Medal of Freedom winner and United States resident Paul Rusesabagina, who was portrayed in the movie "Hotel Rwanda." Rwanda's Embassy in the United States coordinated these activities and conspired with paid agents in the United States and members of the Rwandan Community Abroad Texas chapter to conduct this campaign in the United States. Ultimately, Rwanda lured Paul from his home in Texas with a false job offer, made through a private citizen, which enabled Rwanda, once Paul was outside of the United States, to drug, kidnap, torture, and jail him, eventually subjecting him to a sham trial. The United States government has formally designated Paul under the Robert Levinson Hostage Recovery and Hostage-taking Accountability Act as wrongfully detained and, along with Members of Congress, has called for his release.[1]

Rwanda's conduct satisfies two different exceptions of the Foreign Sovereign Immunities Act, which provides jurisdiction over Rwanda's conduct in this case. FSIA immunity does not extend to Rwanda's commercial activity or to its commission of entire torts in the United States. None of Rwanda's other arguments have merit. Its conduct in the United States, targeting a United States resident for abuse, does not satisfy the requirements of the act of state doctrine, nor

---

[1] President Biden recently signed an "Executive Order on Bolstering Efforts to Bring Hostages and Wrongfully Detained United States Nationals Home", which declares a national emergency to address Rwanda's actions and similar conduct by other nations. E.O. 14,078 (July 19, 2022) ("the wrongful detention of United States nationals are heinous acts that undermine the rule of law. . . . foreign states that engage in the practice of wrongful detention . . . . threaten the integrity of the international political system and the safety of United States nationals [defined to include "a lawful permanent resident", such as Paul] and other persons abroad.").

does the abuse that violated Rwandan as well as U.S. law. Finally, Plaintiffs have adequately

pled their claims.

Foreign states that reach into U.S. territory to violate U.S. law, causing injuries to U.S.

citizens and legal residents, are not immune from suit in the United States.[2]

## I.  BACKGROUND

### A.   Paul Rusesabagina, a world-wide hero due to his bravery in the Rwandan Genocide, moved himself and his family to the United States

Paul Rusesabagina is an award-winning humanitarian and political activist.

As violence swept through Rwanda in 1994, Paul converted Kigali's Hôtel des Milles Collines,

which he managed for Sabena Hotels, into a safe haven despite the risk to himself and his family.

Am. Compl., Dkt. 17, ¶8 [hereinafter, "AC"]. Paul offered refuge at the hotel to 1,268 Tutsis and

moderate Hutus—who were sure to be horrifically murdered at the time—as they fled the

Interhamwe militias. *Id.* Although genocide raged outside the hotel's gates, no one in the hotel

was injured or killed, and Paul's story inspired the Academy Award-nominated film Hotel

Rwanda, which was met with international acclaim. *Id.* Paul is a hero to many millions of people

around the world and in Rwanda for his incredible heroism.

Paul has also been an outspoken critic of Rwandan President Paul Kagame and his

increasingly repressive government, AC ¶11, resulting in decades of systematic targeting by the

Rwandan regime. AC ¶¶9, 11. He fled from Rwanda to Belgium, and then to the United States to

avoid Kagame's revenge. AC ¶35. He founded the Hotel Rwanda Rusesabagina Foundation to

---

[2] The increasingly bold actions of Chinese, Russian, Rwandan and other agents in the United States have resulted in the prioritization of the issue by the FBI. https://www.fbi.gov/investigate/counterintelligence/transnational-repression ("Some countries' governments harass and intimidate their own citizens living in the U.S. These governments may also target naturalized or U.S.-born citizens who have family overseas or other foreign connections. This violates U.S. law and individual rights and freedoms.").

initially support the education of young girls and women who were genocide survivors and then to generate support for the Truth and Reconciliation Commission for Rwanda and the Great Lakes Region of Africa. AC ¶9. He has received many awards, including the U.S. Presidential Medal of Freedom from George W. Bush in 2005. *Id.*

Paul is a permanent legal resident of San Antonio, Texas, along with his wife, Taciana. AC ¶10. Paul's son Roger and daughter Carine are both American citizens, and his son Trésor and daughter Anaïse are both legal permanent residents of the United States. *Id.* They have all currently lived and worked in the U.S. for almost two decades or more. *Id.*

**B.      Kagame has choked off any dissent and dissenters are murdered or forced to flee Rwanda**

Paul fled Rwanda, after surviving the Genocide, because of his criticism of Kagame's regime, which does not tolerate dissent. AC ¶¶36, 46-52. Tragically, many dissenters who fled Rwanda have been assassinated, which has been publicly celebrated by Kagame and his regime. AC ¶¶38-45. The U.S. State Department has highlighted "numerous reports the [Rwandan] government committed arbitrary or unlawful killings," including of members of the domestic political opposition. AC ¶43; *see also* AC ¶41 (annual EU report detailing "enforced disappearances, arbitrary detentions and use of torture and other inhuman or degrading treatments in detention facilities" especially in connection with "political rights, freedoms of expression, association and assembly."). Well-regarded international NGOs such as Human

Rights Watch, Freedom House, and the Lantos Foundation have also documented the Kagame government's lengthy track-record of the "enforced disappearance, imprisonment and extrajudicial killings" of political dissenters inside Rwanda. AC ¶¶38-40, 44-45. Political dissenters who fled Rwanda have been hunted down and assassinated as well. AC ¶¶38-40, 45, 75-78. There is no press freedom, AC ¶¶57-63, or room for political dissent in Rwanda. The State Department 2020 Country Report on Human Rights Practices has documented abuses by the Kagame regime including unlawful or arbitrary killings; forced disappearance; torture; arbitrary detention; detention of political prisoners; politically motivated reprisal against individuals located outside the country; unlawful interference with privacy; serious restrictions on free expression and other abuses. AC ¶51.

Kagame's last term was supposed to end in 2017, but a constitutional amendment now allows him to remain president until 2034, and in the most recent election, he won with an implausible 98.79% of the vote. AC ¶36.

## C.       Rwanda has exported its overseas machine of repression to the United States

The Rwandan government has built a secret machinery of repression on U.S. soil. AC ¶¶85-86, 126. The Rwandan Embassy coordinates the actions of paid agents, such as Michelle Martin, AC ¶¶73, 67-85, as well as the efforts of the Rwandan diaspora in the United States through the Rwandan Community Abroad ("RCA"), AC ¶¶111-20. The system that Rwanda built in the U.S. allows it to secretly track and disrupt the lives of political dissidents living here.

Rwanda's agent, Michelle Martin, tried to infiltrate Paul's inner circles and encouraged his associates to join a Rwandan rebel group—which they refused to do. AC ¶¶67, 69, 71, 82. Ms. Martin intentionally misrepresented herself (AC ¶¶69, 79, 81) over a period of years to win the trust of Paul's associate Providence Rubingisa and used her position of trust to steal "hundreds of notes, screenshots, emails, and text messages" from him. AC ¶¶68-69, 72-73, 83.

Ms. Martin's role as a paid agent for Rwanda was discovered when she disclosed her work for the Rwandan government via late FARA filings in 2013. AC ¶¶79-81. Rwanda's effort to extradite Paul through Belgium was based in part on emails stolen by Ms. Martin. AC ¶¶128-29. Mr. Rubingisa, however, realized that at least some of the emails were forgeries and the Belgian authorities rejected the extradition attempt. AC ¶¶128-130. Years later, Ms. Martin reemerged to act as a "star witness" at Paul's show trial in 2021 in Kigali and referred to the stolen data in her highly-scripted performance. AC ¶¶83, 91.

The Rwandan Embassy in Washington, D.C. also coordinates the efforts of the U.S. chapter of the RCA, which is a formal organization supported by both the Rwandan Embassy and the Rwandan Ministry of Foreign Affairs and International Cooperation ("MINAFFET"). AC ¶¶111-20. The Rwanda Embassy touts the U.S. chapter of the RCA on its website, which is described by the MINAFFET as "a Unit at MINAFFET that deals on a daily basis with Rwandans living abroad."  AC ¶112. The head of the San Antonio, Texas, RCA chapter Moses Rudasunikwa met Mr. Rusesabagina in 2007 and, in his own words, made Mr. Rusesabagina his "main focus," making it a "task to follow" Mr. Rusesabagina since then. AC ¶¶111, 113, 120 (Mr. Rudasunikwa organized attempts to disrupt speeches by Paul as recently as 2020). He coordinated his efforts with the Rwandan Embassy in Washington D.C. For example, Mr. Rudasunikwa admits that after he met Paul for the first time, he called the Embassy, spoke to a councilor at the Embassy, and asked for documentation to support his opposition to Paul. AC ¶114. Mr. Rudasunikwa's ties to the Embassy eventually resulted in a visit by the Ambassador Kimonyo to San Antonio to speak in 2007. *Id.* Embassy personnel directly contributed to the Rwandan government campaign against Paul in the United States. For example, Ambassador Kimonyo made spectacularly wild and untrue claims against Paul during a public forum in

Chicago, an easily disproved fabulation. AC ¶¶55-56. The Ambassador also engaged in fruitless

attempts to convince Susan Rice, then U.S. Ambassador to the United Nations that Paul

supported terrorists. AC ¶89. In 2021, officials at St. Mary's School of Law documented

attempts by Charles Ntageruka, the Second Counselor at the Rwandan Embassy, to spy on a

Zoom discussion attended by members of Paul's family regarding his kidnapping and legal

defense in Rwanda. AC ¶¶121-25. The Rwandan Embassy coordinated this multi-tiered stalking

and harassment for over a decade. AC ¶55, 126.

**D.      The conspiracy to kidnap Paul and silence his dissent**

After Rwanda failed to extradite Paul through Belgium, Kagame and his security

agencies put another scheme into play. On February 27, 2020, the Rwanda Investigation Bureau

("RIB") coerced a man named Mr. Constantin Niyomwungere into participation in a conspiracy

to lure Paul to Kigali under false pretenses. AC ¶¶140-45. Mr. Niyomwungere had been in

discussions with Paul to bring him to Burundi for a series of public discussions regarding his

personal experiences during the Genocide, and to allow him to further his goal to foster the

creation of a truth and reconciliation commission for the Great Lakes Region in Africa, which

included Burundi and Rwanda. AC ¶¶132-36. Mr. Niyomwungere kept Rwandan security

services informed about Paul's potential travel to Burundi. AC ¶142. Mr. Niyomwungere

reassured Paul that he had nothing to fear about the flight plan, which would stray close to

Rwanda. AC ¶145. But based on Mr. Niyomwungere's information, Rwanda rented a private jet,

which would take Paul from Dubai to Kigali, instead of Burundi as he had been told. AC ¶¶142-

43, 146-152. Rwandan officials, including Defendants Kagame, Nzabamwita, and Busingye, all

later admitted during public interviews that the Rwandan government and Mr. Niyomwungere

had plotted together to trick Paul into coming to Kigali. AC ¶¶155-172.

Rwandan security services arrested Paul after the plane landed in Kigali, took him to a

secret detention facility where he was prevented from speaking to his family or a lawyer, and tortured him into a false confession. AC ¶¶173-79. Michel Mbazabagabo, the RIB agent who had conspired with Mr. Niyomwungere to trick him into coming to Dubai, led the torture. For example, the agent, wearing military boots, would step on Paul's neck and tape his mouth and nose while he was tied up, making it almost impossible to breathe, causing Paul's legs to convulse involuntarily. AC ¶178. The Rwandan authorities boasted to Paul: "we know how to torture." Paul lost almost 20 pounds due to the torture. AC ¶¶178-79.

**E.   Universal condemnation of Paul's kidnapping, torture, and show trial**

While the Rwandan security services had devoted many years to stalking and illegally surveilling Paul, it could not conjure up any evidence of his purported crimes. AC ¶¶203-04.

Rwanda's abuse of Paul has been condemned by the United States Executive and Legislative Branches, as well as the U.N. and the E.U.:

- On May 6, 2022, the United States Department of State concluded that "[p]ursuant to the Robert Levinson Hostage Recovery and Hostage-taking Accountability Act, Section 302(c) of the Consolidated Appropriations Act, 2021, Public Law 116-260, the U.S. Department of State has determined the government of Rwanda has wrongfully detained U.S. Lawful Permanent Resident Paul Rusesabagina." AC ¶¶2, 211-14.

- On March 18, 2022, the United Nations also concluded that "Mr. Rusesabagina's detention has no legal basis and is therefore arbitrary." AC ¶¶4, 215. The U.N. also concluded the Rwandan government subjected Mr. Rusesabagina to arbitrary detention to silence his political opposition: "The Working Group concludes that Mr. Rusesabagina's detention resulted from the peaceful exercise of his right to freedom of opinion and expression and the right to take part in the conduct of public affairs, contrary to articles 19 and 21 of the Universal Declaration of Human Rights and 19 and 25 of the Covenant." AC ¶¶216-17.

- And on October 7, 2021, the European Union Parliament passed a resolution that "[s]trongly condemns . . . the illegal arrest, detention and conviction of Paul Rusesabagina, which violates international and Rwandan law; considers the case of Mr. Rusesabagina to be exemplary of the human rights violations in Rwanda and call into question the fairness of the verdict, which reportedly lacked guarantees for a fair trial in line with international best practices of representation,

the right to be heard and the presumption of innocence . . . ." AC ¶¶5, 218-20 (emphasis added).

The American Bar Association monitored Paul's 2021 trial in Rwanda and found serious procedural flaws and evidentiary issues:

> The trial was regrettably overshadowed by President Kagame's extravagant declarations of Mr. Rusesabagina's guilt. For all the reasons given in this report, and in its predecessor published last year, I consider that the procedures in a number of respects violated international and regional standards for fair trial procedures, and smacked of a "show trial."

AC ¶¶205-08 (emphasis added). The report concluded, "[f]or all of these reasons, this report concludes that the judgment convicting Mr. Rusesabagina should not be relied upon and did not meet the necessary guarantees of fairness." AC ¶209. The EU made troubling observations regarding the "evidence" that Rwanda contrived for the prosecution:

> when the verdict was rendered, additional evidence was announced that had not been previously heard by the court or submitted during the trial relating to the allegation that Mr Rusesabagina had raised funds for the FLN armed group; whereas some of the evidence cited derived from statements that Mr Rusesabagina claims were made under duress and without counsel. . . .

AC ¶218 (emphasis added). The NGO Human Rights Watch also found:

> The September conviction and 25-year sentence of critic and political opponent Paul Rusesabagina on charges including murder and membership in a terrorist group after a flawed trial was emblematic of the government's overreach and manipulation of the justice system. Rusesabagina was forcibly disappeared and unlawfully returned to Rwanda in August 2020. His trial was marred with fair trial and due process rights violations.

AC ¶210. As the U.N. concluded:

> It is clear on the facts that Mr. Rusesabagina has been targeted by the Government on account of his work as a human rights defender, because of his criticism of the Government on a broad range of human rights issues, including unfair elections and a lack of democracy, freedom of speech, freedom of association and freedom of the press. He has also challenged cases of arbitrary detention, torture and extrajudicial killings. He has publicly made allegations of war crimes and crimes against humanity since before the 1994 genocide and especially since 1998. Mr. Rusesabagina's criticisms are echoed on a regular basis by civil society organizations and government agencies, among others.

8

AC ¶217 (emphasis added).

## II.  <u>STANDARD OF LAW</u>

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.*, governs U.S. courts' jurisdiction to hear suits against foreign sovereigns. Although the default rule is that foreign sovereigns are immune from suit, the FSIA establishes several exceptions. *See id.* §§ 1604-1605; *see also, e.g.*, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013). In weighing a motion to dismiss for foreign sovereign immunity, courts employ a burden-shifting framework. The plaintiff bears the initial burden to produce evidence that an exception to the FSIA applies, but "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F. 4th 686, 696 (D.C. Cir. 2022) (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)). When a defendant brings a Rule 12(b)(1) motion and "contests only the legal sufficiency of the plaintiff's jurisdictional claims, [the] standard of review is akin to that applied under Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018).

A complaint should not be dismissed for failure to state a claim under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This pleading requirement, however, does not demand "the plaintiff to plead all elements of her prima facie case in the complaint, or

to plead law or match facts to every element of a legal theory. . . ." *Gill v. District of Columbia*, 872 F. Supp. 2d 30, 34 (D.D.C. 2012) (internal citations omitted). Furthermore, "[a] court considering [a 12(b)(6)] motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor." *Id.* at 33.

### III.  ARGUMENT

**A.    RWANDA IS NOT ENTITLED TO SOVEREIGN IMMUNITY**

> 1.    **The Court has jurisdiction over Plaintiffs' claims under the commercial-activity exception to the FSIA**

The court has subject matter jurisdiction over Plaintiffs' fraud, civil conspiracy, solatium, false imprisonment, loss of consortium, IIED, intrusion upon seclusion, and Wiretap Act claims against Rwanda because each falls within at least one of the three alternative prongs of the FSIA's commercial-activity exception, 28 U.S.C. § 1605(a)(2).[3] All of these claims can be brought under § 1605(a)(2)'s second or third prong, and Plaintiffs' fraud and civil conspiracy can also be brought under the first prong. Rwanda's argument to the contrary misses the mark: Rwanda argues that the "gravamen" the entire complaint must be Rwanda's commercial activity, Br. at 14-15 ("the gravamen of the Amended Complaint concerns . . . ."), but this is wrong. *Matos Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 713 (D.C. Cir. 2022) ("The FSIA text does not require courts to look to the entire lawsuit to determine the gravamen thereof."). Rather, the Supreme Court "instructs courts to define the 'gravamen' on a claim-by-claim basis." *Id.* (quoting *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33-34 (2015)). Furthermore, the caselaw and plain text of § 1605(a)(2) show that the "gravamen" analysis only applies to claims brought under the first prong. Here, because Plaintiffs' claims fall within the second or third

---

[3] Plaintiffs concede the Court does not have jurisdiction to hear their assault and battery claims against Rwanda, but they continue to maintain those claims against the other defendants.

prong (and Rwanda does not argue otherwise), Rwanda's gravamen analysis does not even apply. Separately, this Court has jurisdiction over Plaintiffs' fraud and conspiracy claims under the first prong because the gravamen of those claims is Rwanda's commercial activity in the United States.

The parties agree that the commercial activity exception to the FSIA authorizes jurisdiction over an action against a foreign sovereign that is based upon any one of three distinct categories of claims: "(1) a commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2); Br. at 13. Rwanda overlooks, however, that each of § 1605(a)(2)'s three prongs include distinct elements and thus require distinct analyses. *See, e.g.*, *Wye Oak Tech.,* 24 F.4th at 691-92; *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 50-51 (D.D.C. 2014).

The court has jurisdiction under 1605(a)(2)'s second prong if "(1) the plaintiff's action is based upon an act performed in the United States, and (2) that it was taken in connection with a commercial activity of the defendants." *Kettey*, 53 F. Supp. 3d at 50. The court has jurisdiction under § 1605(a)(2)'s third prong if "the plaintiff's action is (1) based upon an act outside the territory of the United States, (2) that was taken in connection with a commercial activity of the defendants outside of this country, and (3) that caused a direct effect in the United States." *Id.* at 50-51. Under the first two prongs, act is "taken in connection with" a commercial activity if there is "some substantive connection or a causal link to the commercial activity." *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149, 165 (D.D.C. 2018) (Jackson, J.) (quoting *Adler v. Federal Republic*

*of Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997)), *rev'd on other grounds*, 926 F.3d 870 (D.C. Cir.

2019). Under the third prong, "an effect qualifies as direct 'if it follows as an immediate

consequence of the defendant's ... activity'" and "no intervening event stood between" the

defendant's activity and the effect. *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of

Can.*, 600 F.3d 661, 664 (D.C. Cir. 2010) (quoting *Republic of Argentina v. Weltover, Inc.*, 504

U.S. 607, 618 (1992)).

　　In addition, the court has jurisdiction under § 1605(a)(2)'s first prong if the plaintiff's

claim is "based upon' a 'commercial activity' by defendants that had 'substantial contact' with

the United States." *Kettey*, 53 F. Supp. 3d at 50. A claim is "based upon a commercial activity"

when the commercial activity constitutes the "gravamen" of the claim. *Sachs*, 577 U.S. at 33-34.

　　A foreign sovereign engages in a commercial activity when it "exercise[s] . . . those

powers that can also be exercised by private citizens" as opposed to "powers peculiar to

sovereigns." *Weltover*, 504 U.S. at 614. Importantly, the text of the FSIA instructs courts to

assess an activity's commercial character "by reference to the nature of the course of conduct or

particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Thus,

as the Supreme Court has instructed whether the foreign sovereign is acting "with the aim of

fulfilling uniquely sovereign objectives" is irrelevant, what matters is whether the acts

"(whatever the motive behind them) are the type of actions by which a private party engages."

*Weltover*, 504 U.S. at 614.

　　　　a.　　**Plaintiffs' claims satisfy either § 1605(a)(2)'s second or third prong**

　　Plaintiffs' claims satisfy § 1605(a)(2)'s second prong as long as the alleged torts were

committed in the United States and were "taken in connection with" Rwanda's commercial

activity abroad. *See Kettey*, 53 F. Supp. 3d at 50. For those torts committed outside the United

States, Plaintiffs' claims satisfy § 1605(a)(2)'s third prong if they were "taken in connection

with" Rwanda's commercial activity abroad and caused a "direct effect" in the United States. *Id.* at 50-51.

Plaintiffs' claims each satisfy § 1605(a)(2)'s second or third prong because Rwanda committed each alleged tort in connection with a commercial activity – the fraudulent job offer its agent made to Paul – and these acts were either committed in or had a direct effect in the United States. Rwanda does not dispute this, but instead relies solely on its "gravamen" argument. Br. at 13. This argument fails because the "gravamen" analysis applies on a "claim-by-claim" basis and does not apply to § 1605(a)(2)'s second or third prong.

> **(1)     Under § 1605(a)(2)'s second and third prong, Plaintiffs need not show Rwanda's commercial activity is the gravamen of their claims**

Only the first prong requires Plaintiffs to show that Rwanda's commercial activity forms the gravamen of their claims. The first prong applies where the plaintiff's action is directly "based upon a commercial activity. . . ." § 1605(a)(2). By comparison, the second and third prongs both apply to actions based upon "an act . . . *in connection with* a commercial activity . . . ." *Id.* In other words, while, as discussed above, the second and third prong require only "some substantive connection or causal link" between the wrongful conduct and a commercial activity, the first prong applies when the alleged wrongful conduct is *itself* a commercial activity. *See Adler*, 107 F.3d at 725. Thus, the Supreme Court has instructed that, in first-prong cases, courts must assess whether the "gravamen" of the plaintiff's action is a domestic commercial activity. *See Sachs*, 577 U.S. at 33-34. But this analysis does not apply to second and third prong cases like this because, under these prongs, Plaintiffs need not show their claims are "based upon a commercial activity." *See* § 1605(a)(2).

Rwanda's argument that the *Sachs* gravamen analysis requires analysis of the entire complaint, or applies to all three prongs of § 1605(a)(2), takes the Court's jurisprudence

egregiously out of context and ignores the plain language of the statute. *Sachs* expressly dealt only with § 1605(a)(2)'s first prong. *See* 577 U.S. at 31 n.1 ("As *Sachs* relies only on the first clause to establish jurisdiction over her suit, we limit our inquiry to that clause."). Same too with *Saudi Arabia v. Nelson*, which was *Sachs's* predecessor case. *See* 507 U.S. 349, 354 (1993) (respondent argued "that jurisdiction existed, under the first clause of § 1605(a)(2), because the action was one 'based upon a commercial activity' . . . .'"). Indeed, *Nelson* specifically juxtaposed § 1605(a)(2)'s first prong with its second and third prongs and observed that "Congress manifestly understood there to be a difference between a suit 'based upon' commercial activity and one 'based upon' acts performed 'in connection with' such activity." *Id.* at 357-58.

*Azima* demonstrates the correct approach. There, the plaintiff alleged an Emirati-owned company hacked his computers to gain an advantage in its commercial dealings with him. 305 F. Supp. 3d at 155-57. In finding the plaintiff's hacking claim was judiciable under § 1605(a)(2)'s third prong, then-Judge (now-Justice) Jackson analyzed whether there was a sufficient connection between the defendant's business dealings with the plaintiff and the alleged computer hacking. *See id.* at 165-68. That the claim was plainly "based upon" the hacking, and not the parties' commercial relationship, did not affect the analysis. *See id.*

Rwanda's heavy reliance on *Nelson* is thus inapplicable to Plaintiffs' second and third-prong arguments. *Nelson* stands, at most, for the proposition that a sovereign's abuse of its police power cannot *itself* be a commercial activity. *Nelson* does not say that abuse of police power can never be "an act" under § 1605(a)(2)'s second or third prong that is excepted from FSIA immunity when it is performed in connection with a commercial activity and causes a direct effect in the United States. *See Doe I v. Unocal Corp.*, 395 F.3d 932, 957 (9th Cir. 2002) ("The

problem with this reasoning is that neither *Nelson*, nor other case law, nor the legislative history of § 1605(a)(2) suggest that a foreign state's conduct 'in connection with a commercial activity' must itself be a commercial activity to fall within the third exception to foreign sovereign immunity."), *vacated on other grounds*, 403 F.3d 708 (9th Cir. 2005) (en banc).

Under the second and third prongs, Plaintiffs thus need only show their claims are based on acts Rwanda took "in connection with" its commercial activity (and that it took in or had a direct effect in the United States). Rwanda does not dispute that Plaintiffs make this showing and thus cannot carry its burden to show immunity attaches.

### (2) Rwanda does not dispute that its fraudulent job offer was a commercial activity

First, Rwanda does not, and cannot, dispute that the fraudulent job offer it made through a third-party acting as its agent was a commercial activity, the first required element of the second and third prong of § 1605(a)(2). It is well settled in the FSIA context that fraud is, by its nature, a commercial act. *See EIG Energy Fund XIV,* 894 F.3d at 345; *Kettey*, 53 F. Supp. 3d at 52; *MTS Secs., Inc. v. Creditanstalt-Bankverein*, 1997 WL 251482, at *2-3 (W.D.N.Y. 1997). Even when conceptualized at a more specific level, the Amended Complaint shows that private actors make fraudulent job offers with alarming frequency, including to induce the victim to travel overseas. AC ¶¶153-54. Rwanda committed an act in the manner of an ordinary market participant – albeit a criminal one.[4]

---

[4] The illegal nature of Rwanda's conduct does not remove it from the realm of § 1605(a)(2). *See, e.g.*, *Adler*, 219 F.3d at 875; *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1217 (10th Cir.1999). The question is not whether private actors are allowed to conduct the commercial activity, but whether they have the ability to do so. *See United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 349 (2d Cir. 2021).

That the *purpose* of Rwanda's fraud was to conduct an unlawful "law enforcement" operation is irrelevant to the analysis; the Court may look only to the nature of the conduct. *See* § 1603(d); *Weltover*, 504 U.S. at 614; *see also, e.g.*, *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 349-50 (2d Cir. 2021) (holding criminal acts conducted in connection to Turkey's purchase of Iranian oil was commercial despite sovereign purpose); *Pablo Star Ltd. v. Welsh Government*, 961 F.3d 555, 561 (2d Cir. 2020) (alleged copyright infringement by government was commercial despite its " goal of enhancing the image of the country and the prosperity of its citizens"); *Nnaka v. Federal Republic of Nigeria*, 756 F. Appx 16, 17-18 (D.C. Cir. 2019) (unpublished) ("While the agreement allegedly charged Nnaka to recover sovereign funds, that does not make it any less commercial."); *Janini v. Kuwait Univ.*, 43 F.3d 1534 (D.C. Cir. 1995) (holding cancellation of contract was commercial act, even though invasion of Kuwait "necessitated abrogation of all contracts with non-nationals").

In fact, the unanimous authority shows that a commercial act taken for an express (and even lawful) law enforcement purpose, including apprehending a fugitive, can still falls within the ambit of § 1605(a)(2). *See Guevara v. Republic of Peru*, 468 F.3d 1289, 1298-99 (11th Cir. 2006); *see also Nnaka,* 756 F. App'x at 17-18 (acting as a sovereign agent to recover sovereign assets treated as commercial activity); *Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Cts.*, 727 F.3d 10, 20 (1st Cir. 2013) (same). In *Guevara*, the Eleventh Circuit found that Peru's offer of a reward for information that led to that capture of fugitive fell within the commercial-activity exception, even though it was part of the Peru's broader attempt to "locat[e] and capture [] a fugitive." 468 F.3d at 1298-99.

The D.C. Circuit followed *Guevara* in *Nnaka* and reached the same result. 756 F. App'x at 17-18. In that case, the plaintiff alleged that Nigeria hired him to help locate and repatriate

stolen sovereign assets, but then when the plaintiff sought to intervene in a forfeiture action over

the stolen assets, Nigeria repudiated its agreement and referred the plaintiff for prosecution. *Id.* at

17. Citing *Guevara*, the D.C. Circuit held that the commercial-activity exception applied because

Nigeria's conduct was made in connection with its alleged agreement with the plaintiff and,

"[w]hile the agreement allegedly charged Nnaka to recover sovereign funds, that does not make

it any less commercial." *Id.* at 17-18; *see also Universal Trading*, 727 F.3d at 20-22 (explaining

the conduct at issue was Ukraine's breach of its contract with the plaintiff, and therefore qualifies

as "commercial" activity under the FSIA, even though Ukraine's "final goal or purpose . . . was

uniquely governmental—prosecuting criminal conduct and repatriating stolen assets into a

sovereign treasury.").

Rwanda cannot get around this caselaw by framing the character of its actions at such an

overly broad level of generality that they take on a sovereign character. Past defendants have

tried this tactic to no avail. *See Pablo Star*, 961 F.3d at 562 ("[A] very broad characterization of

the activity that forms the basis of the claim would tend to conflate the act with its purpose.");

*Nnaka v. Fed. Republic of Nigeria*, 238 F. Supp. 3d 17, 28 (D.D.C. 2017) ("[T]he D.C. Circuit

has warned against defendants' strategy of 'describing the act in question as intertwined with its

purpose [to] avoid the statutory preclusion.'" (alteration in original) (internal citation omitted)),

*aff'd,* 756 F. App'x 16.

### (3) Rwanda does not dispute that it committed the alleged torts "in connection with" its fraudulent job offer

Second, Rwanda does not dispute that it committed each alleged tort "in connection with"

its fraudulent offer of employment to Paul, which is the second element of § 1605(a)(2)'s second

and third prongs. Although the D.C. Circuit has not expressly addressed this standard, other

courts have a held that a tort is committed in "connection with" a commercial activity as long as

there is "some substantive connection or a causal link to the commercial activity." *Azima*, 305 F. Supp. 3d at 165 (quoting *Adler*, 107 F.3d at 726).

Here, the connection between Rwanda's alleged torts and its commercial activity is even closer than the connection in *Azima*. Rwanda was only able to kidnap, torture, and imprison Paul because its commercial activity—solicitation for a speaking tour in Burundi—lured him away from the safety of the United States, so there is a direct causal line between Rwanda's commercial activity and Paul's claims for false imprisonment, (Count IV), and his family's claims for solatium, loss of consortium, and IIED (Counts III, VII, and VIII). *See Azima*, 305 F. Supp. 3d at 166 (finding sufficient connection between commercial activity and tort where defendant's "engagement in certain commercial activity . . . caused [defendant] to commit the" alleged tort). Rwanda's intrusion upon Plaintiffs' seclusion and unlawful hacking of Plaintiffs' electronic devices (Counts IX and X) helped it defraud Paul, much as the hacking in *Azima* enabled the defendant to "gain an advantage over" the plaintiff in his business dealings with the defendant. *Id.* Finally, as discussed below, Plaintiffs' fraud and civil conspiracy claims (Counts I and II) are directly based upon Rwanda's commercial activity. As this satisfies the more stringent "gravamen" standard under § 1605(a)(2)'s first prong, it follows that it likewise satisfies the looser "in connection with" standard under the third prong. *See CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 976 (C.D. Cal. 2011) (finding "causal link" between plaintiff's claims and sovereign's commercial activities where "[p]laintiff base[d] its allegations" on sovereign defendant's commercial activities).

### (4) Rwanda does not dispute that its alleged torts were performed in or caused a direct effect in the United States

Third, Rwanda does not dispute that its torts were either "performed in the United States" or "cause[d] a direct effect in the United States," and are thus actionable under § 1605(a)(2)'s second or third prong. § 1605(a)(2).

Plaintiffs' civil conspiracy, intentional infliction of emotional distress, and intrusion upon seclusion claims fall under § 1605(a)(2)'s second prong insofar as they relate to Rwanda's conspiracy to harass, stalk, and surveil Paul and his family members. As detailed in Plaintiffs' complaint, the Rwandan Embassy in Washington, D.C., spied on Plaintiffs through its employees and various agents in the United States. AC ¶¶55, 61, 111-20, 121-26. *See, e.g.*, *Hyewoong Yoon v. Seyeon Lee*, 433 F. Supp. 3d 18, 24-25 (D. Mass. 2019) (claim for illegal wiretap made in the United States satisfies § 1605(a)(2)'s second prong).

Plaintiffs' claims otherwise fall within § 1605(a)(2)'s third prong because, though based upon acts Rwanda performed abroad, they each had direct effects in the United States. "[A]n effect qualifies as direct 'if it follows as an immediate consequence of the defendant's … activity'" and "no intervening event stood between" the defendant's activity and the effect. *Cruise Connections Charter Mgmt. 1, LP.*, 600 F.3d at 664 (quoting *Weltover*, 504 U.S. at 618). To satisfy § 1605(a)(2)'s direct-effect requirement, a plaintiff need only "identif[y] a direct effect from Defendants' alleged [tort] that is not 'purely trivial.'" *Exxon Mobil Corp. v. Corporacion CIMEX S.A.*, 534 F. Supp. 3d 1, 19 (D.D.C. 2021) (quoting *Weltover*, 504 U.S. at 618). The effect need not be "legally significant" to the plaintiff's claim, *id.*, it need not constitute an injury to the plaintiff, *Cruise Connection*, 600 F.3d at 666, nor must the defendant "agree that the effect would occur," *id.* at 665. A fraud directed to a person in the United States is sufficient. *See EIG Energy Fund XIV*, 894 F.3d at 345; *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-*

19

*Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016). A fraud that causes a U.S. permanent resident to travel outside the U.S. to allow his kidnapping, torture, and illegal detention even more plainly satisfies that requirement. Indeed, generally, that the locus of a tort is in the United States is sufficient, but not necessary, to establish a direct connection. *See Atlantica Holdings*, 813 F.3d 98 at 109; *Nnaka*, 238 F. Supp. 3d at 29; *EIG Energy Fund*, 894 F.3d at 347.

Here, there can be no doubt that to the extent Rwanda's tortious acts were not performed in the United States, they at least had a direct effect in the United States. The locus of plaintiffs' claims fraud, civil conspiracy, inclusion upon seclusion, and hacking under the ECPA[5] are all in the United States. *See Atlantica Holdings*, 813 F.3d at 109 (holding locus of fraud claim "is the forum 'where the loss is sustained'" (quoting *Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973))); Restatement (First) of Conflict of Laws § 377 (Am. L. Inst. 1934) ("When a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."); *Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*, 472 F. Supp. 2d 740, 750 (E.D. Va. 2007) (locus of civil conspiracy is forum where plaintiff relied on misrepresentation and suffered loss); *Peterson v. Aaron's, Inc.*, 2017 WL 4390260, at *3 (N.D. Ga. 2017) (locus of intrusion-upon-seclusion is the forum where the plaintiff is located at the time of the intrusion); *Azima*, 305 F. Supp. 3d at 168 (statutory hacking claim had a direct-effect in the United States where it could be reasonably inferred that at least one of the affected computers "was in the United States when the hacking occurred").

The D.C. Circuit has previously held that a foreign sovereign's failure to return stolen

---

[5] Rwanda argues that it surveilled Plaintiffs from abroad. Plaintiffs' complaint alleges that much of the relevant conduct under Plaintiffs' hacking and intrusion upon seclusion claims took place in the United States. Regardless, to the extent Rwanda is correct that this conduct took place abroad, they fall under § 1605(a)(2)'s third prong. But as discussed further below, to the extent the conduct took place in the United States, they fall under § 1605(a)(2)'s second prong.

property to a family it knew resided in the United States had a direct effect in the United States. *See de Cespel v. Republic of Hungary*, 714 F.3d 591, 601 (D.C. Cir. 2013). Rwanda's failure to return home a kidnapped person that it knows to reside in the United States has an equally direct effect in the United States. Rwanda's torts have also directly caused substantial and immediate effects on Paul's family in the United States, AC ¶10, upending their lives, depriving them of Paul's companionship, and forcing them to live in constant fear of his safety and wellbeing – these of course are the exact bases for Plaintiffs' solatium, loss of consortium claims, and intentional infliction of emotional distress claims. This was especially true during the period immediately following Paul's kidnapping when Rwanda held him incommunicado, so his family in the United States did not even know whether he was alive. Indeed, the practice of enforced disappearance is designed in part to intimidate the victim's family and exacerbate their suffering (and is universally condemned in part for that reason).[6]

Among other direct effects arising from Paul's kidnapping, his family immediately swung into action to defend the man who had defended them since the time of the Genocide[7], and as an immediate result of Rwanda's imprisonment of Paul, among other actions, had to coordinate his legal defense, AC ¶¶186, 201, and organize attempted deliveries of proper medicine to his prison, AC ¶¶192-93. To keep tabs on Paul's family's campaign to free him, no less a person than Charles Ntageruka "the Second Counselor at the Embassy of the Republic of

---

[6] *See, e.g.*, *Republic of Sudan v. Owens*, 194 A.3d 38, 42-43 (D.C. 2018) (because terrorism is designed to cause anguish and intimidation in third persons, the court held that allowing IIED claims by terrorism victims' family members is consistent with the Restatement); Ariel E. Duliltzky, *The Latin-American Flavor of Enforced Disappearances*, 19 Chi. J. of Int'l L. 423, 435 (2019) (discussing practice's "intimidating effect on family members and the community").

[7] Paul and his wife rescued their daughters Anaïse and Carine—whose parents had been murdered—from a refugee camp after the end of the Genocide and adopted them. AC ¶10.

Rwanda in Washington," AC ¶125, invaded a non-public Zoom discussion held by St. Mary's School of Law with Paul's wife and daughter to discuss the kidnapping. AC ¶¶121-25. The Rwandan government also hacked into legal strategy sessions between the family and Paul's Rwanda lawyers which resulted in searches of the lawyer as he entered Rwandan prison to crush their attempts to document Paul's torture. AC ¶¶201-02. There can be no more "nontrivial" and "immediate consequence" in the United States of Rwanda's conduct abroad.

Paul also suffered a "'nontrivial financial loss in the United States'" due to the fraud which robbed him of a valuable commercial opportunity. *See UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 218 (5th Cir. 2009) (quoting *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 896 (5th Cir. 1998)); *see also* AC ¶¶131-32. While the terms of the agreement between Paul and Niyomwungere are not known—because Rwanda kidnapped Paul and refuses to allow unfettered access to him, even by his Rwandan lawyers—a term designating the U.S. as a place of payment is not necessary for a court to find a "direct effect" created by non-payment of an amount owed. *I.T. Consultants, Inc. v. Islamic Republic of Pakistan*, 351 F.3d 1184, 1186-87, 1189-90 (D.C. Cir. 2003).

As a final matter, because each of Rwanda's torts caused a direct effect in the United States, the Court need not decide for the purposes of § 1605(a)(2) whether Rwanda committed the torts in the United States or elsewhere. For example, Rwanda argues that its agents abroad are the ones who hacked Plaintiffs' phones. Br. at 19. If Rwanda is wrong about this, Plaintiffs' hacking claims fall within § 1605(a)(2)'s second prong because the conduct was performed in the United States. But even if Rwanda is correct, as demonstrated above, the conduct had a direct effect in the United States, so it would fall under § 1605(a)(2)'s third prong. The same is true

regarding any dispute over the location of Rwanda's relevant acts towards its conspiracies to stalk, harass, and surveil Plaintiffs and to defraud and kidnap Paul.

Then-Judge Jackson confronted this exact situation in *Azima*. *See* 305 F. Supp. 3d at 170. The defendant there argued that the plaintiff could not maintain his hacking claim because he did not know whether the defendant took the relevant acts in the United States or abroad. *Id.* at 171-72. The court ruled that the question of location was irrelevant because, insofar as there are direct effects in the United States, it must be the case that "*either* clause two or three of the commercial activity exception is applicable, and a court need not necessarily decide which circumstance applies." *Id.* at 171.

In sum, the FSIA's commercial-activity exception applies to Plaintiffs' claims because each claim is based on an act Rwanda committed in connection with its fraudulent employment offer that had a direct effect in the United States. Rwanda does not argue that Plaintiffs' claims fail on any of these elements, so it cannot meet its burden to establish immunity at this stage.

> ### b. Plaintiffs' fraud and civil conspiracy claims also fall within § 1605(a)(2)'s first prong

As Rwanda agrees, Plaintiffs' claims will fall within § 1605(a)(2)'s first prong if the "gravamen" of the claim is a commercial activity Rwanda carried on in the United States. Therefore, in addition to falling within § 1605(a)(2)'s second or third prong, Plaintiffs' fraud and civil conspiracy claims are justiciable under § 1605(a)(2)'s first prong because both are based upon a commercial activity that Rwanda carried on in the United States.

> ### (1) Rwanda's commercial activity forms the gravamen of Plaintiffs' fraud and civil conspiracy claims

Rwanda argues that to show their claims are "based upon a commercial activity," Plaintiffs must show that Rwanda's commercial activity constitutes the gravamen of the Amended Complaint as a whole. Br. at 14. The D.C. Circuit recently rejected this exact argument

and held that "the FSIA text does not require courts to look to the entire lawsuit to determine the gravamen thereof." *Rodriguez*, 29 F.4th at 713. Rather, the D.C. Circuit explained that "*Sachs* instructs courts to define the 'gravamen' on a claim-by-claim basis." *Id.*

When analyzed on a claim-by-claim basis, the gravamen of plaintiffs' fraud and civil conspiracy claims are that Niyomwungere, Rwanda's agent, made fraudulent misrepresentations to Paul in the United States, which, as discussed above, were commercial activity. Section III.A.1.(2), *supra*. And because the alleged commercial activity "itself gives rise to a cause of action," it constitutes the gravamen of the action. *Rodriguez*, 29 F.4th at 716; *see also Nelson*, 507 U.S. at 357 ("Although the Act contains no definition of the phrase 'based upon,' . . . the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.").

**(2)    Rwanda's commercial activity had substantial contact with the United States**

Otherwise, Rwanda does not appear to dispute that its fraudulent misrepresentations were "carried on in the United States" for the purpose of § 1605(a)(2)'s first prong. Under the FISA, a commercial activity is "carried on in the United States" if the act has "substantial contact with the United States." § 1603(e). The conspiracy and the fraud were both directed toward Rusesabagina in the United States, and Rwanda knew Paul's location at all times because of its illegal surveillance. Courts have had little difficulty finding a substantial contact between a sovereign's commercial activity and the United States when the sovereign specifically and intentionally directs its commercial activity towards the United States.[8] *See, e.g.*, *BP Chems. Ltd.*

---

[8] Although Plaintiffs are permitted to argue in the alternative, Fed. R. Civ. P. 8(d)(2), there is no inconsistency between Plaintiffs' arguments that these claims are based upon an act Rwanda took overseas under § 1605(a)(2)'s first prong and their argument that these claims are

*v. Jiangsu Sopo Corp.*, 285 F.3d 677, 687 (8th Cir. 2002); *Shapiro v. Republic of Bolivia*, 930

F.2d 1013, 1019-20 (2d Cir. 1991); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d

736, 750-51 (S.D.N.Y. 2004); *Turkmani v. Republic of Bolivia*, 193 F. Supp. 2d 165, 175-76

(D.D.C. 2002). Here, Rwanda's agent engaged an extensive campaign of phone calls and text

messages to convince Paul to leave Texas, AC ¶¶133-138. This steady campaign to trick him

into leaving the U.S., plus Rwanda's parallel illegal surveillance campaign directed from its

Washington, D.C. embassy, AC ¶126, constitutes "substantial contact."

In sum, Rwanda's fraudulent job offer to Paul forms the gravamen of Plaintiffs' fraud

and civil conspiracy claims and has substantial contact with the United States. Accordingly, the

Court has jurisdiction to hear those claims under the first prong of § 1605(a)(2).

2.     **The Court has subject matter jurisdiction over Rwanda under the non-commercial tort exception to the FSIA**

Paul and his family seek "money damages" "against a foreign state for personal injury . .

. occurring in the United States and caused by the tortious act or omission of that foreign state or

of any official or employee of that foreign state while acting within the scope of his office or

employment . . . .", as required under 28 U.S.C. § 1605(a)(5). Entire torts were committed in the

United States—such as intrusion upon seclusion—which fall squarely within 28 U.S.C. §

1605(a)(5).

Rwanda's harassment campaign and invasion of Paul's privacy in the United States falls

within the requirements announced by *Doe v. Federal Democratic Republic of Ethiopia,* which

states the current rule governing 28 U.S.C. § 1605(a)(5): "'[T]he entire tort'—including not only

the injury but also the act precipitating that injury—must occur in the United States." *Doe v.*

---

based upon a commercial activity that Rwanda "carried on in the United States," since the latter
requires only "substantial contact with the United States." § 1603(e).

*Federal Democratic Republic of Ethiopia,* 851 F.3d 7, 10 (D.C. Cir. 2017) (quoting *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014)).[9] In this case, Rwandan officials and employees at the Rwandan Embassy in Washington, D.C. led a campaign of harassment, stalking, and illegal surveillance for over a decade in the United States against Paul, with the assistance of agents such as Michelle Martin and Moses Rudasunikwa, seeking to silence his protests of Kagame's corrupt regime. This activity constitutes an entire tort, and Rwanda is liable for it under 28 U.S.C. § 1605(a)(5).

Nor can Rwanda's extra-judicial surveillance or steps taken to kidnap Paul be described as the performance of a "discretionary function" under 28 U.S.C. § 1605(a)(5)(A). First and foremost, Rwanda has no authority to launch a law enforcement operation inside the United States—even if its nefarious conduct on U.S. soil could be described as such, which it cannot. Secondly, Rwanda's actions are criminal and unjustified:  the U.S. government, the E.U., the U.N., and a host of non-profit humanitarian foundations have found Paul's kidnapping and detention to be illegal, wrongful, and unjustified. AC ¶¶2-6, 160-61. Rwanda intentionally chose illegal kidnapping over the legitimate legal process of extradition.

Finally, Rwanda seeks to rely on the exception to the exception in Section 1605(a)(5)(B), which excludes certain torts (including malicious prosecution and abuse of process) from the FSIA tort exception. Br. at 17, 24. But Plaintiffs' claims sound in stalking, harassment, and illegal surveillance, not abuse of process as Rwanda did not avail itself of the extradition process in the United States.

---

[9] Plaintiffs believe the entire tort rule described most recently in *Doe v. Federal Democratic Republic of Ethiopia* is atextual and improperly decided. *See Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 844 (D.C. Cir. 1984) (Edwards, C.J dissenting). Plaintiffs reserve their rights to challenge this interpretation on appeal if necessary.

**(1)     Sufficient acts by Rwanda occurred entirely within the United States to create liability**

The Rusesabagina family's injuries arise from a Rwandan government campaign that occurred entirely inside the United States: "The Rwandan government has openly admitted that it planned an elaborate operation inside the United States to track Paul Rusesabagina . . . ." AC ¶¶1, 86, 105, 113-20. Thus, the entire tort of intrusion upon Paul's seclusion, "including not only the injury but also the act precipitating that injury" occurred in the United States. *See Doe,* 851 F.3d at 10.

Rwanda seeks to immunize this extensive U.S. conduct by arguing that Kagame and his lieutenants directed the overall conspiracy from Kigali. Br. at 17-20. But *Doe* made clear that such overseas connections do not immunize torts that occurred in the U.S., even if those torts are part of a larger plot. 851 F.3d at 10-11. *Doe* specifically distinguished *Liu v. Republic of China,* 892 F.2d 1419 (9th Cir. 1989), and *Letelier v. Republic of Chile,* 488 F. Supp. 665 (D.D.C. 1980), both of which involved some degree of supervision and direction from overseas, because "[b]oth involved actions 'occurring in the United States' that were—without reference to any action undertaken abroad—tortious." *Doe,* 851 F.3d at 11. The same is true here.

Furthermore, the Rwandan Embassy in Washington, D.C. coordinated both electronic surveillance and the harassment and stalking of Paul by agents in the United States such as Michelle Martin and Moses Rudasunikwa. AC ¶¶85-86, 105, 109, 111-15, 261. In any event, even if officials in Kigali played some role in the illegal spying and harassment campaign, the actions of Rwanda agents such as Ms. Martin and members of the U.S. Chapter of the RCA, coordinated by the Rwandan Embassy in Washington, D.C., are sufficient for liability under *Doe* for "actions 'occurring in the United States' that were—without reference to any action undertaken abroad—tortious."  *Doe,* 851 F.3d at 11 (quoting 28 U.S.C. § 1605(a)(5)).

Rwanda committed the tort of intrusion on seclusion via its illegal surveillance, stalking, and harassment of Paul conducted entirely inside the United States. *See Schuchart v. La Taberna del Alabardero, Inc.*, 365 F.3d 33, 35-36 (D.C. Cir. 2004); *Hunsinger v. 204S6Th LLC*, 2022 WL 1102864, at *15-16 (N.D. Tex. 2022). Rwanda (1) intentionally intruded, physically or otherwise, (2) upon the solitude or seclusion of another of Paul's private affairs or concerns, and, (3) the intrusion would be highly offensive to a reasonable person. *Id.*; *see also* AC ¶261 (alleging "Rwanda has tracked and stalked Paul Rusesabagina and his family members while they resided in the United States . . . in order to conjure embarrassing material or to identify all of the Rusesabagina family's contacts . . .for the purpose of the campaign against Paul Rusesabagina and his family members or to find targets for blackmail or bribery").

### (2)   Rwanda intentionally intruded, physically or otherwise

The Rwandan Embassy in Washington, D.C. is charged with spying on and tracking Rwandan dissidents who live in the United States, and there was no Rwandan political dissenter more important to Kagame than Paul, AC ¶¶85-86, which is illustrated by the involvement of the Rwandan Ambassador himself in these plots. AC ¶¶85-86, 89. The Rwandan Embassy coordinated this campaign in two ways, first through paid agents in the United States, AC ¶73, and second through the Rwandan Community Abroad ("RCA") in the United States, a formal organization supported by both the Rwandan Embassy and the Rwandan Ministry of Foreign Affairs and International Cooperation ("MINAFFET"). AC ¶112.

Moses Rudasunikwa, the head of the RCA chapter in Paul's hometown has publicly stated that he has stalked Paul since 2007. AC ¶¶111, 113. Mr. Rudasunikwa also admits that in 2007 he called the Rwandan Embassy, spoke to a councilor, and asked for documentation regarding Paul. AC ¶114. Thereafter, Mr. Rudasunikwa organized attempts to disrupt speeches by Paul, including as recently as 2020. Meanwhile, the Rwandan Ambassador to the United

States at the time, Ambassador Kimonyo, was involved in various plots against Paul. AC ¶¶55-56, 89. And the Second Counselor at the Embassy was caught red-handed spying on the Rusesabagina family during a Zoom call to discuss their campaign to free Paul. AC ¶¶121-125. Finally, Rwandan officials illegally surveilled Paul's cellphone in the United States as well. AC ¶¶93, 95, 103, 104, 105.

For years the Rwandan government, via its Embassy, also paid an agent in the United States named Michelle Martin to manufacture evidence against Paul. AC ¶¶79-82. Among her various plots, she attempted to convince the FBI that Paul supported terrorists. AC ¶¶ 89-90. Ms. Martin attempted to entrap Paul and his associates by fruitlessly pushing Paul to join the Democratic Forces for the Liberation of Rwanda (FDLR), a group run by Rwandan Hutu rebels. AC ¶82. Ms. Martin stole thousands of emails from an associate of Paul. AC ¶¶72-73, 83. Rwanda then used the stolen data in its failed attempt to extradite Paul through Belgium and used them again at the 2021 show trial. AC ¶¶83, 91, 128-29. Ms. Martin conducted her activities in coordination with the Rwanda Embassy in Washington, AC ¶84-86, 89-90, and in furtherance of Kagame's plot to silence Paul, his most famous political critic**.**

### (a)     Rwanda intruded upon the solitude or seclusion of Paul's private affairs or concerns

Rwanda's illegal hacking through its Pegasus program, Ms. Martin's spying activities which involved stealing emails, and Mr. Rudasunikwa's stalking of Paul all constitute intrusions upon seclusion. *See Schuchart*, 365 F.3d at 36 (finding "eavesdropping on personal conversations" paradigmatic intrusion upon seclusion); *Doe v. United States*, 83 F. Supp. 2d 833, 840 (S.D. Tex. 2000).

**(b)     Rwanda's intrusions would be highly offensive to a reasonable person**

This harassment and stalking campaign caused Paul and his family great distress as they feared for his safety, especially in light of the well-known Rwandan government overseas assassination campaign against its dissidents. AC ¶¶38-45, 75-76, 78. Indeed, the Rwandan government's use of the Rwandan diaspora inside the United States to inflict violence against its dissidents has been documented by many foreign governments. AC ¶90. The Rwandan campaign against Paul was waged so relentlessly, that it affected the quality of his communications with his beloved family. In 2018 and 2019, Paul often told his daughter Anaïse that he thought the Rwandan authorities were listening to his calls and would therefore limit the sharing of information during phone calls. AC ¶104. Thus, for example, his family did not learn of his trip to Burundi until he called his wife the day of his travel. *Id.* No one should have to suffer from such a malignant course of conduct, inflicted upon them over the course of decades. Such intrusions are highly offensive to a reasonable person.

While Plaintiffs have demonstrated that Rwanda's tortious conduct occurred entirely within the United States, Rwanda raises two additional arguments, that § 1605(a)(5)(A) and § 1605(a)(5)(B) both separately apply to allow it to reassert its immunity. Br. at 21-25. Rwanda is incorrect.

**(3)     Rwanda's conduct does not qualify as a "discretionary function"**

Rwanda claims that its use of employees and agents in the United States as part of the secret surveillance and stalking plot were a legitimate law enforcement operation; and raises the "discretionary function" defense as another bar to the lawsuit. Br. at 21-22; *see also* 28 U.S.C. § 1605(a)(5)(A). The Supreme Court has defined the two-part "discretionary function" test as follows, (1) whether the conduct involved an element of judgment and (2) whether that judgment

is of the kind that the discretionary function exception was designed to shield. *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991).

Rwanda did not seek to extradite Paul. Instead, it stalked, harassed, illegally surveilled, and conspired against him.  But even Rwanda's own framing that it was conducting a law enforcement operation does not save its argument. Rwanda had zero authority to launch a law enforcement operation inside the United States; *Gaubert*'s first prong cannot be satisfied. "If a foreign government has no authority to take a certain type of action in the United States, its employee's action in that sphere cannot constitute an exercise of discretion." *Usoyan*, 6 F.4th at 40 ("The first *Berkovitz* condition therefore requires that we understand the source of" discretion). In *Usoyan*, the D.C. Circuit found that the Republic of Turkey had authority to act on U.S. soil to protect its President inside the United States because "a sending state has a right in customary international law to protect diplomats and other high officials representing the sending state abroad . . . ." *Id.* at 43. Even if the secret surveillance and harassment could be described as a law enforcement operation, which it cannot, Rwanda had no authority to engage in such conduct in the United States. *Id.* at 39. A foreign power cannot "perform law enforcement functions inside the United States." *Id.* ("[A] state may not exercise jurisdiction to enforce in the territory of another state.") (citing Restatement (Fourth) of the Foreign Relations Law of the United States § 432(b) (Am. L. Inst. 2018)).

Secondly, Rwanda's conduct inside the United was unrelated to any legal procedure or judicial functions, instead seeking only to silence a famous political critic of Kagame's corruption and murderous regime; *Gaubert*'s second prong cannot be satisfied. All Rwandan officials, employees, and agents who took part in the illegal conspiracy to harass, stalk, and surveil Paul did so without justification, as evidenced by the worldwide condemnation of the

2021 sham trial in Kigali. *See* Section I.E., *supra*. When police or judicial officials take clearly unjustified actions, "the employee's exercise of discretion" is not "'the kind that the discretionary function exception was designed to shield'—that is, 'based on considerations of public policy.'" *Usoyan*, 6 F.4th at 38 (quoting *Berkovitz v. U.S.*, 486 U.S. 531, 536-37 (1988)). Rwanda claims its officials, employees, and agents were engaged in "the investigation, arrest, detention, prosecution and conviction of Paul Rusesabagina", Br. at 21, inside the United States but did not inform the U.S. or seek his extradition. Rwanda's actions are unauthorized and unjustified:  the U.S. government, the E.U., the U.N., and a host of non-profit humanitarian foundations have all found Mr. Rusesabagina's treatment to be illegal and unjustified, and based on his "peaceful exercise of his right to freedom of opinion and expression and the right to take part in the conduct of public affairs" AC ¶216; *see also* AC ¶¶2-6, 160-61.

### (4)     Rwanda's stalking, harassment, and surveillance of Paul does not qualify for the § 1605(a)(5)(B) exception

Section 1605(a)(5)(B) does not preclude claims against a sovereign state that arise out of its extra-legal plot to track, harass, and invade the privacy of a U.S. permanent legal resident, all of which occurred inside the United States. Section 1605(a)(5)(B) exempts certain enumerated torts from the FSIA's noncommercial tort exception. Intentional infliction of emotional distress, intrusion upon seclusion, and digital espionage are not among the exempted torts listed in § 1605(a)(5)(B). And the fact that Rwanda's unlawful campaign to stalk, harass, and illegally surveil Plaintiffs in the United States relates to the subsequent sham trial does not mean that § 1605(a)(5)(B)'s bar on claims for malicious prosecution applies to this case.

Even if the show trial which Rwanda later subjected Paul to—after torturing a confession out of him—were not a complete sham, what happened in Rwanda cannot immunize its conduct inside the United States. The cases cited by Rwanda, Br. at 23, further illustrate the inability of

Rwanda to utilize § 1605(a)(5)(B). In *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, the plaintiffs' claims against Australia were dismissed under Section 1605(a)(5)(B) as "malicious prosecution, abuse of process" but in that case Australia had of course (unlike Rwanda here) formally extradited the plaintiff from the United States. *Blaxland v. Commonwealth Dir. of Pub. Prosecutions,* 323 F.3d 1198, 1202-04 (9th Cir. 2003). For the same reason, *Khochinsky v. Republic of Poland* does not support Rwanda's attempt to immunize its secret stalking, harassment, and kidnaping plot on U.S. soil. *Khochinsky v. Republic of Poland,* 1 F.4th 1, 4 (D.C. Cir. 2021) ("[Poland] sought Khochinsky's extradition from the United States on the ground that he was knowingly in possession of a stolen painting. Poland's extradition attempt ultimately failed . . . ."); *see also Leffer v. Fed. Republic of Germany*, 2021 WL 17773355, at *2 (D.D.C. 2021) (claims based on extradition would have failed due to the Section 1605(a)(5)(B) bar); *Lambros v. Federative Republic of Brazil*, 2021 WL 1820206, at *2, *9 (D.D.C. 2021) (same). While those plaintiffs complained of the use of a formal legal procedure, Rwanda did not seek to extradite Paul through the ordinary legal process but instead resorted to illegal and tortious conduct to pry Paul out of the safety of his home in the United States.

Undoubtedly due to the lack of evidence against Paul, Rwanda's sole attempt to utilize formal legal procedure to extradite him failed, and then it resorted to extra-legal trickery instead. Rwanda admits that it issued an arrest warrant and request for extradition to Belgium. Br. at 5; Br. Ex. B. Rwanda's attempt to extradite Paul through Belgium failed, AC ¶¶128-30, partially at least due to its use of falsified evidence. AC ¶129. Rwanda did not attempt to extradite him through U.S. government channels. AC ¶90, 218. Thus, it resorted to an extra-legal covert plot to trick Paul into flying to Kigali.

As detailed in Section I.E., *supra*, Rwanda's extra-legal process has been condemned by

the United States Executive and Legislative Branches, as well as the U.N. and the E.U. To briefly recap: the U.S. Department of State concluded that "the government of Rwanda has wrongfully detained U.S. Lawful Permanent Resident Paul Rusesabagina." AC ¶2. The United Nations also concluded that "Mr. Rusesabagina's detention has no legal basis and is therefore arbitrary." AC ¶4. The European Union Parliament has "call[ed] into question the fairness of the verdict, which reportedly lacked guarantees for a fair trial in line with international best practices of representation, the right to be heard and the presumption of innocence . . . ." AC ¶5. Thirty-seven U.S. Congressmen have condemned "the extrajudicial transfer of Mr. Rusesabagina [in] disregard for U.S. law." AC ¶3. Kagame himself admitted that his government tricked Paul into flying into Kigali and did not seek him through the formal legal procedure of extradition. AC ¶161. The public confessions of Kagame's top intelligence officials, and their leadership of the operation, confirm that no official legal procedure was contemplated. AC ¶160.

Furthermore, Rwanda's explanations and description of its conduct today must be viewed through the lens of its past disinformation campaign, which sunk its attempt to extradite Paul through Belgium. AC ¶128-30; *see also* AC ¶¶156-57 (detailing misinformation campaign after Paul's kidnapping).

## B.    PERSONAL JURISDICTION EXISTS HERE

Rwanda concedes that personal jurisdiction depends on satisfying an applicable FSIA exception, Br. at 25, and raises no other argument. "[P]ersonal jurisdiction follows [under the FSIA] where proper 'service has been made under § 1608.'" *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005) (quoting 28 U.S.C. § 1330(b)). Because service has been accomplished, there is personal jurisdiction here.

**C.    THE ACT OF STATE DOCTRINE DOES NOT PROVIDE GROUNDS FOR DISMISSAL**

In *W.S. Kirkpatrick*, the Supreme Court held that "[t]he act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990) (emphasis added). Rwanda mischaracterizes Plaintiffs' claims, the facts of this case, and the scope of the act of state doctrine in an attempt to justify its application. But here, as in *Kirkpatrick*, the doctrine does not bar consideration of plaintiffs' claims.

The act of state doctrine is "not required by the Constitution, the inherent nature of sovereign immunity or any principle of international law" but is a function of the separation of powers: "its continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964); *see also Kirkpatrick*, 493 U.S. at 404; *Agudas Chasidei Chabad of United States v. Russian Federation*, 528 F.3d 934, 951 (D.C. Cir. 2008). Thus, "the doctrine demands a case-by-case analysis of the extent to which in the context of a particular dispute separation of powers concerns are implicated." *Bigio v. Coca Cola*, 239 F.3d 440, 452 (2d Cir. 2000). The party invoking the act of state doctrine bears the burden of proving its applicability. *Agudas*, 528 F.3d at 951. Finally, the application of the doctrine is left to this court's discretion: "the policies underlying the act of state doctrine should be considered in deciding whether, despite the doctrine's technical availability, it should nonetheless not be invoked." *W.S. Kirkpatrick*, 493 U.S at 409.

No separation of powers concerns are implicated by this litigation, which is entirely consistent with United States foreign policy and U.S. law. Pursuant to the Robert Levinson

Hostage Recovery and Hostage-taking Accountability Act, Public Law 116-260, the U.S.

Department of State determined that Rwanda has wrongfully detained Paul and announced that

the United States, under the guidance of the Special Presidential Envoy for Hostage Affairs,

"remains committed to assuring his welfare and securing his release." AC ¶¶2, 211; *see also* Ex.

A (May 6, 2022 Letter from Roger D. Carstens, Special Presidential Envoy for Hostage Affairs).

The legislative branch has also weighed in: thirty-seven Members of Congress, including Chair

and Ranking Member of the Senate Committee on Foreign Affairs, decried the illegal procedures

used to extrajudicially transfer Paul and noted that resort to such tactics "demonstrates a

disregard for U.S. law and suggests a lack of confidence in the credibility of the evidence against

him." AC ¶3. Furthermore, on July 14, 2022, the U.S. House of Representative passed a

Resolution 413-8, which condemned Rwanda's extrajudicial transfer of Paul from Texas to

Kigali, noted that several parties, including the U.S. State Department "question the fairness of

the verdict", and "calls on the Government of Rwanda to immediately release Paul Rusesabagina

. . . ." H.R. Res. 892, 117th Cong. (2022).

Rwanda's arguments regarding the letter by the State Department Envoy, Br. at 27-28,

are frivolous. For example, Rwanda quibbles with the wording of the Department of State letter,

arguing there is dispositive distinction between "wrongful" and "unlawful" but does not contest

that the United States has determined that Paul is wrongfully held.[10] Rwanda's argument that

---

[10] The Amended Complaint squarely alleges that Mr. Rusesabagina is unlawfully held (*see, e.g.*, AC ¶¶12, 305) and cites numerous reports by well-regarded human rights organizations and international governing bodies condemning the kidnapping and sham trial. *E.g.*, AC ¶¶1 n.1 (American Bar Association, Freedom House, and Lantos Foundation); 4 (United Nations concludes detention has no legal basis and is arbitrary), 5 (European Union Parliament resolution condemns illegal arrest, detention and conviction in violation of international and Rwandan law); 206 (Clooney Foundation for Justice); 210 (Human Rights Watch).

dismissal is appropriate to assist "ongoing diplomatic efforts" to free Paul when Rwanda *itself* has illegally detained him is frankly galling. To the extent this Court has any genuine concerns about whether this lawsuit impacts diplomatic efforts to free Paul, the appropriate step is to inquire of the State Department. Plaintiffs, Paul's own family, respectfully submit that they, not his torturers and captors, have his best interests at heart.

By definition, the act of state doctrine only applies only to acts performed in the foreign state's own territory: it does not apply to acts in the United States or in other countries. *Kirkpatrick*, 493 U.S. at 405; *Agudas*, 528 F.3d at 952. Acts performed even partly outside a state's own territory are not protected by the doctrine. Restatement (Fourth) of Foreign Relations law § 441 cmt. e (Am. L. Inst. 2018). Plaintiffs' claims, consistent with this Court's FSIA jurisprudence, focus on Rwanda's conduct in the United States, including its participation in fraud and civil conspiracy in the United States (Counts I & II), Rwanda's tracking and stalking Paul and his family members in the United States (Count IX) and Rwanda's use of Pegasus software in the United States to intercept Paul's and his daughter's communications in violation of U.S. law (Count X). Plaintiffs' claims against Rwanda do not challenge any legitimate acts of state taken wholly within Rwanda's own territory. Indeed, Rwanda's motion concedes that at least some portion of the tortious conduct occurred in the United States. Br. at 17-20 (arguing that "the tortious conduct alleged did not occur entirely in the United States . . . .").

Even if conduct within Rwanda's territory was alleged, the act of state doctrine applies only to official acts. *Kirkpatrick*, 493 U.S. at 405. To qualify as an official act, "an act must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or resolution.'" *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695

(1976)). The act of state doctrine does not apply to conduct that violates Rwandan law or that violates *jus cogens* principles of international law from which no derogation is permitted. *See, e.g.*, *Kashef*, 925 F.3d at 61 ("acts that flagrantly violate a foreign state's own laws cannot, at the same time, constitute official acts entitled to deference."); *Jimenez v. Aristeguieta*, 311 F.2d 547, 558 (5th Cir. 1962) ("common crimes committed by the Chief of State" are not acts of state); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 661–62 (E.D. Va. 2014) (acts that violate *jus cogens* norms are not officially authorized by any foreign sovereigns and therefore cannot serve as a basis for the act of state doctrine); *see also Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 488–89 (D. Md. 2009) (observing that the Congress "in passing the TVPA, specifically confirmed that torture and similar human rights abuses can never be "public acts" for the purpose of the acts of state doctrine"). Plaintiffs' claims include claims of torture, enforced disappearance, and other illegal abuse suffered by Paul. AC ¶¶161 (Rwandan President Kagame noting that rendition to Kigali "seem to be illegal"); 174, 178-179 (Paul held in an undisclosed location and tortured). Rwanda has not argued that torture or enforced disappearance are official government policies, nor can it, as such acts plainly violate Rwandan law. *See* AC ¶173 (Rwanda constitution and law prohibits torture); *see also* Rwanda Law Nº 68/2018 of 30/08/2018 Determining Offences and Penalties in General Art. 112 (prohibiting torture); Art. 151 (prohibiting abduction and unlawful detention); Art. 94 (defining crimes against humanity to include enforced disappearance). The conduct alleged here does not constitute official acts entitled to deference because they are illegal under Rwandan law. In addition, torture and enforced disappearance violate *jus cogens* principles of international law and can never constitute official acts of state.

Finally, the act of state doctrine does not apply to foreign court decisions. Restatement (Fourth) The Foreign Relations Law of the United States § 441 cmt. c (Am. L. Inst. 2018); *see*

*also Riggs Nat. Corp. & Subsidiaries v. Comm'r*, 163 F.3d 1363, 1368 (D.C. Cir. 1999) ("We are, however, hesitant to treat an interpretation of law as an act of state, for such a view might be in tension with rules of procedure directing U.S. courts to conduct a de novo review of foreign law when an issue of foreign law is raised"); *Dominicus Americana Bohio v. Gulf & W. Indus., Inc.*, 473 F. Supp. 680, 689 (S.D.N.Y. 1979) ("the initiation of judicial proceedings in a foreign country is not encompassed by the act of state doctrine" but is a "well-recognized exception" to that doctrine). As a result, the doctrine does not bar consideration of claims related to the outcome of the show trial.

The act of state doctrine does not apply here.

## D. THE AMENDED COMPLAINT MEETS THE REQUIREMENTS OF RULE 12(b)(6).

Plaintiffs' Amended Complaint contains factual allegations sufficient to state a claim for relief precluding dismissal under Rule 12(b)(6).

**Fraud (Count I):** Rwanda does not dispute that Plaintiffs have pleaded sufficient facts to state a viable claim for fraud under Fed. R. Civ. Proc. 9(b). Rather, Rwanda's only argument in favor of dismissing Plaintiffs' fraud claim is that, it says, the fraudulent misrepresentation that Rwanda's agent Niyomwungere made to Paul is barred by the FSIA. In this, Rwanda simply repeats its jurisdictional argument, which Plaintiffs address in Section III.A.1., *supra*. To the extent the Court concludes it has jurisdiction over Plaintiffs' fraud claim, Rwanda makes no additional argument for dismissal. That is because Plaintiffs' have plainly met Rule 9(b)'s requirements to plead fraud with particularity by pleading "who precisely was involved in the fraudulent activity,' the 'time, place, and content of the false misrepresentations,' the 'fact misrepresented,' and 'what was retained or given up as a consequence of the fraud.'" *Frese v. City Segway Tours of Wash., D.C., LLC*, 249 F. Supp. 3d 230, 236 (D.D.C. 2017) (quoting

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256-59 (D.C. Cir. 2004)); *see also, e.g.*, AC ¶¶131-39, 143-146, 224.[11]

**Civil Conspiracy (Count II).** There are two well-pleaded conspiracies for which Rwanda bears liability: the conspiracy to harass, stalk, illegally surveil, and invade Paul's privacy in the United States and the conspiracy to offer a fake employment opportunity in Burundi to kidnap him. As with their fraud claim, Rwanda does not dispute that Plaintiffs adequately pleaded a conspiracy between Rwanda and Mr. Niyomwungere, its agent, to offer Paul fake employment for the purpose of kidnapping, torturing, and imprisoning him. Instead, it again argues that is "not actionable" because it is barred by the FSIA. It offers no argument that, insofar as the Court finds it has jurisdiction over this claim, the Court should nevertheless dismiss it for failure to state a claim.

Plaintiffs also describe above, Section III.A.1., *supra*, the conspiracy on U.S. soil to stalk, harass, surveil, and invade the privacy of Paul. This conduct is unlawful. *See Schuchart v. La Taberna del Alabardero, Inc.*, 365 F.3d 33, 35-36 (D.C. Cir. 2004). The Rwanda Embassy coordinated the efforts of Ms. Martin, AC ¶¶73, 79-82, 85-86, 89, who stole emails involving Paul, infiltrated his inner circle, and attempted to manufacture evidence against him, resulting in a failed extradition attempt and sham trial in 2021. AC ¶¶72-73, 82, 83-91, 128-29. The Rwanda

---

[11] To the extent the Amended Complaint is not even more detailed, it is because evidence of the communications between Mr. Niyomwungere and Mr. Rusesabagina, are in the complete control of Rwanda. Rwanda has tortured, imprisoned, and precluded Mr. Rusesabagina from being able to adequately communicate with his attorneys in the United States. AC at ¶139. "We have recognized that 'pleadings on information and belief are permitted when 'the necessary information lies within defendants' control.'" *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989)). Regardless, Plaintiffs have plainly pleaded sufficient details to allow Rwanda to "defend against the charge," and Rwanda does not suggest otherwise. *United States ex rel Williams*, 389 F.3d at 1259 (D.C. Cir. 2004).

Embassy also coordinated the efforts of the RCA in San Antonio where Paul lived. AC ¶¶111-14, 126. The allegations of coordination in conjunction with common activity between Rwanda, the RCA, and Ms. Martin leads to the reasonable inference of an agreement to stalk, harass, surveil, and invade the privacy of Paul. *See Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30 (D.D.C. 2016) ("[C]ourts in this circuit have recognized that 'a plaintiff need not allege that an express or formal agreement was entered into.' In fact, 'in most civil conspiracy cases,' courts are required to 'infer an agreement from indirect evidence.'" (citation omitted) (first quoting *U.S. ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014); then quoting *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983))).

All of this harassment occurred in the context of the well-known Rwandan government overseas assassination campaign against its dissidents, AC ¶¶38-45, 75-76, 78, and Paul and his family suffered great emotional trauma as a result of the overt acts alleged here. Accordingly, Plaintiffs have stated a claim for this conspiracy as well. *See, e.g.*, *Al-Tamimi v. Adelson*, 916 F.3d 1, 9 (D.C. Cir. 2019)

**Loss of Consortium (Count III).** Rwanda's only defense to Plaintiff Taciana Mukangamije's consortium claim is that Plaintiffs do not have any valid torts claims, therefore the consortium claim cannot survive alone. As Plaintiffs argue herein, Mr. Rusesbagina has valid tort claims and the Court has jurisdiction over those claims, so Taciana has a valid consortium claim. Rwanda makes no other argument for dismissal.

**False Imprisonment (Count IV).** Rwanda's principal defense to Plaintiffs' false imprisonment claim is the stunning assertion that Plaintiffs have not alleged that Paul "was imprisoned without process of law." Br. at 32. On the contrary, Plaintiffs have documented the illegality of Rwanda's entire kidnapping plot, from start to finish, and specifically alleged his

detention "was illegal and unjust, and carried out without any lawful authority." AC ¶239; *see also, e.g.*, AC ¶¶155-57, 174, 184, 203-12, 215-20. Plaintiffs allege Rwanda and its agents forcibly abducted Paul, tortured him, held him incognito, and then subjected him to an internationally condemned sham trial. *See* Section I.D-E, *supra*; *see also, e.g.*, AC ¶¶1, 6, 252. Rwanda's contention that Plaintiffs have not alleged a lack of due process is contradicted by nearly every allegation of the complaints: "The cruel, degrading, and barbaric actions of Defendants and their employees have perverted and degraded their offices and corrupted every person involved." AC ¶7. Rwanda focuses on Plaintiffs' allegation that the RIB *claimed* to have arrested Paul pursuant to an "International Arrest Warrant" and through "international cooperation, but Plaintiffs further allege that (1) the RIB's version of events was contradicted by the UAE, (2) the details of this supposed warrant were never provided, and (3) Paul was not the subject of notices from the International Criminal Police Organization (INTERPOL) or from any other organization. AC ¶¶155-57. Rwanda's contentions are entirely meritless and directly contravene the allegations of the Complaint.

**IIED & Solatium (Counts VII & VIII).** To state a claim for intentional infliction of emotional distress, a plaintiff must allege sufficient facts to show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Smith v. U.S.*, 121 F. Supp. 3d 112, 124 (D.D.C. 2015), *aff'd*, 843 F.3d 509 (D.C. Cir. 2016) (citation omitted). "To be actionable, the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)). "Conduct will be sufficient to sustain a claim for

42

intentional infliction of emotional distress if 'the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!''" *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 53 (D.D.C. 2019) (quoting *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013)).

Rwanda conspired to lure a United States permanent resident away from the safety of his home, drugged him, kidnapped him, tortured him, subjected him to sham-trial, and imprisoned him for life. AC ¶¶1, 21. There can be no dispute that this is extreme and outrageous conduct and, in fact, has been universally condemned as such by the international community. *See* Section I.E., *supra*.

Restatement § 46(2)(a) does not prevent Paul's family members from recovering for the emotional distress Rwanda caused them by kidnapping and torturing Paul, who is husband or father to the other Plaintiffs. Although §46(2)(a) generally restricts family members' IIED claims to cases in which the family witnessed the harm, its commentary recognizes that this is a crudely drawn line and "leave[s] open the possibility of situations in which presence at the time may not be required." Restatement (Second) of the Law of Torts § 46 cmt. l. (Am. L. Inst. 1977) The D.C. Court of Appeals, on certification from the D.C. Circuit, has held that claims brought under the FSIA's terrorism exception present one such situation in which presence is not required. *See Republic of Sudan v. Owens*, 194 A.3d 38, 42-43 (D.C. 2018). Because terrorism is designed to cause anguish and intimidation in third persons, the court held that allowing IIED claims by terrorism victims' family members is consistent with the Restatement. *See id.* at 43; *see also Owens v. Rep. of Sudan*, 924 F.3d 1256, 1257 (D.C. Cir. 2019) (accepting D.C. Court of Appeals' answer to certified question). This same reasoning applies where, as here, a foreign government kidnaps a political opponent from U.S. soil and disappears him. Such enforced

43

disappearances are designed to cause anguish to the victims' families and intimidate them and other dissidents. *See* n.6, *supra*. Further proof that Rwanda has targeted and continues to target Paul's family is found in its on-line harassment of them, AC ¶¶221-222 and the Embassy's illegal spying campaign on them. AC ¶¶121-25.

To the extent Rwanda argues that Plaintiffs' IIED claims fail because it took some relevant acts abroad, Rwanda again repackages its jurisdictional arguments. As argued in Part Section III.A.1.-2., *supra*, the Court has jurisdiction over Plaintiffs' IIED claims under both the commercial activity and noncommercial torts exceptions to the FSIA.[12]

**Intrusion Upon Seclusion (Count IX).** As set forth in opposition to Rwanda's 12(b)(1) motion, Section III.A.2., *supra*, Plaintiffs adequately pled a claim for intrusion upon seclusion. Plaintiffs incorporate that argument into their opposition to Rwanda's 12(b)(6) motion.

**Wiretap Act (Count X).** Rwanda's primary defense against the Wiretap Act is that the violations did not include surveillance in the United States and thus Plaintiffs' Wiretap Act claims are barred by the FSIA. Br. at 35-36. Rwanda yet again repeats its jurisdictional arguments, which, as discussed in Section III.A.2., *supra*, Rwanda gets wrong.

Rwanda's only other argument is that Plaintiffs' claims do not fall within the applicable two-year statute of limitations. Br. at 36. The Wiretap Act requires that a cause of action "may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). Because Ms. Martin did not admit her violations of the Wiretap Act until 2021 and Paul had no reason to know of the Pegasus program until Gen. Joseph Nzabamwita revealed Rwanda's illegal hacking of his phone

---

[12] For the present motion, Plaintiffs agree with Rwanda that the solatium claims and IIED claims should be treated identically. Br. at 33.

in a 2020 interview, the Wiretap Act violations have been timely brought. Paul's general suspicion that Rwanda was listening to his calls, reported to his daughter in 2018 and 2019, AC ¶¶103-04, stems from its campaign to invade his privacy in the United States, but not from the knowledge of a specific violation sufficient to bring a claim under the Wiretap Act. Moreover, Rwanda suggests only that the violations *began* as early as 2018 or 2019. The complaint does not suggest when Rwanda *ended* its illegal wiretapping of Paul, and the reasonable inference the Court must draw at this stage is that it continued until Paul was kidnapped in 2020. In cases like this, where the Plaintiffs' injury is cumulative from a pattern of ongoing conduct, the continuing tort rule delays the claim's accrual. *See Loumiet v. United States*, 828 F.3d 935, 948 (D.C. Cir. 2016).[13]

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Rwanda's motion to dismiss.

---

[13] As Plaintiffs concede that this Court does not have jurisdiction to hear their assault and battery claims against Rwanda, the Court need not address Rwanda's arguments that these claims should be dismissed under Rule 12(b)(6). Plaintiffs note however that Rwanda raises no actual argument that Plaintiffs have failed to state these claims on the merits – it merely parrots its jurisdictional argument. Plaintiffs maintain that they have stated claims for assault and battery and will continue to pursue these claims against the other defendants.

August 1, 2022                    Respectfully submitted,


/s/ Steven R. Perles
Steven R. Perles (D.C Bar #326975)
Edward MacAllister (D.C Bar #494558)
Joshua K. Perles (D.C Bar # 1031069)
Emily Amick (D.C Bar #242018)
Perles Law Firm, PC
816 Connecticut Avenue, NW
12th Floor
Washington. D.C 20036
Phone: (202) 955-9055
sperles@perleslaw.com
emacallister@perleslaw.com

Agnieszka M. Fryszman (D.C Bar #459208)
Nicholas Jacques (D.C. Bar #1673121)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Phone: (202) 408-4600
Fax: (202) 408-4699
afryszman@cohenmilstein.com
NJacques@cohenmilstein.com

John Arthur Eaves, Jr. (D.C Bar # 432137)
Christopher Brady Eaves (V.T. Bar #6370)
Eaves Law Firm
101 North State Street
Jackson, MS 39201
Phone: (601) 355-7961
johnjr@eaveslawmail.com

*Attorneys for Plaintiffs*

John Calvin Patterson (M.S. Bar #103140)
213 Main Street
Como, MS 38619
Phone: (662) 526-1992
JCP@Pattersonehrhardt.com

*Of Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2022, I electronically filed the *Plaintiffs' Response to Defendant the Republic of Rwanda's Motion to Dismiss the Amended Complaint* with the Clerk of the Court using the ECF, who in turn sent notice to all counsel of record.


Dated:    August 1, 2022                          /s/ Steven R. Perles
                                                  Steven R. Perles