# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAUL RUSESABAGINA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 22-469 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| THE REPUBLIC OF RWANDA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS JOHNSTON BUSINGYE'S, JOSEPH NZABAMWITA'S, AND JEANNOT RUHUNGA'S MOTION TO DISMISS THE AMENDED COMPLAINT

TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................ 2

      A.    Relevant Factual Background ........................................................... 2

            1.    Paul Rusesabagina, a hero to millions, risked his personal safety to
                  call attention to the Kagame Regime's descent into
                  authoritarianism and disrespect for human rights ................................. 2
            2.    The Defendants joined a conspiracy to silence Paul Rusesabagina,
                  recruiting co-conspirators and agents in the United States to help
                  them do so ............................................................................................... 3
            3.    The conspiracy succeeds in silencing Paul by kidnapping him,
                  extracting a false confession through torture, and falsely
                  imprisoning him ...................................................................................... 7

      B.    Procedural History ............................................................................ 7

II.   STANDARD OF LAW ..................................................................................... 9

III.  ARGUMENT .................................................................................................. 10

      A.    The Individual Defendants Are Not Immune ................................ 10

            1.    The Individual Defendants are not entitled to conduct-based
                  immunity ............................................................................................... 11
                  a.    The TVPA abrogates conduct-based foreign-official
                        immunity ..................................................................................... 11
                  b.    Even if conduct-based immunity were available here – and
                        it is not – it nonetheless does not apply ..................................... 14
                        i.    Conduct-based immunity does not apply to
                              personal-capacity claims .................................................... 15
                        ii.   *Jus cogens* violations are not official acts ........................ 18
            2.    The Individual Defendants are not entitled to status-based
                  immunity ............................................................................................... 22
            3.    Foreign-official immunity is not a question of subject-matter
                  jurisdiction ........................................................................................... 23

      B.    This Court has Personal Jurisdiction over the Individual Defendants ......... 24

            1.    The Court may exercise specific personal jurisdiction under the
                  D.C. longarm statute ............................................................................ 24
                  a.    Plaintiffs sufficiently allege the existence of a conspiracy
                        that the Individual Defendants participated in or agreed to
                        join ............................................................................................. 26

    b. The Individual Defendants' coconspirators took an overt
     act within the District of Columbia................................... 27

  2. Alternatively, the Court may exercise specific personal jurisdiction
   under Rule 4(k)(2) and pendant personal jurisdiction ............................ 30

    a. In the event personal jurisdiction does not exist under
     D.C.'s longarm statute, Plaintiffs' federal claims satisfy the
     requirements for Rule 4(k)(2) ...................................... 31

      i. The Individual Defendants each directed their
       conduct into the United States and relied on an
       agent in the forum, giving rise to personal
       jurisdiction ..................................................... 32

    b. The Court has pendant personal jurisdiction over Plaintiffs'
     state-law claims................................................... 33

  3. The Individual Defendants do not carry their burden to present a
   compelling case that exercising personal jurisdiction is otherwise
   unreasonable ......................................................... 34

**C.** **Plaintiffs' Claims Are Not Subject to Dismissal Under Rule 12(b)(5)** ........... 36

  1. Plaintiffs have properly served each of the Individual Defendants
   pursuant to Rule 4(f) .................................................. 36

    a. Plaintiffs have served Defendant Busingye pursuant to Rule
     4(f)(1)......................................................... 36

    b. Plaintiffs have served Defendants Nzabamwita and
     Ruhunga pursuant to Rule 4(f)(2)(C)(ii)...................... 38

  2. Rule 12(b)(5) is not grounds for dismissal of a complaint against a
   defendant located abroad ............................................. 39

**D.** **Plaintiffs' Claims Should Not be Dismissed Under Rule 12(b)(6) for
Failure to State a Claim**.................................................... 40

**E.** **Leave to Amend**............................................................ 40

IV. <u>CONCLUSION</u>................................................................. 41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Mid-Atlantic Settlement Servs.*,
 233 F.R.D. 32 (D.D.C. 2006)................................................................................38

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
 480 U.S. 102 (1987)............................................................................................35

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)............................................................................................10

*Atchley v. AstraZeneca UK Ltd.*,
 22 F.4th 204 (D.C. Cir. 2022).............................................................................25

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
 813 F.3d 98 (2d Cir. 2016)..................................................................................32

*AutoOpt Networks, Inc. v. GTL, USA Inc.*,
 2015 WL 407894 (N.D. Tex. 2015).....................................................................40

*Barkley v. U.S. Marshals Service ex rel. Hylton*,
 766 F.3d 25 (D.C. Cir. 2014)..............................................................................41

*Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*,
 168 F. Supp. 3d 1 (D.D.C. 2016)...................................................................30, 33

*Birmingham v. Doe*,
 2022 WL 871910 (S.D. Fla. 2022) .................................................................36, 37

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985)..................................................................................25, 34, 35

*Cabrera v. Black & Veatch Special Projects Corps.*,
 2021 WL 3508091 (D.D.C. 2021) .......................................................................32

*Cerner Middle E. Ltd. v. Al-Dhaheri*,
 2017 WL 776409 (D. Mass. 2017) ......................................................................40

*Corley v. United States*,
 556 U.S. 303 (2009)............................................................................................13

*Cruz-Packer v. District of Columbia*,
 539 F. Supp. 2d 181 (D.D.C. 2008) .......................................................................9

i

*Day v. Corner Bank (Overseas) Ltd.*,
    789 F. Supp. 2d 136 (D.D.C. 2011) ........................................................................40

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
    593 F.3d 1249 (11th Cir. 2010) .............................................................................35

*Doe I v. Buratai*,
    318 F. Supp. 3d 218 (D.D.C. 2018) ...............................................14, 17, 18, 21

*Doe I v. Buratai*,
    792 F. App'x 6 (D.C. Cir. 2019) .................................................................14, 18

*DR Music, Inc. v. Aramini Strumenti Musicali S.R.L.*,
    2014 WL 523042 (D.N.J. 2014) .............................................................................35

*Durham v. Martin*,
    388 F. Supp. 3d 919 (M.D. Tenn. 2019).............................................................17

*Edmond v. USPS Gen. Counsel*,
    949 F.2d 415 (D.C. Cir. 1991) .......................................................................26, 28

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
    894 F.3d 339 (D.C. Cir. 2018) ..................................................................................9

*In re Enron Corp.*,
    316 B.R. 434 (Bankr. S.D.N.Y. 2004).................................................................37

*In re Estate of Ferdinand Marcos, Human Rights Litig.*,
    25 F.3d 1467 (9th Cir. 1994) .................................................................................20

*Fagam v. Cent.l Bank of Cyprus*,
    2019 WL 2410075 (S.D. Fla. 2019) .....................................................................37

*FC Inv. Grp. LC v. Lichtenstein*,
    441 F. Supp. 2d 3 (D.D.C. 2006) .............................................................................9

*Foman v. Davis*,
    371 U.S. 178, 182 (1962).........................................................................................41

*Freedom Watch, Inc. v. OPEC*,
    766 F.3d 74 (D.C. Cir. 2014) ................................................................................39

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
    2011 WL 3903232 (N.D. Cal. 2011) .....................................................................39

*Genus Med. Techs. LLC v. FDA*,
    994 F.3d 631 (D.C. Cir. 2021) ..............................................................................13

*Gill v. District of Columbia,*
    872 F. Supp. 2d 30 (D.D.C. 2012) ........................................................10

*Guy Carpenter & Co. v. Samengo-Turner,*
    2007 WL 1705070 (S.D.N.Y. 2007) ......................................................37

*Hafer v. Melo,*
    502 U.S. 21 (1991)............................................................................16, 17

*Hammond v. Fed. Bureau of Prisons,*
    740 F. Supp. 2d 105 (D.D.C. 2010) ........................................................9

*Harris v. D.C. Water & Sewer Auth.,*
    791 F.3d 65 (D.C. Cir. 2015)..................................................................10

*Hashem v. Shabi,*
    2018 WL 3382913 (D.D.C. 2018) ..........................................................39

*Holland v. Cardem Ins. Co., Ltd,*
    2020 WL 9439381 (D.D.C. 2020) ............................................................9

*\*Jung v. Assoc. of Am. Med. Colls.,*
    300 F. Supp. 2d 119 (D.D.C. 2004) ..........................................25, 29, 32

*Kontrick v. Ryan,*
    540 U.S. 443 (2004)................................................................................23

*Lans v. Adduci Mastriani & Schaumberg L.L.P.,*
    786 F. Supp. 2d 240 (D.D.C. 2011) ........................................................9

*Lewis v. Clarke,*
    137 S. Ct. 1285 (2017)......................................................................16, 18

*\*Lewis v. Mutond,*
    918 F.3d 142 (D.C. Cir. 2019)...........................1, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22

*Louis Vuitton Malletier, S.A. v. Mosseri,*
    736 F.3d 1339 (11th Cir. 2013) ..............................................................25

*Loumiet v. United States,*
    828 F.3d 935 (D.C. Cir. 2016) ................................................................19

*Lyon v. Carey,*
    533 F.2d 649 (D.C. Cir. 1976) ................................................................19

*Mamani v. Sánchez Bustamante,*
    968 F.3d 1216 (11th Cir. 2020) ..............................................................14

*Martinez v. White*,
   2006 WL 2792874 (N.D. Cal. 2006) ...................................................................39

*Metlife Inc. v. Fin. Stability Oversight Council*,
   865 F.3d 661 (D.C. Cir. 2017) .............................................................................13

*Mohammadi v. Islamic Republic of Iran*,
   947 F. Supp. 2d 48 (D.D.C. 2013) .......................................................................29

*Mouzavires v. Baxter*,
   434 A.2d 988 (D.C. Cir. 1981) ............................................................................24

*Muthana v. Pompeo*,
   985 F.3d 893 (D.C. Cir. 2021) ............................................................................22

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) .............................................................25, 30, 33, 34

*Nikwei v. Ross Sch. of Aviation, Inc.*,
   822 F.2d 939 (10th Cir. 1987) .............................................................................38

*The Nurnberg Trial*,
   6 F.R.D. 69, 110 (Int'l Military Trib. at Nuremberg 1946) .................................20

*Oetiker v. Jurid Werke, GmbH*,
   556 F.2d 1 (D.C. Cir. 1977) .................................................................................33

*PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*,
   271 F.R.D. 4 (D.D.C. 2010) .................................................................................41

*Pierson v. Ray*,
   386 U.S. 547 (1967) .............................................................................................13

*Plaintiffs A, B, C, D, E, F v. Jiang Zemin*,
   282 F. Supp. 2d 875 (N.D. Ill. 2003) ......................................................29, 30, 35

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) ..............................................................................29

*Rishikof v. Mortada*,
   70 F. Supp. 3d 8 (D.D.C. 2014) ..........................................................................17

*Robinson v. Kelly*,
   2021 WL 1978294 (N.D. Ill. 2021) .....................................................................16

*Samantar v. Yousuf* (*Samantar I*),
   560 U.S. 305 (2010) .......................................................................................10, 23

*Second Amendment Found. v. U.S. Conference of Mayors*,
274 F.3d 521 (D.C. Cir. 2001) ...........................................................................26

*Siderman de Blake v. Republic of Argentina*,
965 F.2d 699 (9th Cir. 1992) ........................................................................20, 21

*SignalQuest, Inc. v. Tien-Ming Chou*,
284 F.R.D. 45 (D.N.H. 2012) ............................................................................39

*Stafford v. Grifols Int'l S.A.*,
2019 WL 3521957 (N.D. Ga. 2019) ..................................................................40

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)..............................................................................................24

*Thompson Hine, LLP v. Taieb*,
734 F.3d 1187 (D.C. Cir. 2013) ...................................................................25, 26

*United States v. Ballestas*,
795 F.3d 138 (D.C. Cir. 2015) .....................................................................25, 26

*United States v. Benbow*,
709 Fed. App'x 25 (D.C. Cir. 2018) (unpublished)...........................................29

*United States v. Texas*,
507 U.S. 529 (1993).............................................................................................13

*Urquhart-Bradley v. Mobley*,
964 F.3d 36 (D.C. Cir. 2020) .............................................................................24

*In re Vitamins Antitrust Litig.*,
270 F. Supp. 2d 15 (D.D.C. 2003) .....................................................................32

*Young v. Mitsubishi Motors Corp.*,
2019 WL 6327581 (W.D. Tex. 2019)..................................................................35

*\*Yousuf v. Samantar* (*Samantar II*),
699 F.3d 763 (4th Cir. 2012) ...........................................................10, 14, 15, 19, 21

**Statutes**

18 U.S.C. § 2520 .......................................................................................................31

22 U.S.C. § 254d .......................................................................................................22

22 U.S.C. § 1741 .......................................................................................................21

28 U.S.C. § 1350........................................................................................11, 24, 31

28 U.S.C. § 1350 note ...................................................................................12

42 U.S.C. § 1983 ...........................................................................................13

D.C. Stat. § 13-423(a)(1) ....................................................................24, 25, 32

Torture Victim Protection Act of 1991, Pub. L. 102-256, 106 Stat. 73 .....1, 11, 12, 14, 15, 17, 19, 31, 34

**Other Authorities**

4A Adam N. Steinman, *Federal Practice and Procedure* § 1069.7 (Wright & Miller, 4th ed. 2022 update)......................................................................34

Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 Fordham L. Rev. 2669, 2678 (2011)....................................................16

Chiméne I. Keitner, *Categorizing Acts by State Officials: Attribution and Responsibility in the Law of Foreign Official Immunity,* 26 Duke J. of Comparative & Int'l L. 451, 456-59 (2016) ...............................................19

Chiméne I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 61, 62-63 (2010) .....................................................................19

Fed. R. Civ. P. 4 ........................................................ 2, 8, 10, 24-25, 30-31, 33-41

Fed. R. Civ. P. 12 ...........................................................9-10, 23, 36, 40-41

Fed. R. Civ. P. 25 ...........................................................................................17

Fed. R. Civ. P. 44.1 ........................................................................................19

Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters art. 10(a), Nov. 15, 1965, 658 U.N.T.S. 163 ....................................................................................36, 37

*Status Table,* The World Org. for Cross-border Co-operation in Civ. and Com. Matters (last accessed Aug. 26, 2022), https://www.hcch.net/en/instruments/conventions/status-table/print/?cid=17 .................36, 38

Restatement (Second) of Foreign Relations Law § 66 ........................................12, 15

Restatement (Third) of the Foreign Relations Law of the United States § 102 ............................19

Restatement (Third) of the Foreign Relations Law of the United States § 702..............................21

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 500 U.N.T.S. 95............................22

Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S.
332 .................................................................................................................................. 19

William S. Dodge & Chiméne I. Keitner, *A Roadmap for Foreign Official
Immunity in Cases in U.S. Courts*, 90 Fordham L. Rev. 677, 705 & n.182
(2021) ............................................................................................................................ 19

The Court should deny Defendants Johnston Busingye's, Joseph Nzabamwita's, and Jeannot Ruhunga's motion to dismiss. These Defendants argue dismissal is warranted on four separate grounds, but they are wrong on each.

First, the Individual Defendants are not immune from suit: they are not entitled to conduct-based immunity or status-based immunity. As for conduct-based immunity, the D.C. Circuit held in *Lewis v. Mutond* that (1) the Torture Victim Protect Act abrogates conduct-based immunity and (2) foreign officials are not immune from tort suits brought against them in their personal capacities, even if the torts were committed in the course of their official duties. *See Lewis v. Mutond*, 918 F.3d 142, 144 (D.C. Cir. 2019). The Individual Defendants cite *Mutond* only once in their brief. Def. Br. 16. They do not acknowledge its holding that the TVPA abrogated conduct-based foreign-official immunity, a holding that is binding precedent, and instead urge this Court to adopt a rule contrary to the D.C. Circuit's decision. And they seek to escape *Mutond*'s holding on personal capacity suits by erroneously mischaracterizing Plaintiffs' Amended Complaint as asserting official-capacity claims. As for status-based immunity, the Individual Defendants are plainly and indisputably not entitled to status-based foreign-official immunity because none of them hold a position to which status-based immunity attaches.

Second, this Court has personal jurisdiction over the Individual Defendants. The Individual Defendants' extensive conduct reaching into and causing harm in the United States, including actions taken through agents in the District of Columbia, satisfies well-established tests for personal jurisdiction. As the Amended Complaint thoroughly sets forth, the Individual Defendants orchestrated a conspiracy that involved U.S.-based coconspirators (including coconspirators in the District of Columbia) and agents, had extensive contacts with the District

of Columbia and the United States as a whole, and reached into the United States to lure a U.S. resident from the safety of his Texas home.

Third, Plaintiffs' affidavits of service establish that each Individual Defendant has been served. Defendant Businyge was served in compliance with the Hague Convention and Federal Rule 4(f)(1), while Defendants Nzabamwita and Ruhunga were served in compliance with Federal Rule 4(f)(2)(c)(ii). Regardless, dismissal is not available as the time for service has not expired.

Fourth, to the extent the Individual Defendants incorporate Defendant the Republic of Rwanda's arguments that portions of the Amended Complaint should be dismissed for failure to state a claim, the Individual Defendants' motion should be denied for the reasons explained in Plaintiffs' response to Rwanda's motion, Dkt. 31.

## I.     BACKGROUND

### A.     Relevant Factual Background

1.     Paul Rusesabagina, a hero to millions, risked his personal safety to call attention to the Kagame Regime's descent into authoritarianism and disrespect for human rights

As violence swept through Rwanda in 1994, Plaintiff Paul Rusesabagina offered refuge at Kigali's Hôtel des Milles Collines to 1,268 Tutsis and moderate Hutus, all of whom faced immediate and horrific murder at the time as they fled the rampaging Interhamwe militias. Am. Compl., Dkt. 17, ¶8 [hereinafter, "AC"]. Although genocide raged outside the hotel's gates, no one in the hotel was injured or killed, and Paul's story inspired the Academy Award-nominated film Hotel Rwanda, which was met with international acclaim. *Id.* Paul is a hero to many millions of people around the world and in Rwanda for his incredible heroism. In the years since the Genocide, Paul founded the Hotel Rwanda Rusesabagina Foundation to initially support the education of young girls and women who were genocide survivors and then to generate support

2

for the Truth and Reconciliation Commission for Rwanda and the Great Lakes Region of Africa. AC ¶9. He also become an outspoken critic of Rwandan President Paul Kagame's authoritarian regime. AC ¶11. Paul has received many awards for his activism, including the U.S. Presidential Medal of Freedom from George W. Bush in 2005. AC ¶9.

President Kagame does not tolerate dissent, nor has he allowed international borders to stop him from silencing his critics. As detailed in the Amended Complaint and in Plaintiffs' response to Rwanda's motion to dismiss, tragic instances abound of Kagame critics being murdered, disappeared, or arbitrarily imprisoned – both in Rwanda and abroad. AC ¶¶36-45; Plaintiffs' Response to Defendant the Republic of Rwanda's ("Rwanda") Motion to Dismiss the Amended Complaint, Dkt. 31, at 3-4. Paul Rusesabagina's criticisms of Kagame have resulted in decades of systematic targeting by the Kagame regime, AC ¶¶9, 11, and forced him to flee from Rwanda to Belgium, and then to the United States to avoid Kagame's revenge, AC ¶35.

> 2.  <u>The Defendants joined a conspiracy to silence Paul Rusesabagina, recruiting co-conspirators and agents in the United States to help them do so</u>

In the years following Paul's flight to the United States, a number of high-ranking members of the Kagame regime, including Defendants Busingye, Nzabamwita, and Ruhunga (the "Individual Defendants"), joined a conspiracy with Kagame, the Republic of Rwanda, and others in the United States aimed at unlawfully silencing Paul's dissent. AC ¶¶31-33, 155-72. Other members and agents of the conspiracy included James Kimonyo and his staff, who was at the relevant time the Rwandan Ambassador to the United States and was living and working in the District of Columbia, AC ¶¶85-86, 89, 112-16, 121-26, 229, 261; Michelle Martin, an American academic-turned hired Rwandan agent, AC ¶¶67-85; and Moses Rudasunikwa, a pro-Kagame expatriate living in San Antonio, Texas, who volunteered to spy on and harass Paul in exchange for favored status within the Rwandan diaspora community, AC ¶¶109-120, 126.

Defendant Nzabamwita, the head of Rwanda's National Intelligence and Security Service ("NISS"), has publicly taken credit for orchestrating this conspiracy – "from the planning to the full execution." AC ¶160. Nzabamwita and the NISS worked in tandem with the Rwandan Investigation Bureau ("RIB"), which was led by Defendant Ruhunga and fell under the ultimate control of Defendant Busingye, both of whom also personally participated in the conspiracy. AC ¶¶31-32 (Busingye and Ruhunga led the RIB); AC ¶¶140-43 (detailing RIB's role in luring Paul from safety in the United States); AC ¶¶167-68 (discussing "clear evidence" of Busingye's and Ruhunga's "significant role" in the plot to kidnap Paul, including Busingye's own public statements); AC ¶180 (alleging Ruhunga personally visited Paul in prison to demand a false confession).

Nzabamwita and the NISS also worked with Kimonyo and the Rwandan Embassy in Washington, D.C., to spy on Paul and track his movements. AC ¶¶105, 116, 126. Nzabamwita's public comments after Paul's kidnapping reveal that he was receiving and monitoring information of Paul's movements within the United States via illegal electronic surveillance in order to ensure the success of the conspiracy. AC ¶95. Kimonyo and other co-conspirators at the Embassy in Washington, D.C., were charged with surveilling Paul in the United States, and they enlisted members of the Rwandan diaspora in the United States. AC ¶¶105-26 In particular, Embassy officials brought Moses Rudasunikwa into the conspiracy. AC ¶¶109-20. Rudasunikwa was the head of the San Antonio chapter of the Rwandan Community Abroad ("RCA"), which is a formal organization supported by both the Rwandan Embassy and the Rwandan Ministry of Foreign Affairs and International Cooperation ("MINAFFET"). AC ¶¶111-12.[1] Rudasunikwa

---

[1] The Rwanda Embassy touts the U.S. chapter of the RCA on its website, which is described by the MINAFFET as "a Unit at MINAFFET that deals on a daily basis with

spoke with a member of Kimonyo's staff in 2007 and then, in his own words, made Mr. Rusesabagina his "main focus," making it a "task to follow" Mr. Rusesabagina. AC ¶¶111, 113, 119-20.

The Embassy's personnel also directly contributed to the Rwandan government campaign against Paul in the United States. For example, Ambassador Kimonyo publicized wild accusations against Paul during a public forum in Chicago, an easily disproved fabulation. AC ¶¶55-56. The Ambassador also engaged in fruitless attempts to convince Susan Rice, then U.S. Ambassador to the United Nations, that Paul supported terrorists. AC ¶89. In 2021, officials at St. Mary's School of Law documented attempts by Charles Ntageruka, the Second Counselor at the Embassy, to spy on a Zoom discussion attended by members of Paul's family regarding his kidnapping and legal defense in Rwanda. AC ¶¶121-25. The Embassy coordinated this multi-tiered stalking and harassment for over a decade. AC ¶¶55, 126.

Kimonyo and others at the Embassy also coordinated efforts to spy on Paul Rusesabagina and manufacture evidence that he was providing support to terrorists. For example, the Embassy, coordinated the work of Michelle Martin to spy on Paul. AC ¶85.[2] Martin tried to infiltrate Paul's inner circles and encouraged his associates to join a Rwandan rebel group—which they refused to do. AC ¶¶67, 69, 71, 82. Ms. Martin, who was working in Chicago at the time, won the trust of Providence Rubingisa, an associate of Paul's, and stole "hundreds of notes, screenshots, emails, and text messages" from him. AC ¶¶68-69, 72-73, 83. Martin travelled from the United States to Kigali multiple times during this period and personally met with Kagame at

---

Rwandans living abroad."  AC ¶112. Michelle Martin's first FARA report lists the address of the Rwandan government at the MINAFFET office in Kigali, Rwanda. *Id.*

[2] Ms. Martin's role as a paid agent for Rwanda was discovered when she disclosed her work for the Rwandan government via untimely filings with the United States government pursuant to the Foreign Agents Registration Act in 2013. AC ¶¶79-81.

his private residence. AC ¶88.

Kagame directed the Rwandan Ambassador to the United Nations to set up a meeting between Martin, Kimonyo, and Ambassador Rice as part of the conspirators' efforts to deceive the United States into taking legal action against Paul. AC ¶¶89-90. To this end, Martin claimed to have shared information with the FBI in the United States regarding Paul's supposed links to terrorism. AC ¶89. Despite the conspirators' efforts, the United States took no legal action against Paul, and Rwanda never formally sought Paul's extradition. AC ¶90.

Rwanda's effort to extradite Paul through Belgium was based in part on the emails that had been stolen in the United States by Ms. Martin. AC ¶¶128-29. Mr. Rubingisa, however, was able to demonstrate that at least some of the emails were forgeries, and the Belgian authorities rejected the extradition attempt. AC ¶¶128-130.

After Rwanda failed to extradite Paul through Belgium, the conspiracy evolved to use extrajudicial tactics to silence Paul. On February 27, 2020, Michel Mbazabago, an agent of the RIB working under the command of Defendants Jeannot Ruhunga and Johnston Busingye, coerced a man named Mr. Constantin Niyomwungere into joining the conspiracy. AC ¶¶140-45. Mr. Niyomwungere lured Paul from Texas with the promise of a speaking engagement. He was kidnapped en route and taken instead to Kigali. AC ¶¶132-36, 142-43, 145-152. Based on Mr. Niyomwungere's information, the conspirators retained GainJet, a private charter flight company with close links to President Kagame, to take Paul from Dubai to Kigali, instead of Burundi as he had been told. AC ¶¶142-43, 146-152. Defendant Busingye later admitted to knowledge about the conspirators' arrangement with GainJet, AC ¶163, and the bill for the flight was sent directly to President Kagame's office, AC ¶152. Defendant Nzabamwita also later admitted during public interviews that the Rwandan government and Mr. Niyomwungere had plotted together to trick

Paul into coming to Kigali and claimed responsibility for orchestrating the entire conspiracy. AC ¶¶155-172.

   3. <u>The conspiracy succeeds in silencing Paul by kidnapping him, extracting a false confession through torture, and falsely imprisoning him</u>

Rwandan security services arrested Paul after the plane landed in Kigali, took him to a secret detention facility where he was prevented from speaking to his family or a lawyer, and tortured him into a false confession. AC ¶¶173-79. Defendants Ruhunga and Busingye supervised the RIB. An RIB agent named Mbazabagabo led the torture. AC ¶178. For example, Mbazabago would step on Paul's neck while wearing military boots and tape his mouth and nose while he was tied up, making it almost impossible to breathe causing Paul's legs to convulse involuntarily. *Id.* Defendant Ruhunga, Mbazabagabo's boss, personally visited Paul in prison during this period. Defendant Ruhunga told Paul that he would be released if he (falsely) confessed to funneling money from the president of Zambia to an opposition group that Rwanda has accused of terrorism. AC ¶180. The Rwandan authorities boasted to Paul: "we know how to torture." AC ¶179. Paul lost almost 20 pounds due to the torture. *Id.* Defendants then subjected Paul to a sham show trial that has been widely condemned by the United Nations, European Union, human rights groups, and bar associations. AC ¶¶203-20.

**B.** **Procedural History**

Plaintiffs filed their original Complaint on February 22, 2022. Dkt. 1. On May 9, Rwanda filed a motion to dismiss, which was signed by attorney Michael Cryan. Dkt. 13. On May 11, Counsel for Plaintiffs asked Mr. Cryan if he would accept service for the Individual Defendants. Mr. Cryan responded that he was "not authorized" to do so. Ex. 1, Email from Michael S. Cryan to Edward B. Macallister (May 11, 2022).

On May 31, in light of new factual developments, Plaintiffs filed an Amended Complaint, Dkt. 17. On June 24, a Clerk of this Court issued new summons for the Amended Complaint. Dkt. 21. That same day, pursuant to Federal Rule 4(f)(2)(C)(ii), Plaintiffs submitted affidavits requesting the Clerk send copies of the summons and Amended Complaint to the Individual Defendants via FedEx. Dkt. 22. The Clerk shipped a copy of the summons and Amended Complaint to each Individual Defendant on June 29. Dkt. 24. As detailed in the affidavits of service filed with the court (Dkts. 27-1 & 28-1), the packages addressed to Jeannot Ruhunga and Joseph Nzabamwita were delivered and signed for.

On July 4, FedEx attempted to deliver the package addressed to Busingye at the Rwandan High Commission in London, which is Busingye's current place of work. FedEx was unable to deliver the package because it was "[r]efused by recipient." Dkt. 33 at ¶7. Plaintiffs on July 8 attempted to ship another FedEx package to Busingye, but FedEx was unable to deliver the package, providing the explanation "[c]ustomer not available or business closed." *Id.* ¶9.

Simultaneous to their attempts to serve Busingye via FedEx, Plaintiffs on June 30 sent a copy of the summons and Amended Complaint via international priority mail, addressed to Busingye at the High Commission. *Id.* ¶10. On July 25, 2022, USPS returned that package to Plaintiffs' Counsel's office. *Id.* at ¶11. The envelope had the address crossed out in black ink, with the words "send away" added in handwriting and an arrow pointing towards Counsel's return address. *Id.* The envelope appeared to have been opened and taped back shut. Counsel's staff member who prepared the envelope confirmed that he did not use tape to secure the envelope when he originally sent it. *Id.* at ¶12.

The Individual Defendants filed the present motion on July 26, seeking dismissal under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6). Dkt. 29. The motion

was again signed by Mr. Cryan. Although Plaintiffs contend that each Defendant has been properly served, in an effort to narrow the issues before the Court, Plaintiffs' counsel requested Mr. Cryan provide an address that defendants would deem as a suitable residential address for service of process or to accept service on behalf of the Individual Defendants. Mr. Cryan refused. Ex. 2. Email from Michael S. Cryan to Ed B. Macallister (Aug. 22, 2022).

## II.     STANDARD OF LAW

When a defendant brings a Rule 12(b)(1) motion for lack of subject matter jurisdiction and "contests only the legal sufficiency of the plaintiff's jurisdictional claims, [the] standard of review is akin to that applied under Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018).

Likewise, on a Rule 12(b)(2) motion for lack of personal jurisdiction, "[i]n the absence of an evidentiary hearing, the plaintiff need only make a prima facie showing that the Court has personal jurisdiction." *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 263 (D.D.C. 2011). Under such circumstances, the Court may rule "on the basis of the pleadings," and "factual discrepancies are resolved in favor of the Plaintiffs." *FC Inv. Grp. LC v. Lichtenstein*, 441 F. Supp. 2d 3, 8 (D.D.C. 2006).

A motion to dismiss under Rule 12(b)(5) for insufficient service should be denied where the plaintiff "demonstrate[s] that the procedure employed satisfie[s] the requirements of Rule 4 and any other applicable provision of law." *Holland v. Cardem Ins. Co., Ltd*, 2020 WL 9439381, at *4 (D.D.C. 2020) (quoting *Cruz-Packer v. District of Columbia*, 539 F. Supp. 2d 181, 186 (D.D.C. 2008)). Even where granted "dismissal under Rule 12(b)(5) is ordinarily without prejudice." *Hammond v. Fed. Bureau of Prisons*, 740 F. Supp. 2d 105, 109 (D.D.C. 2010).

A complaint should not be dismissed for failure to state a claim under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This pleading requirement, however, does not demand "the plaintiff to plead all elements of her prima facie case in the complaint, or to plead law or match facts to every element of a legal theory . . . ." *Gill v. District of Columbia*, 872 F. Supp. 2d 30, 34 (D.D.C. 2012) (internal citations omitted). Furthermore, "[a] court considering [a 12(b)(6)] motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor." *Id.* at 33.

## III.   ARGUMENT

### A.   The Individual Defendants Are Not Immune

Foreign-official immunity is governed by federal common law, based on principles of customary international law. *See Samantar v. Yousuf* (*Samantar I*), 560 U.S. 305, 310-11 (2010); *see also Yousuf v. Samantar* (*Samantar II*), 699 F.3d 763, 773 (4th Cir. 2012) ("From the earliest Supreme Court decisions, international law has shaped the development of the common law of foreign sovereign immunity."). There are two types of immunity for foreign officials: conduct-based immunity and status-based immunity. *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019). The defendant bears the burden of proving foreign official immunity under either standard. *Id.*

Binding authority holds that conduct-based immunity is not available to the Individual Defendants. The D.C. Circuit held in *Mutond* that (1) the TVPA abrogates conduct-based foreign-official immunity and (2) foreign officials are not immune from tort suits brought against

them in their personal capacities, even if the torts were committed in the course of their official duties.[3] 918 F.3d at 144. Here, because Plaintiffs bring claims under the TVPA and sue the Individual Defendants in their personal capacities, *Mutond* precludes Defendants' claims to foreign-official immunity on multiple, alternative grounds. Even if *Mutond* did not govern, the Individual Defendants would still not be entitled to immunity because conduct immunity is not available for conduct that violates *jus cogens* norms. *See infra* Part III.A.1.b.ii.

The Individual Defendants' claim to status-based immunity is entirely baseless. None of the Individual Defendants hold a position entitled to status-based immunity. Defendants Nzabamwita and Ruhunga are not heads of state or diplomats. Defendant Busingye's status as a diplomat assigned to the United Kingdom, Ireland, and Malta does not grant him immunity from civil suit in the United States.

   1. <u>The Individual Defendants are not entitled to conduct-based immunity</u>

    a. *The TVPA abrogates conduct-based foreign-official immunity*

Binding D.C. Circuit precedent holds that the TVPA deprives the Individual Defendants of conduct-based immunity. *See Mutond*, 918 F.3d at 144 ("[T]he TVPA displaces conduct-based immunity in this context."). The TVPA imposes civil liability upon individuals who commit torture or extrajudicial killing "under *actual* or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 statutory note § 2(a) (emphasis added). In *Mutond*, Judge

---

[3] In *Mutond*, Judge Wilkins wrote the opinion of the court, joined by Judge Srinivasan. Judges Wilkins and Srinivasan held that foreign officials do not enjoy immunity from tort claims brought against them in their personal capacities. *See Mutond*, 918 F.3d at 147. Judge Randolph concurred in the judgment and opined that the TVPA abrogated common-law conduct-based foreign-official immunity, *see id.* at 149-50 (Randolph, J., concurring in judgment), and Judge Srinivasan filed a concurring opinion expressing his agreement with that aspect of Judge Randolph's opinion, *see id.* at 148 (Srinivasan, J., concurring). Accordingly, a majority of the panel adopted both grounds for rejecting immunity. *See id.* at 144 (Maj. Op.) (summarizing court's two "alternative holding[s]").

Randolph, joined in relevant part by Chief Judge Srinivasan, observed that the text of the TVPA

came into "clear conflict" with common law conduct based immunity: "The Torture Act thus

imposes liability for actions that would render the foreign official eligible for immunity under the

Restatement." 918 F.3d at 150 (Randolph J., concurring in judgment). As Judge Randolph

concluded, "[w]hen there is such a clear conflict between statutory law and judge-made common

law, the common law must give way." *Id.* at 150; *see also id.* at 148 (Srinivasan, J., concurring)

("I also agree with the portion of Judge Randolph's concurrence in the judgment explaining that

the Torture Victim Protection Act (TVPA) subjects foreign officials to liability for acts

undertaken in an official capacity and thus displaces any common-law, conduct-based immunity

that might otherwise apply in the context of claims under that Act."); *id.* at 144 (Maj. Op.) ("In

the opinion by Senior Judge Randolph, which is joined in relevant part by Judge Srinivasan, we

provide the alternative holding that the TVPA displaces conduct-based immunity in this

context.").

Despite dedicating four pages of their brief arguing that the TVPA does not abrogate

foreign-official immunity, the Individual Defendants fail to so much as acknowledge this binding

Circuit precedent that directly conflicts with their argument. *See* Defs.' Br. 21-25. Indeed, the

*Mutond* defendants asserted the same argument for conduct-based immunity that the Individual

Defendants rely upon here: that § 66(f) of the Restatement (Second) of Foreign Relations Law

provides the common-law of foreign-official immunity. *Compare Mutond*, 918 F.3d at 146

("[B]oth parties assume § 66 accurately sets out the scope of common-law immunity for current

or former officials . . . ."), *with* Defs.' Br. 9 (setting forth test from § 66). The facts bear striking

resemblance too. The *Mutond* plaintiff was an American national who, while working for a

political dissident in the Democratic Republic of the Congo ("DRC"), was arrested and tortured

by state security forces. 918 F.3d at 144. Like Paul Rusesabagina in this case, the *Mutond* plaintiff sued the DRC's Minister of Justice (Defendant Busingye's Congolese counterpart) and the head of the DRC's National Security Agency (Defendant Nzabamwita's Congolese counterpart), arguing both were liable for his abuse. *Id.*

Given that *Mutond* is both binding and indistinguishable, the Individual Defendants' four pages of argument asserting that common-law conduct-based immunity survived the TVPA is unavailing. The Individual Defendants chiefly rely on the canon that, when possible, statutes should be interpreted consistently with the common law. Defs.' Br. 22. But *Mutond* disposes of this argument. As *Mutond* held, 918 F.3d at 150, the TVPA plainly evinces "a statutory purpose" to contravene any common-law immunity doctrines that would shield government officials who commit torture under the actual authority of a foreign nation, a holding consistent with ample additional authority. *See Metlife Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 674 (D.C. Cir. 2017) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)); *cf. Mutond*, 918 F.3d at 150 n.6 (Randolph, J., concurring in judgment) (criticizing canon as "a relic of the courts' historical hostility to the emergence of statutory law" (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 318 (2012))). Defendants ignore another cannon, "the basic interpretive canon that a 'statute should be construed [to give effect] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021) (alteration in original) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).[4]

---

[4] Defendants' comparison to 42 U.S.C. § 1983 is thus inapt. *See* Defs.' Br. 22-23. Although § 1983 has been interpreted to preserve common-law immunities, *see Pierson v. Ray*, 386 U.S. 547, 554 (1967), those immunities merely limit the scope of liability under § 1983; they do not render any part of § 1983's text inoperable or remove a category of defendant specifically included in the statute from its scope.

The TVPA was passed by the United States Congress and signed into law by President George H.W. Bush. *See* Torture Victim Protection Act of 1991, Pub. L. 102-256, 106 Stat. 73. It squarely authorizes United States courts to hear suits against individuals who, acting under actual or apparent authority of any foreign nation, commit torture or extrajudicial killing. *See id.* § 2. And indeed, cases have proceeded to trial against foreign officials on that basis. *See, e.g.*, *Mamani v. Sánchez Bustamante*, 968 F.3d 1216, 1219-20 (11th Cir. 2020). In light of the policy determinations already made by the political branches when they enacted the TVPA into law and the D.C. Circuit's binding interpretation of that statute, Defendants' policy arguments are not only misplaced but also unconvincing.[5] In sum, the D.C. Circuit has held that the TVPA abrogates conduct-based foreign-official immunity. As a result, the Individual Defendants are not entitled to conduct-based immunity.

> b. *Even if conduct-based immunity were available here – and it is not – it nonetheless does not apply*

Although additional analysis is unnecessary in light of the binding authority discussed above, even if the TVPA had left common-law conduct-based immunity intact (it did not), Defendants are not entitled to it under the facts of this case.

---

[5] For example, Defendants rely heavily on the district court opinion in *Doe I v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018), which involved TVPA claims brought by Nigerian nationals against Nigerian government officials alleging events that took place exclusively in Nigeria and bore no apparent relationship to the United States. *See id.* at 228-29. The district court found immunity in an opinion that, as further discussed *infra*, directly conflicts with (and if decided today, would be controlled by) the later-decided *Mutond*. Moreover, the D.C. Circuit affirmed based solely on personal jurisdiction, not immunity, grounds. *See Doe I v. Buratai*, 792 F. App'x 6, 8 (D.C. Cir. 2019) (unpublished).

Apart from rare exceptions, the only apparent instance when a TVPA claim for purely foreign conduct may be brought in the United States is when the defendant takes up residence here after the alleged acts. But there is no unfairness in litigating such cases in the United States. *See Samantar II*, 699 F.3d at 777-78.

In *Mutond*, the D.C. Circuit looked to the three-part test set forth in § 66(f) of the Second Restatement to resolve the defendants' claims of conduct-based immunity. *See* 918 F.3d at 146. Under this test, a defendant is entitled to conduct-based immunity if (1) the defendant "is a public minister, official, or agent of the foreign state"; (2) "the acts were performed in her official capacity"; and (3) "exercising jurisdiction would serve to enforce a rule of law against the foreign state." *Id.*[6] *Mutond* further clarified that to satisfy the third element of this test, the defendant must show that the plaintiff's claim against the foreign official "seeks to draw on the [foreign state]'s treasury or force the state to take specific action." *Id.* at 147.

The Individual Defendants cannot satisfy the three-part test. The Individual Defendants meet the first element of the Restatement test: each Individual Defendant is a minister, official, or agent of Rwanda. But the claims against the Individual Defendants fail both of the other two elements of the test, and therefore do not qualify for common law conduct based immunity. *Mutond* is again decisive on the third element because Plaintiffs sue the Individual Defendants in their personal capacities. *See* 918 F.3d at 147. And Defendants' immunity claims also fail on the second element, because, as the Fourth Circuit has held, *jus cogens* violations—such as the Individual Defendants' disappearance, torture, and arbitrary detention of Paul Rusesabagina— cannot be considered official acts. *See Samantar II*, 699 F.3d at 776.

> i.  Conduct-based immunity does not apply to personal-
>     capacity claims

Binding D.C. Circuit authority holds that the Individual Defendants' assertion of conduct-based immunity fails on the third element of the Restatement test because Plaintiffs' claims against the Individual Defendants do not seek to enforce a judgment against Rwanda.

---

[6] As in *Mutond* the parties here agree that the Second Restatement § 66(f) test applies.

Here, the Individual Defendants again run headlong into *Mutond*, in which the D.C. Circuit held that tort claims asserted against foreign government officials in their individual capacities by definition do not seek to enforce a judgment against the foreign state and thus fail the third element of the Restatement test. *See* 918 F.3d at 147 ("Defendants in this case are being sued in their individual capacities and Plaintiff is not seeking compensation out of state funds."); *see also, e.g.*, Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 Fordham L. Rev. 2669, 2678 (2011) (explaining that at common law, "foreign officials were not immunized for all acts performed in an official capacity, but only for those in which the state itself would be bound by a judgment against the official."). This is consistent with Supreme Court precedent holding that a tribal employee does not enjoy immunity from a personal-capacity suit, even for a tort committed in the course of employment. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

The Individual Defendants try to circumvent this binding precedent by suggesting that because the Plaintiffs seek damages for acts that they took in the course of their official duties and for which Rwanda is also liable, this suit must be brought against the Individual Defendants in their official capacities. Defs.' Br. 14-15. Not so: "whether to pursue an official or personal-capacity suit is the choice of the plaintiff, not a function of the actions of the state official defendant." *Robinson v. Kelly*, 2021 WL 1978294, at *2 (N.D. Ill. 2021) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)); *see also Clarke*, 137 S. Ct. at 1291 ("[S]overeign immunity 'does not erect a barrier against suits to impose individual and personal liability.'" (quoting *Hafer*, 502 U.S. at 30-31)). Here, Plaintiffs have sued the Individual Defendants in their personal

capacities.[7] Plaintiffs are not seeking to recover damages from Rwanda's treasury through a judgment against the Individual Defendants.[8]

Further, the notion that any suit based on an act that a foreign official committed in the course of employment must necessarily seek to enforce a judgment against the state proves too much. As *Mutond* explained, "[t]his position elides the second and third elements for establishing conduct-based immunity." 918 F.3d at 146. The third element only comes into consideration once it has been established that the act was taken in the Defendants' official capacity. *Id.* The third element focuses on the nature of the *relief* the plaintiff seeks, and not the nature of the *act* defendant took. *Id.* To treat it otherwise would be to render it a nullity.

Tellingly, Defendants' argument to the contrary relies primarily on *Buratai*. *Buratai*'s analysis on this point, in turn, relied primarily on the district court opinion that the D.C. Circuit

---

[7] For example, Plaintiffs claim against Defendant Busingye makes clear they sue Defendants in their personal capacities. Defendant Busingye had stepped down as minister of justice before Plaintiffs filed this lawsuit. AC ¶¶12, 31. Had Plaintiffs sought to sue Defendants in their official capacities, they would have sued Busingye's successor. *See, e.g.*, *Durham v. Martin*, 388 F. Supp. 3d 919, 930 (M.D. Tenn. 2019). Defendant Busingye must understand he is being sued in his personal capacity, as he has not sought substitution under Federal Rule of Civil Procedure 25(d).

[8] Plaintiffs separately seek to recover from Rwanda's treasury on certain claims asserted directly against Rwanda, but this does not change the nature of the suit against the separate Individual Defendants. Since the Individual Defendants are sued in their personal capacities, a judgment against the Individual Defendants would be against them alone. *See Hafer*, 502 U.S. at 31. To the extent Rwanda is found immune or otherwise prevails, there will be no judgment that can be enforced against Rwanda. To the extent Rwanda is found not immune and liable, the judgment against Rwanda will be rightly enforced against it consistent with the Foreign Sovereign Immunities Act and international law. Moreover, even if that were not the case, Plaintiffs' TVPA and Alien Tort Statute ("ATS") claims are asserted only against the Individual Defendants, so there is no scenario in which a judgment on those claims could be enforced against Rwanda. This case is therefore unlike *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 15 (D.D.C. 2014). *Rishikof* predated *Mutond* and cites no caselaw—domestic or foreign—on foreign-official immunity in its analysis of this issue. *See Rishikof*, 70 F. Supp. 3d at 15-16; *see also* Ex. 3, Decl. of William S. Dodge, ¶17 (opining that *Rishikof* had "gone astray" from international law by conflating meanings of official capacity). Defendants have not argued that this Court should follow *Rishikof* on this issue.

subsequently reversed in *Mutond*. *See Buratai*, 318 F. Supp. 3d at 226-36 (citing reversed *Mutond* district court opinion 15 times); *see also Mutond*, 918 F.3d at 144 (vacating *Mutond* district court opinion). *Buratai* does not survive *Mutond*. *Compare Buratai*, 318 F. Supp. 3d at 233 (holding a judgment is enforceable against a foreign state when "a decision by this Court on the legality of the defendants' actions would amount to a decision on the legality of [the state's] actions"), *with Mutond*, 918 F.3d at 147 (holding a judgment is enforceable against a foreign state only when the judgment would "draw on the DRC's treasury or force the state to take specific action"). Notably, the D.C. Circuit affirmed *Buratai* exclusively on personal jurisdiction grounds, without reaching the question of immunity. *See Doe v. Buratai*, 792 F. App'x 6, 8 (D.C. Cir. 2019) (unpublished).

The Individual Defendants' remaining arguments regarding the Restatement's third element all follow from their erroneous assertion that Plaintiffs have sued them in their official capacities. Because this is a personal-capacity suit, the Individual Defendants, not Rwanda, are the real parties in interest. *See Clarke*, 137 S. Ct. at 1291. And as such, it is not true that "Plaintiffs seek money damages that would necessarily have to be paid by Rwanda." Defs.' Br. 13. To the extent Defendants mean to hint that Rwanda would indemnify them for any money damages assessed against them in this case, this is irrelevant. *See Clarke*, 137 S. Ct at 1292 ("[A]n indemnification provision cannot, as a matter of law, extend sovereign immunity to individual employees who would otherwise not fall under its protective cloak.").

As *Mutond* is again binding and indistinguishable on this issue, the Individual Defendants' assertions of conduct-based immunity would fail even if the TVPA allowed such claims, which it does not.

ii.   *Jus cogens* violations are not official acts

Although, again, additional analysis is unnecessary in light of the binding authority

discussed above, the Individual Defendants' conduct-based immunity claims would also fail for

another independent reason: because their *jus cogens* violations are not official acts entitled to

immunity. States universally recognize certain peremptory rules (or *jus cogens*), which no states

have the authority to violate. *See* Ex. 3, Decl. of Professor William S. Dodge, ¶7;[9] Vienna

Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 332; Restatement

(Third) of the Foreign Relations Law of the United States § 102 cmt. k (Am. Law Inst. 1987).

Accordingly, any government official who violates a *jus cogen* norm inherently exceeds his

authority to act.[10] Ex. 3, Dodge Decl., ¶12. Thus, "[t]here has been an increasing trend in

international law to abrogate foreign official immunity for individuals who commit acts,

otherwise attributable to the State, that violate jus cogens norms—*i.e.*, they commit international

crimes or human rights violations." *Samantar II*, 699 F.3d at 776; *see also* Ex. 3, Dodge Decl.,

¶¶10-11.[11] "American courts have generally followed the [international] trend, concluding that

---

[9] Plaintiffs submit the Declaration of Professor William S. Dodge, a leading professor of international law and transnational litigation, to assist the Court in evaluating the matters of international law implicated by the Individual Defendants' claims to foreign-official immunity. *Cf.* Fed. R. Civ. P. 44.1.

[10] It is important to note that a foreign state may not dodge its own liability for *jus cogens* violations of its agents by pointing to the *ultra vires* nature of those violations. Modern international law embraces the principle of dual responsibility for *jus cogens* violations. *See* Chimène I. Keitner, *Categorizing Acts by State Officials: Attribution and Responsibility in the Law of Foreign Official Immunity*, 26 Duke J. of Comparative & Int'l L. 451, 456-59 (2016). This is consistent with domestic U.S. law, which recognizes that both governments and private employers can be held vicariously liable for acts of their agents that are unlawful or contravene the principal's orders. *See, e.g.*, *Loumiet v. United States*, 828 F.3d 935, 944 (D.C. Cir. 2016); *Lyon v. Carey*, 533 F.2d 649, 652-53 (D.C. Cir. 1976).

[11] *See also, e.g.*, William S. Dodge & Chimène I. Keitner, *A Roadmap for Foreign Official Immunity in Cases in U.S. Courts*, 90 Fordham L. Rev. 677, 705 & n.182 (2021) (collecting cases and concluding that "a number of [foreign] courts have denied conduct-based immunity for violations of universally accepted prohibitions."); Chimène I. Keitner, *The*

jus cogens violations are not legitimate official acts and therefore do not merit foreign official

immunity." *Id.*; *see also, e.g.*, *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d

1467, 1472 (9th Cir. 1994) ("Marcos' acts of torture, execution, and disappearance were clearly

acts outside of his authority as President."); *Siderman de Blake v. Republic of Argentina*, 965

F.2d 699, 718 (9th Cir. 1992) ("International law does not recognize an act that violates *jus

cogens* as a sovereign act. A state's violation of the *jus cogens* norm prohibiting official torture

therefore would not be entitled to the immunity afforded by international law."). A rule that

allows foreign government officials to hide behind their official status to claim immunity for *jus

cogens* violations would run contrary to "what may be the most famous principle of the

Nuremberg Tribunal: 'Crimes against international law are committed by men, not by abstract

entities, and only by punishing individuals who commit such crimes can the provisions of

international law be enforced.'" Stephens, *supra*, at 1172 (quoting *The Nurnberg Trial*, 6 F.R.D.

69, 110 (Int'l Military Trib. at Nuremberg 1946)).[12]

     In arguing against this rule, the Individual Defendants again rely primarily on citations to

*Buratai*. As discussed above, *Buratai* relies primarily on the vacated district court opinion in

---

*Common Law of Foreign Official Immunity*, 14 Green Bag 61, 62-63 (2010) ("International law, and many countries' domestic laws, impose individual responsibility on officials who commit acts such as war crimes, genocide, and crimes against humanity, even when they commit these acts in their official capacities. Conduct-based immunity does not automatically shield individual defendants from the legal consequences of these acts, whether in the form of criminal penalties or civil damages.").

    [12] There is some debate among commentators over whether the violation of a *jus cogens* norm prevents a *prima facie* showing of immunity because it negates the requirement that the putatively immune act be taken in the defendant's official capacity or whether the violation of a *jus cogens* norm creates an exception to immunity where a *prima facie* case is otherwise made. *See, e.g.*, Dodge & Keitner, *supra*, at 703-04. There may be some implications to this debate in some international law contexts, but for present purposes it can be safely confined to the halls of academia: regardless of the conceptual framework, it is at least clear that government officials who violate *jus cogens* norms are not immune from civil suit.

*Mutond* and is not persuasive authority. *See Supra* Pt. III.A.1.b.i. Otherwise, the Individual

Defendants raise the specter of various foreign-policy issues, Defs.' Br. 20-21, but the State

Department has already weighed in with its view on this case. In a public letter published in May

2022, it announced that "the U.S. Department of State has determined the government of

Rwanda has wrongfully detained U.S. Lawful Permanent Resident Paul Rusesabagina." AC

¶211. The State Department issued its finding pursuant to the Robert Levinson Hostage

Recovery and Hostage-taking Accountability Act, 22 U.S.C. § 1741. To make a determination

under the Levinson Act, the State Department considers, *inter alia*, "credible information

indicating the innocence of the detained individual," the detention's legality under "the laws of

the detaining country," the adequacy of the process used to support the detention, and the

conditions in which the hostage is detained. *Id.* Thus the United States' foreign policy concerns

in this case are no mystery, and Plaintiffs' lawsuit is entirely consistent with the State

Department's goals on this matter.

Additionally, the State Department's ability to weigh in, via a statement of interest or

suggestion of immunity, adequately addresses the concerns raised the Individual Defendants

regarding any interference in the foreign policy making of the Executive Branch. Furthermore,

the Individual Defendants have apparently chosen to forego requesting a suggestion of immunity

in this case. Defs.' Br. 8-9. Having chosen to do so, they should not be permitted to step into the

State Department's shoes to opine on the consequences that U.S. foreign policy will suffer if

they are held to account for their actions.

The Individual Defendants do not dispute that the torts Plaintiffs allege each constitute a

*jus cogens* violation. The prohibition of torture, enforced disappearance, and arbitrary detention

are among the best-settled *jus cogens* norms. *See* Restatement (Third) of the Foreign Relations

Law of the United States § 702(c)-(d) (Am. Law Inst. 1987); *see also, e.g.*, *Samantar II*, 699 F.3d at 775; *Siderman de Blake*, 965 F.2d at 716-17. International law likewise denies immunity for kidnapping and espionage – at least when it is carried out in violation of the forum state's territorial sovereignty, as is the case here. *See* Dodge & Keitner, *supra* n.9, at 708 ("Outside the human rights context, one finds other examples of conduct authorized by foreign governments that is not entitled to conduct-based immunity. The classic example is espionage, but authorities today typically include sabotage, kidnapping, and political assassination, as well.").

In sum, even if the Individual Defendants could claim conduct-based immunity from personal-capacity tort claims (they cannot), their alleged torts all violate peremptory norms of international law and thus cannot be considered official acts entitled to conduct-based immunity.

2.    <u>The Individual Defendants are not entitled to status-based immunity</u>

The Individual Defendants' claims to status-based immunity carry no water. "Status-based immunity is reserved for diplomats and heads of state . . . ." *Mutond*, 918 F.3d at 145. Defendants Nzabamwita and Ruhunga do not claim to be heads of state. And while they do not claim to be diplomats either, they nevertheless argue that they should be treated like diplomats "by virtue of their status as 'high ranking officials' of the Rwandan Government." Defs.' Br. 19.

Diplomatic immunity is not "high ranking official" immunity. "Diplomatic immunity is governed by the Vienna Convention on Diplomatic Relations, [Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 500 U.N.T.S. 95]." *Muthana v. Pompeo*, 985 F.3d 893, 903 (D.C. Cir. 2021); *see also* 22 U.S.C. §254d (incorporating the Vienna Convention's immunity provisions into federal law). The Vienna Convention extends immunity only to "diplomatic agent[s]," art. 31(1), which it defines as "the head of the mission or a member of the diplomatic staff of the mission," art. 1(e). Defendants Nzabamwita and Ruhunga do not assert that they are

22

the head or a member of the diplomatic staff of any mission, nor is there any evidence they are. Accordingly, they cannot carry their burden to show they are entitled to status-based immunity.

Defendant Busingye is at least a diplomat. But his status as the head of Rwanda's missions to the United Kingdom, Ireland, and Malta does not immunize him from suit *in the United States*. The Vienna Convention immunizes diplomatic agents only from the "jurisdiction of the receiving State" – in Busingye's case, the United Kingdom, Ireland, and Malta. Vienna Convention art. 31(1); *see also* Ex. 3, Dodge Decl., ¶6 n.1. Defendants cite no authority suggesting that an individual's diplomatic status in one (or even three) states immunizes him from all the world's courts. Thus, Busingye is not entitled to diplomatic immunity.[13]

3.   Foreign-official immunity is not a question of subject-matter jurisdiction

Although this distinction does not impact the outcome of the immunity determination, the better rule is that the question of foreign-official immunity should be treated as a Rule 12(b)(6), not 12(b)(1) issue. As Professors Dodge and Keitner explain, foreign-official immunity is best viewed as an affirmative defense not a question of subject matter jurisdiction. *See* Dodge & Keitner, *supra* n.9, at 720-26. In *Samantar I*, the Supreme Court held that foreign-official immunity was a matter for federal common law and not within the FSIA's ambit. *See* 560 U.S. at 310-11. Because this court's subject matter jurisdiction is authorized by statute (*e.g.* 28 U.S.C §§ 1331, 1350, 1367) only an act of Congress, not the common law, can divest the court of that jurisdiction. *See Kontrick v. Ryan*, 540 U.S. 443, 452 (2004). Congress has not enacted a statute treating foreign official immunity as jurisdictional. *Samantar*, 560 U.S. at 325-26. Treating foreign official immunity as an affirmative defense would not affect the protections immunity is

---

[13] Additionally, as Plaintiffs separately explain in their opposition to Defendant Paul Kagame's Motion to Dismiss, status-based immunity is inappropriate absent a suggestion of immunity from the State Department, which the Individual Defendants have not requested.

meant to provide, *see* Dodge & Keitner, *supra* n.9, at 723, and is consistent with recent Supreme Court jurisprudence.

## B.    This Court has Personal Jurisdiction over the Individual Defendants

Plaintiffs have alleged that the Individual Defendants engaged in extensive conduct reaching into and causing harm in the United States, including actions taken through agents in the District of Columbia. Under these allegations, the Court may exercise specific personal jurisdiction under the D.C. longarm statute, D.C. Stat. § 13-423(a)(1), or, in the alternative, under Federal Rule of Civil Procedure 4(k)(2). In the event the Court exercises personal jurisdiction over Plaintiffs' federal claims under Rule 4(k)(2), it may also exercise pendant personal jurisdiction over Plaintiffs' state-law claims.

### 1.    The Court may exercise specific personal jurisdiction under the D.C. longarm statute

Federal Rule of Civil Procedure 4(k)(1)(A) grants a federal court personal jurisdiction over a defendant who is served with a summons and is subject to the jurisdiction of a state court sitting in the federal court's judicial district. As demonstrated in Part III.C., *infra*, the Individual Defendants have each been served with a summons, and the Defendants would be subject to personal jurisdiction in D.C. superior court pursuant to D.C.'s longarm statute, D.C. Stat. § 13-423(a)(1).

D.C.'s longarm statute grants personal jurisdiction over claims arising from a defendant's "transacting any business in the District of Columbia," whether the defendant does so "directly or by an agent." § 13-423(a)(1). As the D.C. Court of Appeals has held, § 13-423(a)(1) is "coextensive with the due process clause." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. Cir. 1981). Thus, the "'statutory and constitutional' predicates for specific personal jurisdiction 'merge into a single inquiry,'" and personal jurisdiction is proper so long as it comports with due

process. *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020) (quoting *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013)). Specific jurisdiction comports with due process where there are "(1) minimum contacts demonstrating that the defendant purposefully availed itself of the forum; (2) relatedness between the contacts and the claim"; and (3) the exercise of jurisdiction otherwise "compli[es] with 'fair play and substantial justice.'" *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 233 (D.C. Cir. 2022).[14] Once the plaintiff meets her burden on the first two of these factors, the burden on the third factor shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Mwani v. Bin Laden*, 417 F.3d 1, 14 (D.C. Cir. 2005); (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)).

Under the doctrine of conspiracy jurisdiction, where, as here, a plaintiff alleges the defendant participated in a conspiracy, the district court may assert jurisdiction over the defendant based on a coconspirator's case-related contacts with the forum. *See, e.g.*, *Jung v. Assoc. of Am. Med. Colls.*, 300 F. Supp. 2d 119, 140-41 (D.D.C. 2004); *cf. United States v.*

---

[14] Although the argument is not entirely clear, the Individual Defendants appear to assert that in order to show minimum contacts in a tort case, a plaintiff *must* show that the defendant committed intentional conduct, aimed her conduct at the forum state, and knew her conduct would harm the defendant in the forum state. This is not the law. Although the "effects test" that the Individual Defendants cite is a *permissible* means of showing minimum contacts in a tort case, it is not the *exclusive* means of making this showing. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1357 (11th Cir. 2013) ("The 'effects test' provides an additional means, unavailable in contract cases, of determining the appropriateness of personal jurisdiction—one that is based on a plaintiff's ties to the forum state and the harm suffered by the plaintiff. The 'effects test,' however, does not supplant the traditional minimum contacts test for purposeful availment applicable in contract and tort cases alike."). A recent decision by the D.C. Circuit also makes this clear. *Atchley*, 22 F.4th at 231 (finding specific jurisdiction over defendant for tort claims arising from terrorist attacks in Iraq based on defendant's business contacts in the United States).

*Ballestas*, 795 F.3d 138, 146 (D.C. Cir. 2015) (holding co-conspirator's overt acts "on board" a vessel were attributable to defendant for purposes of Maritime Drug Law Enforcement Act's extraterritorial application). Conspiracy jurisdiction "presumes that '[p]ersons who enter the forum and engage in conspiratorial acts are deemed to "transact business" there "directly"; [and] coconspirators who never enter the forum are deemed to "transact business" there "by an agent."'" *Id.* at 141 (quoting *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)). A plaintiff establishes conspiracy jurisdiction by alleging "(1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries." *Id.*; *see also, e.g.*, *Edmond v. USPS Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991). Plaintiffs here adequately allege each of these elements.

> a.     *Plaintiffs sufficiently allege the existence of a conspiracy that the Individual Defendants participated in or agreed to join*

First, Plaintiffs plainly allege the existence of a conspiracy to unlawfully silence Paul Rusesabagina's dissent, which each Individual Defendant participated in. AC ¶¶52-54, 64, 85-90. Defendant Nzabamwita has publicly taken credit for orchestrating the conspiracy (although he referred to it as an "operation"). AC ¶160. Plaintiffs allege the RIB took a central role in this conspiracy. AC ¶¶140-43. In particular, Plaintiffs allege that RIB agent Mbazabago coerced Niyomwungere into participating in the conspiracy. AC ¶¶140-41. Niyomwungere then deceived Paul into believing Niyomwungere had organized a speaking tour for him in Burundi to lure Paul away from home and the safety of the United States. AC ¶¶133-39, 144-46. Paul was then forcibly taken to Rwanda, where he was detained, disappeared, and tortured by RIB agents (led by Mbazabago). AC ¶¶146-51, 174-82.

Defendant Ruhunga, the Secretary General of the RIB, had a direct management role in the RIB. Defendant Busingye, the Minister of Justice and Attorney General, also oversaw the RIB and its activities. AC ¶¶31-32. Plaintiffs allege Ruhunga' active participation in the conspiracy: during Paul's initial detention and while Mbazabago and other RIB agents were torturing him, Ruhunga personally visited Paul in prison and demanded a false confession. AC ¶180. Plaintiffs allege Busingye led the communications plan following Paul's kidnaping to try to legitimize the conspirators' actions to the world. AC ¶165. Moreover, Busingye publicly admitted to his knowledge and approval of Paul's kidnapping, and he revealed in a media interview the details of the payment the Rwandan government made to GainJet to forcibly fly Rusesabagina to Kigali. AC ¶¶155, 163, 167-68.

Even absent this direct evidence of their involvement, it is reasonable at this stage to infer that Busingye and Ruhunga knew of and agreed to the conspiracy to kidnap Paul, which was being carried out in large part by their subordinates, especially in light of the foreseeability of the international controversy the kidnapping would cause and the importance the Kagame Regime had placed on silencing Paul's dissent. AC ¶¶85-90. This is consistent with findings from the Lantos Foundation for Human Rights & Justice, a well-respected human rights watchdog, that "in the case of Paul Rusesabagina's kidnapping, the complicity and responsibility of both Busingye and Ruhunga is crystal clear," that Ruhunga "oversaw the operation to kidnap Rusesabagina," and that there is "clear evidence of Mr. Busingye's involvement in the kidnapping." AC ¶¶167-68.

        b.     *The Individual Defendants' coconspirators took an overt act within the District of Columbia*

Second, the conspiracy to silence Paul's dissent was conducted from the District of Columbia for a period of years. Plaintiffs alleged that for years prior to his kidnapping, the

Rwandan Embassy in Washington, D.C. coordinated efforts to track and surveil Paul Rusesabagina. AC ¶¶85-86, 109-14, 116, 126. Nzabamwita publicly affirmed that he had been receiving intelligence on Paul gathered by illegal hacking of his phone, which the conspirators used to facilitate his kidnapping. AC ¶95.

Embassy officials also acted in building the "case" that Rwanda would present at Paul's sham trial. Plaintiffs alleged that Rwanda's then-Ambassador to the United States Kimonyo and other Embassy staff conspired with Rwandan-paid agent Michelle Martin to build a fraudulent case against Paul. AC ¶¶67-91. Martin tried to entrap Rusesabagina by encouraging him and his associates to join a Rwandan rebel group. AC ¶82. This effort failed. *Id.* She stole thousands of emails from a close associate of Paul and then turned over "evidence" of Paul's purported wrongdoing to Belgian authorities and the FBI, at least some of which proved to be fraudulent. AC ¶71-72, 89-90, 127-30. As Plaintiffs allege, Martin worked closely with Kimonyo during this time, even joining him for a meeting with Ambassador Susan Rice as part of the conspirators' initial efforts to trick the United States into bringing bogus charges against Paul. AC ¶89. President Kagame himself had this meeting set up. *Id.* It was only after the conspirators failed at these earlier efforts to silence Paul by manipulating the judicial process that they pivoted to achieve their goal by kidnapping Paul.

The D.C.-based conspirators took other acts to try to silence Paul through harassment and defamation. Embassy officials enlisted Moses Rudasunikwa, the president of the Rwandan Community Abroad in Paul's hometown in San Antonio, Texas, to their cause, who then made following Paul his "main focus," and continued to do so up until Paul was kidnapped in 2020. AC ¶¶113-14, 126. Kimonyo made efforts to publicize allegations against Paul, including by making wild and quickly disproven claims against Paul during a public forum in Chicago. AC

¶54. Even after Paul was kidnapped, in 2021, an Embassy official attempted to spy on a Zoom discussion about Paul's kidnapping attended by members of his family. AC ¶¶121-25. These allegations demonstrate that Rwandan officials at the Embassy in the District of Columbia for years served as the nerve center of the conspiracy's U.S. operations against Paul.[15]

The many D.C.-based actions of Kimonyo and other Embassy officials in furtherance of the conspiracy to unlawfully silence Paul can be imputed to all conspirators and thus establish specific jurisdiction over them in the District of Columbia. *See Jung*, 300 F. Supp. 2d at 140-41. These imputed contacts distinguish this case from the two cases the Individual Defendants finding that torture committed abroad is, on its own, insufficient to establish specific jurisdiction. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (noting it was "it is undisputed that Libya has no connection with the District of Columbia or with the United States, except for the alleged fact that it tortured two American citizens in Libya"); *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 73 n.26 (D.D.C. 2013) (noting that "[w]ithout sufficient facts connecting the ongoing harassment of the plaintiffs in the United States with the personal conduct of Khamenei or Ahmadinejad, it is doubtful that the Court would be able to exercise personal jurisdiction" over those individuals). Neither case addressed conspiracy jurisdiction.

Defendants also rely on *Zemin*, a case from outside this jurisdiction that also did not address conspiracy jurisdiction. In that case, the plaintiffs, members of the Falun Gong religious movement, sued a Chinese government office in Illinois for abuses committed in China.

---

[15] In their opposition to Rwanda's motion to dismiss, Plaintiffs argued that the conspiracy can be conceptualized as two sub-conspiracies, both part of a larger conspiracy. *United States v. Benbow*, 709 Fed. App'x 25, 27 (D.C. Cir. 2018) (unpublished) ("Even if there were also separate smaller conspiracies, that does not mean there was not also one larger conspiracy.").

*Plaintiffs A, B, C, D, E, F v. Jiang Zemin*, 282 F. Supp. 2d 875, 878-79 (N.D. Ill. 2003). The court held that the Defendants' activities were not continuous and systematic enough to support general jurisdiction and that the conduct in Illinois could not support specific jurisdiction. *Id.* at 888-89. Unlike the Plaintiffs here, there was no indication in *Zemin* that the defendant's activities in Illinois targeted the plaintiffs or were otherwise part of the conspiracy that injured them abroad. *See id.* at 878-79, 888-89. Indeed, the plaintiffs in *Zemin* do not appear to have even relied on a theory of conspiracy jurisdiction. *See id.* at 886-89.

> **2.** <u>Alternatively, the Court may exercise specific personal jurisdiction under Rule 4(k)(2) and pendant personal jurisdiction</u>

In the event the Court concludes that it cannot exercise personal jurisdiction pursuant to Rule 4(k)(1) and § 13-423(a)(1), then the Court has personal jurisdiction pursuant to Rule 4(k)(2). Rule 4(k)(2) "permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani*, 417 F.3d at 10. Here, even in the event that the conspiracy's contacts with the District of Columbia are insufficient to support specific jurisdiction in D.C., the conspiracy's extensive contacts with the United States and its actions specifically directed towards the United States support personal jurisdiction with respect to plaintiffs' federal claims under Rule 4(k)(2). In addition, the Court can exercise pendant personal jurisdiction over the Individual Defendants with respect to Plaintiffs' state law claims because each arose out of the same core of operational facts as Plaintiffs' federal claims. *See Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 12 n.6 (D.D.C. 2016).

> a.   *In the event personal jurisdiction does not exist under D.C.'s longarm statute, Plaintiffs' federal claims satisfy the requirements for Rule 4(k)(2)*

First, there can be no dispute that Plaintiffs' TVPA, Alien Tort Statute, and Electronic Communications Privacy Act claims arise under federal law. *See* 18 U.S.C. § 2520; 28 U.S.C. § 1350; 28 U.S.C. § 1350 note.

Second, as demonstrated in Part III.C., *infra*, the Individual Defendants have each been served with a summons.

Third, the Individual Defendants do not assert that they are subject to personal jurisdiction in any judicial district of the United States. *See* Defs.' Br. 25-30. While Plaintiffs argue that the Individual Defendants are subject to personal jurisdiction in the District of Columbia, insofar as the Court rules otherwise, then Plaintiffs agree with the Individual Defendants that they are not subject to personal jurisdiction elsewhere in the United States.

Fourth, jurisdiction under Rule 4(k)(2) comports with due process. Even if the conspiracy's contacts with the District of Columbia are insufficient to create personal jurisdiction under § 13-423(a)(1), the conspiracy's reach into the United States extended well beyond the District of Columbia. Paid Rwandan-agent Michelle Martin volunteered at Paul's charitable foundation in Chicago, where she spied on Paul and his associates and attempted to entrap them by convincing them to join a Rwandan rebel group. AC ¶¶67-82. The conspirators then leveraged Martin's time volunteering at the foundation to present her as a "star witness" at Paul's sham trial, which was the final step in their conspiracy to silence Paul's dissent. AC ¶91. Martin also sent information to the FBI and met with Ambassador Rice at the United Nations as part of the conspirators' unsuccessful attempts to trick the United States into bringing criminal charges against Paul. AC ¶¶89-90.

Moreover, the conspiracy specifically targeted Paul while he was living in the United States – a fact that the Individual Defendants and their coconspirators were well aware of. *See supra* Pt. III.B.1.a. Constantin Niyomwungere, the individual whom the RIB coerced into joining the conspiracy, reached into and targeted Paul in the United States. He directed his conduct towards the United States by fraudulently offering to pay Paul for a nonexistent speaking tour in Burundi and materially misleading Paul about the nature and safety of his trip to Burundi and caused an injury felt at least in part in the United States. AC ¶¶143-52; *see also, e.g.*, *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016) (locus of fraud is place of reliance). Although Niyomwungere may not have set foot in the United States, his conduct calculated at harming Paul and his family members in the United States nevertheless creates sufficient minimum contacts with the United States. *See In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15, 32 (D.D.C. 2003) (explaining specific jurisdiction attaches under the so-called effects test "even when the defendant's only contact with the forum was calculated to cause and did cause injurious effects to plaintiffs in the forum state."). And because Plaintiffs adequately allege Niyomwungere took these acts in furtherance of the conspiracy, his contacts are imputed to the Individual Defendants. *See, e.g.*, *Jung*, 300 F. Supp. 2d at 140-41.

      i.    The Individual Defendants each directed their conduct into the United States and relied on an agent in the forum, giving rise to personal jurisdiction

Even without relying on conspiracy jurisdiction, Niyomwungere's contacts with the United States can be directly imputed to the Individual Defendants as their agent. *See, e.g.*, *Cabrera v. Black & Veatch Special Projects Corps.*, 2021 WL 3508091, at *13 (D.D.C. 2021) (imputing agent's contacts onto defendant to establish Rule 4(k)(2) jurisdiction). Defendant Nzabamwita acknowledged that he personally executed the operation to kidnap Paul –that is, that

he was working through Niyomwungere and supervising and directing Niyomwungere's contacts

into the United States. AC ¶160. Likewise, Plaintiffs allege that Niyomwungere was working at

the behest the RIB—and thus at the behest of Defendants Busingye and Ruhunga—when he

fraudulently lured Paul away from the safety of the United States. AC ¶¶31-32, 140-43.

Accordingly, whether imputed through their coconspirators or by directing Niyomwungere's

conduct specifically targeted at the United States, the Individual Defendant have sufficient

minimum contacts with the United States to support jurisdiction under Rule 4(k)(2). *See Mwani*,

417 F.3d at 12-13 (finding personal jurisdiction under Rule 4(k)(2) for terrorist attack abroad

where "the defendants 'engaged in unabashedly malignant actions directed at [and] felt in'" the

United States, including "the publication of *fatwas* in a newspaper distributed in the United

States; the shipment to Virginia of the power supply for a cell phone that bin Laden used in

Afghanistan; the scheduling of a bin Laden interview in Afghanistan through an agent in

Washington, D.C.; and the transmission of bin Laden's views to the District via interviews on

CNN and ABC").

      b.    *The Court has pendant personal jurisdiction over Plaintiffs' state-law claims*

Although Rule 4(k)(2) only expressly provides for personal jurisdiction with regard to

federal claims, under the doctrine of pendant personal jurisdiction the Court can also exercise

personal jurisdiction over defendants with regards to those state law claims that arise "'out of the

same core of operative facts as those claims which clearly [fall] within the scope of' the Court's

personal jurisdiction." *Bazarian*, 168 F. Supp. 3d at 12 n.6 (alteration in original) (quoting

*Oetiker v. Jurid Werke, GmbH*, 556 F.2d 1, 4 (D.C. Cir. 1977)).

Here, each of Plaintiffs' state-law claims arise from the same core of operative facts as

one or more of their federal-law claims. Plaintiffs' fraud, false imprisonment, solatium, and loss

of consortium claims, as well as parts of their civil-conspiracy and IIED claims, all arise from

Paul's kidnapping, as do Plaintiffs' federal ATS claims. *Compare* AC ¶¶223-40, *and* AC ¶¶251-

58, *with* AC ¶¶280-310. Plaintiffs' assault and battery claims arise from Paul's torture, as does

their federal TVPA claims. *Compare* AC ¶¶241-50, *with* AC ¶¶268-79. Plaintiffs' intrusion upon

seclusion claim and the remainder of their civil conspiracy and IIED claims arise from

Defendants' stalking, harassment, and surveillance of Paul and his family, as does Plaintiffs'

federal ECPA claim. *Compare* AC ¶¶227-33, AC ¶¶251-54, *and* AC ¶¶ 259-63, *with* AC ¶¶264-

67. Indeed, where, as here, the sole grounds for subject-matter jurisdiction over a plaintiff's

state-law claim is 28 U.S.C. § 1367, which Defendants have not challenged, the claim is also

subject to pendant personal jurisdiction, as they "necessarily arise from the same common

nucleus of operative fact." 4A Adam N. Steinman, Federal Practice and Procedure § 1069.7

(Wright & Miller, 4th ed. 2022 update).

> 3.   The Individual Defendants do not carry their burden to present a compelling case that exercising personal jurisdiction is otherwise unreasonable

Because Plaintiffs establish the Individual Defendants' case-related contacts with both

the District of Columbia under Rule 4(k)(1)(a) and the United States as a whole under Rule

4(k)(2), it becomes the Individual Defendants' burden under both analyses to "present a

compelling case that the presence of some other considerations would render jurisdiction

unreasonable." *Mwani*, 417 F.3d at 14; (quoting *Burger King*, 471 U.S. at 479). The Individual

Defendants fail to do so.

The Individual Defendants first argue that litigating in the District of Columbia will

"place a substantial burden" on them. Defs.' Br. 30. But they do not explain how specifically

they expect to be burdened, so they cannot present the "compelling case" required to show

jurisdiction is unreasonable. *Burger King*, 471 U.S. at 479; *see also, e.g.*, *Diamond Crystal*

*Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1274 (11th Cir. 2010). The Individual Defendants are sophisticated individuals who have hired a prestigious international law firm to defend them in this lawsuit. Moreover, as courts have recognized, modern communications technologies have greatly reduced the burdens on foreign litigants and has consequently diminished the weight courts place on evaluating a foreign defendant's burden for personal jurisdiction purposes. *See, e.g.*, *Young v. Mitsubishi Motors Corp.*, 2019 WL 6327581, at *6 (W.D. Tex. 2019); *DR Music, Inc. v. Aramini Strumenti Musicali S.R.L.*, 2014 WL 523042, at *3 (D.N.J. 2014). And even to the extent Defendants can identify specific burdens, "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477. *Asahi*, cited by Defendants, recognized that upon the establishment of minimum contacts "the interests of the plaintiff and the forum in the exercise of jurisdiction will justify" the exercise of personal jurisdiction. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987).

The Individual Defendants' assertion that this court and the judicial system have little interest in resolving this controversy rests on their argument that they had no case-related contacts with the United States, which, as demonstrated above, is simply untrue. *See supra* Pts. III.B.1–2. In addition, the District of Columbia has an interest in remedying an injury to a U.S. national caused by a conspiracy orchestrated within its borders. Likewise, the United States plainly has an interest in vindicating the rights of a plaintiff kidnapped from its territory by agents of a foreign government.

Lastly, the Individual Defendants bizarrely claim that *Plaintiffs* do not have an interest in litigating in this forum. Of course they do, which is why they filed here. If the Amended Complaint demonstrates one thing, it is that Plaintiffs could not fairly and safely litigate this case

in Rwanda. An American forum is thus their only option, which the Individual Defendants must

recognize since they have not moved for *forum non conveniens* dismissal. And given the

Individual Defendants' extensive contacts with the District of Columbia and lack of an

alternative U.S. forum, Plaintiffs have a particular interest in litigating in this forum specifically.

### C.   Plaintiffs' Claims Are Not Subject to Dismissal Under Rule 12(b)(5)

The Individual Defendants' motion to dismiss for insufficient process under Federal Rule

of Civil Procedure 12(b)(5) must also be denied. Plaintiffs served Defendant Busingye pursuant

to Rule 4(f)(1), and they served Defendants Nzabamwita and Ruhunga pursuant to Rule

4(f)(2)(C)(ii). Even if the Court disagrees, insufficient service of process is not grounds to

dismiss the Amended Complaint at this juncture.

> 1.   <u>Plaintiffs have properly served each of the Individual Defendants pursuant to Rule 4(f)</u>

> > a.   *Plaintiffs have served Defendant Busingye pursuant to Rule 4(f)(1)*

Rule 4(f)(1) authorizes service on an individual in a foreign country by means

"authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial

Documents." Article 10(a) of the Hague Convention authorizes service "by postal channels."

Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or

Commercial Matters art. 10(a), Nov. 15, 1965, 658 U.N.T.S. 163. Although the Hague

Convention permits member states to object to Article 10(a), the United Kingdom has not

objected. *See Status Table,* The World Org. for Cross-border Co-operation in Civ. and Com.

Matters (last accessed Aug. 26, 2022) [hereinafter "Hague Convention Status Table"],

https://www.hcch.net/en/instruments/conventions/status-table/print/?cid=17; *see also, e.g.*,

*Birmingham v. Doe*, 2022 WL 871910, at *6 (S.D. Fla. 2022). Accordingly, as federal courts

have found, service by mail or commercial carrier upon a defendant located in the United

Kingdom is proper means of service under Rule 4(f). *See Birmingham*, 2022 WL 871910, at *6;
*Fagam v. Cent.l Bank of Cyprus*, 2019 WL 2410075, at *1 (S.D. Fla. 2019); *Guy Carpenter &
Co. v. Samengo-Turner*, 2007 WL 1705070, at *2 (S.D.N.Y. 2007); *In re Enron Corp.*, 316 B.R.
434, 446 n.10 (Bankr. S.D.N.Y. 2004).

      As Plaintiffs' affidavit of service demonstrates, Dkt. 33, Plaintiffs effected service upon
Defendant Busingye by international priority mail. Counsel for Plaintiffs on June 30, 2022, sent
via international priority mail a copy of the summons and Amended Complaint addressed to
Busingye's place of work in London. *Id.* ¶2. On July 25, 2022, USPS returned the envelope
containing the summons and Amended Complaint to Plaintiffs' Counsel's office. *Id.* ¶11. The
envelope had the address crossed out in black ink, with the words "send away" added in
handwriting and an arrow pointing towards Counsel's return address. *Id.* The envelope appeared
to have been opened and taped back shut. Counsel's staff member who prepared the envelope
confirmed that he did not use tape to secure the envelope when he originally sent it. The most
logical inference to be drawn from this is that Busingye received the envelope containing the
summons, opened it, realized what it was, and then resealed the envelope and placed in back in
the mail in an attempt to avoid being served in this case. This is especially likely given
Defendant Busingye's refusal to accept the Federal Express packages sent by the Clerk of this
court and by Plaintiffs. *Id.* ¶7. Mr. Busingye's motion to dismiss demonstrates he is on actual
notice of the lawsuit, this plus Plaintiffs' multiple good faith efforts to serve him constitute valid
service:

> Where the defendant receives actual notice and the plaintiff makes a good faith
> effort to serve the defendant pursuant to the federal rule, service of process has
> been effective. Good faith efforts at service are effective <u>particularly where the
> defendant has engaged in evasion, deception, or trickery</u> to avoid being served.

*Ali v. Mid-Atlantic Settlement Servs.*, 233 F.R.D. 32, 36 (D.D.C. 2006) (emphasis added) internal citation omitted); *see also Nikwei v. Ross Sch. of Aviation, Inc.*, 822 F.2d 939, 945 (10th Cir. 1987) ("[C]ourts view service by registered or certified mail as being complete when such is refused though the act of the defendant."). By all indications, the Complaint arrived at his office and was opened there. Accordingly, the Court should find that Plaintiffs validly served Defendant Busingye pursuant to Rule 4(f)(1).

b.   *Plaintiffs have served Defendants Nzabamwita and Ruhunga pursuant to Rule 4(f)(2)(C)(ii)*

Rule 4(f)(2)(C)(ii) states that in the absence of an international agreement[16] and "unless prohibited by the foreign country," a plaintiff may serve a defendant in a foreign country "using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt." On June 29, 2022, a clerk of this court addressed and sent to Defendants Nzabamwita and Ruhunga one copy each of the summons and Amended Complaint. Dkt. 24. The summons and Amended Complaint was received and signed for at Defendant Ruhunga's place of work on July 5, 2022, Dkt. 28, and at Defendant Nzabamwita's place of work on July 6, 2022. Dkt. 27. Plaintiffs attached both signed receipts to their affidavits of service, along with an affidavit from FedEx authenticating the receipts and verifying service. *See* Dkt. 27-1; Dkt. 28-1.

Defendants Nzabamwita and Ruhunga challenge their service on two grounds. First they say that the service was invalid under Rule 4(f)(2)(C)(ii) because they did not *personally* sign for the FedEx deliveries. Defs.' Br. 32. But Rule 4(f)(2)(C)(ii) "does not require defendant's signature; it merely requires a signed receipt. Plaintiffs have produced a signed receipt."

---

[16] Rwanda is not a member of the Hague Convention. *See* Hague Convention Status Table, *supra*.

*Martinez v. White*, 2006 WL 2792874, at *2 (N.D. Cal. 2006).[17] The Individual Defendants do not cite any authority to the contrary.[18]

Second, the Individual Defendants argue that Plaintiffs have failed to carry their burden to show that "mailing is not prohibited by Rwandan law." Defs.' Br. 32. Plaintiffs submit two declarations from experts of Rwandan law demonstrating that mailing is not prohibited by Rwandan law. Ex. 4, Decl. of R. Niyibizi; Ex. 5, Decl. of I. Edwards. Defendants offer no alternative interpretation of Rwandan law. Rwandan law's silence on the matter suffices to show service by FedEx is not "prohibited" by Rwandan law and thus valid under Rule 4(f)(2)(C)(ii). *See, e.g.*, *SignalQuest, Inc. v. Tien-Ming Chou*, 284 F.R.D. 45, 48-50 (D.N.H. 2012); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 2011 WL 3903232, at *3 (N.D. Cal. 2011).

Accordingly, the Court should find that Plaintiffs validly served Defendants Nzabamwita and Ruhunga under Rule 4(f)(2)(C)(ii).

### 2.    Rule 12(b)(5) is not grounds for dismissal of a complaint against a defendant located abroad

The Individual Defendants' Rule 12(b)(5) motion must be rejected because there is no deadline for Plaintiffs to serve them. Rule 4(m) provides a 90-day deadline to serve a defendant

---

[17] It also appears likely that Defendant Nzabamwita *did* personally sign for the FedEx delivery. Although the signature is not clearly legible and Plaintiffs have no examples of Nzabamwita's signature for comparison, the FedEx delivery records list Nzabamwita as the recipient and indicated the package was signed for by "Joseph." *See* Dkt. 27-1 ¶¶4, 6.

[18] The two cases the Individual Defendants cite have no bearing on whether Rule 4(f)(2)(C)(ii) requires the defendant's personal signature. In *Hashem v. Shabi*, 2018 WL 3382913 (D.D.C. 2018), the court found service was improper under Rule 4(f)(2)(C)(ii) solely because the plaintiff failed to carry her burden to show the method of service was not prohibited by Emirati law. *See id.* at *4. Indeed, the Plaintiff provided a receipt. *See id.* at *3. In *Freedom Watch, Inc. v. OPEC*, 766 F.3d 74 (D.C. Cir. 2014), the Plaintiff argued it effected service under Rule 4(f)(2)(A). *See id.* at 80. After rejecting that argument, the court simply noted that Rule 4(f)(2)(C)(ii) was also inapplicable because there was no evidence "that a clerk of the court addressed and dispatched the mailing or that it required a signed receipt." *Id.*

located within the United States, but it specifically exempts "service in a foreign country under Rule 4(f), 4(h)(2), or 4(j)(1)." *See also, e.g.*, *Day v. Corner Bank (Overseas) Ltd.*, 789 F. Supp. 2d 136, 146 n.9 (D.D.C. 2011). Thus, courts routinely reject Rule 12(b)(5) motions filed by defendants located abroad as premature as long as "the circumstances do not prevent the plaintiff from a second attempt at service of process on the foreign defendant." *Stafford v. Grifols Int'l S.A.*, 2019 WL 3521957, at *4 (N.D. Ga. 2019) (collecting cases); *see also, e.g.*, *Cerner Middle E. Ltd. v. Al-Dhaheri*, 2017 WL 776409, at *1 n.1 (D. Mass. 2017); *AutoOpt Networks, Inc. v. GTL, USA Inc.*, 2015 WL 407894, at *4 (N.D. Tex. 2015).

Here, although Plaintiffs maintain they have effectuated service, *see supra* Pt. III.C.1.a. , in the event the Court disagrees, Plaintiffs intend to continue their efforts. Plaintiffs may also move for service by alternate means pursuant to Rule 4(f)(3). Accordingly, in the event the Court finds Plaintiffs have not effectuated service on any of the Individual Defendants, it should nevertheless deny their motion to dismiss.

### D. Plaintiffs' Claims Should Not be Dismissed Under Rule 12(b)(6) for Failure to State a Claim

The Individual Defendants state that they join Rwanda's motion to dismiss because they argue that Rwanda is the real party in interest. As explained in Part III.A.1.b.i., *supra*, the Individual Defendants, not Rwanda, are the real parties in interest. Nevertheless, Plaintiffs likewise adopt and incorporate their Response to Rwanda's Motion to Dismiss, Dkt. 31, into their opposition to the present motion. The Individual Defendants do not otherwise argue that the Amended Complaint fails to state a claim for relief.

### E. Leave to Amend

In the event the Court finds any of Plaintiffs' allegations insufficient, Plaintiffs request leave to amend pursuant to Federal Rule of Civil Procedure 15(a). Leave to amend should be

"freely given," particularly where, as here, the case is at its inception. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Barkley v. U.S. Marshals Service ex rel. Hylton*, 766 F.3d 25, 39 (D.C. Cir. 2014); *PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*, 271 F.R.D. 4, 6 (D.D.C. 2010).

## IV.   <u>CONCLUSION</u>

For the reasons stated above, the Court should deny the Individual Defendants' motion to dismiss.

September 8, 2022                             Respectfully submitted,

<u>/s/ Agnieszka M. Fryszman</u>
Agnieszka M. Fryszman (D.C Bar #459208)
Nicholas J. Jacques (D.C. Bar #1673121)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Phone: (202) 408-4600
Fax: (202) 408-4699
<u>afryszman@cohenmilstein.com</u>
<u>NJacques@cohenmilstein.com</u>

Steven R. Perles (D.C Bar #326975)
Edward MacAllister (D.C Bar #494558)
Joshua K. Perles (D.C Bar # 1031069)
Emily Amick (D.C Bar #242018)
Perles Law Firm, PC
816 Connecticut Avenue, NW
12th Floor
Washington. D.C 20036
Phone: (202) 955-9055
<u>sperles@perleslaw.com</u>
<u>emacallister@perleslaw.com</u>

John Arthur Eaves, Jr. (D.C Bar # 432137)
Christopher Brady Eaves (V.T. Bar #6370)
Eaves Law Firm
101 North State Street
Jackson, MS 39201
Phone: (601) 355-7961

johnjr@eaveslawmail.com

*Attorneys for Plaintiffs*

John Calvin Patterson (M.S. Bar #103140)
213 Main Street
Como, MS 38619
Phone: (662) 526-1992
JCP@Pattersonehrhardt.com

*Of Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2022, I electronically filed the *Plaintiffs' Response to Defendants Johnston Busingye's, Jospeh Nzabamwita's, and Jeannot Ruhunga's Motion to Dismiss the Amended Complaint* with the Clerk of the Court using the ECF, who in turn sent notice to all counsel of record on this matter.

Dated:     September 8, 2022                    /s/ Agnieszka M. Fryszman
                                               Agnieszka M. Fryszman