# **Exhibit 3**

## DECLARATION OF PROFESSOR WILLIAM S. DODGE

1. I am Martin Luther King, Jr. Professor of Law and John D. Ayer Chair in Business Law at the University of California, Davis, School of Law, where I teach International Litigation and Arbitration and International Business Transactions among other subjects.

2. From 2011 to 2012, I served as Counselor on International Law to the Legal Adviser of the U.S. Department of State, where I worked extensively on questions of foreign official immunity following the Supreme Court's decision in *Samantar v. Yousuf*, 560 U.S. 305 (2010). I currently serve as a member of the State Department's Advisory Committee on International Law.

3. From 2012 to 2018, I served as a Reporter for the American Law Institute's *Restatement (Fourth) of the Foreign Relations Law of the United States* (2018).

4. I am the author, among other publications, of *A Roadmap for Foreign Official Immunity Cases in U.S. Courts*, 90 Fordham L. Rev. 677 (2021) (with Chimène I. Keitner). I am also a Founding Editor of the Transnational Litigation Blog (TLB), where I have written about foreign official immunity, including *A Primer on Foreign Official Immunity*, TLB (May 23, 2022), https://tlblog.org/a-primer-on-foreign-official-immunity/, and *Is MBS Entitled to Head of State Immunity*, TLB (August 18, 2022), https://tlblog.org/is-mbs-entitled-to-head-of-state-immunity/.

5. Counsel for the plaintiffs have asked me to provide my expert opinion on the customary international law rules governing conduct-based immunity.

6. Customary international law recognizes two kinds of immunity. Sitting heads of state, heads of government, and foreign ministers are entitled to status-based immunity. Other sitting officials and all former officials are entitled to conduct-based immunity. *See generally Case*

*Concerning the Arrest Warrant of 11 April 2000* (Dem. Rep. Congo v. Belg.), 2002 I.C.J 3 (Feb. 14).[1] Conduct-based immunity applies only to "acts taken in [an] official capacity." *Samantar v. Yousuf*, 560 U.S. 305, 322 (2010); *see also Arrest Warrant*, 2002 I.C.J. at ¶ 61.

7.  On remand from the Supreme Court in *Samantar*, the Fourth Circuit concluded that, "as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign." *Yousuf v. Samantar*, 699 F.3d 763, 776 (4th Cir. 2012); *see also Hilao v. Estate of Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994) (concluding that "Marcos' acts of torture, execution, and disappearance were clearly acts outside of his authority as President"). A *jus cogens* norm "is a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted." Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 (1969).[2] The *Restatement (Third) of Foreign Relations Law* has identified certain human rights norms as *jus cogens* norms. *See Restatement (Third) of the Foreign Relations Law of the United States* § 702 (Am. L. Inst. 1987).[3] Review of state practice confirms that customary international law does not recognize *jus cogens* violations as acts taken in an official capacity entitled to conduct-based immunity.

---

[1] Diplomatic and consular immunities are codified by treaty. *See* Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 [hereinafter VCDR]; Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. These treaties are self-executing and are also implemented in part by federal statute. 22 U.S.C. § 254(a)-(e). Diplomatic immunity is nearly absolute, but it only applies in the courts of the "receiving State," VCDR art. 31(a), which is to say the State to which the diplomat is accredited, *id.* art. 4. A diplomatic accredited to another state is not entitled to diplomatic immunity under the VCDR.

[2] The United States is not a party to the Vienna Convention but accepts it as a declaration of customary international law. *See Restatement (Third) of Foreign Relations Law*, Part III, intro. note (1987).

[3] When the *Restatement (Third)* is cited, it is because the *Restatement (Fourth) of Foreign Relations Law* has not yet addressed the topic.

2

8. "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." *Restatement (Third)* § 102(2); *see also* North Sea Continental Shelf (Germ. v. Den.; Germ. v. Neth.), 1969 ICJ 3, ¶ 77 (Feb. 2) ("Not only must the acts concerned amount to a settled practice, but they must also be such, or be carried out in such a way, as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it."); International Law Commission, *Draft Conclusions on Identification of Customary International Law*, conclusion 2 (2018) ("To determine the existence and content of a rule of customary international law, it is necessary to ascertain whether there is a general practice that is accepted as law (*opinio juris*)."). The two elements are generally referred to as "state practice" and "*opinio juris*." Without a general and consistent practice of states, there can be no rule of customary international law.

9. There is no general and consistent practice of states recognizing *jus cogens* violations as acts taken in an official capacity that are entitled to conduct-based immunity, which means that customary international law does not recognize conduct-based immunity for such violations. In the criminal context, only some courts and prosecutors have found that former officials were entitled to conduct-based immunity for *jus cogens* violations. *See* Cour de cassation [Cass.] [supreme court for judicial matters] crim., Jan. 13, 2021, No. 42 ¶ 20 (unofficial English translation), https://perma.cc/3FGQ-2A4W (upholding prosecutor's decision to dismiss charges against former President George W. Bush and other former U.S. officials); Letter from Pub. Prosecutor, Paris Ct. of Appeal, to Patrick Baudouin (Feb. 27, 2008), https://perma.cc/U7ZQ-SBFZ (affirming Paris prosecutor's decision to dismiss charges against former U.S. Defense Secretary Donald Rumsfeld); Jiang Zemin, Decision of the Federal Prosecutor General of 24 June 2005, 3 ARP 654/03-2 (Ger.) (dismissing charges against the former president of China);

*Prosecutor v. Hissène Habré*, July 4, 2000 (Ct. App. Dakar), March 20, 2001 (Court of Cassation) (Senegal), 125 I.L.R. 571-77 (dismissing claims against the former president of Chad).

10.     However, a larger number of decisions have denied conduct-based immunity for *jus cogens* violations. The International Law Commission's Special Rapporteur on the Immunity of State Officials from Foreign Criminal Jurisdiction has identified nine decisions since 1998 as denying conduct-based immunity for international crimes. See *Report of the International Law Commission, Sixty-Ninth Session* 179 n.762, U.N. Doc. A/72/10 (2017) (draft commentary to Draft Article 7) (citing *Regina v. Bow St. Metro. Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)*, [2000] 1 AC (HL) 147 (appeal taken from Eng.); [Tribunal of First Instance] *Re Pinochet* (Brussels, Nov. 6, 1998, 119 I.L.R. 345, 349 (Belg.); *In re Hussein*, Oberlandesgericht [Higher Regional Court] Cologne, May 16, 2000, No. 2 Zs 1330/99, ¶ 11; *In re Bouterse*, Hof Amsterdam, Nov. 20, 2000, NJ 2001, 51, ¶ 4.2, Eng. trans. at 2001 Neth. Y.B. Int'l L., *aff'd on other grounds*, Hoge Raad [Supreme Court], Sept. 18, 2001, NJ 2002, 59, Eng. trans. at 2001 Neth. Y.B. Int'l L. 282; *H.S.A. v. S.A.* (Ariel Sharon), Cour de cassation, Feb. 12, 2003, No. P.02.1139.F, 127 ILR 110, 123, 42 ILM 596 (2003) (Belg.); *H v. Public Prosecutor*, Hoge Raad, July 8, 2008, No. 07/10063 (E), Int'l L. Domestic Cts. [ILDC] 1017, ¶ 7.2 (Neth.); *Lozano v. Italy*, Corte suprema di cassazione, sez, un., July 24, 2008, No. 31171/2008, ILDC 1085, ¶ 6 (It.); *A. v. Office of the Public Prosecutor*, Bundesstrafgericht [Federal Criminal Court], July 25, 2012, No. BB.2011.140 (Switz.); *FF v. Director of Public Prosecutions (Prince Nasser case)*, [2014] EWHC (Admin) 3419 (Eng.)). There is older state practice to the same effect. *See* Claus Kress, *Article 98: Cooperation with Respect to Waiver of Immunity and Consent to Surrender* ¶¶ 54-65, *in Rome Statute of the International Criminal Court* (Kai Ambros ed., 4th ed. 2021).

4

After an extensive review of state practice, Germany's Federal Court of Justice recently concluded that there was "no doubt" that conduct-based immunity did not apply to *jus cogens* violations such as war crimes. Bundesgerichtshof [BGH] [Federal Court of Justice] Jan. 28, 2021, 3 StR 564/19, ¶ 56, https://perma.cc/XU7UNDLP.

11.  In their separate joint opinion in the *Arrest Warrant* case, Judges Higgins, Kooijmans, and Buergenthal noted the trend against recognizing community for *jus cogens* violations:

> The increasing recognition of the importance of ensuring that the perpetrators of serious international crimes do not go unpunished has had its impact on the immunities which high State dignitaries enjoyed under traditional customary law. Now it is generally recognized that in the case of such crimes, which are often committed by high officials who make use of the power invested in the State, immunity is never substantive and thus cannot exculpate the offender from personal criminal responsibility.

*Arrest Warrant*, 2002 I.C.J. 63, ¶ 74 (joint separate opinion of Judges Higgins, Kooijmans, and Buergenthal). As the decisions cited above confirm, the trend has continued since 2002. Today, there is no general and consistent practice of states granting conduct-based immunity from criminal prosecution for *jus cogens* violations.

12.  The principal reason for denying *jus cogens* violations the status of official acts entitled to conduct-based immunity appears to be that international law cannot treat such violations as sovereign acts. The rationale was first articulate by the Supreme Court of Israel in the *Eichmann* case, which concluded that crimes against humanity "are completely outside the 'sovereign' jurisdiction of the State that ordered or ratified their commission, and therefore those who participated in such acts must personally account for them and cannot shelter beyond the official character of their task or mission." *Attorney General of Israel v. Eichmann*, 36 I.L.R. 277 (Isr. S.

5

Ct. 1962). Other decisions have agreed. *See A. v. Off. of Pub. Prosecutor*, Bundesstrafgericht [Federal Criminal Court], July 25, 2012, No. BB.2011.140, ¶ 5.4.3 (Switz.) ("[I]t would be difficult to admit that conduct contrary to fundamental values of the international legal order can be protected by rules of that very same legal order."); *In re Bouterse*, Hof Amsterdam, Nov. 20, 2000, NJ 2001, ¶ 4.2 (noting that "the commission of very serious offences as are concerned here—cannot be considered to be one of the official duties of a head of state").

13.     There is less state practice with respect to civil proceedings. There are only two decisions of which I am aware that have granted conduct-based immunity to *jus cogens* violations in civil cases. *See* Case C/09/554385/HAZA18/647, Judgment (Hague Dist. Ct. 2020) (Neth.), https://perma.cc/LW2B-FEY7;  Fang v. Jiang, [2007] NZAR 420 (N.Z.).[4] On the other hand, there are a number of U.S. decisions that have denied conduct-based immunity for *jus cogens* violations. *See, e.g.*, *Yousuf*, 699 F.3d at 776; *Hilao*, 25 F.3d at 1472. State practice in the criminal context is also relevant to the existence of conduct-based immunity from civil proceedings. There is no principled reason why an official who is immune from criminal liability should be immune from civil liability. *See* William S. Dodge & Chimène I. Keitner, *A Roadmap for Foreign Official Immunity Cases in U.S. Courts*, 90 Fordham L. Rev. 677, 707 (2021); Zachary Douglas, *State Immunity for the Acts of State Officials*, 82 Brit. Y.B. Int'l L. 281, 301-

---

[4] Decisions such as *Jones v. Ministry of Interior of the Kingdom of Saudi Arabia*, [2006] UKHL 26; *Propend Finance Ltd. v. Sing* (1997) 111 I.L.R. 611 (Eng. & Wales Ct. App.); *Jaffe v. Miller* (1993) 5 O.R. 2d 133 (Can. Ont. C.A.); and *Zhang v. Zemin* (2010) NSWCA 255 (Austl.), do not count as state practice on this question. In each of these cases, state immunity was extended to foreign officials by statute. The question in these cases, therefore, was not whether customary international law required immunity for *jus cogens* violations but rather whether customary international law required an *exception* to the immunity that the statute had already granted. *See* William S. Dodge & Chimène I. Keitner, *A Roadmap for Foreign Official Immunity Cases in U.S. Courts*, 90 Fordham L. Rev. 677, 707 (2021).

04 (2012); Chimène I. Keitner, *Foreign Official Immunity After* Samantar, 44 Vand. J. Transnat'l L. 837, 848 (2011). But even if one looks exclusively at decisions involving civil proceedings, there is no general and consistent practice of states granting conduct-based immunity for *jus cogens* violations. Without a general and consistent practice of states, there can be no rule of customary international law requiring such immunity.[5]

14. Some scholars have suggested that analysis should assume a baseline of immunity for all conduct by foreign officials and require a general and consistent practice of states accompanied by *opinio juris* to create an exception. *See* Sean D. Murphy, *Immunity* Ratione Materiae *of State Officials from Foreign Criminal Jurisdiction: Where is the State Practice in Support of Exceptions?*, 112 AJIL Unbound 4 (2018). But this view is far from being universally accepted. As Professor Rosalyn Higgins explained before her appointment to the International Court of Justice, "[i]t is sovereign immunity which is the exception to jurisdiction and not jurisdiction which is the exception to a basic rule of immunity." Rosalyn Higgins, *Certain Unresolved Aspects of the Law of State Immunity*, 29 Neth. Int'l L. Rev. 265, 271 (1982).

15. Treating immunity as a baseline is also inconsistent with the approach of the International Court of Justice to determining the customary international law of state immunity in *Jurisdictional Immunities of the State* (Ger. v. It.), 2012 I.C.J. 97 (Feb. 3). In analyzing whether states are immune under customary international law from suits based on the conduct of their armed forces during armed conflict, the Court did not rest on the general proposition that "States are generally entitled to immunity in respect of *acta jure imperii*." *Id.* ¶ 61. Instead, the Court

---

[5] Even if one could establish a general and consistent practice of states, customary international law also requires that the practice have been followed out of a sense of legal obligation (*opinio juris*). *See supra* ¶ 8. Because there is no general and consistent practice, I do not address *opinio juris*.

looked for state practice and *opinio juris* specifically with respect to the conduct allegedly entitled to immunity. *Id.* ¶¶ 65-77. It held that customary international law required immunity for armed forces during armed combat only after finding such state practice and *opinio juris*. *Id.* ¶ 78; *see also* Dodge & Keitner, *supra*, at 703-04 (discussing the ICJ's decision in *Jurisdictional Immunities*). There is no reason the approach to determining rules of customary international law with respect to foreign official immunity should be different. Accordingly, proceeding from the proper baseline of no immunity as the ICJ has done, and in the absence of consistent state practice, customary international law cannot be said to recognize *jus cogens* violations as official acts entitled to conduct-based immunity.

16.     The proposition that customary international law does not treat *jus cogens* violations as acts taken in an official capacity entitled to conduct-based immunity must be distinguished from the argument that customary international law recognizes a "*jus cogens* exception" to immunity more generally. *See* Dodge & Keitner, *supra*, at 704 (noting that "whether immunity has attached and whether there is an exception to immunity after it has attached are separate questions"). The ICJ has rejected *jus cogens* exceptions both for state immunity, *see Jurisdictional Immunities*, 2012 I.C.J. ¶¶ 92-97, and for head-of-state immunity, *see Arrest Warrant*, 2002 I.C.J. ¶¶ 56-55. In both of those cases, immunity had already attached: in *Jurisdictional Immunities* based on a general and consistent practice of states with respect to armed forces; in *Arrest Warrant* based on the status of the foreign official as a foreign minister. Conduct-based immunity attaches only to acts taken in an official capacity and, as discussed above, customary international law does not recognize *jus cogens* violations as official acts. It is therefore unnecessary to reach the question whether a *jus cogens* exception exists for conduct-based immunity because such immunity never attaches to *jus cogens* violations in the first place.

17.     The facts that the defendants are alleged to have acted in an official capacity for the purposes of the Torture Victim Protection Act (TVPA) and that their acts may be attributable to the state of Rwanda do not establish that the defendants' acts were taken in an official capacity for purposes of conduct-based immunity. Customary international law relies on the concept of "official capacity" in different contexts, and the concept has different meanings in different contexts. *See* William S. Dodge, *Foreign Official Immunity in the International Law Commission: The Meanings of "Official Capacity"*, 109 AJIL Unbound 156 (2015), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2703907. Some U.S. district courts have gone astray by conflating these different meanings. *See, e.g.*, *Miango v. Democratic Republic of Congo*, CV 15-1265 (ABJ), 2020 WL 3498586, at *6 (D.D.C. June 29, 2020) (relying on plaintiffs' allegations that defendants were acting in their official capacities to find that defendants were entitled to conduct-based immunity); *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 13 (D.D.C. 2014) (looking to "whether the act was performed on behalf of the foreign state and thus attributable to the state" to find that defendant was entitled to conduct-based immunity).

18.     The customary international law of human rights sometimes uses "official capacity" to distinguish crimes that are of international concern from similar crimes that are only of domestic concern. Torture, for example, violates customary international law only if it "is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1(1), *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85 (entered into force June 26, 1987).[6] The TVPA incorporates this

---

[6] Other *jus cogens* norms do not require state action. *See, e.g.*, Convention on the Prevention and Punishment of the Crime of Genocide art. II, Dec. 9, 1948, 78 UNTS 277 (defining "genocide"). I refer here for convenience to the definitions in international conventions. Customary

requirement of state action, by limiting its cause of action for torture and extrajudicial killing to "individual[s] who, under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 note. The fact that a defendant acted in an official capacity for purposes of the customary international law norm prohibiting torture and for purposes of the TVPA does not establish that the defendant acted in an official capacity for purposes of conduct-based immunity. If that were so, torturers would always be entitled to conduct-based immunity, and the TVPA would be a dead letter. The distinction between official capacity for purposes of substantive liability and official capacity for purposes of immunity is the same one the Supreme Court has recognized in the context of § 1983. *See Hafer v. Melo*, 502 U.S. 21, 27-28 (1991) (rejecting argument that acting under color of state law for purposes of 42 U.S.C. § 1983 simultaneously immunizes the defendant from suit under that provision).

19. Neither does the fact that a *jus cogens* violation may be attributable to a foreign state mean that the act was taken in an official capacity for purposes of conduct-based immunity. Under the customary international law on state responsibility, "[t]he conduct of an organ of a State or of a person or entity empowered to exercise elements of the governmental authority shall be considered an act of the State under international law if the organ, person or entity acts in that capacity, even if it exceeds its authority or contravenes instructions." International Law Commission, Draft Articles on the Responsibility of States for Internationally Wrongful Acts art. 7, 19 U.N. GAOR Supp. No. 10, U.N. Doc. A/56/10 (2001), *available at* https://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.[7] Thus, a state is responsible under international law for torture by an official exercising governmental authority

---

international law also prohibits human rights violations such as torture and genocide. On the question of state action, the conventions track the requirements of customary international law.
[7] The Draft Articles on State Responsibility reflect customary international law.

even if the official exceeded his authority. But the Draft Articles are quite clear that attributability to the state does not absolve the official of responsibility under international law, stating in Article 58 that "[t]hese articles are without prejudice to any question of the individual responsibility under international law of any person acting on behalf of a state." *Id.* art. 58. The principle is one of dual responsibility. As the ILC's commentary explains:

> The State is not exempted from its own responsibility for internationally wrongful conduct by the prosecution and punishment of the State officials who carried it out. Nor may those officials hide behind the State in respect of their own responsibility for conduct of theirs which is contrary to rules of international law which are applicable to them.

*Id.* art. 58, commentary (3); *see also* Dodge & Keitner, *supra*, at 702 ("Whether an act is taken in an official capacity for purposes of conduct-based immunity does not depend on whether it is attributable to the state for purposes of state responsibility."); Douglas, *supra*, at 296 (noting that it is "wrong to apply the rules of attribution in state responsibility to determine the scope of state immunity for the acts of state officials"); Chimène I. Keitner, *Categorizing Acts by State Officials: Attribution and Responsibility in the Law of Foreign Official Immunity*, 26 Duke J. Comp. & Int'l L. 451, 459 (2016) (noting that "the mere attributability of an act to the state is an inadequate touchstone, both conceptually and doctrinally, for determining whether a foreign official is entitled to claim conduct-based immunity for that act").

20.     In summary, customary international law does not recognize *jus cogens* violations as official acts entitled to conduct-based immunity, as two U.S. Courts of Appeals have already held. *See Yousuf*, 699 F.3d at 776; *Hilao*, 25 F.3d at 1472. There is no general and consistent practice of states granting conduct-based immunity to *jus cogens* violations and therefore no

11

customary international law rule requiring it. The fact that a foreign official acted in an official capacity for the purposes of the customary international law norm prohibiting torture and the TVPA does not establish that the official acted in an official capacity for the purposes of conduct-based immunity. And the fact that a foreign official's conduct is attributable to the state does not absolve the official of his own responsibility.

    I declare under penalty of perjury of the laws of the District of Columbia that the foregoing is true and correct to the best of my knowledge.

September 8, 2022

William S. Dodge