**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PAUL RUSESABAGINA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 22-00469 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| THE REPUBLIC OF RWANDA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT PRESIDENT PAUL KAGAME'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.  BACKGROUND ................................................................................................ 2

    A.  Relevant Factual Background ............................................................... 2

        1.  Paul Rusesabagina, a hero to millions, risked his personal safety to call attention to the Kagame Regime's dissent into authoritarianism and disrespect for human rights ............... 2

        2.  Kagame instigated and directed the conspiracy to silence Paul Rusesabagina, recruiting co-conspirators and agents in the United States to help them do so .................................................. 3

    B.  Procedural History ............................................................................... 7

II. STANDARD OF LAW .................................................................................... 8

III. ARGUMENT ................................................................................................. 9

    A.  This Court has Personal Jurisdiction over Kagame ............................. 12

        1.  The Court may exercise specific personal jurisdiction under the D.C. longarm statute ...................................................................... 12

            a.  Plaintiffs sufficiently allege the existence of a conspiracy that Kagame participated in or agreed to join ............................ 14

            b.  Kagame's Coconspirators Took an Overt Act within the District of Columbia .................................................................. 16

        2.  Alternatively, the Court may exercise specific personal jurisdiction under Rule 4(k)(2) and pendant personal jurisdiction .............................. 19

            a.  In the event personal jurisdiction does not exist under D.C.'s longarm statute, Plaintiffs' federal claims satisfy the requirements for Rule 4(k)(2) ........................................ 20

            b.  The Court has pendant personal jurisdiction over Plaintiffs' state law claims ........................................................................ 24

        3.  Kagame does not Carry his Burden to Present a Compelling Case that Exercising Personal Jurisdiction is Otherwise Unreasonable ........... 25

    B.  Plaintiffs' Claims are not subject to dismissal Under Rule 12(b)(5) ................... 27

        1.  Plaintiffs have properly Kagame pursuant to Rule 4(f)(2)(C)(ii) ............ 28

        2.  Rule 12(b)(5) is not grounds for dismissal of a complaint against a defendant located abroad ........................................................................ 29

    C.  Kagame cannot insert arguments from another brief without any supporting argument or explanation ........................................................ 29

    D.  Leave to Amend ........................................................................................ 30

IV.     <u>CONCLUSION</u>............................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
   480 U.S. 102 (1987)................................................................................................25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................9

*Atchley v. AstraZeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022)..................................................................................13

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   813 F.3d 98 (2d Cir. 2016).......................................................................................21

*AutoOpt Networks, Inc. v. GTL, USA Inc.*,
   2015 WL 407894 (N.D. Tex. 2015)..........................................................................29

*Barkley v. U.S. Marshals Service ex rel. Hylton*,
   766 F.3d 25 (D.C. Cir. 2014)....................................................................................31

*Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*,
   168 F. Supp. 3d 1 (D.D.C. 2016).......................................................................20, 24

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)......................................................................................13, 25, 26

*Cabrera v. Black & Veatch Special Projects Corps.*,
   2021 WL 3508091 (D.D.C. 2021).............................................................................22

*Cerner Middle E. Ltd. v. Al-Dhaheri*,
   2017 WL 776409 (D. Mass. 2017) ...........................................................................29

*Chi. Title Ins. Co. v. Fisher*,
   No. 06-1608, 2007 U.S. App. LEXIS 19857 (4th Cir. Aug. 21, 2007) ...................23

*Cruz-Packer v. District of Columbia*,
   539 F. Supp. 2d 181 (D.D.C. 2008) ...........................................................................8

*Day v. Corner Bank (Overseas) Ltd.*,
   789 F. Supp. 2d 136 (D.D.C. 2011)..........................................................................29

*Doe v. Exxon Mobile Corp.*,
   573 F. Supp.2d 16 (D.D.C. 2008) .............................................................................23

*Doe v. State of Israel*,
    400 F. Supp. 2d 86 (D.D.C. 2005) ........................................................................10

*In re Doe*,
    860 F.2d 40 (2d Cir. 1988) ...................................................................................10

*DR Music, Inc. v. Aramini Strumenti Musicali S.R.L.*,
    2014 WL 523042 (D.N.J. 2014) ............................................................................26

*Edmond v. USPS Gen. Counsel*,
    949 F.2d 415 (D.C. Cir. 1991) ..............................................................................14

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
    894 F.3d 339 (D.C. Cir. 2018) ................................................................................8

*El-Hadad v. Embassy of the U.A.E.*,
    69 F. Supp. 2d 69 (D.D.C. 1999) ..........................................................................10

*Ford ex rel. Estate of Ford v. Garcia*,
    289 F.3d 1283 (11th Cir. 2002) .............................................................................23

*FC Inv. Grp. LC v. Lichtenstein*,
    441 F. Supp. 2d 3 (D.D.C. 2006) ............................................................................8

*Foman v. Davis*,
    371 U.S. 178 (1962) ..............................................................................................31

*Freedom Watch, Inc. v. OPEC*,
    766 F.3d 74 (D.C. Cir. 2014) ................................................................................28

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
    2011 WL 3903232 (N.D. Cal. 2011) .....................................................................29

*Gill v. District of Columbia*,
    872 F. Supp. 2d 30 (D.D.C. 2012) ..........................................................................9

*Habyarimana v. Kagame*,
    696 F.3d 1029 (10th Cir. 2012) ......................................................................10, 11

*Habyarimana v. Kagame*,
    821 F. Supp. 2d 1244 (W.D. Okla. 2011) ........................................................10, 11

*Habyarimana v. Kagame*,
    No. 4:12-cv-00191 (RWP), 2013 U.S. Dist. LEXIS 205222 (S.D. Iowa Feb. 6,
    2013) ......................................................................................................................11

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..............................................................................15

*Hammond v. Fed. Bureau of Prisons*,
  740 F. Supp. 2d 105 (D.D.C. 2010) ................................................................8

*Harris v. D.C. Water & Sewer Auth.*,
  791 F.3d 65 (D.C. Cir. 2015) ........................................................................9

*Hashem v. Shabi*,
  2018 WL 3382913 (D.D.C. 2018) ...............................................................28

*Herbert v. Architect of the Capitol*,
  839 F. Supp. 2d 284 (D.D.C. 2012) ............................................................31

*Holland v. Cardem Ins. Co.*
  839 F. Supp. 2d 284 (D.D.C. 2012) ............................................................31

*Holland v. Cardem Ins. Co.*,
  2020 WL 9439381 (D.D.C. 2020) ...............................................................8

*Jones v. Bernanke*, 557 F.3d 670
  (D.C. Cir. 2009) ..........................................................................................31

*\*Jung v. Assoc. of Am. Med. Colls.*,
  300 F. Supp. 2d 119 (D.D.C. 2004) .............................................13, 14, 18, 22

*Lans v. Adduci Mastriani & Schaumberg L.L.P.*,
  786 F. Supp. 2d 240 (D.D.C. 2011) ..............................................................8

*Manoharan v. Rajapaksa*,
  845 F. Supp. 2d 260 (D.D.C. 2012) ............................................................10

*Martinez v. White*,
  2006 WL 2792874 (N.D. Cal. 2006) ...........................................................28

*Mason v. Geithner*,
  811 F. Supp. 2d 128 (D.D.C. 2011) ............................................................30

*Matar v. Dichter*,
  500 F. Supp. 2d 284 (S.D.N.Y. 2007) .........................................................10

*Monument Realty LLC v. Wash. Metro. Area Transit Auth.*,
  535 F. Supp. 2d 60 (D.D.C. 2008) ..............................................................23

*Mouzavires v. Baxter*,
  434 A.3d 988 (D.C. 1981) ...........................................................................13

*\*Mwani v. Bin Laden*,
  417 F.3d 1 (D.C. Cir. 2005) ...........................................................13, 19, 24, 25

*Nikbin v. Islamic Republic of Iran*,
   471 F. Supp. 2d 53, (D.D.C. 2007) .................................................................18

*Oetiker v. Jurid Werke, GmbH*,
   556 F.2d 1 (D.C. Cir. 1977) ...........................................................................24

*PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*,
   271 F.R.D. 4 (D.D.C. 2010) ............................................................................31

*Plaintiffs A, B, C, D, E, F v. Jiang Zemin*,
   282 F. Supp. 2d 875 (N.D. Ill. 2003) .......................................................19, 26

*Ry. Labor Executives' Ass'n v. U.S.R.R. Ret. Bd.*,
   749 F.2d 856 (D.C. Cir. 1984) ........................................................................31

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ........................................................................................31

*Second Amendment Found. v. U.S. Conference of Mayors*,
   274 F.3d 521 (D.C. Cir. 2001) ........................................................................14

*SignalQuest, Inc. v. Tien-Ming Chou*,
   284 F.R.D. 45 (D.N.H. 2012) ..........................................................................29

*Stafford v. Grifols Int'l S.A.*,
   2019 WL 3521957 (N.D. Ga. 2019) ................................................................29

*Thompson Hine, LLP v. Taieb*,
   734 F.3d 1187 (D.C. Cir. 2013) ......................................................................13

*United States v. Cabrera*,
   699 F. Supp. 2d 35 (D.D.C. 2010) ..................................................................31

*United States v. Dunkel*,
   927 F.2d 955 (7th Cir. 1991) ..........................................................................31

*United States v. Noriega*,
   117 F.3d 1206 (11th Cir. 1997) ......................................................................10

*Urquhart-Bradley v. Mobley*,
   964 F.3d 36 (D.C. Cir. 2020) ..........................................................................13

*In re Vitamins Antitrust Litig.*,
   270 F. Supp. 2d 15 (D.D.C. 2003) ..................................................................22

*Wash. Legal Clinic for the Homeless v. Barry*,
   107 F.3d 32 (D.C. Cir. 1997) ..........................................................................30

*Young v. Mitsubishi Motors Corp.*,
2019 WL 6327581 (W.D. Tex. 2019)..................................................................26

**Statutes**

18 U.S.C. § 2520.....................................................................................................20

28 U.S.C. § 1350.....................................................................................................20

28 U.S.C. § 1350 note.............................................................................................20

28 U.S.C. § 1367.....................................................................................................25

D.C. Stat. § 13-423(a)(1) ...........................................................................12, 13, 20, 21

**Other Authorities**

4A Adam N. Steinman, Federal Practice and Procedure § 1069.7 (Wright &
Miller 4th ed. 2022 update)..................................................................................25

Fed. R. Civ. P. 4.....................................1, 2, 5, 7, 8, 12, 19, 20, 22, 23, 24, 25, 28, 29

Fed. R. Civ. P. 12...........................................................................8, 27, 29, 30

Fed. R. Civ. P. 15(a) ..............................................................................................31

*Status Table,* The World Org. for Cross-border Co-operation in Civ. and Com.
Matters,, https://www.hcch.net/en/instruments/conventions/status-
table/print/?cid=17 ..............................................................................................28

## **INTRODUCTION**

The Court should deny Defendant President Paul Kagame's motion to dismiss. Kagame argues dismissal is warranted on four separate grounds, but he is wrong on each.

First, Kagame has not shown that he is immune from suit.  All of the cases cited by Kagame follow the two-part procedure known as the "post-*Schooner Exchange* procedure", which begins with a request for a Suggestion of Immunity from the Executive Branch. No case cited by Kagame supports the Court's recognition of immunity prior to that request. Nor has the U.S. government recommended immunity based upon the facts present in this case.

Second, this Court has personal jurisdiction over Kagame. Kagame launched a conspiracy which resulted in extensive conduct reaching into and causing harm in the United States, including actions taken through Rwandan officials and their agents in the District of Columbia, satisfies well-established tests for personal jurisdiction. As the Amended Complaint thoroughly sets forth, this conspiracy involved U.S.-based coconspirators (including coconspirators in the District of Columbia) and agents, had extensive contacts with the District of Columbia and the United States as a whole, and reached into the United States to lure a U.S. resident from the safety of his Texas home.

Third, Plaintiffs' affidavit of service establish that Kagame has been served in compliance with Federal Rule 4(f)(2)(c)(ii). Regardless, dismissal is not available as the time for service has not expired.

Fourth, to the extent Kagame incorporates Defendant the Republic of Rwanda's ("Rwanda") arguments that portions of the Amended Complaint should be dismissed for failure to state a claim, his motion should be denied for the reasons explained in Plaintiffs' response to Rwanda's motion, [D.E. 31].

# I.    BACKGROUND[1]

## A.    Relevant Factual Background

1.    Paul Rusesabagina, a hero to millions, risked his personal safety to call attention to the Kagame Regime's dissent into authoritarianism and disrespect for human rights

As violence swept through Rwanda in 1994, Plaintiff Paul Rusesabagina offered refuge at Kigali's Hôtel des Milles Collines in to 1,268 Tutsis and moderate Hutus—all of whom faced immediate and horrific murder at the time—as they fled the Interhamwe militias. Am. Compl., [D.E., 17, ¶8] (hereinafter, "AC"). Although genocide raged outside the hotel's gates, no one in the hotel was injured or killed, and Paul's story inspired the Academy Award-nominated film Hotel Rwanda, which was met with international acclaim. *Id.* Paul is a hero to many millions of people around the world and in Rwanda for his incredible heroism. In the years since the Genocide, Paul founded the Hotel Rwanda Rusesabagina Foundation to initially support the education of young girls and women who were genocide survivors and then to generate support for the Truth and Reconciliation Commission for Rwanda and the Great Lakes Region of Africa. AC ¶9. He also become an outspoken critic of Rwandan President Paul Kagame's ("Kagame") authoritarian regime. AC ¶11. Paul has received many awards for his activism, including the U.S. Presidential Medal of Freedom from George W. Bush in 2005. AC ¶9.

Kagame does not tolerate dissent, nor has he allowed international borders to stop him from silencing his critics. As detailed in the Amended Complaint and in Plaintiffs' response to Rwanda's motion to dismiss, tragic instances abound of Kagame critics being murdered,

---

[1] Plaintiffs focus on the facts most relevant to this motion. A more complete recitation of the background of this case is set forth in Plaintiffs' Response to Defendant the Republic of Rwanda's Motion to Dismiss the Amended Complaint, [D.E. 31, at 2-9], which they incorporate into their present memorandum.

disappeared, or arbitrarily imprisoned – both in Rwanda and abroad. AC ¶¶36-45; Plaintiffs'

Response to Defendant Rwanda's Motion to Dismiss the Amended Complaint, [D.E. 31, at 3-4].

Paul's criticisms of Kagame have resulted in decades of systematic targeting by the Kagame

regime, AC ¶¶9, 11, and forced him to flee from Rwanda to Belgium, and then to the United

States to avoid Kagame's revenge, AC ¶35.

> 2.   <u>Kagame instigated and directed the conspiracy to silence Paul
> Rusesabagina, recruiting co-conspirators and agents in the United States to
> help them do so</u>

In the years following Paul's flight to the United States, Kagame instigated and directed a

conspiracy, which was joined by Defendants Busingye, Nzabamwita, Ruhunga, and the Republic

of Rwanda, among others in the United States and elsewhere, aimed at unlawfully silencing

Paul's dissent. AC ¶¶31-33, 155-72. For fuller details of this conspiracy, Plaintiffs refer the

Court to their response to Rwanda's motion to dismiss and to Busuingye's, Nzabamwita's, and

Ruhunga's motion to dismiss. For present purposes, Plaintiffs focus on Kagame's role in leading

the conspiracy.

Kagame who holds on to power by crushing political opponents with intimidation and

violence, AC ¶¶37-45, 50-51, 57-63, 75-76—was the driving force behind the conspiracy in this

case, the sole purpose of which was to silence his most famous and foremost political critic: Paul

prior to his imprisonment. AC ¶¶46-49, 52-54, 64. Other members and agents of the conspiracy,

who were directed by Kagame,included James Kimonyo and his staff, who was at the relevant

time the Rwandan Ambassador to the United States and was living and working in the District of

Columbia, AC ¶¶85-86, 89, 112-16, 121-26, 229, 261; Michelle Martin, an American academic-

turned hired Rwandan agent, AC ¶¶67-85; and Moses Rudasunikwa, a pro-Kagame expatriate

living in San Antonio, Texas, who volunteered to spy on and harass Paul in exchange for favored

status within the Rwandan diaspora community, AC ¶¶109-120, 126.

Kagame's subordinates took command of their respective legs of the conspiracy: Defendant Nzabamwita, the head of Rwanda's National Intelligence and Security Service ("NISS"), orchestrated the involvement of his agency – "from the planning to the full execution." AC ¶160. Kagame assigned Defendant Ruhunga and Defendant Busingye their roles, both of whom also personally participated in the conspiracy. AC ¶¶31-32 (Busingye and Ruhunga led the RIB); AC ¶¶140-43 (detailing RIB's role in luring Paul from safety in the United States); AC ¶¶167-68 (discussing "clear evidence" of Busingye's and Ruhunga's "significant role" in the plot to kidnap Paul, including Busingye's own public statements); AC ¶180 (alleging Ruhunga personally visited Paul in prison to demand a false confession).

Kagame's personal secretary and then-Major (now General) Patrick Karuretwa coordinated, and on Kagame's behalf, led the efforts of Kimonyo and the Rwandan Embassy in Washington, D.C., to spy on Paul and track his movements. AC ¶¶85, 87, 105, 116, 126. Nzabamwita's public comments after Paul's kidnapping reveal that the NISS was receiving and monitoring information of Paul's movements within the United States via illegal electronic surveillance in order to ensure the success of the conspiracy. AC ¶95. Kimonyo and other co-conspirators at the Embassy in Washington, D.C., were charged with surveilling Paul in the United States, and they enlisted members of the Rwandan diaspora in the United States. AC ¶¶105-26 In particular, Embassy officials brought Moses Rudasunikwa into the conspiracy. AC ¶109-20. Rudasunikwa was the head of the San Antonio chapter of the Rwandan Community Abroad ("RCA"), which is a formal organization supported by both the Rwandan Embassy and the Rwandan Ministry of Foreign Affairs and International Cooperation ("MINAFFET"). AC ¶¶111-12. Karuretwa coordinated the ties between MINAFFET and the Rwandan agents in America involved in the conspiracy. AC ¶¶79, 85, 87, 112. Rudasunikwa spoke with a member

of Kimonyo's staff in 2007 and then, in his own words, made Mr. Rusesabagina his "main focus," making it a "task to follow" Mr. Rusesabagina. AC ¶¶111, 113, 119-20. Mr. Rudasunikwa's ties to the Embassy eventually resulted in a visit by the Ambassador Kimonyo to San Antonio to speak in 2007. AC ¶¶114-15. The Embassy's personnel also directly contributed to the Rwandan government campaign against Paul in the United States. For example, Ambassador Kimonyo made spectacularly wild and untrue claims against Paul during a public forum in Chicago, an easily disproved fabulation. AC ¶¶55-56. The Ambassador also engaged in fruitless attempts to convince Susan Rice, then U.S. Ambassador to the United Nations, that Paul supported terrorists. AC ¶89. In 2021, officials at St. Mary's School of Law documented attempts by Charles Ntageruka, the Second Counselor at the Rwandan Embassy, to spy on a Zoom discussion attended by members of Paul's family regarding his kidnapping and legal defense in Rwanda. AC ¶¶121-25. At the behest of Kagame and Karuretwa, the Rwandan Embassy coordinated this multi-tiered stalking and harassment for over a decade. AC ¶¶55, 126.

Karuretwa—Kagame's private secretary and the conduit to him—also hired American Michelle Martin to spy on Paul. AC ¶85. Martin, tried to infiltrate Paul's inner circles and encouraged his associates to join a Rwandan rebel group—which they refused to do. AC ¶¶67, 69, 71, 82. Ms. Martin intentionally misrepresented herself (AC ¶¶69, 79, 81) over a period of years to win the trust of Paul's associate Providence Rubingisa and used her position of trust to steal "hundreds of notes, screenshots, emails, and text messages" from him. AC ¶¶68-69, 72-73, 83. Martin travelled to Kigali multiple times during this period and personally met with Kagame at his private residence. AC ¶88. Karuretwa coordinated these visits to Kagame, which were unusual with someone with her profile as an academic researcher. *Id.* Kagame directed the Rwandan Ambassador to the United Nations to set up a meeting between Martin, Kimonyo, and

Ambassador Rice as part of the conspirators' efforts to deceive the United States into taking legal action against Paul. AC ¶¶89-90. To this end, Martin claimed to have shared information with the FBI in the United States regarding Paul's supposed links to terrorism. AC ¶89. Despite the conspirators' efforts, the United States took no legal action against Paul, and Rwanda never formally sought Paul's extradition. AC ¶90.

Ms. Martin's role as a paid agent for Rwanda was discovered when she disclosed her work for the Rwandan government via untimely filings with the United States government pursuant to the Foreign Agents Registration Act in 2013. AC ¶¶79-81. Rwanda's effort to extradite Paul through Belgium was based in part on the emails that had been stolen in the United States by Ms. Martin. AC ¶¶128-29. Mr. Rubingisa, however, was able to demonstrate that at least some of the emails were forgeries, and the Belgian authorities rejected the extradition attempt. AC ¶¶128-130.

After Rwanda failed to extradite Paul through Belgium, the conspiracy evolved to use extrajudicial tactics to silence Paul. On February 27, 2020, Michel Mbazabago, an agent of the RIB, coerced a man named Mr. Constantin Niyomwungere into joining the conspiracy. AC ¶¶140-45. Mr. Niyomwungere lured Paul from Texas with the promise of a speaking engagement. He was kidnapped en route and taken instead to Kigali. AC ¶¶132-36, 142-43, 145-152. Based on Mr. Niyomwungere's information, the conspirators retained GainJet, a private charter flight company with close links to President Kagame, to take Paul from Dubai to Kigali, instead of Burundi as he had been told. AC ¶¶142-43, 146-152. President Kagame's office, AC ¶152 paid for this flight, and Defendant Nzabamwita also later admitted during public interviews that the Rwandan government and Mr. Niyomwungere had plotted together to trick Paul into

coming to Kigali and claimed responsibility for orchestrating the entire conspiracy. AC ¶¶155-172.

Immediately after Paul's kidnapping, Kagame appeared in public, televised interviews to gloat and exult in the success of his plot, AC ¶¶158-59, 161-62. Kagame himself described the fraud and tricks used to lure Paul out of Texas and into his prisons: "[i]t's like if you fed somebody with a false story that, you know, fits well in his narrative of what he wants to be and he follows it and then finds himself [in Kigali]", AC ¶158.

### B.    Procedural History

Plaintiffs filed their original Complaint on February 22, 2022. [D.E. 1]. On May 9, Rwanda filed a motion to dismiss, which was signed by attorney Michael Cryan. [D.E. 13]. On May 11, Counsel for Plaintiffs asked Mr. Cryan in an email if he would accept service for Kagame and the other Defendants. Mr. Cryan responded that he was "not authorized to accept service of process for any defendant." Ex. A.

On May 31, in light of new factual developments, Plaintiffs filed an Amended Complaint, [D.E. 17]. On June 24, a Clerk of this Court issued new summons for the Amended Complaint. [D.E. 21]. That same day, pursuant to Federal Rule 4(f)(2)(C)(ii), Plaintiffs submitted affidavits requesting the Clerk send a copy of the summons and Amended Complaint to Kagame via FedEx. [D.E. 22-1]. The Clerk shipped a copy of the summons and Amended Complaint to Kagame on June 29. [D.E. 24-1]. FedEx records show that the package addressed to Kagame's place of work was signed for on July 6, 2022, [D.E. 26].

Kagame filed the present motion on July 22, seeking dismissal under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6). [D.E. 25]. The motion was again signed by Mr. Cryan. Because Kagame argued he had not been properly served, despite their apparent notice of the lawsuit, and because it was now confirmed that Mr. Cryan was

representing Kagame in connection with this lawsuit, Counsel for Plaintiffs on August 18

requested Mr. Cryan to provide a residential address that Kagame would deem as a suitable

residential address for service of process or to accept service on his behalf. Mr. Cryan responded

that counsel's email was "improper" and refused to accept service. Ex. B.

## II.     STANDARD OF LAW

When a defendant brings a Rule 12(b)(1) motion for lack of subject matter jurisdiction

and "contests only the legal sufficiency of the plaintiff's jurisdictional claims, [the] standard of

review is akin to that applied under Rule 12(b)(6), under which dismissal is warranted if no

plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds

for relief." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir.

2018).

Likewise, on a Rule 12(b)(2) motion for lack of personal jurisdiction, "[i]n the absence of

an evidentiary hearing, the plaintiff need only make a prima facie showing that the Court has

personal jurisdiction." *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 263

(D.D.C. 2011). Under such circumstances, the Court may rule "on the basis of the pleadings,"

and "factual discrepancies are resolved in favor of the Plaintiffs." *FC Inv. Grp. LC v.

Lichtenstein*, 441 F. Supp. 2d 3, 8 (D.D.C. 2006).

A motion to dismiss under Rule 12(b)(5) for insufficient service should be denied where

the plaintiff "demonstrate that the procedure employed satisfied the requirements of Rule 4 and

any other applicable provision of law." *Holland v. Cardem Ins. Co., Ltd*, 19—cv-02362

(TSC/GMH), 2020 WL 9439381, at *4 (D.D.C. 2020) (quoting *Cruz-Packer v. District of

Columbia*, 539 F. Supp. 2d 181, 186 (D.D.C. 2008)). Even where granted "dismissal under Rule

12(b)(5) is ordinarily without prejudice." *Hammond v. Fed. Bureau of Prisons*, 740 F. Supp. 2d

105, 109 (D.D.C. 2010).

A complaint should not be dismissed for failure to state a claim under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This pleading requirement, however, does not demand "the plaintiff to plead all elements of her prima facie case in the complaint, or to plead law or match facts to every element of a legal theory. . . ." *Gill v. District of Columbia*, 872 F. Supp. 2d 30, 34 (D.D.C. 2012) (internal citations omitted). Furthermore, "[a] court considering [a 12(b)(6)] motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor." *Id.* at 33.

## III.    ARGUMENT

### A.  Kagame has ignored the well-established process for ascertaining head of state immunity

No head of state has ever requested immunity from the U.S. Department of State for launching a sprawling criminal conspiracy inside the United States to kidnap a U.S. permanent legal resident. Perhaps for this reason, Kagame does not appear to have requested immunity from the Executive Branch in this case, which renders all his arguments irrelevant. Kagame writes, incorrectly, that "[h]ead-of-state immunity mandates the immediate dismissal of the Amended Complaint as to President Kagame." Kagame Br. at 7. But all the cases cited by Kagame lay out the formal process which he has not followed in this case. Nor does Kagame cite any case which would justify his decision to skip that process in this case.

The first step, which Kagame apparently have not taken in this case, would be for Rwanda to formally request a statement of interest from the U.S. government. *See e.g.*,

*Habyarimana v. Kagame*, 821 F. Supp. 2d 1244, 1260 (W.D. Okla. 2011) ("the Republic of Rwanda had transmitted to the United States Government a request for the State Department to submit a statement of interest in the claims underlying this lawsuit."). The Court itself may also request the view of the State Department. *See e.g.*, *Matar v. Dichter*, 500 F. Supp. 2d 284, 287 (S.D.N.Y. 2007) ("On July 20, 2006, this Court issued an Order inviting the State Department to 'state its views, if any' on Defendant's motion."). The Executive Branch must then decide how it will respond: "the Executive Branch's position on head-of-state immunity falls into one of three categories: the Executive Branch (1) explicitly suggests immunity; (2) expressly declines to suggest immunity; or (3) offers no guidance." *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997). "Some courts have held that absent a formal suggestion of immunity, a putative head of state should receive no immunity." *Id.* (citing *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988)).

If the Executive Branch files a statement determining the head of state is immune, the court follows the advice of the U.S. government. *See e.g.*, *Habyarimana v. Kagame*, 696 F.3d 1029, 1031 (10th Cir. 2012). This "two-part procedure to determine whether a foreign sovereign or foreign official was immune from suit" has been called the "post-*Schooner Exchange* procedure . . . ." *Manoharan v. Rajapaksa*, 845 F. Supp. 2d 260, 262 (D.D.C. 2012). Under this procedure, "[w]hen the Executive Branch concludes that a recognized leader of a foreign sovereign should be immune from the jurisdiction of American courts, that conclusion is determinative." *Doe v. State of Israel*, 400 F. Supp. 2d 86, 110 (D.D.C. 2005). Should the State Department remain silent, "[s]ome courts have suggested that absent a formal suggestion of immunity, a putative head of state should receive no immunity." *El-Hadad v. Embassy of the U.A.E.*, 69 F. Supp. 2d 69, 82 n.10 (D.D.C. 1999) (citing *United States v. Noriega*, 117 F.3d 1206, 1211-12 (11th Cir. 1997)).

Kagame can identify only a single case where a court adopted an earlier grant of immunity which had been recognized in a different case, without requesting the advice of the Department of State first. This is what Kagame demands the Court do in this case, despite the different circumstances. In 2010, a group of plaintiffs filed multiple cases against Kagame in federal court in Oklahoma and Iowa based upon the assassination of "Juvenal Habyarimana, Chief of State of Rwanda, and Cyprien Ntaryamira, Chief of State of Burundi" and Kagame's alleged involvement. *Habyarimana v. Kagame*, No. 4:12-cv-00191 (RWP), 2013 U.S. Dist. LEXIS 205222, at *2 (S.D. Iowa Feb. 6, 2013). The cases were all filed at the same time and based upon the same conduct:

> Virtually identical claims were the subject of Plaintiffs' lawsuit against Kagame in the United States District Court for the Western District of Oklahoma— *Habyarimana v. Kagame*, 821 F. Supp. 2d 1244 (W.D. Okla. 2011) (hereinafter "*Kagame I*"). *Compare* Am. Compl. (Clerk's No. 43) (W.D. Okla. Case No. 5:10-cv-00437) ¶ 29 *with* Compl. (Clerk's No. 7) (S.D. Iowa Case No. 4:12-cv-00191) ¶ 46. The only difference is that in *Kagame I*, Plaintiffs claimed that Kagame's alleged crimes violated the laws of Oklahoma and Rwanda, while, in this case, they claim that Kagame's alleged wrongdoings violated the laws of Iowa.

*Id.* at *3 n.4 (emphasis added). Thus, it is not entirely surprising that the second *Habyarimana* court to rule on Kagame's immunity in those series of cases relied upon the State Department's suggestion of immunity, filed in the first case in that series. "The Court concludes that, for the reasons set forth in *Habyarimana v. Kagame*, 696 F.3d 1029 (10th Cir. 2012), Kagame, the current President of the Republic of Rwanda,[5] is immune from suit." *Id.* at *6.

In this case, Kagame's conduct is sui generis. In no case cited did a foreign head of state direct an illegal surveillance operation inside the United States, with the goal of kidnaping a legal, permanent U.S. resident. The suggestion of immunity filed by the State Department in 2011 concerning Kagame's conduct in the *Habyarimana*  case has no bearing on this case. Here either Defendants or the Court must utilize the "post-*Schooner Exchange* procedure" to engage

the State Department. Then the State Department must decide whether a sitting head of foreign state should be immunized for the blatant violations of U.S. sovereignty at issue here.

> **B.      This Court has Personal Jurisdiction over Kagame**

Kagame's extensive conduct reaching into and causing harm in the United States, including actions taken through agents in the District of Columbia, establishes personal jurisdiction in this case. Kagame's arguments to the contrary all rest on a distortion of the facts and circumstances of this case and ignore many of the Amended Complaint's well-pleaded allegations. This is not, as Kagame strains mightily to imagine, a case seeking to vindicate human-rights abuses abroad that bear no connection to the United States. *See* Kagame Br. 15-17. Rather, as the Amended Complaint thoroughly sets forth, this is a case in which Kagame orchestrated a conspiracy that involved U.S.-based coconspirators and otherwise reached into the United States to lure a U.S. resident from the safety of his home in the United States. Kagame's conspiracy may have culminated in abuses abroad, but the conspiracy relied upon its extensive contacts with the District of Columbia and the United States as a whole.

Under the facts as Plaintiffs have alleged them, the Court may exercise specific personal jurisdiction under the D.C. longarm statute, D.C. Stat. § 13-423(a)(1), or, in the alternative, under Federal Rule of Civil Procedure 4(k)(2). In the event the Court exercises personal jurisdiction over Plaintiffs' federal claims under Rule 4(k)(2), it may also exercise pendant personal jurisdiction over Plaintiffs' state-law claims.

> 1.      The Court may exercise specific personal jurisdiction under the D.C.
> longarm statute

Federal Rule of Civil Procedure 4(k)(1)(A) grants a federal court personal jurisdiction over a defendant who is served with a summons and is subject to the jurisdiction of a state court sitting in the federal court's judicial district. As demonstrated in Part III.C., *infra*, Kagame has

been served with a summons and, would be subject to personal jurisdiction in D.C. superior court

pursuant to D.C.'s longarm statute, D.C. Stat. § 13-423(a)(1).

D.C.'s longarm statute grants personal jurisdiction over claims arising from a defendant's

"transacting any business in the District of Columbia," whether the defendant does so "directly

or by an agent." § 13-423(a)(1). As the D.C. Court of Appeals has held, § 13-423(a)(1) is

"coextensive with the due process clause." *Mouzavires v. Baxter*, 434 A.3d 988, 992 (D.C.

1981). Thus, the "'statutory and constitutional' predicates for specific personal jurisdiction

'merge into a single inquiry,'" and personal jurisdiction is proper so long as it comports with due

process. *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020) (quoting *Thompson*

*Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013)). Specific jurisdiction comports with

due process where there are "(1) minimum contacts demonstrating that the defendant

purposefully availed itself of the forum; (2) relatedness between the contacts and the claim"; and

(3) the exercise of jurisdiction otherwise "compli[es] with 'fair play and substantial justice.'"

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 233 (D.C. Cir. 2022). Once the plaintiff meets her

burden on the first two of these factors, the burden on the third factor shifts to the defendant to

"present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *Mwani v. Bin Laden*, 417 F.3d 1, 14 (D.C. Cir. 2005) (quoting *Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)).

Under the doctrine of conspiracy jurisdiction, where, as here, a plaintiff alleges the

defendant participated in a conspiracy, the district court may assert jurisdiction over the

defendant based on a coconspirator's case-related contacts with the forum. *See, e.g.*, *Jung v.*

*Assoc. of Am. Med. Colls.*, 300 F. Supp. 2d 119, 140-41 (D.D.C. 2004). Conspiracy jurisdiction

"presumes that '[p]ersons who enter the forum and engage in conspiratorial acts are deemed to

"transact business" there "directly"; [and] coconspirators who never enter the forum are deemed to "transact business" there "by an agent."'" *Id.* at 141 (quoting *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)). A plaintiff establishes conspiracy jurisdiction by alleging "(1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries." *Id.*; *see also, e.g.*, *Edmond v. USPS Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991). Plaintiffs here adequately allege each of these elements.

    a.    *Plaintiffs sufficiently allege the existence of a conspiracy that Kagame participated in or agreed to join*

First, Plaintiffs plainly allege the existence of a conspiracy to unlawfully silence Paul Rusesabagina's dissent, which existed to fulfil Kagame's specific policy of crushing Paul's dissent, which each Individual co-Defendant participated in. AC ¶¶52-54, 64, 85-90. In this case, Kagame launched, directed, and otherwise affirmed a conspiracy of Rwandan government officials and their agents to illegally track, surveil, harass and then lure Paul out of Texas with a false promise of employment, so he could be tortured and illegally imprisoned, which mostly occurred in the United States. AC ¶¶1, 7, 11, 12, 19, 30-33, 85-89, 95, 132-36, 140-45, 159, 165, 228. As Rwanda conceded in its Motion to Dismiss, "the Amended Complaint admits that the purported harassment and surveillance of Paul Rusesabagina in the United States was allegedly ordered and supervised directly by senior Rwandan Government officials *in Rwanda*." [D.E. 18 at 19] (emphasis in original).

As Plaintiffs set out in their Amended Complaint, Kagame sat at the head of the conspiracy which unfolded in the United States, which existed only to fulfil his requirement to crush his political opponent:

- Kagame is an iron-fisted dictator who routinely orders the murders of political opponents and does not tolerate any political dissent, AC ¶¶37-45, 50-51, 57-63, 75-76;

- Paul was his most famous and foremost political critic, AC ¶¶46-49;

- Paul has been one of Kagame's top targets since at least 2007, AC ¶¶52-54, 64.

In such a dictatorship, Kagame's officials and employees took whatever steps were necessary to enact Kagame's wishes. Kagame's personal secretary and then-Major (now General) Patrick Karuretwa, a member of the President's Office, ensured that Kagame's directives were fulfilled and acted as the link between him and the Embassy, and between MINAFFET and the Rwandan agents in America. AC ¶¶79, 85, 87, 105, 112, 116, 126.

Fulfilling Kagame's plot against Paul was a top priority for the Washington, DC embassy, including Ambassador James Kimonyo, and they were "charged with tracking the Rwandan diaspora in the United States to keep Kagame apprised of any U.S. based opposition; Mr. Rusesabagina was at the top of their list", AC ¶¶85-90. "As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy." *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983).

All actions taken by Kagame's co-conspirators were taken to support his requirement to silence his primary critic and point of dissent, which was Paul. Plaintiffs allege that RIB agent Mbazabago coerced Niyomwungere into participating in the conspiracy. AC ¶¶140-41. Niyomwungere then deceived Paul into believing Niyomwungere had organized a speaking tour for him in Burundi to lure Paul away from home and the safety of the United States. AC ¶¶ 133-39, 144-46. Paul was then forcibly taken to Rwanda, where he was detained, disappeared, and tortured by RIB agents (led by Mbazabago). AC ¶¶146-51, 174-82.

Kagame entrusted the NISS and RIB to manage different aspects of the conspiracy, including the RIB's procurement of a confession through Paul's detention and torture, public communications by the RIB and NISS after the kidnapping which attempted to spin the operation favorably, AC ¶¶155, 163, 165, 167, 168, 180. Immediately after Paul's kidnapping, Kagame appeared in public, televised interviews to gloat and exult in the success of his plot, AC ¶¶158-59, 161-62. Kagame revealed his knowledge of the conspiracy when he described the fraud and tricks used to lure Paul out of Texas and into his prisons: "[i]t's like if you fed somebody with a false story that, you know, fits well in his narrative of what he wants to be and he follows it and then finds himself [in Kigali]", AC ¶158.

Even absent this direct evidence of Kagame's involvement in the conspiracy, it is reasonable at this stage to infer that he knew of and agreed to the conspiracy to kidnap Paul, which was being carried out by his subordinates, especially in light of the foreseeability that the international controversy the kidnapping would cause and the importance that Kagame had placed on silencing Paul's dissent. AC ¶¶85-90.

> b.   *Kagame's Coconspirators Took an Overt Act within the District of Columbia*

Second, the conspiracy to silence Paul's dissent was conducted from the District of Columbia for a period of years. Plaintiffs alleged that for years prior to his kidnapping, the Rwandan Embassy in Washington, D.C. coordinated efforts to track and surveil Paul Rusesabagina. AC ¶¶85-86, 109-14, 116, 126. Nzabamwita publicly affirmed that he had been receiving intelligence on Paul gathered by illegal hacking of his phone, which the conspirators used to facilitate his kidnapping. AC ¶95.

Kagame and Embassy officials also acted in building the "case" that Rwanda would present at Paul's sham trial. Plaintiffs alleged that Rwanda's then-Ambassador to the United

States Kimonyo and other Embassy staff conspired with paid Rwandan agent Michelle Martin to build a fraudulent case against Paul. AC ¶¶67-91. Martin tried to entrap Rusesabagina by encouraging him and his associates to join a Rwandan rebel group. AC ¶82. This effort failed. *Id.* She stole thousands of emails from a close associate of Paul and then turned over "evidence" of Paul's purported wrongdoing to Belgian authorities and the FBI, at least some of which proved to be fraudulent. AC ¶¶71-72, 89-90, 127-30. As Plaintiffs allege, Martin worked closely with Kimonyo during this time, even joining him for a meeting with Ambassador Susan Rice as part of the conspirators' initial efforts to trick the United States into bringing bogus charges against Paul. AC ¶89. Kagame not only created the goal of the conspiracy, but directed overt steps which occurred in the forum: he himself had this meeting set up. *Id.* It was only after the conspirators failed at these earlier efforts to silence Paul by manipulating the judicial process that they pivoted to achieve their goal by kidnapping Paul.

The D.C.-based conspirators took other acts to try to silence Paul through harassment and defamation. Embassy officials enlisted Moses Rudasunikwa, the president of the Rwandan Community Abroad in Paul's hometown in San Antonio, Texas, to their cause, who then made following Paul his "main focus," and continued to do so up until Paul was kidnapped in 2020. AC ¶¶113-14, 126. Kimonyo made efforts to publicize allegations against Paul, including by making wild and quickly disproven claims against Paul during a public forum in Chicago. AC ¶54. Even after Paul was kidnapped, in 2021, an Embassy official attempted to spy on a Zoom discussion about Paul's kidnapping attended by members of his family. AC ¶¶121-25. These

allegations demonstrate that Rwandan officials at the Embassy in the District of Columbia for

years served as the nerve center of the conspiracy's U.S. operations against Paul.[2]

The many D.C.-based actions of Kimonyo and other Embassy officials in furtherance of

the conspiracy to unlawfully silence Paul can be imputed to all conspirators and thus establish

specific jurisdiction over them in the District of Columbia. *See Jung*, 300 F. Supp. 2d at 140-41.

These imputed contacts distinguish this case from the two cases cited by Kagame—neither of

which address conspiracy personal jurisdiction—finding that torture committed abroad is, on its

own, insufficient to establish specific jurisdiction. Kagame Br. at 15-16. Indeed *Nikbin v. Islamic*

*Republic of Iran*, cited by Kagame, illustrates why this Court can assert personal jurisdiction

over him in this case. 471 F. Supp. 2d 53, 73 (D.D.C. 2007). In *Nikbin*, the plaintiffs alleged that

"Rafsanjani planned, ordered, authorized, or consciously disregarded the occurrence of" torture

"against Nikbin that took place entirely in Iran . . . ." *Id.* But the *Nikbin* victim lived in Iran; the

Iranian head-of-state did not launch a conspiracy to spirit him outside the United States so he

could be tortured in Iran. *Id.* ("Nikbin has not alleged, however, that the effects of these acts

were directed at the United States. Instead, the acts were targeted at Nikbin as an individual, as

punishment for actions he undertook or beliefs that he held while he was living in Iran as an

Iranian."). In this case, Kagame sat at the head of a conspiracy launched against Paul while he

lived in the United States, pried him from the safety of his home, and lured him to Kigali, where

he remains illegally imprisoned after his tortured "confession".

---

[2] In their opposition to Rwanda's motion to dismiss, Plaintiffs argued that the conspiracy can be conceptualized as two sub-conspiracies, one of which took place entirely within the United States and focused on stalking, surveilling, and harassing Paul and is actionable without reference to the broader transnational conspiracy. These interlocking sub-conspiracies do not detract from the existence of the overall conspiracy or otherwise prevent attribution of the U.S. conspirators' overt acts to the Individual Defendants.

Kagame also relies on *Zemin* where the plaintiffs, members of the Falun Gong religious movement, sued a Chinese government office in Illinois for abuses committed in China. *Plaintiffs A, B, C, D, E, F v. Jiang Zemin*, 282 F. Supp. 2d 875, 878-79 (N.D. Ill. 2003). The court held that the defendants' activities were not continuous and systematic enough to support general jurisdiction and that the conduct in Illinois could not support specific jurisdiction. *Id.* at 888-89. Unlike the Plaintiffs here, there was no indication in *Zemin* that the defendant's activities in Illinois targeted the plaintiffs or were otherwise part of the same conspiracy that injured them abroad. *See id.* at 878-79, 888-89. Indeed, the plaintiffs in *Zemin* do not appear to have even relied on a theory of conspiracy jurisdiction. *See id.* at 886-89.

      2.    <u>Alternatively, the Court may exercise specific personal jurisdiction under Rule 4(k)(2) and pendant personal jurisdiction</u>

In the event the Court concludes that it cannot exercise personal jurisdiction pursuant to Rule 4(k)(1) & § 13-423(a)(1), then the Court has personal jurisdiction pursuant to Rule 4(k)(2). Rule 4(k)(2) "permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani*, 417 F.3d at 10. Here, even in the event that the conspiracy's contacts with the District of Columbia are insufficient to support specific jurisdiction in D.C., the conspiracy's extensive contacts with the United States and its actions specifically directed towards the United States support personal jurisdiction with respect to plaintiffs' federal claims under Rule 4(k)(2). In addition, the Court can exercise pendant personal jurisdiction over Kagame with respect to Plaintiffs' state law claims because each arose out of the same core of operational facts as

19

Plaintiffs' federal claims. *See Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 12 n.6 (D.D.C. 2016).

> a.   *In the event personal jurisdiction does not exist under D.C.'s longarm statute, Plaintiffs' federal claims satisfy the requirements for Rule 4(k)(2)*

First, there can be no dispute that Plaintiffs' TVPA, ATS, and ECPA claims arise under federal law. *See* 18 U.S.C. § 2520; 28 U.S.C. § 1350; 28 U.S.C. § 1350 note.

Second, as demonstrated in Part III.C., *infra*, Kagame has been served with a summons.

Third, Kagame does not assert that he is subject to personal jurisdiction in any judicial district of the United States. *See* Kagame Br. 12-17. While Plaintiffs argue that Kagame is subject to personal jurisdiction in the District of Columbia, insofar as the Court rules otherwise, then Plaintiffs agree with Kagame that he is not subject to personal jurisdiction elsewhere in the United States. These claims arise from conduct which occurred across the United States. Kagame's motion to dismiss failed to rebut Plaintiffs' Rule 4(k)(2) argument and therefore conceded it despite the allegations in support in the Amended Complaint. *See* AC ¶17.

Fourth, jurisdiction under 4(k)(2) comports with due process. Even if the conspiracy's contacts with the District of Columbia are insufficient to create personal jurisdiction under § 13-423(a)(1), the conspiracy's reach into the United States extended well beyond the District of Columbia. Kagame's personal secretary acted at his direction and tied him to the Embassy's efforts, Martin, and the RCA. AC ¶¶79, 85, 87, 105, 112, 116, 126.  Indeed, Karuretwa's name appears on her contracts. AC ¶¶79, 87, 88. Rwandanpaid agent Michelle Martin volunteered at Paul's charitable foundation in Chicago, where she spied on Paul and his associates and attempted to entrap them by convincing them to join a Rwandan rebel group. AC ¶¶67-82. Martin travelled to Kigali multiple times during this period and personally met with Kagame at his private residence. AC ¶88. Karuretwa, a key member of Kagame's staff with foreign policy

and defense portfolios, received her and brought her to Kagame's private residence. *Id.* It is highly unusual that the President of Rwanda spent time at his personal residence with an "academic researcher." AC ¶¶79, 87, 88. The mystery is answered by the fact that she was working for Karuretwa, who was the conduit to Kagame.

The conspirators then leveraged Martin's time volunteering at the foundation to present her as a "star witness" at Paul's sham trial, which was the final step in their conspiracy to silence Paul's dissent. AC ¶91. Martin also sent information to the FBI and met with Ambassador Rice at the United Nations as part of the conspirators' unsuccessful attempts to trick the United States into bringing criminal charges against Paul. AC ¶¶89-90. Kagame directed the Rwandan Ambassador to the United Nations to set up the meeting between Martin, Kimonyo, and Ambassador Rice. AC ¶¶89-90.

Moreover, the conspiracy specifically targeted Paul while he was living in the United States – a fact that Kagame was well aware of through his meetings with Martin at the very least. *See also supra* Pt. III.B.1.a. Paul resided in the United States as the Rwanda officials and agents in the Embassy, coordinated by Karuretwa, spied on and harassed Paul and tracked his movements. AC ¶¶85, 87, 105, 116, 126.

Rwanda officials and agents also directed communications at him designed to entice him to fly to a place where he could be kidnapped, AC ¶¶133-46. Constantin Niyomwungere, the individual whom the RIB coerced into joining the conspiracy, reached into and targeted Paul in the United States. He directed his conduct towards the United States by fraudulently offering to pay Paul for a nonexistent speaking tour in Burundi and materially misleading Paul about the nature and safety of his trip to Burundi and caused an injury felt at least in part in the United States. AC ¶¶143-52; *see also, e.g.*, *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-*

*Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016) (locus of fraud is place of reliance). Although

Niyomwungere may not have set foot in the United States, his conduct calculated at harming

Paul and his family members in the United States nevertheless creates sufficient minimum

contacts with the United States. *See In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15, 32

(D.D.C. 2003) (explaining specific jurisdiction attaches under the so-called effects test "even

when the defendant's only contact with the forum was calculated to cause and did cause

injurious effects to plaintiffs in the forum state."). And because Plaintiffs adequately allege

Rwanda officials and agents in the Embassy and Niyomwungere took these acts in furtherance of

the conspiracy, those contacts are imputed to Kagame. *See, e.g.*, *Jung*, 300 F. Supp. 2d at 140-41.

Even without relying on conspiracy jurisdiction, Karuretwa and Niyomwungere's

contacts with the United States can be directly imputed to Kagame as his agents. *See, e.g.*,

*Cabrera v. Black & Veatch Special Projects Corps.*, 2021 WL 3508091, at *13 (D.D.C. 2021)

(imputing agent's contacts onto defendant to establish Rule 4(k)(2) jurisdiction). To fulfil

Kagame's requirement to silence Paul's dissent, the NISS executed the operation to kidnap Paul

–that is, working through Niyomwungere and supervising and directing Niyomwungere's

contacts into the United States. AC ¶160. Likewise, Plaintiffs allege that Niyomwungere was

working at the behest the RIB—and thus at the behest of Defendants  Busingye and Ruhunga—

when he fraudulently lured Paul away from the safety of the United States. AC ¶¶31-32, 140-43.

At this stage and given Kagame's dictatorial rule of Rwanda and his obsession with silencing

Paul, it is reasonable to infer that Nzabamwita, Busingye, and Ruhnuga were all operating

directly on the orders of Kagame. AC ¶¶37-45, 50-54, 57-64, 75-76. Accordingly, whether

imputed through his co-Defendants and coconspirators or by directing their conduct specifically

targeted at the United States, Kagame has sufficient minimum contacts with the United States to support jurisdiction under Rule 4(k)(2).

Even in the unlikely event that Kagame had somehow not been aware of the conspiracy launched by the heads of all his major national security agencies against his most hated political opponent despite the well-known record of his personal interest in Paul's activities in the U.S., his statements subsequent to Paul's kidnapping and torture ratify the conduct and bring him within the conspiracy. *See e.g.*, *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 535 F. Supp. 2d 60, 71 (D.D.C. 2008) ("Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'"); *Chi. Title Ins. Co. v. Fisher*, No. 06-1608, 2007 U.S. App. LEXIS 19857, at *8 (4th Cir. Aug. 21, 2007) (a principal may ratify the statements of an agent); *see also Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002) (under the command responsibility doctrine the leader of a group of subordinates is responsible for their conduct where he knew they were plotting a crime and then failed to prevent it or punish them). Kagame's statements exhibited an understanding of minute details of the plot to lure Paul from Texas to Kigali. AC ¶¶158-59, 161-62. As Kagame stated: "[i]t's like if you fed somebody with a false story that, you know, fits well in his narrative of what he wants to be and he follows it and then finds himself [in Kigali]", AC ¶158. Contacts may also be imputed to Kagame under the doctrine of respondeat superior. *See e.g.*, *Doe v. Exxon Mobile Corp.*, 573 F. Supp.2d 16, 24-28 (D.D.C. 2008) ("There are two requirements to establish liability: (1) a master-servant relationship; and (2) the tortious conduct must occur while the servant is acting within the scope of his or her employment . . . . These are both questions generally to be decided by a finder of fact."). There is no question that the actions of

every Rwandan official involved in this case can be attributed to Kagame.

Thus, Plaintiffs have made the required "prima facie showing that" Kagame purposefully directed his activities at a resident "of the United States and that this litigation results from injuries to the plaintiffs that rise out of or relate to those activities," Kagame therefore had "fair warning that his activities would subject him to the jurisdiction of the United States." 417 F.3d at 12-13 (internal citations and quotation marks omitted) (finding personal jurisdiction under Rule 4(k)(2) for terrorist attack abroad where "the defendants 'engaged in unabashedly malignant actions directed at [and] felt in'" the United States, including "the publication of *fatwas* in a newspaper distributed in the United States; the shipment to Virginia of the power supply for a cell phone that bin Laden used in Afghanistan; the scheduling of a bin Laden interview in Afghanistan through an agent in Washington, D.C.; and the transmission of bin Laden's views to the District via interviews on CNN and ABC").

      b.   *The Court has pendant personal jurisdiction over Plaintiffs' state law claims*

Although Rule 4(k)(2) only expressly provides for personal jurisdiction with regard to federal claims, under the doctrine of pendant personal jurisdiction the Court can also exercise personal jurisdiction over Kagame with regards to those state law claims that arise "'out of the same core of operative facts as those claims which clearly [fall] within the scope of' the Court's personal jurisdiction." *Bazarian*, 168 F. Supp. 3d at 12 n.6 (alteration in original) (quoting *Oetiker v. Jurid Werke, GmbH*, 556 F.2d 1, 4 (D.C. Cir. 1977)).

Here, each of Plaintiffs' state-law claims arise from the same core of operative facts as one or more of their federal-law claims. Plaintiffs' fraud, false imprisonment, solatium, and loss of consortium claims, as well as parts of their civil-conspiracy and IIED claims, all arise from Paul's kidnapping, as do Plaintiffs' federal ATS claims. *Compare* AC ¶¶223-40, *and* AC ¶¶251-

58, *with* AC ¶¶280-310. Plaintiffs' assault and battery claims arise from Paul's torture, as does their federal TVPA claims. *Compare* AC ¶¶241-50, *with* AC ¶¶268-79. Plaintiffs' intrusion upon seclusion claim and the remainder of their civil conspiracy and IIED claims arise from Defendants' stalking, harassment, and surveillance of Paul and his family, as does Plaintiffs' federal ECPA claim. *Compare* AC ¶¶227-33, AC ¶¶251-54, *and* AC ¶¶ 259-63, *with* AC ¶¶264-67. Indeed, where, as here, the sole grounds for subject-matter jurisdiction over a plaintiff's state-law claim is 28 U.S.C. § 1367, which Kagame has not challenged, the claim is also subject to pendant personal jurisdiction, as they "necessarily arise from the same common nucleus of operative fact." 4A Adam N. Steinman, Federal Practice and Procedure (Wright & Miller) § 1069.7 (4th ed. 2022 update).

3.   <u>Kagame does not Carry his Burden to Present a Compelling Case that<br>Exercising Personal Jurisdiction is Otherwise Unreasonable</u>

Because Plaintiffs establish Kagame's case-related contacts with both the District of Columbia under Rule 4(k)(1)(a) and the United States as a whole under Rule 4(k)(2), it becomes Kagame's burden under both analyses to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Mwani*, 417 F.3d at 14 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. at 479). Kagame fails to do so.

Kagame first argues that litigating in the District of Columbia will "place a substantial burden" on him. Kagame Br. 17. But *Asahi*, cited by Kagame, recognized that upon the establishment of minimum contacts "the interests of the plaintiff and the forum in the exercise of jurisdiction will justify" the exercise of personal jurisdiction. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987). Kagame also argues that "President Kagame is the head of state of a sovereign nation, and in that capacity is charged with heavy political, administrative, diplomatic, and national security responsibilities" to support his undue burden argument.

25

Kagame Br. 17. But the head-of-state has vast resources to call upon to coordinate his defense, and Kagame is a sophisticated individual who has hired a prestigious international law firm to defend him in this lawsuit.

Moreover, as courts have recognized, modern communications technologies have greatly reduced the burdens on foreign litigants and has consequently diminished the weight courts place on evaluating a foreign defendant's burden for personal jurisdiction purposes. *See, e.g.*, *Young v. Mitsubishi Motors Corp.*, 2019 WL 6327581, at *6 (W.D. Tex. 2019); *DR Music, Inc. v. Aramini Strumenti Musicali S.R.L.*, 2014 WL 523042, at *3 (D.N.J. 2014). And even to the extent Kagame can identify specific burdens, "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional." *Burger King*, 471 U.S. 462, 477 (1985).

Kagame's assertion that this court and the judicial system have little interest in resolving this controversy rests on his argument that he has no case-related contacts with the United States, which, as demonstrated above, is simply untrue. *See supra* Pts. III.B.1–2. In addition, the District of Columbia has an interest in remedying an injury to a U.S. national caused by a conspiracy orchestrated within its borders. Likewise, the United States plainly has an interest in vindicating the rights of a plaintiff kidnapped from its territory by agents of a foreign government. Kagame argues here that "[s]ubjecting President Kagame to personal jurisdiction based on unspecified acts by unidentified third parties would offend traditional notions of fair play and substantial justice." Kagame Br. 18. But as described above, Plaintiffs have described the plot and Kagame's role with specificity, as it rolled out over the years. *See supra* Pt. III.B.1.a.

Kagame also bizarrely claims that *Plaintiffs* do not have an interest in litigating in this forum. Of course they do, which is why they filed here. If the Amended Complaint demonstrates

one thing, it is that Plaintiffs could not fairly and safely litigate this case in Rwanda. An American forum is thus their only option, which Kagame must recognize since he has not moved for *forum non conveniens* dismissal. And given the Kagame's extensive contacts with the District of Columbia and lack of an alternative U.S. forum, Plaintiffs have a particular interest in litigating in this forum specifically.

Lastly, Kagame inaccurately claims "that Plaintiffs are for the most part foreign nationals complaining about alleged conduct occurring elsewhere", Kagame Br. 18. Once again Kagame's arguments ignore the Amended Complaint, which explains the extensive ties of Plaintiffs to the forum:

> Mr. Rusesabagina is a permanent legal resident of San Antonio, Texas, along with his wife, Taciana. Mr. Rusesabagina's son Roger and his daughter Carine are both American citizens. They originally came to the U.S. in the late 2000s, graduated from American universities, and currently live and work in the U.S. Two of Mr. Rusesabagina's children – his son Trésor and daughter Anaïse – are both legal permanent residents of the United States. They came to the U.S. in 2005 and 2006, and attended middle school, high school, and college in the U.S. They currently live and work in the U.S. as well.

AC ¶10. And as described through both the Amended Complaint and described herein, Kagame directed a plot by his officials and their agents inside the United States in an attempt to force Paul from the refuge he found after fleeing both Rwanda and then Belgium. AC ¶35 ("Rwandan government agents attempted to assassinate Mr. Rusesabagina first in his home in Rwanda in 1994, and then ransacked his home in Belgium in 2009, forcing him to move to the United States for fear of his life.").

### C.      Plaintiffs' Claims are not subject to dismissal Under Rule 12(b)(5)

Kagame's motion to dismiss for insufficient process under Federal Rule of Civil Procedure 12(b)(5) must also be denied because Plaintiffs properly served Kagame pursuant to

Rule 4(f)(2)(C)(ii). Regardless, insufficient service of process is not grounds to dismiss the Amended Complaint at this juncture.

        1.      <u>Plaintiffs have properly Kagame pursuant to Rule 4(f)(2)(C)(ii)</u>

Rule 4(f)(2)(C)(ii) states that in the absence of an international agreement[3] and "unless prohibited by the foreign country," a plaintiff may serve a defendant in a foreign country "using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt." On June 29, 2022, a clerk of this court addressed and sent to Kagame one copy each of the summons and Amended Complaint. [D.E. 24]. The summons and Amended Complaint was received and signed for at Kagame's place of work on July 6, 2022, [D.E. 26]. Plaintiffs attached the signed receipt to their affidavit of service, along with an affidavit from FedEx authenticating the receipts and verifying service. *See* [D.E. 26-1].

Kagame challenges his service on two grounds. First, he says that the service was invalid under Rule 4(f)(2)(C)(ii) because he did not *personally* sign for the FedEx deliveries. Kagame Br 19. But Rule 4(f)(2)(C)(ii) "does not require defendant's signature; it merely requires a signed receipt. Plaintiffs have produced a signed receipt." *Martinez v. White*, 2006 WL 2792874, at *2 (N.D. Cal. 2006). Kagame does not cite any authority to the contrary.[4]

---

[3] Rwanda is not a member of the Hague Convention. *See Status Table,* The World Org. for Cross-border Co-operation in Civ. and Com. Matters (last accessed Aug. 26, 2022), https://www.hcch.net/en/instruments/conventions/status-table/print/?cid=17.

[4] The two cases Kagame cites have no bearing on whether Rule 4(f)(2)(C)(ii) requires the defendant's personal signature. In *Hashem v. Shabi*, 2018 WL 3382913 (D.D.C. 2018), the court found service was improper under Rule 4(f)(2)(C)(ii) solely because the plaintiff failed to carry her burden to show the method of service was not prohibited by Emirati law. *See id.* at *4. Indeed, the plaintiff provided a receipt. *See id.* at *3. In *Freedom Watch, Inc. v. OPEC*, 766 F.3d 74 (D.C. Cir. 2014), the plaintiff argued it effected service under Rule 4(f)(2)(A). *See id.* at 80. After rejecting that argument, the court simply noted that Rule 4(f)(2)(C)(ii) was also inapplicable because there was no evidence "that a clerk of the court addressed and dispatched the mailing or that it required a signed receipt." *Id.*

Second, Kagame argues that Plaintiffs have failed to carry their burden to show that "mailing is not prohibited by Rwandan law." Kagame Br 19. Plaintiffs submit two declarations from experts of Rwandan law demonstrating that mailing is not prohibited by Rwandan law. Ex. C., Decl. of R. Niyibizi; Ex. D., Decl. of I. Edwards. Kagame offers no alternative interpretation of Rwandan law. Rwandan law's silence on the matter suffices to show service by FedEx is not "prohibited" by Rwandan law and thus valid under Rule 4(f)(2)(C)(ii). *See, e.g.*, *SignalQuest, Inc. v. Tien-Ming Chou*, 284 F.R.D. 45, 48-50 (D.N.H. 2012); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 2011 WL 3903232, at *3 (N.D. Cal. 2011).

Accordingly, the Court should find that Plaintiffs validly served Kagame under Rule 4(f)(2)(C)(ii).

### 2.   Rule 12(b)(5) is not grounds for dismissal of a complaint against a defendant located abroad

Kagame's Rule 12(b)(5) motion must be rejected because there is no deadline for Plaintiffs to serve him. Rule 4(m) provides a 90-day deadline to serve a defendant located within the United States, but it specifically exempts "service in a foreign country under Rule 4(f), 4(h)(2), or 4(j)(1)." *See also, e.g.*, *Day v. Corner Bank (Overseas) Ltd.*, 789 F. Supp. 2d 136, 146 n.9 (D.D.C. 2011). Thus, courts routinely reject Rule 12(b)(5) motions filed by defendants located abroad as premature as long as "the circumstances do not prevent the plaintiff from a second attempt at service of process on the foreign defendant." *Stafford v. Grifols Int'l S.A.*, 2019 WL 3521957, at *4 (N.D. Ga. 2019) (collecting cases); *see also, e.g.*, *Cerner Middle E. Ltd. v. Al-Dhaheri*, 2017 WL 776409, at *1 n.1 (D. Mass. 2017); *AutoOpt Networks, Inc. v. GTL, USA Inc.*, 2015 WL 407894, at *4 (N.D. Tex. 2015).

Here, although Plaintiffs maintain they have effectuated service, *see supra* Pt. III.C.1., in the event the Court disagrees, Plaintiffs intend to continue their efforts. Plaintiffs may also move

for service by alternate means pursuant to Rule 4(f)(3). Accordingly, in the event the Court finds

Plaintiffs have not effectuated service on Kagame, it should nevertheless deny his motion to

dismiss.

### D. Kagame cannot insert arguments from another brief without any supporting argument or explanation

Kagame appears to reference arguments made in an earlier motion to dismiss, filed on

behalf of Rwanda the foreign sovereign itself. Kagame Br. at 7, 20 ("[T]his action is subject to

dismissal for the reasons explained in Rwanda's Motion to Dismiss [D.E. 18] concerning the

Foreign Sovereign Immunities Act. . . ."). To the extent that Kagame is trying to leverage any

arguments presented in Rwanda's Motion to Dismiss, [D.E. 18], without supporting arguments

of law in his brief, he should fail. Nowhere in his motion does he explain how any of the

arguments presented by Rwanda would support his defense. Kagame cannot cross reference

arguments made in other motions without such an explanation: "[S]uch an argument hardly

warrants serious attention; courts need not resolve arguments raised in a cursory manner and

with only the most bare-bones arguments in support." *Mason v. Geithner*, 811 F. Supp. 2d 128,

190 (D.D.C. 2011) (citing *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C.

Cir. 1997)).[5] Otherwise Plaintiffs have an impossible task of trying to guess Kagame's

arguments in order to respond to them.

---

[5] To the extent that Kagame's vague and unexplained cross-reference results in the insertion of any arguments from Rwanda's Motion to Dismiss [D.E. 18], Plaintiffs therefore refer to their arguments made in response, *see* [D.E. 31], to respond to Kagame's cross-reference. Kagame does not otherwise argue that the Amended Complaint fails to state a claim for relief pursuant to Rule 12(b)(6).

More importantly, Rwanda's defenses arise from the Foreign Sovereign Immunities Act ("FSIA") and Kagame does not attempt to explain how the FSIA would support any of the defenses raised in his brief: "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Cabrera*, 699 F. Supp. 2d 35, 41 (D.D.C. 2010) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 297-98 (D.D.C. 2012) (the defendant "has simply failed to support its argument with any meaningful measure of factual or legal argument. Courts need not consider cursory arguments of this kind, and the Court declines to do so here."). The Supreme Court has made clear that the FSIA does not apply to the issue of foreign official immunity. *Samantar v. Yousuf*, 560 U.S. 305, 325-26 (2010).

Because Kagame "neither cites nor discusses any relevant case law to support his argument" regarding the FSIA, "we consider the argument waived." *Jones v. Bernanke*, 557 F.3d 670, 676-77 (D.C. Cir. 2009) (citing *Ry. Labor Executives' Ass'n v. U.S.R.R. Ret. Bd.,* 749 F.2d 856, 859 n.6 (D.C. Cir. 1984)).

### E.    Leave to Amend

In the event the Court finds any of Plaintiffs' allegations insufficient, Plaintiffs request leave to amend pursuant to Federal Rule of Civil Procedure 15(a). Leave to amend should be "freely given," particularly where, as here, the case is at its inception. See *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Barkley v. U.S. Marshals Service ex rel. Hylton*, 766 F.3d 25, 39 (D.C. Cir. 2014); *PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*, 271 F.R.D. 4, 6 (D.D.C. 2010).

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Kagame's motion to dismiss.

September 8, 2022                    Respectfully submitted,


                                    **/s/ Steven R. Perles**
                                    Steven R. Perles (D.C. Bar # 326975)
                                    Edward MacAllister (D.C. Bar # 494558)
                                    Joshua K. Perles (D.C. Bar # 1031069)
                                    Emily Amick (D.C. Bar # 242018)
                                    Perles Law Firm, PC
                                    816 Connecticut Avenue, NW
                                    12th Floor
                                    Washington, D.C. 20036
                                    Phone: (202) 955-9055
                                    sperles@perleslaw.com
                                    emacallister@perleslaw.com

                                    Agnieszka M. Fryszman (D.C. Bar #459208)
                                    Nicholas Jacques (D.C. Bar #1673121)
                                    Cohen Milstein Sellers & Toll PLLC
                                    1100 New York Ave., N.W.
                                    East Tower, Suite 500
                                    Washington, DC 20005
                                    Phone: (202) 408-4600
                                    Fax: (202) 408-4699
                                    afryszman@cohenmilstein.com
                                    NJacques@cohenmilstein.com

                                    John Arthur Eaves, Jr. (D.C. Bar #432137)
                                    Christopher Brady Eaves (V.T. Bar #6370)
                                    Eaves Law Firm
                                    101 North State Street
                                    Jackson, MS 39201
                                    Phone: (601) 355-7961
                                    johnjr@eaveslawmail.com

                                    John Calvin Patterson (M.S. Bar # 103140) *Of Counsel*
                                    213 Main Street
                                    Como, MS 38619
                                    Phone: (662) 526-1992
                                    JCP@Pattersonehrhardt.com