UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PAUL RUSESABAGINA,** *et al.*, ) | |
| ) | |
| **Plaintiffs** ) | |
| ) | |
| v. ) | Civil Case No. 22-469 (RJL) |
| ) | |
| **THE REPUBLIC OF RWANDA,** *et al.*, ) | |
| ) | |
| **Defendants** ) | |
| ) | |

MEMORANDUM OPINION
January 23, 2023 [Dkt. ## 18, 25]

Plaintiffs Paul Rusesabagina ("Rusesabagina"), his wife, and his six children (collectively, "plaintiffs") have sued the Republic of Rwanda, its President, Paul Kagame, and three Rwandan officials for harms stemming from Rusesabagina's alleged kidnapping, torture, and detention. Now before the Court are motions to dismiss filed by Rwanda and President Kagame. All plaintiffs' claims against those defendants are barred by foreign sovereign immunity and head of state immunity. Therefore, I will **GRANT** Rwanda's [Dkt. # 18] and President Kagame's [Dkt. # 25] Motions to Dismiss.

## BACKGROUND

### I.    Factual Background

Except where otherwise noted, the recitation of facts is drawn from the Amended Complaint. *See* Am. Compl. ("Compl.") [Dkt. #17]. In resolving a motion to dismiss, the

Court accepts all well-pleaded allegations in the Amended Complaint as true and draws all inferences in plaintiffs' favor. *Bernier v. Allen*, 38 F.4th 1145, 1149 (D.C. Cir. 2022).

Paul Rusesabagina is an internationally recognized political activist, citizen of Belgium, and resident of San Antonio, Texas. Compl. ¶ 8. As a hotel manager in Kigali, Rwanda during the 1994 Rwandan genocide, Rusesabagina offered refuge to more than 1,200 Tutsis and moderate Hutus who would otherwise have been at risk of being killed during the violence. *Id.* Rusesabagina's heroic efforts were later depicted in the 2004 film *Hotel Rwanda*. *Id.* After 1994, Rusesabagina became a prominent critic of defendant Paul Kagame, who has served as President of Rwanda since the aftermath of the 1994 genocide. *Id.* ¶ 35. Prompted by attempts against his life by Rwandan security forces, Rusesabagina moved to Belgium in 1996 and then to the United States in 2009. *Id.* ¶ 35, 46. But the Rwandan government continued to monitor Rusesabagina after he moved to the United States because of his ongoing criticism of Kagame and Rwanda. *Id.* ¶¶ 65–85. This surveillance took multiple forms, including the use of Rwandan government employees operating out of the Rwandan embassy in Washington, DC, other Rwandan law enforcement agents, undercover informants, and illegal electronic surveillance. *Id.* The Rwandan government sought the extradition of Rusesabagina from Belgium in 2019. *Id.* ¶ 128. Belgium rejected Rwanda's request. *Id.* ¶ 129–30.

The events leading to Rusesabagina's ongoing detention in Rwanda began in 2019. A Rwandan man named Constantin Niyomwungere began communicating with Rusesabagina about a potential trip to Burundi, which borders Rwanda. *Id.* ¶ 133–37. Rusesabagina had first met Niyomwungere, who identified himself as a bishop, on a 2017

trip to Belgium, and they stayed in touch after Rusesabagina returned to the United States. *See id.* Rusesabagina understood that the purpose of the trip would be to speak at churches and with civic leaders in Burundi about his experiences during the 1994 genocide. *Id.* ¶ 137. However, unbeknownst to Rusesabagina and apparently under duress, Niyomwungere was working in concert with Rwandan officials in the Rwandan Intelligence Bureau ("RIB") to lure Rusesabagina back to Rwanda. *Id.* ¶¶ 139–45. Relying on Niyomwungere's representations that he would charter a private jet from Dubai to Burundi to prevent Rwandan security officers from diverting a commercial flight to Rwanda, Rusesabagina agreed to the trip. *Id.* ¶ 144–45. He flew from his home outside San Antonio to Dubai on August 26, 2020, where he met Niyomwungere. *Id.* ¶ 146. They then boarded a private jet that Rusesabagina believed would take them to Burundi. *Id.* However, the aircraft actually transported Rusesabagina to Kigali, Rwanda. *Id.* Upon arrival, Rwandan security officers boarded the aircraft and seized Rusesabagina. *Id.* ¶ 151. He was subsequently charged with terrorism-related offenses, convicted, and sentenced to 25 years in prison. *Id.* ¶ 21. He alleges that the confessions that formed the basis for his conviction were obtained by torture while in Rwandan custody. *Id.* ¶¶ 178–79. He remains incarcerated. *Id.* ¶ 21.

The United States State Department has issued a statement condemning Rwanda in relation to these events, making a finding under the Robert Levinson Hostage Recovery and Hostage-taking Accountability Act that Rwanda "wrongfully detained U.S. Lawful Permanent Resident Paul Rusesabagina." *Id.* ¶ 211. Separately, 37 Senators and Members of Congress signed a letter to President Kagame urging Rusesabagina's immediate release

and criticizing Rwanda for "extrajudicially transferr[ing]" him from the United Arab Emirates to Rwanda. *Id.* ¶ 3. The United Nations, European Union Parliament, Human Rights Watch, and others have likewise criticized Rwanda's actions. *Id.* ¶¶ 4–5, 210.

## II.   Procedural Background

Plaintiffs initiated this suit on February 22, 2022 and filed the operative Amended Complaint on May 31, 2022. *See* Complaint [Dkt. # 1]; Am. Complaint ("Compl.") [Dkt. # 17]. Rwanda moved to dismiss on June 14, 2022, *see* Mot. of Def. the Republic of Rwanda to Dismiss the Am. Compl. ("Rwanda's Mot.") [Dkt. # 18], followed by President Kagame on July 22, 2022, *see* Mot. of His Excellency President Paul Kagame, President of the Republic of Rwanda, to Dismiss the Am. Compl. [Dkt. # 25]. Both motions have been fully briefed and are now ripe.

## LEGAL STANDARD

In resolving a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the Court should "engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case' before trial." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027–28 (D.C. Cir. 1997) (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990)). Two such limitation on that authority are the doctrines of foreign sovereign immunity, which applies to foreign sovereigns as parties, and foreign-sovereign official immunity, which applies to foreign officials including heads of state. *See Samantar v. Yousuf*, 560 U.S. 305, 313–14, 321 n.16 (2010).

4

The Foreign Sovereign Immunities Act ("FSIA") is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989). A foreign sovereign is presumptively immune from suit in a United States court unless a statutory exception under the FSIA applies. *Rosenkrantz v. Inter-American Dev. Bank,* 35 F.4th 854, 861 (D.C. Cir. 2022). Foreign heads of state are categorically immune from suit in American courts. *See Lewis v. Mutond,* 918 F.3d 142, 145 (D.C. Cir. 2019).

## DISCUSSION

Both Rwanda and President Kagame challenge the subject matter jurisdiction of the Court under some theory of foreign sovereign immunity. Because defendants' arguments, if accepted by the Court, would "provide[] protection from suit and not merely a defense to liability," the Court should "engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case' before trial." *Jungquist,* 115 F.3d at 1027–28 (quoting *Foremost-McKesson,* 905 F.2d at 449).

### I. Rwanda

As a foreign sovereign, Rwanda is immune from suit in United States courts unless plaintiffs can establish that an exception applies under the FSIA. Plaintiffs argue jurisdiction is proper under two exceptions to the general grant of immunity under the FSIA: the "commercial activity" exception, 28 U.S.C. § 1605(a)(2), and the non-commercial torts exception, *id.* § 1605(a)(5). Unfortunately, plaintiffs have failed to plead facts sufficient to establish jurisdiction over Rwanda under either theory.

The commercial activity exception to the FSIA, as its name implies, requires plaintiffs to establish that the conduct giving rise to the suit stems from "commercial activity" engaged in by the sovereign defendant. *Id.* § 1605(a)(2). The act defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). The Supreme Court has interpreted that definition to mean that an activity must be "the *type*" of activity "by which a private party engages in" trade or commerce to be considered commercial. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (emphasis in original). Moreover, the Court has held that, to fall within the scope of § 1605(a)(2), a court must find that the "particular conduct that constitutes the 'gravamen' of the suit" is commercial activity. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (quotations omitted). While the exception contains three sub-exceptions, differentiated by the relationship between the location of the underlying commercial activity and the claimed harm, none are applicable absent an allegation of commercial activity. *See* 28 U.S.C. § 1605(a)(2).

In this case, the illegal conduct plaintiffs allege giving rise to their suit does not constitute commercial activity. Rather, plaintiffs allege that Rwanda, acting both through government officials and other agents, undertook a course of conduct to spy on Rusesabagina, intimidate him and his colleagues, discredit him among the Rwandan diaspora in the United States, and, eventually, to lure him to Dubai, kidnap him, and bring him to Rwanda. But none of those activities are "the type" of activity "by which a private party engages in" trade or commerce." *Weltover*, 504 U.S. at 614. Therefore, this Court cannot establish jurisdiction under § 1605(a)(2).

Plaintiffs argue that, at a minimum, Rwanda's efforts to recruit Rusesabagina to speak at churches in Burundi through Niyomwungere constituted commercial activity. Unfortunately for plaintiffs, this argument is also unavailing. Plaintiffs do not allege that Rwanda proceeded to defraud Rusesabagina by failing to comply with the terms of the contract. Instead, they allege that Rwanda injured Rusesabagina by committing various illegal acts against him, none of which are alleged to be commercial in nature. That is insufficient to satisfy the requirements of § 1605(a)(2). Supreme Court precedent squarely holds that, "if the 'gravamen' of a lawsuit is tortious activity abroad, the suit is not 'based upon' commercial activity within the meaning of the FSIA's commercial activity exception." *Jam v. International Finance Corp.*, 139 S. Ct. 759, 772 (2019) (quoting *OBB Personenverkehr AG*, 577 U.S. at 35; *Saudi Arabia v. Nelson*, 507 U.S. 349, 356–59 (1993)). Read fairly, there is no doubt that the gravamen of plaintiffs' Amended Complaint is Rwanda's treatment of Rusesabagina, not any commercial dispute between plaintiffs and Rwanda and its agents.

Plaintiffs have also failed to plead facts on which the Court could find that Rwanda "acted 'in the manner of a private player within' the market," as they must. *Nelson*, 507 U.S. at 360 (citations and quotations omitted). Plaintiffs describe Niyomwungere as having "invited Rusesabagina to speak at churches in Burundi and with leaders there about his personal experiences in 1994." Compl. ¶ 137. Even accepting that Niyomwungere acted as Rwanda's agent and his actions can be attributed to Rwanda, Plaintiffs have not alleged the existence of a relevant market in which Rwanda participated. *See Nelson*, 507 U.S. at 360. The commercial activity exception does not apply here.

Plaintiffs also argue that this Court has jurisdiction over Rwanda because the harms alleged in the Amended Complaint fall within the non-commercial tort exception to the FSIA. *See* Pls.' Resp. to Def. The Republic of Rwanda's Mot. to Dismiss the Am. Compl. ("Pls. Opp. to Rwanda's Mot.") [Dkt. # 31] at 25. Under that exception, federal courts have jurisdiction over non-commercial[1] claims against foreign sovereigns "in which money damages are sought against a foreign state for personal injury or death ... , occurring in the United States and caused by the tortious act ... of that foreign state ...." 28 U.S.C. § 1605(a)(5). This exception applies, however, only if every element of the tort, including both the wrongful act and the resulting injury, occurred entirely in the United States. *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115 (2d Cir. 2013) ("For this exception to apply, however, the 'entire tort' must be committed in the United States."). Moreover, this exception does *not* apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused," 28 U.S.C. § 1605(a)(5)(A), or "any claim arising out of malicious prosecution, abuse of process ..., misrepresentation, [or] deceit," *id.* § 1605(a)(5)(B). Our Circuit Court has characterized "acts or omissions of a fundamentally governmental nature," including law enforcement functions, as "discretionary functions for the purposes of subsection A." *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir.) (citation omitted), *modified*, 823 F.2d 606 (D.C. Cir. 1987).

---

[1] Defined as falling outside the scope of 28 U.S.C. § 1605(a)(2). *See id.* § 1605(a)(5).

None of plaintiffs' claims against Rwanda fall within this exception. First, Count I, fraud, is the paradigmatic example of a tort "arising out of misrepresentation [or] deceit." 28 U.S.C. § 1605(a)(5)(B). As such, it is excluded from the range of alleged torts that can give rise to jurisdiction over a foreign sovereign under the FSIA. Every other claim alleged by plaintiffs occurred abroad in whole or in part and is thus barred. *See Jerez*, 775 F.3d at 424. Plaintiffs concede that every element of each alleged tort must have occurred in the United States, *see* Pls.' Opp. to Rwanda's Mot. at 25, but they failed to meet that standard as to any of their claims.

Count II, for example, alleging civil conspiracy, could only be proven by proving some elements that took place, at least in part, outside the United States. *See id.* The crux of the conspiracy was the agreement between Niyomwungere and the RIB to lure Rusesabagina from Texas to Dubai, from whence he could be tricked into flying to Rwanda. That agreement, and any acts by Niyomwungere in furtherance of that conspiracy, necessarily took place outside of the United States. In addition, a plaintiff alleging civil conspiracy must allege an agreement between the co-conspirators. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 9 (D.C. Cir. 2019) (citation omitted). If the Court were to find that Rwanda had "agreed" to participate in the alleged conspiracy, the locus of the act of agreement logically must have been in Rwanda. But § 1605(a)(5) only applies if each element of the tort occurred in the United States. Therefore, because at least one element

of the claim necessarily occurred outside the United States, this Court cannot establish jurisdiction over Rwanda. *See Jerez*, 775 F.3d at 424.[2]

Similarly, the alleged conduct underlying Counts III (solatium), IV (false imprisonment), V (assault), VI (battery), VII (intentional infliction of emotional distress), and VIII (loss of consortium) relates to allegations about actions Rwanda and its agents took, in part or in whole, *in Rwanda*. The relevant conduct underlying each count—Rwanda's seizure, detention, and alleged mistreatment of Rusesabagina—took place in Rwanda. *See* Compl. ¶¶ 236, 239, 242–43, 247–48, 252, and 257. But this Court lacks jurisdiction over Rwanda unless each element of the tort occurred in the United States. *See Jerez*, 775 F.3d at 424. Therefore, this Court lacks jurisdiction over plaintiffs' claims against Rwanda as to those causes of action.

Nor can this Court exercise jurisdiction over Count IX, alleging intrusion upon seclusion at Rusesabagina's Texas home and elsewhere. To establish their claim, plaintiffs must establish that defendants intentionally intruded upon their private affairs in a manner that would be highly offensive to a reasonable person. *See Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993) (listing elements under Texas law); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989) (describing the tort of intrusion upon seclusion under D.C. law as requiring a showing that the defendant "intentionally intrudes" upon plaintiffs' affairs) (quoting Restatement (Second) of Torts § 652B (1977)). True, plaintiffs' claims are predicated in part on conduct that took part in the United States, including, at a

---

[2] Even if the fraud claim were not barred by the plain language of the statute, the same logic also applies to bar that count as well.

minimum, various intrusions upon the privacy of Rusesabagina and other plaintiffs. *See, e.g.*, Compl. ¶¶ 113–20. But even if the qualified conduct occurred in the United States, intent is a necessary element of the tort. *See Valenzuela*, 853 S.W.2d at 513; *see also Regardie*, 553 A.2d at 1217. And, as our Circuit Court reasoned in holding that § 1605(a)(5) did not confer jurisdiction over a foreign sovereign for a claim of intrusion upon seclusion under state law, the "tortious intent aimed at [Rusesabagina] plainly lay abroad...." *Doe v. Fed. Democratic Republic of Nigeria*, 851 F.3d 7, 10 (D.C. Cir. 2017). Because Rwanda could not have committed the tort of intrusion upon seclusion without the "intent to spy," "integral aspects of the final tort lay solely abroad." *Id.* at 11. Therefore, this Court lacks jurisdiction over Count IX. *See id.*

Finally, this Court also lacks jurisdiction over Count X (violations of the Electronic Communications Privacy Act ("ECPA")), the final claim brought against Rwanda. Plaintiffs' ECPA claim, as described in the Amended Complaint, is predicated on the infection of Paul and Carine Rusesabagina's cell phones by spyware controlled by the Rwandan government while they were *in Belgium* in 2018 and 2021, respectively. Compl. ¶¶ 102–03. As described in the Amended Complaint, then, the underlying act on which the claim is predicated did not take place in the United States. *Id.* Therefore, the Court lacks jurisdiction over that count as well. *See Doe*, 851 F.3d at 10 (finding no jurisdiction over a foreign sovereign under § 1605(a)(5) in a claim under the ECPA in which the "tortious acts of computer programming" occurred outside the United States).

Because none of plaintiffs' claims against Rwanda fall within any exception to the FSIA, Rwanda is immune from suit as to all Counts. Therefore, this Court lacks subject

11

matter jurisdiction over those claims, and the Amended Complaint must be dismissed as to Rwanda.

## II.  President Kagame

All claims against President Paul Kagame must be dismissed because, as a sitting head of state, he is entitled to absolute immunity from suit in United States courts. "'A head-of-state recognized by the United States Government is absolutely immune from personal jurisdiction in United States courts,' regardless of whether the claims arise from official or private acts." *Matar v. Dichter*, 500 F.Supp.2d 284, 290 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009); *see also Lewis*, 918 F.3d at 145 (recognizing absolute immunity from suit for sitting heads of state). This form of immunity, as distinct from foreign sovereign immunity codified in the FSIA, is governed by the common law. *See Samantar*, 560 U.S. at 321 & n.15 (2010).

There is no dispute that President Kagame is a sitting head of state; plaintiffs concede as much in their Amended Complaint. *See* Compl. ¶ 30. Nor have plaintiffs identified any exception to the absolute immunity from suit that status confers. Therefore, all claims must be dismissed as to President Kagame. *See Lewis*, 918 F.3d at 145.

Plaintiffs raise two principal counterarguments. First, they argue that a court may not determine that a defendant is entitled to immunity as a sitting head of state unless the State Department files a suggestion of immunity. *See* Pls. Resp. to Def. President Paul Kagame's Mot. to Dismiss the Am. Compl. ("Pls.' Opp. to Kagame's Mot.") [Dkt. # 35] at 9–10. Second, they suggest that, even if the Court were to find that President Kagame

is a sitting head of state, the "sui generis" nature of the allegations against him justify disregarding that immunity. *Id.* at 11–12. Neither, unfortunately, is persuasive.

Plaintiffs note, correctly, that the State Department may, either at the request of a foreign sovereign or the court, file a notice of immunity to inform the court of its views with respect to the application of some form of immunity. *Id.* at 9–10; *see, e.g.*, *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997). Plaintiffs cite several out-of-circuit cases for the proposition that U.S. courts can exercise jurisdiction in a civil matter over a sitting head of state merely because the State Department failed to file such a notice of immunity. Pls. Opp. to Kagame's Mot. at 10. But even assuming that those cases correctly resolved the question of head-of-state immunity, they are of no benefit to plaintiffs here. Unlike the defendants over whom jurisdiction was established in those cases, President Kagame has been formally recognized by the United States and is the current occupant of his office. *Compare* The [CIA] World Factbook – Rwanda, § Executive Branch, https://www.cia.gov/the-world-factbook/countries/rwanda/summaries, (last visited December 15, 2022), Kagame's Mot. Exh. 1 [Dkt. # 25-1] (identifying President Paul Kagame as "chief of state") *with Noriega*, 117 F.3d at 1212 (holding that a federal court had jurisdiction over former Panamanian strongman Manuel Noriega "because the United States government never recognized Noriega as Panama's legitimate, constitutional ruler") *and In re Doe*, 860 F.2d 40, 44 (2nd Cir. 1988) (holding that whatever head-of-state immunity had previously attached to the spouse of a former head of state, that immunity was waived by the successor government). As such, plaintiffs cannot

overcome our Circuit Court's unambiguous, binding precedent that sitting heads of state are entitled to absolute immunity in United States courts. *See Lewis*, 918 F.3d at 145.

Plaintiffs next argue that the allegations against President Kagame are so heinous that the Court should disregard any immunity to which he is legally entitled. But our Circuit Court has rejected that argument as applied to torture claims brought under the Torture Victims Protection Act ("TVPA")—the most serious charges alleged by plaintiffs in this suit. *See Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C. Cir. 2013) (holding that the TVPA does not abrogate head-of-state immunity). Rather, the immunity of a sitting head of state is absolute and subject to no such balancing test. *Cf. Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 713 (2021) ("[A] State is not deprived of immunity by reason of the fact that it is accused of serious violations of international human rights law.") (citation omitted). Plaintiffs cite no legal authority for the proposition that the Court could fashion an exception to this categorical rule.

President Kagame, a sitting head of state, is entitled to absolute immunity from suit in United States courts. The Court therefore grants his motion to dismiss in full.

## CONCLUSION

President Kagame is categorically immune from suit in United States courts as a sitting head of state. As for plaintiffs' claims against Rwanda, they do not fall within any exception to the FSIA that would permit this Court to establish jurisdiction over that foreign sovereign. I will accordingly **GRANT** Rwanda's [Dkt. # 18] and President

Kagame's [Dkt. # 25] motions to dismiss. An Order consistent with this Memorandum Opinion will issue on this date.

/s/ Richard J. Leon
RICHARD J. LEON
United States District Judge