## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PAUL RUSESABAGINA**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| v. | ) | **Civil Case No. 22-469 (RJL)** |
| | ) | |
| **THE REPUBLIC OF RWANDA**, *et al.*, | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

## MEMORANDUM OPINION
March 16, 2023 [Dkt. # 29]

Plaintiffs Paul Rusesabagina ("Rusesabagina"), his wife, and his six children (collectively, "plaintiffs") have sued the Republic of Rwanda, its President, Paul Kagame, and Rwandan officials Johnston Busingye, Joseph Nzabamwita and Jeannot Ruhunga (collectively, "Officials") for harms stemming from Rusesabagina's alleged kidnapping, torture, and detention. Now before the Court is the Officials' motion to dismiss. While the Officials lack immunity and this court may exercise jurisdiction over them, some of plaintiffs' claims nonetheless are precluded by the act of state doctrine. As such, I will **GRANT in part** and **DENY in part** the Officials' [Dkt. # 29] motion.

## BACKGROUND

### I.    Factual Background

The factual background underlying this case was described in detail in this Court's previous opinion granting the motion to dismiss filed by Rwanda and President Paul

Kagame. *See Rusesabagina v. Rwanda*, --- F. Supp. 3d ----, Civ. No. 22-469, 2023 WL 355951, at \*1–2 (D.D.C. Jan. 23, 2023). The Court will therefore limit its recitation of facts to those necessary to resolve the pending motion. Except where otherwise noted, the recitation of facts is drawn from the Amended Complaint. *See* Am. Compl. ("Compl.") [Dkt. #17]. As always, in resolving a motion to dismiss, the Court accepts all well-pleaded allegations in the Amended Complaint as true and draws all inferences in plaintiffs' favor. *Bernier v. Allen*, 38 F.4th 1145, 1149 (D.C. Cir. 2022).

As this Court previously noted, plaintiffs allege that the Rwandan Officials engaged in a wide-ranging conspiracy to surveil, kidnap, and ultimately imprison plaintiff Paul Rusesabagina in Rwanda. *See Rusesabagina*, 2023 WL 355951, at \*1–2. Plaintiffs allege that two critical elements of the scheme were carried out while Rusesabagina, a United States lawful permanent resident living in San Antonio, Texas, was physically present in the United States. *See* Am. Compl. ¶¶ 93–95, 103, 133–46. First, plaintiffs allege that agents of the Rwandan government illegally surveilled Rusesabagina and his daughter while in the United States using spyware illegally planted on their telephones. *Id.* ¶¶ 102– 05. No later than 2018, Rwandan intelligence agents acting in furtherance of the conspiracy allegedly infected Rusesabagina's Belgian cell phone with Pegasus, a form of spyware, while he was in Belgium. *Id.* ¶ 103. Rusesabagina continued to use that cell phone when he returned to the United States to communicate by voice and text message. *Id.*

Second, plaintiffs allege that a Rwandan bishop named Constantin Niyomungere ("Niyomwungere"), acting in furtherance of the conspiracy and at the direction of the

2

Officials, fraudulently induced Rusesabagina to travel from the United States to Burundi via the United Arab Emirates in August 2020.  Am. Compl. ¶¶ 133–46.  Specifically, Niyomwungere invited Rusesabagina to travel to Burundi to speak to church groups and civil society leaders about his experiences during the 1994 Rwandan genocide.  *Id.* ¶ 137. Plaintiffs do not have access to Rusesabagina's cell phone records because his phone was seized by defendants and remains in their possession, *id.* ¶ 139, but plaintiffs assert that these plans were in place by early February 2020, *id.* ¶ 136.

Shortly thereafter, Niyomwungere was arrested by the Rwandan Intelligence Bureau ("RIB") on February 27, 2020.  *Id.* ¶ 141.  Under threat of prosecution, he was compelled to cooperate with the RIB by "coordinating with RIB to bring about the kidnapping."  *Id.* ¶ 142.  Over the course of the next few months, Niyomwungere, acting at the direction of the RIB, convinced Rusesabagina to fly to Dubai via commercial carrier and then to board a privately chartered airplane that would take Rusesabagina to Burundi. *Id.* ¶¶ 143–46.  Niyomwungere offered to charter a private plane specifically to assuage Rusesabagina's concerns that a commercial airliner flying to Burundi could be forced to divert to Rwanda.  *Id.* ¶ 145.  In fact, that is exactly what Niyomwungere and his coconspirators intended to do.  *See id.* ¶¶ 146–47.  In the event, the Rwandan government chartered a private aircraft for Niyomwungere and Rusesabagina's flight, *id.* ¶ 152, and the aircraft took Rusesabagina to Rwanda against his will, *id.* ¶ 150.

Finally, plaintiffs have made specific allegations about the involvement of each Official in the broader conspiracy to surveil and kidnap Rusesabagina.  General Joseph Nzabamwita, the head of Rwanda's National Intelligence and Security Services, allegedly

admitted that he "executed" the plot to kidnap Rusesabagina "from the planning to the full execution, when he landed in Kigali." *Id.* ¶ 160.  Similarly, Johnston Busingye, the former Minister of Justice, allegedly admitted his involvement in the plan to pay for the private aircraft used to kidnap Rusesabagina. *Id.* ¶ 167.  And Colonel Jeannot Ruhunga both heads the RIB, which allegedly planned and executed the scheme, and was personally involved in its oversight. *Id.* ¶ 168.

## II.    Procedural Background

Plaintiffs initiated this suit on February 22, 2022 and filed the operative Amended Complaint on May 31, 2022. *See* Complaint [Dkt. # 1]; Am. Compl.  The Officials jointly moved to dismiss on July 26, 2022.  *See* Mot. of Defs. Johnston Busingye, Joseph Nzabamwita, and Jeannot Ruhunga, High Gov't Officials (Collectively, the "Officials") of the Republic of Rwanda ("Rwanda"), to Dismiss the Am. Compl. ("Officials' Mot.") [Dkt. # 29].[1]  The motion has been fully briefed and is now ripe.

## LEGAL STANDARD

In resolving a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the Court should "engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case' before trial." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027–28 (D.C. Cir. 1997) (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990)).  Foreign

---

[1] This Court previously granted motions to dismiss filed by Rwanda and President Paul Kagame. *See generally Rusesabagina*, 2023 WL 355951.

diplomats and certain other foreign officials are immune from civil process in United States courts. *See Lewis v. Mutond*, 918 F.3d 142, 145–46 (D.C. Cir. 2019).

In resolving a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of 'establishing a factual basis for the exercise of personal jurisdiction' over each defendant." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F.Supp.3d 15, 20 (D.D.C. 2017) (Moss, J.) (quoting *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)), *aff'd*, No. 17-7033, 2018 WL 4440459 (D.C. Cir. July 17, 2018). "When ruling on a 12(b)(2) motion, the court 'may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts.'" *Doe 1 v. Buratai*, 318 F.Supp.3d 218, 226 (D.D.C. 2018) (Friedrich, J.) (quoting *Triple Up Ltd.*, 235 F.Supp.3d at 20).

Finally, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In resolving a motion to dismiss, the court accepts as true all well-pleaded allegations in the amended complaint and draws all reasonable factual inferences in favor of the plaintiff. *Bernier*, 38 F.4th at 1149. However, if an element of a plaintiff's claim requires a determination that an official act of a foreign state in that foreign state's territory was illegal, then the court must dismiss that claim as a matter of law under the act of state doctrine. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 439 (1964).

## DISCUSSION

The Officials argue that they are immune from suit, challenge the exercise of personal jurisdiction, and raise a variety of merits defenses.  The Court will address each in turn.

## I.        Foreign-Sovereign Official Immunity

The Officials argue that they are immune from suit under the foreign-sovereign official immunity doctrine.  *See* Officials' Mot. to Dismiss at 7.  Because their argument, if accepted by the Court, would "provide[] protection from suit and not merely a defense to liability," the Court should "engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case' before trial."[2]  *Jungquist*, 115 F.3d at 1027–28 (quoting *Foremost-McKesson*, 905 F.2d at 449).  Courts recognize two forms of this immunity: status-based immunity and conduct-based immunity.  The Officials argue both apply.  Officials' Mot. to Dismiss . at 9–19.  Neither does!

Status-based immunity "is reserved for diplomats and heads of state and attaches 'regardless of the substance of the claim.'"  *Lewis*, 918 F.3d at 145 (quotation omitted).  "Diplomatic immunity is governed by the Vienna Convention on Diplomatic Relations."  *Muthana v. Pompeo*, 985 F.3d 893, 903 (D.C. Cir. 2021); *see also* Vienna Convention on Diplomatic Relations, Apr. 23, 1961, 23 U.S.T. 3227 (the "Vienna Convention").

---

[2] The Officials do not contest this Court's jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331.  Plaintiffs' state-law claims arise from the same events and are so closely intertwined as to be part of the same controversy, so jurisdiction over those claims is also proper.  *Id.* § 1367(a).

Diplomatic immunity extends only to persons "entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations," an international treaty to which the United States is a party. 22 U.S.C. § 254d. The Vienna Convention, in turn, provides that a "diplomatic agent shall enjoy immunity from the criminal jurisdiction *of the receiving State*. He shall also enjoy immunity from *its* civil and administrative jurisdiction ...." Vienna Convention, Art. 31(1) (emphasis added). By its express terms, Article 31 protects only those diplomats who have been *received* by the state that might exercise jurisdiction. In contrast, a "third state"—i.e. a state other than a diplomat's home country or the country to which she has been posted—is only bound to extend immunity to the official in limited circumstances. *See id.* Art. 40. The Convention does not extend any form of immunity to a diplomat who is neither posted to nor compelled to be physically present in a State that would exercise jurisdiction. *See generally id.*

Turning to the facts at hand, none of the three Officials are entitled to status-based immunity. Two—Brigadier General Joseph Nzabamwita and Colonel Jeannot Ruhunga— are neither diplomats nor heads of state: Nzabamwita is the Secretary General of the Rwandan National Intelligence and Security Services and Ruhunga oversees the RIB. Am. Compl. ¶ 32–33. Accordingly, neither is entitled to status-based immunity under any theory. *See Lewis*, 918 F.3d at 145.

Unfortunately for Busingye, while he is a diplomat, he is not entitled to immunity in a United States court. Busingye is currently posted as High Commissioner to the United Kingdom, Non Resident Ambassador to Ireland, and Non Resident High Commissioner to Malta. Officials' Mot. to Dismiss at 2. As such, while Busingye falls within the category

of persons to whom status-based immunity *can* attach, immunity from suit in court in the United States extends only to those diplomats posted to the United States itself, or physically present in this country for certain reasons not applicable here. *See* 22 U.S.C. § 254; Vienna Convention Art. 31(1). Were Busingye to be posted to the United States, a different outcome would result. But he is not, so he is not entitled to such immunity.

The Officials also argue that they are entitled to conduct-based immunity. To resolve whether a particular foreign official is entitled to conduct-based immunity, courts apply a two-step procedure. *Lewis*, 918 F.3d at 145–46 (citing *Samantar*, 560 U.S. at 311–12). At the first step, the foreign official requests a "suggestion of immunity" from the State Department. *Id.* at 145. If the State Department notifies the district court that the officials are immune, that determination is binding on the judiciary and the district court must dismiss the suit. *Id.* But if the State Department does not file such a notice, as is the case here, the district court itself resolves the question of immunity itself. *Id.* at 145-46.

The parties agree that the Court should apply the three-part test outlined in the Second Restatement of Foreign Relations law to determine if immunity applies. *See* Officials' Mot. at 8-9; Pls' Resp. to Defs. Johnston Busingye's, Joseph Nzabamwita's, and Jeannot Ruhunga's Motion to Dismiss the Am. Compl. ("Pls.' Opp. to Officials' Mot.") [Dkt. # 34] at 15 n.6. Neither the Supreme Court, nor our Circuit Court, has resolved whether the Restatement "correctly sets out the scope of the common-law immunity applicable to current or former foreign officials." *Lewis*, 918 F.3d at 146 (quoting *Samantar*, 560 U.S. at 321 n.15). But given that the parties in this case agree that it correctly describes the law, the Court adopts that test to resolve that question in this case.

8

*See id.* ("Here, however, both parties assume § 66 accurately sets out the scope of common-law immunity for current or former officials, [] and we therefore proceed on that understanding without deciding the issue.").

Under the Restatement test, a foreign official is entitled to conduct-based immunity if: (1) he is a "public minister, official, or agent" of the foreign state; (2) the acts underlying the suit were "performed in his official capacity"; and (3) "the effect of exercising jurisdiction would be to enforce a rule of law against the state." Restatement (Second) of Foreign Relations Law ("Restatement") § 66(f). An official must establish all three elements to establish immunity. *Lewis*, 918 F.3d at 146. A decision would have the effect of "enforc[ing] a rule of law against the state" if the judgment against an official "would bind (or be enforceable against) the foreign state." *Id.*

The Officials here cannot meet their burden of showing that a decision against them would enforce a rule against the state because a decision against any Official would only be binding on that person, not on Rwanda itself. Defendants have not shown that plaintiffs "seek[] to draw on [Rwanda]'s treasury or force the state to take specific action, as would be the case if the judgment were enforceable against the state." *Id.* at 147. Instead, each Official is sued only in his individual capacity. Pls.' Opp. to Officials' Mot. at 15; *see also Lewis*, 918 F.3d at 147. Because this is fatal to the Officials' conduct-based immunity argument, the Court need not resolve the Parties' dispute whether the challenged conduct was performed in an "official capacity." *See Lewis*, 918 F.3d at 147. As such, no form of immunity applies.

## II.     Personal Jurisdiction

The Officials also move to dismiss under Rule 12(b)(2), arguing that they are not subject to the personal jurisdiction of this Court.  Plaintiffs, in turn, argue that the Officials are subject to jurisdiction in the District of Columbia under Rule 4(k)(1), or, in the alternative, that jurisdiction is proper because the Officials have sufficient minimum contacts with the United States to render jurisdiction proper despite not being subject to personal jurisdiction in the courts of general jurisdiction of any state under Rule 4(k)(2). This Court has jurisdiction over the Officials under the latter theory.

### A. Service of Process

To establish personal jurisdiction under either provision of Rule 4(k), plaintiffs must show that they have effectuated service on the Officials.  *See* Fed. R. Civ. P. 4(k)(1), (k)(2); *Mwani v. Bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005).  Contesting sufficiency of service, the Officials argue that plaintiffs failed to comply with the provisions of Rule 4 because certified mail does not suffice under Rwandan law and the Officials did not actually receive the summons and Amended Complaint.  Both arguments fail.

Rule 4 authorizes service on an individual in a foreign country by means "authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1).  Article 10(a) of the Hague Convention, in turn, authorizes service "by postal channels." Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters art. 10(a), Nov. 15, 1965, 658 U.N.T.S. 163.  Courts that have considered the issue have held that service by means of mail or commercial carrier on individual defendants located in the United Kingdom, a party

to the Hague Convention, is proper. *See, e.g.*, *Birmingham v. Doe*, 593 F. Supp. 3d 1151, 1159–60 (S.D. Fla. 2022). Alternatively, service of process of a defendant in a foreign country that is not party to the Hague Convention or a similar regime—like Rwanda—is sufficient if it is made "using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt" as long as that method "is not prohibited by the foreign country's law." Fed. R. Civ. P. 4(f)(2)(C), (C)(ii).

In this case, all three Officials were properly served. The summons and Amended Complaint were received and signed for at defendant Ruhunga's Rwanda office on July 5, 2022, and at defendant Nzabamwita's office on July 6, 2022. While neither Official personally signed for the documents, that is unnecessary. Rule 4 permits plaintiffs to prove service "by other evidence satisfying the court that the summons and complaint were delivered to the addressee." Fed. R. Civ. P. 4(*l*)(2)(B). Plaintiffs have provided affidavits and FedEx tracking documents showing that the Amended Complaint and summons were "delivered to" Ruhunga and Nzabamwita at their places of work. *See* Aff. Of Service of Def. Joseph Nzabamwita, Decl. of Tracey Chappell, Ex. 1, Ex. 2 [Dkt. # 27-1]; Aff. Of Service of Def. Jeannot Ruhunga, Decl. of Tracy Chappell, Ex. 1, Ex. 2 [Dkt. # 28-1]. Further, the Officials' argument notwithstanding, plaintiffs have met their burden of establishing that service by mail is not "prohibited by [Rwandan] law." Plaintiffs have provided the Court sworn affidavits from two experts on Rwandan law for the proposition that service by mail is not prohibited by Rwandan law. *See* Pls. Opp. to Officials' Mot. Ex. 4, Decl. of Remy Niyibizi ("Niyibizi Decl.") 2–3; *id.* Ex. 5, Decl. of I. Edwards ("Edwards Decl.") 2–4 [Dkt. # 34-5]. Plaintiffs have satisfied Rule 4's requirements.

As for defendant Busingye, plaintiffs effectuated service upon him at his London place of business on June 30, 2022, via international priority mail.  Service of process by international priority mail on a person in the United Kingdom is sufficient to satisfy the requirements of Rule 4.  *See* Fed. R. Civ. P. 4(f)(1); *Birmingham*, 593 F. Supp. 3d at 1159–60.  The summons and Amended Complaint were returned to plaintiffs' counsel, with the envelope having been opened and resealed with scotch tape, Busingye's address crossed out in black ink, and the words "send away" written on the address label with an arrow pointing to plaintiffs' counsel's address.  *See* Aff. of Service of Process of Def. Johnston Busingye ("Jacque Aff.") [Dkt. # 33].  The Court credits the affidavit submitted by plaintiffs' counsel stating that the individual who sealed the envelope did not use scotch tape to do so.  *Id.* ¶ 12.  The logical inference is that Busingye (or his agent) received the documents, opened the envelope, viewed the contents, and only then directed them to be returned to the sender.  This is insufficient to avoid service.  As my former colleague Judge Roberts found in another case, service of process requires "actual notice" and "a good faith effort to serve the defendant pursuant to the federal rule."  *Ali v. Mid-Atlantic Settlement Servs.*, 233 F.R.D. 32, 36 (D.D.C. 2006) (Roberts, J.).  "Good faith efforts at service are effective particularly where the defendant has engaged in evasion, deception, or trickery to avoid being served."  *Id.*  Plaintiffs have complied with the requirements of Rule 4 in good faith.  Busingye's artful attempts to evade service are unavailing.

All three Officials were properly served.  Thus, the Court must resolve whether plaintiffs have otherwise alleged sufficient facts to establish personal jurisdiction.

### B. Rule 4(k)(1)

Rule 4(k)(1) allows a federal district court to establish personal jurisdiction over a defendant if the defendant would be subject to the jurisdiction of a state court of general jurisdiction in the judicial district in which the federal court sits. Fed. R. Civ. P. 4(k)(1)(A). Specific jurisdiction comports with due process where there are "(1) minimum contacts demonstrating that the defendant purposefully availed itself of the forum; (2) relatedness between the contacts and the claim"; and (3) the exercise of jurisdiction otherwise "compli[es] with 'fair play and substantial justice.'" *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 233 (D.C. Cir. 2022). The Washington, D.C., long-arm statute grants personal jurisdiction over claims arising from a defendant's "transacting any business in the District of Columbia," whether in person or by an agent. D.C. Code § 13-423(a)(1). The longarm statute's reach under this provision is coextensive with the limits set by the Due Process Clause. *Forras v. Rauf*, 812 F.3d 1102, 1106 (D.C. Cir. 2014) (quotations omitted). Furthermore, a court may assert jurisdiction over defendants outside the forum based on a co-conspirator's case-related contacts with the forum if the plaintiff pleads "with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy." *Jungquist*, 115 F.3d at 1031 (quotations omitted).

Plaintiffs have not satisfied their burden under Rule 4(k)(1). The Amended Complaint alleges facts which, taken as true, establish the existence of a conspiracy to spy on Rusesabagina while in his Texas home, lure him abroad, kidnap him, and forcibly bring him to Rwanda where he was tortured and imprisoned. Moreover, the Amended Complaint adequately alleges the central role played by the RIB and its top leadership, including the

Officials, in that conspiracy.  However, plaintiffs did not plead specific acts within the District of Columbia that would give a court of general jurisdiction in the District of Columbia jurisdiction over the Officials.  Instead, plaintiffs rely on the inference that Rwanda's ambassador and other embassy staff, who are not named as parties, took certain unspecified actions to "coordinate" or "direct" the actions of other agents of the Rwandan government, operating elsewhere within the United States, to harass or surveil Rusesabagina.[3]  The claimed harmful conduct itself occurred outside the District of Columbia.  The only nexus to the District alleged in the Amended Complaint is that certain activities of the conspiracy were coordinated through the Rwandan Embassy, which is physically located in the District of Columbia.  *See* Am. Compl. ¶¶ 85, 105, 122–26.  These allegations are insufficient to establish the requisite minimum contacts necessary to establish personal jurisdiction.  *See Iqbal*, 556 U.S. at 678.

## C. Rule 4(k)(2)

Unfortunately for the Officials, however, they are still subject nonetheless to this Court's jurisdiction under Rule 4(k)(2).  Rule 4(k)(2) "is essentially a federal long-arm statute." *Atchley.*, 22 F.4th at 231.  The rule permits a federal court to establish personal jurisdiction over a foreign defendant for "(1) claims arising under federal law (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single

---

[3] To the extent that plaintiffs' amended complaint can be read to allege specific acts, they must be read as acts "[falling] within [the] official duties" of the Rwandan diplomats working at the Rwandan Embassy in Washington, D.C. *Jungquist*, 115 F.3d 1031. Our Circuit Court has held that this Court cannot establish personal jurisdiction over defendants outside the forum in cases in which the only nexus with the District is official acts of embassy-based personnel. *Id.*

state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani*, 417 F.3d at 10. "Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Id.* at 11 (citations omitted). That, in turn, requires a court find "(1) minimum contacts demonstrating that the defendant purposefully availed itself of the forum; (2) relatedness between the contacts and the claim; and (3) compliance with "fair play and substantial justice." *Atchley*, 22 F.4th at 233.

Plaintiffs' Amended Complaint does satisfy these requirements!  Plaintiffs bring multiple claims under federal law, including alleged violations of the Electronic Communications Privacy Act, Torture Victim Protection Act, and Alien Tort Statute. *See generally* Am. Compl.  They have perfected service upon each Official.  And the Officials have declined to identify any state court of general jurisdiction in which they would consent to personal jurisdiction.  Under our Circuit Court's precedent, that is sufficient for plaintiffs to establish that the Officials are not subject to suit in any single state court. *Mwani*, 417 F.3d at 11.  The critical question, then, is whether "the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Id.* at 10.  Put differently, plaintiffs must allege sufficient minimum contacts between the Officials and the United States, as a whole; that their claims arise from those contacts; and that the exercise of personal jurisdiction would be consistent with norms of "fair play and substantial justice." *Atchley*, 22 F.4th at 233.  Plaintiffs have met their burden here.  How so?

15

As to *Atchley*'s first prong, plaintiffs have alleged two critical, related contacts between the Officials or their co-conspirators and the United States.  First, they allege that the conspirators monitored Rusesabagina's communications on his Belgian cell phone using spyware while Rusesabagina was in Texas.  Am. Compl. ¶¶ 103–04.  Second, they allege that the conspirators defrauded Rusesabagina by making "false statements … describing non-existent speaking opportunities with false promises of pay and employment in Burundi."  *Id.* ¶ 224.  The purpose of those false statements was to lure Rusesabagina out of the United States and onto a private aircraft so that he could be brought to Rwanda against his will.  *Id.*  Rusesabagina was physically in the United States when those statements were made.  *Id.*  Moreover, the timing of Niyomwungere's arrest by the RIB supports the logical inference that that he was targeted by Rwandan security services *because* its agents became aware that he was coordinating a possible trip to Burundi with Rusesabagina.  Specifically, the amended complaint alleges that Rusesabagina and Niyomwungere began to firm up the specifics of the travel plans in early 2020.  *See id.* ¶ 136.  Within a matter of weeks, the RIB arrested Niyomwungere and accused him of conspiring with Rusesabagina.  *Id.* ¶ 140–43.  Niyomwungere, threatened with prosecution himself, agreed to help the Rwandan government by convincing Rusesabagina to travel to a location where he would be susceptible to kidnapping.  *Id.* ¶ 143.

According to the amended complaint, at the time these events transpired, the RIB had access to Rusesabagina's communications on his Belgian cell phone.  *Id.* ¶ 103.  Rusesabagina used that phone to communicate "with those who only had the phone number of his Belgian cellphone."  *Id.*  And Rusesabagina met Niyomwungere in Belgium in 2017.

16

*Id.* ¶ 133. The logical inference is that the conspirators became aware of Niyomwungere by intercepting communications between the two men using Rusesabagina's telephone. The RIB then exploited that knowledge by forcing Niyomwungere to lure Rusesabagina from his safe haven in the United States through a series of false representations about the planned Burundi trip.

These allegations satisfy the first two prongs laid out in *Atchley*. First, plaintiffs have alleged sufficient facts to establish two critical contacts between the conspirators and the United States: (1) the illegal monitoring of Rusesabagina's phone over a period of at least a year and (2) fraudulent statements relating the proposed Burundi trip. *See* Restatement (First) of Conflict of Laws § 377, Note 4 (1934) ("When a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."). Those are sufficient minimum contacts. *See Atchley*, 22 F.4th at 233. Moreover, Rusesabagina's alleged harms flow directly from the Officials' surveillance of him and their alleged exploitation of the information gleaned from that spying to lure him to Dubai where he could be kidnapped. Am. Compl. ¶¶ 103, 133–46.

Finally, the exercise of jurisdiction over the Officials would comport with "fair play and substantial justice." *Atchley*, 22 F.4th at 233. Applying the four-part test established by the Supreme Court in *Burger King Corp. v. Rudzewicz*, the Court finds that the burden on the Officials, while significant, does not outweigh the United States' interest in adjudicating this case, plaintiffs' interest in convenient and effective relief, and the judicial system's interest in the efficient resolution of plaintiffs' claims. 471 U.S. at 477; *see also Atchley*, 22 F.4th at 234. First, the Amended Complaint alleges the existence and operation

of a conspiracy operating in part within the United States targeting a United States resident. The Officials argue that the forum—the entire United States for purposes of Rule 4(k)(2)— lacks any interest in resolving the case. This position is predicated on their argument that they have had no contacts with the United States relevant to plaintiffs' claims. Having rejected the latter proposition, the Court now rejects the former as well. Second, plaintiffs have a clear interest in litigating in this forum. Of the eight named plaintiffs, two are American citizens and four others, including Paul Rusesabagina, are lawful permanent residents of the United States. Moreover, one plaintiff, Rusesabagina's daughter Anaïse Umubyeyi Kanimba, lives in Washington, D.C., *see* Compl. ¶ 19, and plaintiffs' choice to bring this lawsuit in this district signals their interest in litigating here. As such, plaintiffs have alleged sufficient interest in litigating in this forum. Third, the judicial system maintains a strong interest in the efficient resolution of a complaint, brought by a combination of U.S. residents and citizens, alleging criminal conduct directed at the United States for the purpose of kidnapping and mistreating a resident of the United States.

While Rule 4(k)(2) only establishes personal jurisdiction over the Officials with respect to claims under federal law, the Court may also exercise personal jurisdiction over the Officials in resolving the related state-law claims under the doctrine of pendent jurisdiction. The doctrine of pendent jurisdiction allows a plaintiff in federal court to "obtain personal jurisdiction over the defendant with respect to any of his claims that arose out of the same core of operative fact" giving rise to the underlying federal claims. *Oetiker v. Jurid Werke, G. m. b. H.*, 556 F.2d 1, 4 (D.C. Cir. 1977) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). In this case, plaintiffs' state law claims all arise from

the same "core of operative fact" on which the federal claims are based. *See generally* Compl. Therefore, the Court can exercise personal jurisdiction over the Officials as to those claims.

### III.   Merits Analysis

The Officials, adopting Rwanda's brief, next challenge the sufficiency of plaintiffs' claims. The Officials both invoke the act of state doctrine and argue that plaintiffs have failed to make out a claim as to each count. *See* Officials' Mot. at 33; Rwanda's Mot. at 25–28. I will therefore proceed in two steps; first assessing the applicability, if any, of the act of state doctrine to plaintiffs' claims, and then resolving the Officials' challenges to any surviving claims on the merits.

#### A. Act of State Doctrine

The Officials move to dismiss plaintiffs' Amended Complaint on the grounds that the act of state doctrine bars plaintiffs' claims. While it does bar some, it does not bar all of their claims.

The act of state doctrine prohibits U.S. courts from "declar[ing] invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Env'tl Tectonics Corp., Int'l.*, 493 U.S. 400, 405 (1990). "The doctrine reflects the prudential concern that the courts, if they question the validity of sovereign acts taken by foreign states, may be interfering with the conduct of American foreign policy by the Executive and Congress." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) (citing *W.S. Kirkpatrick*, 493 U.S. at 404). In cases in which it applies, the

act of state doctrine does not divest district courts of jurisdiction over a particular category of claims, but it does establish a rule of decision that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick., 493 U.S. at 409.* The act of state doctrine may apply "when the outcome turns upon the legality or illegality … of official action by a foreign sovereign performed within its own territory." *Riggs Nat'l Corp. & Subsidiaries v. Comm'r,* 163 F.3d 1363, 1367 (D.C.Cir.1999); *see also W.S. Kirkpatrick,* 493 U.S. at 406. The party invoking the act of state doctrine bears the burden of proving its applicability. *See Agudas Chasidei Chabad of United States v. Russian Federation,* 528 F.3d.934, 951 (D.C. Cir. 2008).

If the doctrine is invoked, courts must first resolve the threshold question whether a foreign sovereign has in fact taken "an official act" within its territory. Courts then consider three principal factors in assessing whether the act of state doctrine applies: (1) whether consensus exists as to the particular question of international law at issue; (2) the degree to which the contested issue implicates the United States' foreign relations; and (3) whether the government that carried out the challenged act is still in power. *See Sabbatino,* 376 U.S. at 427–28; *see also Doe v. State of Israel,* 400 F. Supp. 2d 86, 113 (D.D.C. 2005) (Bates, J.). If the act of state doctrine applies, the "act within its own boundaries of one Sovereign state … becomes … a rule of decision for the courts of this country." *W.S. Kirkpatrick & Co.,* 493 U.S. at 406 (quotations and citations omitted). However, "[t]he act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the

process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id.* at 409.

Adopting Rwanda's brief, the Officials argue that the act of state doctrine applies to all Counts. However, for the reasons that follow, the Court finds that the doctrine applies only as to Counts III (solatium), IV (false imprisonment), V (assault), VI (battery), VII (intentional infliction of emotional distress), and VIII (loss of consortium).

Counts III–VIII, all common-law claims, contest the legality of Rwanda's imprisonment of Rusesabagina and his treatment by his Rwandan captors, in Rwanda. The first question is whether the challenged conduct was "official conduct" of the Rwandan government. It was. Plaintiffs challenge the acts of Rwandan law enforcement officers who arrested, charged, detained, and allegedly mistreated Rusesabagina while he was in Rwandan custody in a Rwandan prison. The fact that those alleged acts were reprehensible does not mean that they were not "official action[s]" of the Rwandan Government. *See Doe*, 400 F. Supp. 2d at 114 (finding that the act of state doctrine may apply even to allegations of *jus cogens* norms); *cf. Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) ("A foreign state's exercise of the power of its police [,] ... however monstrous such abuse undoubtedly may be, ... [is] peculiarly sovereign in nature.").

The Court next applies the three-factor test derived from *Banco Nacional de Cuba v. Sabbatino* to resolve whether those official acts are subject to the act of state doctrine. They are. Plaintiffs easily satisfy the first prong of the test. The Officials do not contest that the illegality of torture and illegal detention are well-established under international law. Indeed, the prohibition of torture is a paradigmatic example of *jus cogens*, defined by

our Circuit Court as "peremptory norms [that] are nonderogable and enjoy the highest status within international law." *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 940, 942 (D.C. Cir. 1988).

As to the second prong, the U.S. Government, via the State Department, has already taken a position on this issue, finding that Rwanda has "wrongfully detained" Rusesabagina and transferring responsibility for overseeing his case to the Special Presidential Envoy for Hostage Affairs. *See* Pls. Resp. to Rwanda, Ex. A, Letter from Roger D. Carstens, Special Presidential Envoy for Hostage Affairs, May 6, 2022 [Dkt. # 31-1]. That finding requires a determination by the Secretary of State that, "based on the totality of the circumstances, there is credible information that the detention of a United States national abroad is unlawful or wrongful." Plaintiffs argue that this resolves the question in their favor. 22 U.S.C. § 1741(b). However, "[t]he dangers of [hearing the case] are present regardless of whether the State Department has, as it did in this case, asserted that the relevant act violated international law." *Sabbatino*, 376 U.S. at 432. Indeed, subsequent public statements by the Department of State suggest that diplomatic efforts are ongoing. *See* 22 U.S.C. § 1741a; Letter from Roger Carstens, Pls. Opp. to Rwanda's Mot., Ex. A. The Court is reluctant to insert itself into those negotiations. This factor, then, favors the Officials' position.

As to the third prong, the fact that the same Rwandan government that allegedly harmed Rusesabagina is still in power weighs heavily against plaintiffs, because it tends to increase the likelihood that judicial involvement would implicate those ongoing diplomatic efforts. *See, e.g.*, *Warfaa v. Ali*, 33 F. Supp. 3d 653, 662 (E.D.Va. 2014) (noting that the

fact that the regime alleged to have harmed the plaintiff was no longer in power lessened

the likelihood that allowing the suit would "give rise to any new hostilities or political

tensions").  In light of the totality of the circumstances, the Court finds that the act of state

doctrine properly applies to Counts III–VIII, which cannot be resolved in plaintiffs' favor

without a finding that official acts taken by Rwanda in its own territory were unlawful.

Because application of the doctrine precludes plaintiffs from establishing a necessary

element of those counts, they must be dismissed.

The act of state doctrine, of course, applies only to those official acts taken *in

Rwanda*.  However, plaintiffs have also alleged that the Officials committed, directed

others to commit, or conspired to commit various other illegal acts *outside* Rwanda.  These

include false statements to lure Rusesabagina from his Texas home to Dubai (Count I), acts

in furtherance of a civil conspiracy that occurred, at least in part, in Dubai (Count II), and

illegally intercepting plaintiffs' electronic communications in the United States and

elsewhere (Counts IX and X).  Because plaintiffs could prevail on those claims without the

Court finding that an official act of the Rwandan government, in Rwanda, was illegal, the

act of state doctrine does not bar those claims.  Nor does the Court find that the act of state

doctrine bars plaintiffs' claims against the Officials under the TVPA (Count XI) or ATS

(Counts XI and XIII).  How so?

First, while Rwanda raised the act of state doctrine in its motion to dismiss, those

counts were not brought against Rwanda, so Rwanda did not raise the act of state doctrine

with respect to those claims.  *See* Rwanda's Mot. to Dismiss at 25–28.  Nor did the Officials

raise the act of state doctrine in their own pleading other than by a general incorporation of

Rwanda's motion. *See* Officials' Mot. to Dismiss at 33. As the party invoking the doctrine, the burden is on the Officials to show that it applies. *See Agudas*, 528 F.3d at 951. But the Officials here have advanced no argument that resolving these statutory claims in plaintiffs' favor would require finding that an official act done by Rwandan officials in Rwandan territory was unlawful.

Even if Rwanda and the Officials' motions were read to encompass those claims, the Officials' argument still fails. Count XII alleges that the Officials violated the prohibition on enforced disappearances under international law. But resolving plaintiffs' claim would not require a finding that Rwandan agents acted illegally in Rwanda; the tortious act occurred when the Officials, working with Niyomwungere, caused Rusesabagina to be kidnapped while aboard a private jet from Dubai to Burundi and diverted the aircraft. Because the tort occurred before the aircraft arrived in Rwanda, the act of state doctrine does not bar plaintiffs' claim. Similarly, Count XIII, plaintiffs' other claim under the ATS, alleges that the Officials violated the well-settled prohibition against a sovereign state exercising its enforcement jurisdiction in the territory of another sovereign state. *See* Am. Compl. ¶ 300. As with Count XII, the relevant underlying conduct relevant to Count XIII—specifically fraudulently inducing Rusesabagina to leave the United States and then seizing him—occurred outside Rwanda. By definition, the tortious violation of the enforcement jurisdiction of another sovereign can only occur outside the territory of the state whose official is accused of such conduct. As such, neither Count XII nor Count XIII is barred by the act of state doctrine.

Finally, plaintiffs' claims under the TVPA alleged in Count X are not barred by the doctrine.  Unlike plaintiffs' claims under the ATS, the TVPA claim squarely challenges the legality of actions of Rwandan officials in Rwanda, thus implicating the act of state doctrine.  However, in light of the statutory framework of the TVPA, the court's prudential concerns must yield to the considered judgment of Congress that federal courts exercise jurisdiction over complaints like that brought by plaintiffs.  *See Sabbatino*, 376 U.S. at 427–28.

As noted previously, the first part of *Sabbatino*'s three-part test strongly favors plaintiffs.  There is no question that "consensus exists as to the particular question" whether torture is illegal under customary international law: it is.  Our Circuit Court, other courts, and other authorities unanimously consider the prohibition on torture as a *jus cogens* norm from which no derogation is permitted.  *See, e.g., Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1173 (D.C. Cir. 1994); *see also Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1151 (7th Cir. 2001); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992); Restatement (Third) of the Foreign Relations Law of the United States (1987) § 702(d), cmt. n.

The critical difference between plaintiffs' common law battery claims alleging conduct amounting to torture and their claims under the TVPA is the existence of a specific congressional enactment authorizing the latter claims to proceed.  *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73(codified at 28 U.S.C. § 1350 note).  The statute provides that a defendant "under *actual or apparent authority*, or color of law, of any *foreign* nation" is liable to a plaintiff if the defendant "subjects [that plaintiff]

to torture." *Id.* § 2(a), 2(a)(1) (emphasis added). By its terms, the TVPA applies *only* to foreign officials acting in their official capacities. *See id.* Moreover, Congress enacted the TVPA against the longstanding, baseline principle that foreign officials can *only* exercise "actual" authority within the territory of their respective sovereign. *See F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1313 & n.67 (D.C. Cir. 1980) ("[T]he first and foremost restriction imposed by international law upon a State is that failing the existence of a permissive rule to the contrary it may not exercise its powers in any form in the territory of another State.") (quoting Case of The S.S. "Lotus," (1927) P.C.I.J., Ser. A., No. 10 at 18, 2 M. Hudson, World Court Reports 20, 35 (1935)). By its own terms, then, the language of the statute unambiguously establishes the jurisdiction of the federal courts over a narrow range of conduct—officially sanctioned torture abroad—that would otherwise be deemed immune from challenge in United States courts under the act of state doctrine. The statutory language reflects Congress's determination that courts need not consider "the degree to which the contested issue implicates the United States' foreign relations" on this narrow question. The Officials have made *no* argument why the third *Sabbatino* factor, standing alone, should overcome the first two factors in this analysis!

   This approach allows plaintiffs to pursue statutory claims against the Officials under one theory while disallowing common law claims against the same Officials for the same underlying conduct. But the act of state doctrine is *prudential* in nature; it is derived not from limitations on the power of the judiciary but from a concern of improper interference by courts in international affairs in which the judiciary must play a secondary role to that

of the political branches. *See Sabbatino*, 376 U.S. at 427–28 (describing the act of state doctrine as "compelled by neither international law nor the Constitution" but reflecting a judgment on "the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs"); *see also Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1542 (D.C. Cir. 1984) (describing the act of state doctrine as a "prudential balance"), *vacated on other grounds*, 471 U.S. 1113 (1985). The Supreme Court decided *Sabbatino* in 1964, and Congress enacted the TVPA in in 1991. Congress was presumably aware of the act of state doctrine when it framed the cause of action arising under the TVPA as applying only in cases in which the doctrine would otherwise be implicated to bar a claim. *Cf. Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 278–79 (1977) (holding that Congress is presumed to be aware of Supreme Court precedent when legislating).[4]  Therefore, enactment of the TVPA represents a clear statement by Congress that federal courts should not cite the act of state doctrine as grounds to refuse to hear a case to which the statute applies. *Cf. Lewis*, 918 F.3d at 150 (Randolph, J., concurring) (writing with respect to common-law immunity and the TVPA: "When there is such a clear conflict between statutory law and judge-made common law, the common law must give way.") (citation omitted).

---

[4] Congress was demonstrably aware of the core holding of *Sabbatino*. Indeed, Congress expressly overruled the act of state doctrine as applied to foreign expropriation of American investment abroad—the central issue in *Sabbatino*—in the Foreign Assistance Act of 1964. Foreign Assistance Act of 1964 § 301(d)(4), Pub. L. No. 88-633, 78 Stat. 1009, 1013 (codified as amended at 22 U.S.C. § 2370(e)(2)).

As such, the Officials are entitled to dismissal of Counts III–VIII on the act of state doctrine for failure to state a claim on which relief could be granted, but Counts I, II, and IX–XIII against the Officials may proceed.

### B. Sufficiency of Plaintiffs' Remaining Claims

Finally, the Officials argue that plaintiffs have failed to state a claim upon which relief could be granted as to each of plaintiffs' surviving claims against them. Unfortunately for the Officials, plaintiffs have alleged sufficient facts upon which a jury could find the Officials liable for fraud (Count I), civil conspiracy (Count II), intentional intrusion upon seclusion (Count IX), violation of ECPA (Count X), violation of the TVPA (Count XI), and violation of the ATS with respect to enforced disappearances (Count XII) and violation of enforcement jurisdiction (Count XIII).  Therefore, the Officials' motion to dismiss for failure to state a claim is denied as to those counts.

### CONCLUSION

The Officials are not immune from suit, and they are subject to this Court's jurisdiction.  Some, but not all of plaintiffs' claims against Rwandan Officials Johnston Busingye, Joseph Nzabamwita and Jeannot Ruhunga are barred by the act of state doctrine. I will accordingly **GRANT in part** and **DENY in part** the Officials' motion to dismiss [Dkt. # 29].  An Order consistent with this Memorandum Opinion will issue on this date.

RICHARD J. LEON
United States District Judge